**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, MISSISSIPPI REPUBLICAN PARTY, JAMES PERRY, and MATTHEW LAMB, <br><br> Plaintiffs, <br><br> v. <br><br> JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*; TONI JO DIAZ, BECKY PAYNE, BARBARA KIMBALL, CHRISTENE BRICE, and CAROLYN HANDLER, *in their official capacities as members of the Harrison County Election Commission*; and MICHAEL WATSON, *in his official capacity as the Secretary of State of Mississippi*, <br><br> Defendants. | No. 1:24-cv-00025-LG-RPM |

**[PROPOSED] INTERVENOR-DEFENDANTS'**
**MEMORANDUM BRIEF IN SUPPORT OF MOTION TO DISMISS**

Intervenor-Defendants Vet Voice Foundation ("Vet Voice") and the Mississippi Alliance for Retired Americans (the "Alliance") (together, "Intervenors"), move to dismiss the Complaint (ECF No. 1) in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## INTRODUCTION

This case marks at least the fifth time in four years that a plaintiff has come to federal court seeking to invalidate a state law or procedure that allows for the counting of ballots cast by eligible voters on or before election day but received in the mail within a certain period after that date. *None* has been successful; in each, the court has found that the plaintiffs—who have included

national and state political party committees, candidates for office, presidential electors, voters, and at least one local election official—lacked standing. And, where those courts have considered these claims on the merits, they have rejected them on those grounds, too, as a matter of law.

This case is no different. Invoking previously-rejected standing and merits theories, the Republican National Committee ("RNC") and its co-plaintiffs ask this Court to invalidate the Mississippi Legislature's choice to ensure that lawful voters who vote on or before election day are not disenfranchised, by requiring that absentee ballots be counted if postmarked by election day and received by the registrar within five days after. Miss. Code § 23-15-637(1)(a) ("Ballot Receipt Deadline"). The Legislature enacted this provision in 2020 by wide and bipartisan margins, bringing Mississippi in line with eighteen other states, D.C., Puerto Rico, and the Virgin Islands, all of which have similar laws on the books. These extended receipt deadlines represent a commonsense effort to guard against the disenfranchisement of lawful voters who may be faced with unpredictable mail delays that could otherwise result in the rejection of their ballots—and are particularly important to enfranchising members of our Armed Services.

If Plaintiffs' requested relief is granted, the voters most likely to be disenfranchised as a result are those among Vet Voice's and the Alliance's membership and constituencies—members of the military and their families, veterans, disabled voters, and older voters. Plaintiffs would have this Court believe that this disenfranchisement is required by federal law. It is not. Mississippi's Ballot Receipt Deadline does not directly conflict with the federal Election Day Statutes, 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1, which say nothing about the method for counting ballots that are timely cast by qualified voters. Mississippi's decision to count these ballots is well within its constitutional authority to set the "Manner" of elections within its boundaries. Nor does the Ballot Receipt Deadline violate any constitutional right, including the right to vote or to run for office.

But the Court need not even reach those issues, because—as in each of the prior attempts to bring similar claims—the Plaintiffs here, too, fail to establish standing. Simply put, a law that ensures that qualified Mississippians' timely voted ballots are not rejected due to circumstances largely beyond their control, including mail delays, does not cause a cognizable injury, in the same way that a high-turnout election does not cause anyone injury—much less one that gives Plaintiffs the right to adjudicate their disagreement in federal court.

## BACKGROUND

### I.    Mississippi's Ballot Receipt Deadline

The Elections Clause grants states the power to set the "Times, Places and Manner of holding Elections for Senators and Representatives," but reserves the right of Congress to, "at any time by Law make or alter such regulations." U.S. Const., Art. I, § 4, cl.1. Similarly, the Electors Clause provides that "Congress may determine the Time of choosing the [presidential] Electors, and the Day on which they shall give their Votes," U.S. Const., Art. II, § 1, cl. 4, but reserves to the states the power to choose the "Manner" of appointing electors, *id.* § 1, cl. 2.

Consistent with this authority, Congress enacted the Election Day Statutes, which set the general election day for congressional races as "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," 2 U.S.C. §§ 1, 7, and the presidential election as "the Tuesday next after the first Monday in November, in every fourth year," 3 U.S.C. § 1. Exercising the constitutional authority reserved to it to set the Manner for these elections, the Mississippi Legislature enacted the Ballot Receipt Deadline at issue here, which provides for the counting of absentee mail ballots that are cast by a qualified voter by election day, "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." Miss. Code § 23-15-637(1)(a).

3

The Ballot Receipt Deadline is just one part of a comprehensive code that the Legislature has adopted to govern the administration of elections in Mississippi. That code sets forth how voters may cast their ballots, where they may cast them, and the procedures for counting them. These include provisions that allow certain voters to cast their ballots absentee. *See* Miss. Code § 23-15-1, *et seq.* Unlike many other states, Mississippi has elected to keep absentee voting strictly limited; only voters who fall into certain categories set by statute may cast their votes absentee. These include voters 65 years or older; voters with temporary or permanent physical disabilities; voters away from their county of residence on election day; and enlisted or commissioned members of the Armed Services. *See id.* §§ 23-15-713, 23-15-673. There are no drop boxes available to voters to deliver their ballots back to election officials in Mississippi, and the law reflects the Legislature's general expectation that absentee ballots are ordinarily returned through the mail. *See also id.* § 23-15-907 (strictly limiting who may return absentee ballots beyond employees of the U.S. Postal Service and other common carriers).[1]

The Ballot Receipt Deadline passed out of both houses with broad bipartisan margins— with only one vote against in the House and a unanimous vote in favor in the Senate—in 2020.[2] It ensures that ballots shown by postmark to be cast on or before election day are not rejected simply because of minor mail delivery delays. But the Mississippi Legislature strictly limited this rule's application: even a ballot that is postmarked on or before election day "shall not be counted" if it

---

[1] Miss. Code § 23-15-907 was partially preliminarily enjoined by a federal court in *Disability Rights Mississippi v. Fitch*, No. 3:23-CV-350-HTW-LGI, 2023 WL 4748788, at *4 (S.D. Miss. July 25, 2023), *appeal docketed sub nom. Disability Rights MS v. Fitch*, No. 23-60463 (5th Cir. Aug. 28, 2023), which prohibited enforcement to the extent it would prevent voters who are disabled, blind, or have limited ability to read or write from receiving assistance from the person of their choice. That decision is on appeal. *Id.*

[2] *See* Roll Call Vote, H.B. 1521, Miss. H.R., 2020 Reg. Sess. (Mar. 10, 2020), https://billstatus.ls.state.ms.us/2020/pdf/votes/house/0640030.pdf; Roll Call Vote, H.B. 1521, Miss. State S., 2020 Reg. Sess. (June 15, 2020), https://billstatus.ls.state.ms.us/2020/pdf/votes/senate/1610021.pdf.

is received more than five business days after the election. *Id.* § 21-15-637(1)(a).

Nearly two dozen other U.S. states and territories have similar laws, accepting timely-cast ballots that are received by election officials within some designated window after election day. With its five-day deadline, Mississippi is firmly on the conservative side of these laws—some accept ballots that arrive up to two weeks after the election, or any time before the official canvass.[3]

## II.   Plaintiffs' Complaint

Plaintiffs are the RNC, the Mississippi Republican Party ("MSGOP"), a Mississippi voter and member of the MSGOP executive committee named James Perry, and Matthew Lamb, described in the Complaint as a District 4 Commissioner for the George County Election Commission and a Mississippi voter.[4] Their primary allegation is that Mississippi's Ballot Receipt Deadline is preempted by the Election Day Statutes. *See* Compl. ¶¶ 62–69 (Count I). Although their Complaint also alleges two constitutional claims, both are derivative of the preemption claim. Count II—titled as a claim for the "Violation of the Right to Stand for Office"—relies on the assumption that any ballots cast in accordance with the Ballot Receipt Deadline "are *not valid*" "*[u]nder federal law*." *Id.* ¶ 71 (emphases added); *see also id.* ¶ 72 (alleging Plaintiffs' "right to stand for office" is injured because they must "spend money, devote time, and otherwise injuriously rely on *unlawful provisions of state law* in organizing, funding, and running their campaigns" (emphasis added)). The same is true of Count III, which is titled "Violation of the Right to Vote," but relies on the premise that the Ballot Receipt Deadline requires counties to count

---

[3] Tbl. 11: Receipt & Postmark Deadlines for Absentee/Mail Ballots, Nat'l Conf. of State Legs. (July 12, 2022), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-11-receipt-and-postmark-deadlines-for-absentee-ballots.aspx.

[4] Although the Complaint is not explicit, Mr. Lamb appears to bring this case in his personal capacity, not his official capacity. The Complaint does not state that he is suing in his official capacity, the injury he claims (potential dismissal if he fails to follow Mississippi law) is personal to him, and there is no allegation that he is authorized to sue on behalf of George County or in his official capacity.

ballots that "*[u]nder federal law . . . are not valid.*" *Id*. ¶ 76 (emphasis added); *see also id*. ¶ 78 ("Mississippi's voting system *permits illegitimate votes* and *therefore* violates the Fourteenth Amendment." (emphases added)).

Plaintiffs seek an injunction prohibiting Defendants from counting any absentee ballots received by mail after election day in all future congressional and presidential elections in Mississippi, as well as a declaration that the Ballot Receipt Deadline deprives them of rights secured by the Constitution and Acts of Congress. *See* Compl. at 14 (Prayer for Relief).

## III.    Prior Failed Challenges to Mail Ballot Receipt Deadlines

Since 2020, there have been at least four cases brought alleging similar challenges to ballot receipt deadlines in federal court, by similarly-situated plaintiffs—including one brought by the RNC (with others). None have been successful.

In the first, *Donald J. Trump for President, Inc. v. Way*, the RNC, Trump campaign, and a state Republican Party alleged that a New Jersey law that allowed officials to canvass ballots received within two days of election day was preempted by the Election Day Statutes. *See* 492 F. Supp. 3d 354, 369 (D.N.J. 2020) ("*Way I*"). The district court rejected the plaintiffs' motion for a preliminary injunction, finding they were unlikely to succeed on the merits. *Id.* at 373. It later dismissed the action in its entirety for lack of standing. *Donald J. Trump for President, Inc. v. Way*, No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477, at *11 (D.N.J. Oct. 22, 2020) ("*Way II*") (finding plaintiffs' alleged injury both speculative and a generalized grievance).

Next, a Pennsylvania Republican congressional candidate and voters brought a similarly reasoned suit challenging a state supreme court decision that found that a three-day post-election receipt deadline was required by Pennsylvania's constitution. *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 345–46 (3d Cir. 2020), *cert. granted, judgment vacated*

*sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).[5] The plaintiffs argued the deadline violated the Fourteenth Amendment's Equal Protection Clause, because (1) it "treated them," as in-person voters, "in an arbitrary and disparate way by elevating mail-in voters to a 'preferred class of voters,'" and (2) unlawfully diluted their votes. *Id.* They further alleged violations of the Elections Clause, the Electors Clause, and the Election Day Statutes. *See* Compl. at 20–25, *Bognet v. Boockvar*, No. 3:20-cv-215 (W.D. Pa. Oct. 22, 2020), ECF No. 1. The district court declined to issue injunctive relief and the Third Circuit affirmed, finding the plaintiffs lacked standing. *Bognet*, 980 F.3d at 364.[6]

The third case, *Bost v. Illinois State Board of Elections*, was filed in May 2022 by a Republican congressman and voters who had previously served as presidential electors. *See* No. 22-cv-2754, 2023 WL 4817073, at *2 (N.D. Ill. Jul. 26, 2023), *appeal pending* No. 23-2644 (7th Cir.). The plaintiffs asserted nearly identical challenges to Illinois' 14-day ballot-receipt deadline as the Plaintiffs do here, alleging three counts: (1) "Violation of the Right to Vote," (2) "Violation of the Right to Stand for Office," and (3) "Violation of 2 U.S.C. § 7 and 3 U.S.C. § 1." Compl. at 7–10, *Bost v. Ill. State Bd. of Elections*, No. 22-cv-2754, (N.D. Ill. May 25, 2022), ECF No. 1. Plaintiffs asserted standing as voters based upon the "dilution" of their votes by "invalid" ballots counted after election day, and the Congressman alleged standing as a candidate based on the possibility "invalid" votes would be counted in his race and because the law "forces [him] to

---

[5] In the underlying state court action, the Respondents (including the RNC) pointed to the Election Day Statutes as a reason to prohibit relief allowing timely cast ballots received after election day to be counted. *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 368 (Pa. 2020). The Pennsylvania Supreme Court was unpersuaded, noting the Election Day Statutes were consistent with "federal and state law allowing for the tabulation of military and overseas ballots received after Election Day." *Id.* at 368 n.23.

[6] The Supreme Court's vacatur of *Bognet* as moot was not based on the merits but rather in keeping its practice of vacating opinions that become moot on appeal. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). The vacated decision remains persuasive. *See Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) (finding persuasive a "thoughtful opinion" that was "vacated as moot on rehearing").

spend money and time campaigning after Election Day." 2023 WL 4817073, at *1, *7. The district court dismissed, rejecting each asserted basis for standing and further holding that the plaintiffs had not alleged a claim upon which relief may be granted. *Id.* at *14.[7]

In July 2023, a county elections administrator brought a fourth case in federal court, this one challenging a North Dakota statute that permits mail ballots to be counted if postmarked the day before election day and received within 13 days of the election. *See Splonskowski v. White*, No. 1:23-cv-00123, 2024 WL 402629, at *1 (D.N.D. Feb. 2, 2024). That plaintiff alleged the law conflicts with the federal Election Day Statutes. *See* Compl. at 8–9, *Splonskowski v. White*, No. 1:23-cv-00123-DMT-CRH (D.N.D. July 5, 2023), ECF No. 1. He argued that "following his understanding of federal law will inevitably result in criminal prosecution under North Dakota law because he will have to forego his duty to follow North Dakota law." 2024 WL 402629, at *1. The district court dismissed the case for lack of standing just one week ago. *Id.* at *2.[8]

## LEGAL STANDARD

Rule 12(b)(1) requires dismissal when a plaintiff fails to show it has standing to adjudicate its claims in federal court. A plaintiff must show it has (1) "suffered an injury-in-fact," (2) that is "fairly traceable to the challenged action of the defendant," and (3) that is "likely" to be "redressed by a favorable [judicial] decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). An injury-in-fact requires: (1) the "invasion of a legally protected interest," (2) an injury that is both "concrete and particularized," and (3) an injury that is "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504

---

[7] The plaintiffs' appeal of that ruling is currently pending. *See* No. 23-2644 (7th Cir. Aug. 21, 2023).

[8] Two days ago, another case was filed alleging effectively the same claims under the same theories as the instant case, also against the Mississippi Ballot Receipt Deadline, in this district and division, by the Libertarian Party of Mississippi. That case has been assigned case number 1:24-cv-00037-LG-RPM.

U.S. at 560). Notably, "standing is not dispensed in gross." *Town of Chester. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)). Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quoting *Davis*, 554 U.S. at 734).

Rule 12(b)(6) requires that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Id.* at 664. The Court is not "bound to accept as true a legal conclusion couched as a factual allegation," *id.* at 678 (quoting *Twombly*, 550 U.S. at 555), and dismissal is required "whenever a claim is based on an invalid legal theory," such as a misreading of statute. *Thomas v. Liberty Mut. Ins. Co.*, No. 15-00434-BAJ-SCR, 2015 WL 6142876, at *1–2 (M.D. La. Oct. 19, 2015) (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)); *see also ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, 667 F. Supp. 3d 411, 419 (S.D. Tex. 2023). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [also] do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.    Plaintiffs lack standing.

Plaintiffs allege four theories of standing but none satisfy Article III. First, the RNC and MSGOP attempt to assert organizational standing based on bare claims that the Ballot Receipt Deadline requires them to divert resources. Second, Plaintiffs allege a competitive injury to unidentified candidates who may stand for office in Mississippi based on effectively the same theory. Third, the individual plaintiffs claim that they have standing because ballots that are postmarked by election day but arrive after are "invalid" as a matter of law and counting them

"dilutes" their votes. Finally, Mr. Lamb contends he is injured because he risks removal from his position if he fails to enforce a state law that he personally believes violates federal law. These theories are recycled from similar recent challenges—sometimes verbatim—and, as in those cases, fail to plead cognizable injuries in fact. That failure requires dismissal of the Complaint.

### A.    Plaintiffs' alleged injuries are nothing more than the generalized grievance that the Ballot Receipt Deadline violates federal law.

All of Plaintiffs' standing theories boil down to a complaint that the Ballot Receipt deadline is invalid, and that Plaintiffs should not have to conform their behavior to an invalid law, Compl. ¶¶ 13, 48–49, 60, or to vote and conduct campaigns in elections where other voters' ballots are counted in accordance with an invalid law, *id.* ¶¶ 50–59, 72. But this is a circular argument, always returning to the unavoidable fact that, at bottom, Plaintiffs simply assert a "right to have the Government act in accordance with law." *Allen v. Wright*, 468 U.S. 737, 754 (1984); *see also Hotze v. Hudspeth*, 16 F.4th 1121, 1124 n.2 (5th Cir. 2021) (holding an injury "based solely on an allegation 'that the law . . . has not been followed' amounts to an 'undifferentiated, generalized grievance about the conduct of government' [that is] insufficient to establish standing" (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam))). This was the core reason that prior courts found similar plaintiffs lacked standing to pursue similar challenges. *See Bognet*, 980 F.3d at 349; *Bost*, 2023 WL 4817073, at *5. Plaintiffs provide no reason for this Court to find otherwise. A closer examination of the theories alleged in the Complaint only confirms this conclusion.

### B.    The RNC and MSGOP do not allege a cognizable diversion of resources injury.

The RNC and MSGOP attempt to establish standing by alleging that the Ballot Receipt Deadline "forces" them "to divert resources and spend money on absentee-specific programs and post-election activities." Compl. ¶¶ 13, 15. But as *three* federal courts have held (including in a case involving the RNC), these allegations cannot satisfy Article III because they are not concrete

10

or particularized and are speculative. *Way II*, 2020 WL 6204477, at *11; *Bognet*, 980 F.3d at 352; *Bost*, 2023 WL 4817073, at *8. To plead a cognizable injury, a plaintiff must plausibly allege both that (1) it "diverted significant resources to counteract the defendant's conduct," *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir, 2020) (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)), and (2) its "ability to carry out its mission was perceptibly impaired" *because of* that diversion. *Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*, 82 F.4th 345, 352–53 (5th Cir. 2023) ("*LaFHAC*") (cleaned up). Plaintiffs fail to do so.

First, the alleged diversion itself is purely speculative. The Complaint claims in conclusory fashion that the deadline somehow "forces the RNC to divert resources and spend money on absentee-specific programs and post-election activities," Compl. ¶ 13, but never says *why* these efforts are required to counteract enforcement of the Ballot Receipt Deadline, a commonsense measure to help ensure timely-cast ballots are counted. *See also id.* ¶ 15 (claiming MSGOP "has the same interests as the RNC"). These allegations about unspecified "post-election activities" are speculative for the same reasons identified in *Bost*. As that court explained:

> It is mere conjecture that, if [a candidate] does not spend the time and resources to confer with his staff and watch the results roll in, his risk of losing the election will increase. Under the letter of [state] law, *all votes must be cast by Election Day, so [a candidate's] electoral fate is sealed at midnight on Election Day, regardless of the resources he expends after the fact*.

*Bost*, 2023 WL 4817073, at *8 (emphasis added).

Second, mere resource diversion, on its own, is not sufficient for standing. The diversion must "perceptibly impair[]" the organization's "ability to pursue its mission." *LaFHAC*, 82 F.4th at 351 (quoting *Tenth St. Residential*, 968 F.3d at 500). The RNC's and MSGOP's conclusory allegation that the Ballot Receipt Deadline "specifically and disproportionately harms Republican

candidates," Compl. ¶ 13, is insufficient because it fails to *connect* the alleged *resource diversion* and any alleged impairment of the RNC's or MSGOP's ability to elect Republican candidates. *Tenth St. Residential*, 968 F.3d at 500. Instead, the Complaint contends that later-arriving ballots are more likely to favor their opponents, but even assuming this could be a cognizable injury (*but see infra* at 15-16), it still fails to *connect* the organizations' *purported resource diversion to* that alleged harm. *See LaFHAC*, 82 F.4th at 353 (explaining the actual "Article III injury comes" under a diversion theory comes from the impairment to the group's ability to pursue its mission).[9]

At bottom, the "harm" that the RNC and MSGOP complain of is that, because of the Ballot Receipt Deadline, more ballots cast by qualified voters may be counted, a result that—far from undermining the integrity or validity of elections—will help ensure that the results more accurately reflect the will of the voters. That alleged "harm"—that too many qualified voters will have their timely cast ballots counted—has nothing to do with any purported diversion of resources. The RNC and MSGOP fail to explain why the Court should find that the fact that *election officials* may count more ballots—voted by election day—forces the RNC or MSGOP to expend additional resources after election day. *Cf. Bost*, 2023 WL 4817073, at *8 ("Under the letter of Illinois law, all votes must be cast by Election Day, so Congressman Bost's electoral fate is sealed at midnight on Election Day, regardless of the resources he expends after the fact.").

If the RNC and MSGOP could claim organizational standing merely on the basis that the Ballot Receipt Deadline allows for more ballots to be counted, then they could invoke federal jurisdiction *whenever* a law facilitated voter turnout and broadened the voting pool. That

---

[9] Although they vaguely refer to "post-election activities," Compl. ¶¶ 13, 48, the RNC and MSGOP never clearly allege *what* post-election activities they must engage in *because of* the Ballot Receipt Deadline. Furthermore, neither organization identifies any specific efforts or programs that have suffered *as a result* of any diversion required by the Ballot Receipt Deadline. *See El Paso Cnty. v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020); *Tenth St. Residential*, 968 F.3d at 500.

contravenes basic democratic principles and raises traceability concerns. *See Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1002 (D. Nev. 2020) (observing that in cases where courts have recognized organizational standing to challenge an election rule, "the challenged law has a direct and specific impact on a voter's ability to vote"); *cf. Short v. Brown*, 893 F.3d 671, 677, 679 (9th Cir. 2018) (rejecting *Anderson-Burdick* claim challenging law that "ma[de] it easier for some voters to cast their ballots" and kept "access to the ballot [] exactly the same" for other voters, and explaining Plaintiffs' theory would "essentially bar a state from implementing any pilot program to increase voter turnout").

Here, because "[t]he challenged law expands access to voting through mail without restricting prior access to in-person voting . . . plaintiffs need not divert resources to enable or encourage their voters to vote." *Cegavske*, 488 F. Supp. 3d at 1002 (emphasis omitted). Their alleged choice to divert any resources (to whatever unspecified activity) is purely their own, and not traceable to Defendants' enforcement of the Ballot Receipt Deadline.[10]

### C.     Plaintiffs fail to allege any injuries to the right to stand for office.

Plaintiffs also fail to plausibly allege an injury to the right to stand for public office. *See* Compl. ¶¶ 70–74 (Count II). Similar to RNC's and MSGOP's failure to adequately allege standing on their own behalf as political party committees, Plaintiffs fail to plausibly allege how any of their candidates stand to suffer an injury because of the Ballot Receipt Deadline.

The Third Circuit in *Bognet* and the district court in *Bost* rejected indistinguishable

---

[10] The RNC and MSGOP also seem confused about which election procedures apply. In their Complaint (at ¶ 48), they point to Miss. Code § 23-15-577, which authorizes political parties to have credentialed poll watchers to monitor "the manner in which the election is held," but does not do the same for the *counting* of ballots. Most likely they meant Miss. Code § 23-15-581, which requires that, "[d]uring the holding of the election and the counting of the ballots, the whole proceedings shall be in fair and full view of the voting public, candidates or their duly authorized representatives and other authorized poll watchers . . . ." But that still fails to answer the question of what the Ballot Receipt Deadline has to do with this—the mere counting of more ballots during the post-election process alone is not a cognizable harm, for the reasons discussed.

candidate standing arguments for the reasons described above. *See Bognet*, 980 F.3d at 351−52; *Bost*, 2023 WL 4817073, at *8–9; *see also supra* § I.B. Plaintiffs' failure to explain how the Ballot Receipt Deadline requires them—as political parties or standing in the shoes of candidates—to divert resources to "counteract" the effect of more people having their ballots counted in a way that undercuts their mission is fatal to their standing under a diversion of resources theory. *Tenth St. Residential*, 968 F.3d at 500. In fact, Plaintiffs' allegation that the Ballot Receipt Deadline "forc[es]" their candidates "to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns," Compl. ¶ 72, is *identical*—word for word—to an allegation rejected in *Bost*. *See* 2023 WL 4817073, at *13 ("Plaintiffs allege that the Ballot Receipt Deadline Statute forces Congressman Bost and other candidates 'to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns.'" (quoting Complaint)). It fails here for the same reason. Plaintiffs have not even attempted to allege how the Ballot Receipt Deadline "forces" some unspecified candidate to "spend money" or "devote time" to something they would not have absent the Ballot Receipt Deadline. *Bost,* 2023 WL 4817073, at *13.

Plaintiffs also fail to adequately allege standing based on threatened harm to their electoral prospects. To invoke "competitive standing," a candidate must "make [a] showing of 'an unfair advantage in the election process.'" *Cegavske*, 488 F. Supp. 3d at 1003 (quoting *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)). But the same Ballot Receipt Deadline applies equally to *all* candidates and to *all* voters—no one "is specifically disadvantaged" by this even playing field. *Bost*, 2023 WL 4817073, at *12 (quoting *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020)); *see also Bognet*, 980 F.3d at 351 (noting "all candidates in Pennsylvania,

14

including Bognet's opponent, are all subject to the same rules"). As such, the Ballot Receipt Deadline does not threaten Plaintiffs with any "harms that are unique from their electoral opponents." *Cegavske*, 488 F. Supp. 3d at 1003. The voters that support them stand to be benefitted as much by the grace given by the Ballot Receipt Deadline as those who support their opponents. Indeed, Intervenors are unaware of any case in which a court found that it had jurisdiction because a plaintiff hoped to improve their electoral prospects by *throwing out ballots cast by qualified voters* for no other reason than a speculative fear that those voters may be more likely to vote for their opponent.

This makes logical sense. As the Third Circuit observed in *Bognet*, is it not at all clear "how counting *more* timely cast votes would lead to a *less* competitive race." 980 F.3d at 351. As in that case, Plaintiffs fail to allege facts upon which this Court could reasonably conclude that the Ballot Receipt Deadline makes their races less competitive in any meaningful way. Simply claiming many Democratic voters across the country vote by mail and may do so closer to election day, Compl. ¶¶ 56–58, is not enough to demonstrate that the Ballot Receipt Deadline threatens, or will threaten, a candidate's electoral prospects in Mississippi. *Cf. Varela v. Gonzales*, 773 F.3d 704, 711 (5th Cir. 2014) (concluding it was implausible to infer from county-wide salary averages that employees in the data set were comparable to appellants solely because they occupied same broad field of work).[11] Republican candidates do very well in Mississippi—

---

[11] Plaintiffs' bare reliance on national mail voting statistics similarly provides no plausible inference about mail voting patterns *in* Mississippi. Among other things, it does not account for the fact that eight states— California, Colorado, Hawaii, Nevada, Oregon, Utah, and Washington—conduct *all mail* elections. *See* Nat'l Conference of State Legs., *Table 1: States with No-Excuse Absentee Voting* (Dec. 20, 2023), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting.  Most of these states—including the nation's largest—have favored Democratic candidates in federal races in recent election cycles, meaning that many voters in Democratic-leaning states cast their ballots via mail *by default* under their state electoral regimes. These statistics say little, if anything, about absentee voters in Mississippi—where absentee voting is limited to specific categories of voters—never mind about the relative partisanship of absentee ballots received *after*, rather than before or on, election day.

even with the Ballot Receipt Deadline in place. In last year's elections, Republicans won every statewide office, as well as control of the House by 79 to 41 and the Senate by 36 to 16. *See 2023 General Election Results*, Michael Watson, Sec'y of State, https://www.sos.ms.gov/elections-voting/2023-general-election-results (last accessed Feb. 9, 2024).

Finally, Plaintiffs' concern that ballots voted before, but received after, election day will "disproportionately break for Democrats," cutting into "fragile" "early Republican leads in close races," Compl. ¶¶ 56–57, also does not state a cognizable injury for standing purposes—competitive or otherwise. Any "lead" before all ballots are counted is an arbitrary consequence of the order in which ballots are counted. Unlike a game of musical chairs, where the winner is whoever happens to be sitting when the music stops, American elections end when all the ballots are counted. Mississippi law confirms: election results are only proclaimed "[w]hen the votes have been completely and correctly counted and tallied," Miss. Code § 23-15-591, and the candidate "duly elected" is "the person . . . having the largest number of votes," *id.* § 23-15-605—not whoever happens to be leading at some point on election night. Plaintiffs have no legal entitlement to any "early lead" in an election; this basis for standing must be rejected, as well.

### D.     Plaintiffs' alleged vote dilution injuries are insufficient to confer standing.

The Court should also reject Plaintiffs' claim that individual voters are injured because their "timely, valid ballots are *diluted* by untimely, invalid ballots" due to the Ballot Receipt Deadline. Compl. ¶ 4 (emphasis added); *see also id.* ¶¶ 75–80 (Count III). This exact theory was rejected in *Bost*, 2023 WL 4817073, at *6–7, and in *Bognet*, 980 F.3d at 356–60, as well as by a "veritable tsunami" of decisions that have considered it. *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd,* No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022). This Court should do the same.

At bottom, Plaintiffs contend that "honest votes" carry less overall weight because the

Ballot Receipt Deadline allows "illegitimate" ballots to be counted in violation of federal law. Compl. ¶ 51. This, Plaintiffs allege, injures them because Democrats are more likely—at a national level—to vote by mail. *Id.* ¶¶ 56–57. Simply put, even if Plaintiffs were correct that their votes have been "diluted" by allegedly "illegitimate" votes, then so, too, have the votes of every other "honest" Mississippi voter. "Vote dilution in this context is a 'paradigmatic generalized grievance that cannot support standing.'" *Wood*, 981 F.3d at 1314–15 (quoting *Bognet*, 980 F.3d at 356); *see also Bost*, 2023 WL 4817073, at *5, *8 (finding plaintiffs who alleged the same injuries under Illinois's receipt deadline did not have standing because the claimed injury was a generalized grievance, noting that "[c]ourts faced with similar allegations have rejected plaintiffs' claims that they possessed standing").

Numerous plaintiffs attempted to secure federal jurisdiction under this very theory in litigation during and after the 2020 elections, without success, with courts uniformly finding that this type of "vote dilution argument fell into the 'generalized grievance' category." *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 608 (E.D. Wis. 2020); *see also Wood*, 981 F.3d at 1314–15 ("'[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" (quoting *Bognet*, 980 F.3d at 356)); *O'Rourke*, 2021 WL 1662742, at *6–9 (collecting over a dozen decisions from 2020 election cycle rejecting voter dilution theory); *see also Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such [is] more akin to a generalized grievance about the government than an injury in fact.").

The "vote dilution" cases cited in the Complaint—all of which concern apportionment or redistricting—illustrate the point. Compl. ¶¶ 52–55. Those cases recognize an injury when a law

*minimizes* a voter's or a group of voters' voting strength or ability to access the political process *as compared to other voters*. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962). As the Third Circuit put it in *Bognet*, the body of cases Plaintiffs seek to rely upon here are "concerned with votes being weighed *differently*." 980 F.3d at 355 (emphasis added). As the Eleventh Circuit explained, distinguishing those cases: "To be sure, vote dilution can be a basis for standing. But it requires a point of comparison. For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts." *Wood*, 981 F.3d at 1314 (first citation omitted) (quoting *Baker*, 369 U.S. at 207–08). No such allegations are made here—no single Mississippi voter's ballot is alleged to be diluted more than any other, unlike in the redistricting context. Plaintiffs' alleged "vote dilution" harm is thus insufficiently particularized to satisfy Article III's injury-in-fact requirement.

**E.    Plaintiff Lamb's injury as a county election official is not cognizable.**

Finally, Mr. Lamb argues that he is injured because the Ballot Receipt Deadline "forces him to choose between following Congress' election-day deadline or Mississippi's post-election day deadline," and opens him up to removal from his position under state law if he does not enforce the Ballot Receipt Deadline. Compl. ¶ 60. A federal court in North Dakota rejected a similar claim just one week ago. *See Splonskowski*, 2024 WL 402629 at *2. This Court should do the same.

Mr. Lamb cannot manufacture standing by refusing to comply with state law based on nothing more than his own personal reading (or misreading) of federal statutes. Nor is anyone *forcing* Mr. Lamb to ignore Mississippi law in favor of his own interpretation of federal law. He is *choosing* to do so. But he "cannot manufacture standing merely by inflicting harm on [himself] based on [his] fear[] of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). And he has not identified any harm—hypothetical or otherwise—that he would suffer if he simply follows Mississippi law, as enacted by Legislature.

*Cf. Kearns v. Cuomo*, 981 F.3d 200, 207 (2d Cir. 2000) (official lacked standing where he failed to plausibly allege that following an allegedly preempted state law would subject him to prosecution).

Complying with a law that one believes to be invalid is not, without more, an injury in fact. *See TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). If that were the case, *any* public official charged with implementing *any* legislative enactment would have standing to challenge the law based on their personal view that the law is preempted or infirm. Election officials do not get to decide for themselves which state laws are or are not preempted by federal statutes, nor may they request what is, in effect, an advisory opinion from a federal court.

## II.      Plaintiffs fail to state a claim.

In the alternative, the Complaint should be dismissed for failure to state a claim under Rule 12(b)(6). Plaintiffs' claims depend entirely on their theory that counting mail-in ballots received after election day violates the Election Day Statutes, a reading properly rejected in *Bost* and *Way I*. The Ballot Receipt Deadline is wholly consistent with the Election Day Statutes and Plaintiffs' interpretation of those laws is flawed. Because Plaintiffs' claims are "based on invalid legal theories," they must be dismissed under Rule 12(b)(6). *ADR Int'l Ltd.*, 667 F. Supp. 3d at 419.

### A.      Count I fails to state a claim for which relief can be granted.

The Elections Clause of the U.S. Constitution grants to the states the power to set the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's power to "by Law make or alter such regulations." U.S. Const., Art. I, § 4, cl.1. Similarly, the Electors Clause vests Congress with the power to determine when electors for the office of the President and Vice President are chosen, U.S. Const., Art II, § 1, cl. 4, but otherwise reserves the manner of such selection to the states, *id.* Art. II, § 1, cl. 2. Thus, "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot *directly conflict* with federal election laws on the

subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000) (emphasis added). Federal law only can be found to "alter" state election laws if the state law cannot possibly "operate harmoniously" with the federal law "in a single procedural scheme." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012).

Mississippi's Ballot Receipt Deadline and the Election Day Statutes do not conflict at all; like the numerous examples of similar laws across the country, they operate harmoniously. Indeed, while Mississippi's law is relatively new, many other states have had extended ballot receipt deadlines that *for decades* have operated harmoniously with the Election Day Statutes. *Cf. Bost*, 2023 WL 4817073, at *11 (noting that despite the fact that post-election day ballot receipt deadlines have been "in place for many years in many states, Congress has never stepped in and altered the rules"). The Election Day Statutes set the date by which ballots in federal elections are to be cast by voters; they do not say anything as to when those ballots must be received by election officials in order to be counted. *See Bognet*, 980 F.3d at 353; *see also Way I*, 492 F. Supp. 3d at 372. Given that silence, the states retain their constitutional prerogative to choose whether to count absentee ballots that are voted by but arrive after election day—a prerogative nearly half the states have exercised to protect voters, including in Mississippi. *See supra* at n.3.

Mississippi's Ballot Receipt Deadline does nothing to alter the date when ballots must be cast; indeed, it *requires* that all absentee ballots must be postmarked on or before the date of the election. Miss. Code § 23-15-637(1)(a). It simply ensures that timely-cast ballots are not rejected if their delivery through the postal service is slightly delayed. In doing so, Mississippi properly exercised its discretion to enact laws that provide for the counting of timely-cast ballots. *See Bost*, 2023 WL 4817073, at *11 (holding similar Illinois law "operates harmoniously with the federal statutes that set the timing for federal elections"); *Way I*, 492 F. Supp. 3d at 372 (similar).

Plaintiffs' arguments to the contrary rely on an impossibly broad and unsupportable reading of the statutory phrase "day for the election" in the Election Day Statutes, arguing that Mississippi's practice of counting votes received after "Election Day" equates to "holding voting open" in violation of federal law. *E.g.*, Compl. ¶¶ 28, 45. But that simply ignores that the ballots counted under the Ballot Receipt Deadline are in fact voted by or before the federal day set for elections. *Foster v. Love*, 522 U.S. 67 (1997), does not hold otherwise. In *Foster*, the Supreme Court addressed a Louisiana "open primary" system under which the election of candidates for Congress could be *concluded* as a matter of law *before* the federally-mandated "election day." 522 U.S. at 70. Under that system, if any candidate received a majority of the votes cast in the open primary, they would be "elected," and *no* general election would be held on the federal election day. *Id.* The Court concluded this system was inconsistent with the Election Day Statutes, but it emphasized that its ruling was narrow, holding "only that if an election does take place, it *may not be consummated prior to* federal election day." *Id.* at 72 n.4 (emphasis added). It did not purport to "isolate[e] precisely what acts a State must cause to be done on federal election day . . . in order to satisfy the [Election Day Statutes]." *Id.* at 72.

Unlike the Louisiana statute, Mississippi's Ballot Receipt Deadline does not "consummate[]" an election "prior to federal election day," or set a competing date on which "a contested selection of candidates for a [federal] office [] is concluded as a matter of law." *Id.* at 72 & n.4. To the contrary, it mandates that ballots be cast by election day. Miss. Code § 23-15-637(1)(a). And, by providing time to receive ballots cast on or before that day, it in fact *ensures* the election is "not . . . consummated prior to federal election day." *Foster*, 522 U.S. at 72 n.4. Plaintiffs' argument to the contrary ignores these clear differences and cannot be reconciled with the *Foster* Court's "express disavowal . . . that it was establishing any particular actions a State

must perform on election day to comply with the federal statutes." *Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001) (citing *Foster*, 522 U.S. at 72 & n.4). Indeed, its holding was expressly limited to the point that the "combined actions of voters and officials meant to make a final selection of an officeholder" cannot be *consummated before* election day. *Foster*, 522 U.S. at 71.

Plaintiffs' argument is also contrary to the Fifth Circuit's reading of *Foster* which, in addressing an analogous challenge to an early voting statute, expressly rejected the argument that the Election Day Statutes require all activity associated with voting to occur on the federal election day set by statute. *See Bomer*, 199 F.3d at 776; *see also Voting Integrity Project v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001); *Millsaps*, 259 F.3d at 546. It is well understood that "official action to confirm or verify the results of the election extends well beyond federal election day." *Millsaps*, 259 at 546 n.5. Election officials must, for example, count, certify, and publicly announce the results. *Id.* at 546; *see also Bush v. Gore*, 531 U.S. 98, 116 (2000) (Rehnquist, C.J., concurring) (cataloguing administrative actions occurring in Florida after election day to conclude the election process); *see, e.g.*, Miss. Code § 23-15-651 (requiring results of votes by absentee ballots be announced *after* the five-business-day period for receiving absentee ballots); *id.* § 23-15-603 (requiring election commissioners to transmit final vote counts to the Secretary of State within ten days after election day).

Nor does the purpose behind the Election Day Statutes require a different result. As both the U.S. Supreme Court and the Fifth Circuit have explained, the Election Day Statutes were enacted to prevent "distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and . . . the burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years." *Bomer*, 199 F.3d at 777; *Foster*, 522 U.S. at 73–74. But once a Mississippi voter

has completed their ballot and put it in the mail—relinquishing it from the voter's custody and control—the voter has made their "final selection" and can neither alter nor withdraw the ballot. Mississippi's system thus fulfills the purposes of the Election Day Statutes as described in *Foster*.

Finally, declining to count ballots cast on or before election day, but received after election day would disenfranchise large numbers of Mississippians. In fact, Plaintiffs *admit* that is why they brought this suit. They believe the Ballot Receipt Deadline will "disproportionately break for Democrats," cutting into "fragile" "early Republican leads in close races," Compl. ¶¶ 56–57, and accordingly seek to enjoin Defendants from counting ballots cast on or before election day by qualified voters because those voters are (allegedly) likely to vote for their political opponents. As the Fifth Circuit said in *Bomer*, "we cannot conceive that Congress intended the federal Election Day Statutes to have the effect of impeding citizens in exercising their right to vote. The legislative history of the statutes reflects Congress's concern that citizens be able to exercise their right to vote." 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407-08 (1872)). Plaintiffs' argument runs directly contrary to this recognized purpose and denigrates the very constitutional rights that Plaintiffs claim they seek to safeguard.

### B.       Counts II and III fail to state a claim upon which relief may be granted.

Plaintiffs' Counts II and III, which allege that the Ballot Receipt Deadline violates their constitutional rights to stand for office and to vote, also fail as a matter of law. As discussed, each of these counts expressly depends on Plaintiffs' misreading of the Election Day Statutes. *See* Compl. ¶¶ 70–80. As a result, for the same reasons that the underlying preemption claim fails, these derivative claims also fail as a matter of law.

Counts II and III also fail on their own terms. Alleged violations of the right to vote and to stand for office are reviewed under the *Anderson-Burdick* test. *See Texas League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 143 (5th Cir. 2020); *Texas Indep. Party v. Kirk*, 84 F.3d 178,

182 (5th Cir. 1996). The first step is to determine whether the right to vote has been impacted at all. *See Texas League of United Latin Am. Citizens*, 978 F.3d at 144–45. Laws that do not make it harder to vote do not implicate the right to vote. *Id.* at 144. The same is true of laws that do not impede a candidate's ability to stand for office. *See Texas Indep. Party*, 84 F.3d at 184.

Nothing about the Ballot Receipt Deadline law makes it harder for voters to exercise their right to vote. It simply ensures that qualified voters do not have their timely-cast ballots rejected. It accordingly *protects* the right to vote; it will only be if Plaintiffs succeed that the right to vote will be impeded. Such a theory, on its face, fails to plead a claim under *Anderson-Burdick*. *See Short*, 893 F.3d at 677 (affirming dismissal of challenge to law that "does not burden anyone's right to vote" and instead "makes it easier for some voters to cast their ballots by mail").

Similarly, Plaintiffs have failed to allege any basis for finding that the Ballot Receipt Deadline injures any Mississippi candidate, much less that it makes it harder to run for office. *See supra* § I.C; *see also Bost*, 2023 WL 4817073, at *14 (finding congressman failed to plausibly allege "right to stand for office" claim where he failed to allege law "prevents [him] from standing for office at all"). Indeed, Plaintiffs do not provide even threadbare allegations as to how the Ballot Receipt Deadline is alleged to violate these rights, apart from their repackaged and deficient standing and preemption arguments. Because these arguments hinge entirely on whether ballots received after election day are in fact "unlawful," they too fail.

In contrast, Mississippi has strong interests in ensuring that qualified voters who have already cast their votes can have those votes counted, and in avoiding the voter confusion that would follow if the law was suddenly changed as Plaintiffs demand. Indeed, the Ballot Receipt Deadline and the Election Day Statutes share common purposes in expanding the franchise and protecting the right to vote. "These state interests constitute the very backbone of our constitutional

scheme—the right of the people to cast a meaningful ballot." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1084 (10th Cir. 2018); *Riddell v. Nat'l Democratic Party*, 508 F.2d 770, 778 (5th Cir. 1975) (noting "the avoidance of voter confusion is a worthwhile objective" for the state).

The Ballot Receipt Deadline sets a clear, predictable rule for voters to know when they must mail their ballot to ensure that it is counted, allowing them to vote with as much information as possible and without having to project whether they may encounter significant mail delays, which have plagued previous elections. Because Plaintiffs fail to state a cognizable constitutional claim, those claims must also be dismissed, as a matter of law.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully requests that the Court dismiss Plaintiffs' Complaint.

Dated: February 9, 2024

Respectfully submitted,

*/s/ Robert B. McDuff*
Robert B. McDuff
Paloma Wu
**MISSISSIPPI CENTER FOR JUSTICE**
210 E. Capitol Street
Suite 1800
Jackson, MS 39201
Phone: (601) 259-8484
Fax: (601) 352-4769
rmcduff@mscenterforjustice.org
pwu@mscenterforjustice.org

*Counsel for Proposed Intervenors Vet Voice*
*Foundation and Mississippi Alliance for*
*Retired Americans*