**IN THE UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF
MISSISSIPPI SOUTHERN DIVISION
GULFPORT**

REPUBLICAN NATIONAL COMMITTEE;
MISSISSIPPI REPUBLICAN PARTY;
JAMES PERRY; and MATTHEW LAMB,

      *Plaintiffs*,

      vs.

JUSTIN WETZEL, *in his official capacity as
the clerk and registrar of the Circuit Court of
Harrison County*; TONI JO DIAZ, BECKY
PAYNE, BARBARA KIMBALL,
CHRISTENE BRICE, and CAROLYN
HANDLER, *in their official capacities as
members of the Harrison County Election
Commission*; and MICHAEL WATSON, *in
his official capacity as the Secretary of State
of Mississippi*,

      *Defendants*.

**No. 1:24-cv-25-LG-RPM**

**[PROPOSED] INTERVENOR-DEFENDANTS
DISABILITY RIGHTS MISSISSIPPI'S AND LEAGUE OF WOMEN VOTERS OF
MISSISSIPPI'S MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS**

0

**TABLE OF CONTENTS**

FACTUAL BACKGROUND ........................................................................................ 2

I.    Congress Enacts Election Timing Statutes to Prevent Release of Results in One State While Others are Still Voting and to Promote Voter Convenience. ..................................... 2

II.   The Mississippi Legislature Passes a Law in 2020 Requiring Acceptance of Mail Ballots Cast by Voters and Postmarked by Election Day that Arrive Up to Five Business Days After Election Day ............................................................................................................. 3

III.  Plaintiffs Bring This Action Asserting Harm from the Counting of Votes Timely Submitted Under Mississippi State Law by Arguing Federal Statutes Prevent Counting of Ballots After Election Day ........................................................................................................... 4

ARGUMENT ............................................................................................................. 5

I.    Plaintiffs Lack Standing Under Rule 12(b)(1). ........................................................... 5

      A.   Plaintiffs Purport to Assert a Generalized Grievance Masquerading as Vote Dilution. 6

      B.   The RNC and MSGOP Fail to Adequately Assert Organizational Standing ............... 8

           1.   The RNC and MSGOP Fail to Adequately Assert Associational Standing. ......... 8

           2.   The RNC and MSGOP Fail to Adequately Assert Standing in Their Own Right. ................................................................................................................. 10

      C.   Plaintiff Lamb Fails to Allege Any Harm ............................................................ 11

II.   All Three Counts Fail to State a Claim for Relief Because Each Relies Upon an Incorrect Reading of Both Mississippi Law and the Federal Election Day Statutes ......................... 12

      A.   Mississippi's Receipt Deadline Complies with the Federal Election Day Statutes When Applying Basic Principles of Statutory Interpretation and Precedent ............. 13

           1.   The ordinary meaning of the Federal Election Day Statutes does not prohibit Mississippi from counting absentee ballots that are timely cast by voters on or before Election Day and received by election officials on or after Election Day. ....................................................................................................... 14

           2.   Plaintiff's interpretation of the Federal Election Day Statutes would lead to absurd results. ......................................................................................... 18

           3.   Plaintiffs' reading of the Federal Election Day Statutes would frustrate Congress's purposes in enacting them. ...................................................... 20

           4.   Congress's longstanding approval of widespread absentee voting and post-Election-Day ballot receipt deadlines further discredits Plaintiffs' reading of the Federal Election Day Statutes. ................................................................ 21

      B.   Counts II and III Fail to State a Claim for Relief Under the Constitution ................. 24

CONCLUSION ......................................................................................................... 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Milligan,*
    599 U.S. 1 (2023)...................................................................................................24

*Am. Legion v. Am. Humanist Ass'n,*
    139 S. Ct. 2067 (2019) (Gorsuch, J., concurring) ....................................................7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................12

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023)..............................................................................................5

*Bognet v. Sec'y Commonwealth of Pennsylvania,*
    980 F.3d 336 (3d Cir. 2020)............................................................................. *passim*

*Bost v. Illinois State Bd. of Elections,*
    No. 22-CV-02754, 2023 WL 4817073 (N.D. Ill. July 26, 2023)...........................17, 22, 23, 25

*Bush v. Gore,*
    531 U.S. 98 (2000)..................................................................................................20

*In re Chapman,*
    166 U.S. 661 (1897)................................................................................................19

*Clapper v. Amnesty Int'l. USA,*
    568 U.S. 398 (2013)..............................................................................................6, 12

*Colony Ins. Co. v. Peachtree Const., Ltd.,*
    647 F.3d 248 (5th Cir. 2011) ..................................................................................12

*Donald J. Trump for President, Inc. v. Cegavske,*
    488 F. Supp. 3d 993 (D. Nev. 2020) ......................................................................10

*Donald J. Trump for President, Inc. v. Way,*
    492 F. Supp. 3d 354 (D.N.J. 2020) ...................................................................18, 20

*Feehan v. Wisc. Elections Comm'n,*
    506 F. Supp. 3d 596 (E.D. Wis. 2020)...................................................................10

*Foster v. Love,*
    522 U.S. 67 (1997) .......................................................................................... *passim*

*Freedom From Religion Found., Inc. v. Mack*,
    49 F.4th 941 (5th Cir. 2022) ...................................................................7

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
    634 F.3d 787 (5th Cir. 2011) ...................................................................6

*Hotze v. Hudspeth*,
    16 F.4th 1121 (5th Cir. 2021) ...................................................................7

*Hunt v. Wash. St. Apple Advertising Comm'n*,
    432 U.S. 333 (1977) ...................................................................8

*Kearns v. Cuomo*,
    981 F.3d 200 (2d Cir. 2020) ...................................................................12

*KVUE, Inc. v. Moore*,
    709 F.2d 922 (5th Cir. 1983) ...................................................................12

*Lance v. Coffman*,
    549 U.S. 437 (2007) ...................................................................7

*League of United Latin Am. Citizens v. Abbott*,
    2023 WL 4055392 (W.D. Tex. June 16, 2023) ...................................................................10

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................5

*Lutostanski v. Brown*,
    88 F.4th 582 (5th Cir. 2023) ...................................................................7

*Millsaps v. Thompson*,
    259 F.3d 535 (6th Cir. 2001) ................................................................... *passim*

*N.A.A.C.P. v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ...................................................................11

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ...................................................................11

*Pa. Democratic Party v. Boockvar*,
    238 A.3d 345 (Pa. 2020) ...................................................................18, 23

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985) ...................................................................14

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ...................................................................12

*Rucho v. Common Cause,*
  139 S. Ct. 2484 (2019) ........................................................................................24

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ..............................................................................................6

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ..........................................................................................5, 8

*Tenth St. Residential Ass'n v. City of Dallas,*
  968 F.3d 492 (5th Cir. 2020) ...............................................................................10

*Tex. Indep. Party v. Kirk,*
  84 F.3d 178 (5th Cir. 1996) .................................................................................25

*Tex. Workforce Comm'n v. United States Dep't of Educ.,*
  973 F.3d 383 (5th Cir. 2020) ...............................................................................21

*Thole v. U.S. Bank N.A.,*
  140 S. Ct. 1615 (2020) ..........................................................................................5

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ..............................................................................................5

*United States v. A Female Juvenile,*
  103 F.3d 14 (5th Cir. 1996) .................................................................................19

*United States v. Classic,*
  313 U.S. 299 (1941) ............................................................................................13

*United States v. Granderson,*
  511 U.S. 39 (1994) ..............................................................................................19

*Vote.Org v. Callanen,*
  89 F.4th 459 (5th Cir. 2023) ................................................................................10

*Voting Integrity Project, Inc. v. Bomer,*
  199 F.3d 773 (5th Cir. 2000) ....................................................................... *passim*

*Voting Integrity Project, Inc. v. Keisling,*
  259 F.3d 1169 (9th Cir. 2001) .............................................................................22

*Warth v. Seldin,*
  422 U.S. 490 (1975) ..........................................................................................6, 8

*Wise v. Circosta,*
  978 F.3d 93 (4th Cir. 2020) ........................................................................7, 8, 25

*Wood v. Raffensperger*,
    981 F.3d 1307 (11th Cir. 2020) ..................................................................7, 9

**Constitution and Statutes**

U.S. Const. art II, § 1, cl. 2 ...........................................................................13

U.S. Const. art. I, § 4, cl.1 .............................................................................13

U.S. Const. art. II, § 1, cl. 4 ...........................................................................13

U.S. Const. art. III ...............................................................................5, 8, 10

2 U.S.C. §§ 1 ...............................................................................................1, 2, 3

2 U.S.C. § 7 .......................................................................................2, 3, 15, 17

3 U.S.C. § 1 ...................................................................................1, 2, 3, 17

28 U.S.C. § 10502(d) .....................................................................................20

52 U.S.C. § 10502(a)(5) .................................................................................21

52 U.S.C. §§ 20302(a)(10) .............................................................................23

Electoral Count Reform Act of 2022, Pub. L. No. 117-328 (Dec. 29, 2023), 136
    Stat. 4459, 5233–34 ..................................................................................3

Miss. Code Ann. § 23-15-629(2) ......................................................................3

Miss. Code Ann. § 23-15-637(1) .............................................1, 4, 14, 16, 19, 24

Miss. Code Ann. § 23-15-713 ...........................................................................3

Miss. Code Ann. § 23-15-637(2) .....................................................................14

Miss. Code Ann. § 23-15-697 ........................................................................14

Miss. Code Ann. § 23-15-673 ...........................................................................3

Miss. Code Ann. § 23-15-713(a)–(g) ...............................................................3

**Other Authorities**

*Cast*, Black's Law Dictionary ........................................................................14

*Canvass, Certification and Contested Election Deadlines and Voter Intent Laws*,
Nat'l Conf. of State Legislatures (last updated Oct. 26, 2022),
*https://www.ncsl.org/elections-and-campaigns/canvass-certification-and-
contested-election-deadlines-and-voter-intent-laws* [https://perma.cc/Y4ZD-
CP6F .................................................................................................................................19

Cong. Globe, 42d Cong., 2d Sess. 3407–3408 (1872)............................................................3, 20

Congressional Research Serv., *The Uniformed and Overseas Citizens Absentee
Voting Act: Overview and Issues* (Oct. 26, 2016),
https://crsreports.congress.gov/product/pdf/RS/RS20764 ......................................................23

*Election*, Black's Law Dictionary (11th ed. 2019) ......................................................................16

*Election Management Guidelines*, Ch. 13, p. 133, U.S. Election Assistance
Comm'n (Aug. 26, 2010)
https://www.eac.gov/sites/default/files/eac_assets/1/6/EMG_chapt_13_august
_26_2010.pdf .........................................................................................................................19

Federal Voting Assistance Program, *UOCAVA Voting in U.S. States*, Dep't of
Defense, https://www.fvap.gov/info/interactive-data-center/states
[https://perma.cc/5U5H-E6R2] ..............................................................................................23

Miss. House of Representatives, Yeas and Nays on H.B. 1521, 2020 Reg. Sess.
(June 15, 2020),
https://billstatus.ls.state.ms.us/2020/pdf/votes/senate/1610021.pdf .........................................4

Miss. State Senate, Yeas and Nays on H.B. 1521, 2020 Reg. Sess. (June 15,
2020), https://billstatus.ls.state.ms.us/2020/pdf/votes/house/0640030.pdf ..............................4

State Legis., *Voting Outside the Polling Place Report, Table 11: Receipt and
Postmark Deadlines for Absentee/Mail Ballots* (last updated July 12, 2022),
https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-
deadlines-for-absentee-mail-ballots ..........................................................................................4

U.S. Election Assistance Comm'n (Aug. 26, 2010)
https://www.eac.gov/sites/default/files/eac_assets/1/6/EMG_chapt_13_august
_26_2010.pdf .........................................................................................................................19

Intervenor-Defendants Disability Rights Mississippi and the League of Women Voters of Mississippi—organizations that represent Mississippi voters who rely on absentee voting and that promote and educate the public about absentee voting—move to dismiss with prejudice Plaintiffs' Complaint (ECF No. 1). Plaintiffs challenge a Mississippi law—enacted several years ago with nearly unanimous bipartisan approval from the state legislature—that ensures that absentee voters who mail and have their ballot postmarked by Election Day are not disenfranchised by counting those ballots received up to five business days later (the "Receipt Deadline"), MISS. CODE ANN. § 23-15-637(1). Their complaint requires dismissal for two reasons.

First, Plaintiffs lack standing to bring claims to invalidate the Receipt Deadline. Plaintiffs' vote dilution arguments are either generalized grievances shared by all voters that are insufficient to establish a concrete, particularized injury, or depend on factually unsupported, nonviable theories of vote-dilution. The Republican National Committee ("RNC") and Mississippi Republican Party ("MSGOP") further fail to show organizational or associational standing because they fail to plead any diversion of resources away from other organizational priorities whatsoever. As to George County Election Commissioner Matthew Lamb's assertion that the Mississippi law he has enforced without incident for four years "forces him to choose between following Congress's election-day deadline or Mississippi's post-election day deadline," this relied on a far-fetched hypothetical. Accordingly, the Court should dismiss the Complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

Second, Plaintiffs fail to state a cognizable claim for relief because their theory depends on a fundamental misreading of the Receipt Deadline and three federal statutes setting the date for Election Day for congressional and presidential races, 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1 (collectively, the "Federal Election Day Statutes"), which departs from the plain meaning of

"election" and longstanding Supreme Court and Fifth Circuit precedent. Moreover, Plaintiffs' interpretation would lead to absurd results at odds with Congress's well-established intent in enacting the Federal Election Day Statutes and cannot be squared with Congress's continued validation of states' post-election-day absentee ballot receipt deadlines through subsequent legislation, such as the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 52 U.S.C. §§ 20301–20311. Plaintiffs' interpretation, if accepted, would upend election administration across the country by prohibiting not only counting of timely mailed ballots, but also any work to canvass ballots received on or before Election Day after midnight on Election Day. The Court should dismiss Plaintiffs' Complaint with prejudice.

## FACTUAL BACKGROUND

I. **Congress Enacts Election Timing Statutes to Prevent Release of Results in One State While Others are Still Voting and to Promote Voter Convenience.**

In the aftermath of the Civil War, many states held elections for Congress on different dates. *See Foster v. Love*, 522 U.S. 67, 73 (1997). In 1872, Congress sought to change this system to counteract "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States," and to minimize "the burden on citizens forced to turn out on two different election days to make final selections of federal officers in Presidential election years." *Id.* Congress passed 2 U.S.C. § 7 to create a uniform federal Election Day for the House of Representatives, as well as 3 U.S.C. § 1, to create a similar date for the selection of Presidential electors. It followed suit with 2 U.S.C. § 1 regarding the selection of Senators in 1914. *See Millsaps v. Thompson*, 259 F.3d 535, 540 (6th Cir. 2001). These statutes "reflect[ed] Congress's concern that citizens be able to exercise their right to vote." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 777 (5th Cir. 2000) (citing Cong. Globe, 42d Cong., 2d Sess. 3407–3408 (1872)).

2

As currently constituted, 2 U.S.C. § 7 provides that the "Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election . . . ." 2 U.S.C. § 1 states that "[a]t the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof . . . ." Finally, 3 U.S.C. § 1 provides that "[t]he electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day."[1]

## II.     The Mississippi Legislature Passes a Law in 2020 Requiring Acceptance of Mail Ballots Cast by Voters and Postmarked by Election Day that Arrive Up to Five Business Days After Election Day.

Mississippi restricts absentee voting by mail to qualified voters who fall within certain enumerated categories. *See* MISS. CODE ANN. § 23-15-713. Those categories include: voters who are temporarily residing away from their county of residence on Election Day; voters who are unable to vote in person without hardship due to a "temporary or permanent physical disability" (and, if those voters are hospitalized away from home on Election Days, their family members); any voter who is 65 or older; any voter who is required to be at work on Election Day during voting hours; and certain military members, veterans, and their families. *Id.* §§ 23-15-673, 23-15-713(a)–(g). Mississippi law further entitles voters with permanent disabilities to register "to automatically receive an absentee ballot for all elections on a continuing basis without the necessity for reapplication." *Id.* § 23-15-629(2).

In 2020, the Mississippi Legislature passed—with all but one member voting in favor—

---

[1] Plaintiffs' Complaint quotes a prior version of 3 U.S.C. § 1, which has recently been repealed by Congress to allow states flexibility to modify the timing of elections as necessitated by catastrophic events like the COVID-19 pandemic and to prevent subversive attempts to alter ballot counting laws after Election Day. *See* Electoral Count Reform Act of 2022, Pub. L. No. 117-328 (Dec. 29, 2023), 136 Stat. 4459, 5233–34.

the Receipt Deadline Law, which sets rules for the counting of absentee ballots sent by these qualified voters. *See* MISS. CODE ANN. § 23-15-637(1).[2] That law provides that "[a]bsentee ballots and applications received by mail . . . must be postmarked on or before the date of the election," and allows election officials to count timely mailed and postmarked ballots that are received in the elections office no later than "five (5) business days after the election." *Id.* Indeed, a ballot that is postmarked on or before Election Day "shall not be counted" if it is received more than five business days after the election. *Id.* As a result, Mississippi is one of 20 states (including the District of Columbia) that allows the post-election-day receipt of mail ballots that were postmarked on or before Election Day.[3]

III.   **Plaintiffs Bring This Action Asserting Harm from the Counting of Votes Timely Submitted Under Mississippi State Law by Arguing Federal Statutes Prevent Counting of Ballots After Election Day.**

Plaintiffs RNC, MSGOP, Mr. Perry, and Mr. Lamb filed this action on January 26, 2024, against Mississippi Secretary of State Watson, clerk and registrar of the Circuit Court of Harrison County Justin Wetzel, and all five members of the Harrison County Election Commission. *See* Compl. ¶¶ 8–24. Plaintiffs bring three claims, all targeting the Receipt Deadline, MISS. CODE ANN. § 23-15-637(1)(a), which requires absentee voters to mail their ballot on or before Election Day and election officials to accept any otherwise valid ballots postmarked by Election Day and

---

[2] *See* Miss. State Senate, Yeas and Nays on H.B. 1521, 2020 Reg. Sess. (June 15, 2020), https://billstatus.ls.state.ms.us/2020/pdf/votes/house/0640030.pdf; Miss. House of Representatives, Yeas and Nays on H.B. 1521, 2020 Reg. Sess. (June 15, 2020), https://billstatus.ls.state.ms.us/2020/pdf/votes/senate/1610021.pdf.

[3] Those states include Alaska, California, D.C., Illinois, Kansas, Maryland, Massachusetts, Mississippi, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Virginia, Washington, West Virginia. *See* Nat'l Conf. of State Legis., *Voting Outside the Polling Place Report, Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, (last updated July 12, 2022), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots [perma.cc/DD36-TBVY]. Utah also permits post-Election-Day receipt of absentee ballots, so long as they were postmarked by the day before Election Day. *Id.* Puerto Rico and the Virgin Islands also permit absentee ballots to be counted when received after Election Day. *Id.*

received up to five business days after Election Day. *Id.* ¶¶ 62–80. At core, Plaintiffs argue that, by accepting absentee ballots that are received after Election Day—even if they were cast (*i.e.*, voted, sworn, witnessed, mailed, and postmarked) on or before Election Day—Mississippi is "holding voting open beyond the federal Election Day," *id.* ¶ 45. Plaintiffs contend this "effectively extends Mississippi's federal election past the Election Day established by Congress," *id.* ¶ 3, and thereby "violates federal law and harms Plaintiffs," *id.* ¶ 45. Plaintiffs also purport to allege two constitutional claims that rest entirely upon the same supposed conflict between state and federal law. *See* Compl. ¶¶ 70–74 (Count II) (alleging a "violation of the right to stand for office" because "[u]nder federal law" "ballots that have been cast after Election day . . . are not valid"); *id*. ¶¶ 75–80 (Count III) (alleging a "violation of the right to vote" due to "the casting of fraudulent or illegitimate votes" after Election Day). Plaintiffs seek a declaratory judgment that the Receipt Deadline violates the Constitution and federal statutes and an injunction prohibiting Defendants from counting any absentee ballots received after Election Day. Compl. at 14.

## **ARGUMENT**

### I.   **Plaintiffs Lack Standing Under Rule 12(b)(1).**

"Under Article III of the Constitution, a plaintiff needs a 'personal stake' in the case." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). It is Plaintiffs' burden to establish standing. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("*SFFA*"). At minimum, Plaintiffs must establish each of three elements: "(1) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Where a plaintiff fails to establish standing, the court must dismiss a complaint for lack

of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) (explaining that "dismissal for lack of constitutional standing . . . should be granted under Rule 12(b)(1)").

Here, none of the Plaintiffs sufficiently alleges that the Receipt Deadline has caused them to suffer a concrete, particularized, and actual or imminent injury. For an injury to be "concrete," it must bear a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *See Spokeo*, *Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). A "particularized" injury is one that affects "the plaintiff in a personal and individual way." *Id.* at 339. A "'generalized grievance' shared in substantially equal measure by all or a large class of citizens" does not suffice, *Warth v. Seldin*, 422 U.S. 490, 499 (1975). For an injury in fact to be actual or imminent, a plaintiff must show that it is "certainly impending," and not simply possible. *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 409 (2013).

Plaintiffs' allegation that the Receipt Deadline dilutes their vote is nothing more than a generalized grievance that does not give rise to constitutional standing. Nor can the RNC or MSGOP allege standing as organizations: the lack of injury described above means that neither organization has associational standing to bring this action on behalf of any of their members, and neither organization has properly alleged a cognizable injury based on a diversion-of-resources theory that would support standing in its own right. Finally, Mr. Lamb has failed to allege a non-hypothetical injury as a county election official. Because Plaintiffs have not established constitutional standing, the Court should dismiss the Complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

A.   **Plaintiffs Purport to Assert a Generalized Grievance Masquerading as Vote Dilution.**

Plaintiffs lack an injury-in-fact because "generalized grievances about the conduct of

Government are insufficient to confer standing to sue." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2100 (2019) (Gorsuch, J., concurring) (cleaned up); *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th 941, 949 (5th Cir. 2022) (explaining "the general principle that standing is absent where a plaintiff has only a 'generalized grievance shared in substantially equal measure by all or most citizens.'" (cleaned up)).

Plaintiffs' allegations of "vote dilution" simply reflect Plaintiffs' subjective belief that the Receipt Deadline is invalid. *See, e.g.*, Compl. ¶¶ 13, 48–49, 50–60, 72. But Plaintiffs' generalized concerns about the Receipt Deadline are "plainly undifferentiated [from] and common to all" Mississippians, and do not give rise to standing. *Lance v. Coffman*, 549 U.S. 437, 440-41 (2007). "As the Supreme Court explained in *Lance v. Coffman*, an alleged injury based solely on an allegation that the law . . . has not been followed amounts to an undifferentiated, generalized grievance about the conduct of government insufficient to establish standing." *Hotze v. Hudspeth*, 16 F.4th 1121, 1124 n.2 (5th Cir. 2021) (cleaned up). "That is precisely the sort of alleged harm that all of the Plaintiffs claim that they experienced here." *Id.*

Plaintiffs' "dilution" argument also fails as a matter of law, because vote-dilution injuries arise only where voters' votes are "mathematically diluted by the method of election." *Lutostanski v. Brown*, 88 F.4th 582, 586 (5th Cir. 2023). Although "vote dilution can be a basis for standing," it "occurs when voters are harmed compared to "'irrationally favored' voters from other districts" and thus "no single voter is specifically disadvantaged" if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020); *see also Wise v. Circosta*, 978 F.3d 93, 104 (4th Cir. 2020) (Motz, J., concurring) (rejecting vote-dilution theory where ballots received after Election Day are counted because "plaintiffs' votes would not count

for less *relative to other North Carolina voters*.") (internal citation omitted).

Nor can Plaintiffs' asset any injury from a burden on or denial of their right to vote. Rather than *infringing* on any Mississippian's right to vote, the law *protects* all Mississippians' rights. This enfranchisement is not vote dilution. *See, e.g.*, *Wise*, 978 F.3d at 100 (concluding that a ballot receipt deadline extension "does not in any way infringe upon a single person's right to vote: all eligible voters who wish[ed] to vote may do so on or before Election Day.").

Absent a particularized harm, Plaintiffs' generalized grievances with the Mississippi Legislature fall far short of establishing Article III standing.

**B.    The RNC and MSGOP Fail to Adequately Assert Organizational Standing.**

Where plaintiffs are organizations, standing may be satisfied in either of two ways. "Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *SFFA*, 600 U.S. at 199 (quoting *Warth*, 422 U.S. at 511). Here, neither the RNC nor the MSGOP has alleged standing under either theory.

1.    The RNC and MSGOP Fail to Adequately Assert Associational Standing.

To assert standing as a representative of its members—a theory known as associational standing—an organization "must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* at 199 (quoting *Hunt v. Wash. St. Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). Here, the RNC and MSGOP fail at the first step. Because these two organizations have not alleged how any of their members would have standing in their own right, they cannot bring this case under a theory of associational standing.

The RNC and MSGOP allege that they "bring[] this suit . . . in a representational capacity to vindicate the rights of its members, affiliated voters, and candidates." Compl. ¶¶ 12, 15. They

allege that the Receipt Deadline "violates the rights of candidates, campaigns, and voters" by allowing "timely, valid ballots" to be "diluted by untimely, invalid ballots." *Id.* ¶ 4. Because voting by mail is "starkly polarized by party," with significantly more Democratic voters choosing to mail in their ballots, Plaintiffs further allege that the Receipt Deadline "specifically and disproportionately harms Republican candidates and voters." *Id.* ¶¶ 56, 59. Plaintiffs also allege that candidates will have to "spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns." *Id.* ¶ 72.

Putting aside the absurdity of Plaintiff's theory that Mississippi's Republican-dominated House and Senate overwhelmingly passed, and Mississippi's Republican governor signed, a bill to expand the counting of absentee ballots and thereby aid Democratic voters at the expense of Republican voters, these alleged injuries are insufficient for any of the RNC's or MSGOP's members, whether Republican voters or Republican candidates, to have standing. As described *supra*, the generalized grievance of failing to follow the law does not give rise to an injury-in-fact, and so cannot be used as a predicate for associational standing. Nor does the allegedly disproportionate harm to Republican candidates and voters, by virtue of the fact that Democratic voters are more likely to vote by mail, create a cognizable injury-in-fact. "[E]ven assum[ing] that absentee voters are favored over in-person voters," such claims of disparate treatment amount only to generalized grievances that do not provide standing to individual voters. *Wood*, 981 F.3d at 1315; *see also Feehan v. Wisc. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020) (no standing for a plaintiff who argued that Wisconsin election procedures diluted his and other Republican votes; such an argument "show[ed] no more than a generalized grievance common to any voter").

Courts across the nation have dismissed similar challenges, finding there is no injury-in-

fact to candidates who "face[s] no harms that are unique from their electoral opponents." *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1003 (D. Nev. 2020); *Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336, 351 (3d Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). Standing thus cannot be predicated on any harm to any candidate who is a member of the RNC or MSGOP.

Here, too, because the RNC and MSGOP have failed to allege that any of their members have any injury-in-fact, they cannot establish associational standing.

2.    The RNC and MSGOP Fail to Adequately Assert Standing in Their Own Right.

For an organization to assert its own standing, it must show that the "defendant's actions perceptibly impair the organization's activities and consequently drain the organization's resources." *Vote.Org v. Callanen*, 89 F.4th 459, 470 (5th Cir. 2023) (cleaned up).  This includes pleading facts to show "that it had diverted significant resources to counteract the defendant's conduct." *Id.* (cleaned up). The RNC and MSGOP allege that the Receipt Deadline "forces" them "to divert resources and spend money on absentee-specific programs and post-election activities." Compl. ¶¶ 13, 15. Yet "even if an organization incurs some expense because of a defendant's conduct, that expense is not a cognizable Article III injury unless it 'detract[s] or differ[s] from its routine activities.'" *League of United Latin Am. Citizens v. Abbott*, 2023 WL 4055392, at *3 (W.D. Tex. June 16, 2023) (citing *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020)).

For example, in *OCA-Greater Houston v. Texas*, 867 F.3d 604, 611–12 (5th Cir. 2017), the Fifth Circuit explained that the plaintiff "went out of its way to counteract the effect of Texas's

allegedly unlawful voter-interpreter restriction" by educating voters "to reduce the chance that other voters would be denied their choice of interpreter," and in doing so, "consumed its time and resources in a way" that "'perceptibly impaired' OCA's ability to 'get out the vote' among its members." Here, the RNC and MSGOP have failed to allege *any* fact suggesting that its alleged diversion of resources would detract from its routine activities at all by pleading any facts indicating from which other activities it was forced to divert resources. Rather, the complaint indicates only activities that the RNC's and MSGOP's would merely extend activities the organizations were already doing without any detraction. *See, e.g.*, Compl. ¶ 48 ("[c]ounting ballots received after Election Day . . . require political committees to spend *more* time and money on poll waters and mail-in ballot activities") (emphasis added); ¶ 49 ("Mississippi's law also requires the RNC and Mississippi Republican Party to maintain absentee-specific get-out-the-vote operations to encourage absentee voters to return their mail-in ballots through Election Day."). *See, e.g.*, *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238–39 (5th Cir. 2010) (dismissing for lack of standing where plaintiffs failed to identify activities they had to "hold or otherwise curtail in order to respond to the" challenged law)

These facts are insufficient to establish organizational standing.

## C.      Plaintiff Lamb Fails to Allege Any Harm.

Finally, Plaintiff Lamb's argument that the Receipt Deadline "forces him to choose between following Congress's election-day deadline or Mississippi's post-election day deadline" and "opens [him] up" "to removal from his position" is no harm at all, let alone an injury-in-fact. Compl. ¶ 60.  Plaintiff Lamb is not being forced to choose anything: he has a ministerial duty to conduct elections in accordance with Mississippi's law, not to attempt lay interpretations of federal statutes. "To invoke a federal trial court's jurisdiction, a litigant 'must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'" *KVUE,*

*Inc. v. Moore*, 709 F.2d 922, 927 (5th Cir. 1983), *aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S. 1092 (1984). Plaintiff Lamb has not done so. There is *no* allegation that his removal from his position for failure to enforce the Receipt Deadline has been threatened or may possibly proceed, nor that in the previous years this law was in effect that he chose not to follow it. Plaintiff Lamb cannot establish standing "based on [his] fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *Kearns v. Cuomo*, 981 F.3d 200, 207 (2d Cir. 2020) (official's contention that he could be prosecuted under federal law for enforcing state law was "conjectural, not actual or imminent") (internal quotation marks omitted). As such, he has not alleged an injury-in-fact and does not have standing.

II.   **All Three Counts Fail to State a Claim for Relief Because Each Relies Upon an Incorrect Reading of Both Mississippi Law and the Federal Election Day Statutes.**

Even if they had standing (they do not), Plaintiffs fail to state a claim for relief. Although the Court must "construe the complaint in favor of the plaintiff and accept all well-pleaded factual allegations as true," the Complaint "must set forth 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). These "[f]actual allegations must be sufficient to raise a non-speculative right to relief." *Id.* Granting a motion to dismiss for "failure to state a claim [is] appropriate when a defendant [successfully] attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001). Dismissal with prejudice is appropriate.

Here, the Complaint rises and falls on Plaintiffs' fundamental distortion of both the challenged Receipt Deadline and Federal Election Day Statutes. The Receipt Deadline complies

with federal law requiring that all voting take place on or before Election Day. Contrary to the Complaint's misrepresentations of law, Mississippi does not "hold open voting" after Election Day. Rather, the Receipt Deadline permits and requires officials to accept an absentee ballot only if it bears a postmark proving it was timely cast on or before Election Day.  It thus does not conflict with the Federal Election Day Statutes as interpreted by the Supreme Court in accordance with their plain meaning. In addition, Plaintiffs base their constitutional claims (Counts II and III) on a misunderstanding of the legal theories they purport to allege, and those claims separately require dismissal for that reason as well. Plaintiffs' unsupported and distorted arguments fail to state a claim and threaten to disenfranchise voters. They should be dismissed.

A.    <u>**Mississippi's Receipt Deadline Complies with the Federal Election Day Statutes When Applying Basic Principles of Statutory Interpretation and Precedent.**</u>

The Elections Clause of the United States Constitution, U.S. Const. art. I, § 4, cl.1, provides states the responsibility for establishing the time, place, and manner of holding elections for Senators and Representatives, unless Congress acts to preempt state choices. Likewise, the Electors Clause gives Congress the authority to determine the time for choosing presidential and vice-presidential electors, *id.* art. II, § 1, cl. 4, but otherwise allows states to determine the manner of their selection, *id.* art II, § 1, cl. 2. States "are given . . . a wide discretion in the formulation of a system for the choice by the people" of Congresspersons, Senators, and electors. *United States v. Classic,* 313 U.S. 299, 311 (1941). The effect of these clauses is well established: "[A] state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000).

Relevant here, Congress passed the Federal Election Day Statutes, which relate to the

timing of federal elections, under these clauses. To manufacture a potential conflict, Plaintiffs misinterpret these statutes. But the Receipt Deadline does not "directly conflict" in with the Federal Election Day Statutes, *Bomer*, 199 F.3d at 775, defeating their claims.

      1.    <u>The ordinary meaning of the Federal Election Day Statutes does not prohibit Mississippi from counting absentee ballots that are timely cast by voters on or before Election Day and received by election officials on or after Election Day.</u>

Reading a statute "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). A plain reading of the Receipt Deadline law and the Federal Election Day Statutes dooms Plaintiffs' claims.

First, contrary to Plaintiffs' unsupported allegations and bizarre construction that counting ballots cast by voters on or before Election Day means Mississippi is "holding voting open beyond the federal Election Day," Compl. ¶ 45, all actions of voters occur on or before Election Day. Far from "holding open voting," the Receipt Deadline on its face requires that all absentee ballots must be postmarked on or before the date of election. In other words, the only absentee ballots at issue here are those timely cast by eligible voters on or before Election Day. *See* Compl. ¶ 34; MISS. CODE ANN. §23-15-637(1)(a).[4] Because Plaintiffs' argument depends upon an unstable predicate—misreading this statute to imply that voters continue to cast ballots past Election Day—the rest of their argument falls.

---

[4] Plaintiffs would have the Court believe that Mississippi allows voters to continue to fill out and cast new ballots even after polls close on Election Day. Not so. Plaintiffs' own allegations and citations to state law belie their misreading. As Plaintiffs recognize, *see* Compl. ¶ 35—under Mississippi's absentee voting provisions, a completed ballot has been "*timely cast*" the moment that it has been deposited in the mail with a postmark on or before Election Day—the registrar's act of "reciev[ing] [the ballot] by mail" is statutorily distinct from the voter's act of "cast[ing]" one's ballot. Miss. Code § 23-15-637(2); *see also Cast*, Black's Law Dictionary ("To formally deposit (a ballot) or signal one's choice (in a vote)"); *cf.* Miss. Code § 23-15-697 ("When the [military] absentee ballot has *been voted* and the envelope sealed, signed and certified to as provided above, the absentee voter shall mail the envelope containing the ballot to the registrar.").

14

Second, with Plaintiffs' preceding misinterpretation of the Receipt Deadline falling away, the Supreme Court's and Fifth Circuit's interpretation of the plain meaning of "election" in the Federal Election Day Statutes bars their claims. In *Foster v. Love,* 522 U.S. 67 (1997), the Supreme Court considered a challenge under the Federal Election Day Statutes to Louisiana's election system, which allowed the "final selection" of a winning candidate who received a majority of the vote in a pre-Election-Day primary. The Court analyzed the Federal Election Day Statutes and determined that "election" "plainly refer[s] to the combined actions of voters and officials meant to make a final selection of an officeholder." *Id.* at 71. Accordingly, the Court struck down Louisiana's primary system because it permitted the "final selection" of a winner to "conclude[] as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress." *Id.* at 72.

Following *Foster* and after the 2000 election, the Fifth Circuit considered a challenge under the Federal Election Day Statutes to Texas laws permitting early voting in federal elections. *Bomer*, 199 F.3d 773. Relying on the Supreme Court's "plain, common sense reading" of these statutes, the *Bomer* court squarely rejected the argument that "the federal statutes, by establishing '*the* day for the election,' contemplate that the entire election, including all voting, will occur that day." *Id.* at 775 (quoting 2 U.S.C. § 7)). To the contrary, the court held that "the plain language of the statute does not require all voting to occur on federal election day," rather, "[*a*]*ll* the statute requires is that the election be held that day." *Id.* at 776 (emphasis added). Thus, Texas's early voting period did not "contravene the federal election statutes" even though it "[a]llow[ed] some voters to cast votes before election day . . . because the final selection [was] not made before the federal election day." *Id.*

These precedents rest on two components of an election: (1) the combined actions of voters

and officials, and (2) the consummation of the election in selecting the winner. In other words, although the "combined actions of voters and officials meant to make a final selection of an officeholder" must not conclude before Election Day, *Foster,* 522 U.S. at 71—not all election-related actions of either voters or election officials need occur on that specific day, *Bomer*, 199 F.3d at 776. For one, a voter's act of casting a ballot need not happen on Election Day. *Bomer*, 199 F.3d at 776; *see also Millsaps v. Thompson*, 259 F.3d 535, 547 (6th Cir. 2001) ("An 'election' under the federal statutes requires more than just voting . . . ."). In reaching this conclusion, the Supreme Court and Fifth Circuit's interpretation of the Federal Election Day Statutes comports with the ordinary meaning of an "election" as a process, rather than a single moment in time. *See Election*, Black's Law Dictionary (11th ed. 2019) ("The process of selecting a person to occupy an office . . .").

Like in *Bomer*, applying the Federal Election Day Statutes' ordinary meaning here does not "directly conflict" with Mississippi's absentee voting system. *Bomer*, 199 F.3d at 775. Absentee voters' casting of mail-in ballots before or on Election Day is unquestionably permitted under the Federal Election Day Statutes. *See Bomer*, 199 F.3d at 776; *Millsaps*, 259 F.3d at 547–48. Additionally, an election official's mere *receipt* of a mailed ballot is not a "combined action[] of voters and officials meant to make a final selection of an officeholder." *Foster,* 522 U.S. at 71; *see* Miss. Code Ann. § 23-15-637(1). Rather, the counting of ballots after midnight on Election Day (regardless of when they are received) is an independent, administrative duty of election officials meant to confirm the outcome of a concluded officeholder selection—it does not include any volitional act "meant to make a final selection." *See Millsaps*, 259 at 546 n.5 ("[O]fficial action to confirm or verify the results of the election extends well beyond federal election day."). Thus, "the plaintiffs' focus on the single act of receiving a ballot from a voter presents an unnatural and

stilted conception of the actions taken by officials under [Mississippi] election laws and loses sight of the fact that an official's mere receipt of a ballot without more is not an act meant to make a final selection." *Id.* at 546.

*Foster* "clear[ly] signal[ed]" that "some acts associated with the election may be conducted before the federal election day without violating the federal election statutes," *Bomer*, 199 F.3d at 776, and the same is true of post-Election-Day administrative acts. It is a necessary reality that "official action to confirm or verify the results of the election extends well beyond federal election day." *Millsaps*, 259 at 546 n.5. This was true when *Foster* and *Bomer* were decided, and when Congress first passed the Federal Election Day Statutes. The fact that some administrative acts associated with the election—like Mississippi election officials' receipt of absentee ballots that have already been timely cast—occur after Election Day, cannot lead to a direct conflict with a statute that merely declares a specific date as Election Day. Any other reading would require this Court impermissibly to "give a hyper-technical meaning to 'election'" which Congress did not intend. *Bomer*, 199 F.3d at 776 (quoting *Foster*, 522 U.S. at 72).

Not surprisingly, the courts that have considered challenges identical to Plaintiffs' here and have squarely rejected them. In *Bost v. Illinois State Bd. of Elections*, No. 22-CV-02754, 2023 WL 4817073 (N.D. Ill. July 26, 2023), the court dismissed a complaint raising an identical argument against an Illinois statute that allowed the state "to count votes that are received after Election Day" if "they are postmarked on or before the date of the election or certified before Election Day." *Id.* at *11. The court concluded that state law "does not contradict 2 U.S.C. § 7 and 3 U.S.C. § 1," because "[n]owhere in the text does the [state law] allow ballots postmarked or certified after Election Day to be counted" and "[t]here is a notable lack of federal law governing the timeliness of mail-in ballots." *Id.* Rather, such a "Ballot Receipt Deadline Statute operates harmoniously with

17

the federal statutes that set the timing for federal elections." *Id.*

The court rejected a similar argument in *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020), where it found no direct conflict between" a law allowing ballots without a postmark to be counted if received within two days of Election Day "and the Federal Election Day Statutes" because "New Jersey law prohibits canvassing ballots cast after Election Day, in accordance with the Federal Election Day Statutes." So too in *Bognet*, where the Third Circuit rejected a challenge to Pennsylvania's extension of absentee ballot receipt deadline to allow "counting ballots received within three days of Election Day" because "[t]he Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously." *Bognet*, 980 F.3d at 354; *see also Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020) ("[A]llowing the tabulation of ballots received after Election Day does not undermine the existence of a federal Election Day, where the proposal requires that ballots be cast by Election Day . . . .").

In sum, the Receipt Deadline creates no direct conflict with the Federal Election Day Statutes. They say nothing about regulating the manner of conducting absentee voting and do not purport to impose any requirements for determining the timing of the receipt of ballots cast on or before Election Day. By their ordinary meaning, they merely declare a date before which states cannot close voting and announce results, and after which election officials may not allow more voters to cast a vote. *See Bomer*, 199 F.3d at 776. Accordingly, Plaintiffs' claims fail as a matter of law.

2.   Plaintiff's interpretation of the Federal Election Day Statutes would lead to absurd results.

Plaintiffs' insistence that "Congress established one specific day as the uniform, national Election Day for federal office" and that, as a result, "[a] qualified ballot for federal office is not a

legal vote unless it is received by the proper election officials by Election Day," Compl. ¶¶ 65–66, goes too far, given its impact on other critical post-election activities. Laws should be interpreted to reach "'a sensible construction' that avoids attributing to [Congress] either 'an unjust or an absurd conclusion.'" *United States v. Granderson*, 511 U.S. 39, 56 (1994) (quoting *In re Chapman*, 166 U.S. 661, 667 (1897)); *see United States v. A Female Juvenile*, 103 F.3d 14, 16–17 (5th Cir. 1996) ("Axiomatic in statutory interpretation is the principle that laws should be construed to avoid an absurd or unreasonable result.").

Here, because all actions of voters are completed on or before Election Day, *see* MISS. CODE ANN. § 23-15-637(1)(a), Plaintiffs' argument necessarily targets the post-election-day administrative acts of election officials, which leads to absurd results. Specifically, if all absentee ballot reception must occur before Election Day regardless of whether those ballots were lawfully cast by Election Day, Plaintiffs' same argument would also apply to post-election-day ballot counting, tallying, canvassing, certification, and more. For example, every single state conducts their canvasses and certifications (and thereby finalizes the results of the election) *after* the official date of the election, with many extending more than a month beyond Election Day.[5] *See Millsaps*, 259 F.3d at 546 (recognizing and explaining in detail how "official action to confirm or verify the results of the election extends well beyond federal election day"). Plaintiffs' interpretation would mean election officials violate federal law whenever they fail to complete their count of ballots by midnight on Election Day. Plaintiffs' reading would not only upturn the absentee ballot receipt

---

[5] *See Canvass, Certification and Contested Election Deadlines and Voter Intent Laws*, Nat'l Conf. of State Legislatures (last updated Oct. 26, 2022), *https://www.ncsl.org/elections-and-campaigns/canvass-certification-and-contested-election-deadlines-and-voter-intent-laws* [https://perma.cc/Y4ZD-CP6F]; s*ee also*, *Election Management Guidelines*, Ch. 13, p. 133, U.S. Election Assistance Comm'n (Aug. 26, 2010) https://www.eac.gov/sites/default/files/eac_assets/1/6/EMG_chapt_13_august_26_2010.pdf ("Many voters believe that the election results they see on television on election night are the final results. In fact, the outcome of the election is not official until the completion of the canvass of votes and certification of results, which sometimes may be several weeks after Election Day.").

laws in forty percent of states, *see Bognet*, 980 F.3d at 354, it would require an effectively impossible, wholesale reconfiguration of state election systems, *cf. Bush v. Gore*, 531 U.S. 98 (2000) (Rehnquist, C.J., concurring) (describing election-related acts that officials must occur "[a]fter the election has taken place").[6]

Congress could not have intended this absurd result. Given "the Court's express disavowal in *Foster* that it was establishing any particular actions a State must perform on Election Day to comply with the federal statutes, this reading simply asks too much." *Millsaps*, 259 F.3d at 546.

3.    Plaintiffs' reading of the Federal Election Day Statutes would frustrate Congress's purposes in enacting them.

While the ordinary reading of the Federal Election Day Statutes further their purpose, Plaintiffs' alternate interpretation frustrates it. In *Bomer*, the Fifth Circuit insisted that it "[could not] conceive that Congress intended the Federal Election Day Statutes to have the effect of impeding citizens in exercising their right to vote." 199 F.3d at 777. The court's review of the statutes' original purposes "reflect[ed] Congress's concern that citizens be able to exercise their right to vote. *Id.* (citing Cong. Globe, 42d Cong., 2d Sess. 3407–3408 (1872)). Congress identified two "primary evils . . . as reasons for passing the federal statutes: 'distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in

---

[6] Similarly, Plaintiffs' logic also does not distinguish between election-related acts that occur *before* Election Day and those that occur *after*. If Congress's declaration of "one specific day as the uniform, national Election Day" carries so much force as to prohibit the counting of votes received outside of that "one specific day," Compl. ¶¶ 65–66, it would also preclude activity before the election. The Fifth Circuit refused to accept a nearly identical reading of the Federal Election Day Statutes because it could not "logically" do so "without also finding that absentee balloting—which occurs in every state—violates federal law." 199 F.3d at 776; *see also Way*, 492 F. Supp. 3d at 367 ("The interpretation that the Federal Election Day Statutes preempt any state discretion on the timing of election-related activity cannot be reconciled with Congress's requirement that states permit absentee voting, but leaving the manner and timing of absentee voting to the discretion of each state." (citing 28 U.S.C. § 10502(d))). Of course, Plaintiffs' reading would also lead to the further absurd result of necessitating the overturning of dozens, possibly hundreds, of court opinions protecting voters' ability to vote absentee or early, extending receipt deadlines and canvassing periods, and ruling on the validity of ballots counted after Election Day.

other States, and . . . the burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years." *Id.* (quoting *Foster,* 522 U.S. at 73); *see also Millsaps*, 259 F.3d at 541 ("Congress wanted to prevent States that voted early from unduly influencing those voting later, to combat fraud by minimizing the opportunity for voters to cast ballots in more than one election, and to remove the burden of voting in multiple elections in a single year.").

As in *Bomer*, an ordinary reading of the federal election statutes creates no direct conflict with state laws that—like Mississippi's ballot receipt deadline—"further the important federal objective of reducing the burden on citizens to exercise their right to vote by allowing them to vote at a time convenient to them, without thwarting other federal concerns" about "reveal[ing] any election results before the polls close on election day." 199 F.3d at 777; *cf. Tex. Workforce Comm'n v. United States Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) ("Justice Scalia identified one of the fundamental principles of reading law to be a presumption against ineffectiveness. That is, a textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.").[7] Plaintiffs' overly broad reading would inhibit citizens' right to cast an effective ballot and ability to vote at convenient times.

        4.      <u>Congress's longstanding approval of widespread absentee voting and post-Election-Day ballot receipt deadlines further discredits Plaintiffs' reading of the Federal Election Day Statutes.</u>

"[T]he long history of congressional tolerance, despite the federal election day statute[s], of absentee balloting," post-election-day receipt deadlines, "and express congressional approval

---

[7] Congress has continued to express its concern that "the lack of sufficient opportunities for . . . absentee balloting" can have "the impermissible purpose or effect of denying citizens the right to vote for such officers because of the way they may vote." 52 U.S.C. § 10502(a)(5). In light of Congress's continued commitment to ensuring individuals can effectively exercise their right to vote through absentee voting, it would be an exceptional overreach to interpret broadly phrased statutes declaring a date for Election Day in a manner that denies the right to vote simply because they chose to cast their vote by absentee ballot.

of absentee balloting"—including when those ballots are received after the election—further counsels in favor of rejecting Plaintiffs' interpretation. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001).

In *Bomer*, the Fifth Circuit refused to broaden its reading of the Federal Election Day Statutes because it could not "logically" do so "without also finding that absentee balloting— which occurs in every state—violates federal law." 199 F.3d at 776. The Fifth Circuit insisted that

> Congress would [not] have allowed absentee balloting to occur under state laws if it attached the meaning to the federal election day statutes urged by [plaintiffs]. More than a century ago, some states began to allow absentee voting, and all states currently provide for it in some form; yet Congress has taken no action to curb this established practice. We are unable to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously well aware.

*Id.* (citation omitted); *see Keisling*, 259 F.3d at 1175. The same considerations apply here, where plaintiffs' interpretation of federal law would necessarily preclude the counting of any ballots received on any day other than the "one specific day" identified by Congress. Compl. ¶ 65.

Moreover, Congress has specifically tolerated post-election-day absentee ballot receipt deadlines. "Many states have post-Election Day absentee ballot receipt deadlines," yet "[d]espite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules." *Bost*, 2023 WL 4817073, at *11. It follows from the Fifth Circuit's controlling reasoning in *Bomer* that "Congress would [not] have allowed" post-election-day absentee ballot receipt "to occur under state laws if it attached the meaning to the federal election day statutes urged by [Plaintiffs]." 199 F.3d at 776.

Further, Congress has expressed its approval of post-election-day absentee ballot receipt deadlines through more recent legislation. *See Bomer*, 199 F.3d at 776–77 (looking to "[m]ore recent legislation," including the Uniformed and Overseas Citizens Absentee Voting Act of 1986

("UOCAVA"), 52 U.S.C. §§ 20301–20311, to "buttress[] [the court's] conclusion"). As noted by numerous courts, "even federal laws governing elections allow ballots received after Election Day to be counted." *Bost*, 2023 WL 4817073, at *11. For example, UOCAVA requires states to "process[] and accept[] . . . marked absentee ballots of absent overseas uniformed services voters" and to "facilitate the delivery" of such ballots "to the appropriate State election official" by "not later than the date by which an absentee ballot must be received in order to be counted in the election" under state law. 52 U.S.C. §§ 20302(a)(10); 20304(b)(1). In passing—and frequently amending[8]—UOCAVA, Congress has repeatedly recognized and approved of states setting their own receipt deadlines for absentee ballots, a substantial portion of which postdate Election Day.[9] *See, e.g.*, *Bognet*, 980 F.3d at 354 ("[M]any States also accept absentee ballots mailed by overseas uniformed servicemembers that are received after Election Day, in accordance with UOCAVA."); *Boockvar*, 238 A.3d at 368 n.23 (pointing to "the procedure under federal and state law allowing for the tabulation of military and overseas ballots received after Election Day" to explain why "allowing the tabulation of ballots received after Election Day does not undermine the existence of a federal Election Day"). Moreover, "the United States Attorney General often seeks court-ordered extensions of ballot receipt deadlines to ensure that military voters are not disenfranchised." *Bost*, 2023 WL 4817073, at *11 (citing United States's statement of interest).

Accordingly, Congress's longstanding approval of absentee voting and post-election-day ballot receipt deadlines discredits Plaintiffs' reading of the Federal Election Day Statutes and

---

[8] *See* Congressional Research Serv., *The Uniformed and Overseas Citizens Absentee Voting Act: Overview and Issues* (Oct. 26, 2016), https://crsreports.congress.gov/product/pdf/RS/RS20764 (detailing the numerous congressional amendments to UOVACA).

[9] *See* Federal Voting Assistance Program, *UOCAVA Voting in U.S. States*, Dep't of Defense, https://www.fvap.gov/info/interactive-data-center/states [https://perma.cc/5U5H-E6R2] ("Each U.S. state or territory sets its own deadlines for . . . [UOCAVA absentee] ballot return.").

requires dismissal of their complaint.

**B.**       **Counts II and III Fail to State a Claim for Relief Under the Constitution.**

Plaintiffs seek relief for vote dilution under the Fourteenth Amendment (Count III), and violations of the right to stand for office under the First and Fourteen Amendment (Count II). As an initial matter, because both counts depend on the same erroneous reading of the Federal Election Day Statutes, they fail for the same reasons explained in the previous section. *Supra* Section II.A. These unsupportable claims fail for additional reasons as well, requiring dismissal with prejudice.

First, Plaintiffs' allegation that the Receipt Deadline dilutes votes is entirely conclusory at best and misapplies well-established Supreme Court precedent. Vote dilution is a well-recognized theory for relief in particular contexts that are inapplicable here, such as under Section 2 of the Voting Rights Act for racial vote dilution, where an "electoral structure operates to minimize or cancel out minority voters' ability to elect their preferred candidates," *Allen v. Milligan*, 599 U.S. 1, 17–18 (2023) (cleaned up), and for violations of one-person, one-vote principles under the Fourteenth Amendment, *see Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019). Vote dilution "refers to the idea that each vote must carry equal weight. In other words, each representative must be accountable to (approximately) the same number of constituents." *Id.; see also Bognet*, 980 F.3d at 354–55 ("the Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently"). Because Plaintiffs' claim does not allege that Mississippi's Ballot Receipt Law weighs the vote of any voter or category of voters differently than another, the concept of vote dilution is inapplicable.

Further, focusing on Count III's "Violation of the Right to Vote," Plaintiffs have not— because they cannot—plead any injuries, because the Receipt Deadline does not take away from the ability to vote. To the contrary, the Receipt Deadline encourages voting on or before Election

Day. MISS. CODE ANN. § 23-15-637(1). As the *en banc* Fourth Circuit explained in a similar challenge, ballot receipt deadlines "[do] not in any way infringe upon a single person's right to vote: all eligible voters who wish to vote may do so on or before Election Day." *Wise*, 978 F.3d at 100. Nor do Plaintiffs allege any facts suggesting that they face any unreasonable burdens on their ability to vote, foreclosing a claim under the traditional *Anderson-Burdick* Fourteenth Amendment framework. *See Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (describing framework for analyzing degree of burden and weighing state interests). Under any recognized theory of harm to voters under the Fourteenth Amendment, Plaintiffs' "right to vote" claim fails as a matter of law.

As for Count II, alleging a violation of the right to stand for office, Plaintiffs' allegations bear no connection to such a claim because nowhere do they allege any basis apart from conclusory allegations that the Receipt Deadline injures any candidate's right to "stand for office." As another court recently held in dismissing a similar pleading, "Plaintiffs do not, in connection with their right to stand for office claim, explain why the Statute constitutes an invalid regulation of the times, places, and manner of federal elections." *Bost*, 2023 WL 4817073, at *13–14. The same reasoning applies here. Plaintiffs plead no underlying basis for why any harm from allegedly having to "to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns" (Compl. ¶ 72) unconstitutionally violates their right to stand for office, instead re-packaging their already conclusory claims.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss Plaintiffs' claims with prejudice.

DATED this 21st day of February, 2024.

/s/ Joshua Tom
Joshua Tom (Miss. Bar No. 105392)
AMERICAN CIVIL LIBERTIES UNION OF
MISSISSIPPI FOUNDATION
101 South Congress Street
Jackson, MS 39201
(601) 354-3408
JTom@aclu-ms.org

Greta Kemp Martin (Miss. Bar No. 103672)
DISABILITY RIGHTS MISSISSIPPI
5 Old River Place, Suite 101
Jackson, MS 39202
(601) 968-0600
gmartin@drms.ms

DECHERT LLP
Neil Steiner*
Julia Markham-Cameron*
Three Bryant Park,
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com
julia.markham-cameron@dechert.com

Respectfully submitted,

Davin M. Rosborough*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
slakin@aclu.org

Jacob van Leer*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, D.C. 20005
(212) 549-2500
jvanleer@aclu.org

DECHERT LLP
Angela Liu*
35 West Wacker Drive,
Suite 3400,
Chicago IL 60601
(312) 646-5813
angela.liu@dechert.com

DECHERT LLP
Christopher J. Merken*
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-2380
Christopher.merken@dechert.com

*Attorneys for Intervenor-Defendants Disability
Rights Mississippi and League of Women Voters
of Mississippi*

*Application for admission *pro hac vice*
forthcoming or pending