**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | |
|---|---|
| **REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; and MATTHEW LAMB** | **PLAINTIFFS** |
| **VS.** | **Civil Action No. 1:24-cv-25-LG-RPM** |
| **JUSTIN WETZEL,** *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, **et al.** | **DEFENDANTS** |

*and*

| | |
|---|---|
| **VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS** | **INTERVENOR DEFENDANTS** |

*consolidated with*

| | |
|---|---|
| **LIBERTARIAN PARTY OF MISSISSIPPI** | **PLAINTIFF** |
| **VS.** | **Civil Action No. 1:24-cv-37-LG-RPM** |
| **JUSTIN WETZEL,** *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, **et al.** | **DEFENDANTS** |

---

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF DEFENDANT SECRETARY OF STATE MICHAEL WATSON'S MOTION FOR SUMMARY JUDGMENT IN CONSOLIDATED LIBERTARIAN PARTY CASE**

---

## INTRODUCTION

In response to the COVID-19 pandemic in 2020, the Mississippi Legislature amended MISS. CODE ANN. § 23-15-637(1)(a) ("the Mississippi Statute") to provide that mail-in absentee ballots would be counted in state and federal elections if "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." 2020

H.B. 1521.  Whatever one may think of the policy embodied in the Mississippi Statute, Plaintiff's Complaint should be dismissed because the Mississippi Statute does not violate federal law.

Plaintiff's entire case rests on a fiction that Mississippi law permits mail-in absentee voters to "cast" their votes after Election Day.  But the Mississippi Statute allows no such thing.  That law requires that all mail-in absentee ballots must be *cast*—i.e., deposited in the mail and postmarked—*on or before Election Day*.  The Mississippi Statute does not harm Plaintiff or any of its members in any way.  It does not conflict with laws that set the election day for federal offices.  And it does not impair Plaintiff's members' rights to vote or to stand for office under the First and/or Fourteenth Amendments.  Plaintiff does not have standing to challenge the Mississippi Statute, and all of its claims fail on the merits.

At the threshold jurisdictional inquiry, Plaintiff lacks Article III standing to bring this lawsuit on behalf of either its members or itself.  To begin with, it has not established that it meets the requirements for associational standing.  First, Plaintiff's Complaint merely asserts a generalized grievance; it cannot show that its members have been (or will be) personally harmed in any concrete and particularized way by the counting of mail-in absentee ballots in federal elections within five business days after Election Day.  Second, as multiple federal courts have held in this context, claims of so-called "vote dilution" are too speculative and generalized to confer standing, there being no unequal weighing of ballots.  Third, any alleged "injury" to Libertarian Party member candidates is not sufficient to establish associational standing.  Significantly, Plaintiff has not shown—or even alleged—that if all mail-in absentee ballots were received and counted on or before Election Day, Libertarian Party candidates would win federal election contests in Mississippi that they would otherwise lose.

Nor has Plaintiff made the requisite showing for organizational standing.  It has not shown (or even alleged) that any specific projects or activities were curtailed, postponed, cancelled, or otherwise forgone as a result of any alleged additional post-election monitoring activities, or that such forgone activities impaired its ability to achieve its mission.  Nor has it shown that the Mississippi Statute has caused or will cause it to do anything it does not do already.

Because Plaintiff lacks standing, this Court lacks subject-matter jurisdiction, and Plaintiff's Complaint should be dismissed without reaching the merits.  Even if this Court finds that Plaintiff has standing, its claims nevertheless fail on the merits.  Federal law provides for an "election day" ("Election Day") for Presidential and Congressional elections.  *See* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. Mississippi law provides for absentee voting "either by mail or in person with a regular ballot." Miss. Code Ann. § 23-15-637(3).  Mail-in absentee ballots shall be counted only if they are "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election."  *Id.* § 23-15-637(1)(a).

As a matter of law, states are given wide discretion in establishing the time, place, and manner of electing their federal representatives; the *sole limitation* on that discretion is that state laws cannot *directly conflict* with federal election laws.  By requiring that mail-in absentee ballots shall only be counted if postmarked by Election Day, the Mississippi Legislature ensured that the Mississippi Statute operates harmoniously with federal statutes.  Under both statutory regimes, ballots are counted only if they are cast on or before Election Day.  Thus, there is no direct conflict between federal and state law.  That Mississippi law comports with federal law is further confirmed by the following:  a long history of Congressional acquiescence in state statutory schemes providing for post-Election Day receipt of mail-in absentee ballots; federal laws which themselves provide for post-Election Day receipt of absentee ballots; and consistency with federal statutory

objectives.  For all these reasons, Plaintiff's principal claim that the Mississippi Statute violates federal election statutes fails as a matter of law.

Plaintiff's constitutional claims fare no better.  As to Plaintiff's claim that the Mississippi Statute violates its member candidates' First and Fourteenth Amendment "right to stand for office," the Mississippi Statute only regulates the timing and manner of casting and counting mail-in absentee ballots.  It does not speak to candidate eligibility or qualification requirements *at all*. Because the challenged statute does not impair any right to stand for office, it does not infringe on any associated First Amendment rights as a matter of law.

As to Plaintiff's claim that the Mississippi Statute violates its members' Fourteenth Amendment "right to vote" by allegedly holding open voting after Election Day, nothing in the Mississippi Statute permits the counting of ballots that have been cast after Election Day.  Rather, to be counted at all, mail-in absentee ballots must be postmarked on or before Election Day. Finally, Plaintiff cannot establish a Fourteenth Amendment equal-protection violation where no voter is specifically disadvantaged by the counting of mail-in absentee ballots, and votes cast in person are likewise counted and weighed equally.  A voter has a right to cast a lawful ballot and have that lawfully-cast ballot counted.  Nothing in the Mississippi Statute infringes on that right. Accordingly, Plaintiff's Fourteenth Amendment "right to vote" claim likewise fails as a matter of law.

For these reasons and those set forth herein, Plaintiff's Complaint should be dismissed for lack of standing.  Alternatively, Plaintiff's claims fail on the merits, and the Court should enter summary judgment for Defendant.

## BACKGROUND

**Legal Background.**  This case involves the interplay between federal and state law bearing on the administration of Presidential and Congressional elections.  As a matter of law, "[t]he states have broad power to regulate the conduct of both federal and state elections."  *Goodloe v. Madison County Bd. of Election Comm'rs*, 610 F. Supp. 240, 242 (S.D. Miss. 1985).  The states' authority in this regard is constrained by "only one limitation:  the state system cannot directly conflict with federal election laws on the subject."  *Voting Integrity Proj., Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000), *cert. denied*, 530 U.S. 1230 (2000).

Federal law provides for an "election day" for Presidential and Congressional elections.  *See* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1.  Mississippi law provides for absentee voting "either by mail or in person with a regular ballot."  Miss. Code Ann. § 23-15-637(3).  Mail-in absentee ballots shall only be counted if they are "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election."  Miss. Code Ann. § 23-15-637(1)(a).  Mississippi law does not permit ballots to be cast after Election Day.

**Factual and Procedural Background.**  This case involves a facial challenge to Miss. Code Ann. § 23-15-637(1)(a) implicating a pure question of law, *viz.*, whether mail-in absentee ballots that are postmarked on or before Election Day but are received during the first five business days after Election Day must be disregarded as untimely under federal law.  Plaintiff is the Libertarian Party of Mississippi, which brings this suit on behalf of itself and its members, supporters, and candidates who "organize, select, and promote the election of party standard bearers and others that promote the Party's beliefs."  Dkt. #1 at 3, ¶ 13.

On February 5, 2024, Plaintiff filed its Complaint against Defendant and certain Harrison County election officials asserting three claims pursuant to 42 U.S.C. § 1983:  (1) **Count I,**

asserting that the Mississippi Statute violates "the Right to Vote" protected by the First and Fourteenth Amendments to the U.S. Constitution, as well as the Elections and Electors Clauses of the U.S. Constitution; (2) **Count II**, asserting that the Mississippi Statute violates "the Right to Stand for Office" protected by the same constitutional provisions; and (3) **Count III**, asserting that the Mississippi Statute violates 3 U.S.C. § 1 and 2 U.S.C. §§ 1 and 7. Dkt. #1 at 10-12, ¶¶ 57-81. Plaintiff seeks declaratory and injunctive relief to prevent the counting of mail-in absentee ballots received during the five-business day period after Election Day. *See id.* at 13.

As noted above, the Mississippi Legislature enacted the challenged statutory language as an amendment necessitated by the COVID-19 pandemic in 2020. Defendant Secretary of State Michael Watson ("Defendant") had no involvement in debating, voting on, or enacting the aforementioned amendment. Plaintiff has sued him here only because it alleges in its Complaint that he "is responsible for receiving certified election results from each county" and "is responsible for tabulating results statewide or by district, whatever the case may be, which represent the final results of federal elections." *Id.* at 4, ¶ 20.

On March 5, 2024, this Court entered a briefing schedule providing for the adjudication of this case via cross-motions for summary judgment. Dkt. #38. In accordance with the Court's Order, Defendant timely files the instant motion for summary judgment.

### STANDARD FOR SUMMARY JUDGMENT

**Lack of standing.** Subject-matter jurisdiction fails where the plaintiffs lack Article III standing. *Stallworth v. Bryant*, 936 F.3d 224, 232 (5th Cir. 2019). "When the defendant moves for summary judgment because of lack of standing, . . . the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) (quoting *Cramer v.*

*Skinner*, 931 F.2d 1020, 1025 (5th Cir. 1991)) (quotation marks omitted).  "The moving party is not required to negate all elements of the non-moving party's claims, therefore the motion should be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56([a]), is satisfied."  *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004) (quotation marks omitted).  A grant of summary judgment predicated on lack of standing results in a dismissal without prejudice.  *See id.* at 383, 386.

 **Merits.**  "Summary judgment is appropriate where the only issue before the court is a pure question of law."  *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).  While all "'evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant,'" summary judgment is warranted "'when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.'"  *Harness v. Watson*, 47 F.4th 296, 303 (5th Cir. 2022).  When parties file cross-motions for summary judgment, the Court should "review each party's motion independently."  *Colony Ins. Co. v. First Mercury Ins. Co.*, 88 F.4th 1100, 1106-07 (5th Cir. 2023).

## ARGUMENT

## I.  PLAINTIFF LACKS STANDING TO BRING THIS LAWSUIT.

 Article III of the U.S. Constitution requires an actual case or controversy as a necessary predicate to subject-matter jurisdiction—that is, the plaintiff must have standing.  *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  To maintain any lawsuit in federal court, plaintiffs must establish Article III standing by showing injury in fact, traceability, and redressability.  *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560-61 (1992).  In the absence of *any one* of these requisite elements, the plaintiffs lack Article III standing, and the action must be dismissed.  *See Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001).

Plaintiff appears to claim that it has both associational and organizational standing. It alleges that it brings this suit to protect its own rights and the rights of "its members, supporters, and candidates . . . to join together and associate in support of their common political beliefs." Dkt. #1 at 3, ¶ 13.  For purposes of Article III standing, "[a]n association or organization can establish an injury in fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'"  *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).  "'Associational standing' is derivative of the standing of the association's members" and requires that "they have standing and that the interests the association seeks to protect" are "germane to its purpose."  *Id.*  "By contrast, 'organizational standing' does not depend on the standing of the organization's members."  *Id.*  Rather, "[t]he organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'"  *Id.*  Plaintiff has not shown that it has standing to bring this lawsuit under either of these theories.

**A.   Plaintiff has not made the requisite showing for associational standing.**

To establish associational standing, a plaintiff must show that its members would otherwise have standing to sue in their own right.  *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 781 (5th Cir. 2024).  In keeping with this requirement, an associational plaintiff must show that its members independently meet the Article III standing requirements; allegations that are neither concrete nor imminent but are merely speculative will not suffice to support associational standing.  *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010).  *See also Miller v. Hughes*, 471 F. Supp. 3d 768, 777 (W.D. Tex. 2020); *Am. Civil Rights Union v. Martinez-Rivera*,

166 F. Supp. 3d 779, 802-03 (W.D. Tex. 2015).  At the summary-judgment stage, associational standing fails where "there is no evidence in the record showing that a specific member" of the entity plaintiff has experienced the alleged harm.  *See City of Kyle*, 626 F.3d at 237.  Specifically, "at the summary judgment stage, to establish associational standing, an organization must name specific members who would be, or have been, directly affected by the allegedly illegal activity and provide affidavits with specific facts supporting its allegations." *Perez v. Texas*, Civil Action Nos. 11–CA–360–OLG–JES–XR, *et al.*, 2011 WL 9160142, at *9 (W.D. Tex. Sept. 2, 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-500 (2009)); *Lujan*, 504 U.S. at 561.

In the case at bar, Plaintiff has not shown that its members would have standing to sue in their own right.  To the extent Plaintiff contends that its members—i.e., voters, candidates, or others—have standing due to an alleged conflict between the Mississippi Statute and federal law or based on a "vote dilution" theory, those arguments should be rejected out of hand. It is well settled that such generalized grievances do not constitute an injury in fact sufficient to establish Article III standing. To the extent Plaintiff argues that standing is conferred on its members who are current or prospective candidates for elected office, that argument likewise fails because the alleged "injury" to such candidates' purported interest in accurate vote-tallying is inherently speculative and is neither concrete nor particularized.

1. **Plaintiff cannot show any concrete and particularized injury—or anything beyond a generalized grievance—to its members from the counting of mail-in absentee ballots received within five business days after Election Day.**

"Abstract injury is not enough" to establish standing.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).  Rather, a plaintiff must show an invasion of a legally-protected interest that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks omitted).  For an injury in fact to be "particularized," it

"must affect the plaintiff[s] in a personal and individual way." *Id.* at 560 n.1. *See also Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218-19 (5th Cir. 2001) (same). For an injury in fact to be actual or imminent, a plaintiff must show that an alleged injury is "certainly impending," not merely possible. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). *See also Attala County, Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022).

As a general rule, standing cannot be predicated on "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). *See also Apache Bend Apartments, Ltd. v. U.S. ex rel. I.R.S.*, 987 F.2d 1174, 1178 (5th Cir. 1993). It is well settled that a plaintiff cannot show a concrete and particularized injury sufficient for Article III standing by showing a mere "general interest common to all members of the public." *Ex parte Levitt*, 302 U.S. 633 (1937). As the Fifth Circuit recently reaffirmed, an "undifferentiated, generalized grievance about the conduct of government" does not satisfy Article III's injury-in-fact requirement. *See Lutostanski v. Brown*, 88 F.4th 582, 586 (5th Cir. 2023) (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007)). Where the plaintiff asserts a generally-available grievance about government, claiming only "harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—[he] does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74.

Applying these precepts to a claim that Colorado state law violated the federal Elections Clause, U.S. CONST., art. I, § 4, cl. 1, the U.S. Supreme Court held that the plaintiffs lacked standing because such an alleged conflict between state and federal law "is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has] refused to countenance in the past." *Lance v. Coffman*, 549 U.S. 437, 442 (2007). A federal

district court in Illinois recently applied these same principles in holding that the plaintiffs (who were former/prospective candidates and registered voters) lacked standing to challenge Illinois' comparable mail-in absentee ballot receipt deadline statute as violating the U.S. Constitution and the same federal statutes at issue in this case (*viz.*, 2 U.S.C. §§ 1, 7; and 3 U.S.C. § 1). *Bost v. Ill. State Bd. of Elections*, No. 22-cv-02754, 2023 WL 4817073, at *4-6 (N.D. Ill. July 26, 2023).

In the case at bar, the counting of mail-in absentee ballots received within five business days after Election Day does not constitute a concrete and particularized injury to Plaintiff's members and thus does not confer associational standing on Plaintiff to sue on their behalf. Plaintiff alleges, *inter alia*, that the Mississippi Statute "conflicts with and is superseded by the Time regulations chosen by Congress under" 2 U.S.C. §§ 1,7 and 3 U.S.C. § 1. *See* Dkt. #1 at 12, ¶¶ 75-77. Further, Plaintiff asserts that "its members, supporters, and nominees for federal office are entitled to have election results certified with only legal, qualified votes received in compliance with the Time regulations set by Congress in the federal Election Day statutes." *Id.* at 7, ¶ 40.

While Plaintiff alleges generally that the Mississippi Statute violates federal law, it "do[es] not specify how [its members], individually, are or will be harmed in a concrete and particularized way by the [Mississippi] Statute's alleged facial conflict with [federal law]." *Bost*, 2023 WL 4817073 at *5. Like the plaintiffs in *Bost*, Plaintiff does not plead "specific, personal harms" affecting its members but "merely state that they 'have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional [and federal] rights unless Defendants are enjoined from implementing and enforcing [Section 23-15-637(1)(a)].'" *Id. See also* Dkt. #1 at 10, ¶ 63. Because Plaintiff has not shown that the counting of mail-in absentee ballots received within five days after Election Day actually harms its members in any "personal and individual

way," *Lujan*, 504 U.S. at 560 n.1, it cannot show any concrete and particularized injury to its members and thus cannot establish associational standing.

At best, any "harm" purportedly emanating from an alleged conflict between the Mississippi Statute and federal law "is the kind of generalized grievance that is insufficient to confer standing." *Bost*, 2023 WL 4817073 at *5. That is, it implicates "a general interest that every citizen shares in the proper application of the Constitution and the laws of the United States." *Id.* (citing *Lujan*, 504 U.S. at 560-61). "Seeking relief for this grievance no more 'directly and tangibly benefits [Plaintiff's members] than it does the public at large' and thus 'does not state an Article III case or controversy.'" *Id.* (quoting *Lujan*, 504 U.S. at 573-74). This alleged conflict between state and federal law is the same kind of "injury" that the Supreme Court found "too undifferentiated to confer standing in *Lance*," *supra*. *See Bost*, 2023 WL 4817073 at *6.

For all these reasons, Plaintiff cannot demonstrate that its members will experience any concrete and particularized injury; therefore, Plaintiff cannot establish associational standing.

**2. Allegations of "vote dilution" resulting from the counting of allegedly unlawful mail-in absentee ballots are insufficient to confer standing.**

Plaintiff further alleges that its "members who cast timely and valid votes for [Libertarian Party] nominees [for federal office in Mississippi] by Election Day will have their votes diluted by illegal and invalid ballots received in violation of the federal Election Day statutes." Dkt. #1 at 7, ¶ 36. Plaintiff alleges that this alleged "dilut[ion]" violates its members' "[r]ight to [v]ote" under the First and Fourteenth Amendments to the U.S. Constitution. *See id.* at 10, Count I Heading and ¶¶ 60-62. This allegation of injury presupposes that the Mississippi Statute does indeed violate federal law, which Defendant disputes. *See infra.* However, even assuming for the sake of argument that ballots received after Election Day are unlawful, the counting of such ballots—which have been mailed and postmarked on or before Election Day—does not "dilute"

12

the vote of any particular, individual voter.  An in-person voter's vote for a given candidate counts the same whether mail-in absentee ballots are counted after Election Day or not.  No lesser weight or value is afforded an in-person voter's vote based on the counting of allegedly "unlawful" mail-in absentee ballots.  Thus, the counting of such "unlawful" ballots is—at best for Plaintiff—a generalized grievance shared by all Mississippi voters, and not the sort of concrete and particularized injury needed to supply standing.

Multiple courts have held that claims of so-called "vote dilution" in the context of unlawful ballots are too speculative and generalized to confer standing.  For instance, just last summer, a federal district court in Illinois—considering a challenge to that state's comparable mail-in absentee ballot receipt deadline statute—held that the plaintiffs lacked standing to sue on a "vote dilution" theory.  *Bost*, 2023 WL 4817073 at *6-8.  In *Bost*, the statute at issue allowed mail-in ballots "cast in federal elections to be received and counted for up to 14 days after Election Day, so long as the ballot was postmarked or certified on or before Election Day."  *Id.* at *2.  The plaintiffs argued that the counting of such ballots after Election Day diluted their votes, thereby creating an injury sufficient to confer standing.  *Id.* at *6.  The district court rejected that argument, finding that the plaintiffs had not "allege[d] an injury beyond the general grievance that all Illinois voters would share" if the challenged ballots were counted.  *Id.* at *7.  The district court thus concluded that the plaintiffs' allegations of "vote dilution" were "too speculative and generalized to constitute an injury in fact for the purposes of Article III standing."  *Id.* at *8.

In 2020, a federal district court in North Carolina—applying similar reasoning—held that voters asserting ballot-fraud claims lacked Article III standing to sue on a "vote dilution" theory.  *Moore v. Circosta*, 494 F. Supp. 3d 289, 312-13 (M.D.N.C. 2020).  In *Moore*, the state law in question allowed mail-in absentee ballots "to be received [and counted] up to nine days after

Election Day if they [were] postmarked on Election Day." *Id.* at 314.  The district court reasoned that in "vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted," the harm alleged "is unduly speculative and impermissibly generalized because all voters in a state are affected." *Id.* at 312.  "[T]he notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing." *Id.*

Along the same lines, a federal district court in Wisconsin held in 2020 that a voter alleging wide-spread ballot fraud lacked Article III standing to sue on a "vote dilution" theory. *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020).  In *Feehan*, the plaintiff sought an order requiring Wisconsin's governor to decertify the results of the 2020 Presidential election and declare President Donald Trump the winner. *Id.* at 601-02.  In alleging that Wisconsin election officials facilitated voter fraud by enacting regulations and issuing guidance favoring Democratic absentee voters over Republican voters, the plaintiff argued that his right to vote had been diluted, thereby "injuring" him and affording him standing. *See id.* at 608.  The district court rejected that argument, finding that in basing his standing theory on so-called "vote dilution," the plaintiff failed to allege that "as a voter, he ha[d] suffered a particularized, concrete injury sufficient to confer standing." *Id.*  Rather, the plaintiff "show[ed] no more than a generalized grievance common to any voter," which was insufficient to establish Article III standing. *Id.*

Here, just as in *Moore*, *Feehan*, and *Bost*, *supra*, Plaintiff asserts claims of "vote dilution" predicated on the counting of allegedly unlawful mail-in absentee ballots.  Like the allegations of the plaintiffs in those cases, Plaintiff's allegations of "vote dilution" in the instant case fail to show that any member of the Libertarian Party has experienced, or will experience, any particularized, concrete injury as a result of counting mail-in absentee ballots received no later than five business

14

days after Election Day.   At best, Plaintiff has alleged a generalized grievance shared by all Mississippi voters.   For the same reasons articulated by the district courts in *Bost*, *Moore*, and *Feehan*, *supra*, this Court should likewise reject any theory of associational standing predicated on so-called "vote dilution."

3. **Allegations of harm to Libertarian Party member candidates are insufficient to confer associational standing.**

Plaintiff alleges that its "nominees suffer a concrete and particularized injury from vote tallies that are inaccurate because of late-arriving and invalid ballots."   Dkt. #1 at 9, ¶ 53.   Again, this allegation of injury presupposes that counting ballots that are postmarked on or before Election Day but received thereafter violates federal law, which Defendant disputes.   *See infra*.   However, even assuming for the sake of argument that ballots received after Election Day are invalid, Plaintiff cannot show that the counting of such ballots has caused, or will cause, the loss of any federal election by a Libertarian Party candidate.   The alleged injury to its member candidates— an inaccurate vote tally— is therefore insufficient to establish associational standing

Plaintiff's candidates' alleged injury from potentially inaccurate vote tallies is neither concrete nor particularized.   For Libertarian Party candidates to have standing "to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to [their] detriment."   *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 351-52 (3d Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).   That is, Plaintiff would have to show that if all mail-in absentee ballots were received and counted on or before Election Day (i.e., the remedy Plaintiff seeks), Libertarian Party candidates would win federal election contests that they would otherwise lose.   *Cf. Miller*, 471 F. Supp. 3d at 777 (where associational plaintiff fails to allege that any candidate member "has lost or will lose an election" as a result of a challenged balloting statute,

plaintiff's "allegations are insufficient for associational standing because the alleged injury is neither concrete nor imminent").[1]  Not only has Plaintiff not made that showing, it does not even allege that any of its member candidates might win a federal election if the Mississippi Statute were enjoined.  Rather, Plaintiff merely claims that because its member candidates "receive[] a relatively lower proportion" of their votes from absentee ballots, their "electoral performance" will be "seen as less impressive" if mail-in absentee ballots received after Election Day are counted.  Dkt. #1 at 9, ¶ 54, 55.  Having a less "impressive" performance in an election loss is  not a concrete and particularized injury sufficient to confer standing on a political candidate.

To the extent Plaintiff would argue that it has associational standing on a theory of member candidates' "competitive standing" pursuant to *Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006), that argument is misplaced.  In *Benkiser*, the Fifth Circuit held that a specific Democratic Party candidate actively locked in a congressional race would have had standing to challenge the Republican Party's disqualification and attempted replacement—several months before the election—of the candidate's Republican opponent, an action which "threaten[ed] [the Democratic candidate's] election prospects and campaign coffers."  *Benkiser*, 459 F.3d at 587.  On that basis, the Fifth Circuit held that the Texas Democratic Party had associational standing.  *Id.*

Unlike the Democratic Party in *Benkiser*, Plaintiff does not allege that any specific candidate is harmed by the concrete action of an opposing political party involving a competing candidate in a specific race.  Rather, Plaintiff alleges that the Mississippi Statute—a generally-

---

[1] Plaintiff alleges that Mississippi received 22,221 absentee ballots during the 2022 General Election, and 142,591 absentee ballots during the 2020 General Election. Dkt. #1 at 6, ¶¶ 29-30.  Of course, these figures include both mail-in absentee ballots (received both before and in the five business days after Election Day) and absentee ballots cast in person.  *See* MISS. CODE ANN. § 23-15-637(3) (absentee ballots may be cast "either by mail or in person with a regular paper ballot").  As Plaintiff correctly acknowledges, only a small fraction of these absentee ballots were both mailed and received after Election Day.  *See* Dkt. #1 at 6, ¶ 32 (alleging that "as many as 1.7% of votes case in 2020 were received after Election Day").

applicable absentee ballot law—generally harms all of its candidates for Congressional and Presidential races.  Because Plaintiff has not alleged any specific, particularized injury caused by a competing political party that threatens any of their candidate members individually in any particular election, *Benkiser* is distinguishable and has no application here.  *See Taitz v. Democratic Party of Miss.*, Civil Action No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at *19-20 (S.D. Miss. Mar. 31, 2015) (holding that *Benkiser's* "competitive standing" rationale did not apply where plaintiffs could not show that "they ha[d] a particularized injury").  *See also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1251 (11th Cir. 2020) (distinguishing *Benkiser* as inapplicable where political party did not allege that state ballot order statute "has affected or will affect any particular candidate in any particular election").

Because Plaintiff's candidates' alleged injuries are speculative and neither concrete nor particularized, Plaintiff cannot establish associational standing arising from its members who are candidates.  For all these reasons, associational standing fails.

**B.**  **Plaintiff has not made the requisite showing for organizational standing.**

Under the theory of "organizational standing," an organization may establish injury in fact by showing that it diverted resources to counteract the defendants' conduct.  *City of Kyle*, 626 F.3d at 238.  "However, an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct."  *El Paso County, Tex. v. Trump*, 982 F.3d 332, 333 (5th Cir. 2020).  "Rather, the Article III injury comes when that diversion of resources concretely and 'perceptibly impairs' the organization's ability to carry out its purpose."  *La. Fair Housing Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) (cleaned up).  "Put differently, the 'perceptible impairment' to an organization's ability to carry out its mission, not the 'drain on the organization's resources,' is the 'concrete and demonstrable

injury' for organizational standing." *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)) (cleaned up).

To make the requisite showing of harm, the organization must identify specific projects that were curtailed, postponed, cancelled, or otherwise forgone as a result of the organization's efforts to counteract the defendant's conduct. *See, e.g., id.* at 353-54; *Tenth Street Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020); *City of Kyle*, 626 F.3d at 238. The organization must "explain how any curtailment of these projects perceptibly impaired its ability to achieve its mission." *See La. Fair Housing Center*, 82 F.4th at 354. *See also Jacobson*, 974 F.3d at 1250-51 (reaffirming that to establish organizational standing, plaintiff must show what activities organization "would divert resources away *from* in order to spend additional resources on combatting" challenged law) (emphasis in original). Further, "the organization's reaction to the allegedly unlawful conduct must differ from its routine activities." *El Paso County*, 982 F.3d at 344. *See also La. Fair Housing Center*, 82 F.4th at 352-54.

In the case at bar, Plaintiff has not shown the requisite diversion of resources to establish organizational standing. Plaintiff alleges that "[b]y extending the [mail-in] ballot receipt deadline, Mississippi increases expenses and other resources for Plaintiff to monitor post-election canvassing." Dkt. #1 at 8, ¶ 47. Plaintiff claims that the "receipt of absentee ballots after Election Day inhibits [its] ability to monitor counties' receipt of those ballots, as it must sparingly use limited resources during the post-election certification process." *Id.* at 8, ¶ 49. It further alleges that, "[a]fter the passage of [the Mississippi Statute], it has been even more expensive and difficult for Plaintiff to monitor canvassing." *Id.* at 9, ¶ 49.

Plaintiff's allegations are insufficient to meet the requirements of organizational standing for two reasons. First, Plaintiff has not shown (or even alleged) that any specific projects or

activities were curtailed, postponed, cancelled, or otherwise forgone as a result of its alleged additional post-election monitoring activities.  Nor has Plaintiff shown how any such forgone activities concretely and perceptibly impaired the Libertarian Party's ability to achieve its mission. This deficiency alone is fatal to any claim of organizational standing.

Second, Plaintiff has not shown how any additional post-election monitoring activities differ from its routine activities.  The national Libertarian Party describes its purposes as "electing Libertarians to public office to move public policy in a libertarian direction," "nominating candidates for President and Vice-President of the United States, and supporting Party and affiliate party candidates for political office."  Libertarian Party Bylaws, Convention Special Rules, and Judicial Committee Rules of Appellate Procedure, Art. 2 (Ex. 1).  Similarly, Plaintiff, an affiliate of the national Libertarian Party, "promote[s] the election of party standard bearers and others that promote the Party's beliefs." *See* Dkt. #1 at 3, ¶ 13.  Monitoring the post-election certification process thus "fall[s] within the ambit of [Plaintiff's] routine activities."  *See La. Fair Housing Center*, 82 F.4th at 354.  Indeed, Plaintiff admits that it already allocated "funds and resources" to "the post-election certification process" before the passage of the Mississippi Statute, and that the Statute has merely made it "more expensive and difficult for Plaintiff to monitor canvassing."  *See* Dkt. #1 at 8, ¶ 49.  Plaintiff has not shown that the Mississippi Statute has caused or will cause it to do anything it does not do already, *viz.*, work within the bounds of current election law in an effort to get its candidates elected.  *Cf. Clark v. Edwards*, 468 F. Supp. 3d 725, 748 (M.D. La. 2020) ("The law is not static.  It cannot follow that every change in voting laws that causes voting advocacy groups to 'check and adjust' is an injury.").  For all these reasons, Plaintiff cannot establish organizational standing.

To the extent Plaintiff would argue that it has organizational standing pursuant to *Benkiser*, 459 F.3d at 586-87, on a theory of economic loss or harm to Libertarian Party electoral prospects, those arguments are misplaced. *Benkiser* is distinguishable for the same reasons set forth *supra* in relation to associational standing. Unlike *Benkiser*, this is not a case where Plaintiff is forced to spend money to combat the actions of an opposing political party causing concrete harm to an individual candidate months before a particular election. *See Benkiser*, 459 F.3d at 586 (holding that Democratic Party's "need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame" was sufficient to establish organizational standing) (quotation marks and citation omitted). Further, the notion that the threatened loss of political power can constitute "a concrete and particularized injury sufficient for standing purposes," *Benkiser*, 459 F.3d at 587, has no application in a case asserting generalized harm to partisan interests. Plaintiff asserts "group political interests, not individual legal rights." *Gill v. Whitford*, 138 S. Ct. 1916, 1933, 585 U.S. --- (2018). "[T]his Court is not responsible for vindicating generalized partisan preferences." *Id.* On the contrary, this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Id.*

Because Plaintiff has not shown that any diversion of resources to non-routine activities concretely and perceptibly impairs its ability to carry out its mission, it cannot establish organizational standing, and this Court thus lacks subject-matter jurisdiction.

## II. PLAINTIFF'S CLAIMS FAIL ON THE MERITS.

As set forth above, Plaintiff lacks standing to bring this lawsuit. If this Court agrees, it lacks subject-matter jurisdiction and cannot reach the merits. Rather, its only course is to dismiss Plaintiff's Complaint in its entirety. If, however, this Court determines that Plaintiff does have

standing, all of its claims nevertheless fail on the merits, and the Court should enter summary judgment for Defendant, thereby disposing of Plaintiff's Complaint in its entirety.

Assuming that Plaintiff can establish standing—which Defendant contends it cannot, *see supra*—Plaintiff's merits case turns on a pure question of law:  whether mail-in absentee ballots that are postmarked on or before Election Day but are received during the first five business days after Election Day should be disregarded as untimely under federal law.  Because Plaintiff cannot show that the Mississippi Statute violates federal statutory law or the United States Constitution, its claims cannot survive summary judgment.

### A.   <u>As to Count I, the Mississippi Statute does not violate the First or Fourteenth Amendments.</u>

In Count I of the Complaint, Plaintiff alleges that the Mississippi Statute "requires counties to hold open voting and count ballots that have been cast and received after Election Day in violation of 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1."  Dkt. #1 at 10, ¶ 58.  Plaintiff asserts that these "untimely and illegal ballots . . . dilute the value of timely ballots cast and received on or before Election Day," thus violating its members' and supporters' "[r]ight to [v]ote."  *Id.* at 10, Count I Heading and ¶ 60.  Plaintiff thereupon claims that the Mississippi Statute violates the First and Fourteenth Amendments to the U.S. Constitution.  *Id.* at 10, ¶ 62.  This claim likewise fails on the merits.

First, Plaintiff's Fourteenth Amendment claim mischaracterizes the plain language of the Mississippi Statute.  Nothing in the Mississippi Statute permits the counting of "ballots that have been *cast* . . . after Election Day" as Plaintiff alleges.  *Id.* at 10, ¶ 58 (emphasis added).  To the contrary—the Legislature expressly provided that to be counted, mail-in absentee ballots "must be postmarked *on or before the date of the election*."  Miss. Code Ann. § 23-15-637(1)(a) (emphasis added).  That is, they must be "cast" by Election Day.  *See* Part II.C., *infra*.  Further, Plaintiff has

not shown any specific instances of allegedly "fraudulent" voting.  And Plaintiff's allegations of "illegitimate" voting presuppose that the Mississippi Statute violates federal statutory law, which—as set forth *infra*—it does not.

Further, Plaintiff has not established a valid legal or factual predicate for a Fourteenth Amendment claim premised on alleged "vote dilution."  An equal-protection claim predicated on a theory of "vote dilution" requires a point of comparison.  *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020).  In racial gerrymandering cases, for example, "vote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts."  *Id.*  By contrast here, "[i]f ballots cast by mail and postmarked by Election Day are counted, no single voter 'is specifically disadvantaged,' even if the votes counted in compliance with the [Mississippi] Statute have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'"  *Bost*, 2023 WL 4817073 at *12 (quoting *Wood*, 981 F.3d at 1314).  "A voter is not guaranteed to have their vote be decisive or to have their vote be for the ultimate winner of an election.  On the contrary, a voter has a right to cast a lawful ballot and have that lawfully cast ballot counted.  Nothing in the [Mississippi] Statute infringes on that right."  *See id.*  Simply stated, Plaintiff's members' "votes here are not diluted by other valid, lawfully cast votes."  *See id.*

Furthermore, "vote dilution under the Equal Protection Clause is concerned with votes being weighed differently."  *Bognet*, 980 F.3d at 355.  "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).  Plaintiff does not allege any "arbitrary and disparate treatment" in the way votes are counted as between in-person voters and mail-in absentee voters.  To the extent Plaintiff argues that the Mississippi Statute creates two groups of voters—*viz.*, in-person voters and mail-in absentee voters—"a vote cast by a voter in the

[latter] group counts not one bit more than the same vote cast by the [former] group—no matter what set of scales one might choose to employ." *Bognet*, 980 F.3d at 359. "It is passing strange to assume that one of these voters would be denied 'equal protection of the laws' were *both* votes counted." *Id.* (emphasis in original). Here, as in *Bost*, "[a]ll ballots cast by Election Day are treated the same under the Statute's plain text. Untimely ballots, *i.e.*, those not cast on or by Election Day, are not counted." *Bost*, 2023 WL 4817073 at *13. There is no equal-protection violation here.

Because there is no equal-protection violation, there can be no First Amendment violation. This is so because "the First Amendment provides no greater protection for voting rights than is otherwise found in the Fourteenth Amendment." *Hand v. Scott*, 888 F.3d 1206, 1211 (11th Cir. 2018); *see also Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1359 (4th Cir. 1989) ("In voting rights cases, the protections of the First . . . Amendment[] do not in any event extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.") (internal quotation marks omitted). For these reasons, Defendant is entitled to summary judgment on Count I.

**B. As to Count II, the Mississippi Statute does not violate any right to stand for office.**

In Count II of its Complaint, Plaintiff asserts that the Mississippi Statute "depriv[es] Plaintiff of rights protected under the First and Fourteenth Amendment [*sic*] to the U.S. Constitution." Dkt. #1 at 11, ¶ 66. Specifically, Plaintiff asserts that the Mississippi Statute "[v]iolat[es] . . . the [r]ight to [s]tand for [o]ffice" by "forcing Plaintiff to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their [sic] campaigns." *Id.* at 11-12, Count II heading and ¶ 66. This claim likewise fails on the merits.

"While the right to run for public office is protected by the First Amendment, it is not an absolute right." *Phillips v. City of Dallas*, 781 F.3d 772, 779 (5th Cir. 2015) (quotation marks omitted). "There is no fundamental right to be a candidate." *Hatten v. Rains*, 854 F.2d 687, 693 (5th Cir. 1988). *See also Williams v. Delany*, Civil Action No. 16-93-SDD-EWD, 2016 WL 4253972, at *5 (M.D. La. June 28, 2016) (reaffirming *Hatten*). And as a matter of law, "[t]he states have broad power to regulate the conduct of both federal and state elections." *Goodloe v. Madison County Bd. of Election Comm'rs*, 610 F. Supp. 240, 242 (S.D. Miss. 1985). Where, on its face, a state statute does nothing more than regulate the times, places, and/or manner of holding elections—as authorized by the Elections Clause, *supra*—the state statute "cannot be said to infringe on the right to stand for office." *Bost*, 2023 WL 4817073 at *13.

In the case at bar, the challenged Mississippi Statute only regulates the timing and manner of casting and counting mail-in absentee ballots. *See* MISS. CODE ANN. § 25-15-637(1)(a). It does not speak to candidate eligibility or qualification requirements *at all*. *See id.* Accordingly, the statute cannot be read as a legal impediment to any prospective candidate's placement on any given ballot. "Spending time and money on campaigning is an inevitable feature of running for office, and Plaintiffs do not contend that the extra time and money they might have to spend due to the Statute prevents them from standing for office at all." *Bost*, 2023 WL 4817073 at *14. Because the Mississippi Statute does not impair any right to stand for office, it does not infringe on any associated First Amendment rights as a matter of law. For all these reasons, the Court should enter summary judgment for Defendant as to Count II.

### C. As to Count III, the Mississippi Statute does not violate federal law.

In Count III of their Complaint, Plaintiff asserts that the Mississippi Statute "conflicts with and is superseded by the Time regulations chosen by Congress under" 2 U.S.C. §§ 1, 7 and 3

U.S.C. § 1, and thus "violates the plenary authority given to Congress" by the Elections and Electors Clauses of the Constitution to regulate the time for holding congressional and presidential elections.  *See* Dkt. #1 at 12, ¶¶ 75-76.  According to Plaintiff, the Mississippi Statute "requires counties to hold open voting and count ballots that have been cast and received after Election Day in violation of 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1."  Dkt. #1 at 10, ¶ 58.

Plaintiff's framing of this claim is itself a mischaracterization of Mississippi law.  Nothing in the Mississippi Statute permits the counting of "ballots that have been *cast* . . . after Election Day" as Plaintiff alleges.  Dkt. #1 at 10, ¶ 58 (emphasis added).  To the contrary—the Legislature provided that to be counted, mail-in absentee ballots "must be postmarked on or before the date of the election."  MISS. CODE ANN. § 23-15-637(1)(a).  That is, they must be "cast" by Election Day. There is no support for the notion that an absentee ballot deposited in the mail has not yet been "cast," or that it is considered "cast" only when received.  It is axiomatic that a mail-in ballot is cast when it is mailed, not when it is received.  *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 140 (5th Cir. 2020) (the traditional option . . . for *casting* a mail-in ballot [is] *mailing* it) (emphasis added).  *Cf. Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) (drawing distinction between "the date by which [mail-in] ballots may be *cast* by voters" and the date they must be "*received* by the municipal clerks") (emphasis added). For this reason and those that follow, this claim fails on the merits.

The Elections Clause of the U.S. Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ."  U.S. CONST. art. I, § 4, cl. 1.  The Constitution thus defaults to the States to determine "the mechanics of congressional elections . . . but only so far as Congress declines to

preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997).  "[T]he Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States.   [Citation omitted.]   [T]he regulations made by Congress are paramount to those made by the State legislature; and *if they conflict therewith*, the latter, *so far as the conflict extends*, ceases to be operative." *Id.* (quotation marks omitted) (emphasis added).

Pursuant to the Elections Clause (and its Executive Branch counterpart, the Electors Clause, U.S. CONST. art. II, § 1, cl. 3), Congress acted to set the date of the biennial election for federal offices.  *Id.  See* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1.  Title 2 U.S.C. § 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."  2 U.S.C. § 7.  This provision works in conjunction with 2 U.S.C. § 1 (setting the same rule for electing Senators under the Seventeenth Amendment) and 3 U.S.C. § 1 (doing the same for selecting Presidential electors).  *See Foster*, 522 U.S. at 69-70.

In keeping with the foregoing, "states are given, and in fact exercise a wide discretion" in establishing the time, place, and manner of electing their federal representatives.  *See United States v. Classic*, 313 U.S. 299, 311 (1941).  Accordingly, the Fifth Circuit has expressly recognized that "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has *only one limitation*:  the state system cannot *directly conflict* with federal election laws on the subject."  *Voting Integrity Proj., Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000), *cert. denied*, 530 U.S. 1230 (2000) (emphasis added).

The challenged Mississippi Statute does not directly conflict with 2 U.S.C. §§ 1, 7 and/or 3 U.S.C. § 1.  Together, these federal statutes establish an "election day" for Presidential and

Congressional elections.  The U.S. Supreme Court has defined "election" to mean the "*final choice*" of a federal officer "by the duly qualified electors."  *Newberry v. United States*, 256 U.S. 232, 250 (1921) (emphasis added).  "From time immemorial an election to public office has been in point of substance no more and no less than the *expression* by qualified electors of their *choice* of candidates."  *Classic*, 313 U.S. at 318 (emphasis added).  In 1997, the Supreme Court defined "election" as "the combined actions of voters and officials meant to make a *final selection* of an officeholder."  *Foster*, 522 U.S. at 71 (emphasis added).  Notably, the *Foster* Court declined to "par[e] the term 'election' . . . down to the definitional bone" and expressly left "room for argument about just what may constitute the *final act of selection* within the meaning of the law."  *Id.* at 72.[2] *See also Bomer*, 199 F.3d at 776 (recognizing Supreme Court's refusal to give a hyper-technical meaning to "election").

In amending § 23-15-637(1)(a) in 2020, the Legislature provided that "[a]bsentee ballots received by mail . . . must be postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election."  Miss. Code Ann. § 23-15-637(1)(a).  Any absentee ballots received after that time are never opened "and shall not be counted."  *Id.  See also id.* § 23-15-647.  The Mississippi Statute is facially compatible with the

---

[2] In *Foster*, the Supreme Court held that Louisiana's "open primary" system violated federal election statutes because it permitted the conclusion of a congressional election "as a matter of law *before* the federal election day . . . with no act in law or in fact to take place on the date chosen by Congress."  *Foster*, 522 U.S. at 72 (emphasis added).  The *Foster* Court took great care to limit its holding to the facts of that case, which—unlike this case—did not involve post-Election Day counting of mail-in absentee ballots postmarked on or before Election Day.  "To underscore the ground left uncovered by its holding," *Millsaps v. Thompson*, 259 F.3d 535, 544 (6th Cir. 2001), the Supreme Court said in *Foster*:  "This case thus does not present the question whether a State must always employ the conventional mechanics of an election. We hold today only that if an election does take place, it may not be consummated *prior to* federal election day."  *Foster*, 522 U.S. at 72 n.4 (emphasis added).  "*Foster's* narrow holding suggests that, so long as a State does not conclude an election *prior to* federal election day, the State's law will not 'actually conflict' with federal law."  *Millsaps*, 259 F.3d at 546 (emphasis added).  *See also Bomer*, 199 F.3d at 775 ("In striking down Louisiana's open primary statute, the Supreme Court *held only* that elections must not be 'consummated' before federal election day.") (emphasis added) (quoting *Foster*, 522 U.S. at 72 n.4).

relevant federal statutes.  Only those ballots placed in the mail and postmarked by Election Day will be counted.  Once a voter deposits the absentee ballot in the mail, the voter has irretrievably cast his/her ballot, thereby expressing his/her final choice in the selection of candidates.  "By counting only these ballots that are postmarked no later than Election Day, the Statute complies with federal law that set the date for Election Day."  *See Bost*, 2023 WL 4817073 at *11 (holding that comparable Illinois mail-in absentee ballot statute did not violate the same federal statutes at issue in this case, where statute required absentee ballots postmarked by Election Day to be counted if received within 14 days after Election Day).  Because the Mississippi Statute does not "directly conflict," *Bomer*, 199 F.3d at 775, with the aforementioned federal statutes—but instead operates harmoniously with federal law—Plaintiff's claim predicated on these statutes fails on the merits.

Like Mississippi, "[m]any states have post-Election Day absentee ballot receipt deadlines." *Bost*, 2023 WL 4817073 at *11 (collecting statutes).  "Despite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules." *Id.  See also Millsaps*, 259 F.3d at 544 (emphasizing "long history of absentee voting throughout the country" and fact that despite surely being aware of absentee voting, Congress "has taken no action to curb it").

Not only has Congress acquiesced for years in permitting state statutory schemes providing for post-Election Day receipt of mail-in absentee ballots, but "even federal laws governing elections allow ballots received after Election Day to be counted."  *Bost*, 2023 WL 4817073 at *11 (citing "longstanding efforts by Congress and the executive branch to ensure that ballots cast by Americans living overseas"—including military voters protected by the Uniformed Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA")—"are counted, so long as they are cast by

Election Day"). In the same vein, where Congress has "required . . . states to provide for absentee voting in federal elections," *Voting Integrity Proj., Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001), it has nevertheless expressly provided that "[n]othing in [the governing federal statute] shall prevent any State or political subdivision from adopting *less restrictive voting practices* than those that are prescribed" in federal law where absentee voting is concerned. *See* 52 U.S.C. § 10502(g) (emphasis added). These features of federal law "strongly suggest that statutes like the one at issue here are compatible with the Elections Clause." *Bost*, 2023 WL 4817073 at *11.

Finally, the legislative history of federal statutes establishing a federal "Election Day" supports the notion that the Mississippi Statute does not directly conflict with federal law. "This history indicates that Congress wanted a uniform election day to prevent earlier elections in some states unduly influencing the later voters, to prevent fraudulent voting in multiple state elections, and to remove the burden of voting in more than one federal election in a given year." *Love v. Foster*, 90 F.3d 1026, 1029 (5th Cir. 1996). Allowing mail-in absentee ballots that are postmarked by Election Day to be counted if received within five business days thereafter "do[es] not stand as an obstacle to substantial achievement of these goals." *Millsaps,* 259 F.3d at 549.

For all these reasons, the Mississippi Statute does not directly conflict with federal election statutes. Plaintiff's claim predicated on the contrary proposition must fail, and the Court should enter summary judgment for Defendant as to Count III.

## **CONCLUSION**

Plaintiff's Complaint should be dismissed for lack of subject-matter jurisdiction predicated on lack of Article III standing. Alternatively, Plaintiff's claims fail on the merits, and the Court should enter summary judgment for Defendant, thereby disposing of this case in its entirety with prejudice.

THIS the 26th day of March, 2024.

Respectfully submitted,

MICHAEL WATSON, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF STATE OF
MISSISSIPPI, DEFENDANT

By:     LYNN FITCH, ATTORNEY GENERAL
        STATE OF MISSISSIPPI

By:     s/Wilson D. Minor
        WILSON D. MINOR (MSB #102663)
        Special Assistant Attorney General

REX M. SHANNON III (MSB #102974)
WILSON D. MINOR (MSB #102663)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi  39205-0220
Tel.:  (601) 359-4184
Fax:  (601) 359-2003
rex.shannon@ago.ms.gov
wilson.minor@ago.ms.gov

ATTORNEYS FOR DEFENDANT MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF STATE OF MISSISSIPPI

## CERTIFICATE OF SERVICE

I, Wilson D. Minor, Special Assistant Attorney General and one of the attorneys for the
above-named State Defendant, do hereby certify that I have this date caused to be filed with the
Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing
system, which sent notification of such filing to all counsel of record.

THIS the 26th day of March, 2024.

s/Wilson D. Minor
WILSON D. MINOR