IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, et al, | |
| Plaintiffs, | |
| v. | No. 1:24-cv-25-LG-RPM (lead case) |
| JUSTIN WETZEL, et al., | |
| Defendants. | |
| LIBERTARIAN PARTY OF MISSISSIPPI, | |
| Plaintiff, | |
| v. | No. 1:24-cv-37-LG-RPM (consolidated) |
| JUSTIN WETZEL, et  al., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

**Page No.**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

SUMMARY JUDGMENT STANDARD ...............................................................................5

ARGUMENT ........................................................................................................................5

I.     Mississippi's Receipt Deadline Contravenes, and Is Preempted by, the Text of the Federal Election Day Statutes .............................................................................5

      A.     Mississippi's Receipt Deadline Violates Federal Law by Allowing Voting to Continue Five Business Days After Federal Election Day .................................7

      B.     Congress Intended that Election Day Be the Day Of "Final Selection." ...............10

      C.     Save One Recently Created Exception, Congress Has Repeatedly Rejected Efforts to Extend Ballot Receipt Deadlines .........................................................11

II.     The Ordinary Public Meaning of Election Day Is the Date by Which Ballots Must Be Received by State Election Officials ...................................................................12

      A.     There Was No Common Law Right to Vote Absentee .........................................13

      B.     The Public Would Have Understood That Election Day Meant Receipt Day Because It Remained Physically Impossible for Votes to Be Received After Election Day for Most of the 19th Century ...................................................15

      C.     Even During the Civil War Absentee Ballots Were Not Cast Until Received by State Officials on Election Day .........................................................17

      D.     Until Very Recently, the Original Public Meaning of Election Day Was Nearly Universal .................................................................................................19

CONCLUSION ....................................................................................................................20

i

**TABLE OF AUTHORITIES**

**Cases**                                                                    **Page No.**

*ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995)...............................................................6

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n.*, 576 U.S. 787 (2015).....................5

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ..............................................5, 15

*Bob Jones University v. United States*, 461 U.S. 574 (1982) ......................................................11

*Bost v. Ill. State Bd. of Elections,* 2023 U.S. Dist. LEXIS 129509 (N.D. Ill. July 26, 2023) ........5

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) ...................................................................1, 12

*Burns v. Alcala*, 420 U.S. 575 (1975) .........................................................................................12

*Burson v. Freeman*, 504 U.S. 191 (1992) ........................................................................13, 14, 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................5

*Cook v. Gralike*, 531 U.S. 510 (2001) .........................................................................................3

*Doe v. Reed*, 561 U.S. 186 (2010) ..............................................................................................14

*Ex parte Siebold*, 100 U.S. 371 (1880) ........................................................................................3

*Ex parte Yarbrough*, 110 U.S. 651 (1884)...................................................................................15

*Foster v. Love*, 522 U.S. 67 (1997)...................................................................... *passim*

*Goodell v. Judith Basin County*, 224 P. 1110 (Mont. 1924)........................................................18

*Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008) .....................................................................6

*Hughey v. United States*, 495 U.S. 411 (1990) ...........................................................................12

*Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860 (7th Cir. 2016) ....................................................12

*K Mart Corp. v. Cartier*, 486 U.S. 281 (1988) ...........................................................................12

*Lynch v. Malley*, 74 N.E. 723 (Ill. 1905) ................................................................................8, 14

*Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (Mont. 1944) ..........................................7, 8, 16

*Millsaps v. Thompson*, 259 F.3d. 535 (6th Cir. 2001) ............................................................2, 9, 10

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) ....................................................13

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ...........................................19

*New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019)........................................................12

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990)................................11

*Perrin v. United States*, 444 U.S. 37 (1979) ....................................................................12

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014).................................................13, 18

*Smiley v. Holm*, 285 U.S. 355 (1932) ................................................................................3

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ....................................16

*U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995).......................................................3

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d. 773 (5th Cir. 2000)......................2, 9

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169 (9th Cir. 2001) .......................*passim*

**Constitutional Provisions**

U.S. Const. art. I, § 4 cl.1 .............................................................................................*passim*

U.S. Const. art. II, § 1 cl.4 ............................................................................................*passim*

**Federal Statutes**

2 U.S.C. § 1 .................................................................................................................*passim*

2 U.S.C. § 7 ..................................................................................................................*passim*

2 U.S.C. § 8 ..........................................................................................................................10

3 U.S.C. § 1 ..................................................................................................................*passim*

3 U.S.C § 2 ..........................................................................................................................10

3 U.S.C. § 21 .....................................................................................................................1, 11

26 U.S.C. § 7502...................................................................................................................14

52 U.S.C. § 10101 ...................................................................................................8

**State Statutes**

Cal. Elec. Code § 3020 ...........................................................................................19

Miss. Code Ann. § 23-15-637 ............................................................................. *passim*

Neb. Rev. Stat. Ann. § 32-950 ...............................................................................19

**Federal Rules**

Fed. R. Civ. P. 56 ....................................................................................................5

**Other Authorities**

Charles Kettleborough, THE AMERICAN POLITICAL SCIENCE REVIEW,
  Vol. 11, No. 2 (May 1917) ...............................................................................18

Charles Stewart III, *How We Voted in 2020: A First Look at the Survey of the
  Performance of American Elections*, MIT Election Data + Science Lab,
  (Dec. 15, 2020) ...............................................................................................19

Cong. Globe, 42 Cong., 2d Sess. 676 (1872) .......................................................11

Cortland F. Bishop, HISTORY OF ELECTIONS IN THE AMERICAN COLONIES (1893) ................ 13-14

DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL
CONSTITUTION 68 (Jonathan Elliot ed., 1836) ........................................................6

Donald A. Debats, HOW AMERICA VOTED: BY VOICE,
  Univ. of Virg. Inst. For Advanced Tech. in Humanities (2016) .......................16

E. Evans, A HISTORY OF THE AUSTRALIAN BALLOT SYSTEM
  IN THE UNITED STATES (1917) ...........................................................................16

THE FEDERALIST No. 59 (C. Rossiter ed. 1961) (A. Hamilton) .................................5, 15

Geoffrey Skelley, *Why Pennsylvania's Vote Count Could Change After Election Night*,
  FiveThirtyEight.com, (Oct. 29, 2020) ...............................................................20

George W. McCrary, A TREATISE ON THE AMERICAN LAW OF ELECTIONS
  (Henry L. McCune eds. 4th ed. 1897) ...............................................................14

J. Harris, ELECTION ADMINISTRATION IN THE UNITED STATES (1934) .........................16

James H. Lewis and Albert H. Putney, HANDBOOK ON ELECTION LAWS (1912) .........................15

Jeffrey M. Stonecash, Jessica E. Boscarino, Rogan T. Kersh,
    CONGRESSIONAL INTRUSION TO SPECIFY STATE VOTING
    DATES FOR NATIONAL OFFICES, PUBLIUS: THE JOURNAL OF FEDERALISM .......................15

John C. Fortier, ABSENTEE AND EARLY VOTING: TRENDS, PROMISES, AND PERILS,
    AEI Press (2006) ....................................................................................................18

Josiah Henry Benton, VOTING IN THE FIELD (1915) ....................................................17

Kirk H. Porter, Ph.D., HISTORY OF SUFFRAGE IN THE UNITED STATES (1918) .............................14

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
    (Joseph E. Worcester, *et al*. eds. 1st ed. 1830)...................................................13

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE
    (Joseph E. Worcester, *et al*. eds. 2nd ed. 1860) ................................................13

P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 12, No. 2 (May 1918) ...........18

P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 12, No. 3 (Aug. 1918)...........18

Scott Rasmussen, "70% Want All Mail-In Ballots Received By
    Election Day," ScottRasmussen.com (July 13, 2021) .......................................13

Scott Rasmussen, "80% Favor Requiring Photo ID Before Casting a Ballot,"
    ScottRasmussen.com (Jan. 17, 2022) ...............................................................13

*The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on Rules and*
    *Admin.*, 95th Cong. (1977)..........................................................................11, 19

## INTRODUCTION

This case involves the question of whether Mississippi absentee ballots received after federal election day are illegal under the applicable federal law. *See* 2 U.S.C. § 7 (the "Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election" of congressional representatives); *id.* § 1 (senatorial elections to coincide with congressional elections); 3 U.S.C. § 1 (the "electors of President and Vice President shall be appointed, in each State, on election day").[1]

"[T]he election" as used in these federal Election Day statutes "plainly refers to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster v. Love*, 522 U.S. 67, 71 (1997). The "final act of selection within the meaning of the law" is ballot receipt by state election officials, which therefore must occur no later than Election Day. *See Id.* at 72; and Dkt. 1 at ¶46. This interpretation of the "final act of selection" is based on the original public meaning of term, "the election," which courts must consult when interpreting statutory terms. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). Congress reaffirmed this interpretation of "election day" in 2022 when it enacted the Electoral Count Reform Act ("ECRA"). Dkt. 1 at 5; *see* 3 U.S.C. § 21 ("'election day' means the Tuesday next after the first Monday in November, in every fourth year," except where a "State modifies the period of voting" to account for "force majeure events that are extraordinary and catastrophic").

Congress first established a uniform national election day in the United States in 1845 (presidential elections) and 1872 (congressional elections). A survey of history before and contemporaneous to these enactments shows that the ordinary public meaning of Election Day at that time would have been understood by the public as the day by which all ballots must be received

---

[1]        The day defined in these federal statutes is referred to throughout as "Election Day."

by state election officials. Historical electoral practices under the common law and during Colonial, early Republic, Civil War, and Reconstruction eras provide the best evidence of the original public meaning of "the election" when it was enacted. None allowed post-Election Day receipt. It is not just that post-election receipt was not permitted under historical electoral practices, but it was not possible. The public, thus, would have affirmatively understood "the election" to mean the day by which all qualified ballots must be received by state election officials. That near-universal public meaning prevailed until shortly after the 2000 presidential election controversy when a few state legislatures rewrote longstanding laws holding voting open days and sometimes weeks after Election Day.

This lawsuit challenges the 2020 amendment to Miss. Code Ann. § 23-15-637(1)(a) ("Receipt Deadline"), which holds voting open in Mississippi for five business days after Election Day. Because the "combined actions of voters and officials meant to make the final selection" in Mississippi continues five business days after Election Day, its Receipt Deadline violates the federal Election Day statutes. *See Foster*, 522 U.S. at 71-72. Plaintiff is a political party, suing to enjoin § 23-15-637(1)(a) on the grounds that it contravenes, and is preempted by 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1. Plaintiff seeks to protect its First and Fourteenth Amendment rights, as well as those of its members, supporters, and candidates. Plaintiff respectfully requests the Court grant this Motion for Summary Judgment.[2] Plaintiff seeks a declaratory judgment that the Receipt Deadline violates the federal Election Day statutes and Plaintiff's First and Fourteenth Amendment rights and seek an order from the Court scheduling remedial proceedings as appropriate.

---

[2]   Disputes regarding state compliance with federal Election Day statutes are commonly handled via summary judgment. *See Foster*, 522 U.S. at 70; *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d. 1169, 1170 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d. 535, 536 (6th Cir. 2001); and *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d. 773, 774 (5th Cir. 2000).

# BACKGROUND

### Statutory Background

The United States Congress is authorized under U.S. Const. art. I, § 4 cl.1 and art. II, § 1 cl.4 to establish the Time for conducting federal elections.

> [T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932) (discussing Congress' art. I, § 4 powers). These two clauses give "Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States."[3] *Foster*, 522 U.S. at 69 (citing *U.S. Term Limits*, 514 U.S. at 832-833). Federal election laws governing federal elections "are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1880).

Congress exercised this authority almost 200 years ago when it enacted the first of a trio of statutes that establish a uniform national Election Day. In 1845, Congress passed the "Presidential Election Day Act," which is now codified as 3 U.S.C. § 1. 28 Cong. Ch. 1, 5 Stat. 721.[4] Twenty-seven years later, Congress passed what is now 2 U.S.C § 7, establishing the same day for congressional elections. In 1914, following the adoption of the Seventeenth Amendment, Congress aligned Senate elections with those in the House. 2 U.S.C. § 1.

---

[3]     The Article II delegation of authority is the states' sole basis for regulating presidential elections. This power is neither inherent nor preserved under the Tenth Amendment. *Cook v. Gralike*, 531 U.S. 510, 522 (2001); *U.S. Term Limits v. Thornton*, 514 U.S. 779, 805 (1995).

[4]     Originally codified as 5 Stat. 721, non-material wording changes occurred over the years before it was recodified as 3 U.S.C. § 1.

Prior to 2020, Mississippi required absentee ballots to be received by 5:00 p.m. on the day prior to Election Day to be counted. 2012 Miss. ALS 465, 2012 Miss. Gen. Laws 465, 2012 Miss. S.B. 2552. In 2020, Mississippi's Receipt Deadline was amended to allow absentee ballots to be received up to five business days after Election Day. 2020 Miss. H.B. 1521, 2020 Miss. Gen. Laws 472, 2020 Miss. ALS 472 25.

***Facts Pertaining to Plaintiff***

Plaintiff is a Mississippi political party that tries to have its candidates elected to state and federal office. Hanson Decl. ¶ 3. Plaintiff notes that it is important for any professional political campaign to monitor the canvassing of ballots, especially absentee ballots. Hanson Decl. ¶ 18.[5] Before Mississippi's law changed, Plaintiff's candidates struggled to monitor the canvassing of ballots. *Id.* ¶¶ 22-24. After the 2020 change extending the Receipt Deadline for five additional business days, Plaintiff and its candidates are even less able to undertake this important task. *Id.* ¶¶ 25-26. This burden puts Plaintiff's candidates in an even worse position compared to Democratic and Republican candidates, who can more easily afford the extra monitoring. *Id.* ¶ 26. Plaintiff also believes that the unlawful ballots received after Election Day are more likely to be cast for Democratic and Republican candidates, which causes Plaintiff to endure worse electoral outcomes than it otherwise would. *Id.* ¶ 27.

Plaintiff has a clear interest in having its candidates garner as large a vote total as possible. Even if Plaintiff's candidates do not win, the extent of their support affects the public's perception of Plaintiff's message, and of any dissatisfaction with the major parties. *Id.* ¶ 20. The extent to

---

[5]     All referenced exhibits are attached to the Motion for Summary Judgment.

which Plaintiff's candidates attract electoral support affects Plaintiff's ability to influence donors, volunteers, future candidates, and voters.[6] *Id.* ¶ 21.

## SUMMARY JUDGMENT STANDARD

A plaintiff is entitled to summary judgment when it shows that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Where the "case concerns only legal issues, and no facts are in dispute," summary judgment is proper. *Keisling*, 259 F.3d at 1170 (reviewing summary judgment ruling on whether Oregon's early voting statutes violated federal Election Day statutes). Indeed, the "issue here [is] a narrow one turning entirely on the meaning of the state and federal statutes." *Foster*, 522 U.S. at 71. Under those standards, Plaintiff's claims with respect to § 23-15-637(1)(a) can be decided by this Motion.

## ARGUMENT

I. **Mississippi's Receipt Deadline Contravenes, and Is Preempted by, the Text of the Federal Election Day Statutes.**

"The dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules, not to restrict the way States enact legislation." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n.*, 576 U.S. 787, 814-15 (2015). The grant of complete Congressional power over the timing of federal elections "was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013); *see also* THE FEDERALIST No. 59, at 362-63 (C. Rossiter ed. 1961) (A. Hamilton)

---

[6]     Another federal court recently held that three federal candidates lacked standing to sue over post-election receipt of ballots in Illinois. *Bost v. Ill. State Bd. of Elections,* 2023 U.S. Dist. LEXIS 129509 (N.D. Ill. July 26, 2023). An appeal of that ruling is pending before the Seventh Circuit. *Bost v. Ill. State Bd. of Elections*, No. 23-644.

(providing exclusive authority in state legislatures "would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it by neglecting to provide for the choice of persons to administer its affairs"). The solution was the Elections Clause, which "enables Congress to alter such regulations as the states shall have made with respect to elections." DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 68 (Jonathan Elliot ed., 1836).

Accordingly, the Elections Clause gives Congress "plenary authority over federal elections," "explicitly ensur[ing] that all conflicts with similar state laws would be resolved wholly in favor of the national government." *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *see Foster*, 522 U.S. at 69 (Elections Clause "invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to pre-empt state legislative choices") (citations omitted); *ACORN v. Edgar*, 56 F.3d 791, 794 (7th Cir. 1995) (unlike most constitutional provisions that tell states "what they can or cannot do," the Elections Clause provides "that Congress can if it wants step in and either make its own regulations or alter those adopted by the state . . . Congress was given the whip hand").

With respect to the Electors Clause, Congressional power over states' time for choosing electors is plenary. *See* U.S. Const. art. II, § 1, cl. 4 ("Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."). States retained no authority whatsoever to alter or abridge the uniform time regulations set by Congress under Article II.

Unquestionably, 2 U.S.C. §§ 1 and 7 are valid exercises of Congress' power under the Elections Clause, *see Foster*, 522 U.S. at 70, and 3 U.S.C. § 1 is a valid Time regulation set by Congress under the Electors Clause. No otherwise valid state regulation can limit or abridge a valid

exercise of these federal powers. *Foster*, 522 U.S. at 71-72; *see also Keisling*, 259 F.3d at 1170 ("Without question, Congress has the authority to compel states to hold these elections on the dates it specifies.").

**A.    Mississippi's Receipt Deadline Violates Federal Law by Allowing Voting to Continue Five Business Days After Federal Election Day.**

Congress "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70. In *Foster*, the Court defined "election" as used in the Election Day statutes. "When the federal statutes speak of 'the election' […], they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder[.]" *Id.* at 71. Put differently, this "final act of selection," *id.* at 72, "means a 'consummation' of the process of selecting an official." *Keisling*, 259 F.3d at 1175.

Voters' role in the "final act of selection" includes not just marking a ballot but also "having it delivered to the election officials and deposited in the ballot box." *See, e.g., Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944) (citation omitted). This "consummation" or the "final act of selection" does not occur until *ballots are received* by state election officials. The Montana Supreme Court described the process by which a ballot is transformed into a vote to be canvassed:

> Nothing short of the delivery of the ballot to the election officials for deposit in the ballot box constitutes casting the ballot, which fact was unmistakable so long as the ballot continued to be, as originally, a ball or marble or other marker which was "cast" or deposited in an official receptacle or custody. The fact that the ballot has now become a sheet of paper upon which the voter's choices for the various offices are marked before it is deposited has not changed either the word used to characterize the act of casting the ballot, or the meaning of the word.

*Id.* For "[i]t is not the marking but the depositing of the ballot in the custody of election officials which constitutes casting the ballot or vot[ing]." *Id.* After all, a ballot has "no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made

effective." *Id.* Stated differently, it is the *receipt of a qualified ballot by state election officials* that transforms a ballot into a vote.[7] Under Mississippi law, that "final act of selection" now continues as much as five business days after Election Day.

This concept is illustrated by reviewing the status of a Mississippi absentee ballot once it is received by a voter. The ballot sitting on a voter's kitchen table waiting to be completed is not a vote. Even once it is marked, its status does not change. Nor does it change once it is handed to a third party (*i.e.*, U.S. Postal Service, or a family member, or a ballot harvester) for delivery. Likewise, a ballot in transit or sitting in the Postal Service's distribution center is not a vote. A ballot that is lost, stolen, or destroyed is not a vote. A ballot is not a vote until it is properly marked *and* received by the election official. At receipt, a qualified ballot becomes a vote that can be counted during canvassing. This concept has long been recognized under federal law. For example, when Congress passed the Civil Rights Act of 1957 it defined a "vote [as including] all action necessary to make a vote effective including . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(e). Thus, "all action necessary to make a vote effective" includes both casting a ballot *and* receiving it for canvassing.

Given the "binding" nature of federal regulations adopted pursuant to the Elections Clause, *Foster*, 522 U.S. at 69, the Supreme Court had no problem finding that Louisiana's election regime violated federal law if "the combined actions of voters and officials meant to make a final selection of an officeholder" occur "*prior* to federal election day." *Id.* at 71, 73 (emphasis added). The Court unanimously invalidated Louisiana's procedure for holding congressional elections in October.

---

[7]     This point is driven home when we remember that a "ballot originally consisted of a little ball, a bean or a grain of corn, a coin, or any other small article which could be concealed in the hand so that others might not know how the voter cast his ballot." *Lynch v. Malley*, 74 N.E. 723, 725 (Ill. 1905).

Louisiana's system was constitutionally flawed because it established "a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress." *Id.* at 72. Similarly, the "final act of selection" of federal candidates in Mississippi, which occurs, as a matter of state law, as much as five business days after Election Day, can *never* be concluded on Election Day. Thus, Mississippi's scheme contravenes governing federal law.

The Fifth, Sixth, and Ninth Circuits have all considered the meaning of "Election Day," but only in evaluating whether state early voting practices complied with federal law. In those cases, courts ruled such practices did not violate federal law because they did not consummate the election before Election Day or alter the "final act of selection." *See Keisling*, 259 F.3d at 1175-76; *Bomer*, 199 F.3d at 775-77; *Millsaps*, 259 F.3d at 543-46. Early absentee voting merely complements other "voting," which "still takes place on" Election Day, which was the day of the "final selection of an officeholder." *Keisling*, 259 F.3d at 1175, 1176 (quoting *Foster*, 522 U.S. at 71); *see also Bomer*, 199 F.3d at 776 ("Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day."). The electorate's "final act of selection" still occurs no earlier or later than Election Day (even if post-election canvassing still remains to be done).

Mississippi's Receipt Deadline violates 2 U.S.C. §§ 1, 7, and 3 U.S.C. § 1 for the same reason that Louisiana's system did in *Foster*. Here, because the "final selection" of candidates can never be consummated on Election Day, it does not, in fact, take place on the date chosen by Congress. *Foster*, 522 U.S. at 71-72. Ballot receipt is the "act in law or fact" that must occur on or before Election Day. The final act of selection can no more conclude five business days after Election Day than it can five days before. *See id.* Louisiana's former, and Mississippi's current,

election regimes both "affect the timing of federal elections." The October election in Louisiana "require[d] no further act by anyone to seal the election" on Election Day. *Id.* at 73. And holding voting open five business days after Election Day in Mississippi necessarily does require "further act[s]," meaning further receipt of cast ballots, before the election is over. *Id.* Both of these schemes contravene Congress' "final say" about the time for federal elections and clearly violate 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1. *Id.* at 72.

As a matter of law, Mississippi's Receipt Deadline allows a "contested selection of candidates" to continue after Election Day. *Foster*, 522 U.S. at 72. It requires state election officials to continue to accept and count ballots received after the national Election Day. On its face, it morphs the single "day for the election" into an additional five business days.

### B.     Congress Intended that Election Day Be the Day Of "Final Selection."

The legislative history surrounding Election Day statutes shows that Congress considered and rejected requests for a multiday Election Day in both 1845 and in 1872. *Keisling*, 259 F.3d. at 1169-74 (discussing the legislative history of 3 U.S.C. § 1 and 2 U.S.C. § 7); *see also Millsaps*, 259 F.3d at 540-43. Other federal statutes in Title 2 and 3 emphasize Congress' intent that Election Day, and not five business days later, is the deadline for "final selection." *See* 3 U.S.C § 2 ("Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law . . ."); and 2 U.S.C. § 8 ("whether such vacancy is caused by a failure to elect at the time prescribed by law"). If all voters' "final selections" are not available to election officials by Election Day, then the final selection cannot be ascertained within "the time prescribed by law." In consequence, federal elections in Mississippi suffer from the same fatal flaw as did federal primaries in Louisiana: the final selection of candidates for office is not concluded on Election Day. *Foster*, 522 U.S. at 72.

"By establishing a particular day as 'the day' on which [the final selection] must take place, the statutes simply regulate the time of the election, a matter on which the Constitution explicitly gives Congress the final say." *Id.* at 71. No state-enacted time or manner regulation may alter a time regulation after Congress has spoken. *Id.*

### C.   Save One Recently Created Exception, Congress Has Repeatedly Rejected Efforts to Extend Ballot Receipt Deadlines.

Since 1845, Congress has repeatedly rejected requests to make Election Day a multiday event or extend it beyond the first Tuesday after the first Monday in November. *See* Cong. Globe, 42 Cong., 2d Sess. 676 (1872); *The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on Rules and Admin.*, 95th Cong. pp. 13, 34, 59, 67, 84, and 94 (1977) ((rejecting requests to extend ballot receipt deadlines for overseas voters) available at https://bit.ly/38z9zU9; *see also Keisling*, 259 F.3d at 1172-74.[8]

In 2022, Congress enacted the Electoral Count Reform Act ("ECRA"). 136 Stat. 5233, 525 (enacted as Div. P., Title I, § 102(b) of the Consolidated Appropriations Act, 2023, 117 Pub. L. No. 328, Dec. 29, 2022). Relevant here, ECRA revised Title 3 dealing with Presidential elections, adding new 3 U.S.C. § 21, explaining that with respect to those elections:

> (1) "election day" means the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President held in each State, except, in the case of a State that appoints electors by popular vote, if the State modifies the period of voting, as necessitated by force majeure events that are extraordinary and catastrophic, as provided under laws of the State enacted prior to such day, "election day" shall include the modified period of voting.

---

[8]   In general, the Supreme Court has cautioned against drawing inferences from failed attempts to pass legislation. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Notwithstanding this general rule, the Court has on occasion drawn inferences from the failure to enact a bill where the sheer number of legislative attempts to pass it and the clarity of the issue presented make such inferences reasonable. *Bob Jones University v. United States*, 461 U.S. 574 (1982).

*Id.* Thus, Congress for the first time in its history allowed a narrow carveout that allows states to extend receipt deadlines in "force majeure events that are extraordinary and catastrophic." This new *force majeure* exception merely underscores that, in all ordinary circumstances, *Foster*'s "final act of selection" must occur no later than Election Day. The ECRA made no other changes to 3 U.S.C. § 1 and does not apply to 2 U.S.C. §§ 1 and 7.

## II.    The Ordinary Public Meaning of Election Day Is the Date by Which Ballots Must Be Received by State Election Officials.

A historical survey confirms this textual analysis. From 1845 until circa 2005, the national practice was that Election Day was the day of final action, which action was the receipt of ballots by state election officials. For all that time, Election Day was, in effect, "ballot receipt day." By contrast, Mississippi's Receipt Deadline is wholly unmoored from the ordinary public meaning of Election Day, in either 1845 or 1872.

As with all questions of statutory interpretation, analysis starts with the text of the statute to ascertain its plain meaning. *Hughey v. United States*, 495 U.S. 411, 415 (1990); *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). "[T]he court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988) (citations omitted). A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, common public meaning at the time of enactment. *See Bostock*, 140 S. Ct. at 1738; *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580-581 (1975)). "[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted). This inquiry often looks to the development and evolution of the common-law definition, *id.*, or refers to

12

dictionaries contemporaneous with the enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 228 (2014).

Election Day has improved a lot since the 19th century. *See generally Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1882-83 (2018) (quoting *Burson v. Freeman*, 504 U.S. 191 (1992)). While society and election administration has benefited from these changes, the recent efforts to radically redefine Election Day by extending it temporally for weeks beyond the Tuesday next after the first Monday in November has decreased public confidence in elections.[9] More to the point here, it violates the original public meaning of 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1.

Dictionaries published before and after 1845 define "election" as "[t]he *day* of a public choice of officers," emphasizing the temporal nature of this regulation. Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, 288, (Joseph E. Worcester, *et al*. eds. 1st ed. 1830), available at https://bit.ly/3lNC9nG; and Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, 383, (Joseph E. Worcester, *et al*. eds. 2nd ed. 1860), available at https://bit.ly/3LK7ZMF (emphasis added). These contemporaneous dictionary definitions around 1845 speak to the ordinary public meaning of the term "election." A historical survey of contemporaneous practices leaves little doubt that the original public meaning of election meant the final act of selection, and that that act was the receipt of ballots.

A.      **There Was No Common Law Right to Vote Absentee.**

Colonial electoral practices can be grouped together depending on whether the colony followed Puritan, British royal, or some other proprietary rule. *See* Cortland F. Bishop, HISTORY

---

[9]      A recent national survey found that 76% of respondents want all ballots in by Election Day. Scott Rasmussen, "80% Favor Requiring Photo ID Before Casting a Ballot," ScottRasmussen.com (Jan. 17, 2022), https://bit.ly/3aupaFn. This finding was up 6% from a previous poll conducted less than a year before. Scott Rasmussen, "70% Want All Mail-In Ballots Received By Election Day," ScottRasmussen.com (July 13, 2021), https://bit.ly/3OYyJvd.

OF ELECTIONS IN THE AMERICAN COLONIES, 98-99 (1893), available at https://bit.ly/3yso7xC; and Kirk H. Porter, HISTORY OF SUFFRAGE IN THE UNITED STATES, 1-3 (1918), available at https://bit.ly/3RsJ9ES (explaining that colonies were essentially corporations and the right to vote was "much the same" as a stockholder's right to vote). Many of these electoral practices lasted through the American Revolution and early republic. *See* Porter at 1-3; *see generally* Bishop at 1-45. While some colonial corporations later enacted rules allowing limited proxy voting, it was unknown under the common law, and all votes needed to be "personally given" at poll sites.[10] George W. McCrary, A TREATISE ON THE AMERICAN LAW OF ELECTIONS, 132 (Henry L. McCune eds. 4th ed. 1897) available at https://bit.ly/3PlGMCa.[11]

 "During the colonial period, many government officials were elected by the *viva voce* method or by the showing of hands, as was the custom in most parts of Europe." *Burson*, 504 U.S. at 200; *see also Doe v. Reed*, 561 U.S. 186, 224-27 (2010) (Scalia, J., concurring in judgment) (describing historic voting practices). It was simply not physically possible during this time for votes, whether conducted *viva voce* or by electors dropping balls or beans in a bowl, to be received after Election Day. [12]

---

[10]    Certain areas of colonial America allowed limited "proxy voting." *See* Bishop at 127-40. In its basic form, proxy voting allowed eligible voters to assign their vote to a qualified proxy who was required to appear in person on Election Day to cast the assigned vote. *Id.*

[11]    Unlike voting, there is a federal mailbox statute applicable to tax filings under the internal revenue laws. *See* 26 U.S.C. § 7502. Because there was no common law right to proxy voting and absentee voting was yet to be invented, the common law's mailbox rule for contracts would not have applied to voting.

[12]    *See Lynch*, *supra* note 7.

**B.** **The Public Would Have Understood That Election Day Meant Receipt Day Because It Remained Physically Impossible for Votes to Be Received After Election Day for Most of the 19th Century.**

After the Constitution's ratification, concerns immediately arose about the federal government relying on states to fulfill their duties to conduct federal elections. *See* Jeffrey M. Stonecash, Jessica E. Boscarino, Rogan T. Kersh, CONGRESSIONAL INTRUSION TO SPECIFY STATE VOTING DATES FOR NATIONAL OFFICES, PUBLIUS: THE JOURNAL OF FEDERALISM, Vol. 38, Issue 1, Winter 2008, Pages 137–151 available at https://bit.ly/3uEBrh5. In particular, Congress was unsure whether states would conduct timely elections, especially for the newly created office of the president, or, indeed, whether the states would appoint electors at all. *Id*. at 140-41; *Arizona*, 570 U.S. at 8 (2013) (discussing the Framers' purpose for adopting the Elections Clause out of concern "a State would refuse to provide for the election of representatives to the Federal Congress." (citing THE FEDERALIST NO. 59, pp. 362-363 (C. Rossiter ed. 1961) (A. Hamilton))). This concern led to a 1792 act wherein Congress provided a deadline, rather than a designated day, by which states must appoint electors.[13] Act of March 1, 1792, Sess. I, Ch. 8; *see* Stonecash, *et al.*, at 140-41. But further legislation was needed to resolve issues arising from the nation's diverse state electoral calendars, including concern over electoral fraud. *Id.* This prompted Congress to establish a national Election Day for the appointment of presidential electors in 1845.[14] *Id.* at 142; 3 U.S.C. § 1. Within three years, all states had adopted the national Election Day for presidential elections. *Id.* at 141.

---

[13]    This was Congress' first federal election regulation. Stonecash*, et al.*, at 140-41. Save Election Day regulations, Congress used its election powers very rarely until after the Civil War. *See* James H. Lewis and Albert H. Putney, HANDBOOK ON ELECTION LAWS, 239 (1912), available at https://bit.ly/3cceuvC.

[14]    By establishing a uniform date, Congress sought "to remedy more than one evil arising from the election of members of congress occurring at different times in the different states." *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884).

While Congress sought to create a more uniform national election calendar, new state electoral practices emerged, none of which facilitated ballots being received after Election Day. In the 18th and early part of the 19th century, some states began adopting paper ballots, which quickly became the majority practice. E. Evans, A HISTORY OF THE AUSTRALIAN BALLOT SYSTEM IN THE UNITED STATES, 11 (1917) (Evans); *Burson*, 504 U.S. at 200. This practice generally involved voters' handwriting their votes on personal paper, which they delivered to polling places on Election Day. *Id.* at 200. These "ballots" were only cast once marked and deposited in the ballot box or otherwise delivered to election officials on Election Day. *Id.*

*Viva voce* and handwritten ballots remained the majority practices until the advent of preprinted "ticket" ballots in 1829. Evans at 11-12. Ticket voting grew in popularity as newspapers, political parties, unions, and other private groups distributed tickets with advertisements or political messages. *Id.* at 12; and *Burson*, 504 U.S. at 201-03. Many states abandoned *viva voce* voting as tickets grew more popular.[15] *See* Donald A. Debats, HOW AMERICA VOTED: BY VOICE, 5, Univ. of Virg. Inst. For Advanced Tech. in Humanities, (2016), available at https://bit.ly/3sVOMRu. Like handwritten ballots, tickets were simply privately created paper of no legal consequence until deposited into a ballot box by a voter on Election Day. *See Maddox*, 149 P.2d at 115. Following "the 1888 presidential election, which was widely regarded as having been plagued by fraud, many States moved to the Australian ballot system." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 356 (1997); *see also* J. Harris, ELECTION ADMINISTRATION IN THE UNITED STATES, 153-54 (1934), available at https://bit.ly/3cdio7z. By 1896, almost 90 percent of states had adopted that system. *Burson*, 504 U.S. at 203-205.

---

[15]     Arkansas (1846), Missouri (1863), Virginia (1867), and Kentucky (1890) were the last states to abandon v*iva voce*. Evans, at 17.

**C.**   **Even During the Civil War Absentee Ballots Were Not Cast Until Received by State Officials on Election Day.**

There have been two waves in which absentee voting was adopted. Absentee voting first arose in response to circumstances imposed by the Civil War. Josiah Henry Benton, VOTING IN THE FIELD, 4-5 (1915), available at https://bit.ly/3p4OQaq. Prior to 1861, all states required that voting be exercised by the casting of ballots in person in one's election district.[16] *See id.* After war broke out, there was an effort to ensure Union soldiers could still exercise their franchise. *Id.* at 4-14. Thus, between 1861-64 several states adopted one of two absentee voting methods to allow "voting in the field," both of which involved ballots being received by state election officials on Election Day. *Id.* at 4, 15. Some states enacted proxy voting whereby a soldier would mail his marked ballot to someone back home to deliver at his home precinct on Election Day. *Id.* at 15, 265. "Under this method it was claimed that the voter's connection with his ballot *did not end until it was cast into the box at the home precinct*, and therefore that the soldier really did vote, not in the field, but in his precinct." *Id.* at 15 (emphasis added).

Under the second method, states actually created poll sites within military units by providing them ballot boxes and by appointing servicemen as state election officials to receive ballots in the field on Election Day. *Id.* at 15-17; *see also id.* at 43 (describing Missouri's field voting practices). After field ballots were received by the appointed officials, the ballots would be counted in the field or sent back the servicemen's home states.[17] *Id.* at 317.

---

[16]    Technically, Pennsylvania had the first absentee law dating back to 1813. *See* Benton at 189-203. But it was later struck down by the Pennsylvania Supreme Court. *Id.*

[17]    One exception is the 1864 Maryland presidential election. Seven days before that election, Maryland amended its constitution to allow its Union soldiers to mark ballots as many as five days after Election Day. Benton at 223. Maryland was so evenly divided regarding whether to leave the Union—which would have left Washington, D.C. surrounded by the Confederacy—that Maryland soldiers decided many elections. *Id.* No state currently allows ballots to be marked after Election Day.

Absentee voting largely disappeared after the Civil War, *id.* at 314, but reemerged in the early 20th century as a result of changing economics and war.[18] Charles Kettleborough, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 11, No. 2, 320-322 (May 1917), available at https://bit.ly/3z14deH; and *see also* John C. Fortier, ABSENTEE AND EARLY VOTING: TRENDS, PROMISES, AND PERILS, AEI Press, at 8-11 (2006), available at https://bit.ly/3P3HaFD. While these new practices took different forms, they adhered to the original public meaning that Election Day meant receipt day. *See generally* P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 12, No. 2, 251-261 (May 1918) (describing different state absentee voting procedures) available at https://bit.ly/3PjmtVS. For example, some states required absentee voters to swear that they would return their ballots to election officials on or before Election Day. *Id.* at 255. Washington State required absentee voters to appear at any state poll site on Election Day to absentee vote. *Id.* at 253. "[T]he act of voting is not completed until the ballot is deposited in the ballot-box." *Goodell v. Judith Basin County*, 224 P. 1110, 1111-14 (Mont. 1924) (collecting cases on absentee statutes).

Similarly, early 20th century military absentee laws adopted many of the voting practices from the Civil War that reflected the original public meaning that Election Day meant receipt day. *See generally* P. Orman Ray, THE AMERICAN POLITICAL SCIENCE REVIEW, Vol. 12, No. 3, at 461-69 (Aug. 1918) (summarizing 20th century military absentee voting procedures), available at https://bit.ly/3auLHlv. These practices included proxy voting, express requirements that ballots be cast on or before Election Day, opening polling sites at a regiment's location, and deputizing service men to serve as state election officers in the field to receive ballots. *Id.* at 464-68.

---

[18]     Because 20th century absentee practices were enacted almost seven decades after Congress enacted Election Day, they are hardly "contemporaneous to the enactment" or explain the "development and evolution of the common-law definition" of Election Day. *See generally*, *Sandifer*, 571 U.S. at 228. To the extent these practices assist in determining the original public meaning, they reinforce Plaintiff's view that Election Day meant receipt day.

**D.    Until Very Recently, the Original Public Meaning of Election Day Was Nearly Universal.**

Prior to 2002, only a small number of jurisdictions had experimented with holding voting open after Election Day. A 1971 absentee voting study by the Department of Defense reported that 52 of 54 U.S. jurisdictions required ballot receipt on or before Election Day.[19] Washington and Nebraska were the lone outliers holding voting open for 15 and 1 day(s), respectively. Nebraska long ago abandoned this practice, and now requires Election Day receipt.[20] Neb. Rev. Stat. Ann. § 32-950. Washington state has probably experimented with this practice the longest, but as noted, *supra* II.A.3, its 1917 absentee statute required voters to appear at state poll sites to cast absentee ballots.[21] Washington notwithstanding, these experiments were generally short lived and involved a very small number of ballots.

That is no longer the case. Whereas previously the universe of absentee and vote-by-mail ballots ("VBM") ballots was *de minimis*, in 2020 they constituted 46% of total ballots cast, by far the primary means by which ballots are cast in the United States.[22] The growth of this practice led

---

[19]    *See The Overseas Citizens Voting Rights Act of 1975 and S. 703 Before S. Comm. on Rules and Admin.*, 95th Cong. 33-34 (1977), available at https://bit.ly/38z9zU9.

[20]    A 1933 treatise reported California held voting open for up to 15 days after Election Day. Harris at 291. Like Nebraska, however, California's experiment with holding voting open was short lived. As recently as 2015, California had required all ballots to be received by Election Day. Cal. Elec. Code § 3020 and 2014 Cal ALS 618, 2014 Cal SB 29, 2014 Cal Stats. ch. 618.

[21]    Even assuming it existed when Washington joined the union in 1889, this practice of allowing late ballots provides little guidance regarding the original public meaning of statutes enacted in 1845 and 1872. A "few late-in-time outliers" from territories do not provide much insight into historical meaning, especially if it contradicts the overwhelming weight of other, contemporaneous historical evidence. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 64-70 (2022) (finding that one-off, localized firearm regulations affecting "miniscule territorial populations" do not outweigh more contemporaneous historical evidence).

[22]    From 1920-30, absentee ballots were estimated to account for less than .5% of total votes. Harris at 293. In 2000, 10% of voters nationwide voted by mail. *See* Charles Stewart III, *How We Voted in 2020: A First Look at the Survey of the Performance of American Elections*, MIT Election Data + Science Lab, (Dec. 15, 2020), available at https://bit.ly/39WCp0H. That number doubled

state officials and the media to advise the public not to rely on the uncertified results during the 2020 presidential election because late-arriving ballots could change the final results.[23]

## CONCLUSION

For all these reasons, the Court should grant Plaintiff's motion for partial summary judgment on Counts I and II with respect to the November 8, 2022 Congressional elections.

March 26, 2024

   *s/ Russ Nobile*
T. Russell Nobile (MS Bar 100682)
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9866
rnobile@judicialwatch.org

Robert D. Popper*
Eric W. Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
porfanedes@judicialwatch.org
rpopper@judicialwatch.org
elee@judicialwatch.org

*\* Application for admission pro hac vice forthcoming*

---

to 21% by 2016 before doubling yet again to 46% in 2020. VBM is now the predominant voting method over early voting and Election Day voting.

[23] *See* Geoffrey Skelley, *Why Pennsylvania's Vote Count Could Change After Election Night*, FiveThirtyEight.com, (Oct. 29, 2020), available at https://bit.ly/3P1xtcK.