**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

REPUBLICAN NATIONAL COMMITTEE;
MISSISSIPPI REPUBLICAN PARTY;
JAMES PERRY; and MATTHEW LAMB,

        Plaintiffs,

    v.

JUSTIN WETZEL, *in his official capacity as
the clerk and registrar of the Circuit Court of
Harrison County*, TONI JO DIAZ, BECKY
PAYNE, BARBARA KIMBALL,
CHRISTENE BRICE, and CAROLYN
HANDLER, *in their official capacities as
members of the Harrison County Election
Commission*, and MICHAEL WATSON, *in
his official capacity as the Secretary of State of
Mississippi*,

        Defendants,

   and

VET VOICE FOUNDATION AND
MISSISSIPPI ALLIANCE OF RETIRED
AMERICANS

        Intervenor-Defendants.

Case No.   1:24-CV-00025-LG-RPM

    (Lead Case)

|  |  |
|---|---|
| LIBERTARIAN PARTY OF MISSISSIPPI, | Case No.      1:24-CV-00037-LG-RPM |
| Plaintiff, | |
| v. | |
| JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, TONI JO DIAZ, BECKY PAYNE, BARBARA KIMBALL, CHRISTENE BRICE, and CAROLYN HANDLER, *in their official capacities as members of the Harrison County Election Commission*, and MICHAEL WATSON, *in his official capacity as the Secretary of State of Mississippi*, | |
| Defendants. | |

## DEMOCRATIC NATIONAL COMMITTEE'S *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................2

I.      CONGRESS ESTABLISHES A UNIFORM ELECTION DAY ........................................2

II.     MISSISSIPPI LEGISLATORS ENACT A BALLOT RECEIPT DEADLINE .................3

III.    PLAINTIFFS SUE MISSISSIPPI OFFICIALS TO CHALLENGE THE
       BALLOT RECEIPT DEADLINE ...................................................................4

LEGAL STANDARD .......................................................................................................5

ARGUMENT ..................................................................................................................6

      A.     Federal Law Does Not Require Ballots to Be Received or Counted by
            Election Day ...............................................................................................6

            1.     The Plain Language of Federal Law Does Not Prevent States from
                 Counting Ballots Received After Election Day .........................................6

            2.     Plaintiffs' Interpretation Cannot Be Squared with Historical
                 Practices ...................................................................................................10

            3.     Plaintiffs' Interpretation Would Lead to Absurd Results .........................14

            4.     Tossing Out Ballots Submitted Before, but Received After,
                 Election Day Would Frustrate the Purposes Animating Federal
                 Law ..........................................................................................................16

      B.     Plaintiffs' Preemption Claim Fails Because There Is No Conflict Between
            Federal Law and Mississippi Law ............................................................17

      C.     Plaintiffs' Constitutional Claims Fail for Independent Reasons............................19

CONCLUSION...............................................................................................................20

CERTIFICATE OF SERVICE ............................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

*Bank of Louisiana v. Aetna U.S. Healthcare Inc.*,
    468 F.3d 237 (5th Cir. 2006) ...................................................5

*Bost v. Illinois State Bd. of Elections*,
    No. 22-CV-02754, 2023 WL 4817073 (N.D. Ill. July 26, 2023)..................18, 19, 20

*Crown Castle Fiber, LLC v. City of Pasadena, Texas*,
    76 F.4th 425 (5th Cir. 2023) ...................................................5

*Doe v. Walker*,
    746 F. Supp. 2d 667 (D. Md. 2010) ...............................................14

*Donald J. Trump for President, Inc. v. Way*,
    492 F. Supp. 3d 354 (D.N.J. 2020) ..............................................18, 19

*Foster v. Love*,
    522 U.S. 67 (1997).......................................................... *passim*

*Harris v. Fla. Elections Canvassing Comm'n*,
    122 F. Supp. 2d 1317 (N.D. Fla. 2000).............................................7

*Millsaps v. Thompson*,
    259 F.3d 535 (6th Cir. 2001) ....................................................15

*Moore v. Harper*,
    600 U.S. 1 (2023)...............................................................17

*Ross v. Blake,*
    578 U.S. 632 (2016)..............................................................6

*Short v. Brown*,
    893 F.3d 671 (9th Cir. 2018) ....................................................19

*Smiley v. Holm*,
    285 U.S. 355 (1932)..............................................................17

*Storer v. Brown,*
    415 U.S. 724 (1974)..............................................................17

*Texas Indep. Party v. Kirk*,
    84 F.3d 178 (5th Cir. 1996) .....................................................19

*Texas League of United Latin Am. Citizens v. Hughs,*
   978 F.3d 136 (5th Cir. 2020) .................................................................19

*U.S. Term Limits, Inc. v. Thornton,*
   514 U.S. 779 (1995) ...............................................................................17

*United States v. A Female Juvenile,*
   103 F.3d 14 (5th Cir. 1996) ...................................................................14

*United States v. Granderson,*
   511 U.S. 39 (1994)...................................................................................14

*Voting Integrity Project, Inc. v. Bomer,*
   199 F.3d 773 (5th Cir. 2000) .......................................................... *passim*

**STATE CASES**

*Bourland v. Hildreth,*
   26 Cal. 161 (1864) ....................................................................................7

*Gillespie v. Palmer,*
   20 Wis. 544 (1866) ...................................................................................7

*Goodell v. Judith Basin Cnty.,*
   224 P. 1110 (Mont. 1924) .......................................................................13

*Maddox v. Bd. of State Canvassers,*
   149 P.2d 112 (Mont. 1944) .....................................................................13

*Pa. Democratic Party v. Boockvar,*
   238 A.3d 345 (Pa. 2020) ...................................................................18, 19

*Pradat v. Ramsey,*
   47 Miss. 24 (1872) ....................................................................................7

**FEDERAL STATUTES**

2 U.S.C. § 1 ...............................................................................................1, 3

2 U.S.C. § 1a .................................................................................................7

2 U.S.C. § 7 ...........................................................................................1, 3, 7

3 U.S.C. § 1 ........................................................................................ *passim*

3 U.S.C. § 5(a)(2).........................................................................................9

3 U.S.C. § 21 ...........................................................................................3, 9

52 U.S.C. § 10502(d) ...................................................................................9, 15

52 U.S.C. § 10502(g) ........................................................................................9

52 U.S.C. § 20303(a)(1) ....................................................................................8

52 U.S.C. § 20304 .............................................................................................8

52 U.S.C. § 20304(b)(1) ....................................................................................8

52 U.S.C. § 20304(b)(3) ....................................................................................8

52 U.S.C. § 20307(a) .........................................................................................8

Act of Jan. 23, 1845, 28 Cong. ch. 1, 5 Stat. 721 ........................................2, 3

Act of Feb. 2, 1872, 42 Cong. ch. 11, 17 Stat. 28...........................................3

Act of June 4, 1914, 63 Cong. ch. 103, 38 Stat. 384 .......................................3

Military and Overseas Voter Empowerment Act, Pub. L. No. 111-84, 123 Stat.
   2190 (2009)..................................................................................................14

Electoral Count Reform and Presidential Transition Improvement Act of 2022,
   Pub. L. No. 117-328, div. P, 136 Stat. 4459 ...............................................3

**STATE STATUTES**

Ala. Code § 17-11-18(b) ............................................................................13, 14

Alaska Stat. § 15.20.081 ..................................................................................13

Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii) .....................................................13, 14

Cal. Elec. Code § 3020(b) ................................................................................13

Cal. Political Code § 1360 (James H. Derring ed. 1924) .................................12

D.C. Code § 1-1001.05(a)(10B) .......................................................................13

Fla. Stat. § 101.6952(5)..............................................................................13, 14

Ga. Code Ann. § 21-2-386(a)(1)(G) ...........................................................13, 14

10 Ill. Comp. Stat. 5/18A-15 ...........................................................................13

10 Ill. Comp. Stat. 5/19-8.................................................................................13

Ind. Code § 3-12-1-17(b) ............................................................................13, 14

Kan. Stat. Ann. 25-1132(b) ...................................................................................13

Kans. Rev. Stat § 25-1106 (Chester I. Long, et al., eds. 1923) ...................................12

Mass. Gen. Laws Chapter 54 § 93 .............................................................................13

Md. Code Ann., Elec. Law, § 9-309 ...........................................................................13

Md. Code Ann., Pub. Gen. L., art. 33, § 229 (1924) .................................................12

Mich. Comp. Laws § 168.759a(18) ......................................................................13, 14

Miss. Code § 23-15-637(1)(a) .............................................................................*passim*

Miss. Code § 23-15-637(2) ........................................................................................18

Miss. Code § 23-15-645(1) ........................................................................................18

Miss. Code § 23-15-673 ..............................................................................................3

Miss. Code § 23-15-675 ..............................................................................................3

Miss. Code § 23-15-699 ............................................................................................18

Mo. Rev. Stat. § 115.920(1) ................................................................................13, 14

Mo. Rev. Stat. § 11474 (1939) ..................................................................................12

Neb. Rev. Stat. § 32-838 (1943) ...............................................................................12

N.D. Cent. Code Ann. § 16.1-07-09 ..........................................................................13

N.J. Stat. Ann. § 19:63-22(a) .....................................................................................13

N.Y. Elec. Law § 8-412(1) .........................................................................................13

Nev. Rev. Stat. § 293.269921(1)(b) ...........................................................................13

N.J. Sess. Acts (1815) ................................................................................................12

Ohio Rev. Code Ann. § 3509.05(D)(2)(a) ..................................................................13

Or. Rev. Stat. § 254.470(6)(e)(B) ..............................................................................13

25 Pa. Cons. Stat. § 3511(a) ...............................................................................13, 14

Pa. Sess. L. ch. 171, §§ 1, 3 (1813) ...........................................................................12

Pierce's Code Wash. § 2090 (1926) ...........................................................................13

R.I. Gen. Laws § 17-20-16......................................................................................13, 14

R.I. Session L. ch. 1863 § 6 (1932) ..............................................................................13

S.C. Code Ann. § 7-15-700(A) ...............................................................................13, 14

Tex. Elec. Code Ann. § 86.007(a)(2)..............................................................................13

Utah Code Ann. § 20A-3a-204(2)(a)...............................................................................13

Va. Code Ann. § 24.2-709(B) ........................................................................................14

W. Va. Code § 3-3-5(g)(2)..............................................................................................14

Wash. Rev. Code Ann. § 29A.40.091 ............................................................................14

**FEDERAL RULES**

Fed. R. Civ. P. 56 .............................................................................................................5

**LEGISLATIVE MATERIALS**

116 Cong. Rec. 6996 (1970) (statement of Sen. Goldwater)...........................................13

156 Cong. Rec. S4513–02 (daily ed. May 27, 2010).....................................................14

Cong. Globe, 42d Cong., 2d Sess., 141 (1871)................................................................2

Cong. Globe, 42d Cong., 2d Sess. 3407 (1872)...............................................................3

*House Bill 1521*, Miss. Leg.,
    https://billstatus.ls.state.ms.us/2020/pdf/history/HB/HB1521.xml (last visited
    Mar. 26, 2024)............................................................................................................4

**OTHER AUTHORITIES**

Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee
    Voting Act, Dep't of Just., (last accessed Mar. 6, 2024) (collecting cases),
    available at https://www.justice.gov/crt/cases-raising-claims-under-
    uniformed-and-overseas-citizen-absentee-voting-act ................................................9

Edward B. Moreton, Jr., *Voting by Mail*, 58 S. Cal. L. Rev. 1261 (1985) ....................10

GEORGE FREDERICK MILLER, ABSENTEE VOTERS AND SUFFRAGE LAWS (1948)....................10, 12

HELEN M. ROCCA, A BRIEF DIGEST OF THE LAWS RELATING TO ABSENTEE VOTING
    AND REGISTRATION (1928).........................................................................................12

J.H. BENTON, VOTING IN THE FIELD (1915)..................................................................11

JOSEPH P. HARRIS, ELECTION ADMINISTRATION IN THE UNITED STATES (1934)...............10, 11, 13

N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1844)............................9

Nat'l Conference of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (Updated March 18, 2024), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots......................................................................................14

P. Orman Ray, *Absent Voters*, 8 Am. Pol. Sci. Rev. 442 (1914) ..................................................10

P. Orman Ray, *Absent-voting Laws*, 12 Am. Pol. Sci. Rev. 251 (1917)................................10, 11

P. Orman Ray, *Military Absent-voting Laws*, 12 Am. Pol. Sci. Rev. 461 (1918) .................11, 12

P. Orman Ray, *Absent-voting Laws*, 18 Am. Pol. Sci. Rev. 321 (1924)................................10, 11

V.O. Key, Jr., *Politics Parties and Pressure Groups* (1947).........................................................12

## INTRODUCTION

The Republican National Committee, the Mississippi Republican Party, two individual plaintiffs, and the Libertarian Party of Mississippi (the "Plaintiffs")[1] sued several Mississippi officials (the "Defendants"), alleging that a Mississippi statute, Miss. Code § 23-15-637(1)(a), conflicts with federal law and, as a result violates Plaintiffs' constitutional rights.  Section 23-15-637 forms part of Mississippi's Absentee Balloting Procedures Law, setting the deadline for receipt of mail-in ballots.  To be counted, a mail-in ballot must "be postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." *Id.*  Plaintiffs ask the Court to enjoin this "Ballot Receipt Deadline."  They argue that federal law prohibits counting mail-in ballots received after the date of the election—even if those ballots were completed and mailed by election day.  Because the Ballot Receipt Deadline is entirely consistent with federal law, and because the Democratic National Committee (DNC) has an interest in how elections are run and in the success of Democratic candidates, the DNC files this *amicus curiae* brief in support of Defendants.

Federal law unambiguously permits Mississippi's practice, which is followed by dozens of states and has historical antecedents dating back over a century.   Federal law establishes election day as the date on which the "election" of members of Congress (2 U.S.C. §§ 1, 7) and the "appoint[ment]" (3 U.S.C. § 1) of presidential electors occurs.  But the federal requirement that the election, or appointment, occur on a single day is satisfied by state laws that ensure that the "election"—the "act of choosing a person to fill an office"—occurs by the close of election day. *Foster v. Love*, 522 U.S. 67, 71 (1997).  Once the voters have made their final *choice*, i.e., cast their ballots, the relevant "election" or "appoint[ment]" ends, and any additional time it takes to receive and tally ballots does not alter the choice that has already been made.

---

[1] The Libertarian Party of Mississippi filed a separate suit, Case No. 1:24-cv-37, which the Court consolidated with the other plaintiffs' action, Case No. 1:24-cv-25.  The DNC's *amicus* brief pertains to both complaints.

Mississippi's Ballot Receipt Deadline comports with these election day statutes by requiring that all ballots be postmarked by election day.  In effect, Mississippi has established a mailbox rule:  absentee votes are cast upon mailing, which must happen by election day.  Indeed, 28 states and the District of Columbia have adopted similar mailbox rules, allowing election officials to count absentee ballots that arrive after election day.  Many of the statutes apply to ***all*** eligible voters; others apply only to those voters who are overseas—in particular, members of the military serving our country abroad.  Collectively, these statutes protect the franchise of countless citizens.  Yet under Plaintiffs' theory, they would all be invalid.

Plaintiffs' constitutional claims based on the rights to vote and stand for office fail for the additional reason that Mississippi's Ballot Receipt Deadline places no ***burden*** on the Plaintiffs' constitutional rights.  Instead, the Ballot Receipt Deadline simply ensures that eligible voters may exercise their franchise pursuant to the legislature's establishment of their right to vote absentee by mail.

## **BACKGROUND**

## I.   **CONGRESS ESTABLISHES A UNIFORM ELECTION DAY**

For almost a hundred years, "each State" was free to fix its federal elections "upon a different day."  *See Foster*, 522 U.S. at 74 (quoting Cong. Globe, 42d Cong., 2d Sess., 141 (1871) (remarks of Rep. Butler)).  This practice threatened to (and actually did) "distort[]" the voting process.  *Id.* at 73.  The "results of an early federal election," like the 1840 election in Pennsylvania and other states, exerted "influence" on later State elections, thereby providing certain voters an "undue advantage" in influencing federal elections.  *Id.* at 73-74.  Also, states were free to set their congressional elections on a different day from the already-fixed day for appointment of presidential electors.  *See id.* at 73; *see also* Act of Jan. 23, 1845, 28 Cong. ch. 1, 5 Stat. 721 (setting date for appointment of presidential electors); *cf.* 3 U.S.C. § 1.  Thus, states could establish multiple days for voting, thereby inconveniencing citizens.

To curb these adverse effects, Congress required that all congressional elections occur on a single day.  In 1872, Congress enacted a provision that "fixed and established" the day for the

"election" of "Representatives."  *See* Act of Feb. 2, 1872, 42 Cong. ch. 11, § 3, 17 Stat. 28, 28.

Amended a few times over the years, that provision was eventually codified as 2 U.S.C. § 7.  And

that Section now requires that "the election" of "Representatives" occur on the "Tuesday next after

the 1st Monday in November."  After the Seventeenth Amendment was ratified, providing for the

direct election of Senators, Congress enacted a similar provision applicable to Senators.  *See* Act

of June 4, 1914, 63 Cong. ch. 103, § 1, 38 Stat. 384, 384. That statute requires the "elect[ion]" of

Senators to occur on the same day as the "election" of Representatives, *id.*, and it was codified in

2 U.S.C. § 1 with no material change.  Collectively, these statutes "reflect[] Congress's concern

that citizens be able to exercise their right to vote." *See Voting Integrity Project, Inc. v. Bomer*,

199 F.3d 773, 777 (5th Cir. 2000) (citing Cong. Globe, 42d Cong., 2d Sess. 3407-08 (1872)).

Congress established a single day for the appointment of presidential electors in 1845.  Act

of Jan. 23, 1845, 28 Cong. ch. 1, 5 Stat. 721; *see* 3 U.S.C. § 1.  More recently, Congress amended

the statute that sets the date for "appoint[ment]" of presidential electors.  *See* Electoral Count

Reform and Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, div. P, 136

Stat. 4459, 5233-34 (enacted as part of an appropriations act and codified in scattered sections of

Title 3).  In all but the most extraordinary of circumstances, the appointment of electors also occurs

on the "Tuesday next after the first Monday in November." 3 U.S.C. § 21.[2]

## II.    MISSISSIPPI LEGISLATORS ENACT A BALLOT RECEIPT DEADLINE

In Mississippi, certain voters are entitled to vote absentee by mail.  This includes voters

who are enlisted or commissioned members of the Armed Forces, Miss. Code §§ 23-15-673, 23-

15-675; voters who must work on election day during the times at which the polls are open, *id.*

§ 23-15-713(h); voters who have permanent or temporary disabilities that impact their ability to

vote, *id.* § 23-15-713(d); voters who are "away from [their] county of residence on election day,"

*id.* § 23-15-713(c); and voters who are members of Mississippi's congressional delegation or

---

[2] If a State that appoints electors by popular vote "modifies the period of voting" based on
"extraordinary and catastrophic" events, "election day" includes the "modified period of voting."
*See* 3 U.S.C. § 21.  That provision was not the basis for Mississippi's Ballot Receipt Deadline.

employees of any member of that delegation, *id.* § 23-15-713(g).  *See also id.* § 23-15-627 (identifying eligible voters in application for absentee ballot).  Eligible voters must apply, and if their applications are approved, the registrar will mail them an absentee ballot and return envelope. *See id.* §§ 23-15-627 (application), 23-15-719 (process).  After an absentee voter completes their ballot, they must mail it to the address provided on the official return envelope.  *Id.* § 23-15-719(1)

To be counted, an absentee ballot returned by mail must "be postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." *Id.* § 23-15-637(1)(a).  This Ballot Receipt Deadline was enacted in 2020 with overwhelming bipartisan support.  *See House Bill 1521*, Miss. Leg., https://billstatus.ls.state.ms.us/ 2020/pdf/history/HB/HB1521.xml (last visited Mar. 26, 2024) (collecting legislative history). Measures in the House, Senate, and the Conference Committee report were all adopted by wide (sometimes unanimous) margins that were not divided along political lines.  *See id.* (linking to vote tallies).  Governor Reeves signed the bill into law on July 8, 2020.  *Id.*

## III.   PLAINTIFFS SUE MISSISSIPPI OFFICIALS TO CHALLENGE THE BALLOT RECEIPT DEADLINE

The Republican National Committee, the Mississippi Republican Party, and two individual plaintiffs raise three claims, all of which assert a conflict between federal law and Mississippi's Ballot Receipt Deadline.  *See* Compl. ¶¶ 62-80 ("RNC Compl.").[3]  The first claim is a straightforward preemption argument:  by requiring Mississippi counties to count mail-in ballots that are "received up to five business days after Election Day," Section 23-15-637(1)(a) allegedly conflicts with federal law.  RNC Compl. ¶ 67.  The two other claims, which purport to invoke constitutional provisions, follow from that alleged conflict.  By counting votes that have been received after Election Day, these plaintiffs claim, Mississippi officials are "depriving Plaintiffs of rights protected under the First and Fourteenth Amendment."  RNC Compl. ¶ 72.  Specifically, these plaintiffs claim they must "spend money" and other resources in reliance "on unlawful

---

[3] All citations to docket entries refer to the lead case, Case No. 1:24-cv-25, unless otherwise noted.

provisions of state law."  RNC Compl. ¶ 72.  Finally, they allege the same Mississippi statute "violates the right to vote" by diluting "honest votes."  RNC Compl. ¶ 77.

The Libertarian Party of Mississippi raises three claims, all of which purport to sound in constitutional rights.  Case No. 1:24-cv-37, Compl. ¶¶ 57-81 ("Libertarian Party Compl.").  Each claim is premised on the same purported conflict with federal law on which the RNC complaint is based.  *See* Libertarian Party Compl. ¶¶ 58, 65, 76-77.  This is true even of the claim that purports to sound in the Elections and Electors Clauses.  *See* Libertarian Party Compl. ¶¶ 69-81.  That claim alleges that Mississippi law establishes an election day that conflicts with (or usurps) Congress's choice to enact the federal election day statutes.  *See* Libertarian Party Compl. ¶¶ 69-81.  The other two counts in the Libertarian Party's complaint, like similar counts in the RNC complaint, claim that Mississippi's Ballot Receipt Deadline infringes the right to vote and the right to stand for office.  Libertarian Party Compl. ¶¶ 58, 65.

Vet Voice Foundation and the Mississippi Alliance for Retired Americans ("Intervenor-Defendants") moved to intervene as defendants in the suit filed by the Republican National Committee and other plaintiffs.  *See* ECF No. 6.  The Court granted that motion as unopposed.  The DNC sought to intervene, but the Court denied that motion, instead allowing the DNC to file an amicus brief.  ECF Nos. 45, 47.

## LEGAL STANDARD

The Court must grant summary judgment in the Defendants' favor if there is no "genuine dispute" of material fact and the DNC is entitled to judgment "as a matter of law."  Fed. R. Civ. P. 56.  Courts often resolve preemption questions—which are by their nature legal disputes—at summary judgment.  *E.g.*, *Crown Castle Fiber, LLC v. City of Pasadena, Texas*, 76 F.4th 425, 432 (5th Cir. 2023); *Bank of Louisiana v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006).  This case turns entirely on the interpretation of federal and Mississippi statutes, and Plaintiffs and Defendants accordingly agree their legal dispute can be resolved as a matter of law.  *See, e.g.*, ECF Nos. 37, 38.

## ARGUMENT

Plaintiffs' claims all rest on the assertion that Mississippi's statutory framework for counting mail-in ballots is preempted by federal statutes that establish a nationwide federal election day. That assertion is meritless. The federal statutes providing for the election to occur on election day require only that the voters' choice of candidate occur by election day. Nothing in federal law prohibits states from counting votes *received* later so long as the final *choice* has occurred by election day. No conflict thus exists between federal law and Mississippi's Ballot Receipt Deadline, and all of Plaintiffs' claims fail for that reason. Plaintiffs' constitutional claims based on the right to vote and right to stand for office also fail for an independent reason: the Ballot Receipt Deadline does not burden the Plaintiffs' constitutional rights. Thus, the Court should grant summary judgment in Defendants' favor.

### A.    Federal Law Does Not Require Ballots to Be Received or Counted by Election Day

Plaintiffs' theory that, to be counted, a ballot must be *received* by election day finds no support in any federal law. The precise nature of that theory is less than clear. Plaintiffs seem to be arguing that either (1) votes must be *cast* by election day and the act of "casting" requires receipt by an election official or (2) votes must be cast *and* received by election day. But that distinction is immaterial for present purposes. The "election" and "appoint[ment]" that federal law requires to occur on election day takes place when citizens make their final *choice* of their preferred candidates. Nothing in federal law speaks to when a properly submitted ballot must be received. Indeed, such a conclusion would be inconsistent with a plain understanding of federal statutes and longstanding, undisturbed state practices.

### 1.    The Plain Language of Federal Law Does Not Prevent States from Counting Ballots Received After Election Day

As with all questions of statutory interpretation, the court must start with the plain terms of the relevant statutes. *See, e.g.*, *Ross v. Blake*, 578 U.S. 632, 638 (2016). In arguing that federal law requires all votes to be *received* by election day, Plaintiffs ignore the plain text of numerous statutes. The "election" of members of Congress (2 U.S.C. §§ 1, 7) and "appoint[ment]" of

presidential electors (3 U.S.C. § 1) occurs once all citizens make their final *choice* of their preferred candidates, even if state law permits counting of votes received after election day.

**First**, the term "election," as used in the relevant federal statutes, means the "combined actions of voters and officials" that makes a "final selection of an officeholder." *Foster*, 522 U.S. at 71 (citing 1869 edition of Webster's dictionary, published just before Congress enacted the statute that became 2 U.S.C. § 7).[4]  In other words, the election is the voters' choice of a candidate through a process managed by election officials.  In providing that "the election" of a Senator or Representative must take place on election day, therefore, Sections 1 and 7 require that the "act of choosing a person to fill an office" occur by the close of election day.  *Id.*  Administrative efforts, whether before or after "the election," have no bearing on when that election—the voters' final act of selection—occurred.  *Cf. id.* at 71-72; *Bomer*, 199 F.3d at 776 (holding that some acts may be performed "before election day" without running afoul of Section 7).  That it might take some time to determine which officeholder has been elected—for example, time to receive ballots, count votes, and certify results—is of no import.  *E.g.*, *Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla. 2000) (explaining that votes are "[r]outinely" counted after election day).  The *choice* of officeholder is made once all voters *finalize* their votes.  At that point, the "election" has been completed.

Other provisions in Title 2 confirm this plain reading of "election."  A number of provisions equate the *election* of an officeholder with that officeholder having been *chosen*.  *See* 2 U.S.C. § 1a (requiring "the executive of the State from which any Senator has been *chosen* to certify his *election*"), § 381 (defining "election" to mean "an official general or special election to *choose*" a

---

[4] Some state supreme court decisions from the period define "vote" in a similar way.  *Gillespie v. Palmer*, 20 Wis. 544, 553 (1866) (interpreting "vote" as "the expression of the choice of the voter for or against any measure, any law, or the election of any person to office"); *Bourland v. Hildreth*, 26 Cal. 161, 194 (1864) (interpreting "vote" to mean "expression of choice by or through a ballot, or by outcry or any other particular means by which the choice of the voter may be lawfully made known or communicated to others in the given instance"); *cf. Pradat v. Ramsey*, 47 Miss. 24, 33 (1872) (the "entire machinery" of election laws "is to elicit an expression of the will of the electors, in the choice of officers").

Representative (emphasis added)).  Section 1 itself employs this phrasing by tying the date on which a Senator "shall be elected" to the date of "the regular election" at which a "Representative" is to be "*chosen*."  *Id.* § 1 (emphasis added).  Each of these provisions suggest the core of an "election" is choice.  And under Mississippi law, the choice of candidate is made by the close of election day—when all voters have submitted their ballots, including ballots mailed by absentee voters.

Provisions outside of Title 2 are in accord.  Most clearly, federal law recognizes that states may impose ballot receipt deadlines that post-date election day.  Congress has guaranteed that certain members of the uniformed services may vote in elections for federal office by absentee ballot, even if denied a ballot by their home state.  *See* 52 U.S.C. § 20303(a)(1).  To implement that guarantee, Congress established procedures for collection and delivery of absentee ballots to state election officials.  *See id.* § 20304.  In most circumstances, a completed absentee ballot must be collected by a designated federal official by the "seventh day preceding" the "general election" and then transferred to the United States Post Office.  *Id.* § 20304(b)(3).  Then, the ballot must be delivered to appropriate election officials "not later than the date by which an absentee ballot must be ***received*** in order to be ***counted*** in the election."  *Id.* § 20304(b)(1) (emphases added).  These provisions recognize that the "election" itself occurs on a particular date—and further recognize that the date on which a ballot must be "received" to be "counted" after being submitted in the election may be a different date pursuant to state law.  *Id.*  In other words, federal law recognizes that the act of receiving the votes is not necessarily a part of the election itself, and also expressly provides states leeway to determine the date on which votes must be received.  The "election" is the voters' choice of a candidate, and the process of receiving and counting ballots is a ministerial act aimed at identifying the results of the election.

Moreover, in addressing these military-voting statutes, courts often recognize that ballot receipt deadlines may be extended well past election day.  Specifically, the Attorney General is authorized to enforce these military-voting statutes, which are part of the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA).  52 U.S.C. § 20307(a) (providing enforcement

authority).  Exercising that authority, the government has sued states on several occasions and secured orders that *require* states to extend their deadlines for receipt of absentee ballots— sometimes several days after election day—to prevent disenfranchisement of military members serving overseas.  *See Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act*, Dep't of Just., (last accessed Mar. 26, 2024) (collecting cases), https://www.justice. gov/crt/cases-raising-claims-under-uniformed-and-overseas-citizen-absentee-voting-act.     That practice cannot be reconciled with Plaintiffs' claim that the election day statutes require all ballots to have been received as of election day.

**Second**, federal statutes providing that the "appoint[ment]" of presidential electors must occur on election day similarly refer to when those electors are finally *chosen*, irrespective of ministerial efforts before or after that choice.  *See* 3 U.S.C. §§ 1, 21.  The term "appointed" was first introduced into the statutory provisions in 1845, and at that time, "appointment" meant "*designation* to office."  N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 46 (1844) (emphasis added) (also defining appoint and appointed in similar terms).  That definition parallels *Foster*'s definition of "election" as the "final *selection*" of an officeholder.  *See Foster*, 522 U.S. at 71 (emphasis added).  In either case, voters' final *choice* is what matters.  And other provisions in Title 3 support this conclusion.  *See* 3 U.S.C. § 5(a)(2) (requiring reporting of the number of votes "given or cast," which suggests choice is the key inquiry); *id.* § 21 (allowing adjustment of "election day" based on "period of *voting*," suggesting election day is tied to the day voting occurs (emphasis added)).  In fact, Congress has required states to adopt certain minimum absentee voting procedures for electors, including allowing for ballots to be received on or before election day, but it has also expressly allowed "any State" to adopt "less restrictive voting practices."  52 U.S.C. § 10502(d), (g).  That expressly contemplates that states have leeway to enact ballot-receipt deadlines that fall after election day.

Put simply, the "election" of members of congress and the "appoint[ment]" of presidential electors concludes once citizens make their final *choice* of candidates.  And when federal law

mentions receiving or counting votes, it treats those acts as separate acts that do not implicate or affect the voters' final choice of candidate.

2.     Plaintiffs' Interpretation Cannot Be Squared with Historical Practices

Courts may not "read the federal election day statutes in a manner that would prohibit . . . a universal, longstanding practice." *Bomer*, 199 F.3d at 776.  Yet accepting Plaintiffs' radical theory of the election day statutes would do just that.  For years, states have used absentee balloting frameworks like Mississippi's—that is, frameworks that require ballots to be mailed by election day but permit them to be received and then counted afterwards.  Those statutes remain prevalent today.  Plaintiffs' theory would cause mass disruption and chaos, upending long-established laws in this election and future ones.  It would result in the disenfranchisement of countless voters, including in the military and overseas.

States have permitted absentee balloting for "[m]ore than a century." *Id.* (citing Edward B. Moreton, Jr., *Voting by Mail*, 58 S. Cal. L. Rev. 1261, 1261-62 (1985)); *cf.* GEORGE FREDERICK MILLER, ABSENTEE VOTERS AND SUFFRAGE LAWS 179-97 (1948) (collecting colonial and State laws, enacted as early as 1635, that address indirect voting).  Indeed, all but four states had some form of absentee voting provisions by 1924.  P. Orman Ray, *Absent-voting Laws*, 18 Am. Pol. Sci. Rev. 321, 321 (1924).  And for civilian voting provisions, these states fell into one of "two general types, namely, the Kansas and North Dakota types."  P. Orman Ray, *Absent-voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 251 (1918).  Some states in both camps permitted votes *submitted* by election day to be received and counted at a later date.

For example, statutes in the first (Kansas) camp allowed for the receipt and counting of ballots *after* election day.  P. Orman Ray, *Absent Voters*, 8 Am. Pol. Sci. Rev. 442, 442-43 (1914); *see* JOSEPH P. HARRIS, ELECTION ADMINISTRATION IN THE UNITED STATES 287-288 (1934).  Under those statutes, the absentee voter was required to present himself at a polling place where he was located on election day, swear that he was a qualified voter (among other things), and complete a ballot.  Ray, 8 Am. Pol. Sci. Rev. at 443 (summarizing Kansas practice).  Then, the vote would be "sent by mail to the proper official" before "the result of the official canvass [wa]s declared." *Id.*

Implicitly, this framework established that ballots submitted on election day would be received by mail after election day, and the "result" would be declared after election day.

While statutes in the second (North Dakota) camp generally required absentee ballots to be received by election day, some also permitted ballots to be received after election day. *See* Ray, *Absent-voting Laws, 1917*, at 254, 258-259; Harris, *Election Administration* at 291. Under those statutes, an absentee voter was required to complete his ballot in front of an official authorized to administer oaths and then mail the ballot to his polling place to be opened and counted on election day. Ray, 12 Am. Pol. Sci. Rev. at 254, 258-259. But there were exceptions to that general practice. California and Pennsylvania deferred the "counting of absent[ ]voters' ballots" until "the official canvas." P. Orman Ray, *Absent-Voting Laws*, 18 Am. Pol. Sci. Rev. 321, 322 (1924); *see also* Harris, *Election Administration* at 291 (noting that, as of 1934, California allowed counting of ballots received within fifteen days of the election). In this way, the California and Pennsylvania laws more "closely conform to the Kansas (1911) statute," but both made "more adequate provision for safeguarding the secrecy of the ballot." Ray, 18 Am. Pol. Sci. Rev. at 322.

Many states also passed statutes specifically aimed at allowing "qualified voters in military service to vote outside their home precincts." *See* P. Orman Ray, *Military Absent-Voting Laws*, 12 Am. Pol. Sci. Rev. 461, 461 (1918).[5] Those laws first appeared during the Civil War, *see id.* at 462, when several states enacted laws ensuring that soldiers could exercise their franchise. *See generally* J.H. BENTON, VOTING IN THE FIELD (1915) (summarizing Civil War-era practices). Several states allowed Civil War soldiers to "*vot*[*e*] in the field" and extended the "time for canvassing the votes" thereafter received in the relevant state. *Id.* at 317-318 (emphasis added). Although many northern states did not extend the time for counting, that was because it was "understood . . . that a sufficient period would elapse between the day of the election, which was the day on which the soldiers were to vote in the field, and the counting of the votes" in the relevant

---

[5] In some states, a single provision allowed for both military and civilian absentee voters. *See* Ray, 12 AM. POL. SCI. REV. at 461.

state. *Id.* at 318.  Fifty years later, many states were still allowing military absentees to vote in the field on election day and have their voted received and counted in their home state at some later time.  *See Military Absent-voting Laws*, 12 Am. Pol. Sci. Rev. at 468-69 (discussing counting of ballots).

All told, states have been enacting ballot receipt deadlines—including deadlines that fall *after* election day—for centuries.  *See* V.O. Key, Jr., *Politics Parties and Pressure Groups* 672 (1947); *cf.* HELEN M. ROCCA, A BRIEF DIGEST OF THE LAWS RELATING TO ABSENTEE VOTING AND REGISTRATION (1928) (summarizing then-effective statutes).  As just a few examples, states enacted the following statutes throughout the 19th and 20th centuries:

- Absentee ballots must be received "within *fourteen days after* the date of the election in which such ballots are to be counted." Cal. Political Code § 1360 (James H. Derring ed. 1924) (emphasis added).

- For voters in actual military service, ballots must be "cast[]" according to a specific procedure and then "return[ed]" "before the *tenth day following* [the] election." Kans. Rev. Stat. § 25-1106 (Chester I. Long, et al., eds. 1923) (emphasis added).

- Servicemembers' absentee ballots must be "marked on or before election day, and mailed in time to arrive at [their] destination not more than *7 days after election day*." Md. Code Ann, Pub. Gen. L., art. 33, § 229 (1924) (emphasis added) (providing instructions to voter).

- Absentee ballots must be received "not later than 6 o'clock p. m. on *the day next succeeding* the day of [the] election." Mo. Rev. Stat. § 11474 (1939) (emphasis added).

- Requiring acceptance of mail-in ballots received "not later than 10:00 a.m. on the *second day following election day*." Neb. Rev. Stat. § 32-838 (1943) (emphasis added).

- Soldiers' absentee votes, which would be cast in the field "on the first day appointed by law," must be transmitted to state officials "within *three days after* said election," to be received thereafter.  N.J. Sess. Acts (1815) (reproduced in at *Absentee Voters and Suffrage Laws* 203-05) (emphasis added).

- Absentee votes, which would be cast by soldiers in the field "on the days appointed by law for holding general elections," must be delivered to state officials "within *three days after* said election."  Pa. Sess. L. ch. 171, §§ 1, 3 (1813) (emphasis added).

- Ballot must be mailed "on [] election day" so that "it shall be received on or before midnight of the *Monday following said election*." R.I. Session L. ch. 1863 § 6 (1932) (emphasis added).

- No absentee ballot may be counted "unless received by the auditor within *six days from the day* of [the] general or primary election." Pierce's Code Wash. § 2090 (1926) (emphasis added).

Some commentators even recommended removing "[t]ime restrictions" for "delivery of [a] ballot after it has been marked," "provided that the ballot is mailed on or before the day of the election and before the hour for closing the polls." Harris, *Election Administration* at 300.[6]

Congress's enactment of the "election day" statutes in 1845 and 1872 must be construed against this unbroken historical practice. The uniform understanding of elections was that the receiving of votes was something that could occur *after* the election itself. And there can be no question that Congress has been aware of this practice for decades. *E.g.*, 116 Cong. Rec. 6996 (1970) (statement of Sen. Goldwater) (reporting that states have allowed absentee ballots to be "returned as late as the day of the election or even later").

Today, at least 28 states and the District of Columbia permit mailed ballots to arrive after election day for at least some voters.[7] Some of those states do not permit all late-arriving ballots

---

[6] Although some absentee-voting statutes were struck down under *state* law, the DNC is not aware of any court that has invalidated a ballot-receipt deadline as inconsistent with federal law. *See, e.g.*, *Goodell v. Judith Basin Cnty.*, 224 P. 1110, 1112 (Mont. 1924) (collecting challenges based on *state* constitutional provisions); *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944) (invalidating statute based on *state* law that defined voting to require "not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day").

[7] *See* Ala. Code § 17-11-18(b); Alaska Stat. § 15.20.081; Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii); Cal. Elec. Code § 3020(b); D.C. Code § 1-1001.05(a)(10B); Fla. Stat. § 101.6952(5); Ga. Code Ann. § 21-2-386(a)(1)(G); 10 Ill. Comp. Stat. 5/19-8, 10 Ill. Comp. Stat. 5/18A-15; Ind. Code § 3-12-1-17(b); Kan. Stat. Ann. 25-1132(b); Mass. Gen. Laws ch. 54 § 93; *see* Md. Code Ann., Elec. Law, § 9-309 (allowing the State Board to establish receipt deadline, which has been set for after election day); Mich. Comp. Laws § 168.759a(18); Miss. Code Ann. § 23-15-637(1)(a); Mo. Rev. Stat. § 115.920(1); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Elec. Law § 8-412(1); N.D. Cent. Code Ann. § 16.1-07-09; Ohio Rev. Code Ann. § 3509.05(D)(2)(a); Or. Rev. Stat. § 254.470(6)(e)(B); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16; S.C. Code Ann. § 7-15-700(A); Tex. Elec. Code Ann. § 86.007(a)(2); Utah Code

to be counted, but they do count late-arriving votes from overseas citizens.[8]  This reflects the entirely reasonable assumption that mailed ballots will take some time to arrive from overseas, and it serves as an important protection for the franchise of military voters stationed abroad while serving our country.  It is also consistent with Congress's clear direction that citizens who are overseas, including members of the military, must not be disenfranchised.  *Bomer*, 199 F.3d at 777 (discussing purposes behind UOCAVA, including how it requires states to provide absentee ballots to certain voters); *see also Doe v. Walker*, 746 F. Supp. 2d 667, 670-71 (D. Md. 2010) (discussing purposes of military-voting acts); 156 Cong. Rec. S4513 (daily ed. May 27, 2010) (statement of Sen. Schumer) (recounting legislative history of Military and Overseas Voter Empowerment Act, Pub. L. No. 111-84, §§ 577-82, 583(a), 584-87, 123 Stat. 2190 (2009)).

Plaintiffs' argument thus cannot be reconciled with longstanding historical practice and accepting it would invalidate numerous state statutes and disenfranchise mail-in voters, including members of the military who vote in Mississippi.   Plaintiffs' radical and unsupported construction of federal law therefore must be rejected.  *Bomer*, 199 F.3d at 776.

3.  Plaintiffs' Interpretation Would Lead to Absurd Results

Statutes should be interpreted to reach "a sensible construction that avoids attributing to [Congress] either an unjust or an absurd conclusion." *United States v. Granderson*, 511 U.S. 39, 56 (1994) (quotation marks omitted).  Indeed, avoiding absurd results is "[a]xiomatic in statutory interpretation." *United States v. A Female Juvenile*, 103 F.3d 14, 16 (5th Cir. 1996).  Although the full scope of Plaintiffs' position is obscure, what is clear is the absurd results that will follow

---

Ann. § 20A-3a-204(2)(a); Va. Code Ann. § 24.2-709(B); Wash. Rev. Code Ann. § 29A.40.091; W. Va. Code § 3-3-5(g)(2) (tied to day of canvassing, which is five days after election); *see also* Nat'l Conference of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (Updated March 18, 2024), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots.

[8] Ala. Code § 17-11-18(b); Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii); Fla. Stat. § 101.6952(5); Ga. Code Ann. § 21-2-386(a)(1)(G); Ind. Code § 3-12-1-17(b); Mich. Comp. Laws § 168.759a(18); Mo. Rev. Stat. § 115.920(1); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16; S.C. Code Ann. § 7-15-700(A).

if that position were adopted.  Requiring all votes to be submitted *and* received as of election day would work mischief, regardless of whether that requirement was based on the meaning of "casting" a vote or based on some requirement that votes be cast and received as of election day.

To start, Plaintiffs offer no meaningful basis for distinguishing between votes received *after* election day and votes received *before* election day.  If counting a ballot received after election day "holds voting open after Election Day," *see* RNC Compl. ¶ 68; Libertarian Party Compl. ¶ 42, it would seem to follow that counting a ballot received before election day would likewise extend the "election" to a period before the congressionally prescribed day.  That would, however, mean that absentee voting would be valid only for votes submitted and received *on* Election Day itself, leading to an absurdly difficult (if not impossible) system for voting by mail.

In response to this problem, Plaintiffs might contend (atextually) that the "election" must be complete and *final* as of election day, but can begin taking place before election day.  But elections are *never* final as of election day.  *See Millsaps v. Thompson*, 259 F.3d 535, 546 n.5 (6th Cir. 2001) (recognizing and explaining in detail how "official action to confirm or verify the results of the election extends well beyond federal election day").  Extensive counting and certification efforts occur thereafter, and Plaintiffs make no claim that ***those*** efforts improperly hold open the day for elections.  Nor could they.  Requiring election officials to tally millions of votes by midnight on election day would be absurd and impracticable.[9]  So any position based on the election being final would require Plaintiffs to draw a meaningful distinction between receipt and counting of votes, which they have not done under either possible articulation of their position.

---

[9] This interpretation could also result in serious constitutional and statutory problems.  For example, the inevitable inability to count all votes submitted on election day by midnight would create Equal Protection problems—treating similarly situated voters differently by the pure happenstance of whether officials were able to count their votes in time.

It might also be in tension with 52 U.S.C. § 10502(d), which requires States to provide absentee voting for presidential elections and to hold open the deadline for receipt of those votes at least until election day.  If states are unable to count all votes received on election day under Section 10502(d), Plaintiffs' theory would bar them from doing so after election day (in violation of federal law).

Instead, the only reasonable understanding of the "final selection" language in *Foster* is the plain meaning of the statutory language as articulated above:  the final ***choice*** must conclude by election day.  Surrounding ministerial efforts, whether before or after the election, are irrelevant.

By contrast, the interpretation the DNC offers would prevent each of these absurd results.  At bottom, the election day statutes say nothing about when ballots must be received.  Instead, those provisions require only that citizens' final choice of candidates occur by the close of election day.  Thus, there is no need to jury-rig the construction of federal law to justify counting ballots received *before* election day count and not ballots received *after* election day.  Nor is there any need to distinguish between receipt of ballots after election day (which Plaintiffs argue violates federal law) and counting of ballots after election day (which Plaintiffs do not argue violates federal law).  Under the DNC's interpretation, the election day statutes require nothing more than a voting system that has been in place for more than a century:  all votes must be cast by election day.[10]

### 4.   Tossing Out Ballots Submitted Before, but Received After, Election Day Would Frustrate the Purposes Animating Federal Law

Plaintiffs' interpretation cannot be squared with the purpose of the election day statutes.  As the Fifth Circuit has explained, the election day statutes "reflect[] Congress's concern that citizens be able to exercise their right to vote."  *Bomer*, 199 F.3d at 777.  That court could not "conceive that Congress intended the federal election day statutes to have the effect of impeding citizens in exercising their right to vote."  *Id.*  That would be the ***precise*** result of accepting Plaintiffs' position.  Plaintiffs would have Mississippi election officials toss out perfectly good votes cast by election day simply because they were received after election day.  But that cannot be what Congress intended.

---

[10] To be sure, other state laws (e.g., canvassing deadlines) and federal law (e.g., the ECRA certification deadline) provide limits on setting the receipt deadline far beyond election day.  But that issue is not implicated here.

Likewise, Section 23-15-637(1)(a) does not "foster either of the primary evils identified by Congress as reasons for passing the federal statutes[.]" *Bomer*, 199 F.3d at 777. Nothing about that statute establishes two (or more) election days: every vote must be submitted as of election day. *See id.* Plaintiffs' allegation that Mississippi law "holds open" election day ignores the clear operation of Section 23-15-637(1)(a), which requires that to be counted, every vote must be cast by election day. Moreover, allowing absentee ballots to arrive a bit ***later*** cannot "influence later voting in other [s]tates" because there is ***no*** later voting in other states—the final choice of officeholder in each state must conclude on election day. *See id.*

In short, Plaintiffs' interpretation would stretch the election day statutes beyond their purpose. As the Fifth Circuit has held, that is a strong reason to reject that interpretation. *Bomer*, 199 F.3d at 777.

### B.     Plaintiffs' Preemption Claim Fails Because There Is No Conflict Between Federal Law and Mississippi Law

To prevail on their preemption claim, Plaintiffs must establish that Section 23-15-637(1)(a) directly conflicts with federal law. They cannot do so.

Under the Constitution, states are responsible for "the mechanics" of federal elections. *Foster*, 522 U.S. at 69. They are "given the initial task" of prescribing the manner of such elections, *Storer v. Brown*, 415 U.S. 724, 729-30 (1974)—an authority that empowers states to "provide a complete code for congressional elections," including as to "protection of voters, prevention of fraud and corrupt practices, [and] counting of votes," *Smiley v. Holm*, 285 U.S. 355, 366 (1932), subject, of course, to Congress's superior authority as well as all applicable federal and state constitutional constraints. *See Moore v. Harper*, 600 U.S. 1, 10 (2023); *Foster*, 522 U.S. at 69; *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995). Courts have consistently held that state laws on the receipt and counting of ballots are preempted only if they "directly conflict" with the federal election day statutes, *Bomer*, 199 F.3d at 775.

There is no conflict between the election day statutes and Mississippi's Ballot Receipt Deadline. As explained above, federal law does not forbid the receipt or counting of votes after

election day, only requiring the final *choice* of candidates be finalized by election day.  Mississippi law complies with the governing federal law by requiring all votes to be completed and submitted, and thus the "election" to conclude, as of election day.  Miss Code § 23-15-637(1)(a).  Mississippi law provides that absentee ballots are cast when they are completed and mailed; receipt occurs after the votes have already been cast.  That distinction is borne out in various provisions of the Mississippi Code.  *E.g.*, Miss. Code §§ 23-15-637(2) ("The registrar shall deposit all absentee ballots which have been ***timely cast*** and ***received by mail*** …." (emphasis added)), 23-15-645(1) (explaining that "[a]bsentee ballots" will be announced simultaneously with "all ***other*** votes cast on election day" (emphasis added)), 23-15-699 (discussing when the "registrar has ***received*** a ***voted*** absentee ballot" (emphasis added)).  In effect, Mississippi has established a mailbox rule for absentee ballots:  an absentee ballot is "cast," and thus the final choice of officeholder is made, when a citizen completes and mails their ballot.[11]  And Section 23-15-637(1)(a) ensures that votes are cast by election day, requiring absentee ballots be "postmarked" by that day.  No more is required under the election day statutes, and there is no conflict here.  In particular, Plaintiffs cannot claim that a vote is "cast" only upon receipt.  There is no support in federal or Mississippi law for such an argument.

Indeed, courts have reached the same conclusion with respect to comparable provisions enacted in other states.  *Bost v. Illinois State Bd. of Elections*, No. 22-cv-02754, 2023 WL 4817073, at *11 (N.D. Ill. July 26, 2023) *appeal docketed at* 23-2644 (7th Cir.); *see Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020); *cf. Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 n.23 (Pa. 2020).  In each case, state law required all ballots be cast by election day but permitted those ballots to be received and/or counted later.  And every court held, for reasons similar to those articulated above, that the state statutes complied with federal law.  *Bost* concluded that Illinois law "operates harmoniously" with the federal election day

---

[11] That approach aligns also with common sense:  once the ballot is in the mailbox, the voter has lost any ability to change the decision and thus the choice is necessarily final.

statutes, despite allowing for ballots received after election day to be counted, because votes must be cast by election day. *Bost*, 2023 WL 4817073 at *11. *Way* reached the same conclusion, *Way*, 492 F. Supp. 3d at 372 ("Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked."), and so did *Boockvar*, 238 A.3d at 368 n.23 ("[A]llowing the tabulation of ballots received after Election Day does not undermine the existence of a federal Election Day").

### C.    Plaintiffs' Constitutional Claims Fail for Independent Reasons

Plaintiffs also assert constitutional claims based on the right to vote and based on the right to stand for election. Those claims fail for an independent reason: nothing about Mississippi law burdens Plaintiffs' right to vote or stand for office, and there are no allegations in the complaint that plausibly claim otherwise. To the contrary, Plaintiffs are seeking to diminish the right to vote.

Burdens on a citizen's right to vote are reviewed under the *Anderson-Burdick* test. *See Texas League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 143 (5th Cir. 2020) (assuming right to vote was implicated); *Texas Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). The first step is to determine whether the right has been burdened at all. *See Texas League of United Latin Am. Citizens*, 978 F.3d at 144-45 (explaining how actions that made it easier to vote did not burden the right to vote). Laws that do not make it harder to vote do not implicate the right to vote. *Id.* at 144. The same is true of laws that do not impede a candidate's ability to stand for office. *Cf. Texas Indep. Party*, 84 F.3d at 184 (applying the same *Anderson-Burdick* framework in the context of the right to stand for office).

Nothing about the Ballot Receipt Deadline law makes it harder for voters to exercise their right to vote or for candidates to run for office. It simply ensures that qualified voters do not have their timely-cast ballots rejected. It accordingly *protects* the right to vote. Indeed, it is Plaintiffs' claim that threatens to impede the right to vote. Their theories therefore fail as a matter of law under *Anderson-Burdick*. *See Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (affirming dismissal of challenge to law that "does not burden anyone's right to vote" and instead "makes it easier for some voters to cast their ballots by mail"). There is no burden on the right to vote, and

Plaintiffs' votes are not "diluted," when Mississippi officials count *legally cast* votes. *Bost,* 2023 WL 4817073, at *7 (dilution occurs only when "certain votes [are] given less value than others"). Thus, the Ballot Receipt Deadline unquestionably does not violate Plaintiffs' rights to vote or run for office.

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment in Defendants favor.

Respectfully submitted, this the 26th day of March, 2024.

DEMOCRATIC NATIONAL COMMITTEE

/s/ David W. Baria
David W. Baria, MSB #8646

David W. Baria, MSB #8646
COSMICH, SIMMONS & BROWN, PLLC
544 MAIN STREET
BAY ST. LOUIS, MS  39520
T:  228-242-4987
F:  601-863-0078
E: david.baria@cs-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I electronically filed the above and foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to counsel of record.

This the 26th day of March, 2024.

/s/ David W. Baria
David W. Baria