# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION GULFPORT

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; and MATTHEW LAMB, | |
| Plaintiffs, | No. 1:24-cv-00025-LG-RPM (Lead Case) |
| v. | **MEMORANDUM IN SUPPORT OF REPUBLICAN PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*; TONI JO DIAZ, BECKY PAYNE, BARBARA KIMBALL, CHRISTENE BRICE, and CAROLYN HANDLER, *in their official capacities as members of the Harrison County Election Commission*; and MICHAEL WATSON, *in his official capacity as the Secretary of State of Mississippi*, | |
| Defendants, | |
| VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE OF RETIRED AMERICANS, | |
| Intervenor-Defendants. | |
| LIBERTARIAN PARTY OF MISSISSIPPI, | |
| Plaintiff, | |
| v. | No. 1:24-cv-00037-LG-RPM (Consolidated Case) |
| JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County, et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................3

BACKGROUND ................................................................................................5

LEGAL STANDARDS.........................................................................................6

ARGUMENT.....................................................................................................6

  I.  Mississippi's receipt of post-election ballots violates federal law.........................6

    A.  The consummation of the election—casting and receiving ballots—must end on election day. ...................................................................................7

    B.  Historical practice confirms that ballots must be received by election day ......................................................................................................12

  II. Mississippi's post-election deadline infringes on the rights of candidates and voters ......................................................................................................17

    A.  Counting post-election ballots infringes on the right of candidates to stand for office ...............................................................................18

    B.  Counting post-election ballots infringes on the right to vote .......................19

CONCLUSION ...............................................................................................20

CERTIFICATE OF SERVICE..........................................................................22

## **INTRODUCTION**

When it comes to elections, timing is everything. Deadlines govern when politicians announce their candidacy, when campaigns contact voters, and when states print ballots—just to name a few. Deadlines control parties, candidates, voters, and the government. Above all else, the day of the election looms over the other deadlines. Those with the most at stake organize their electoral efforts around that day, devoting their time and resources according to the immutable calendar. The 2024 general election will occur on Tuesday, November 5. That is the day Congress established by law for the entire country as "election day."

The Constitution gives Congress the power to set the day of the election. Nearly two centuries ago, Congress determined that federal elections would take place on the Tuesday after the first Monday in November of every even-numbered year. States must abide by that decree. Text, history, and precedent indicate that all ballots must be received by election officials no later than election day. This deadline provides clear notice, helps prevent fraud, and quells the suspicions of impropriety that can ensue when ballots flow in after election day and potentially flip the results. Nevertheless, Mississippi permits ballots that come in after election day to be counted. So long as a mail-in ballot is postmarked by election day and received within five business days after election day, Mississippi law requires county election officials to count it. That scheme violates federal law mandating that elections take place on the uniform, national "day for the election."

Plaintiffs filed this suit to vindicate their right to a free and fair election. The Republican National Committee (RNC) is the national committee of the Republican Party. It represents over 30 million registered Republicans throughout the country, and it operates the Republican National Convention, which nominates a candidate for President and Vice President of the United States. The Mississippi Republican Party (MSGOP) is a political party in Mississippi that promotes the Republican Party platform

and helps elect Republican candidates. Both the RNC and MSGOP rely on provisions of federal and state law in conducting their campaigns, which includes allocating resources to election and post-election activities. Mississippi's mail-in ballot deadline forces these parties to spend money chasing votes, appointing poll watchers, and conducting other activities after election day, much later than they would otherwise. The RNC and MSGOP filed this suit to protect their own rights and the rights of their candidates and members.

The individuals Plaintiffs, James "Pete" Perry and Matthew Lamb, are Mississippi voters who plan to vote in the next election. Mr. Perry is the former chairman of the Hinds County Republican Party, a member of the Mississippi Republican Party executive committee, and a member of the Hinds County Republican Executive Committee, which is responsible for conducting the Republican primary election in Hinds County. Mr. Lamb is the District 4 Commissioner for the George County Election Commission and is in the impossible position of having to choose between following the federal election-day deadline or Mississippi's post-election deadline. Both voters fear that Mississippi's post-election deadline will invite fraud, decrease confidence in the outcome of the election, and dilute their votes with untimely ballots.

Plaintiffs move for summary judgment on all three claims in their complaint. Defendants simultaneously move for summary judgment. Like many cases applying the federal election-day statutes, "[t]his case concerns only legal issues, and no facts are in dispute." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1170 (9th Cir. 2001). The parties agreed that these purely legal issues can be adjudicated on summary judgment and requested an expedited briefing schedule. *See* Doc. 37. The Court granted that schedule and ordered cross motions for summary judgment due March 26, 2024. *See* Doc. 38. Because there is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law, the Court should grant Plaintiffs' motion.

**BACKGROUND**

For nearly all of its history, Mississippi required mail-in ballots to be returned before election day. As late as 2012, Mississippi reiterated its general rule that mail-in ballots "must be received by the registrar by 5:00 p.m. on the date preceding the election." Act of Apr. 23, 2012, ch. 465, §3, 2012 Miss. Laws 818, 821. That changed in 2020. In response to the COVID-19 pandemic, the Mississippi Legislature revamped its election process. Among other things, it ordered that mail-in ballots would be counted if they were postmarked by election day and received up to five business days after election day. *See* Act of July 8, 2020, ch. 472, §1, 2020 Miss. Laws Chapter 1410, 1411. Despite the end of the pandemic, that remains the law today. *See* Miss. Code §23-15-637(1)(a).

Several election officials are responsible for enforcing the mail-in ballot deadline. The Secretary of State is the chief election officer for Mississippi. *Id.* §23-15-211.1. He has the authority to promulgate rules regarding absentee voting. *See id.* §23-15-639(2); 1 Miss. Admin. Code Pt. 17, Rs. 2.1, 2.3, 3.2. The Secretary also provides guidance to county officials regarding absentee voting, such as the guidance in the County Elections Handbook. *See* Miss. Sec'y of State's Off., *County Elections Handbook* (June 2023), https://perma.cc/W9RK-KWCY. That guidance includes when and why absentee ballots should be counted or rejected. *See id.* at 22-24, 44-46.

Mississippi law delegates significant duties of election administration to county officials. The county registrars generally oversee absentee voting in their county. *See* Miss. Code §§23-15-625, 23-15-627, 23-15-717, 23-15-719. Among other things, the county registrars must keep "safely and unopened all official absentee ballots which are received by mail after the applicable cutoff period establishing its validity." *Id.* §23-15-647. Absentee ballots received by mail are "processed by the Resolution Board in the office of the Circuit Clerk." *County Elections Handbook*, *supra*, at 22. Finally, at the end of the process, the county election commissions are responsible for canvassing the

returns for their county and certifying the results of the election to the Secretary of State. *See id.* at 50. All of these offices play a role in administering Mississippi's election deadlines and ensuring that mail-in ballots are counted in compliance with those deadlines.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When parties file cross-motions for summary judgment," the Court "review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Colony Ins. v. First Mercury Ins.*, 88 F.4th 1100, 1106-07 (5th Cir. 2023) (citation omitted). Because "[t]he genuine dispute here is legal, not factual," the Court can resolve this case on summary judgment. *Earnest v. Palfinger Marine U S A, Inc.*, 90 F.4th 804, 808 (5th Cir. 2024); *see also Keisling*, 259 F.3d at 1170.

## ARGUMENT

## I.  Mississippi's receipt of post-election ballots violates federal law.

Congress has the final say over the timing of federal elections. As to congressional elections, the Elections Clause of the U.S. Constitution gives States initial authority to determine the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, §4. Where Congress has not acted, the clause "imposes the duty" on state legislatures to regulate congressional elections. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). But "Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, §4. Through this superintendent power, Congress can "preempt state legislative choices" over the conduct of congressional elections. *Foster v. Love*, 522 U.S. 67, 69 (1997).

6

Congress also has the final say over the timing of presidential elections. The Electors Clause vests in "Congress" the power to "determine the Time of chusing the Electors" for the offices of President and Vice President. U.S. Const. art. II, §1. State legislatures have power only to "appoint" presidential electors "in such Manner" as they choose. *Id.* The Elections Clause and the Electors Clause are "counterpart[s]" that give Congress authority over the timing of federal elections. *Foster*, 522 U.S. at 69. And when Congress speaks on the timing of federal elections, its word is final. "The power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith.'" *Inter Tribal Council of Ariz.*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).

Exercising these two constitutional powers, Congress has established a uniform federal election day. For members of the House of Representatives, "the day for the election" is the "Tuesday next after the 1st Monday in November" in "every even numbered year." 2 U.S.C. §7. Senatorial elections occur at the same time, and Senators are elected "[a]t the regular election held in any State next preceding the expiration of the term for which any Senator was elected." *Id.* §1. Likewise, "[t]he electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day." 3 U.S.C. §1. This trio of statutes "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70.

### A. The consummation of the election—casting and receiving ballots—must end on election day.

"The day for the election" means the final day ballots are received by election officials. In its simplest form, the act of electing requires actions by two parties: a citizen casting the vote, and a state official receiving the vote. These two actions comprise the

"election." A voter's desire to elect a particular candidate is ineffective until an election official receives the vote. For this reason, "voting necessarily requires some effort and compliance with some rules." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). Among other things, those rules ensure that ballots are received by election officials on time. And until the proper state official receives the vote, the voter has not "elected" anybody, and an "election" has not occurred. These intuitive rules flow from the plain meaning of the election-day statutes.

The Supreme Court understands these statutes the same way. "When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the *combined actions* of voters and officials meant to make a final selection of an officeholder…." *Foster*, 522 U.S. at 71 (emphasis added). That is, the "final selection" requires the "combined actions" of voters and election officials. A "final selection" does not occur when the voter merely marks the ballot or delivers the ballot to the post office because those events do not involve an election official. Only once the ballot is in the custody of an election official has the "final selection" has occurred. In *Foster*, the Supreme Court confronted Louisiana's "open primary" statute, which provided an opportunity to fill federal offices during the month before election day, without any action to be taken on election day itself. *Id.* at 69-70. The Supreme Court held that closing the election before election day violates the statutes "establishing a particular day as 'the day' on which these actions must take place, … a matter on which the Constitution explicitly gives Congress the final say." *Id.* at 71-72. Although the Court did not address mail-in voting, "*Foster* is instructive on the meaning of 'election.'" *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). And when the two acts of election—casting and receiving ballots—are "concluded as a matter of law before the federal election day," the system violates the federal election-day statutes. *Foster*, 522 U.S. at 72. By the same logic, extending either of those two acts *beyond* election day likewise violates those statutes.

8

In other words, the election must be "consummated" on election day. *Id.* at 72 n.4. Because consummation of the election requires the "combined actions of voters and officials," *id.* at 71, a ballot is cast not when it is marked, but only when it is actually deposited "in the custody of election officials," *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944). "[V]oting is done not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day." *Id.* And just as the election "may not be consummated prior to federal election day," neither may it be "consummated" *after* election day. *Foster*, 522 U.S. at 72 n.4. After election day, election officials go about various duties: counting ballots, disqualifying voters, hearing challenges, and certifying the election. These actions don't implicate the election-day statutes because they are not acts of consummation—they are not the "final selection" resulting from the "combined actions" of voters and election officials. *Id.* at 72. Election day is thus the final day for voters to vote *and* for election officials to receive those votes.

When Congress says, "the day for the election," 2 U.S.C. §7, Congress "says in [the] statute what it means and means in [the] statute what it says," *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). The structure of the election-day statutory scheme confirms this plain reading. Having established a single national election day, Congress carved out exceptions to the rule. "Title 2 U.S.C. §8, which was enacted along with §7, provides that a State may hold a congressional election on a day other than the uniform federal election day," but only in narrow circumstances. *Foster*, 522 U.S. at 72 n.3. First, when a "vacancy is caused by a failure to elect at the time prescribed by law," States can hold runoff elections after the uniform federal election day. 2 U.S.C. §8(a). Second, when the vacancy is caused "by the death, resignation, or incapacity of a person elected," States can hold special elections to fill the vacancy. *Id.*; *see also Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821, 830 (N.D. Ga.) (holding that Georgia's statute mandating a runoff in the event that no candidate achieves a majority vote does not

violate 2 U.S.C. §8), *aff'd*, 992 F.2d 1548 (11th Cir. 1993). These exceptions prove the scope of the election-day rule. Congress didn't need to carve out exceptions for post-election acts such as counting ballots or certifying results because those acts occur *after* the election has been consummated between the voter and election official. But runoffs and vacancies renew the opportunity for consummation by allowing election officials to receive additional ballots, which is why "section 8 creates an exception to section 7's absolute rule in [that] limited class of cases." *Busbee v. Smith*, 549 F. Supp. 494, 526 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).

Congress even carved out exceptions for certain absentee voters in special elections. "[I]n the case of an individual who is an absent uniformed services voter or an overseas voter" States "shall accept" their ballots "so long as the ballot … is received by the appropriate State election official not later than 45 days after the State transmits the ballot or other material to the voter." 2 U.S.C. §8(b)(5)(B). In this unique circumstance, Congress requires absentee ballots to be counted even if received after the date of the special election. This exception proves two things. First, Congress can prescribe exceptions for absentee ballots when it wants to—and it has done so only for a specific class of voters in narrow circumstances. Second, the provision once again demonstrates that Congress understands the consummation of an "election" as the *receipt* of the ballots by election officials. Outside these exceptions, state statutes must "respect[] section 7's formula for determining the date for general elections," and may not "circumvent holding an authentic general election on that date." *Pub. Citizen*, 813 F. Supp. at 830. In other words, these exceptions underscore that the rule itself is absolute.

Other federal statutes confirm Congress's understanding that election-day is a receipt deadline. In the 1970 amendments to the Voting Rights Act, Congress adopted uniform absentee-voting rules for presidential elections. Those absentee rules require States to "provide by law for the casting of absentee ballots" for presidential elections

"by all duly qualified residents of such State who may be absent from their election district" on election day. 52 U.S.C. §10502(d). Ballots of qualified voters must be counted so long as the voters "return such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election." *Id.* Congress could have adopted a postmark rule, or it could have allowed ballots to come in after election day. But it didn't. Instead, Congress remained consistent with its longstanding rule that the election is consummated on election day. And that means ballots must be received by "the appropriate election official" by election day. *Id.*

These rules make good sense. "To state the obvious, a State cannot conduct an election without deadlines." *Democratic Nat'l Comm. v. Wis. State Legislature,* 141 S. Ct. 28, 33 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay). A uniform, national election day prevents "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 73. The federal election day is a "check to frauds in elections, to double voting, to the transmission of voters from one State to another, and [it] allow[s] the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account." *Keisling*, 259 F.3d at 1174 (quoting Cong. Globe, 42 Cong., 2d Sess. 618 (1872)). And "a single deadline" for the receipt of ballots "supplies clear notice, and requiring ballots be in by election day puts all voters on the same footing." *Democratic Nat'l Comm.*, 141 S. Ct. at 28 (Gorsuch, J., concurring in denial of application to vacate stay). There are "important reasons" to "require absentee ballots to be received by election day, not just mailed by election day." *Id.* at 33 (Kavanaugh, J., concurring in denial of application to vacate stay). Among them, election-day receipt helps "avoid the chaos and suspicions of impropriety that can ensue if thousands of absentee ballots flow in after election day and potentially flip the results of an election." *Id.* And "[w]ithout question, Congress has the authority to compel states to hold these elections on the dates it specifies." *Keisling*, 259 F.3d at 1170.

**B.      Historical practice confirms that ballots must be received by election day.**

Were there any doubt over the meaning of the election-day statutes, historical practice resolves it. The Supreme Court has found "historical practice particularly pertinent when it comes to the Elections and Electors Clauses." *Moore v. Harper*, 600 U.S. 1, 32 (2023). And historical practice "[a]t the time of the Act's adoption" is a good indicator of the original public meaning of a statute. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 276-77 (2018) (consulting historical practice to interpret the Railroad Retirement Tax Act). The Ninth Circuit thus extensively analyzed the historical absentee voting practice of States and applied it to interpret the election-day statutes. *Keisling*, 259 F.3d at 1172. This history demonstrates that States did not count mail-in ballots received after election day. It was not a practice at the time Congress enacted the election-day statutes, and it remained unheard of for many decades after.

During the American Colonial period, most elections were conducted by a show of hands or by a voice vote. *Burson v. Freeman*, 504 U.S. 191, 200 (1992). The Founding saw a gradual transition to the use of paper ballots. "Individual voters made their own handwritten ballots, marked them in the privacy of their homes, and then brought them to the polls for counting." *Id.* Election day during this time was chaotic, "akin to entering an open auction place" marked by bribery and intimidation. *Id.* at 201-02.

The scheduling of elections was similarly disorganized. In 1792, Congress established a month-long window for States to appoint presidential electors. The statute required States to appoint presidential electors "within thirty-four days preceding the first Wednesday in December in every fourth year succeeding the last election." Act of March 1, 1792, ch. 8, §1, 1 Stat. 239. The result was that States held their elections on different days over the month of November. For the better part of a century, "Congress left the actual conduct of federal elections to the diversity of state arrangements." *Keisling*, 259 F.3d at 1171.

12

As the telegraph ushered in an era of instant communication, Congress saw the need for a uniform election day. In 1845, Congress mandated that in presidential election years "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November." Act of Jan. 23, 1845, ch. 1, 5 Stat. 721. Even in 1845, Congress recognized the sweep of its pronouncement by providing exceptions "for the filling of any vacancy" of electors and for runoff elections if the voters "fail to make a choice on the [election] day." *Id.* After the Civil War, Congress extended the rule to the House of Representatives by providing that "the Tuesday next after the first Monday in November, in every second year … is established as the day for the election." Act of Feb. 2, 1872, ch. 2, §25, 18 Stat. 5. Again, Congress carved out exceptions for vacancies and runoff elections. *See id.*, §26. It also considered and rejected provisions to allow multi-day voting. *Keisling*, 259 F.3d at 1171-74 (detailing the legislative history of the election-day statute). Finally, soon after the Seventeenth Amendment was ratified, Congress included Senators in the uniform election day. *See* Act of June 4, 1914, ch. 103, §1, 38 Stat. 384. By necessity, elections throughout this period were conducted on a single day, and votes were cast and received in person.

When absentee voting first appeared during the Civil War, it did not change the rules of election day. At the beginning of the war, "there was no legislation under which a soldier or sailor, having the right to vote in an election district of any State could vote anywhere outside of his district." Josiah Henry Benton, *Voting in the Field* 5 (1915), available at https://bit.ly/3TOWdYl. States sought to ensure that soldiers deployed across the nation could still exercise their right to vote. They employed two methods. The first method was "voting in the field," where an election official took the ballot box to the soldiers to enable them to cast their ballots. *Id.* at 15. Through this method, the soldier's "connection with his vote ended when he put it in the box, precisely as it would have ended if he had put it into the box in his voting precinct, at home." *Id.* The other

method, "proxy voting," enabled an authorized agent to take the soldier's ballot and cast it directly into the ballot box back home. *Id.* "Under this method it was claimed that the voter's connection with his ballot did not end until it was cast into the box at the home precinct, and therefore that the soldier really did vote, not in the field, but in his precinct." *Id.* Or, in the language of *Foster*, the election was not "consummated" until the soldier's ballot was placed in the ballot box on election day. *Foster*, 522 U.S. at 72 n.4. Absentee voting largely ended with the war. *See* Benton, *supra*, at 314.

When war returned, so did absentee voting. By 1918, many States had adopted a variety of absentee voting laws. Washington, for example, permitted absent voters to vote anywhere within the State on election day. P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (May 1918), available at https://bit.ly/3PAlbsi. If a voter was unable to return to his home county in time to vote, he could cast a ballot in another county by writing in the names of officers in his home precinct. The ballot was then "sealed and returned to the voter's home county." *Id.* at 253. "In order to be counted the ballot must have been received by the [home] county auditor within six days from the date of the election or primary." *Id.* at 253-54. Even though the ballot was transmitted between election officials after election day, the final act of election—transferring the ballot from the voter to an election official—occurred on election day. Hence, even under Washington's system, the election was consummated on election day.

Many States did not specify a receipt date—it was simply understood that absentee ballots were to be received by election day. For example, Minnesota's law indicated that "when received at the voter's home post office before the day of election … ballots are to be retained there in the custody of the postal officials until their delivery to the precinct officials on the day of election." *Id.* at 258. In Texas, the "county clerk is required to forward the absent voter's ballots to the precincts on the second day prior to election," likewise implying that the ballots must be received before then. *Id.* at 259. "In Indiana, Montana and Wisconsin, the ballot envelopes may be opened at any time

between the opening and the closing of the polls, and this [was] the provision most commonly found in such laws." *Id.* In fact, Illinois was the only State during this time "to make any provision for ballots received too late to be counted." *Id.* Those ballots were to be marked as late, maintained for a time, and destroyed. *Id.* Universally, ballots received after election day were not counted.

Federal law also mandated receipt by election day. In 1942, Congress passed a law to provide for absentee voting for members of the Armed Forces. *See* Act of Sept. 16, 1942, ch. 561, 56 Stat. 753. The law mandated that States permit members of the Armed Forces to vote absentee in federal elections in times of war, and it established certain required balloting procedures. Among other things, the voter was required to "subscribe the oath printed upon the official envelope" and mail the "war ballot" "to the secretary of state of the State of his residence." *Id.*, §8. Although the law deferred to States on canvassing procedures, "no official war ballot shall be valid ... if it is received by the appropriate election officials ... after the hour of the closing of the polls on the date of the holding of the election." *Id.*, §9.

Post-election day receipt is a relatively new phenomenon. In 1971, the Department of Defense issued a directive that contained a survey of state absentee-ballot deadlines. *Overseas Absentee Voting: Hearing on S. 703 Before the S. Comm. on Rules and Admin.*, 95th Cong. 33-34 (1977) (Statement of John C. Broger, Deputy Coordinator of the Federal Voting Assistance Program, Department of Defense), available at https://perma.cc/P4PK-LTL2. At that time, 48 States plus Guam, Puerto Rico, the Virgin Islands, and Washington, D.C., counted ballots only if received at the latest by election day. Only two States counted ballots received after election day. Nebraska accepted ballots one day after the election. It has since repealed that law and now requires absentee ballots to be "returned not later than the hour established for the closing of the polls." Neb. Rev. Stat. §32-950. The other State, Washington, has been discussed above: for quite some time, Washington still required absentee voters to

deliver their ballot to an *election official* by election day, who would then mail the ballot to the proper county. *See* Ray, *supra*, at 253-54. Later, Washington allowed voters to mail ballots directly, and would count ballots "postmarked or received (if not delivered by mail) not later than the primary or election day." Act of Apr. 17, 1963, ch. 23, §5, 1963 Wash. Laws 1454, 1458. But these two "late-in-time outliers" are far removed from the enactment of the election-day statutes, and thus have little bearing on the ordinary public meaning. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022). Nebraska and Washington prove the rule: the overwhelming consensus was that mail-in ballots must be received by election day.

"The law remains the same today." *Keisling*, 259 F.3d at 1171. In recent years, States have begun counting mail-in ballots received after election day. *See* Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (Mar. 18, 2024), https://perma.cc/B3HF-8MBD. Some States, including Mississippi, adopted post-election deadlines in response to the COVOID-19 pandemic. *See* Act of July 8, 2020, ch. 472, §1, 2020 Miss. Laws Chapter 1410, 1411. These recent changes do not have the pedigree to overcome the original meaning of the election day statutes. In considering whether absentee balloting as a whole violates the election day statutes, the Fifth Circuit declined "to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously well aware." *Bomer*, 199 F.3d at 776.; *see also Keisling*, 259 F.3d at 1175 (noting the "long history of congressional tolerance, despite the federal election day statute, of absentee balloting and express congressional approval of absentee balloting when it has spoken on the issue"). But post-election deadlines are neither universal nor longstanding. There is no "long history" of receiving ballots after election day in Mississippi or any other State. *Keisling*, 259 F.3d at 1175. And when Congress has "spoken on the issue," it has set election-day deadlines for absentee ballots. *Id.* This

historical practice compels the conclusion that original understanding of the election-day statutes required receipt of ballots by election day.

*     *     *

Mississippi's mail-in ballot deadline violates the federal election-day statutes. Congress's uniform, national election day requires all ballots to be received by election officials on election day. *See* 2 U.S.C. §§1, 7; 3 U.S.C. §1. Text, history, and precedent compel the conclusion that post-election receipt of mail-in ballots violates the election-day statutes, and no court confronting this issue has analyzed the textual and historical foundation of these rules.[1] Mississippi counts mail-in ballots that are received up to five business days after election day, effectively extending Mississippi's elections past the election day established by Congress. Miss. Code §23-15-637(1)(a). Mississippi's counting of ballots for federal elections received after election day thus violates 3 U.S.C. §1, 2 U.S.C. §1, and 2 U.S.C. §7. The Court should grant summary judgment in favor of Plaintiffs on Count I of the complaint.

## II.     Mississippi's post-election deadline infringes on the rights of candidates and voters.

When Congress legislates under the Elections Clause, it protects "the fundamental right [to vote] involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). The election day statutes are thus judicially enforceable in suits brought under 42 U.S.C. §1983. *See Foster*, 522 U.S. 67 (1997) (adjudicating challenge to State statutes allegedly in conflict with the uniform federal election day brought under §1983); *Millsaps v. Thompson*, 259 F.3d 535, 542 (6th Cir. 2001) (same); *Bomer*, 199 F.3d at 774 (same). Candidates, voters, and political organizations are the ones most injured by unlawful election rules.

---

[1] *See Bognet v. Sec'y Commonwealth of Penn.*, 980 F.3d 336 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020); *Bost v. Ill. State Bd. of Elections*, No. 22-cv-2754, 2023 WL 4817073 (N.D. Ill. July 26, 2023), *on appeal*, No. 23-2644 (7th Cir.); *Penn. Democratic Party v. Boockvar*, 238 A.3d 345, 372 (Pa. 2020).

17

### A.  Counting post-election ballots infringes on the right of candidates to stand for office.

Political parties and their candidates suffer injury when votes are counted in violation of law. *See Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020). The Republican Party is running candidates for a variety of offices for the November 2024 general election. *See* Decl. of Ashley Walukevich, ¶5 (Exh. A to motion); Decl. of Frank Bordeaux, ¶4 (Exh. B to motion). Come November, Mississippi will count mail-in ballots that are received after election day, up to five business days late. Counting those ballots violates federal law, *see supra* Section I, which results in an "inaccurate vote tally" that necessarily harms political candidates. *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020). The RNC and the MSGOP represent the interests of their candidates and members, who have "a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast." *Id.* at 1058.

Moreover, these late mail-in votes will disproportionately harm Republican candidates. Democratic voters tend to mail their ballots later on average than Republican voters, which results in late-arriving ballots favoring Democratic candidates. Walukevich Decl., ¶¶20-22. These harms are magnified because mail-in voting is starkly polarized by party. Walukevich Decl., ¶¶20-21. According to the MIT Election Lab, 46% of Democratic voters in the 2022 General Election mailed in their ballots, compared to only 27% of Republicans. Charles Stewart III, *How We Voted in 2022*, at 10, https://perma.cc/444Z-58ZY. That means the late-arriving mail-in ballots that are counted for five additional days disproportionately harm Plaintiffs' interests. Walukevich Decl., ¶¶12, 20-21.

Mississippi's post-election deadline also costs Plaintiffs money. Both the RNC and MSGOP engage in ballot "chase" programs in which they contact voters, educate them about the mail-in voting process, inform them of key deadlines and rules, remind them to return their mail-in ballots in a timely manner, and encourage them to cure any defects. Walukevich Decl., ¶¶11-13; Bordeaux Decl., ¶¶17-18. These programs cost time,

money, and other resources. Plaintiffs must organize these efforts, hire employees and volunteers, fund the projects, and oversee the programs to their completion. Walukevich Decl., ¶¶11-12; Bordeaux Decl., ¶¶17-18. Plaintiffs also devote substantial resources to poll-watching activities. Mississippi law guarantees political parties "the right to be represented at the polling place by two (2) credentialed poll watchers." Miss. Code. §23-15-577; *see also id.* §23-15-581 (permitting poll watchers to observe "the holding of the election and the counting of the ballots"). Organizing poll-watching efforts requires recruiting employees and volunteers, organizing training, and providing funds to state and local parties. Walukevich Decl., ¶¶15-19; Bordeaux Decl., ¶¶12-16. Late-arriving mail-in ballots often have errors, which means that poll watchers become increasingly important the later a jurisdiction permits mail-in ballots to be received and counted. Walukevich Decl., ¶19; Bordeaux Decl., ¶¶13-15. And the later a State or county permits voters to return mail-in ballots, the later Plaintiffs must run these programs, which costs time, money, and resources that the Plaintiffs would otherwise not spend on these activities. Walukevich Decl., ¶¶18-19; Bordeaux Decl., ¶¶13-16.

**B.   Counting post-election ballots infringes on the right to vote.**

The individual Plaintiffs suffer additional burdens. "A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box." *Baker v. Carr*, 369 U.S. 186, 208 (1962) (citations omitted). "The right to an honest (count) is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson v. United States*, 417 U.S. 211, 226 (1974) (citation omitted). Unlawful votes "dilute[] the influence of honest votes in an election, and whether in greater or less degree is immaterial." *Id.*; *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964). By

counting untimely votes received in violation of the federal election-day deadline, Mississippi dilutes the weight of timely, valid votes of the individual Plaintiffs' and the members of the RNC and MSGOP. *See* Walukevich Decl., ¶21; Bordeaux Decl., ¶21; Decl. of James Perry, ¶¶6, 8 (Exh. C to motion).

Finally, Matthew Lamb suffers a unique injury as a George County Election Commissioner. As a commissioner, Mr. Lamb must follow state law, which requires him to count mail-in ballots that are received up to five business days after election day. Miss. Code §23-15-637(1)(a); *see also* County Elections Handbook, *supra*, at 22-24, 44-46. But Mr. Lamb must also follow federal law, and he has sworn an oath to "faithfully support the Constitution of the United States and the Constitution of the State of Mississippi, and obey the laws thereof." Miss. Const. art. 14, §268; *see also* Decl. of Matthew Lamb, ¶8 (Exh. D to motion). "Mississippi's law forces [him] to choose between following Congress' Election Day statutory deadline or Mississippi's post-election deadline," Lamb Decl., ¶9, a legal impossibility in the course of his duties. *See Bd. of Ed. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5 (1968) (holding that plaintiffs had standing to challenge state law when they had "taken an oath to support the United States Constitution," believed the state law to "be unconstitutional," and were "in the position of having to choose between violating their oath and taking a step" to refuse "to comply with" the state law). Mississippi law empowers the Governor to remove county officers that fail to comply and enforce state law, which means that Mr. Lamb would face removal from his position as county commissioner for following federal law. Miss. Code §§25-5-3, -5; *see also* Lamb Decl., ¶10.

These harms are irreparable. The Court should thus grant summary judgment in favor of Plaintiffs on Counts II and III in the complaint.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment.

Dated: March 26, 2024

Thomas R. McCarthy*
Conor D. Woodfin*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
conor@consovoymccarthy.com

*pending *pro hac vice* admission

Respectfully submitted,

*s/ Spencer M. Ritchie*

Spencer M. Ritchie (MSB #103636)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201
(601) 960-3172
spencer.ritchie@formanwatkins.com

*Counsel for Plaintiffs in*
*Case No. 1:24-cv-25*

## CERTIFICATE OF SERVICE

I certify that on March 26, 2024, the foregoing document was filed on the Court's CM/ECF system, which notifies all counsel of record.

_s/ Spencer M. Ritchie_

Spencer M. Ritchie
_Counsel for Plaintiffs in_
_Case No. 1:24-cv-25_