# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

REPUBLICAN NATIONAL COMMITTEE, et al.,

        Plaintiffs,

  v.

JUSTIN WETZEL, *in his official capacity as the
clerk and registrar of the Circuit Court of Harrison
County*, et al.,

        Defendants,

  and

VET VOICE FOUNDATION and MISSISSIPPI
ALLIANCE FOR RETIRED AMERICANS,

        Intervenor-Defendants.

No. 1:24-cv-00025-LG-RPM

*consolidated with*

LIBERTARIAN PARTY OF MISSISSIPPI,

        Plaintiff,

  v.

JUSTIN WETZEL, *in his official capacity as the
clerk and registrar of the Circuit Court of Harrison
County*; et al.,

        Defendants,

  and

VET VOICE FOUNDATION and MISSISSIPPI
ALLIANCE FOR RETIRED AMERICANS,

        Intervenor-Defendants.

No. 1:24-cv-00037-LG-RPM

**MEMORANDUM BRIEF OF INTERVENOR-DEFENDANTS VET VOICE FOUNDATION AND MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Intervenor-Defendants Vet Voice Foundation ("Vet Voice") and the Mississippi Alliance for Retired Americans (the "Alliance") (together, "Intervenors"), move for summary judgment dismissing all claims in these consolidated actions under Federal Rule of Civil Procedure 56.

## INTRODUCTION

Recycling previously-rejected standing and merits theories, the Republican National Committee and its co-plaintiffs ("RNC Plaintiffs") and the Libertarian Party of Mississippi ask this Court to be the first to endorse their meritless preemption theory and invalidate the Mississippi Legislature's choice to protect against the disenfranchisement of lawful voters who cast timely ballots by counting absentee ballots that are postmarked by election day and received by the registrar within five days after. Miss. Code § 23-15-637(1)(a) ("Ballot Receipt Deadline"). These consolidated cases are the fifth and sixth attempts in four years in which a plaintiff has come to federal court seeking to invalidate a similar state law. In each of the prior challenges, the federal courts presiding over those actions concluded that the plaintiffs—who have included national and state political party committees, candidates for office, presidential electors, voters, and at least one local election official—lacked standing. And, where they have considered the merits of these claims, courts have also uniformly held that they fail as a matter of law.

This case is no different. When the Legislature enacted Mississippi's Ballot Receipt Deadline in 2020 by wide and bipartisan margins, it brought Mississippi in line with eighteen other states, D.C., Puerto Rico, and the Virgin Islands, all of which have similar laws. These laws are a commonsense effort to protect against the disenfranchisement of eligible voters who may otherwise have their ballots rejected, often due to delivery delays outside of their control. They are particularly important to protect the voting rights of members of our Armed Services. Members of

the military and their families, veterans, disabled voters, and older voters—i.e., voters among Vet Voice's and the Alliance's members and constituents—are among those most likely to be disenfranchised if Plaintiffs succeed.[1]

Plaintiffs would have this Court believe that federal law requires this disenfranchisement. It does not. Mississippi's Ballot Receipt Deadline does not conflict with either the U.S. Constitution or the federal Election Day Statutes, 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1, which say nothing about the method for counting ballots timely cast by qualified voters. Nor does the law violate any constitutional right, including the right to vote or to run for office. Mississippi's decision to count these ballots is well within its constitutional authority to set the "Manner" of elections within the state. U.S. Const., art. I, § 4, cl.1; *id.* art. II, § 1, cl. 2.

But the Court need not reach these questions because—as in the prior cases that alleged similar claims—Plaintiffs do not have standing. A law that ensures that qualified voters' timely-voted ballots are not rejected does not cause a cognizable injury, just as a high-turnout election does not cause anyone injury—much less one that gives Plaintiffs the right to adjudicate their disagreement in federal court. The Court should grant summary judgment against Plaintiffs and in favor of Defendants and Intervenor-Defendants on all claims.

---

[1] Military voters face a particular risk of having their ballots rejected due to mail delays. Accordingly, in addition to the eighteen states that have extended ballot receipt deadlines for all mail voters, another nine permit counting ballots from overseas and military voters that arrive after the election. *See* Ala. Code § 17-11-18(b); Ark. Code § 7-5-411(a)(1)(A)(ii); Fla. Stat. § 101.6952(5); Ga. Code § 21-2-386(a)(1)(G); Ind. Code § 3-12-1-17(b); Mo. Rev. Stat. § 115.920(1); 25 Pa. Stat. and Cons. Stat. § 3511(a); 17 R.I. Gen. Laws § 17-20-16; S.C. Code § 7-15-700(A). Plaintiffs' erroneous interpretation of the federal Election Day Statutes would apply equally to such laws meant to protect overseas and military voters.

**BACKGROUND**

I.     **Mississippi's Ballot Receipt Deadline**

The Elections Clause grants states the power to set the "Times, Places and Manner of holding Elections for Senators and Representatives," but reserves the right of Congress to, "at any time by Law make or alter such Regulations." U.S. Const., art. I, § 4, cl.1. Similarly, Article II, Section 1, Clause 4 provides that "Congress may determine the Time of ch[oo]sing the [presidential] Electors, and the Day on which they shall give their Votes," *id.*, art. II, § 1, cl. 4, while the Electors Clause reserves to the states the power to choose the "Manner" of appointing electors, *id.* § 1, cl. 2.

Consistent with this authority, Congress enacted the Election Day Statutes, which set the general election day for congressional races as "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," 2 U.S.C. § 7, and the presidential election as "the Tuesday next after the first Monday in November, in every fourth year," 3 U.S.C. §§ 1, 21. And, exercising its constitutional authority, as a state, to set the Manner for these elections, the Mississippi Legislature enacted the Ballot Receipt Deadline, which provides for the counting of absentee mail ballots that are cast by a qualified voter by election day, "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." Miss. Code § 23-15-637(1)(a).

The Ballot Receipt Deadline is just one part of a comprehensive code enacted by the Legislature to govern the administration of elections in Mississippi. That code sets forth how voters may cast their ballots, where they may cast them, and the procedures for counting them. This includes provisions that allow certain voters to cast their ballots absentee. *See id.* § 23-15-1, *et seq.* Unlike many other states, Mississippi has elected to keep absentee voting strictly limited; only voters who fall into certain categories may cast their votes absentee. These include voters 65 years

or older; voters with temporary or permanent physical disabilities; voters away from their county of residence on election day; and enlisted or commissioned members of the Armed Services. *See id.* §§ 23-15-713, 23-15-673. There are no drop boxes available to voters to return their ballots to election officials in Mississippi, and the law reflects the Legislature's general expectation that absentee ballots are ordinarily returned through the mail. *See also id.* § 23-15-907 (strictly limiting who may return absentee ballots beyond employees of the U.S. Postal Service and other common carriers).[2]

The Ballot Receipt Deadline passed out of both houses with broad bipartisan margins—with only one vote against it in the House and a unanimous vote in favor in the Senate—in 2020.[3] It ensures that ballots shown by postmark to be cast on or before election day are not rejected simply because of minor mail delivery delays. But even then, the Mississippi Legislature strictly limited the rule's application: a ballot that is postmarked on or before election day "shall not be counted" if it is received more than five business days after the election. *Id.* § 21-15-637(1)(a).

Nearly two dozen other U.S. states and territories have similar laws, accepting timely-cast ballots that are received by election officials within some designated window after election day. With its five-day deadline, Mississippi is firmly on the conservative side of these laws—some accept ballots that arrive up to two weeks after the election, or any time before the official canvass.[4]

---

[2] Miss. Code § 23-15-907 was partially preliminarily enjoined by a federal court in *Disability Rights Mississippi v. Fitch*, No. 3:23-CV-350-HTW-LGI, 2023 WL 4748788, at *4 (S.D. Miss. July 25, 2023), *appeal docketed sub nom. Disability Rights MS v. Fitch*, No. 23-60463 (5th Cir. Aug. 28, 2023), which prohibited enforcement to the extent it would prevent voters who are disabled, blind, or have limited ability to read or write from receiving assistance from the person of their choice. That decision is on appeal. *Id.*

[3] *See* Roll Call Vote, H.B. 1521, Miss. H.R., 2020 Reg. Sess. (Mar. 10, 2020), https://billstatus.ls.state.ms.us/2020/pdf/votes/house/0640030.pdf; Roll Call Vote, H.B. 1521, Miss. State S., 2020 Reg. Sess. (June 15, 2020), https://billstatus.ls.state.ms.us/2020/pdf/votes/senate/1610021.pdf.

[4] *Tbl. 11: Receipt & Postmark Deadlines for Absentee/Mail Ballots*, Nat'l Conf. of State Legs., https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots (March 18, 2024).

II.     **Plaintiffs' Complaints**

The RNC Plaintiffs are the RNC, the Mississippi Republican Party ("MSGOP"), an individual Mississippi voter and member of the MSGOP executive committee named James Perry, and Matthew Lamb, described in the Complaint as a District 4 Commissioner for the George County Election Commission and a Mississippi voter.[5]

The RNC Plaintiffs' primary allegation is that Mississippi's Ballot Receipt Deadline is preempted by the Election Day Statutes. *See* RNC Compl. ¶¶ 62–69, No. 1:24-cv-00025-LG-RPM, ECF No. 1 (Count I). Although their Complaint also alleges two constitutional claims, both are derivative of the preemption claim. Count II—styled as a claim for the "Violation of the Right to Stand for Office"—relies on the assumption that any ballots cast in accordance with the Ballot Receipt Deadline "are *not valid*" "*[u]nder federal law*." *Id.* ¶ 71 (emphases added); *see also id.* ¶ 72 (alleging RNC Plaintiffs' "right to stand for office" is injured because they must "spend money, devote time, and otherwise injuriously rely on *unlawful provisions of state law* in organizing, funding, and running their campaigns" (emphasis added)). Similarly Count III, which is titled "Violation of the Right to Vote," relies on the premise that the Ballot Receipt Deadline requires counties to count ballots that "*[u]nder federal law . . . are not valid*." *Id.* ¶ 76 (emphasis added); *see also id.* ¶ 78 ("Mississippi's voting system *permits illegitimate votes* and *therefore* violates the Fourteenth Amendment." (emphases added)).

The Libertarian Party brings nearly identical claims. The primary difference is found in their Count III, which alleges that the Ballot Receipt Deadline conflicts not only with the Election

---

[5] Although the RNC Plaintiffs' Complaint is not explicit, Mr. Lamb appears to bring this case in his personal capacity, not his official capacity. The Complaint does not state that Mr. Lamb is suing in his official capacity, the injury he claims (potential dismissal if he fails to follow Mississippi law) is personal to him, and there is no allegation that he is authorized to sue on behalf of George County or in his official capacity.

Day Statutes (as the RNC Plaintiffs allege), but also with provisions of the U.S. Constitution granting Congress the power to set the time of elections. *See* Libertarian Party Compl. ¶¶ 69–81, No. 1:24-cv-00037-LG-RPM, ECF No. 1 (Count III) (citing Art. I, § 4, cl. 1 and Article II, § 1, cl. 4). Like the RNC Plaintiffs, the Libertarian Party's two other claims are derivative of this primary claim: they, too, allege that the Ballot Receipt Deadline is a "Violation of the Right to Vote" based on the premise that the Ballot Receipt Deadline "conflicts with [the Election Day Statutes] and is invalid," *id.* ¶ 61 (Count I), and that it violates their "Right to Stand for Office," *id.* ¶ 66 (Count II), premised again on the assertion that the Ballot Receipt Deadline is an "unlawful provision[]," *id.*

All Plaintiffs seek an injunction prohibiting Defendants from counting *any* absentee ballots received by mail after election day in all future congressional and presidential elections in Mississippi, as well as a declaration that the Ballot Receipt Deadline deprives them of rights secured by the Constitution and Acts of Congress. *See* RNC Compl. at 14 (Prayer for Relief); Libertarian Party Compl. at 13 (Prayer for Relief).

## III.   Prior Failed Challenges to Mail Ballot Receipt Deadlines

Since 2020, similarly-situated plaintiffs have made at least four prior attempts to challenge ballot receipt deadlines in federal court under similar theories—including one case brought by the RNC (with others). None have succeeded.

In the first such case, *Donald J. Trump for President, Inc. v. Way*, the RNC, the Trump campaign, and the New Jersey Republican Party alleged that a New Jersey law allowing officials to canvass ballots received within two days of election day was preempted by the Election Day Statutes. *See* 492 F. Supp. 3d 354, 369 (D.N.J. 2020) ("*Way I*"). The district court rejected the plaintiffs' motion for a preliminary injunction, finding they were unlikely to succeed on the merits. *Id.* at 373. It later dismissed the action in its entirety for lack of standing. *Donald J. Trump*

*for President, Inc. v. Way*, No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477, at *11 (D.N.J. Oct. 22, 2020) ("*Way II*") (finding plaintiffs' alleged injury both speculative and a generalized grievance).

Next, a Pennsylvania Republican congressional candidate and voters brought a similarly-reasoned suit challenging the Pennsylvania Supreme Court's decision that Pennsylvania's constitution required a three-day post-election receipt deadline. *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 345–46 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).[6] The plaintiffs argued the deadline violated the Fourteenth Amendment's Equal Protection Clause, because (1) it "treated them," as in-person voters, "in an arbitrary and disparate way by elevating mail-in voters to a 'preferred class of voters,'" and (2) unlawfully "dilute[d]" their votes. *Id.* (quoting *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *2 (W.D. Pa. Oct. 28, 2020)). They further alleged violations of the Elections Clause, the Electors Clause, and the Election Day Statutes. *See* Compl. at 20–25, *Bognet v. Boockvar*, No. 3:20-cv-215 (W.D. Pa. Oct. 22, 2020), ECF No. 1. The district court declined to issue injunctive relief and the Third Circuit affirmed, finding the plaintiffs lacked standing. *Bognet*, 980 F.3d at 364–65.[7]

The third case, *Bost v. Illinois State Board of Elections*, was filed in May 2022 by a Republican congressman and voters who had previously served as presidential electors—

---

[6] In the underlying state court action, the Respondents (including the RNC) pointed to the Election Day Statutes as a bar to counting timely cast ballots received after election day. *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 (Pa. 2020). The Pennsylvania Supreme Court was unpersuaded, noting the Election Day Statutes were consistent with "federal and state law allowing for the tabulation of military and overseas ballots received after Election Day." *Id.* at 368 n.23.

[7] The Supreme Court's vacatur of *Bognet* as moot was not based on the merits but rather in keeping its practice of vacating opinions that become moot on appeal. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). The vacated decision remains persuasive. *See Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) (finding persuasive a "thoughtful opinion" that was "vacated as moot on rehearing").

represented by the same counsel representing the Libertarian Party here. *See* No. 22-cv-2754, 2023 WL 4817073, at *2 (N.D. Ill. Jul. 26, 2023), *appeal pending* No. 23-2644 (7th Cir. Aug. 21, 2023). The plaintiffs asserted nearly identical challenges to Illinois' 14-day ballot-receipt deadline as here, alleging a "Violation of the Right to Vote," "Violation of the Right to Stand for Office," and "Violation of [the Election Day Statutes]." Compl. at 7–10, *Bost v. Ill. State Bd. of Elections*, No. 22-cv-2754 (N.D. Ill. May 25, 2022), ECF No. 1 ("*Bost* Compl."). Plaintiffs asserted standing as voters based upon the "dilution" of their votes by "invalid" ballots counted after election day, and the Congressman alleged standing as a candidate based on the possibility that "invalid" votes would be counted in his race and because the law "forces [him] to spend money and time campaigning after Election Day." 2023 WL 4817073, at *1, *7. The district court dismissed, rejecting each asserted basis for standing and further holding that the plaintiffs had not stated a claim upon which relief may be granted. *Id.* at *14.[8]

In July 2023, a county elections administrator brought a fourth case in federal court, this one challenging a North Dakota statute that permits mail ballots to be counted if postmarked by the day before election day and received within 13 days of the election. *See Splonskowski v. White*, No. 1:23-cv-00123, 2024 WL 402629, at *1 (D.N.D. Feb. 2, 2024). That plaintiff similarly alleged the North Dakota law conflicts with the Election Day Statutes. *See* Compl. at 8–9, *Splonskowski v. White*, No. 1:23-cv-00123-DMT-CRH (D.N.D. July 5, 2023), ECF No. 1. He argued that "following his understanding of federal law will inevitably result in criminal prosecution under North Dakota law because he will have to forego his duty to follow North

---

[8] The plaintiffs' appeal of that ruling is currently pending, with argument scheduled to be heard by the Seventh Circuit on March 28, 2024. *See Bost*, No. 23-2644 (7th Cir. Aug. 21, 2023).

Dakota law." 2024 WL 402629, at *1. The district court recently dismissed the case for lack of standing. *Id.* at *2.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "view the evidence and draw all inferences in a light most favorable to the nonmovant," *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023), but "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).

"Each element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of that stage of litigation." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (cleaned up). "Thus, at summary judgment, [Plaintiffs] can't rely on 'mere allegations'; [they] 'must set forth by affidavit or other evidence specific facts' supporting standing." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). That is, they "must point to specific summary judgment evidence showing that [they are] directly affected" by the alleged legal violations. *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) (cleaned up).

## ARGUMENT

### I.     Plaintiffs lack standing.

Plaintiffs assert several theories of standing but none satisfy Article III. *First*, the RNC, MSGOP, and Libertarian Party each assert organizational standing based on alleged injuries to them as political party committees, but their claims fall short. RNC Compl. ¶¶13–15; Libertarian Party Compl. ¶¶ 47–49. *Second*, the same Plaintiffs allege a purported injury to unidentified

candidates who may stand for office in Mississippi based on effectively the same theory, as well as a competitive injury to their candidates' electoral prospects. RNC Compl. ¶¶ 12–13; Libertarian Party Compl. ¶¶ 48, 79. The Libertarian Party claims that this injury to its electoral prospects will contribute to public's perception of the Party's poor electoral performance. Libertarian Party Compl. ¶ 55. *Third*, the individual plaintiffs in the RNC's case, as well as the Libertarian Party itself, claim they have standing because ballots that are postmarked by election day but arrive after are "invalid" as a matter of federal law and counting them "dilutes" their individual votes or those of their members. RNC Compl. ¶¶ 50, 55, 59; Libertarian Party Compl. ¶¶ 36, 44. *Fourth*, Mr. Lamb contends he is injured because he could be removed from his position if he fails to enforce a state law that he personally believes violates federal law. RNC Compl. ¶ 60.

These theories are recycled from similar recent challenges—sometimes verbatim—and, as in those cases, fail to establish standing. For the same reasons that prior courts have found these theories insufficient to satisfy Article III, this Court should similarly find it lacks jurisdiction to hear Plaintiffs' claims.

### A.    Plaintiffs' alleged injuries are generalized grievances.

All of Plaintiffs' standing theories—whether styled as injuries to them as organizations, to their candidates' competitive prospects, to them as voters, or otherwise—boil down to a complaint that the Ballot Receipt Deadline violates federal law. Plaintiffs argue that they should not have to conform their behavior to what they think is an invalid law, RNC Compl. ¶¶ 13, 48–49, 60; Libertarian Party Compl. ¶¶ 26, 33, 37–42, or vote in or conduct campaigns in elections where other voters' ballots are counted in accordance with an invalid law, RNC Compl. ¶¶ 50–59, 72; Libertarian Party Compl. ¶¶ 47–53.

Each of these circular arguments is based on the underlying theory that Plaintiffs have a "right to have  the Government act in accordance with law." *Allen v. Wright*, 468 U.S. 737, 754

(1984). But a claim that a party is injured "based solely on an allegation 'that the law . . . has not been followed' amounts to an 'undifferentiated, generalized grievance about the conduct of government' [that is] insufficient to establish standing." *Hotze v. Hudspeth*, 16 F.4th 1121, 1124 n.2 (5th Cir. 2021) (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam)). For this reason, courts have repeatedly found similar plaintiffs lacked standing to pursue similar challenges based on similar theories of injury. *See Bognet*, 980 F.3d at 349; *Bost*, 2023 WL 4817073, at *5. Plaintiffs provide no reason for this Court to find otherwise.

A closer examination of Plaintiffs' theories only confirms that this case is no different. Plaintiffs have failed to establish standing to pursue their claims—and this Court therefore lacks jurisdiction to hear them.

### B. The organizational Plaintiffs have not suffered a cognizable diversion of resources injury.

At bottom, the organizational Plaintiffs (the Libertarian Party, RNC and MSGOP) allege the Ballot Receipt Deadline "harms" them because it allows more ballots cast by qualified voters to be counted. *See* RNC Compl. ¶¶ 56-57; Libertarian Party Compl. ¶¶ 52-54. As an initial matter, it is far from clear that enfranchising more voters *could* cause anyone to be harmed in a way that is legally cognizable under Article III. *Cf. Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (explaining that a law that "makes it easier for some voters to cast their ballots by mail" "does not burden anyone's right to vote"). But, even if it could, the organizational Plaintiffs fail to show that they have standing to challenge the Ballot Receipt Deadline here.

To do so, the organizational Plaintiffs must demonstrate, *first*, that they have "diverted significant resources to counteract" Defendants' enforcement of the Ballot Receipt Deadline. *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir, 2020) (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)). This resource diversion has to be in response

to a concrete, imminent, actual harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) (holding a plaintiff cannot "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending"). *Second*, Plaintiffs most demonstrate that their "ability to carry out [their] mission was perceptibly impaired" *because of* that diversion. *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 352–53 (5th Cir. 2023) ("*LaFHAC*") (cleaned up). This requires, at a minimum, an explanation as to what they must divert resources *from* as a result of the Ballot Receipt Deadline such that the diversion "perceptibly impair[s]" the organizations' "ability to pursue [their] mission." *Id*. at 351.

Plaintiffs' attempts to satisfy these requirements fall short. Both groups assert that the Ballot Receipt Deadline "forc[es]" them "to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns." RNC Compl. ¶ 72; Libertarian Party Compl. ¶ 66. This claim is not just similar but *identical*— word for word—to an allegation rejected in *Bost*. *See* 2023 WL 4817073, at *13 ("Plaintiffs allege that the Ballot Receipt Deadline Statute forces Congressman Bost and other candidates 'to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns.'" (quoting *Bost* Compl. ¶ 46)). But as that court explained: "Spending time and money on campaigning is an inevitable feature of running for office, and Plaintiffs do not contend that the extra time and money they might have to spend due to the Statute prevents them from standing for office at all." *Id.* at *14. This Court should reach the same conclusion.

The Libertarian Party's theory of harm is particularly opaque. It merely claims that, as a result of the Ballot Receipt Deadline, it has had to "increase[] expenses and other resources" on post-election activities, including "monitor[ing] post-election canvassing" and "challeng[ing] or

otherwise respond[ing] to situations arising during that canvassing." Libertarian Party Compl. ¶¶ 47-48; *see also id.* ¶ 51. But these allegations are entirely conclusory and fall far short of what is required in this Circuit for standing. Among other things, the Libertarian Party fails entirely to explain how or why the Ballot Receipt Deadline causes it to expend additional resources, or what activities it is diverting those resources *from*. Nor could it: the Ballot Receipt Deadline is a commonsense measure to help ensure timely-cast ballots from *all* voters are counted, no matter the voter's party affiliation or who they vote for. It does not require any candidate or political party to expend additional resources.

The RNC and MSGOP's attempt to manufacture a theory of harm also fails. They similarly assert that the Ballot Receipt Deadline "forces" them "to divert resources and spend money on absentee-specific programs and post-election activities." RNC Compl. ¶ 13; *see also id.* ¶ 15 (MSGOP "has the same interests . . . as the RNC"). Specifically, they allege that counting ballots after Election Day "requires political committees to spend more time and money on poll watchers and mail-in ballot activities[,]" and "requires the RNC and Mississippi Republican Party to maintain absentee-specific get-out-the-vote operations to encourage absentee voters to return their mail-in ballots through Election Day." *Id.* ¶ 48–49.[9] That argument fails for two reasons.

First, it is based upon a speculative future injury. As the *Bost* court properly found in rejecting similar allegations as insufficient for standing, this alleged "harm—spending more

---

[9] The RNC and MSGOP also seem confused about which election procedures apply. In their Complaint (at ¶ 48), they point to Miss. Code § 23-15-577, which authorizes political parties to have credentialed poll watchers to monitor "the manner in which the election is held," but does not do the same for the *counting* of ballots. Most likely they meant Miss. Code § 23-15-643, which requires that, "the appropriate election officials shall examine the affidavit of each absentee ballot envelope" and "shall give any person present an opportunity to challenge in like manner and for the same cause as the voter could have been challenged had he presented himself personally in such precinct to vote." But that still fails to answer the question of what the Ballot Receipt Deadline has to do with this—the mere counting of more ballots during the post-election process alone is not a cognizable harm, for the reasons discussed.

resources on the election—is not certainly impending." 2023 WL 4817073, at *8. "It is mere conjecture that, if [the Plaintiffs] do[] not spend the time and resources to confer with [their] staff and watch the results roll in, [their candidates'] risk of losing the election will increase." *Id.* Under Mississippi law, "all votes must be cast by Election Day, so [the Republicans'] electoral fate is sealed at midnight on Election Day, regardless of the resources [they] expend[] after the fact." *Id.* And because "[t]he challenged law expands access to voting through mail without restricting prior access to in-person voting . . . plaintiffs need not divert resources to enable or encourage their voters to vote." *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1002 (D. Nev. 2020) (emphasis omitted); *see* also *Way II*, 2020 WL 6204477, at *11; *Bognet*, 980 F.3d at 352.[10]

Second, the RNC and MSGOP have similarly failed to explain (1) what activities they must divert resources *from* as a result of the Ballot Receipt Deadline or (2) that the alleged diversion "perceptibly impair[s]" the organizations' "ability to pursue [their] mission." *LaFHAC*, 82 F.4th at 351. Mere expenditure of resources, on its own, is not enough to demonstrate standing. *See id.* at 353 (explaining the actual "Article III injury" under a diversion theory comes from the impairment to the group's ability to pursue its mission). They fail to make this showing. Indeed, none of the Plaintiffs—not the Libertarian Party, the RNC, nor MSGOP—identifies any specific efforts or programs that have suffered *as a result* of any diversion required by the Ballot Receipt Deadline. *See El Paso County v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020); *Tenth St. Residential*, 968 F.3d at 500. Their organizational standing theories accordingly fail as a matter of law.

---

[10] The RNC and MSGOP suggest that these expenditures are necessary because ballots that arrive in the mail after election day are more likely to favor their opponents. *Id.* ¶¶ 56-57. But none of the facts they allege in support of this claim—even if admissible—actually support it. And they are unlikely to be able to proffer admissible undisputed evidence that would support it, as is necessary at this stage. *See Inclusive Cmtys. Project*, 946 F.3d at 655.

### C.    Plaintiffs have not demonstrated any injuries to their candidates.

Plaintiffs also cannot pursue their claims based on alleged injuries to the rights of the candidates that they support. *See* RNC Compl. ¶¶ 70–74 (Count II); Libertarian Party Compl. ¶¶ 48, 54, 65–68 (Count II).

As an initial matter, no plaintiff in this action is alleged to be a candidate for office, and neither the RNC Plaintiffs nor the Libertarian Party has identified a particular candidate-member that will be harmed by the Ballot Receipt Deadline. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (requiring organizations to establish "that at least one identified member" will suffer an injury). But regardless of that deficiency, Plaintiffs' theories of candidate harm cannot sustain their claims as a matter of law.

Plaintiffs attempt to assert two theories of harm to their candidates' "right to stand for office." The first is a theory of "financial harm," *see* RNC Compl. ¶ 72; Libertarian Party Compl. ¶ 43, which is essentially a re-hash of the "diversion of resources" argument discussed above. It is also indistinguishable from theories that both the Third Circuit in *Bognet* and the district court in *Bost* rejected. *See Bognet*, 980 F.3d at 351−52; *Bost*, 2023 WL 4817073, at *8–9; *see also supra* § I.B. It fails here for the same reasons.

The second theory that Plaintiffs advance is an alleged harm to their candidates' electoral prospects. *See* RNC Compl. ¶ 59, Libertarian Party Compl. ¶¶ 53-55. The RNC Plaintiffs and Libertarian Party come at this argument from slightly different angles, but neither suffices to confer standing as a matter of law. To invoke "competitive standing," a candidate must "make [a] showing of '*an unfair advantage* in the election process.'" *Cegavske*, 488 F. Supp. 3d at 1003 (emphasis added) (quoting *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)). The theory is thus an ill fit in this case. Here, as in *Bost* and *Bognet*, the same ballot receipt deadline applies equally to *all* candidates and to *all* voters—no one "is specifically disadvantaged" by this even playing field.

*Bost*, 2023 WL 4817073, at *12 (quoting *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020)); *see also Bognet*, 980 F.3d at 351 (noting "all candidates in Pennsylvania, including Bognet's opponent, are subject to the same rules"). As such, the Ballot Receipt Deadline does not threaten Plaintiffs with any "harms that are unique from their electoral opponents." *Cegavske*, 488 F. Supp. 3d at 1003. The voters that support them stand to benefit from the Ballot Receipt Deadline as much as those who support their opponents.

The RNC Plaintiffs nevertheless attempt to support their "competitive standing" by claiming that ballots that arrive in the mail after election day are more likely to favor their opponents. RNC Compl. ¶¶ 56-57. The Libertarian Party attempts something similar by arguing that their candidates receive lower proportions of ballots cast by absentee ballots, as opposed to in-person voting, Libertarian Party Compl. ¶ 54. Intervenors are highly skeptical that Plaintiffs are likely to be able to proffer admissible undisputed evidence that would support these claims, as is necessary at this stage. *See Inclusive Cmtys. Project*, 946 F.3d at 655.[11]  But, in any event,

---

[11] Even if the Plaintiffs *could* prove their allegations with admissible evidence, the fact that many Democratic voters across the country vote by mail and may do so closer to election day, RNC Compl. ¶¶ 56–58, or that Libertarian Party candidates receive lower proportions of ballots cast by absentee ballots as opposed to in-person voting, Libertarian Party Compl. ¶ 54, is not enough to show that *the Ballot Receipt Deadline* threatens, or will threaten, a candidate's electoral prospects here in Mississippi. For instance, the RNC Plaintiffs' bare reliance on national mail voting statistics—even if admissible—similarly provides no plausible inference about mail voting patterns *in* Mississippi. Among other things, it does not account for the fact that eight states—California, Colorado, Hawaii, Nevada, Oregon, Utah, Washington, and Vermont—plus the District of Columbia, conduct *all mail* elections. *See Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legs., https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting (Dec. 20, 2023). Most of these states—including the nation's largest—have favored Democratic candidates in federal races in recent election cycles, meaning that many voters in Democratic-leaning states cast their ballots via mail *by default* under their state electoral regimes. These statistics say little, if anything, about absentee voters in Mississippi—where absentee voting is limited to specific categories of voters—never mind about the relative partisanship of absentee ballots received *after*, rather than before or on, election day. *Cf. Varela v. Gonzales*, 773 F.3d 704, 711 (5th Cir. 2014) (concluding it was implausible to infer from county-wide salary averages that employees in the data set were comparable to appellants solely because they occupied same broad field of work). Republican candidates do very well in Mississippi—even with the Ballot Receipt Deadline in place. In last year's elections, Republicans won every statewide office, as well as control of the House by 79 to 41 and the Senate by 36 to 16. *See 2023*

Intervenors are unaware of any case in which a court found that it had jurisdiction because a plaintiff hoped to improve their electoral prospects by *throwing out ballots timely cast by qualified voters* based on nothing more than a speculative fear that those voters may be more likely to vote for their opponent. As the Third Circuit observed in *Bognet*, is it not at all clear "how counting *more* timely cast votes would lead to a *less* competitive race." 980 F.3d at 351.

Nor is there any basis for concluding that the "harm" that *too many qualified voters will have their timely cast ballots counted* is cognizable under Article III. If it were, then a political party plaintiff could invoke federal jurisdiction *whenever* a law facilitates voter turnout and broadens the voting pool. That contravenes basic democratic principles and raises traceability concerns. *See Cegavske*, 488 F. Supp. 3d at 1002 (observing that in cases where courts have recognized organizational standing to challenge an election rule, "the challenged law has a direct and specific impact on a voter's ability to vote"); *cf. Short*, 893 F.3d at 677, 679 (rejecting *Anderson-Burdick* claim challenging law that "ma[de] it easier for some voters to cast their ballots" and kept "access to the ballot [] exactly the same" for other voters, explaining Plaintiffs' theory would "essentially bar a state from implementing any pilot program to increase voter turnout").

The RNC and MSGOP's concern that ballots voted before, but received after, election day will "disproportionately break for Democrats," cutting into "fragile" "early Republican leads in close races," RNC Compl. ¶¶ 56–57 (citation omitted), also does not state a cognizable injury for standing purposes—competitive or otherwise. Any such "early lead" is an arbitrary consequence of the order in which ballots are counted. A party has no legal right to win based only on ballots counted by dinner time on election night. In Mississippi—as in all American states—democracy

---

*General Election Results (Statewide Certified Results)*, Miss. Sec'y of State, https://www.sos.ms.gov/elections-voting/2023-general-election-results (last accessed Feb. 9, 2024).

depends on election officials counting **all** ballots cast by eligible voters on or before election day. *See, e.g.*, Miss. Code § 23-15-591 (election results are only proclaimed "[w]hen the votes have been completely and correctly counted and tallied"); *id.* § 23-15-605 (the candidate "duly elected" is "the person . . . having the largest number of votes"). Plaintiffs have no legal entitlement to any "early lead" in an election; this basis for standing must be rejected.

Finally, the Libertarian Party tries its hand at a slightly different theory of quasi-electoral injury, contending that it is "injured when an electoral performance is seen as less impressive" because an "unimpressive result leads to the public perception that Mississippi voters are turning away from the [Libertarian Party's] platform," impacting the ability "to generate interest in associating with [the Libertarian Party]." Libertarian Party Compl. ¶ 55. But this theory of harm is not cognizable either. *First*, and again, the Libertarian Party does not allege that purportedly "invalid" late-arriving ballots are likely to be cast by anyone other than a qualified Mississippi voter. Even if these ballots could be rejected under operation of law, they still accurately reflect the Mississippi electorate's views of the Libertarian Party's platform. In other words, the harm that the Libertarian Party complains of is a ballot count that *truthfully reflects* the electorate's views. *Second*, as its complaint acknowledges, the Libertarian Party is "a member of a class of minor political parties in Mississippi," *Id.* ¶ 51, a fact that was true long before the Ballot Receipt Deadline was enacted in 2020. Since then, the Libertarian Party has run only a single statewide candidate—for U.S. Senator in 2020—who received approximately 1.8 percent of the vote.[12] That was actually a modest *improvement* on the Party's performance two years earlier—prior to

---

[12] *See Amended Certification of Vote for United States Senate (Election Summary Report 2020)*, Miss. Sec'y of State (Dec. 7, 2020), https://sos.ms.gov/elections/electionresults/2020General/Statewide%20Certified%20Results/US%20Senate_AMENDED.pdf (Libertarian Party Candidate Jimmy L. Edwards).

enactment of the challenged law—where its candidate for U.S. Senate obtained about 1.4 percent of the vote.[13] There is no factual basis whatsoever to conclude that Libertarian Party candidates would have performed any better—or that the public would perceive the Party's performance any more favorably—absent the Ballot Receipt Deadline. *Lastly*, because the Ballot Receipt Deadline protects *all* Mississippi voters—including supporters of the Libertarian Party—from having their timely-voted ballots rejected if they arrive within the receipt deadline, it guards against the disenfranchisement of voters who support Libertarian Party candidates, too. There is simply no basis to conclude that the Libertarian Party is, in fact, harmed by the challenged law.

> ### D.    Plaintiffs' concept of vote dilution is not a particularized injury.

The Court should also reject Plaintiffs' claim that the individual voter Plaintiffs (or the political parties' individual members) are injured because their "timely, valid ballots are *diluted* by untimely, invalid ballots" due to the Ballot Receipt Deadline. RNC Compl. ¶ 4 (emphasis added); *id.* ¶¶ 75–80 (Count III); *see also* Libertarian Party Compl. ¶ 36 ("Among other harms, Plaintiff's members who cast timely and valid votes for Plaintiff's nominees by Election Day will have their votes diluted by illegal and invalid ballots received in violation of the federal Election Day statutes."). This exact theory of standing was rejected not only in *Bost*, 2023 WL 4817073, at *6–7, and in *Bognet*, 980 F.3d at 356–60, but also by a "veritable tsunami" of decisions from federal courts around the country. *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd*, No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022).

---

[13] *See 2018 General Election (Statewide Certified Results)*, Miss. Sec'y of State (Dec. 3, 2018), https://www.sos.ms.gov/elections-voting/election-results/2018-election-results/2018-general-election (Libertarian Party Candidate Danny Bedwell).

At bottom, Plaintiffs contend that "honest votes" carry less overall weight because the Ballot Receipt Deadline allows "illegitimate" ballots to be counted in violation of federal law. RNC Compl. ¶ 51; *see also* Libertarian Party Compl. ¶ 36. Again, Plaintiffs' concept of "honest" and "illegitimate" ballots is entirely grounded in their false belief that ballots received after election day are invalid under federal law, rather than any assertion that such ballots are cast by anyone other than qualified Mississippi voters. *See* RNC Compl. ¶ 50; *see also* Libertarian Party Compl. ¶¶ 36; 44. And they claim that the power of their votes is "diluted" when these ballots are counted because they believe that voters of other political parties are more likely to vote by mail. RNC Compl. ¶¶ 56–57; Libertarian Party Compl. ¶ 54.

As courts have repeatedly recognized, "[v]ote dilution in this context is a 'paradigmatic generalized grievance that cannot support standing.'" *Wood*, 981 F.3d at 1314–15 (quoting *Bognet*, 980 F.3d at 356); *see also Bost*, 2023 WL 4817073, at *5, *8 (finding same when plaintiffs challenged Illinois' 14-day ballot receipt deadline under identical "vote dilution" theory). These courts are not alone. Far from it. This same "vote dilution" theory was tested and tried across the country in a wide range of litigation during and after the 2020 elections, but courts resoundingly rejected it, finding that it falls squarely into the non-cognizable "'generalized grievance' category." *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 608 (E.D. Wis. 2020); *O'Rourke*, 2021 WL 1662742, at *6–9 (collecting over a dozen decisions from 2020 election cycle rejecting voter dilution theory); *see also Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution [is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").

The "vote dilution" cases cited in RNC Plaintiffs' Complaint—all of which concern apportionment or redistricting—illustrate the point. RNC Compl. ¶¶ 52–55. Those cases recognize

an injury when a law *minimizes* a voter's or a group of voters' voting strength or ability to access the political process *as compared to other voters*. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962). As the Third Circuit put it in *Bognet*, the body of cases Plaintiffs seek to rely upon are "concerned with votes being weighed *differently*." 980 F.3d at 355 (emphasis added). As the Eleventh Circuit explained, distinguishing those cases: "To be sure, vote dilution can be a basis for standing. But it requires a point of comparison. For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts." *Wood*, 981 F.3d at 1314 (first citation omitted) (quoting *Baker*, 369 U.S. at 207–08). But "'no single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" *Id.* at 1314–15 (quoting *Bognet*, 980 F.3d at 356). Plaintiffs' "vote dilution" harm falls squarely in this latter category and is thus insufficiently particularized to satisfy Article III.

Finally, Plaintiffs' generalized concerns about election integrity, *see* RNC Compl. ¶ 51 (claiming their "honest votes" will be diluted by the casting of "fraudulent or illegitimate votes"); Libertarian Party Compl. ¶ 36 (claiming its members who cast "timely and valid votes" will have their votes diluted by "illegal and invalid ballots") do nothing to remedy their deficient vote dilution theory of standing. Such vague and speculative concerns are not only insufficient to satisfy Article III's particularized requirement—because they are common concerns to every Mississippi voter—but they also cannot be reconciled with the actual operation of the law that Plaintiffs challenge. Far from undermining the integrity or validity of elections, the Ballot Receipt Deadline helps ensure that the results of Mississippi's elections more accurately reflect the will of all eligible

voters—not just those whose mail-in ballots, posted on or *before* election day, escape mail-related delays beyond a voters control.

E.     **Plaintiff Lamb does not have standing based on his view of the legality of Mississippi law.**

Mr. Lamb, one of the individual plaintiffs in the RNC case, also does not have standing based on his contention that the Ballot Receipt Deadline "forces him to choose between following Congress' election-day deadline or Mississippi's post-election day deadline," thereby opening him up to the possibility of removal from his position if he opts not to enforce a state law he believes to be invalid. RNC Compl. ¶ 60. A federal court in North Dakota rejected a similar claim less than two months ago. *See Splonskowski*, 2024 WL 402629 at *2. This Court should do the same.

Complying with a law that one believes to be invalid is not, without more, an injury in fact. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) ("[A]n injury in law is not an injury in fact."). If that were the case, *any* public official charged with implementing *any* legislative enactment would have standing to challenge the law based on their personal view that the law is preempted or otherwise infirm. Election officials do not get to decide for themselves which state laws are or are not preempted by federal statutes, nor may they request what is, in effect, an advisory opinion from a federal court.

No one is forcing Mr. Lamb to ignore Mississippi law in favor of his own interpretation of federal law. If he does so, it is a consequence of his own choice. But he "cannot manufacture standing merely by inflicting harm on [himself] based on [his] fear[] of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. And he has not identified any harm— hypothetical or otherwise—that he would suffer if he simply follows Mississippi law, as enacted by Legislature. *See Kearns v. Cuomo*, 981 F.3d 200, 207 (2d Cir. 2000) (official lacked standing

where he failed to plausibly allege that following an allegedly preempted state law would subject him to prosecution).

## II.     The Ballot Receipt Deadline does not violate federal statutes or rights under the Constitution.

This Court can and must enter summary judgment against Plaintiffs based on their failure to establish standing, which renders this Court without jurisdiction to hear and decide their claims. *See Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 389 (5th Cir. 2017) (affirming district court's grant of summary judgment to Defendants where Plaintiffs did not have standing). But even if the Court were to reach the merits, summary judgment in favor of Defendants and Intervenors would be necessary, as well. Plaintiffs' claims all rely on a single question of statutory interpretation: whether the Ballot Receipt Deadline "directly conflict[s]" with the federal Election Day Statutes. *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). It does not. It is therefore consistent with the Elections and Electors Clauses. And because ballots counted according to this Ballot Receipt Deadline are not "invalid," Plaintiffs' claims that their constitutional rights are violated by the counting of "invalid" ballots also cannot survive.

### A.     The Ballot Receipt Deadline is consistent with the Election Day Statutes, as well as the Elections and Electors Clauses.

The Elections Clause of the U.S. Constitution grants to the states the power to set the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's power to "by Law make or alter such Regulations." U.S. Const., art. I, § 4, cl.1. Similarly, the Constitution vests Congress with the power to determine when electors for the office of the President and Vice President are chosen, U.S. Const., art II, § 1, cl. 4, but otherwise reserves the manner of such selection to the states, *id.* art. II, § 1, cl. 2. Thus, "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot *directly conflict* with federal election laws on the subject."

23

*Bomer*, 199 F.3d at 775 (emphasis added). Federal law only "alter[s]" state election laws when the state law cannot possibly "operate harmoniously" with the federal law "in a single procedural scheme." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).

Mississippi's Ballot Receipt Deadline does not conflict at all with the Election Day Statutes; like the numerous similar laws across the country, these laws operate harmoniously. Indeed, while Mississippi's law is relatively new, many other states have had extended ballot receipt deadlines that for decades have operated harmoniously with the Election Day Statutes. During that time period, Congress has readopted the Election Day Statutes without taking any steps to restrict this widespread and well-known state practice. *Cf. Bost*, 2023 WL 4817073, at *11 (noting that despite the fact that post-election day ballot receipt deadlines have been "in place for many years in many states, Congress has never stepped in and altered the rules"). That reflects the well-established understanding that the Election Day Statutes set the date by which ballots in federal elections are to be cast by voters, but do not speak to when those ballots must be received by election officials. *See Bognet*, 980 F.3d at 353; *see also Way I*, 492 F. Supp. 3d at 372. Given Congress's silence on that latter point, the states retain their constitutional prerogative to choose whether to count absentee ballots that are voted by but arrive after election day—a prerogative nearly half the states, including Mississippi, have exercised to protect voters. *See supra* at n.3. These laws, including the Ballot Receipt Deadline, do nothing to alter the date when ballots must be cast; indeed, the Ballot Receipt Deadline *requires* that all absentee ballots must be postmarked on or before the date of the election. Miss. Code § 23-15-637(1)(a). Mississippi thus properly exercised its discretion to enact laws that provide for the counting of timely-cast ballots. *See Bost*,

2023 WL 4817073, at *11 (holding similar Illinois law "operates harmoniously with the federal statutes that set the timing for federal elections"); *Way I*, 492 F. Supp. 3d at 372 (similar).

Plaintiffs' arguments to the contrary rely on an impossibly broad and unsupportable reading of the statutory phrase "day for the election" in the Election Day Statutes, arguing that Mississippi's practice of *counting* votes received after "Election Day" equates to "holding voting open" or choosing an "alternative time" for election day in violation of federal law. *E.g.*, RNC Compl. ¶¶ 28, 45 (citation omitted); *see also* Libertarian Party Compl. ¶¶ 76–77, 79. But that ignores that ballots counted under the Ballot Receipt Deadline are in fact voted by or before the federal day set for elections. Indeed, none of the Plaintiffs make any allegations to the contrary.

*Foster v. Love*, 522 U.S. 67 (1997), does not support Plaintiffs' position. In *Foster*, the Supreme Court addressed a Louisiana "open primary" system under which the election of candidates for Congress could be *concluded* as a matter of law *before* the federally-mandated "election day." 522 U.S. at 70. Under that system, if any candidate received a majority of the votes cast in the open primary, they would be "elected," and *no* general election would be held on the federal election day. *Id.* The Court concluded this system was inconsistent with the Election Day Statutes, but it emphasized that its ruling was narrow, holding "only that if an election does take place, it *may not be consummated prior to* federal election day." *Id.* at 72 n.4 (emphasis added). It did not purport to "isolat[e] precisely what acts a State must cause to be done on federal election day . . . in order to satisfy the [Election Day Statutes]." *Id.* at 72.

Mississippi's Ballot Receipt Deadline does not "consummate[]" an election "prior to federal election day," or set a competing date on which the voters' selection "is concluded as a matter of law." *Id.* at 72 & n.4. It *mandates* that ballots be cast by election day. Miss. Code § 23-15-637(1)(a). And, by providing time to receive ballots cast on or before that day, it *ensures* the

election is "not . . . consummated prior to federal election day." *Foster*, 522 U.S. at 72 n.4. Plaintiffs' reliance on *Foster* not only ignores these clear differences, it cannot be reconciled with the *Foster* Court's "express disavowal . . . that it was establishing any particular actions a State must perform on election day to comply with the federal statutes." *Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001) (citing *Foster*, 522 U.S. at 72 & n.4). *Foster* expressly limited its holding to the straightforward proposition that the "combined actions of voters and officials meant to make a final selection of an officeholder" cannot be *consummated before* election day. *Foster*, 522 U.S. at 71.

Plaintiffs' argument is also contrary to the Fifth Circuit's reading of *Foster* which, in addressing an analogous challenge to an early voting statute, expressly rejected the argument that the Election Day Statutes require all activity associated with voting to occur on the federal election day. *See Bomer*, 199 F.3d at 776; *see also Voting Integrity Project v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001); *Millsaps*, 259 F.3d at 546. It is well understood that "official action to confirm or verify the results of the election extends well beyond federal election day." *Millsaps*, 259 F.3d at 546 n.5. Election officials must, for example, count, certify, and publicly announce the results. *Id.* at 546; *see also Bush v. Gore*, 531 U.S. 98, 116–17 (2000) (Rehnquist, C.J., concurring) (cataloguing administrative actions occurring in Florida after election day to conclude the election process); *see, e.g.*, Miss. Code § 23-15-651 (requiring results of votes by absentee ballots be announced *after* the five-business-day period for receiving absentee ballots); *id.* § 23-15-603 (requiring election commissioners to transmit final vote counts to the Secretary of State within ten days after election day). Contrary to Plaintiffs' arguments, all actions necessary to consummate an election need not—*and do not*—occur before the stroke of midnight on Election Day—cannot be

squared with these separate administrative provisions of Mississippi law, nor their analogs in virtually every other state.

The purpose of the Election Day Statutes further compels entering summary judgment against Plaintiffs. As both the U.S. Supreme Court and the Fifth Circuit have explained, the Election Day Statutes were enacted to prevent "distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and . . . the burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years." *Bomer*, 199 F.3d at 777 (alterations in original) (quoting *Foster*, 522 U.S. at 73–74). But once a Mississippi voter has completed their ballot and put it in the mail—relinquishing it from the voter's custody and control—the voter has made their "final selection" and can neither alter nor withdraw the ballot. Mississippi's system thus fulfills the purposes of the Election Day Statutes as described in *Foster*.

Finally, declining to count ballots cast on or before election day, but received after election day, would disenfranchise large numbers of Mississippians. In fact, Plaintiffs *admit* that is why they brought this suit. They believe the Ballot Receipt Deadline will "disproportionately break for Democrats," cutting into "fragile" "early Republican leads in close races," RNC Compl. ¶¶ 56–57, or result in "an electoral performance" that is "seen as less impressive." Libertarian Party ¶ 55. Based on these concerns, they ask the Court to issue an order that would require Mississippi to *reject* ballots cast by lawful, qualified voters, simply because they arrive after election day—even when the postmark proves they were timely cast.

As the Fifth Circuit noted in *Bomer*, "we cannot conceive that Congress intended the federal Election Day Statutes to have the effect of impeding citizens in exercising their right to vote. The legislative history of the statutes reflects Congress's concern that citizens be able to

exercise their right to vote." 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407-08 (1872)). Plaintiffs' argument runs directly contrary to this recognized purpose and denigrates the very constitutional rights that Plaintiffs claim they seek to safeguard.

> **B.     The Ballot Receipt Deadline does not violate the right to vote or the right to stand for office.**

Plaintiffs' right to vote and stand for office claims also fail as a matter of law. RNC Compl. ¶¶ 70–80 (Counts II, III); Libertarian Party Compl. ¶¶ 57–68 (Count I and II). Each of these counts expressly depends on Plaintiffs' misreading of the Election Day Statutes. *See supra* Section II.A. Because the underlying preemption claim fails, these derivative claims also fail as a matter of law.

Plaintiffs' claims about the right to stand for office and right to vote also fail on their own terms. Violations of the right to vote and to stand for office are reviewed under the *Anderson-Burdick* standard. *See Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 143 (5th Cir. 2020); *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). The first step is to determine whether the right to vote has been impacted at all. *See Tex. League of United Latin Am. Citizens*, 978 F.3d at 144–45. Laws that do not make it harder to vote do not implicate the right to vote. *Id.* at 144. The same is true of laws that do not impede a candidate's ability to stand for office. *See Tex. Indep. Party*, 84 F.3d at 184.

Plaintiffs cannot possibly show that the Ballot Receipt Deadline law makes it harder for anyone to exercise the right to vote. On its face, the law simply ensures that qualified voters do not have their timely-cast ballots rejected. It accordingly *protects* the right to vote; only if Plaintiffs succeed will the right to vote be impeded. Thus, the Ballot Receipt Deadline cannot violate the right to vote under *Anderson-Burdick*. *See, e.g.*, *Short*, 893 F.3d at 677 (affirming dismissal of challenge to law that "does not burden anyone's right to vote" and instead "makes it easier for some voters to cast their ballots by mail"). In the end, Plaintiffs' arguments that the Ballot Receipt

Deadline violates their constitutional rights is premised entirely on the presumption that ballots received after election day are "unlawful" under federal law. Libertarian Party Compl. ¶ 66, 79; *see also* RNC Compl. ¶ 66. Because the Election Day Statutes do not directly conflict with—and do not pre-empt—the Receipt Deadline, this claim, too, must fail.

Mississippi has strong interests in ensuring that qualified voters who timely cast their votes do not have those ballots arbitrarily rejected, and in avoiding the voter confusion that would follow if the law was suddenly changed as Plaintiffs demand. The Ballot Receipt Deadline and the Election Day Statutes share common purposes in expanding the franchise and protecting the right to vote. "These state interests constitute the very backbone of our constitutional scheme—the right of the people to cast a meaningful ballot." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1084 (10th Cir. 2018); *Riddell v. Nat'l Democratic Party*, 508 F.2d 770, 778 (5th Cir. 1975) (noting "the avoidance of voter confusion is a worthwhile objective" for the state).

The Ballot Receipt Deadline sets a clear, predictable rule for voters to know when they must mail their ballot to ensure that it is counted, enabling eligible voters to consume more information about candidates as it becomes available closer to election day, which benefits both candidates and voters. It also accounts for significant mail delays that have plagued previous elections. Because Plaintiffs lack standing to bring this case, they complain of an illusory conflict between rights reserved to Mississippi and federal law, and they fail to state a cognizable constitutional claim, Intervenor-Defendants are entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, Intervenor-Defendants respectfully request that the Court enter summary judgment for Defendants and Intervenor-Defendants and dismiss Plaintiffs' claims as a matter of law.

Dated: March 26, 2024                           Respectfully submitted,

_/s/ Elisabeth C. Frost_                          _/s/ Robert B. McDuff_
Elisabeth C. Frost* (DC Bar # 1007632)           Robert B. McDuff (MS Bar # 2532)
Christopher D. Dodge* (DC Bar # 90011587)         Paloma Wu (MS Bar # 105464)
Michael B. Jones* (DC Bar # 252745)               **MISSISSIPPI CENTER FOR JUSTICE**
Richard A. Medina* (DC Bar # 90003752)            210 E. Capitol Street
Tina Meng Morrison* (DC Bar # 1741090)            Suite 1800
**ELIAS LAW GROUP, LLP**                          Jackson, MS 39201
250 Massachusetts Ave NW                          Phone: (601) 259-8484
Suite 400                                         Fax: (601) 352-4769
Washington, DC 20001                              rmcduff@mscenterforjustice.org
Phone: 202-968-4490                               pwu@mscenterforjustice.org
efrost@elias.law
cdodge@elias.law
mjones@elias.law
rmedina@elias.law                                 _Counsel for Intervenor-Defendants Vet Voice_
tmengmorrison@elias.law                           _Foundation and Mississippi Alliance for_
                                                  _Retired Americans_

*Admitted _pro hac vice_