**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | |
|---|---|
| **REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; and MATTHEW LAMB** | **PLAINTIFFS** |
| **VS.** | **Civil Action No. 1:24-cv-25-LG-RPM** |
| **JUSTIN WETZEL,** *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, **et al.** | **DEFENDANTS** |

*and*

| | |
|---|---|
| **VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS** | **INTERVENOR DEFENDANTS** |

*consolidated with*

| | |
|---|---|
| **LIBERTARIAN PARTY OF MISSISSIPPI** | **PLAINTIFF** |
| **VS.** | **Civil Action No. 1:24-cv-37-LG-RPM** |
| **JUSTIN WETZEL,** *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, **et al.** | **DEFENDANTS** |

---

**DEFENDANT SECRETARY OF STATE MICHAEL WATSON'S RESPONSE**
**IN OPPOSITION TO REPUBLICAN PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

In response to the COVID-19 pandemic in 2020, the Mississippi Legislature amended MISS. CODE ANN. § 23-15-637(1)(a) ("the Mississippi Statute") to provide that mail-in absentee ballots would be counted in state and federal elections if "postmarked on or before the date of the

1

election and received by the registrar no more than five (5) business days after the election." 2020 H.B. 1521. Whatever one may think of the policy embodied in the Mississippi Statute, Plaintiffs' motion for summary judgment [Dkt. #58] should be denied—and their Complaint dismissed—because the Mississippi Statute does not violate federal law.

Plaintiffs' motion for summary judgment is predicated on the notion that to be legally counted under federal election statutes, a mail-in absentee ballot must be both "cast" by the voter and "received" by election officials no later than the federal election day—such that the "consummation" of the election ends on that day. But this view of federal law is not supported by the plain text of federal election statutes or by legislative history. And in construing federal election statutes, the U.S. Supreme Court has held only that elections may not be "consummated" *prior to* the federal election day—a rule that Mississippi law does not violate. The Mississippi Statute does not harm the plaintiff individuals or political parties in any way. It does not conflict with laws that set the election day for federal offices. And it does not impair the plaintiffs' rights to vote or to stand for office under the U.S. Constitution. None of the plaintiffs has standing to challenge the Mississippi Statute, and all of their claims fail on the merits.

At the threshold jurisdictional inquiry, Plaintiffs lack Article III standing. Neither of the individual plaintiffs—*viz.*, James "Pete" Perry and Matthew Lamb—have established the requisite injury in fact to bring this lawsuit. First, these plaintiffs merely assert a generalized grievance; they have not shown that they have been (or will be) personally harmed in any concrete and particularized way by the counting of mail-in absentee ballots in federal elections within five business days after Election Day. Second, as multiple federal courts have held in this context, claims of so-called "vote dilution" are too speculative and generalized to confer standing, there being no unequal weighing of ballots. Third, neither of these plaintiffs has shown that any

threatened injury is "certainly impending."  Mr. Perry does not even allege as much.  Mr. Lamb, a George County Election Commissioner, alleges that he risks removal from office if he disregards state law by refusing to count lawfully-cast mail-in absentee ballots.  But the speculative, multi-step effort (including a special election) that must ensue to remove Mr. Lamb from office is too highly attenuated to establish Article III standing.

The Republican Party entity-plaintiffs likewise lack standing to bring this lawsuit.  Neither the Republican National Committee nor the Mississippi Republican Party has made the requisite showing for associational standing.  Any alleged "injury" to Republican candidates is not "certainly impending" and is inherently speculative.  Significantly, Plaintiffs have not shown—or even alleged—that if all mail-in absentee ballots were received and counted on or before Election Day, Republican candidates would win federal election contests in Mississippi that they would otherwise lose.  Nor have the Republican Party entity-plaintiffs made the requisite showing for organizational standing.  They have not shown that any specific projects or activities were curtailed, postponed, cancelled, or otherwise forgone as a result of any alleged additional voter-education and poll-watching activities, or that such forgone activities impaired their ability to achieve their respective missions.  Nor have they shown that the Mississippi Statute has caused or will cause them to do anything they do not do already.

Because Plaintiffs lack standing, this Court lacks subject-matter jurisdiction, and Plaintiffs' motion should be denied and their Complaint dismissed without reaching the merits.  Even if this Court finds that Plaintiffs have standing, their claims nevertheless fail on the merits.  Federal law provides for an "election day" ("Election Day") for Presidential and Congressional elections.  *See* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1.  Mississippi law provides for absentee voting "either by mail or in person with a regular ballot."  MISS. CODE ANN. § 23-15-637(3).  Mail-in absentee ballots shall be

counted only if they are "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." *Id.* § 23-15-637(1)(a).  Counting of such ballots shall not commence until "the polls close" on Election Day.  *Id.* § 23-15-639(1)(c).

As a matter of law, states are given wide discretion in establishing the time, place, and manner of electing their federal representatives; the *sole limitation* on that discretion is that state laws cannot *directly conflict* with federal election laws.  By requiring that mail-in absentee ballots shall only be counted if postmarked by Election Day, the Mississippi Legislature ensured that the Mississippi Statute operates harmoniously with federal statutes.  Under both statutory regimes, ballots are counted only if they are cast on or before Election Day, and the election is not concluded prior to Election Day.  Thus, there is no direct conflict between federal and state law.  That Mississippi law comports with federal law is further confirmed by the following:  a long history of Congressional acquiescence in state statutory schemes providing for post-Election Day receipt of mail-in absentee ballots; federal laws which themselves provide for post-Election Day receipt of absentee ballots; and consistency with federal statutory objectives.  For all these reasons, Plaintiffs' claim that the Mississippi Statute violates federal election statutes must fail.

Plaintiffs' constitutional claims fare no better.  As to Plaintiffs' claim that the Mississippi Statute violates their First and Fourteenth Amendment "right to stand for office," the Mississippi Statute only regulates the timing and manner of casting and counting mail-in absentee ballots.  It does not speak to candidate eligibility or qualification requirements *at all*.  Because the challenged statute does not impair any right to stand for office, it does not infringe on any associated First Amendment rights as a matter of law.

As to Plaintiffs' claim that the Mississippi Statute violates their Fourteenth Amendment "right to vote" by allegedly holding open voting after Election Day, nothing in the Mississippi

Statute permits the counting of ballots that have been cast after Election Day. Rather, to be counted at all, mail-in absentee ballots must be postmarked on or before Election Day. Finally, Plaintiffs cannot establish a Fourteenth Amendment equal-protection violation where no voter is specifically disadvantaged by the counting of mail-in absentee ballots, and votes cast in person are likewise counted and weighed equally. A voter has a right to cast a lawful ballot and have that lawfully-cast ballot counted. Nothing in the Mississippi Statute infringes on that right. Accordingly, Plaintiffs' Fourteenth Amendment "right to vote" claim likewise fails as a matter of law.

For these reasons and those set forth herein, Plaintiffs' motion for summary judgment should be denied.

## BACKGROUND

**Legal Background.** This case involves the interplay between federal and state law bearing on the administration of Presidential and Congressional elections. As a matter of law, "[t]he states have broad power to regulate the conduct of both federal and state elections." *Goodloe v. Madison County Bd. of Election Comm'rs*, 610 F. Supp. 240, 242 (S.D. Miss. 1985). The states' authority in this regard is constrained by "only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Proj., Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000), *cert. denied*, 530 U.S. 1230 (2000).

Federal law provides for an "election day" for Presidential and Congressional elections. 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. Mississippi law provides for absentee voting "either by mail or in person with a regular ballot." MISS. CODE ANN. § 23-15-637(3). Mail-in absentee ballots shall only be counted if "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." *Id.* § 23-15-637(1)(a). Counting of such ballots shall not commence until "the polls close" on Election Day. *Id.* § 23-15-639(1)(c).

**Factual and Procedural Background.**  This case involves a facial challenge to MISS. CODE ANN. § 23-15-637(1)(a) implicating a pure question of law, *viz.*, whether mail-in absentee ballots that are postmarked on or before Election Day but are received during the first five business days after Election Day must be disregarded as untimely under federal law.  Plaintiffs are two entities, *viz.*, the Republican National Committee and the Mississippi Republican Party; and two individuals, *viz.*, James "Pete" Perry, former chairman of the Hinds County Republican Party and current member of the Hinds County Republican Committee, and Matthew Lamb, District 4 Commissioner for the George County Election Commission.  Dkt. #1 at 2-4, ¶¶ 8, 14, 16, 17.

On January 26, 2024, Plaintiffs filed their Complaint against Defendant and certain Harrison County election officials asserting three claims:  (1) **Count I**, asserting that the Mississippi Statute violates 3 U.S.C. § 1 and 2 U.S.C. §§ 1 and 7; (2) **Count II**, asserting that the Mississippi Statute violates "the Right to Stand for Office . . . . protected under the First and Fourteenth Amendment[s] to the U.S. Constitution" (invoking 42 U.S.C. § 1983); and (3) **Count III**, asserting that the Mississippi Statute violates "the Right to Vote . . . . and therefore violates the Fourteenth Amendment to the U.S. Constitution (invoking 42 U.S.C. § 1983)."  Dkt. #1 at 11-13, ¶¶ 62-80.  Plaintiffs seek declaratory and injunctive relief to prevent the counting of mail-in absentee ballots received during the five-business-day period after Election Day.  *See id.* at 14.

As noted above, the Mississippi Legislature enacted the challenged statutory language as an amendment necessitated by the COVID-19 pandemic in 2020.  Defendant Secretary of State Michael Watson ("Defendant") had no involvement in debating, voting on, or enacting the aforementioned amendment.  Plaintiffs have sued him here only because they allege in their Complaint that he "has the authority to promulgate rules regarding absentee voting" and "provides guidance to county officials regarding absentee voting."  *Id.* at 5, ¶ 24.

On March 5, 2024, this Court entered a briefing schedule providing for the adjudication of this case via cross-motions for summary judgment [Dkt. #38].  Defendant timely filed his own motion for summary judgment on March 26, 2024 [Dkt. #51, #52].  Defendant timely files the instant response in opposition to the RNC's motion for summary judgment [Dkt. #58].

## STANDARD FOR SUMMARY JUDGMENT

**Lack of standing.**  Subject-matter jurisdiction fails where the plaintiffs lack Article III standing.  *Stallworth v. Bryant*, 936 F.3d 224, 232 (5th Cir. 2019).  At the summary-judgment stage, "the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue."  *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) (quoting *Cramer v. Skinner*, 931 F.2d 1020, 1025 (5th Cir. 1991)) (quotation marks omitted).

**Merits.**  "Summary judgment is appropriate where the only issue before the court is a pure question of law."  *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).  Summary judgment is warranted only "when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."  *See Harness v. Watson*, 47 F.4th 296, 303 (5th Cir. 2022) (quotation marks omitted).  When parties file cross-motions for summary judgment, the Court should "review each party's motion independently."  *Colony Ins. Co. v. First Mercury Ins. Co.*, 88 F.4th 1100, 1106-07 (5th Cir. 2023).

## ARGUMENT

## I.  PLAINTIFFS LACK STANDING TO BRING THIS LAWSUIT.

Article III of the U.S. Constitution requires an actual case or controversy as a necessary predicate to subject-matter jurisdiction—that is, the plaintiff must have standing.  *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473

(1982).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each

claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594

U.S. 413, 431 (2021).  To maintain any lawsuit in federal court, plaintiffs must establish Article III

standing by showing injury in fact, traceability, and redressability.  *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560-61 (1992).  In the absence of *any* of these elements, the plaintiffs lack standing,

and the action must be dismissed.  *See Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001).

**A.  Both individual plaintiffs lack standing because they fail to show any injury in fact.**

**1.  Mr. Perry and Mr. Lamb fail to show any concrete and particularized injury—or anything beyond a generalized grievance—from the counting of mail-in absentee ballots received within five business days after Election Day.**

"Abstract injury is not enough" to establish standing.  *City of Los Angeles v. Lyons*, 461

U.S. 95, 101-02 (1983).  Rather, a plaintiff must show an invasion of a legally-protected interest

that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."

*Lujan*, 504 U.S. at 560 (quotation marks omitted).  For an injury in fact to be "particularized," it

"must affect the plaintiff[s] in a personal and individual way."  *Id.* at 560 n.1.  *See also Pub.*

*Citizen, Inc. v. Bomer*, 274 F.3d 212, 218-19 (5th Cir. 2001) (same).  For an injury in fact to be

actual or imminent, a plaintiff must show that an alleged injury is "certainly impending," not

merely possible.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  *See also Attala*

*County, Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022).

As a general rule, standing cannot be predicated on "a 'generalized grievance' shared in

substantially equal measure by all or a large class of citizens."  *Warth v. Seldin*, 422 U.S. 490, 499

(1975).  *See also Apache Bend Apartments, Ltd. v. U.S. ex rel. I.R.S.*, 987 F.2d 1174, 1178 (5th

Cir. 1993).  It is well settled that a plaintiff cannot show a concrete and particularized injury

sufficient for Article III standing by showing a mere "general interest common to all members of

the public." *Ex parte Levitt*, 302 U.S. 633 (1937).  As the Fifth Circuit recently reaffirmed, an "undifferentiated, generalized grievance about the conduct of government" does not satisfy Article III's injury-in-fact requirement.  *See Lutostanski v. Brown*, 88 F.4th 582, 586 (5th Cir. 2023) (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007)).  Where the plaintiff asserts a generally-available grievance about government, claiming only "harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—[he] does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74.

Applying these precepts to a claim that Colorado state law violated the federal Elections Clause, U.S. CONST., art. I, § 4, cl. 1, the U.S. Supreme Court held that the plaintiffs lacked standing because such an alleged conflict between state and federal law "is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has] refused to countenance in the past." *Lance v. Coffman*, 549 U.S. 437, 442 (2007).  A federal district court in Illinois recently applied these same principles in holding that the plaintiffs (who were former/prospective candidates and registered voters) lacked standing to challenge Illinois' comparable mail-in absentee ballot receipt deadline statute as violating the U.S. Constitution and the same federal statutes at issue in this case (*viz.*, 2 U.S.C. §§ 1, 7; and 3 U.S.C. § 1).  *Bost v. Ill. State Bd. of Elections*, No. 22-cv-02754, 2023 WL 4817073, at *4-6 (N.D. Ill. July 26, 2023).

In the case at bar, the counting of mail-in absentee ballots received within five business days after Election Day does not constitute a concrete and particularized injury to Mr. Perry or Mr. Lamb.  Both individual plaintiffs claim to be Mississippi residents and registered Mississippi voters.  Dkt. #1 at 4, ¶¶ 16-17; Dkt. #58-3 at 3, ¶ 2; Dkt. #58-4 at 3, ¶ 2.  But Plaintiffs have not shown that either of them is personally and individually harmed by the Mississippi Statute.

Plaintiffs assert in their brief that as voters, Mr. Perry and Mr. Lamb "fear that Mississippi's post-election deadline will invite fraud, decrease confidence in the outcome of the election, and dilute their votes with untimely ballots." Dkt. #60 at 4. No evidence is offered to support this assertion, which is too speculative to establish Article III standing in any event. *See Lyons*, 461 U.S. at 107 n.8 (reaffirming that plaintiff's "subjective apprehensions" are not "relevant to the standing inquiry"). Mr. Perry further vaguely asserts in his declaration that "Mississippi's post-election deadline forces [him] to devote more of [his] time ensuring that the Mississippi Republican Party has the resources and people necessary to chase ballots and allocate poll watchers." Dkt. #58-3 at 3, ¶ 7. But Plaintiffs "do not specify how [Mr. Perry or Mr. Lamb], individually, have been or will be harmed in a concrete and particularized way by the [Mississippi] Statute's alleged facial conflict with [federal law]." *Bost*, 2023 WL 4817073 at *5.

Because Plaintiffs have not shown that the counting of mail-in absentee ballots received within five business days after Election Day actually harms Mr. Perry or Mr. Lamb in any "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, they have failed to show any concrete and particularized injury, and thus fail to establish standing as to either of the individual plaintiffs. At best, any "harm" purportedly emanating from an alleged conflict between the Mississippi Statute and federal law "is the kind of generalized grievance that is insufficient to confer standing." *Bost*, 2023 WL 4817073 at *5. That is, it implicates "a general interest that every citizen shares in the proper application of the Constitution and the laws of the United States." *Id.* (citing *Lujan*, 504 U.S. at 560-61). "Seeking relief for this grievance no more 'directly and tangibly benefits [Mr. Perry or Mr. Lamb] than it does the public at large' and thus 'does not state an Article III case or controversy.'" *Id.* (quoting *Lujan*, 504 U.S. at 573-74). This alleged conflict between state and

federal law is the same kind of "injury" that the Supreme Court found "too undifferentiated to confer standing in *Lance*," *supra*. *See Bost*, 2023 WL 4817073 at *6.

For all these reasons, Plaintiffs have not shown that Mr. Perry or Mr. Lamb has or will experience any concrete and particularized injury; therefore, both of the individual plaintiffs lack standing to maintain this action.

**2. Allegations of "vote dilution" resulting from the counting of allegedly unlawful mail-in absentee ballots are insufficient to confer standing.**

Plaintiffs further claim to be "directly harm[ed]" by the alleged "[d]ilution of honest votes . . . by the casting of fraudulent or illegitimate votes." Dkt. #1 at 10, ¶ 56; 13, ¶ 77. *See also* Dkt. #60 at 19-20; Dkt. #58-3 at 3, ¶ 8. This allegation of injury presupposes that the Mississippi Statute does indeed violate federal law, which Defendant disputes. *See infra*. However, even assuming for the sake of argument that ballots received after Election Day are unlawful, the counting of such ballots—which have been mailed and postmarked on or before Election Day—does not "dilute" the vote of any particular, individual voter. An in-person voter's vote for a given candidate counts the same whether mail-in absentee ballots are counted after Election Day or not. No lesser weight or value is afforded an in-person voter's vote based on the counting of allegedly "unlawful" mail-in absentee ballots. Thus, the counting of such "unlawful" ballots is—at best for Plaintiffs—a generalized grievance shared by all Mississippi voters, and not the sort of concrete and particularized injury needed to supply standing.

Multiple courts have held that claims of so-called "vote dilution" in the context of unlawful ballots are too speculative and generalized to confer standing. For instance, just last summer, a federal district court in Illinois—considering a challenge to that state's comparable mail-in absentee ballot receipt deadline statute—held that the plaintiffs lacked standing to sue on a "vote dilution" theory. *Bost*, 2023 WL 4817073 at *6-8. In *Bost*, the statute at issue allowed mail-in

ballots "cast in federal elections to be received and counted for up to 14 days after Election Day, so long as the ballot was postmarked or certified on or before Election Day." *Id.* at *2. The plaintiffs argued that the counting of such ballots after Election Day diluted their votes, thereby creating an injury sufficient to confer standing. *Id.* at *6. The district court rejected that argument, finding that the plaintiffs had not "allege[d] an injury beyond the general grievance that all Illinois voters would share" if the challenged ballots were counted. *Id.* at *7. The district court thus concluded that the plaintiffs' allegations of "vote dilution" were "too speculative and generalized to constitute an injury in fact for the purposes of Article III standing." *Id.* at *8.

In 2020, a federal district court in North Carolina—applying similar reasoning—held that voters asserting ballot-fraud claims lacked Article III standing to sue on a "vote dilution" theory. *Moore v. Circosta*, 494 F. Supp. 3d 289, 312-13 (M.D.N.C. 2020). In *Moore*, the state law in question allowed mail-in absentee ballots "to be received [and counted] up to nine days after Election Day if they [were] postmarked on Election Day." *Id.* at 314. The district court reasoned that in "vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted," the harm alleged "is unduly speculative and impermissibly generalized because all voters in a state are affected." *Id.* at 312. "[T]he notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing." *Id.*

Along the same lines, a federal district court in Wisconsin held in 2020 that a voter alleging widespread ballot fraud lacked Article III standing to sue on a "vote dilution" theory. *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020). In *Feehan*, the plaintiff sought an order requiring Wisconsin's governor to decertify the results of the 2020 Presidential election and declare President Donald Trump the winner. *Id.* at 601-02. In alleging that Wisconsin

12

election officials facilitated voter fraud by enacting regulations and issuing guidance favoring Democratic absentee voters over Republican voters, the plaintiff argued that his right to vote had been diluted, thereby "injuring" him and affording him standing. *See id.* at 608.  The district court rejected that argument, finding that in basing his standing theory on so-called "vote dilution," the plaintiff failed to allege that "as a voter, he ha[d] suffered a particularized, concrete injury sufficient to confer standing." *Id.*  Rather, the plaintiff "show[ed] no more than a generalized grievance common to any voter," which was insufficient to establish Article III standing. *Id.*

Here, as in *Bost*, *Moore*, and *Feehan*, *supra*, Plaintiffs assert claims of "vote dilution" predicated on the counting of allegedly unlawful mail-in absentee ballots.  Like the allegations of the plaintiffs in those cases, Plaintiffs' allegations of "vote dilution" in the instant case fail to show that Mr. Perry or Mr. Lamb has experienced, or will experience, any particularized, concrete injury as a result of counting mail-in absentee ballots received no later than five business days after Election Day.  At best, Plaintiffs have alleged a generalized grievance shared by all Mississippi voters.  For the same reasons articulated by the district courts in *Bost*, *Moore*, and *Feehan*, *supra*, this Court should likewise reject any theory of standing predicated on so-called "vote dilution."

### 3.  Mr. Perry and Mr. Lamb lack standing for the additional reason that they have not shown any injury that is certainly impending.

In the context of Article III standing, the U.S. Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (emphasis in original).  As the Fifth Circuit recently reaffirmed, a "theory of standing which relies on a highly attenuated chain of possibilities does not satisfy the certainly-impending requirement." *Louisiana v. Haaland*, 86 F.4th 663, 666 (5th Cir. 2023) (quotation marks omitted) (cleaned up).  *See also Trinity Indus., Inc. v. Martin*, 963 F.2d 795, 799 (5th Cir. 1992) ("The possibility, that maybe, in

the future, if a series of events occur, . . . [plaintiff] might suffer some injury is clearly too impalpable to satisfy the requirements of Art[icle] III.").

In the case at bar, Plaintiffs have not shown any harm to Mr. Perry or Mr. Lamb that is "certainly impending," and thus these plaintiffs lack standing for this additional reason.  As noted above, Plaintiffs allege in their brief—without evidentiary support—that as voters, Mr. Perry and Mr. Lamb "fear that Mississippi's post-election deadline will invite fraud, decrease confidence in the outcome of the election, and dilute their votes with untimely ballots." Dkt. #60 at 4.  Even if the Court were to accept this assertion in the absence of competent summary-judgment evidence, it fails to establish that any individualized harm to Mr. Perry or Mr. Lamb is "certainly impending."

Mr. Perry's vague assertion that the Mississippi Statute "forces [him] to devote more of [his] time" to ensuring that the Mississippi Republican Party has certain resources, Dkt. #58-3 at 3, ¶ 7, fails to establish any "certainly impending" harm.  As to Mr. Lamb, he states that he is "the District 4 Commissioner for the George County Election Commission" and is accordingly "responsible for running the County's general and special elections."  Dkt. #58-4 at 3, ¶ 3.  He further states that he "plan[s] to conduct the George County election in accordance with federal law," which he views as conflicting with the Mississippi Statute.  *Id.* at 3, ¶¶ 5, 9.  Mr. Lamb states that if he "follow[s] the federal Election Day deadline, [he] face[s] removal from [his] position as county commissioner." *Id.* at 4, ¶ 10.

Mr. Lamb's assertion that his prospective failure to apply the Mississippi Statute would subject him to "removal from [his] position as county commissioner," *id.*, is both speculative and highly attenuated.  State law generally allows the Governor "to remove any elective county officer" from office, MISS. CODE ANN. § 25-5-3, for "[k]nowingly or wilfully failing, neglecting, or refusing to perform any of the duties required of such officer by law," *id.*

§ 25-5-5.  However, before the Governor can even *consider* the removal of an elective county official, there must first be filed with him—upon certification by the country registrar—a verified petition signed by not less than 30% of the qualified electors of the county demanding the removal of the county official.  *Id.* §§ 25-5-7, 25-5-13, 25-5-15, 25-5-19.  Notice of a hearing must then be served on the county official whose removal is sought, and the Governor must convene a removal council composed of three Chancery Court judges appointed by the Governor.  *Id.* § 25-5-21, 25-5-23.  The appointed judges must then "hear and determine whether there is substantial basis for a removal election."  *Id.* § 25-5-23.  Only if the removal council determines "that sufficient cause has been shown to justify the removal of the officer," then "an election shall be held in said county to determine . . . whether or not said county official shall be removed from office."  *Id.* § 25-5-25.  "The officer named in the removal petition shall continue to perform the duties of his office until the results of said special removal election shall be officially proclaimed."  *Id.* § 25-5-27.

Plaintiffs assert that given the alleged conflict between the Mississippi Statute and federal law, Mr. Lamb could be subject to the above-described statutory removal procedure.  Dkt. #60 at 20; Dkt. #58-4 at 4, ¶ 10.  However, Plaintiffs have not shown that any removal petition has been filed or even contemplated.  Thus, as a matter of law, the Governor cannot presently even "consider" Mr. Lamb's removal from office.  MISS. CODE ANN. § 25-5-7.  Given the attenuated sequence of speculative events that must occur before Mr. Lamb could ever be removed from office, he is not threatened with any "injury" that is "certainly impending," see *Clapper*, *supra*.

For all these reasons, Plaintiffs have not shown that Mr. Perry or Mr. Lamb faces any "certainly impending" injury from the counting of mail-in absentee ballots received within five business days after Election Day.  These plaintiffs lack standing for this additional reason.

15

**B.  The Republican Party entity-plaintiffs also lack standing.**

In addition to Mr. Perry and Mr. Lamb, the named plaintiffs in the Complaint include the Republican National Committee ("the RNC") and the Mississippi Republican Party ("the MSGOP") (hereinafter collectively "the RNC Plaintiffs").  Dkt. #1 at 1; 2, ¶ 8; 3, ¶ 14.  Plaintiffs allege that the RNC "brings this suit to vindicate its own rights . . . and in a representational capacity to vindicate the rights of its members, affiliated voters, and candidates."  *Id.* at 3, ¶ 13. Plaintiffs allege that "The Mississippi Republican Party has the same interests in this case as the RNC and seeks to vindicate those interests in the same ways."  *Id.* at 3, ¶ 15.

For purposes of Article III standing, "[a]n association or organization can establish an injury in fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'"  *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). "'Associational standing' is derivative of the standing of the association's members" and requires that "they have standing and that the interests the association seeks to protect" are "germane to its purpose."  *Id.*  "By contrast, 'organizational standing' does not depend on the standing of the organization's members."  *Id.*  Rather, "[t]he organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'"  *Id.*  Plaintiffs have not shown that the RNC Plaintiffs have standing to bring this lawsuit under either of these theories.

**1.  The RNC Plaintiffs have not established associational standing.**

To establish associational standing, a plaintiff must show that its members would otherwise have standing to sue in their own right.  *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 781 (5th Cir. 2024).  In keeping with this requirement, an associational plaintiff must show that its members independently meet the Article III standing requirements; allegations that are neither concrete nor imminent but are merely speculative will not suffice to support associational

standing.  *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010).  *See also Miller v. Hughs*, 471 F. Supp. 3d 768, 777 (W.D. Tex. 2020); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 802-03 (W.D. Tex. 2015).  At the summary-judgment stage, associational standing fails where "there is no evidence in the record showing that a specific member" of the entity plaintiff has experienced the alleged harm.  *See City of Kyle*, 626 F.3d at 237.  Specifically, "at the summary judgment stage, to establish associational standing, an organization must name specific members who would be, or have been, directly affected by the allegedly illegal activity and provide affidavits with specific facts supporting its allegations."  *Perez v. Texas*, Civil Action Nos. 11–CA–360–OLG–JES–XR, *et al.*, 2011 WL 9160142, at *9 (W.D. Tex. Sept. 2, 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-500 (2009)); *Lujan*, 504 U.S. at 561.

In the case at bar, Plaintiffs have not shown that the RNC Plaintiffs' members would have standing to sue in their own right.  To the extent Plaintiffs argue that the RNC Plaintiffs' members—i.e., voters, candidates, or others—have standing on a "vote dilution" theory, or due to an alleged conflict between the Mississippi Statute and federal law, those arguments fail for the reasons set forth in Part I.A., *supra*.  To the extent Plaintiffs argue that standing is conferred on members of the RNC Plaintiffs who are current or prospective candidates for elected office, that argument likewise fails because—as set forth *infra*—Plaintiffs' alleged "injury" to such candidates is not "certainly impending," *Clapper*, 568 U.S. at 409, and is inherently speculative.

Significantly, Plaintiffs have not identified a single, specific member or candidate of the Republican Party who has been or will be harmed by operation of the Mississippi Statute.  Rather, Plaintiffs generally assert that "late mail-in votes will disproportionately harm Republican candidates" because "Democratic voters tend to mail their ballots later on average than Republican voters, which results in late-arriving ballots favoring Democratic candidates."  Dkt. #60 at 18.  In

support of this assertion, Plaintiffs rely exclusively on paragraphs 20-22 of the declaration of Ashley Walukevich, Deputy Political Director of the RNC.  *See id.*  Not only do these paragraphs contain no Mississippi-specific facts, but they also consist entirely of conclusory allegations, unsubstantiated assertions, and legal conclusions, none of which constitutes competent summary-judgment evidence.  *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) ("Conclusory allegations and unsubstantiated assertions . . . are not competent summary judgment evidence."); *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018) ("[L]egal conclusions . . . are not competent summary judgment evidence.").  Plaintiffs further argue that counting mail-in absentee ballots received after Election Day "violates federal law, . . . which results in an 'inaccurate vote tally' that necessarily harms [Republican] political candidates."  Dkt. #60 at 18.  That argument is predicated on the erroneous assumption that the Mississippi Statute violates federal law.  *See* Part II.A., *infra*.

But even if the Court were to consider the aforementioned arguments despite their lack of evidentiary and legal support, respectively, neither is sufficient to support associational standing for two additional reasons.  First, Plaintiffs have not shown that any alleged harm to their candidates is "certainly impending," *Clapper*, 568 U.S. at 409.  Plaintiffs have not submitted any candidate affidavits or other competent summary-judgment evidence establishing that a specific Republican candidate for federal office stands to lose an impending federal election in Mississippi if the counting of mail-in absentee ballots is not restricted to ballots received by Election Day.

Second, and relatedly, the RNC Plaintiffs' candidates' alleged harm is inherently speculative.  For the RNC Plaintiffs' candidates to have standing "to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to [the Republican candidates'] detriment."  *See Bognet v. Sec'y*

*Commonwealth of Pa.*, 980 F.3d 336, 351-52 (3d Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).  That is, Plaintiffs would have to show that if all mail-in absentee ballots were received and counted on or before Election Day (i.e., the remedy Plaintiffs seek), Republican candidates would win federal election contests that they would otherwise lose.  Not only have Plaintiffs not made that showing, but "[they] do[] not [even] allege as much, and such a prediction was inherently speculative when the complaint was filed." *See id.* at 352.  *Cf. Miller*, 471 F. Supp. 3d at 777 (where associational plaintiff fails to allege that any candidate member "has lost or will lose an election" as a result of a challenged balloting statute, plaintiff's "allegations are insufficient for associational standing because the alleged injury is neither concrete nor imminent").[1]

To the extent Plaintiffs would argue that they have associational standing on a theory of member candidates' "competitive standing" pursuant to *Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006), that argument is misplaced.  In *Benkiser*, the Fifth Circuit held that a specific Democratic Party candidate actively locked in a congressional race would have had standing to challenge the Republican Party's disqualification and attempted replacement—several months before the election—of the candidate's Republican opponent, an action which "threaten[ed] [the Democratic candidate's] election prospects and campaign coffers."  *Benkiser*,

---

[1] Plaintiffs allege that "Mississippi received 22,221 absentee ballots for the 2022 General Election, and 142,591 absentee ballots during the 2020 General Election."  Dkt. #1 at 11, ¶ 58.  Plaintiffs have submitted no competent-summary judgment evidence to support these allegations.  And Plaintiffs fail to acknowledge that these figures include both mail-in absentee ballots (received both before and in the five business days after Election Day) and absentee ballots cast in person.  *See* MISS. CODE ANN. § 23-15-637(3) (absentee ballots may be cast "either by mail or in person with a regular paper ballot").  The only relevant federal office in Mississippi that is not currently held by a Republican is Mississippi's 2nd Congressional District, which is held by longtime incumbent Bennie Thompson, a Democrat.  Plaintiffs have not cited any data suggesting that a Republican would have unseated Congressman Thompson in any election but for the counting of any mail-in absentee ballots received in that district after Election Day.

459 F.3d at 587.   On that basis, the Fifth Circuit held that the Texas Democratic Party had associational standing.  *Id.*

Unlike the Democratic Party in *Benkiser*, the RNC Plaintiffs do not allege that any specific candidate is harmed by the concrete action of an opposing political party involving a competing candidate in a specific race.   Rather, the RNC Plaintiffs allege that the Mississippi Statute—a generally-applicable absentee ballot law—generally harms all of their candidates for Congressional and Presidential races.   Because the RNC Plaintiffs have not alleged any specific, particularized injury caused by a competing political party that threatens any of their candidate members individually in any particular election, *Benkiser* is distinguishable and has no application here.  *See Taitz v. Democratic Party of Miss.*, Civil Action No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at *19-20 (S.D. Miss. Mar. 31, 2015) (holding that *Benkiser's* "competitive standing" rationale did not apply where plaintiffs could not show that "they ha[d] a particularized injury"). *See also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1251 (11th Cir. 2020) (distinguishing *Benkiser* as inapplicable where political party did not allege that state ballot order statute "has affected or will affect any particular candidate in any particular election").

Because the RNC Plaintiffs' candidates' alleged injuries are not "certainly impending" and are inherently speculative, Plaintiffs have failed to establish associational standing arising from their members who are candidates.  For all these reasons, associational standing fails.

## 2.  The RNC Plaintiffs have not established organizational standing.

Under the theory of "organizational standing," an organization may establish injury in fact by showing that it diverted resources to counteract the defendants' conduct.  *City of Kyle*, 626 F.3d at 238.   "However, an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct."  *El Paso County, Tex. v. Trump*, 982 F.3d

332, 333 (5th Cir. 2020).  "Rather, the Article III injury comes when that diversion of resources concretely and 'perceptibly impairs' the organization's ability to carry out its purpose."  *La. Fair Housing Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) (cleaned up).  "Put differently, the 'perceptible impairment' to an organization's ability to carry out its mission, not the 'drain on the organization's resources,' is the 'concrete and demonstrable injury' for organizational standing."  *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)) (cleaned up).

To make the requisite showing of harm, the organization must identify specific projects that were curtailed, postponed, cancelled, or otherwise forgone as a result of the organization's efforts to counteract the defendant's conduct.  *See, e.g., id.* at 353-54; *Tenth Street Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020); *City of Kyle*, 626 F.3d at 238.  The organization must "explain how any curtailment of these projects perceptibly impaired its ability to achieve its mission."  *See La. Fair Housing Center*, 82 F.4th at 354.  *See also Jacobson*, 974 F.3d at 1250-51 (reaffirming that to establish organizational standing, plaintiff must show what activities organization "would divert resources away *from* in order to spend additional resources on combatting" challenged law) (emphasis in original).  Further, "the organization's reaction to the allegedly unlawful conduct must differ from its routine activities."  *El Paso County*, 982 F.3d at 344.  *See also La. Fair Housing Center*, 82 F.4th at 352-54.

In the case at bar, Plaintiffs have not shown the requisite diversion of resources to establish organizational standing.  The RNC Plaintiffs assert that "Mississippi's mail-in deadline forces the RNC [and MSGOP] to divert resources and spend money on absentee-specific programs and post-election activities."  Dkt. #58-1 at 4, ¶ 10; Dkt. #58-2 at 4, ¶ 11.  In support of this assertion, Plaintiffs rely exclusively on the declarations of RNC Deputy Political Director Ashley

Walukevich and MSGOP Chairman Frank Bordeaux.  The RNC asserts that it "funds and engages in ballot 'chase' programs" focusing on voter education surrounding mail-in voting.  Dkt. #58-1 at 4, ¶ 11.  The RNC "also devotes substantial time and resources to election-day and post-election activities such as poll watchers."  *Id.* at 5, ¶ 15.  The MSGOP likewise asserts that it "engages in ballot 'chase' programs" and devotes resources to poll watchers.  Dkt. #58-2 at 4-5, ¶¶ 12-13, 17.

Plaintiffs' evidence is insufficient to confer organizational standing on the RNC Plaintiffs for two reasons.  First, Plaintiffs have not identified any specific projects or activities that were curtailed, postponed, cancelled, or otherwise forgone as a result of the RNC Plaintiffs' alleged additional voter-education and poll-watching activities.  Rather, the RNC and MSGOP both merely assert that "[i]f Mississippi did not count post-election-day ballots, the RNC [and MSGOP] would spend [allegedly diverted] resources on other activities, or not spend them at all," Dkt. #58-1 at 5, ¶ 18, Dkt. #58-2 at 5, ¶ 16, and that the RNC Plaintiffs "can expend resources to respond to Mississippi's mail-in ballot deadline only by diverting them from the pursuit of [their respective] mission[s] in other areas," Dkt. #58-1 at 6, ¶ 23, Dkt. #58-2 at 5, ¶ 20.  Plaintiffs have not identified any specific activities that the RNC Plaintiffs were forced to forgo as result of any such diversion of resources.  Relatedly, Plaintiffs have not shown how any such forgone activities concretely and perceptibly impaired the RNC Plaintiffs' ability to achieve their respective missions.  Pursuant to the authorities discussed *supra*, this deficiency is fatal to any claim of organizational standing.

Second, Plaintiffs have not shown how any additional voter-education and poll-watching activities differ from the RNC Plaintiffs' routine activities.  The evidence submitted by the RNC reflects that—notwithstanding the Mississippi Statute—the RNC "engages in various activities to help elect Republicans in Mississippi," Dkt. #58-1 at 3, ¶ 6, including both voter-education and poll-watching activities, see *id.* at 4-5, ¶¶ 11-17.  Similarly, notwithstanding the Mississippi

Statute, the MSGOP "spends significant sums of money in Mississippi to further [its] interests," Dkt. #58-2 at 4, ¶ 10, in supporting the election of Republican candidates. That includes both voter-education and poll-watching activities. *See id.* at 4-5, ¶¶ 12-18. While the RNC Plaintiffs argue that the Mississippi Statute prolongs these pre-existing voter-education and poll-watching activities by several days, see Dkt. #58-1 at 4-5, ¶¶ 13, 18, Dkt. #58-2 at 4-5, ¶¶ 11-12, 18, voter-education and poll-watching activities nevertheless "fall within the ambit of [the RNC Plaintiffs'] routine activities." *See La. Fair Housing Center*, 82 F.4th at 354. Plaintiffs have not shown that the Mississippi Statute has caused or will cause them to do anything they do not do already, *viz.*, work within the bounds of current election law in an effort to get their candidates elected. *Cf. Clark v. Edwards*, 468 F. Supp. 3d 725, 748 (M.D. La. 2020) ("The law is not static. It cannot follow that every change in voting laws that causes voting advocacy groups to 'check and adjust' is an injury."). For these additional reasons, Plaintiffs fail to establish organizational standing.

To the extent Plaintiffs would argue that the RNC Plaintiffs have organizational standing pursuant to *Benkiser*, 459 F.3d at 586-87, on a theory of economic loss or harm to Republican electoral prospects, those arguments are misplaced. *Benkiser* is distinguishable for the same reasons set forth *supra* in relation to associational standing. Unlike *Benkiser*, this is not a case where the RNC Plaintiffs are forced to spend money to combat the actions of an opposing political party causing concrete harm to an individual candidate months before a particular election. *See Benkiser*, 459 F.3d at 586 (holding that Democratic Party's "need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame" was sufficient to establish organizational standing) (quotation marks and citation omitted). Further, the notion that the threatened loss of political power can constitute "a concrete and particularized injury sufficient for standing purposes," *Benkiser*, 459 F.3d at 587, has no application in a case asserting

generalized harm to partisan interests.  The RNC Plaintiffs assert "group political interests, not individual legal rights."  *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).  But this Court "is not responsible for vindicating generalized partisan preferences."  *See id.*  On the contrary, this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."  *Id.*

Because the RNC Plaintiffs have not shown that any diversion of resources to non-routine activities concretely and perceptibly impairs their ability to carry out their respective missions, they have failed to establish organizational standing.  Because none of the plaintiffs has Article III standing, this Court lacks subject-matter jurisdiction.

## II.  PLAINTIFFS' CLAIMS FAIL ON THE MERITS.

As set forth above, Plaintiffs lack standing to bring this lawsuit.  If this Court agrees, it lacks subject-matter jurisdiction and cannot reach the merits.  Rather, its only course is to deny Plaintiffs' instant motion and dismiss the Complaint in its entirety.  If, however, this Court determines that one or more of the Plaintiffs have standing, all of their claims nevertheless fail on the merits, and the Court should deny Plaintiffs' motion for summary judgment and enter summary judgment for Defendant, thereby disposing of Plaintiffs' Complaint in its entirety.

Assuming that some or all of the Plaintiffs can establish standing—which Defendant contends they cannot, see *supra*—Plaintiffs' merits case turns on a pure question of law:  whether mail-in absentee ballots that are postmarked on or before Election Day but are received during the first five business days after Election Day should be disregarded as untimely under federal law.  Because Plaintiffs fail to show that the Mississippi Statute violates federal statutory law or the United States Constitution, their motion for summary judgment should be denied.

A. **As to Count I, the Mississippi Statute does not violate federal law.**

In Count I of their Complaint, Plaintiffs assert that 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1 "preempt[]" the Mississippi Statute because it "holds voting open after Election Day and allows ballots to be *cast* after Election Day but still counted as lawfully cast votes." Dkt. #1 at 12, ¶ 68 (emphasis added).   Plaintiffs' framing of this claim is itself a mischaracterization of Mississippi law.  Nothing in the Mississippi Statute "allows ballots to be *cast* after Election Day" as Plaintiffs allege.  Dkt. #1 at 12, ¶ 68 (emphasis added).  To the contrary—the Legislature provided that to be counted, mail-in absentee ballots "must be postmarked on or before the date of the election." MISS. CODE ANN. § 23-15-637(1)(a).  That is, they must be "cast" by Election Day.  There is no support for the notion that an absentee ballot deposited in the mail has not yet been "cast," or that it is considered "cast" only when received.  It is axiomatic that a mail-in ballot is cast when it is mailed, not when it is received. *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 140 (5th Cir. 2020) (the traditional option . . . for *casting* a mail-in ballot [is] *mailing* it) (emphasis added). *Cf. Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) (drawing distinction between "the date by which [mail-in] ballots may be *cast* by voters" and the date they must be "*received* by the municipal clerks") (emphasis added).  For this reason and those that follow, this claim fails on the merits.

The Elections Clause of the U.S. Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ."  U.S. CONST. art. I, § 4, cl. 1.  The Constitution thus defaults to the States to determine "the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997).  "[T]he Elections Clause

grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States.  [Citation omitted.]  [T]he regulations made by Congress are paramount to those made by the State legislature; and *if they conflict therewith*, the latter, *so far as the conflict extends*, ceases to be operative."  *Id.* (quotation marks omitted) (emphasis added).

Pursuant to the Elections Clause (and its Executive Branch counterpart, the Electors Clause, U.S. CONST. art. II, § 1, cl. 3), Congress acted to set the date of the biennial election for federal offices.  *Id.*  *See* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1.  Title 2 U.S.C. § 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."  2 U.S.C. § 7.  This provision works in conjunction with 2 U.S.C. § 1 (setting the same rule for electing Senators under the Seventeenth Amendment) and 3 U.S.C. § 1 (doing the same for selecting Presidential electors).  *See Foster*, 522 U.S. at 69-70.

In keeping with the foregoing, "states are given, and in fact exercise a wide discretion" in establishing the time, place, and manner of electing their federal representatives.  *See United States v. Classic*, 313 U.S. 299, 311 (1941).  Accordingly, the Fifth Circuit has expressly recognized that "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has *only one limitation*:  the state system cannot *directly conflict* with federal election laws on the subject."  *Voting Integrity Proj., Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000), *cert. denied*, 530 U.S. 1230 (2000) (emphasis added).

The challenged Mississippi Statute does not directly conflict with the plain text of 2 U.S.C. §§ 1, 7 and/or 3 U.S.C. § 1.  Together, these federal statutes establish an "election day" for Presidential and Congressional elections.  The U.S. Supreme Court has defined "election" to mean

the "*final choice*" of a federal officer "by the duly qualified electors." *Newberry v. United States*, 256 U.S. 232, 250 (1921) (emphasis added). "From time immemorial an election to public office has been in point of substance no more and no less than the *expression* by qualified electors of their *choice* of candidates." *Classic*, 313 U.S. at 318 (emphasis added). In 1997, the Supreme Court defined "election" as "the combined actions of voters and officials meant to make a *final selection* of an officeholder." *Foster*, 522 U.S. at 71 (emphasis added).

In amending § 23-15-637(1)(a) in 2020, the Legislature provided that "[a]bsentee ballots received by mail . . . must be postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." Miss. Code Ann. § 23-15-637(1)(a). Any absentee ballots received after that time are never opened "and shall not be counted." *Id. See also id.* § 23-15-647. The Mississippi Statute is facially compatible with the relevant federal statutes. Only those ballots placed in the mail and postmarked by Election Day will be counted. Once a voter deposits the absentee ballot in the mail, the voter has irretrievably cast his/her ballot, thereby expressing his/her final choice in the selection of candidates. "By counting only these ballots that are postmarked no later than Election Day, the Statute complies with federal law that set the date for Election Day." *See Bost*, 2023 WL 4817073 at *11 (holding that comparable Illinois mail-in absentee ballot statute did not violate the same federal statutes at issue in this case, where statute required absentee ballots postmarked by Election Day to be counted if received within 14 days after Election Day). Because the Mississippi Statute does not "directly conflict," *Bomer*, 199 F.3d at 775, with the federal election statutes—but instead operates harmoniously with federal law—Plaintiffs' claim predicated on these statutes fails on the merits.

Like Mississippi, "[m]any states have post-Election Day absentee ballot receipt deadlines." *Bost*, 2023 WL 4817073 at *11 (collecting statutes). "Despite these ballot receipt deadline statutes

being in place for many years in many states, Congress has never stepped in and altered the rules."

*Id.  See also Millsaps*, 259 F.3d at 544 (emphasizing "long history of absentee voting throughout the country" and fact that Congress "has taken no action to curb it").

Not only has Congress acquiesced for years in permitting state statutory schemes providing for post-Election Day receipt of mail-in absentee ballots, but "even federal laws governing elections allow ballots received after Election Day to be counted." *Bost*, 2023 WL 4817073 at *11 (citing "longstanding efforts by Congress and the executive branch to ensure that ballots cast by Americans living overseas"—including military voters protected by the Uniformed Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA")—"are counted, so long as they are cast by Election Day").  In the same vein, where Congress has "required . . . states to provide for absentee voting in federal elections," *Voting Integrity Proj., Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001), it has nevertheless expressly provided that "[n]othing in [the governing federal statute] shall prevent any State or political subdivision from adopting *less restrictive voting practices* than those that are prescribed" in federal law where absentee voting is concerned.  *See* 52 U.S.C. § 10502(g) (emphasis added).  These features of federal law "strongly suggest that statutes like the one at issue here are compatible with the Elections Clause." *Bost*, 2023 WL 4817073 at *11.

Finally, the legislative history of federal statutes establishing a federal "Election Day" supports the notion that the Mississippi Statute does not directly conflict with federal law.  "This history indicates that Congress wanted a uniform election day to prevent earlier elections in some states unduly influencing the later voters, to prevent fraudulent voting in multiple state elections, and to remove the burden of voting in more than one federal election in a given year." *Love v. Foster*, 90 F.3d 1026, 1029 (5th Cir. 1996).  Allowing mail-in absentee ballots that are postmarked

by Election Day to be counted if received within five business days thereafter "do[es] not stand as an obstacle to substantial achievement of these goals." *Millsaps,* 259 F.3d at 549.

For all these reasons, the Mississippi Statute does not directly conflict with federal election statutes.  Plaintiffs' arguments to the contrary do not establish a direct conflict between the Mississippi Statute and any controlling interpretation of federal election statutes.  First, Plaintiffs argue that pursuant to federal law, "[t]he consummation of the election—casting and receiving ballots—must end on election day."  Dkt. #60 at 7.  Plaintiffs posit that "until the proper state official receives the vote, the voter has not 'elected' anybody, and an 'election' has not occurred." *Id.* at 8.  Plaintiffs cite no controlling authority that expressly establishes what they characterize as "[t]hese intuitive rules."  *Id.*  Rather, Plaintiffs' argument is crafted entirely from an unsupported inference that Plaintiffs attempt to draw from the U.S. Supreme Court's opinion in *Foster v. Love*, 522 U.S. 67 (1997).

In *Foster*, the Supreme Court held that Louisiana's "open primary" system violated federal election statutes because it permitted the conclusion of a congressional election "as a matter of law *before* the federal election day . . . with no act in law or in fact to take place on the date chosen by Congress."  *Foster*, 522 U.S. at 72 (emphasis added).  The Court defined "election" as "the combined actions of voters and officials meant to make a *final selection* of an officeholder."  *Id.* at 71 (emphasis added).  As noted *supra*, the Court declined to "par[e] the term 'election' . . . down to the definitional bone" and expressly left "room for argument about just what may constitute the *final act of selection* within the meaning of the law."  *Id.* at 72.  *See also Bomer*, 199 F.3d at 776 (recognizing Supreme Court's refusal to give a hyper-technical meaning to "election").

The *Foster* Court took great care to limit its holding to the facts of that case, which—unlike this case—did not involve post-Election Day counting of mail-in absentee ballots postmarked on

or before Election Day. "To underscore the ground left uncovered by its holding," *Millsaps v. Thompson*, 259 F.3d 535, 544 (6th Cir. 2001), the Supreme Court said in *Foster*: "This case thus does not present the question whether a State must always employ the conventional mechanics of an election. We hold today only that if an election does take place, it may not be consummated *prior to* federal election day." *Foster*, 522 U.S. at 72 n.4 (emphasis added). "*Foster's* narrow holding suggests that, so long as a State does not conclude an election *prior to* federal election day, the State's law will not 'actually conflict' with federal law." *Millsaps*, 259 F.3d at 546 (emphasis added). *See also Bomer*, 199 F.3d at 775 ("In striking down Louisiana's open primary statute, the Supreme Court *held only* that elections must not be 'consummated' before federal election day.") (emphasis added) (quoting *Foster*, 522 U.S. at 72 n.4).

*Foster's* narrow holding does not establish a direct conflict between the Mississippi Statute and federal law. Mississippi law does not permit the conclusion of a federal election *prior to* Election Day. Nor does the Mississippi Statute implicate the paramount federal concerns articulated in *Foster*. Most importantly, "it does not foster either of the primary evils identified by Congress as reasons for passing the federal statutes: 'distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and . . . the burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years.'" *Bomer*, 199 F.3d at 777 (quoting *Foster*, 522 U.S. at 73). While Plaintiffs mention several additional cases in the course of their discussion, they have cited no controlling authority holding that the post-Election Day counting of mail-in absentee ballots received by Election Day directly conflicts with federal election statutes.

Second, Plaintiffs argue that certain policy considerations support the notion that the Mississippi Statute violates federal law. For instance, Plaintiffs argue that "[a] uniform, national

election day" accomplishes such objectives as ensuring that the results of "an early federal election" in one state cannot "influence later voting" in other states; and that voters have "clear notice" that all ballots must "be in by election day."  Dkt. #60 at 11.  But the Mississippi Statute, in its operation, does not implicate either of these considerations.  Nor does it stand as an obstacle to the achievement of the legislative objectives set forth in *Love v. Foster*, 90 F.3d 1026, 1029 (5th Cir. 1996).  Plaintiffs' policy arguments are accordingly misplaced.

Finally, Plaintiffs assert that "post-election deadlines are neither universal nor longstanding," and "do not have the pedigree to overcome" Plaintiffs' view of "the original meaning of the election day statutes."  Dkt. #60 at 16.  Plaintiffs argue that because "[p]ost-election day receipt is a relatively new phenomenon," it must necessarily violate federal election law.  But the law—including state election law—"is not static."  *Clark*, 468 F. Supp. 3d at 748.  Plaintiffs have cited no authority precluding states from enacting election laws that keep pace with changing times and societal concerns.  Indeed, the Supreme Court itself has not reached the issue of "whether a State must always employ the conventional mechanics of an election."  *Foster*, 522 U.S. at 72 n.4.  In the absence of controlling authority prohibiting post-Election Day receipt of mail-in absentee ballots postmarked by Election Day, Plaintiffs' historical arguments are unavailing.

For all these reasons, Plaintiffs' claim that the Mississippi Statute violates federal election law must fail, and the Court should deny Plaintiffs' motion for summary judgment as to Count I.

**B.  As to Count II, the Mississippi Statute does not violate any right to stand for office.**

In Count II of their Complaint, Plaintiffs assert that the Mississippi Statute "depriv[es] Plaintiffs of rights protected under the First and Fourteenth Amendment [*sic*] to the U.S. Constitution."  Dkt. #1 at 12, ¶ 72.  Specifically, Plaintiffs assert that the Mississippi Statute "[v]iolat[es] [their] [r]ight to [s]tand for [o]ffice" by "forcing Plaintiffs to spend money, devote

time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their campaigns." *Id.* at 12-13, Count II heading and ¶ 72. This claim likewise fails.

"While the right to run for public office is protected by the First Amendment, it is not an absolute right." *Phillips v. City of Dallas*, 781 F.3d 772, 779 (5th Cir. 2015) (quotation marks omitted). "There is no fundamental right to be a candidate." *Hatten v. Rains*, 854 F.2d 687, 693 (5th Cir. 1988). *See also Williams v. Delany*, Civil Action No. 16-93-SDD-EWD, 2016 WL 4253972, at *5 (M.D. La. June 28, 2016) (reaffirming *Hatten*). And as a matter of law, "[t]he states have broad power to regulate the conduct of both federal and state elections." *Goodloe v. Madison County Bd. of Election Comm'rs*, 610 F. Supp. 240, 242 (S.D. Miss. 1985). Where, on its face, a state statute does nothing more than regulate the times, places, and/or manner of holding elections—as authorized by the Elections Clause, *supra*—the state statute "cannot be said to infringe on the right to stand for office." *Bost*, 2023 WL 4817073 at *13.

In the case at bar, the challenged Mississippi Statute only regulates the timing and manner of casting and counting mail-in absentee ballots. *See* MISS. CODE ANN. § 25-15-637(1)(a). It does not speak to candidate eligibility or qualification requirements *at all*. *See id.* Accordingly, the statute cannot be read as a legal impediment to any prospective candidate's placement on any given ballot. "Spending time and money on campaigning is an inevitable feature of running for office, and Plaintiffs do not contend that the extra time and money they might have to spend due to the Statute prevents them from standing for office at all." *Bost*, 2023 WL 4817073 at *14. Because the Mississippi Statute does not impair any right to stand for office, it does not infringe on any associated First Amendment rights as a matter of law.

In their brief seeking summary judgment as to Count II, Plaintiffs offer no legal argument or analysis supporting an independent constitutional claim. No argument is made that the

Mississippi Statute violates the First or Fourteenth Amendments, neither of which is discussed at all.  *See* Dkt. #60 at 17-19.  For all these reasons, the Court should deny Plaintiffs' motion for summary judgment as to Count II.

## C. **As to Count III, the Mississippi Statute does not violate the right to vote.**

In Count III of their Complaint, Plaintiffs allege that the Mississippi Statute "requires counties to hold open voting and count ballots that have been cast after Election Day."  Dkt. #1 at 13, ¶ 76.  Plaintiffs assert that "[d]ilution of honest votes, to any degree, by the casting of fraudulent or illegitimate votes violates the right to vote."  *Id.* at 13, ¶ 77.  Plaintiffs thereupon claim that the Mississippi Statute "violate[s] the Fourteenth Amendment to the U.S. Constitution."  *Id.* at 13, ¶ 78.  This claim likewise fails on the merits.

First, Plaintiffs' Fourteenth Amendment claim mischaracterizes the plain language of the Mississippi Statute.  Nothing in the Mississippi Statute permits the counting of "ballots that have been *cast* after Election Day" as Plaintiffs allege.  *Id.* at 13, ¶ 76 (emphasis added).  To the contrary—the Legislature expressly provided that to be counted, mail-in absentee ballots "must be postmarked *on or before the date of the election*."  MISS. CODE ANN. § 23-15-637(1)(a) (emphasis added).  That is, they must be "cast" by Election Day.  *See* Part II.A., *supra*.  Further, Plaintiffs have not shown any specific instances of allegedly "fraudulent" voting.  And Plaintiffs' allegations of "illegitimate" voting presuppose that the Mississippi Statute violates federal statutory law, which—as set forth *supra*—it does not.

Further, Plaintiffs have not established a valid legal or factual predicate for a Fourteenth Amendment claim premised on alleged "vote dilution."  An equal-protection claim predicated on a theory of "vote dilution" requires a point of comparison.  *See Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020).  In racial gerrymandering cases, for example, "vote dilution occurs

when voters are harmed compared to 'irrationally favored' voters from other districts." *Id.* By contrast here, "[i]f ballots cast by mail and postmarked by Election Day are counted, no single voter 'is specifically disadvantaged,' even if the votes counted in compliance with the [Mississippi] Statute have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" *Bost*, 2023 WL 4817073 at *12 (quoting *Wood*, 981 F.3d at 1314). "A voter is not guaranteed to have their vote be decisive or to have their vote be for the ultimate winner of an election. On the contrary, a voter has a right to cast a lawful ballot and have that lawfully cast ballot counted. Nothing in the [Mississippi] Statute infringes on that right." *See id.* Simply stated, "Plaintiffs' votes here are not diluted by other valid, lawfully cast votes." *See id.*

Furthermore, "vote dilution under the Equal Protection Clause is concerned with votes being weighed differently." *Bognet*, 980 F.3d at 355. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Plaintiffs do not allege any "arbitrary and disparate treatment" in how votes are counted as between in-person voters and mail-in absentee voters. To the extent Plaintiffs argue that the Mississippi Statute creates two groups of voters—*viz.*, in-person voters and mail-in absentee voters—"a vote cast by a voter in the [latter] group counts not one bit more than the same vote cast by the [former] group—no matter what set of scales one might choose to employ." *Bognet*, 980 F.3d at 359. "It is passing strange to assume that one of these voters would be denied 'equal protection of the laws' were *both* votes counted." *Id.* (emphasis in original). Here, as in *Bost*, "[a]ll ballots cast by Election Day are treated the same under the Statute's plain text. Untimely ballots, *i.e.*, those not cast on or by Election Day, are not counted." *Bost*, 2023 WL 4817073 at *13. There is no equal-protection violation here.

In their brief seeking summary judgment as to Count III, Plaintiffs cite only three cases in support of their argument that the Mississippi Statute "infringes on the right to vote."  Dkt. #60 at 19.  But none of those cases involved a mail-in ballot receipt-deadline statute, nor did any of those cases anywhere hold that the post-Election Day counting of mail-in ballots postmarked by Election Day constitutes "vote dilution."  For all these reasons, Plaintiffs' Fourteenth Amendment claim likewise fails, and the Court should deny Plaintiffs' motion for summary judgment as to Count III.

## III.  PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF.

In addition to seeking summary judgment on their claims for declaratory relief, Plaintiffs— by way of the instant motion—seek "a permanent injunction prohibiting Defendants from counting mail-in ballots received after election day."  *Id.*  A party seeking a permanent injunction must establish all of the following:  (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest.  *Stevens v. St. Tammany Parish Gov't*, 17 F.4th 563, 576 (5th Cir. 2021).  For the reasons set forth in detail *supra*, Plaintiffs' claims fail on the merits.  And Plaintiffs have not even attempted to make any showing of the other three requisite factors for injunctive relief.  For either and both of these independent reasons, any request for injunctive relief should be denied.

## CONCLUSION

Plaintiffs' Complaint should be dismissed for lack of subject-matter jurisdiction predicated on lack of Article III standing.  Alternatively, Plaintiffs' claims fail on the merits, and the Court should enter summary judgment for Defendant, thereby disposing of this case in its entirety with prejudice.  Either way, Plaintiffs' instant motion for summary judgment should be denied.

THIS the 9th day of April, 2024.

Respectfully submitted,

MICHAEL WATSON, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF STATE OF
MISSISSIPPI, DEFENDANT

By:    LYNN FITCH, ATTORNEY GENERAL
       STATE OF MISSISSIPPI

By:    s/Rex M. Shannon III
       REX M. SHANNON III (MSB #102974)
       Special Assistant Attorney General

REX M. SHANNON III (MSB #102974)
WILSON D. MINOR (MSB #102663)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi  39205-0220
Tel.:  (601) 359-4184
Fax:  (601) 359-2003
rex.shannon@ago.ms.gov
wilson.minor@ago.ms.gov

ATTORNEYS FOR DEFENDANT MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF STATE OF MISSISSIPPI

## CERTIFICATE OF SERVICE

I, Rex M. Shannon III, Special Assistant Attorney General and one of the attorneys for the above-named State Defendant, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 9th day of April, 2024.

s/Rex M. Shannon III
REX M. SHANNON III