**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; and MATTHEW LAMB | **PLAINTIFFS** |
| **VS.** | **Civil Action No. 1:24-cv-25-LG-RPM** |
| **JUSTIN WETZEL,** *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, et al. | **DEFENDANTS** |

*and*

| | |
|---|---|
| VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS | **INTERVENOR DEFENDANTS** |

*consolidated with*

| | |
|---|---|
| LIBERTARIAN PARTY OF MISSISSIPPI | **PLAINTIFF** |
| **VS.** | **Civil Action No. 1:24-cv-37-LG-RPM** |
| **JUSTIN WETZEL,** *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, et al. | **DEFENDANTS** |

---

<u>**DEFENDANT SECRETARY OF STATE MICHAEL WATSON'S RESPONSE IN OPPOSITION TO LIBERTARIAN PARTY'S MOTION FOR SUMMARY JUDGMENT**</u>

---

<u>**INTRODUCTION**</u>

In response to the COVID-19 pandemic in 2020, the Mississippi Legislature amended MISS. CODE ANN. § 23-15-637(1)(a) ("the Mississippi Statute") to provide that mail-in absentee ballots would be counted in state and federal elections if "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election."  2020

1

H.B. 1521.  Whatever one may think of the policy embodied in the Mississippi Statute, Plaintiff's motion for summary judgment [Dkt. #55] should be denied—and its Complaint dismissed—because the Mississippi Statute does not violate federal law.

Plaintiff's motion for summary judgment is predicated on the notion that to be legally counted under federal election statutes, a mail-in absentee ballot must be both "cast" by the voter and "received" by election officials no later than the federal election day—such that the "consummation" of the election ends on that day.  But this view of federal law is not supported by the plain text of federal election statutes or by legislative history.  And in construing federal election statutes, the U.S. Supreme Court has held only that elections may not be "consummated" *prior to* the federal election day—a rule that Mississippi law does not violate.  The Mississippi Statute does not harm Plaintiff or any of its members in any way.  It does not conflict with laws that set the election day for federal offices.  And it does not impair Plaintiff's members' rights to vote or to stand for office under the U.S. Constitution.  Plaintiff does not have standing to challenge the Mississippi Statute, and all of its claims fail on the merits.

At the threshold jurisdictional inquiry, Plaintiff lacks Article III standing to bring this lawsuit on behalf of either its members or itself.  To begin with, it has not established that it meets the requirements for associational standing.  First, Plaintiff's Complaint merely asserts a generalized grievance; it cannot show that its members have been (or will be) personally harmed in any concrete and particularized way by the counting of mail-in absentee ballots in federal elections within five business days after Election Day.  Second, as multiple federal courts have held in this context, claims of so-called "vote dilution" are too speculative and generalized to confer standing, there being no unequal weighing of ballots.  Third, any alleged "injury" to Libertarian Party member candidates is not sufficient to establish associational standing.

Significantly, Plaintiff has not shown—or even alleged—that if all mail-in absentee ballots were received and counted on or before Election Day, Libertarian Party candidates would win federal election contests in Mississippi that they would otherwise lose.

Nor has Plaintiff made the requisite showing for organizational standing.  Plaintiff has not shown any diversion of resources or that any alleged diminished monitoring capability has concretely and perceptibly impaired its ability to achieve its mission.  Nor has Plaintiff shown that the Mississippi Statute has caused or will cause it to do anything it does not do already.

Because Plaintiff lacks standing, this Court lacks subject-matter jurisdiction, and Plaintiff's Complaint should be dismissed without reaching the merits.  Even if this Court finds that Plaintiff has standing, its claims nevertheless fail on the merits.  Federal law provides for an "election day" ("Election Day") for Presidential and Congressional elections.  *See* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. Mississippi law provides for absentee voting "either by mail or in person with a regular ballot." MISS. CODE ANN. § 23-15-637(3).  Mail-in absentee ballots shall be counted only if they are "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." *Id.* § 23-15-637(1)(a).  Counting of such ballots shall not commence until "the polls close" on Election Day.  *Id.* § 23-15-639(1)(c).

As a matter of law, states are given wide discretion in establishing the time, place, and manner of electing their federal representatives; the *sole limitation* on that discretion is that state laws cannot *directly conflict* with federal election laws.  By requiring that mail-in absentee ballots shall only be counted if postmarked by Election Day, the Mississippi Legislature ensured that the Mississippi Statute operates harmoniously with federal statutes.  Under both statutory regimes, ballots are counted only if they are cast on or before Election Day, and the election is not concluded prior to Election Day.  Thus, there is no direct conflict between federal and state law.  That

Mississippi law comports with federal law is further confirmed by the following: a long history of Congressional acquiescence in state statutory schemes providing for post-Election Day receipt of mail-in absentee ballots; federal laws which themselves provide for post-Election Day receipt of absentee ballots; and consistency with federal statutory objectives. For all these reasons, Plaintiff's principal claim that the Mississippi Statute violates federal election statutes must fail.

Plaintiff's constitutional claims fare no better. As to Plaintiff's claim that the Mississippi Statute violates its member candidates' First and Fourteenth Amendment "right to stand for office," the Mississippi Statute only regulates the timing and manner of casting and counting mail-in absentee ballots. It does not speak to candidate eligibility or qualification requirements *at all*. Because the challenged statute does not impair any right to stand for office, it does not infringe on any associated constitutional rights as a matter of law.

As to Plaintiff's claim that the Mississippi Statute violates its members' Fourteenth Amendment "right to vote" by allegedly holding open voting after Election Day, nothing in the Mississippi Statute permits the counting of ballots that have been cast after Election Day. Rather, to be counted at all, mail-in absentee ballots must be postmarked on or before Election Day. Finally, Plaintiff cannot establish a Fourteenth Amendment equal-protection violation where no voter is specifically disadvantaged by the counting of mail-in absentee ballots, and votes cast in person are likewise counted and weighed equally. A voter has a right to cast a lawful ballot and have that lawfully-cast ballot counted. Nothing in the Mississippi Statute infringes on that right. Accordingly, Plaintiff's Fourteenth Amendment "right to vote" claim likewise fails.

For these reasons and those set forth herein, Plaintiff's motion for summary judgment should be denied.

## BACKGROUND

**Legal Background.**  This case involves the interplay between federal and state law bearing on the administration of Presidential and Congressional elections.  As a matter of law, "[t]he states have broad power to regulate the conduct of both federal and state elections."  *Goodloe v. Madison County Bd. of Election Comm'rs*, 610 F. Supp. 240, 242 (S.D. Miss. 1985).  The states' authority in this regard is constrained by "only one limitation:  the state system cannot directly conflict with federal election laws on the subject."  *Voting Integrity Proj., Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000), *cert. denied*, 530 U.S. 1230 (2000).

Federal law provides for an "election day" for Presidential and Congressional elections.  2 U.S.C. §§ 1, 7; 3 U.S.C. § 1.  Mississippi law provides for absentee voting "either by mail or in person with a regular ballot."  MISS. CODE ANN. § 23-15-637(3).  Mail-in absentee ballots shall only be counted if they are "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election."  *Id.* § 23-15-637(1)(a).  Counting of such ballots shall not commence until "the polls close" on Election Day.  *Id.* § 23-15-639(1)(c).

**Factual and Procedural Background.**  This case involves a facial challenge to MISS. CODE ANN. § 23-15-637(1)(a) implicating a pure question of law, *viz.*, whether mail-in absentee ballots that are postmarked on or before Election Day but are received during the first five business days after Election Day must be disregarded as untimely under federal law.  Plaintiff is the Libertarian Party of Mississippi, which brings this suit on behalf of itself and its members, supporters, and candidates who "organize, select, and promote the election of party standard bearers and others that promote the Party's beliefs."  Dkt. #1 at 3, ¶ 13.

On February 5, 2024, Plaintiff filed its Complaint against Defendant and certain Harrison County election officials asserting three claims pursuant to 42 U.S.C. § 1983:  (1) **Count I**,

asserting that the Mississippi Statute violates "the Right to Vote" protected by the First and Fourteenth Amendments to the U.S. Constitution, as well as the Elections and Electors Clauses of the U.S. Constitution; (2) **Count II**, asserting that the Mississippi Statute violates "the Right to Stand for Office" protected by the same constitutional provisions; and (3) **Count III**, asserting that the Mississippi Statute violates 3 U.S.C. § 1 and 2 U.S.C. §§ 1 and 7. Dkt. #1 at 10-13, ¶¶ 57-81. Plaintiff seeks declaratory and injunctive relief to prevent the counting of mail-in absentee ballots received during the five-business day period after Election Day. *See id.* at 13.

As noted above, the Mississippi Legislature enacted the challenged statutory language as an amendment necessitated by the COVID-19 pandemic in 2020. Defendant Secretary of State Michael Watson ("Defendant") had no involvement in debating, voting on, or enacting the aforementioned amendment. Plaintiff has sued him here only because it alleges in its Complaint that he "is responsible for receiving certified election results from each county" and "is responsible for tabulating results statewide or by district, whatever the case may be, which represent the final results of federal elections." *Id.* at 4, ¶ 20.

On March 5, 2024, this Court entered a briefing schedule providing for the adjudication of this case via cross-motions for summary judgment [Dkt. #38]. Defendant timely filed his own motion for summary judgment on March 26, 2024 [Dkt. #53]. Defendant timely files the instant response in opposition to the Libertarian Party's motion for summary judgment [Dkt. #55].

## STANDARD FOR SUMMARY JUDGMENT

**Lack of standing.** Subject-matter jurisdiction fails where the plaintiffs lack Article III standing. *Stallworth v. Bryant*, 936 F.3d 224, 232 (5th Cir. 2019). At the summary-judgment stage, "the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue." *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,

178 F.3d 350, 357 (5th Cir. 1999) (quoting *Cramer v. Skinner*, 931 F.2d 1020, 1025 (5th Cir. 1991)) (quotation marks omitted).

 **Merits.**  "Summary judgment is appropriate where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).  Summary judgment is warranted only "'when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.'"  *Harness v. Watson*, 47 F.4th 296, 303 (5th Cir. 2022).  When parties file cross-motions for summary judgment, the Court should "review each party's motion independently." *Colony Ins. Co. v. First Mercury Ins. Co.*, 88 F.4th 1100, 1106-07 (5th Cir. 2023).

## ARGUMENT

## I.  PLAINTIFF LACKS STANDING TO BRING THIS LAWSUIT.

 Article III of the U.S. Constitution requires an actual case or controversy as a necessary predicate to subject-matter jurisdiction—that is, the plaintiff must have standing.  *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  To maintain any lawsuit in federal court, plaintiffs must establish Article III standing by showing injury in fact, traceability, and redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In the absence of *any* of these elements, the plaintiffs standing, and the action must be dismissed.  *See Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001).

 Plaintiff appears to claim that it has both associational and organizational standing. It alleges that it brings this suit to protect its own rights and the rights of "its members, supporters, and candidates . . . to join together and associate in support of their common political beliefs."

Dkt. #1 at 3, ¶ 13.  For purposes of Article III standing, "[a]n association or organization can establish an injury in fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).  "'Associational standing' is derivative of the standing of the association's members" and requires that "they have standing and that the interests the association seeks to protect" are "germane to its purpose." *Id.*  "By contrast, 'organizational standing' does not depend on the standing of the organization's members." *Id.*  Rather, "[t]he organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *Id.*  Plaintiff has not shown that it has standing to bring this lawsuit under either of these theories.

### A.  Plaintiff has not established associational standing.

To establish associational standing, a plaintiff must show that its members would otherwise have standing to sue in their own right.  *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 781 (5th Cir. 2024).  In keeping with this requirement, an associational plaintiff must show that its members independently meet the Article III standing requirements; allegations that are neither concrete nor imminent but are merely speculative will not suffice to support associational standing.  *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010).  *See also Miller v. Hughs*, 471 F. Supp. 3d 768, 777 (W.D. Tex. 2020); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 802-03 (W.D. Tex. 2015).  At the summary-judgment stage, associational standing fails where "there is no evidence in the record showing that a specific member" of the entity plaintiff has experienced the alleged harm.  *See City of Kyle*, 626 F.3d at 237.  Specifically, "at the summary judgment stage, to establish associational standing, an organization must name specific members who would be, or have been, directly affected by the allegedly illegal activity and provide affidavits with specific facts supporting its allegations." *Perez v. Texas*, Civil Action

Nos. 11–CA–360–OLG–JES–XR, *et al.*, 2011 WL 9160142, at *9 (W.D. Tex. Sept. 2, 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-500 (2009)); *Lujan*, 504 U.S. at 561.

In the case at bar, Plaintiff has not shown that its members would have standing to sue in their own right. To the extent Plaintiff contends that its members—i.e., voters, candidates, or others—have standing due to an alleged conflict between the Mississippi Statute and federal law or based on a "vote dilution" theory, those arguments should be rejected out of hand. It is well settled that such generalized grievances do not constitute an injury in fact sufficient to establish standing. To the extent Plaintiff argues that standing is conferred on its members who are current or prospective candidates for elected office, that argument likewise fails because Plaintiff's alleged "injury" to such candidates is not certainly impending and is inherently speculative.

### 1. Plaintiff fails to show any concrete and particularized injury—or anything beyond a generalized grievance—to its members from the counting of mail-in absentee ballots received within five business days after Election Day.

"Abstract injury is not enough" to establish standing. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). Rather, a plaintiff must show an invasion of a legally-protected interest that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks omitted). For an injury in fact to be "particularized," it "must affect the plaintiff[s] in a personal and individual way." *Id.* at 560 n.1. *See also Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218-19 (5th Cir. 2001) (same). For an injury in fact to be actual or imminent, a plaintiff must show that an alleged injury is "certainly impending," not merely possible. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). *See also Attala County, Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022).

As a general rule, standing cannot be predicated on "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499

(1975).  *See also Apache Bend Apartments, Ltd. v. U.S. ex rel. I.R.S.*, 987 F.2d 1174, 1178 (5th Cir. 1993).  It is well settled that a plaintiff cannot show a concrete and particularized injury sufficient for Article III standing by showing a mere "general interest common to all members of the public."  *Ex parte Levitt*, 302 U.S. 633 (1937).  As the Fifth Circuit recently reaffirmed, an "undifferentiated, generalized grievance about the conduct of government" does not satisfy Article III's injury-in-fact requirement.  *See Lutostanski v. Brown*, 88 F.4th 582, 586 (5th Cir. 2023) (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007)).  Where the plaintiff asserts a generally-available grievance about government, claiming only "harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—[he] does not state an Article III case or controversy."  *Lujan*, 504 U.S. at 573-74.

Applying these precepts to a claim that Colorado state law violated the federal Elections Clause, U.S. CONST., art. I, § 4, cl. 1, the U.S. Supreme Court held that the plaintiffs lacked standing because such an alleged conflict between state and federal law "is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has] refused to countenance in the past."  *Lance v. Coffman*, 549 U.S. 437, 442 (2007).  A federal district court in Illinois recently applied these same principles in holding that the plaintiffs (who were former/prospective candidates and registered voters) lacked standing to challenge Illinois' comparable mail-in absentee ballot receipt deadline statute as violating the U.S. Constitution and the same federal statutes at issue in this case (*viz.*, 2 U.S.C. §§ 1, 7; and 3 U.S.C. § 1).  *Bost v. Ill. State Bd. of Elections*, No. 22-cv-02754, 2023 WL 4817073, at *4-6 (N.D. Ill. July 26, 2023).

In the case at bar, the counting of mail-in absentee ballots received within five business days after Election Day does not constitute a concrete and particularized injury to Plaintiff's

members and thus does not confer associational standing on Plaintiff to sue on their behalf. Plaintiff alleges, *inter alia*, that the Mississippi Statute "conflicts with and is superseded by the Time regulations chosen by Congress under" 2 U.S.C. §§ 1,7 and 3 U.S.C. § 1. *See* Dkt. #1 at 12, ¶¶ 75-77.  Further, Plaintiff asserts that "its members, supporters, and nominees for federal office are entitled to have election results certified with only legal, qualified votes received in compliance with the Time regulations set by Congress in the federal Election Day statutes." *Id.* at 7, ¶ 40.

While Plaintiff alleges generally that the Mississippi Statute violates federal law, it "do[es] not specify how [its members], individually, are or will be harmed in a concrete and particularized way by the [Mississippi] Statute's alleged facial conflict with [federal law]." *Bost*, 2023 WL 4817073 at *5.  Like the plaintiffs in *Bost*, Plaintiff does not establish any "specific, personal harms" affecting its members but "merely state[s] that they 'have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional [and federal] rights unless Defendants are enjoined from implementing and enforcing [§ 23-15-637(1)(a)].'"  *Id.  See also* Dkt. #1 at 10, ¶ 63.  Because Plaintiff has not shown that the counting of mail-in absentee ballots received within five days after Election Day actually harms its members in any "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, it cannot show any concrete and particularized injury to its members and thus cannot establish associational standing.

At best, any "harm" purportedly emanating from an alleged conflict between the Mississippi Statute and federal law "is the kind of generalized grievance that is insufficient to confer standing."  *Bost*, 2023 WL 4817073 at *5.  That is, it implicates "a general interest that every citizen shares in the proper application of the Constitution and the laws of the United States." *Id.* (citing *Lujan*, 504 U.S. at 560-61).  "Seeking relief for this grievance no more 'directly and tangibly benefits [Plaintiff's members] than it does the public at large' and thus 'does not state an

Article III case or controversy.'" *Id.* (quoting *Lujan*, 504 U.S. at 573-74).  This alleged conflict between state and federal law is the same kind of "injury" that the Supreme Court found "too undifferentiated to confer standing in *Lance*," *supra.  See Bost*, 2023 WL 4817073 at *6.

For all these reasons, Plaintiff has not shown that its members will experience any concrete and particularized injury; therefore, Plaintiff cannot establish associational standing.

### 2.    Allegations of "vote dilution" resulting from the counting of allegedly unlawful mail-in absentee ballots are insufficient to confer standing.

Plaintiff further alleges that its "members who cast timely and valid votes for [Libertarian Party] nominees [for federal office in Mississippi] by Election Day will have their votes diluted by illegal and invalid ballots received in violation of the federal Election Day statutes."  Dkt. #1 at 7, ¶ 36.  Plaintiff alleges that this alleged "dilut[ion]" violates its members' "[r]ight to [v]ote" under the First and Fourteenth Amendments to the U.S. Constitution.  *See id.* at 10, Count I Heading and ¶¶ 60-62.  This allegation of injury presupposes that the Mississippi Statute does indeed violate federal law, which Defendant disputes.  *See infra.*  However, even assuming for the sake of argument that ballots received after Election Day are unlawful, the counting of such ballots—which have been mailed and postmarked on or before Election Day—does not "dilute" the vote of any particular, individual voter.  An in-person voter's vote for a given candidate counts the same whether mail-in absentee ballots are counted after Election Day or not.  No lesser weight or value is afforded an in-person voter's vote based on the counting of allegedly "unlawful" mail-in absentee ballots.  Thus, the counting of such "unlawful" ballots is—at best for Plaintiff—a generalized grievance shared by all Mississippi voters, and not the sort of concrete and particularized injury needed to supply standing.

Multiple courts have held that claims of so-called "vote dilution" in the context of unlawful ballots are too speculative and generalized to confer standing.  For instance, just last summer, a

federal district court in Illinois—considering a challenge to that state's comparable mail-in absentee ballot receipt deadline statute—held that the plaintiffs lacked standing to sue on a "vote dilution" theory.   *Bost*, 2023 WL 4817073 at *6-8.   In *Bost*, the statute at issue allowed mail-in ballots "cast in federal elections to be received and counted for up to 14 days after Election Day, so long as the ballot was postmarked or certified on or before Election Day."  *Id.* at *2.   The plaintiffs argued that the counting of such ballots after Election Day diluted their votes, thereby creating an injury sufficient to confer standing.  *Id.* at *6.   The district court rejected that argument, finding that the plaintiffs had not "allege[d] an injury beyond the general grievance that all Illinois voters would share" if the challenged ballots were counted.  *Id.* at *7.   The district court thus concluded that the plaintiffs' allegations of "vote dilution" were "too speculative and generalized to constitute an injury in fact for the purposes of Article III standing."  *Id.* at *8.

In 2020, a federal district court in North Carolina—applying similar reasoning—held that voters asserting ballot-fraud claims lacked Article III standing to sue on a "vote dilution" theory. *Moore v. Circosta*, 494 F. Supp. 3d 289, 312-13 (M.D.N.C. 2020).   In *Moore*, the state law in question allowed mail-in absentee ballots "to be received [and counted] up to nine days after Election Day if they [were] postmarked on Election Day."  *Id.* at 314.   The district court reasoned that in "vote dilution cases arising out of the possibility of unlawful or invalid ballots being counted," the harm alleged "is unduly speculative and impermissibly generalized because all voters in a state are affected."  *Id.* at 312.   "[T]he notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing."  *Id.*

Along the same lines, a federal district court in Wisconsin held in 2020 that a voter alleging widespread ballot fraud lacked Article III standing to sue on a "vote dilution" theory.  *Feehan v.*

*Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020).  In *Feehan*, the plaintiff sought an order requiring Wisconsin's governor to decertify the results of the 2020 Presidential election and declare President Donald Trump the winner.  *Id.* at 601-02.  In alleging that Wisconsin election officials facilitated voter fraud by enacting regulations and issuing guidance favoring Democratic absentee voters over Republican voters, the plaintiff argued that his right to vote had been diluted, thereby "injuring" him and affording him standing.  *See id.* at 608.  The district court rejected that argument, finding that in basing his standing theory on so-called "vote dilution," the plaintiff failed to allege that "as a voter, he ha[d] suffered a particularized, concrete injury sufficient to confer standing."  *Id.*  Rather, the plaintiff "show[ed] no more than a generalized grievance common to any voter," which was insufficient to establish Article III standing.  *Id.*

Here, just as in *Moore*, *Feehan*, and *Bost*, *supra*, Plaintiff asserts claims of "vote dilution" predicated on the counting of allegedly unlawful mail-in absentee ballots.  Like the allegations of the plaintiffs in those cases, Plaintiff's allegations of "vote dilution" in the instant case fail to show that any member of the Libertarian Party has experienced, or will experience, any particularized, concrete injury as a result of counting mail-in absentee ballots received no later than five business days after Election Day.  At best, Plaintiff has alleged a generalized grievance shared by all Mississippi voters.  For the same reasons articulated by the district courts in *Bost*, *Moore*, and *Feehan*, *supra*, this Court should likewise reject any theory of associational standing predicated on so-called "vote dilution."

### 3.  Plaintiff has not shown any injury to its candidates that is not inherently speculative or that is certainly impending.

Plaintiff has not identified a single, specific member or candidate of the Libertarian Party who has been or will be harmed by operation of the Mississippi Statute.  Rather, Plaintiff advances the subjective "belie[f]" of its former party Secretary, Vicki Hanson, "that Mississippi's law

allowing receipt of mailed ballots for up to five business days after Election Day has caused the Party's candidates to have worse electoral results than Republican and Democratic candidates." Dkt. #55-3 at 6, ¶ 27. The sole basis for Ms. Hanson's "belie[f]" is her further "belie[f] that more mailed ballots coming in after Election Day are cast for Republican or Democratic candidates." *Id.* Because neither of these assertions is substantiated, neither constitutes competent summary-judgment evidence. *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) ("Conclusory allegations and unsubstantiated assertions . . . are not competent summary judgment evidence."). But even if Ms. Hanson is correct that more mailed ballots received after Election Day are cast for non-Libertarian Party candidates than Libertarian Party candidates, it does not logically follow that this caused Libertarian candidates to lose federal elections in Mississippi. Plaintiff has presented no evidence showing that the number of mail-in absentee ballots received after Election Day exceeded the vote deficit of any Libertarian Party candidate in any given federal election in Mississippi.

For Libertarian Party candidates to have standing "to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to [their] detriment." *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 351-52 (3d Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). That is, Plaintiff would have to show that if all mail-in absentee ballots were received and counted on or before Election Day (i.e., the remedy Plaintiff seeks), Libertarian Party candidates would win federal election contests that they would otherwise lose. *Cf. Miller*, 471 F. Supp. 3d at 777 (where associational plaintiff fails to allege that any candidate member "has lost or will lose an election" as a result of a challenged balloting statute, plaintiff's "allegations are insufficient for associational standing because the alleged injury is neither concrete nor

imminent").[1]  Not only has Plaintiff not made that showing, but it does not even *allege* that any of

its candidates might win a federal election in Mississippi if the Mississippi Statute were enjoined.

Additionally, Plaintiff has not shown that any alleged harm to its candidates is "certainly

impending," *Clapper*, 568 U.S. at 409.  Plaintiff has not submitted any candidate affidavits or other

competent summary-judgment evidence establishing that a specific Libertarian Party candidate for

federal office stands to lose an impending federal election in Mississippi if the counting of mail-

in absentee ballots is not restricted to ballots received by Election Day.

To the extent Plaintiff would argue that it has associational standing on a theory of member

candidates' "competitive standing" pursuant to *Tex. Democratic Party v. Benkiser*, 459 F.3d 582

(5th Cir. 2006), that argument is misplaced.  In *Benkiser*, the Fifth Circuit held that a specific

Democratic Party candidate actively locked in a congressional race would have had standing to

challenge the Republican Party's disqualification and attempted replacement—several months

before the election—of the candidate's Republican opponent, an action which "threaten[ed] [the

Democratic candidate's] election prospects and campaign coffers."  *Benkiser*, 459 F.3d at 587.  On

that basis, the Fifth Circuit held that the Texas Democratic Party had associational standing.  *Id.*

Unlike the Democratic Party in *Benkiser*, Plaintiff does not allege that any specific

candidate is harmed by the concrete action of an opposing political party involving a competing

candidate in a specific race.  Rather, Plaintiff alleges that the Mississippi Statute—a generally-

---

[1] Plaintiff asserts that Mississippi received 22,221 absentee ballots during the 2022 General Election, and 142,591 absentee ballots during the 2020 General Election.  Dkt. #1 at 6, ¶¶ 29-30; Dkt. #55-4 at 2.  Of course, these figures include both mail-in absentee ballots (received both before and in the five business days after Election Day) and absentee ballots cast in person.  *See* MISS. CODE ANN. § 23-15-637(3) (absentee ballots may be cast "either by mail or in person with a regular paper ballot").  As Plaintiff correctly acknowledges, only a small fraction of these absentee ballots were both mailed and received after Election Day.  *See* Dkt. #1 at 6, ¶ 32 (alleging that "as many as 1.7% of votes cast in 2020 were received after Election Day").  Plaintiff has presented no evidence showing that a Libertarian Party candidate would have won any federal election in Mississippi but for this small fraction of mail-in absentee ballots.

applicable absentee ballot law—generally harms all of its candidates for Congressional and Presidential races. Because Plaintiff has not alleged any specific, particularized injury caused by a competing political party that threatens any of their candidate members individually in any particular election, *Benkiser* is distinguishable and has no application here. *See Taitz v. Democratic Party of Miss.*, Civil Action No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at *19-20 (S.D. Miss. Mar. 31, 2015) (holding that *Benkiser's* "competitive standing" rationale did not apply where plaintiffs could not show that "they ha[d] a particularized injury"). *See also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1251 (11th Cir. 2020) (distinguishing *Benkiser* as inapplicable where political party did not allege that state ballot order statute "has affected or will affect any particular candidate in any particular election").

Because Plaintiff's candidates' alleged injuries are inherently speculative and are not certainly impending, Plaintiff has failed to establish associational standing arising from its members who are candidates. For all these reasons, associational standing fails.

**B.** **Plaintiff has not established organizational standing.**

Under the theory of "organizational standing," an organization may establish injury in fact by showing that it diverted resources to counteract the defendants' conduct. *City of Kyle*, 626 F.3d at 238. "However, an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct." *El Paso County, Tex. v. Trump*, 982 F.3d 332, 333 (5th Cir. 2020). "Rather, the Article III injury comes when that diversion of resources concretely and 'perceptibly impairs' the organization's ability to carry out its purpose." *La. Fair Housing Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) (cleaned up). "Put differently, the 'perceptible impairment' to an organization's ability to carry out its mission, not the 'drain on the organization's resources,' is the 'concrete and demonstrable

injury' for organizational standing." *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)) (cleaned up).

To make the requisite showing of harm, the organization must identify specific projects that were curtailed, postponed, cancelled, or otherwise forgone as a result of the organization's efforts to counteract the defendant's conduct. *See, e.g., id.* at 353-54; *Tenth Street Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020); *City of Kyle*, 626 F.3d at 238. The organization must "explain how any curtailment of these projects perceptibly impaired its ability to achieve its mission." *See La. Fair Housing Center*, 82 F.4th at 354. *See also Jacobson*, 974 F.3d at 1250-51 (reaffirming that to establish organizational standing, plaintiff must show what activities organization "would divert resources away *from* in order to spend additional resources on combatting" challenged law) (emphasis in original). Further, "the organization's reaction to the allegedly unlawful conduct must differ from its routine activities." *El Paso County*, 982 F.3d at 344. *See also La. Fair Housing Center*, 82 F.4th at 352-54.

In the case at bar, Plaintiff has not made the evidentiary showing necessary to support organizational standing. Without any supporting "evidence" beyond the conclusory and unsubstantiated assertions contained in Ms. Hanson's declaration, Plaintiff asserts that the post-Election Day receipt of mail-in absentee ballots "causes Plaintiff to endure worse electoral outcomes than it otherwise would," and that this in turn negatively "affects the public's perception of Plaintiff's message." Dkt. #56 at 10. But this is not the sort of concrete and perceptible "injury" that is required to confer organizational standing under Article III.

Nor has Plaintiff shown the requisite diversion of resources to establish organizational standing. In fact, Plaintiff has not shown any diversion of resources *at all*. In Ms. Hanson's declaration, she asserts that "[i]n 2020, due to the change in Mississippi's election code allowing

an additional five business days to receive absentee ballots, the [Libertarian] Party's ability to monitor the canvassing of ballots diminished.  The Party didn't field monitors for all five extra business days in any election held after the law changed, and it is very unlikely it will be able to do so in the near future." Dkt. #55-3 at 5-6, ¶ 26.  Ms. Hanson further asserts that "[t]he receipt of absentee ballots after Election Day inhibits [the] Party's ability to monitor counties' receipt of those ballots, as it must sparingly use limited resources during the post-election certification process." *Id.* at 5, ¶ 22.

Plaintiff's allegations are insufficient to meet the requirements for organizational standing for two reasons.  First, Plaintiff has not shown that it diverted any resources—financial or otherwise—as a result of the Mississippi Statute.  Plaintiff instead contends that it has no resources to divert. *See* Dkt. #55-3 at 5-6, ¶¶ 22-26.  Nor has Plaintiff shown that any diminished monitoring capability has concretely and perceptibly impaired the Libertarian Party's ability to achieve its mission.  This deficiency alone is fatal to any claim of organizational standing.

Second, even assuming that the Mississippi Statute impairs Plaintiff's post-election monitoring capability, Plaintiff's evidence shows that "[t]he Party *already* struggles to provide funds and resources to observe post-election canvassing." *Id.* at 5, ¶ 22.  The Mississippi Statute notwithstanding, "[t]he Party's candidates can rarely afford to hire lawyers or staff to monitor the canvassing of ballots. . . . Often, . . . the Party is simply unable to monitor the canvassing of ballots, and it just forgoes this important task in certain counties, or in certain elections." *See id.* at ¶¶ 23-24.  Thus, Plaintiff has not shown that the Mississippi Statute causes it to do anything it does not do already, *viz.*, work within the bounds of current election law and its own pre-existing resource constraints in an effort to get its candidates elected. *Cf. Clark v. Edwards*, 468 F. Supp. 3d 725, 748 (M.D. La. 2020) ("The law is not static.  It cannot follow that every change in voting laws that

causes voting advocacy groups to 'check and adjust' is an injury.").  For all these reasons, Plaintiff cannot establish organizational standing.

To the extent Plaintiff would argue that it has organizational standing pursuant to *Benkiser*, 459 F.3d at 586-87, on a theory of economic loss or harm to Libertarian Party electoral prospects, those arguments are misplaced.  *Benkiser* is distinguishable for the same reasons set forth *supra* in relation to associational standing.  Unlike *Benkiser*, this is not a case where Plaintiff is forced to spend money to combat the actions of an opposing political party causing concrete harm to an individual candidate months before a particular election.  *See Benkiser*, 459 F.3d at 586 (holding that Democratic Party's "need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame" was sufficient to establish organizational standing) (quotation marks and citation omitted).  Further, the notion that the threatened loss of political power can constitute "a concrete and particularized injury sufficient for standing purposes," *Benkiser*, 459 F.3d at 587, has no application in a case asserting generalized harm to partisan interests.  Plaintiff asserts "group political interests, not individual legal rights."  *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).  But this Court "is not responsible for vindicating generalized partisan preferences."  *See id.*  On the contrary, this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."  *Id.*

Because Plaintiff has not shown that any diversion of resources to non-routine activities concretely and perceptibly impairs its ability to carry out its mission, it cannot establish organizational standing, and this Court thus lacks subject-matter jurisdiction.

## II.  PLAINTIFF'S CLAIMS FAIL ON THE MERITS.

As set forth above, Plaintiff lacks standing to bring this lawsuit.  If this Court agrees, it lacks subject-matter jurisdiction and cannot reach the merits.  Rather, its only course is to deny

Plaintiff's instant motion and dismiss the Complaint in its entirety.  If, however, this Court determines that Plaintiff does have standing, all of its claims nevertheless fail on the merits, and the Court should deny Plaintiff's motion for summary judgment and enter summary judgment for Defendant, thereby disposing of Plaintiff's Complaint in its entirety.

Assuming that Plaintiff can establish standing—which Defendant contends it cannot, see *supra*—Plaintiff's merits case turns on a pure question of law:  whether mail-in absentee ballots that are postmarked on or before Election Day but are received during the first five business days after Election Day should be disregarded as untimely under federal law.  Because Plaintiff cannot show that the Mississippi Statute violates federal statutory law or the United States Constitution, its motion for summary judgment should be denied.

### A.  As to Count I, the Mississippi Statute does not violate the right to vote.

In Count I of the Complaint, Plaintiff alleges that the Mississippi Statute "requires counties to hold open voting and count ballots that have been cast and received after Election Day in violation of 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1."  Dkt. #1 at 10, ¶ 58.  Plaintiff asserts that these "untimely and illegal ballots . . . dilute the value of timely ballots cast and received on or before Election Day," thus violating its members' and supporters' "[r]ight to [v]ote."  *Id.* at 10, Count I Heading and ¶ 60.  Plaintiff thereupon claims that the Mississippi Statute violates the First and Fourteenth Amendments to the U.S. Constitution.  *Id.* at 10, ¶ 62.  This claim fails on the merits.

First, Plaintiff's Fourteenth Amendment claim mischaracterizes the plain language of the Mississippi Statute.  Nothing in the Mississippi Statute permits the counting of "ballots that have been *cast* . . . after Election Day" as Plaintiff alleges.  *Id.* at 10, ¶ 58 (emphasis added).  To the contrary—the Legislature expressly provided that to be counted, mail-in absentee ballots "must be postmarked *on or before the date of the election*."  MISS. CODE ANN. § 23-15-637(1)(a) (emphasis

added).  That is, they must be "cast" by Election Day.  *See* Part II.C., *infra*.  Further, Plaintiff has

not shown any specific instances of allegedly "fraudulent" voting.[2]  And Plaintiff's allegations of

"illegitimate" voting presuppose that the Mississippi Statute violates federal statutory law,

which—as set forth *infra*—it does not.

Further, Plaintiff has not established a valid legal or factual predicate for a Fourteenth

Amendment claim premised on alleged "vote dilution."  An equal-protection claim predicated on

a theory of "vote dilution" requires a point of comparison.  *See Wood v. Raffensperger*, 981 F.3d

1307, 1314 (11th Cir. 2020).  In racial gerrymandering cases, for example, "vote dilution occurs

when voters are harmed compared to 'irrationally favored' voters from other districts."  *Id.*  By

contrast here, "[i]f ballots cast by mail and postmarked by Election Day are counted, no single

voter 'is specifically disadvantaged,' even if the votes counted in compliance with the [Mississippi]

Statute have a 'mathematical impact on the final tally and thus on the proportional effect of every

vote.'"  *Bost*, 2023 WL 4817073 at *12 (quoting *Wood*, 981 F.3d at 1314).  "A voter is not

guaranteed to have their vote be decisive or to have their vote be for the ultimate winner of an

election.  On the contrary, a voter has a right to cast a lawful ballot and have that lawfully cast

ballot counted.  Nothing in the [Mississippi] Statute infringes on that right."  *See id.*  Simply stated,

Plaintiff's members' "votes here are not diluted by other valid, lawfully cast votes."  *See id.*

Furthermore, "vote dilution under the Equal Protection Clause is concerned with votes

being weighed differently."  *Bognet*, 980 F.3d at 355.  "Having once granted the right to vote on

equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote

---

[2] The declaration of Vicki Hanson references unspecified "allegations of impropriety concerning late-arriving ballots" in the 2023 State House District 114 race.  Dkt. #55-3 at 6, ¶ 28.  However, Ms. Hanson concedes that the Libertarian Party was unable "to corroborate any of those allegations in all 82 Mississippi counties."  *Id.*  Such vague and unsubstantiated "allegations of impropriety" in a non-federal election do not constitute competent summary-judgment evidence and have no bearing on the issue at hand.

over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).  Plaintiff does not allege any

"arbitrary and disparate treatment" in how votes are counted as between in-person voters and mail-

in absentee voters.  To the extent Plaintiff argues that the Mississippi Statute creates two groups of

voters—*viz.*, in-person voters and mail-in absentee voters—"a vote cast by a voter in the [latter]

group counts not one bit more than the same vote cast by the [former] group—no matter what set

of scales one might choose to employ." *Bognet*, 980 F.3d at 359.  "It is passing strange to assume

that one of these voters would be denied 'equal protection of the laws' were *both* votes counted."

*Id.* (emphasis in original).  Here, as in *Bost*, "[a]ll ballots cast by Election Day are treated the same

under the Statute's plain text.  Untimely ballots, *i.e.*, those not cast on or by Election Day, are not

counted." *Bost*, 2023 WL 4817073 at *13.  There is no equal-protection violation here.

Because there is no equal-protection violation, there can be no First Amendment violation.

This is so because "the First Amendment provides no greater protection for voting rights than is

otherwise found in the Fourteenth Amendment." *Hand v. Scott*, 888 F.3d 1206, 1211 (11th Cir.

2018); *see also Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1359 (4th Cir. 1989) ("In

voting rights cases, the protections of the First . . . Amendment[] do not in any event extend beyond

those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.")

(internal quotation marks omitted).

Plaintiff presents no argument in support of its constitutional claims predicated on an

alleged violation of the right to vote.  For all these reasons, Plaintiff's motion for summary

judgment should be denied as to Count I.

**B.  <u>As to Count II, the Mississippi Statute does not violate any right to stand for office.</u>**

In Count II of its Complaint, Plaintiff asserts that the Mississippi Statute "depriv[es]

Plaintiff of rights protected under the First and Fourteenth Amendment [*sic*] to the U.S.

Constitution."   Dkt. #1 at 11, ¶ 66.   Specifically, Plaintiff asserts that the Mississippi Statute "[v]iolat[es] . . . the [r]ight to [s]tand for [o]ffice" by "forcing Plaintiff to spend money, devote time, and otherwise injuriously rely on unlawful provisions of state law in organizing, funding, and running their [*sic*] campaigns."   *Id.* at 11-12, Count II heading and ¶ 66.   This claim likewise fails.

"While the right to run for public office is protected by the First Amendment, it is not an absolute right."   *Phillips v. City of Dallas*, 781 F.3d 772, 779 (5th Cir. 2015) (quotation marks omitted).   "There is no fundamental right to be a candidate."   *Hatten v. Rains*, 854 F.2d 687, 693 (5th Cir. 1988).   *See also Williams v. Delany*, Civil Action No. 16-93-SDD-EWD, 2016 WL 4253972, at *5 (M.D. La. June 28, 2016) (reaffirming *Hatten*).   And as a matter of law, "[t]he states have broad power to regulate the conduct of both federal and state elections."   *Goodloe v. Madison County Bd. of Election Comm'rs*, 610 F. Supp. 240, 242 (S.D. Miss. 1985).   Where, on its face, a state statute does nothing more than regulate the times, places, and/or manner of holding elections—as authorized by the Elections Clause, *supra*—the state statute "cannot be said to infringe on the right to stand for office."   *Bost*, 2023 WL 4817073 at *13.

In the case at bar, the challenged Mississippi Statute only regulates the timing and manner of casting and counting mail-in absentee ballots.   *See* MISS. CODE ANN. § 25-15-637(1)(a).   It does not speak to candidate eligibility or qualification requirements *at all*.   *See id.*   Accordingly, the statute cannot be read as a legal impediment to any prospective candidate's placement on any given ballot.   "Spending time and money on campaigning is an inevitable feature of running for office, and Plaintiffs do not contend that the extra time and money they might have to spend due to the Statute prevents them from standing for office at all."   *Bost*, 2023 WL 4817073 at *14.   Because

the Mississippi Statute does not impair any right to stand for office, it does not infringe on any associated First Amendment rights as a matter of law.

Plaintiff presents no argument in support of its constitutional claims predicated on an alleged violation of the right to stand for office. For all these reasons, Plaintiff's motion for summary judgment should be denied as to Count II.

## C. As to Count III, the Mississippi Statute does not violate federal law.

In Count III of their Complaint, Plaintiff asserts that the Mississippi Statute "conflicts with and is superseded by the Time regulations chosen by Congress under" 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1, and thus "violates the plenary authority given to Congress" by the Elections and Electors Clauses of the Constitution to regulate the time for holding congressional and presidential elections. *See* Dkt. #1 at 12, ¶¶ 75-76. According to Plaintiff, the Mississippi Statute "requires counties to hold open voting and count ballots that have been cast and received after Election Day in violation of 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1." Dkt. #1 at 10, ¶ 58.

Plaintiff's framing of this claim is itself a mischaracterization of Mississippi law. Nothing in the Mississippi Statute permits the counting of "ballots that have been *cast* . . . after Election Day" as Plaintiff alleges. Dkt. #1 at 10, ¶ 58 (emphasis added). To the contrary—the Legislature provided that to be counted, mail-in absentee ballots "must be postmarked on or before the date of the election." MISS. CODE ANN. § 23-15-637(1)(a). That is, they must be "cast" by Election Day. There is no support for the notion that an absentee ballot deposited in the mail has not yet been "cast," or that it is considered "cast" only when received. It is axiomatic that a mail-in ballot is cast when it is mailed, not when it is received. *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 140 (5th Cir. 2020) (the traditional option . . . for *casting* a mail-in ballot [is] *mailing* it) (emphasis added). *Cf. Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205,

1207 (2020) (per curiam) (drawing distinction between "the date by which [mail-in] ballots may be *cast* by voters" and the date they must be "*received* by the municipal clerks") (emphasis added). For this reason and those that follow, this claim fails on the merits.

The Elections Clause of the U.S. Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. CONST. art. I, § 4, cl. 1. The Constitution thus defaults to the States to determine "the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). "[T]he Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States. [Citation omitted.] [T]he regulations made by Congress are paramount to those made by the State legislature; and *if they conflict therewith*, the latter, *so far as the conflict extends*, ceases to be operative." *Id.* (quotation marks omitted) (emphasis added).

Pursuant to the Elections Clause (and its Executive Branch counterpart, the Electors Clause, U.S. CONST. art. II, § 1, cl. 3), Congress acted to set the date of the biennial election for federal offices. *Id.* *See* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. Title 2 U.S.C. § 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter." 2 U.S.C. § 7. This provision works in conjunction with 2 U.S.C. § 1 (setting the same rule for electing Senators under the Seventeenth Amendment) and 3 U.S.C. § 1 (doing the same for selecting Presidential electors). *See Foster*, 522 U.S. at 69-70.

In keeping with the foregoing, "states are given, and in fact exercise a wide discretion" in establishing the time, place, and manner of electing their federal representatives. *See United States v. Classic*, 313 U.S. 299, 311 (1941). Accordingly, the Fifth Circuit has expressly recognized that "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has *only one limitation*: the state system cannot *directly conflict* with federal election laws on the subject." *Voting Integrity Proj., Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000), *cert. denied*, 530 U.S. 1230 (2000) (emphasis added).

The challenged Mississippi Statute does not directly conflict with the plain text of 2 U.S.C. §§ 1, 7 and/or 3 U.S.C. § 1. Together, these federal statutes establish an "election day" for Presidential and Congressional elections. The U.S. Supreme Court has defined "election" to mean the "*final choice*" of a federal officer "by the duly qualified electors." *Newberry v. United States*, 256 U.S. 232, 250 (1921) (emphasis added). "From time immemorial an election to public office has been in point of substance no more and no less than the *expression* by qualified electors of their *choice* of candidates." *Classic*, 313 U.S. at 318 (emphasis added). In 1997, the Supreme Court defined "election" as "the combined actions of voters and officials meant to make a *final selection* of an officeholder." *Foster*, 522 U.S. at 71 (emphasis added).

In amending § 23-15-637(1)(a) in 2020, the Legislature provided that "[a]bsentee ballots received by mail . . . must be postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." MISS. CODE ANN. § 23-15-637(1)(a). Any absentee ballots received after that time are never opened "and shall not be counted." *Id. See also id.* § 23-15-647. The Mississippi Statute is facially compatible with the relevant federal statutes. Only those ballots placed in the mail and postmarked by Election Day will be counted. Once a voter deposits the absentee ballot in the mail, the voter has irretrievably

cast his/her ballot, thereby expressing his/her final choice in the selection of candidates.   "By counting only these ballots that are postmarked no later than Election Day, the Statute complies with federal law that set the date for Election Day."   *See Bost*, 2023 WL 4817073 at *11 (holding that comparable Illinois mail-in absentee ballot statute did not violate the same federal statutes at issue in this case, where statute required absentee ballots postmarked by Election Day to be counted if received within 14 days after Election Day).   Because the Mississippi Statute does not "directly conflict," *Bomer*, 199 F.3d at 775, with the federal election statutes—but instead operates harmoniously with federal law—Plaintiff's claim predicated on these statutes fails on the merits.

Like Mississippi, "[m]any states have post-Election Day absentee ballot receipt deadlines." *Bost*, 2023 WL 4817073 at *11 (collecting statutes).   "Despite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules." *Id.   See also Millsaps*, 259 F.3d at 544 (emphasizing "long history of absentee voting throughout the country" and fact that despite surely being aware of absentee voting, Congress "has taken no action to curb it").

Not only has Congress acquiesced for years in permitting state statutory schemes providing for post-Election Day receipt of mail-in absentee ballots, but "even federal laws governing elections allow ballots received after Election Day to be counted."   *Bost*, 2023 WL 4817073 at *11 (citing "longstanding efforts by Congress and the executive branch to ensure that ballots cast by Americans living overseas"—including military voters protected by the Uniformed Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA")—"are counted, so long as they are cast by Election Day").   In the same vein, where Congress has "required . . . states to provide for absentee voting in federal elections," *Voting Integrity Proj., Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001), it has nevertheless expressly provided that "[n]othing in [the governing federal statute] shall

prevent any State or political subdivision from adopting *less restrictive voting practices* than those that are prescribed" in federal law where absentee voting is concerned. *See* 52 U.S.C. § 10502(g) (emphasis added). These features of federal law "strongly suggest that statutes like the one at issue here are compatible with the Elections Clause." *Bost*, 2023 WL 4817073 at *11.

Finally, the legislative history of federal statutes establishing a federal "Election Day" supports the notion that the Mississippi Statute does not directly conflict with federal law. "This history indicates that Congress wanted a uniform election day to prevent earlier elections in some states unduly influencing the later voters, to prevent fraudulent voting in multiple state elections, and to remove the burden of voting in more than one federal election in a given year." *Love v. Foster*, 90 F.3d 1026, 1029 (5th Cir. 1996). Allowing mail-in absentee ballots that are postmarked by Election Day to be counted if received within five business days thereafter "do[es] not stand as an obstacle to substantial achievement of these goals." *Millsaps*, 259 F.3d at 549.

For all these reasons, the Mississippi Statute does not directly conflict with federal election statutes. Plaintiff's arguments to the contrary do not establish a direct conflict between the Mississippi Statute and any controlling interpretation of federal election statutes. First, Plaintiff argues that federal law preempts the Mississippi Statute because, according to Plaintiff, the "'consummation' of the process of selecting an official" in a federal election must occur on Election Day. *See* Dkt. #56 at 13. Plaintiff posits that "[t]his 'consummation' or the 'final act of selection' does not occur until *ballots are received* by state election officials." *Id.* (emphasis in original). Plaintiff cites no controlling authority that expressly prohibits the post-Election Day receipt and counting of mail-in absentee ballots that were postmarked by Election Day. Rather, Plaintiff's argument is crafted entirely from an unsupported inference that Plaintiff attempts to draw from the U.S. Supreme Court's opinion in *Foster v. Love*, 522 U.S. 67 (1997).

In *Foster*, the Supreme Court held that Louisiana's "open primary" system violated federal election statutes because it permitted the conclusion of a congressional election "as a matter of law *before* the federal election day . . . with no act in law or in fact to take place on the date chosen by Congress." *Foster*, 522 U.S. at 72 (emphasis added). The Court defined "election" as "the combined actions of voters and officials meant to make a *final selection* of an officeholder." *Id.* at 71 (emphasis added). As noted *supra*, the Court declined to "par[e] the term 'election' . . . down to the definitional bone" and expressly left "room for argument about just what may constitute the *final act of selection* within the meaning of the law." *Id.* at 72. *See also Bomer*, 199 F.3d at 776 (recognizing Supreme Court's refusal to give a hyper-technical meaning to "election").

The *Foster* Court took great care to limit its holding to the facts of that case, which—unlike this case—did not involve post-Election Day counting of mail-in absentee ballots postmarked on or before Election Day. "To underscore the ground left uncovered by its holding," *Millsaps v. Thompson*, 259 F.3d 535, 544 (6th Cir. 2001), the Supreme Court said in *Foster*: "This case thus does not present the question whether a State must always employ the conventional mechanics of an election. We hold today only that if an election does take place, it may not be consummated *prior to* federal election day." *Foster*, 522 U.S. at 72 n.4 (emphasis added). "*Foster's* narrow holding suggests that, so long as a State does not conclude an election *prior to* federal election day, the State's law will not 'actually conflict' with federal law." *Millsaps*, 259 F.3d at 546 (emphasis added). *See also Bomer*, 199 F.3d at 775 ("In striking down Louisiana's open primary statute, the Supreme Court *held only* that elections must not be 'consummated' before federal election day.") (emphasis added) (quoting *Foster*, 522 U.S. at 72 n.4).

*Foster's* narrow holding does not establish a direct conflict between the Mississippi Statute and federal law. Mississippi law does not permit the conclusion of a federal election *prior to*

Election Day.   Nor does the Mississippi Statute implicate the paramount federal concerns articulated in *Foster*.  Most importantly, "it does not foster either of the primary evils identified by Congress as reasons for passing the federal statutes:  'distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and . . . the burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years.'"  *Bomer*, 199 F.3d at 777 (quoting *Foster*, 522 U.S. at 73).  While Plaintiff mentions several additional cases in the course of its discussion, it has cited no controlling authority holding that the post-Election Day counting of mail-in absentee ballots received by Election Day directly conflicts with federal election statutes.

Second, Plaintiff argues that the "ordinary public meaning" of "election"—circa 1845 when "Election Day" was first established—is "[t]he day of a public choice of officers."  Dkt. #56 at 19 (emphasis and internal quotation marks omitted).  From that definition, Plaintiff extrapolates that there is "little doubt that the original public meaning of election meant the final act of selection, and that that act was the receipt of ballots."  *Id.*  Plaintiff argues that "election day" necessarily meant "receipt day" "because it remained physically impossible for votes to be received after Election Day for most of the 19th Century."  *Id.* at 15 (capitals omitted).  But it can just as easily be argued that since—as a practical matter—there could be no temporal difference between the "casting" and "receiving" of votes in the mid-19th Century, there was then no reason to differentiate between those activities, and it was instead the *casting* of votes by Election Day that alone constituted the consummate act of "election" as that term was understood in 1845.  Regardless, Plaintiff cites no controlling authority mandating its definitional view of "election" as preclusive of the ballot-receipt deadline provided for in the Mississippi Statute.

Finally, Plaintiff argues that post-Election Day receipt of mail-in absentee ballots is inconsistent with "historical practices under the common law and during Colonial, early Republic, Civil War, and Reconstruction eras." *See id.* at 8.  But the law—including state election law—"is not static." *Clark*, 468 F. Supp. 3d at 748.  Plaintiff has cited no authority precluding states from enacting election laws that keep pace with changing times and societal concerns.  Indeed, the Supreme Court itself has not reached the issue of "whether a State must always employ the conventional mechanics of an election." *Foster*, 522 U.S. at 72 n.4.  In the absence of controlling authority prohibiting post-Election Day receipt of mail-in absentee ballots postmarked by Election Day, Plaintiff's historical arguments are unavailing.

For all these reasons, Plaintiff's claim that the Mississippi Statute violates federal election law must fail, and the Court should deny Plaintiffs' motion for summary judgment as to Count III.

## III.  PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF.

In addition to seeking summary judgment on its claims for declaratory relief, Plaintiff—by way of the instant motion—seeks "temporary and permanent [injunctive] relief." *See* Dkt. #55 at 1.  A party seeking a permanent injunction must establish all of the following:  (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Stevens v. St. Tammany Parish Gov't*, 17 F.4th 563, 576 (5th Cir. 2021).  For the reasons set forth in detail *supra*, Plaintiff's claims fail on the merits.  And Plaintiff has not even attempted to make any showing of the other three requisite factors for injunctive relief.  For either and both of these independent reasons, any request for injunctive relief should be denied.

## **CONCLUSION**

Plaintiff's Complaint should be dismissed for lack of subject-matter jurisdiction predicated on lack of Article III standing.  Alternatively, Plaintiff's claims fail on the merits, and the Court should enter summary judgment for Defendant, thereby disposing of this case in its entirety with prejudice.  Either way, Plaintiff's instant motion for summary judgment should be denied.

THIS the 9th day of April, 2024.

Respectfully submitted,

MICHAEL WATSON, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF STATE OF
MISSISSIPPI, DEFENDANT

By:    LYNN FITCH, ATTORNEY GENERAL
       STATE OF MISSISSIPPI

By:    s/Wilson D. Minor
       WILSON D. MINOR (MSB #102663)
       Special Assistant Attorney General

REX M. SHANNON III (MSB #102974)
WILSON D. MINOR (MSB #102663)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi  39205-0220
Tel.:  (601) 359-4184
Fax:  (601) 359-2003
rex.shannon@ago.ms.gov
wilson.minor@ago.ms.gov

ATTORNEYS FOR DEFENDANT MICHAEL WATSON, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF STATE OF MISSISSIPPI

<u>**CERTIFICATE OF SERVICE**</u>

I, Wilson D. Minor, Special Assistant Attorney General and one of the attorneys for the above-named State Defendant, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 9th day of April, 2024.

<u>s/Wilson D. Minor</u>
WILSON D. MINOR