**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION GULFPORT**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; and MATTHEW LAMB, | |
| Plaintiffs, | No. 1:24-cv-00025-LG-RPM (Lead Case) |
| v. | **RESPONSE OPPOSING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*; TONI JO DIAZ, BECKY PAYNE, BARBARA KIMBALL, CHRISTENE BRICE, and CAROLYN HANDLER, *in their official capacities as members of the Harrison County Election Commission*; and MICHAEL WATSON, *in his official capacity as the Secretary of State of Mississippi*, | |
| Defendants, | |
| VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE OF RETIRED AMERICANS, | |
| Intervenor-Defendants. | |
| LIBERTARIAN PARTY OF MISSISSIPPI, | |
| Plaintiff, | |
| v. | No. 1:24-cv-00037-LG-RPM (Consolidated Case) |
| JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................3

ARGUMENT......................................................................................................................4

    I.  Political parties, candidates, voters, and election officials are adversely
        affected by allowing post-election receipt of ballots..............................................4

        A.  The RNC and MSGOP have organizational standing because the laws
             force them to divert money from other critical activities. ...............................5

        B.  The RNC and MSGOP have standing because the post-election deadline
             harms Republican candidates. ..........................................................................11

        C.  The voters have standing because their right to a fair election is infringed
             by elections conducted in violation of federal law. ........................................16

        D.  Election officials suffer an injury when they are put in the position of
             enforcing unlawful rules. ..................................................................................20

        E.  Plaintiffs' injuries are certainly impending because the State insists it
             will enforce the post-election-day deadline this coming election..................22

   II.  Defendants have not shown that the post-election receipt of mail-in ballots is
       consistent with federal law. ....................................................................................23

        A.  The receipt of ballots by election officials marks the final act of selection...24

        B.  Defendants' counterarguments can't overcome the Supreme Court's
             interpretation of the election-day statutes. .....................................................25

        C.  Defendants' violation of federal election law violates Plaintiffs' rights........29

CONCLUSION ................................................................................................................30

CERTIFICATE OF SERVICE.........................................................................................31

**INTRODUCTION**

In 1845, Congress established federal election day as "the Tuesday next after the first Monday in November." Act of Jan. 23, 1845, ch. 1, 5 Stat. 721. Before that, States appointed presidential electors during a month-long window in November. The result was that States held their elections on different days throughout the month of November. In the dawning era of instant communication, that practice courted chaos.

We have now returned to the chaos of election-month. States like Mississippi have recently—and increasingly—begun counting mail-in ballots received days or weeks after election day. *See* Miss. Code §23-15-637(1)(a). The practice grew during the COVID-19 pandemic, and States have largely failed to return their practices to pre-pandemic normality. But Congress's election-day statute is still good law. It sets one day for the election of federal officers, not one month for their election. History and precedent explain what it means to hold an "election." It requires the joint participation of voters to cast ballots and election officials to receive ballots. Until the ballots are in the hands of the proper election official, the election itself has not occurred.

Defendants' arguments have failed to rebut these principles. They focus almost all of their attention on Plaintiffs' standing. But Plaintiffs represent all levels of interest in federal elections. They are voters, election officials, and political parties who represent their own interests and those of their members and candidates. If they don't have standing to challenge the unlawful counting of ballots, no one does. That can't be right, since in *Foster v. Love*, 522 U.S. 67 (1997), the Supreme Court invalidated state law under the election-day statutes in a case brought by voters. Many courts have confirmed that these Plaintiffs have standing in similar contexts. And because this Court need only assure itself of one Plaintiffs' standing to challenge Mississippi Code §23-15-637(1)(a), it should quickly dispense with Defendants' standing arguments.

## ARGUMENT

### I. Political parties, candidates, voters, and election officials are adversely affected by allowing post-election receipt of ballots.

Plaintiffs satisfy Article III's case-or-controversy requirement many times over. Receiving ballots for days after the election forces the RNC and the MSGOP to spend money on a variety of election activities that they would otherwise spend elsewhere. The RNC and MSGOP are running candidates who will suffer competitive electoral injuries because of the late-arriving ballots. Voters will have their votes diluted by late-arriving ballots that under federal law should not be counted. And election officials will be placed in the impossible position of choosing whether to enforce state law or federal law.

Each one of these injuries is sufficient. And to reach the merits, the Court need only assure itself that "[a]t least one plaintiff" has "standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). That is because "in the context of injunctive relief, one plaintiff's successful demonstration of standing 'is sufficient to satisfy Article III's case-or-controversy requirement.'" *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020). Here, all Plaintiffs seek the same relief: declaratory relief and an injunction preventing the State Defendants from enforcing Mississippi's post-election receipt of absentee ballots. And because at least one Plaintiff "has standing" to seek that relief, the Court "need not consider whether the [other parties] also have standing to do so." *Horne v. Flores*, 557 U.S. 433, 446 (2009).

The simplest case for standing is Plaintiffs' monetary expenditures caused by the law they challenge. Resource diversion is frequently the basis for standing in election-law cases. *See, e.g.*, *Brnovich v. DNC*, 141 S. Ct. 2321 (2021) (Democratic Party had standing to challenge ballot-counting and ballot-collection laws); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (Texas Democratic Party had standing to challenge the removal of a Republican candidate from the ballot); *Ass'n of Cmty. Orgs. for Reform Now v. Fowler* [*ACORN*], 178 F.3d 350, 361 (5th Cir. 1999) (voter-registration

organization had standing to challenge the State's alleged violation of federal law). Resource diversion also formed the basis for all of the intervenors' interests in this case. *See* Doc. 7 at 14-15 (intervening to protect their "resources to encourage their members and supporters in Mississippi to apply for absentee ballots, and to assist them in successfully casting those ballots"); Doc. 19 at 8-9 (intervening to protect their resources spent "preparing for Mississippi's upcoming elections"); Doc. 46 at 7 (intervening to avoid spending "resources to encourage Mississippi voters to complete and mail their ballots well before election day"). This well-trodden path cuts through Defendants' arguments and is the shortest route to the merits.

This case presents "a pure question of law" that the Court has authority to decide. Doc. 52 at 2. So long as Plaintiffs' declarations "indicate that a genuine issue of fact exists on the standing issue," Defendants' motion for summary judgment based on standing should be denied. *ACORN*, 178 F.3d at 357. If the Court is inclined to grant Defendants' motions, it can do so only after concluding that there is no "genuine issue of fact" on each one of Plaintiffs' theories of standing. But because at least one Plaintiff has standing—indeed, all do—the Court should deny the motions.

### A. The RNC and MSGOP have organizational standing because the laws force them to divert money from other critical activities.

The case for economic injury to the RNC and MSGOP is straightforward. Declarations, affidavits, and other "comparable evidence" that an organization "has expended resources" in response to the law are sufficient to establish standing at summary judgment. *ACORN*, 178 F.3d at 357-58. As the evidence supporting Plaintiffs' summary judgment motion establishes, the mission of both organizations is to support the Republican Party and help elect Republicans to office. Doc. 58-1 at 2 (RNC Decl.); Doc. 58-2 at 3 (MSGOP Decl.). They spend "finite resources" in pursuit of those goals. *See* Doc. 58-1 at 5; Doc. 58-2 at 4.

Specifically, by accepting ballots after election day Mississippi effectively prolongs the election by an extra week, which forces the RNC and MSGOP to spend more money on absentee ballot-chase programs through election day and on poll-watchers for several days after the election. Doc. 58-1 at 2; Doc. 58-2 at 3. Ballot-chase programs require the RNC to establish a separate get-out-the-vote effort supported by training, voter education, and voter outreach. Decl. of James Blair, ¶5 (Exh. A to brief). Devoting resources to a longer period for ballot chasing requires the RNC to divert resources away from traditional get-out-the-vote operations such as encouraging and assisting people to vote in person. Blair Decl., ¶5. Likewise, prolonging the receipt-days for mail-in ballots requires the MSGOP to divert resources from its efforts to facilitate voter registration, increase in-person turnout, secure election integrity, and educate voters. Supp. Decl. of Frank Bordeaux, ¶5 (Exh. B to brief). These efforts are critical to Plaintiffs' mission to represent the interests of the Republican Party and secure the election of Republican candidates for state and federal office in Mississippi. Blair Decl., ¶5; Bordeaux Supp. Decl., ¶5.

The post-election deadline also forces the RNC and MSGOP to spend time and money on additional poll-watching efforts. "Additional poll-watcher coverage requires training for post-election-day observation, challenges, preparation of relevant materials, payment to attorneys for review, and securing additional volunteer time," all of which cost the parties time and money. Blair Decl., ¶7. The RNC and MSGOP must divert resources for these activities away from other election integrity efforts to educate voters, monitor state and local compliance with election laws, and increase confidence in the election. Blair Decl., ¶8; Bordeaux Supp. Decl., ¶5. Failing to spend these resources damages the Republican Party's ability to "protect its electoral interests and maintain competitive parity with other political parties," thus harming its core mission. Doc. 58-1 at 3. "It is these wasted resources, which [the organizations] could have put to use registering voters," encouraging in-person turnout, securing election integrity, or "could

6

have put toward any other use [they] wished," that give them "standing to pursue" their claim that Mississippi "has failed to comply" federal law. *ACORN,* 178 F.3d at 361.

Indeed, the "injury-in-fact" of political parties and their candidates "should be self-evident." *Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021) (Oldham, J., dissenting). They "spend money, devote time, and otherwise injuriously rely on provisions of the Election Code in organizing, funding, and running their campaigns." *Id.* Changing the timing of the election has a direct effect on "get-out-the-vote efforts" and other expenditures. *Id.* at 1125-26. The majority in *Hotze* held that the plaintiff candidates lacked standing in that case because they sought to enjoin *in 2021* conduct that had occurred in the 2020 election. *Id.* at 1123-24 (maj. op.). Hence, the "issues presented [were] no longer live," and the plaintiffs had no evidence that the defendants would engage in the same conduct "again in the future." *Id.* at 1124 (cleaned up). But that's not an issue here. No one disputes that the State Defendants will enforce Mississippi's post-election-day receipt law. They are litigating this case precisely because they will enforce the law.

Courts often hold that the "need to divert resources from general voting initiatives or other missions of the organization" establishes standing "[i]n election law cases." *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019) (finding various cause-oriented organizations had standing to challenge Georgia's elections laws). The touchstone is whether the laws "perceptibly impair[]" the ability of the organization "to carry out its purpose." *NAACP v. City of Kyle*, 626 F.3d 233, 239 (5th Cir. 2010). Here, there can be no question that the laws harm Plaintiffs' mission "to elect Republican candidates to state and federal office" by "diverting [their resources] from the pursuit of its mission in other areas." Doc. 58-1 at 5. Plaintiffs' expenses incurred in response to the post-election receipt of ballots have nothing to do with "their litigation efforts" in this case or other cases. *City of Kyle*, 626 F.3d at 238. Their expenses

7

are incurred only because of Mississippi's law, and they will be saved if the law is enjoined.

In other words, a political party has standing to challenge laws that "would cause it economic loss." *Tex. Democratic Party*, 459 F.3d at 586. In *Texas Democratic Party v. Benkiser*, the Republican Party of Texas declared one of its candidates ineligible for the upcoming congressional election. *Id.* at 584-85. But it was the Texas *Democratic* Party that sued to enjoin the removal of the Republican candidate from the ballot. *Id.* at 585. That didn't faze the Fifth Circuit—the Democratic Party had standing to enjoin the removal of a Republican candidate because they had organized their campaigns around that candidate. *Id.* at 586. Changing the nature of the race would have required the party to spend money re-strategizing and preparing a "new and different campaign." *Id.* The Fifth Circuit did not require the Democratic Party to show that these expenses were necessary or even conducive "to avoid the prospect of losing an election." Doc. 52 at 19. Political parties are entitled to strategize and run their campaigns in ways that *they think* advance their electoral interests; the economic-injury doctrine does not permit the Court "to second-guess a candidate's reasonable assessment of his own campaign." *Becker v. FEC*, 230 F.3d 381, 387 (1st Cir. 2000) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)). "[I]njury to the [Republican Party's] proverbial pocketbook is an injury in fact for standing purposes." *Tex. Democratic Party*, 459 F.3d at 586.

The post-election deadline harms Plaintiffs' mission in another way. By forcing the RNC and MSGOP to spend money on absentee ballot-chase programs through election day and poll-watching efforts long after election day, Mississippi's law directly harms *those efforts*. By spreading their budgets for ballot-chase programs over additional days, for example, the RNC and MSGOP necessarily decrease the effectiveness of those programs. Contra Defendants' suggestion, Doc. 52 at 21-23, the Fifth Circuit's decision in *Louisiana Fair Housing Action Ctr. v. Azalea Garden*

*Properties, L.L.C.*, 82 F.4th 345 (5th Cir. 2023), is critically different. There, the Fifth Circuit rejected the standing of an organization whose purpose was to send testers to properties to investigate housing discrimination. *Id.* at 352. Spending money on testers was a "routine activity" that the organization undertook regardless of whether any housing discrimination had occurred or whether it eventually filed suit. *Id.* The alleged discrimination the organization challenged thus hadn't required it to spend any more money on testers than it otherwise would have. *Id.* That's not true here. But for Mississippi accepting late-arriving ballots, Plaintiffs would spend their money on other essential activities.

That Plaintiffs would spend *some money* on ballot-chase programs and poll watchers without the challenged law does not mean the additional days don't cause them distinct financial harm. So long as "a portion of the resources" spent on an activity is attributable to counteracting the challenged law, an organization has standing. *ACORN*, 178 F.3d at 361; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that plaintiff organization had standing because it was forced to divert more resources toward investigating the defendant's "racially discriminatory steering practices" because of the challenged conduct). When an organization "divert[s] more resources to accomplishing its goals" because of a challenged law, it suffers an "injury in fact," even if "the added cost has not been estimated and may be slight." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (emphasis added) (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008)). The State's argument that poll-watching and voter-education activities "fall within the ambit of [the RNC Plaintiffs'] routine activities" thus misses the point. Doc. 52 at 23 (alteration in original) (quoting *La. Fair Housing Center*, 82 F.4th at 354). The extra days of those expenses are outside Plaintiffs' "routine activities" and caused only by Mississippi's counting of late-arriving ballots. "It is *these* wasted

resources, which [Plaintiffs] could have put … toward any other use … that provide [Plaintiffs] with standing." *ACORN*, 178 F.3d at 361 (emphasis added).

The State frames organizational interests at an unduly high level of generality. It suggests that because political parties "work within the bounds of current election law in an effort to get their candidates elected," they don't have standing to challenge those election laws. Doc. 52 at 23. But that incorrect rule would put organizations in a Catch-22: Organizations couldn't challenge a law that bears on their activities because they already spend money on those activities. And anything that *doesn't* bear on their activities is irrelevant to their mission. Unsurprisingly, no court frames organizational interests so broadly. When voter registration organizations spend more money registering additional voters because of a State's alleged registration deficiencies, they have standing. *ACORN*, 178 F.3d at 360-61; *see also OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (holding that a voter engagement organization had standing because it spent "additional time and effort" on its activities as a result of the challenged provision). When political parties spend more money running additional election activities because the State runs the elections longer than federal law allows, they have standing.

Courts across the country have thus found standing in situations like this one. The Democratic Party had standing to challenge ballot-counting procedures because it would have to "retool [its] [get-out-the-vote] strategies and divert more resources to ensure that low-efficacy voters are returning their early mail ballots." *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018), *rev'd and remanded sub nom. on other grounds*, *Brnovich*, 141 S. Ct. 2321. "[M]ultiple courts have held" that the Democratic Congressional Campaign Committee had standing to challenge laws that cause it to "divert resources away from engaging and mobilizing voters." *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 45 (S.D.N.Y. 2022) (collecting cases). And "declaration evidence" that political organizations would have to divert resources

from "phone banking, finding canvassing volunteers, in-person and written get-out-the-vote efforts," and other activities was "enough to confer standing even where the added cost has not been estimated and may be slight." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1335 (N.D. Ga. 2018). These cases are legion. *See, e.g.*, *Harding v. Edwards*, 484 F. Supp. 3d 299, 315 (M.D. La. 2020) (finding standing when organizations' missions were "rendered more onerous" by the challenged law); *La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504, 549-52 (W.D. Tex. 2022) (same); *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1177-85 (N.D. Ga. 2022) (same); *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1080-81 (W.D. Ark. 2022) (same); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1286 (N.D. Ga. 2020) (same). Plaintiffs have organizational standing.

### B.   The RNC and MSGOP have standing because the post-election deadline harms Republican candidates.

"A second basis for the [political party's] direct standing is harm to its election prospects." *Tex. Democratic Party*, 459 F.3d at 586. This electoral harm supports both direct organizational standing by the RNC and MSGOP, as well as their associational standing on behalf of Republican candidates.[1] "[C]andidates … have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast. An inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020). "In fact, it's hard to imagine anyone who has a more particularized injury than the candidate has." *Hotze*, 16 F.4th at 1126 (Oldham, J., dissenting). In brief, when election rules "illegally structure a competitive environment … parties defending concrete interests (e.g., retention of elected office) in that environment suffer legal harm under Article III."

---

[1] Associational standing has three requirements, and Defendants challenge only one: whether a member would have standing to sue in their own right. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). Defendants do not contest the other two requirements probably because they are easily satisfied here. This suit is at the core of the RNC's mission and member participation is not necessary because Plaintiffs seek only injunctive and declaratory relief. *See, e.g.*, *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

*Shays v. FEC*, 414 F.3d 76, 82 (D.C. Cir. 2005) (upholding standing of congressional candidates "waging reelection contests governed by" the challenged law). "Voluminous" authority shows that candidates and parties suffer injury when their "chances of victory would be reduced." *Tex. Democratic Party*, 459 F.3d at 587 & n.4 (collecting cases).

The Republican Party has competitive standing regardless of whether the post-election deadline actually favors one party over another. Republican candidates "'are at the very least harmed by having to anticipate other actors taking advantage of the regulations to engage in activities that otherwise would be barred.'" *Shays*, 414 F.3d at 87. As the Democratic National Committee has argued in this case, "[i]nterference with a political party's electoral prospects constitutes a particularized interest." Doc. 46 at 7. That is because ballot-receipt deadlines, like most election rules, "necessarily affect the way these politicians will run their campaigns." *Shays*, 414 F.3d at 87 (cleaned up). It is therefore sufficient that the post-election deadline forces both parties to work "to prevent their opponent from gaining an unfair advantage in the election process." *Owen v. Mulligan*, 640 F.2d 1130, 1133 (9th Cir. 1981). Put simply, counting late ballots "will harm electoral competition in Mississippi." Doc. 46 at 8.

In any event, the post-election deadline favors Democrats. Since at least 2010, Democrats have been more likely than Republicans to vote by mail. *See* Charles Stewart III, *How We Voted in 2022*, at 10, perma.cc/444Z-58ZY. "In 2020, the partisan gap in voting by mail opened up wide." *Id.* This fact is well-established across the country. In 2020, "Republican voters' use of vote by mail minimally increased from 40 percent to 42 percent, while Democratic voters' use increased from 35.5 percent to 61 percent." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 924 (11th Cir. 2023); *see also* Steven J. Mulroy, *Baby & Bathwater: Standing in Election Cases After 2020*, 126 Dick. L. Rev. 9, 44-45 (2021) ("It was well-recognized that 2020 Democratic voters were using mail balloting at a greater rate than the Republican voter plaintiffs."). "Democratic get-out-the-vote drives—which habitually occur shortly before election

day—may delay maximum Democratic voting across-the-board, and produce a 'blue shift' in late mail ballots." Ed Kilgore, *Why Do the Last Votes Counted Skew Democratic?*, Intelligencer (Aug. 10, 2020), perma.cc/R78D-3Q58. The intervenors argue that national statistics might be skewed by all-mail voting States such as California. *See* Doc. 16 at 62. They provide no evidence of that claim. And "[w]hile some of the interstate variability in these time series is accounted for by regional factors ..., changes in the time series are broadly consistent with changes in electoral practices, especially in recent years." Edward B. Foley & Charles Stewart III, *Explaining the Blue Shift in Election Canvassing*, Mass. Inst. of Tech. (2015), perma.cc/24FW-9CPZ. Mississippi doesn't track party registration, but in the RNC's experience running, participating, and studying elections, this phenomenon holds true in Mississippi. *See* Doc. 58-1 at 4-5. At the very least, it creates a genuine issue of material fact, which suffices at this stage. *See ACORN*, 178 F.3d at 357.

Regardless, Defendants are the ones moving to dismiss for lack of jurisdiction, which means they bear the burden of showing no genuine dispute that Mississippi Democrats tend to vote by mail less than Republicans. All the evidence is to the contrary, and any inferences must be drawn in Plaintiffs' favor, so Defendants have failed to carry their burden on that score. "To probe any further into these situations would require the clairvoyance of campaign consultants or political pundits—guises that members of the apolitical branch should be especially hesitant to assume," which is why courts generally do not "second-guess a candidate's reasonable assessment of his own campaign." *Becker*, 230 F.3d at 387.

Any doubt that a post-election deadline favors Democrats is extinguished by the Democratic National Committee's attempted intervention in defense of the deadline. In its intervention brief, the DNC claimed "a strong and particularized interest ... in seeing that Democratic candidates succeed." Doc. 46 at 1. It argued that interest "is especially pronounced" in this case because a win for Plaintiffs could "stack the deck in favor of

Republican candidates." Doc. 46 at 1. And "a decision invalidating Section 23-15-637 would harm Democratic candidates' election prospects." Doc. 46 at 9. The Court should take the DNC at its word. To be sure, whether the post-election deadline favors Republicans or Democrats is irrelevant to the merits. The deadline stands or falls on its compliance with federal law, not on which party it benefits. But the fact that both political parties agree that it favors Democrats is sufficient to show that Plaintiffs will suffer a competitive injury absent injunctive relief.

This competitive disadvantage is itself an injury in fact. By accepting late ballots that are disproportionately cast by Democrats, the Republicans "chances of victory would be reduced." *Tex. Democratic Party*, 459 F.3d at 586. Defendants would have the Court require Plaintiffs to show that "if all mail-in absentee ballots were received and counted on or before Election Day, … Republican candidates would win federal election contests that they would otherwise lose." Doc. 52 at 19. That's an impossible standard, which is why it's not the law. No one can predict what marginal factors will decide the outcome of an election, so the mere fact that a law "enable[s] their opponents to obtain an unfair advantage" inflicts an injury on candidates. *Owen*, 640 F.2d at 1132. "Several circuits," including the Fifth Circuit, have thus held that all that is required is that "the defendant's actions harm the candidate's chances of winning." *Nelson v. Warner*, 472 F. Supp. 3d 297, 304 (S.D.W. Va. 2020) (collecting cases) (citing *Tex. Democratic Party*, 459 F.3d at 587-88).

In other words, elections "are zero-sum," which is why "[a] benefit provided to [one] but not to others necessarily advantages the former … at the expense of the latter." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218-29 (2023). "Because a head-to-head election has a single victor, any benefit conferred on one candidate is the effective equivalent of a penalty imposed on all other aspirants for the same office." *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 38 (1st Cir. 1993); *see also Schulz v. Williams*, 44 F.3d 48, 52-53 (2d Cir. 1994) (affidavit satisfied

14

the competitive-injury test by stating that election rules "could siphon votes from the Conservative Party line and therefore adversely affect the interests of the Conservative Party"); *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (finding Democratic Party had standing because the challenged laws affected voters "who tend to vote disproportionately for Democratic candidates"), *rev'd and remanded sub nom. on other grounds*, *Brnovich*, 141 S. Ct. 2321.

Defendants' last-ditch argument is that Plaintiffs must *name* the candidates, as if they doubt that the Republican Party will run candidates in Mississippi in November. But this Court need not "blind" itself to what "all others can see and understand." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 867 (2020) (cleaned up). And the candidates' names are hardly a secret. Former President Donald Trump is the presumptive Republican nominee, although he will not become the official nominee until the Republican National Convention in July. *See* Doc. 58-1 at 2; Blair Decl. ¶10. Senator Roger Wicker is running for reelection as the Republican candidate to the Senate. Blair Decl. ¶11. Representatives Trent Kelly, Mike Ezell, and Michael Guest are running for reelection to the House. Blair Decl. ¶¶12, 14-15. And Ronald Eller will be the House candidate for District 2. Blair Decl. ¶13. All of these individuals will appear on the ballot in November, and all are affected by the post-election receipt of absentee ballots.

The cases Defendants cite dismissing for lack of competitive standing only confirm that Plaintiffs satisfy the requirements here. In *Taitz v. Democrat Party of Mississippi*, this Court found no competitive standing because the pro se plaintiffs did not allege that they "sought the nomination of their respective parties," "sought to be placed on the Mississippi ballot, either in the primary or general election," or that they "were competing on [the] ballot" at all. No. 3:12-cv-280, 2015 WL 11017373, at *20 (S.D. Miss. Mar. 31, 2015). *Taitz* does not apply here, where Plaintiffs represent Republican candidates who will appear on the ballot in November, and the Party itself is a plaintiff. And in *Jacobson*, the Eleventh Circuit explicitly did "*not decide* whether a political party

would have standing to challenge an electoral practice that harmed one of its candidates' electoral prospects in a particular election." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1251 (11th Cir. 2020) (emphasis added) (citing *Tex. Democratic Party*, 459 F.3d at 586). Plaintiffs have identified "particular candidate[s]" whose "prospects in a future election will be harmed." *Id.* That gives the RNC and MSGOP both "direct standing" as an organization and associational standing on behalf of the candidates it represents.

### C. The voters have standing because their right to a fair election is infringed by elections conducted in violation of federal law.

Voters have standing, too. After all, the plaintiffs who successfully enforced the election-day statutes in *Foster* were "Louisiana voters" who sued "the State's Governor and secretary of state," challenging the state election rules "as a violation of federal law." *Foster v. Love*, 522 U.S. 67, 70 (1997). That describes this case.

To start, the State relies on outdated law. The State claims that "[a]s a general rule, standing cannot be predicated on 'a "generalized grievance"' shared in substantially equal measure by all or a large class of citizens.'" Doc. 52 at 9 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). There's a reason the Supreme Court has cited *Warth* only twice in its 50-year history, and the most recent case walked back the rule the State relies on: that an interest "is widely shared" does not mean "that an interest is abstract." *FEC v. Akins*, 524 U.S. 11, 24 (1998). "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). "[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *Akins*, 524 U.S. at 24 (quoting *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989)). Indeed, standing is "particularly obvious" in election challenges "where large numbers of voters suffer interference with voting rights conferred by law." *Id.*

Vote dilution is the most obvious form of injury suffered by voters when unlawful votes are counted. Courts recognize that "vote dilution can be a basis for standing." *Wood*

*v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). This most often occurs in "the racial gerrymandering and malapportionment contexts," where one block of voters is "harmed compared to 'irrationally favored' voters from other districts." *Id.* Defendants would have that rule apply to racial redistricting, and nowhere else. *See* Doc. 62 at 20-21. But Plaintiffs here, no less than redistricting plaintiffs, "are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right possessed by every citizen to require that the government be administered according to law.'" *Baker v. Carr*, 369 U.S. 186, 208 (1962) (quoting *Coleman v. Miller*, 307 U.S. 433, 438 (1939)). Defendants rely on *Lance v. Coffman*, 549 U.S. 437 (2007), but that case had nothing to with the rules governing the counting of valid ballots, which is the paradigmatic case for dilution of votes. *Cf. Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." (citations omitted)).

Contrary to Defendants' position, the Supreme Court has extended the "equal weight for equal votes" principle beyond redistricting and apportionment. *Bush v. Gore*, 531 U.S. 98, 104 (2000). "Equal protection applies as well to the manner of [the] exercise" of the right to vote. *Id.* "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. That's precisely what happens when jurisdictions accept late ballots. Defendants demand "a point of comparison." Doc. 52 at 31; Doc. 62 at 21. Plaintiffs have provided several.

*First*, the post-election deadline specifically harms voters by damaging the relative weight of their ballot. That is not an injury "common to all members of the public," *Ex parte Levitt*, 302 U.S. 633, 636 (1937), or one that "all citizens share," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974). A Mississippi resident who didn't vote in the last election or didn't plan to vote in the upcoming election would not share that injury—they could not claim that *their vote* has been

harmed. The "impairment resulted from dilution by a false tally" is an injury unique to the voters included in the tally for that specific election. *Baker*, 369 U.S. at 208. That the injury "is widely shared" by other voters does not mean that it "is abstract." *Akins*, 524 U.S. at 24. If that were not the rule, no court could hear redistricting cases.

*Second*, the post-election deadline imposes different rules for mail-in ballots over in-person ballots. All in-person ballots must be received by election officials on election day. But mail-in ballots can continue to come in—and be counted—up to a week after election day. Defendants argue that this discrepancy "is premised entirely on the presumption that ballots received after election day are 'unlawful' under federal law." Doc. 62 at 29; *see also* Doc. 52 at 11 ("This allegation of injury presupposes that the Mississippi Statute does indeed violate federal law, which Defendant disputes."). But "[f]or standing purposes, [courts] accept as valid the merits of [the plaintiff's] legal claims." *FEC v. Cruz*, 596 U.S. 289, 298 (2022). And "[i]f correct on the merits, as [the court] *must assume* for standing purposes, [Plaintiffs'] challenge presents a clearly redressable injury." *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (emphasis added); *see also Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).

*Third*, the post-election deadline favors Democrats over Republicans. Plaintiffs have detailed the partisan advantage above. *See supra* Section I.B. It is enough to note here that partisan disadvantage is a standard injury caused by laws that, for example, "dilute[] the votes of Indiana Democrats." *Davis v. Bandemer*, 478 U.S. 109, 119 (1986) (collecting cases challenging redistricting rules that "minimize or cancel out the voting strength of racial or political elements of the voting population"), *abrogated by Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). The Supreme Court has held that partisan redistricting is nonjusticiable as a *prudential matter*, but the Court has never questioned that "diluting the electoral strength of Democratic voters" is a legitimate Article III injury. *Rucho*, 139 S. Ct. at 2492. Partisan injury is a concrete injury.

Defendants, however, would require Plaintiffs to show that late-arriving ballots are given *extra* weight in the counting, as if election officials were counting them twice. No vote-dilution case requires that. In this case, as in redistricting cases, each ballot counts only once. The mathematical "disadvantage" in the effectiveness of their vote that is the basis for standing in redistricting is the *same injury* that is the basis for standing here. *Baker*, 369 U.S. at 206. That "disadvantage to themselves as individuals," however slight, is an injury in fact, *Baker*, 369 U.S. at 206, "even if [those] harms may be difficult to prove or measure," *Spokeo*, 578 U.S. at 341.

Defendants rely on a handful of cases that dismissed vote-dilution allegations. Those cases have little persuasive value for several reasons. First, even courts that rejected vote-dilution standing did so because those plaintiffs "never describe[d] how their member voters will be harmed by vote dilution where other voters will not." *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1000 (D. Nev. 2020); *see also Wood*, 981 F.3d at 1315 (plaintiff conceded that "he is affected by Georgia's alleged violations of the law in the same way as every other Georgia voter"); *Bognet v. Sec'y Commonwealth of Penn.*, 980 F.3d 336, 358 n.13 (3d Cir. 2020) ("[T]he Voter Plaintiffs have not alleged that their votes are less influential than any other vote….."), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). Even in these skeptical courts, Plaintiffs' unique partisan injuries would have sufficed. Second, those cases primarily relied on predictions of future voter fraud for their theory of injury, which courts held was too speculative. *E.g.*, *Paher v. Cegavske*, 457 F. Supp. 3d 919, 925 (D. Nev. 2020); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 374 (D.N.J. 2020); *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. Dec. 9, 2020). But Plaintiffs' injuries here do not depend on some number of the late ballots being fraudulent. It's the fact that *all* of those ballots are *late* under federal law that produces the injury. Third, more recent cases have recognized that plaintiffs who allege that

"illegitimate votes dilute their own" vote have standing because their injuries "have 'a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts.'" *Green v. Bell*, No. 3:21-cv-493, 2023 WL 2572210, at *4 (W.D.N.C. Mar. 20, 2023).

Well-established precedent shows that parties, candidates, and voters have standing when their political effectiveness is diminished by the effects of a law. This conclusion is hardly surprising. The Supreme Court has a long history hearing cases brought by citizens and voters. *E.g.*, *Smiley v. Holm*, 285 U.S. 355, 361 (1932) ("citizen, elector and taxpayer"); *Wood v. Broom*, 287 U.S. 1, 4 (1932) ("citizen of Mississippi, a qualified elector under its laws"). And "political parties and candidates have standing to represent the rights of voters." *Bay Cnty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 422 (E.D. Mich. 2004) (collecting cases). Parties, candidates, and voters are those most affected by election rules. All have standing here.

### D.  Election officials suffer an injury when they are put in the position of enforcing unlawful rules.

Another independent basis for standing is Mr. Lamb. As a member of the George County Election Commission, Mr. Lamb is responsible for running the County's general and special elections, which includes preparing and printing ballots, hiring and training poll workers, compiling precinct results on election day, and certifying election results. Doc. 58-4 at 2. Mississippi law requires him to count ballots received after election day, but federal law requires that only ballots received by election day are to be counted. (Again, "[f]or standing purposes," the Court must "accept as valid the merits of [the plaintiff's] legal claims." *Cruz*, 596 U.S. at 298.) As a public officer, Mr. Lamb swore an oath to "faithfully support the Constitution of the United States and the Constitution of the State of Mississippi, and obey the laws thereof." Doc. 58-4 at 2. Because the federal and state law conflict, Mr. Lamb faces an impossibility in enforcing the law. And

Mississippi law empowers the Governor to remove county officers that fail to comply and enforce state law. *See* Miss. Code §§25-5-3, -5.

"There can be no doubt that" Mr. Lamb has "a 'personal stake in the outcome' of this litigation." *Bd. of Ed. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5 (1968). Having "taken an oath to support the United States Constitution," and "[b]elieving" the state law to violate federal law, he is "in the position of having to choose between violating [his] oath and taking a step—refusal to comply with [state law]—that would be likely to bring [his] expulsion from office." *Id.*; *see also City of El Cenizo v. Texas*, 890 F.3d 164, 185-86 (5th Cir. 2018) (plaintiffs had standing because state law "would force plaintiff local government officials to choose between violating their oaths of office to defend the U.S. Constitution and facing criminal penalties and expulsion from office").

Defendants claim that before removing Mr. Lamb from office, government officials would have to go through significant red tape. But that is cold comfort to Mr. Lamb, who must still decide whether to expose himself to that substantial risk of removal and inevitable public scrutiny that accompanies it. To be sure, "it is not enough for public officials to assert as an 'injury' the violation of their oaths of office where no adverse consequences would occur." *City of El Cenizo*, 890 F.3d at 186. Thus, where there was "*no danger* of expulsion" because the plaintiffs—who were elected officials— could not be removed from office *at all*, there was no standing. *Finch v. Miss. State Med. Ass'n*, 585 F.2d 765, 773 (5th Cir. 1978) (emphasis added), *modified*, 594 F.2d 163 (5th Cir. 1979); *see also Baxley v. Rutland*, 409 F. Supp. 1249, 1257 (M.D. Ala. 1976) (same); *Athanson v. Grasso*, 411 F. Supp. 1153, 1158 (D. Conn. 1976) (same). Similarly, plaintiffs who alleged "that *others* (those who adopted and signed the legislation) violated *their* oaths by impairing the contract rights of the boards of education" did not have standing because they did "not allege that compliance with state law will require them to violate their oaths to act constitutionally." *Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v. N.Y. State Tchrs. Ret. Sys.*, 60 F.3d 106, 112 (2d Cir. 1995).

The injury, in other words, is the necessary exposure to a variety of consequences if Mr. Lamb chooses to follow federal law. "There is no question" that the exposure to those harms meets "the second and third prongs of the standing." *City of El Cenizo*, 890 F.3d at 185-86. "The injury claimed by the plaintiffs stems directly" from the challenged law, and "[j]udicial invalidation of the [state law] would obviate the plaintiffs' concerns." *Id.* at 186. In *City of El Cenizo*, the plaintiffs faced "criminal penalties in addition to civil fines," which undoubtedly have as much red tape—if not more—than the discretionary removal from state office that Mr. Lamb faces here. *Id.* But the Fifth Circuit did not even mention the speculative aspects of a criminal investigation, prosecutorial discretion, charging decisions, grand jury proceedings, trial, and conviction. It was enough that the Hobson's choice would force the plaintiff to "face" those penalties "and expulsion from office" if he were to "disobey" state law. *Id.* Nothing more is required here.

**E.     Plaintiffs' injuries are certainly impending because the State insists it will enforce the post-election-day deadline this coming election.**

Defendants briefly argue that these injuries are not certainly impending. Meanwhile, the State continues to litigate this case for the purpose of *enforcing the law*. There can be no doubt that Defendants will count mail-in ballots received after election day. They represent in this case that they will. There is also no doubt that Defendants will receive mail-in ballots after election day. These two events are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Courts recognize that these conditions will inevitably arise when the election occurs, which is why they often enjoin laws governing ballot-counting in advance of elections. *E.g.*, *DNC v. Bostelmann*, 451 F. Supp. 3d 952, 983 (W.D. Wis. 2020) (enjoining election officials from *enforcing* an election-day deadline for absentee ballots, and judicially extending the deadline for an additional six days); *In re Ga. S.B. 202*, No. 1:21-cv-1259, 2023 WL 5334582, at *1 (N.D. Ga. Aug. 18, 2023) (enjoining election officials from rejecting

absentee ballots based on missing or incorrect birthdates); *Middleton v. Andino*, 488 F. Supp. 3d 261, 266 (D.S.C. 2020) (enjoining election officials from rejecting absentee ballots based on missing witness signatures); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018) (enjoining election officials from rejecting absentee ballots based on mismatched signatures). Unless the Court grants Plaintiffs' requested injunction, there can be "no genuine dispute" that Defendants will receive and count mail-in ballots after election day. Fed. R. Civ. P. 56(a).

## II.   Defendants have not shown that the post-election receipt of mail-in ballots is consistent with federal law.

On the merits, Defendants rely on assumptions, distractions, and loaded terms. They assume that a ballot is "cast" when it's placed in the mailbox, rather than delivered to an election official. They use loaded terms like "election" and "final selection" without explaining what they mean. But for over a century, the Supreme Court has defined these terms. The "election" means the "final choice" of a federal officer "by the duly qualified electors." *Newberry v. United States*, 256 U.S. 232, 250 (1921); *see also Foster v. Love*, 522 U.S. 67, 71 (1997) (consummation of the election requires the "combined actions of voters and officials"). These definitions compel the conclusion that ballots must be received by election day. History, too, proves that the receipt of ballots was the critical election-day event, but the two district courts that have addressed the merits of this issue have either overlooked or ignored the history of mail-in voting. *See Way*, 492 F. Supp. 3d at 369-73; *Bost v. Ill. State Bd. of Elections*, No. 22-cv-2754, 2023 WL 4817073, at *10-11 (N.D. Ill. July 26, 2023), *on appeal* No. 23-2644 (7th Cir.).

Because Defendants have neither text, nor history, nor precedent on their side, they distract with theories of congressional acquiescence and other methods of tea-leaf reading Congress's intent. But text, history, and precedent cut through these distractions. The election occurs when voters hand over their ballots to election officials. Extending that process beyond "the day" for federal elections violates federal law.

**A.** **The receipt of ballots by election officials marks the final act of selection.**

Defendants' textual arguments rest on unexplained assumptions about what it means to "cast" a ballot and "consummate" an election. The State argues that "Plaintiffs' entire case rests on a fiction that Mississippi law permits mail-in absentee voters to 'cast' their votes after Election Day." Doc. 52 at 2. That's false, the State says, because a ballot is "cast" when it is "deposited in the mail and postmarked." Doc. 52 at 2. But the State has no support for that definition. That's no surprise, as history and caselaw say the opposite. *E.g.*, *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944) (a ballot is cast when it is deposited "in the custody of election officials"). The State plucks a quote out of context from *Texas League of United Latin American Citizens v. Hughs*, 978 F.3d 136, 140 (5th Cir. 2020) (mentioning the "traditional option … for casting a mail-in ballot: mailing it"). *See* Doc. 52 at 25. Nothing in that case—or that quote—implies that merely mailing a ballot "consummates" the election. In the end, the State admits it has no support for its definition: it retreats to claiming "[i]t is axiomatic that a mail-in ballot is cast when it is mailed." Doc. 52 at 25. But that's an assumption, not an axiom.

The intervenors try a different theory. They claim that "once a Mississippi voter has completed their ballot and put it in the mail—relinquishing it from the voter's custody and control—the voter has made their 'final selection' and can neither alter nor withdraw the ballot." Doc. 62 at 27. But that definition runs headlong into *Foster*. The Supreme Court held that the "final selection" requires "the *combined* actions of voters *and officials*." 522 U.S. at 71 (emphases added). Filling out and relinquishing a ballot is only half of the "final selection." The voter must deliver it to the proper election "official" for the "final selection" to be complete. *Id.* "The fact that the ballot has to be marked before its casting can indicate the voter's intent, should not obscure the fact that it is still of no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made effective." *Maddox*, 149 P.2d at 115.

The reasons an election requires the joint action of voters and officials are plain. If ballots were "cast" merely when they were "postmarked," Doc. 52 at 2, a voter who mails her ballot to the Department of Public Safety would be entitled to have her ballot counted. If a ballot were "cast" merely when the voter "relinquish[ed] it from the voter's custody and control," Doc. 62 at 27, a voter who deposits her ballot in the trashcan at the polling place would have made her "final selection." Neither ballot is valid because, "[o]bviously, unless it reaches the officials it is never cast at all, whether or not it is marked for any candidate, or forwarded by mail or otherwise." *Maddox*, 149 P.2d at 115. For the same reason, a voter is not disenfranchised when she gives her mail-in ballot to a family member to take the post office, and the family member forgets to deliver the mail.

Every ballot must be "received by the registrar" to be valid. Miss. Code §23-15-637(1)(a). That act marks the "final selection" that "consummate[s]" the election. *Foster*, 522 U.S. at 71, 72 n.4. The problem is that Mississippi allows that act to occur up to a week after election day. And that violates federal law. *See Maddox*, 149 P.2d at 115 ("Therefore in so far as Chapter 101 purports to extend beyond the election day the time within which voters' ballots may be received by the election officials for the election of presidential electors, it is in conflict with the constitutional congressional Act which requires the electing to be done on election day."). Until the ballot is in the hands of the proper election official, the "final selection" has not occurred. The fact that Mississippi mail-in ballots need a postmark only confirms that the hands of the postal worker are not the right hands.

### B.   Defendants' counterarguments can't overcome the Supreme Court's interpretation of the election-day statutes.

Because they have no answer for when an election is consummated, Defendants turn to red herrings. First, they suggest that this case turns on whether there is a "direct conflict" between state and federal law. Doc. 52 at 26-27; Doc. 62 at 23 (citing *Voting*

*Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000)). But that just begs the question. To answer whether there is a "direct conflict," the Court must resolve what it means to conduct an "election." That's what the Supreme Court did in *Foster*: it determined that Louisiana's open-primary system effectively conducted and consummated the election before election day, thus violating the election-day statutes. *Foster*, 522 U.S. at 74. Defendants, it seems, would have argued that the Court should have just held that the plain text of the election-day statutes is silent about open primaries, so there was no "direct conflict" between the open-primary law and the election-day statutes. But the Supreme Court did not shirk its duty to interpret the law. Instead, it provided important holdings for the meaning of an "election" and what it means to "consummate" an election outside of election day. *Foster*, 522 U.S. at 74.

So the State runs away from *Foster*. *See* Doc. 52 at 27 n.3. The State insists the Court "limit[ed] its holding to the facts of that case." *Id*. And the intervenors emphasize that *Foster* concerned consummating an election "*prior to* federal election day." Doc. 62 at 25 (quoting *Foster*, 522 U.S. at 72 n.4). But Defendants don't confront the necessary conclusion of *Foster*: consummation is the receipt of ballots by the State. That conclusion is necessary to *Foster*'s holding. And consummating an election *after* election day is no less a violation of "the day" for the election. 2 U.S.C. §7; *see also Maddox*, 149 P.2d at 115 ("extend[ing] beyond the election day the time within which voters' ballots may be received by the election officials for the election of presidential electors … conflict[s] with the constitutional congressional Act").

The intervenors try to avoid that conclusion by pointing to other administrative acts that occur after election day. *See* Doc. 62 at 26-27. But none of these administrative acts are the "combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 74. States have always canvassed votes, conducted recounts, heard election challenges, and announced results days or weeks after election day. None of those administrative acts involves the casting of ballots. And when voters

*do* have to cast ballots after election day—in runoffs and vacancies—Congress carved out explicit exceptions. *See* 2 U.S.C. §8(a) (permitting States to conduct elections when a "vacancy is caused by a failure to elect at the time prescribed by law" or "by the death, resignation, or incapacity of a person elected"). Unlike administrative acts such as counting ballots and certifying results, runoffs and vacancies renew the opportunity for consummation by allowing election officials to receive additional ballots. That is why Congress had to "create[] an exception to section 7's absolute rule in [that] limited class of cases." *Busbee v. Smith*, 549 F. Supp. 494, 526 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).

Next, Defendants pivot to congressional acquiescence. For several reasons, the doctrine doesn't apply here. First, it generally refers to the idea that "Congress has acquiesced to an agency or judicial interpretation," not a *state practice*. *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1196 (11th Cir. 2019); *see also CFTFC v. Schor*, 478 U.S. 833, 847 (1986). Second, the Supreme Court has "reasserted in no uncertain terms [its] oft-expressed skepticism toward reading the tea leaves of congressional inaction," because courts "have no idea" whether Congress's inaction is merely its "failure to express any opinion." *Rapanos v. United States*, 547 U.S. 715, 749-50 (2006) (plurality op.). Third, even if it applied here, the proponent of congressional acquiescence "bears the burden of showing 'abundant evidence that Congress both contemplated and authorized' the previous noncongressional interpretation in which it now acquiesces." *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1438 (10th Cir. 1996) (quoting *Schor*, 478 U.S. at 847). Defendants have not carried that heavy burden.

In any event, Congress has not acquiesced. As Plaintiffs' opening brief explains, history shows that for decades after Congress enacted the election-day statutes, States did not count mail-in ballots received after election day. *See* Doc. 60 at 12-17. The handful of laws in the late 20th century, and the very recent surge of laws due to COVID are not evidence that Congress has approved the practice of accepting ballots after

election day. *Foster* itself, after all, invalidated a quarter-century-old state primary system. *Foster*, 522 U.S. at 70.

Defendants also argue that federal law permits counting ballots after election day. *See* Doc. 52 at 28-29; Doc. 62 at 7 n.6. That is false. Other courts have erroneously relied on the Uniformed Overseas Citizens Absentee Voting Act (UOCAVA) to conclude that Congress "allow[s] ballots received after Election Day to be counted." *Bost*, 2023 WL 4817073, at \*11. UOCAVA merely requires overseas voters to mail in their ballots in compliance with the law of the State in which they're voting. 52 U.S.C. §20304(b)(1). It doesn't adopt, incorporate, or approve of those deadlines—it just declines to set a deadline itself. And it did so in 1986, long before most States adopted their post-election mail-in deadlines. UOCAVA also requires States to send ballots to overseas voters "not later than 45 days before the election." 52 U.S.C. §20302(a)(8)(A). In rare circumstances, States miss that deadline. When that happens, the Department of Justice has secured court-ordered extensions to the ballot-receipt deadline as an *equitable remedy* for the State's violation of UOCAVA. *E.g.*, *United States v. West Virginia*, No. 2:14-cv-27456, 2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014). That practice says nothing about the meaning of the election day statutes. UOCAVA does not extend the deadline for the receipt of ballots.

Even if UOCAVA said what Defendants think it says, it wouldn't help them. Where Congress has not acted, States have authority to determine the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, §4. But "Congress may at any time by Law make or alter such Regulations." *Id.* Congress could permit post-election-day receipt of ballots if it wanted to. In fact, it has considered and rejected such proposals. *See Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1171-74 (9th Cir. 2001) (detailing the legislative history of the election-day statute). Regardless, even if Congress had carved out an exception for overseas ballots, it would not mean it had carved out an exception for all ballots in Mississippi.

\*     \*     \*

Defendants have no coherent theory about what it means to hold an election consistent with the election-day statutes. They need to explain what it means to cast a ballot, consummate an election, and hold a final selection for office. The Supreme Court's understanding of those events is binding, and it's incompatible with the post-election-day receipt of mail-in ballots.

### C.   Defendants' violation of federal election law violates Plaintiffs' rights.

This is not an *Anderson-Burdick* case. Intervenors argue that the Court should apply the *Anderson-Burdick* balancing test, but that makes no sense—the test applies only to claims that a law "unfairly or unnecessarily burdens" the right to vote. *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983). That is, voters have a unique cause of action to challenge otherwise valid laws that "impermissibly burden the right to vote." *Burdick v. Takushi*, 504 U.S. 428, 430 (1992). Under those undue-burden claims, "a court 'must weigh the character and magnitude of the asserted injury' to voting rights 'against the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Tex. League of United Latin Am. Citizens*, 978 F.3d at 143 (citation omitted). Plaintiffs' claim is not that the Mississippi law "burdens" their right to vote and stand for office, but that it *violates* those rights because it violates federal law. The violation of Plaintiffs' rights depends entirely on whether Mississippi's ballot-receipt deadline conflicts with federal law.

The Court need look no further than *Foster* to see that the *Anderson-Burdick* test is irrelevant. In *Foster*, the Court held that Louisiana's open-primary statute violated the rights of Louisiana voters because it conflicted with the federal election-day statutes. *Foster*, 522 U.S. at 74. Here, Plaintiffs ask this Court to hold that Mississippi's ballot-receipt statute violates the rights of Mississippi voters, parties, and candidates because it conflicts with the federal election-day statutes. Plaintiffs here, just like the

plaintiffs in *Foster*, seek "declaratory and injunctive relief … under 42 U.S.C. §1983." *Love v. Foster*, 90 F.3d 1026, 1028 (5th Cir. 1996), *aff'd*, 522 U.S. 67; *see also Bomer*, 199 F.3d at 774 (same); *Millsaps v. Thompson*, 259 F.3d 535, 542 (6th Cir. 2001) (same). The Court in *Foster* did not apply the *Anderson-Burdick* test; it did not analyze whether Louisiana's open-primary statute imposed a burden on voters, or whether the State had a legitimate interest in holding open primaries. So, too, the Court here should not analyze any burdens or state interests. They are irrelevant to whether the Mississippi statute conflicts with federal law.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' motions for summary judgment.

Dated: April 9, 2024

Thomas R. McCarthy*
Conor D. Woodfin*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
conor@consovoymccarthy.com

*pending *pro hac vice* admission

Respectfully submitted,

*s/ Spencer M. Ritchie*

Spencer M. Ritchie (MSB #103636)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201
(601) 960-3172
spencer.ritchie@formanwatkins.com

*Counsel for Plaintiffs in
Case No. 1:24-cv-25*

## **CERTIFICATE OF SERVICE**

I certify that on April 9, 2024, the foregoing document was filed on the Court's CM/ECF system, which notifies all counsel of record.

<u>*s/ Spencer M. Ritchie*</u>

Spencer M. Ritchie
*Counsel for Plaintiffs in*
*Case No. 1:24-cv-25*