IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

REPUBLICAN NATIONAL COMMITTEE,
et al.,

                 Plaintiffs,

     v.

JUSTIN WETZEL, et al.,

                Defendants.

No. 1:24-cv-25-LG-RPM
(lead case)

LIBERTARIAN PARTY OF MISSISSIPPI,

                Plaintiff,

     v.

JUSTIN WETZEL, et al.,

                Defendants.

No. 1:24-cv-37-LG-RPM
(consolidated)

**PLAINTIFF LIBERTARIAN PARTY OF MISSISSIPPI'S
MEMORANDUM IN SUPPORT OF ITS COMBINED
OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
<u>FILED BY ORIGINAL DEFENDANTS AND INTERVENOR DEFENDANTS</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

INTRODUCTION ..................................................................................................1

SUMMARY JUDGMENT STANDARD ..............................................................3

ARGUMENT ......................................................................................................3

I.     Plaintiff Has Standing ................................................................................3

        A.     Plaintiff Has Shown Cognizable Organizational Injuries.......................4

                1.     Plaintiff's Traditional Economic Injuries ....................................5

                2.     Plaintiff's Injuries from a Diversion of its Resources ..............11

                3.     Injury to Plaintiff's Electoral Prospects....................................12

                4.     Injury to Plaintiff's Interest in an Accurate Vote Tally ............13

        B.     Plaintiff Has Alleged and Shown Cognizable Associational Injuries ..................15

                1.     Plaintiff Has Associational Standing on Behalf of its Candidates.............15

                2.     Plaintiff Has Associational Standing on Behalf of its Voters...................18

II.     Federal Election Day Statutes "Necessarily Displaced" Mississippi's Authority to Extend the Ballot Receipt Deadline Past Election Day ....................20

        A.     The Meaning of "The Election" and "Combined Actions" Speaks to What State Authority Was Displaced.................................................20

        B.     Neither the Text nor the Original Public Meaning of "the Election" Provide Authority to States to Create a Voting "Mailbox Rule" ...................... 22

        C.     Arguments Against Displacement of State Authority Rely on Courts Not Scrutinizing Claims of Long Congressional Tolerance .........................24

         D.     Plaintiff's Claims Are Consistent with Circuit Early Voting Case Law Relied on By Defendants and Intervenor-Defendants......................................28

        E.     Defendants' Accepting of Late Arriving Absentee Ballots Violates Plaintiff's First and Fourteenth Amendment Rights.................................................29

CONCLUSION..................................................................................................................32

## **TABLE OF AUTHORITIES**

**Cases**                                                                       **Page No.**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ..........................................................1, 29

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ......................... *passim*

*Baker v. Carr*, 369 U.S. 186 (1962).................................................................................26

*Beck v. Somerset Techs., Inc.*, 882 F.2d 993 (5th Cir. 1989)........................................23

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................3, 19

*Bognet v. Boockvar*, 2020 U.S. Dist. LEXIS 200923 (W.D. Pa. Oct. 28, 2020).........10

*Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3rd Cir. 2020)....................9, 16

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024)...............................................5

*Bost v. Ill. State Bd. of Elections*,
    2023 U.S. Dist. LEXIS 129509 (N.D. Ill. Jul. 26, 2023)...........9, 10, 19, 22, 31

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) .........................................................22

*Burdick v. Takushi*, 504 U.S. 428 (1992)................................................................17, 29

*Bush v. Gore*, 531 U.S. 98 (2000)...................................................................................1

*Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70 (2000)....................................1

*Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000) ..................................................9

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020).........................................1, 13, 14, 16

*Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28 (2020) ...........................28

*Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006).........................................1

*Dep't of Educ. v. Brown*, 143 S. Ct. 2343 (2023) ..........................................................3

*Doe v. United States Imm. & Customs Enf't*, 490 F. Supp. 3d 672 (S.D.N.Y. 2020)....8

*Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297 (5th Cir. 2005) .....................5

*Ex parte Siebold*, 100 U.S. 371 (1880) ...................................................2, 20, 21, 30, 31

*Ex parte Yarbrough*, 110 U.S. 651 (1884)........................................................................30

*FEC v. Akins*, 524 U.S. 11 (1998)..................................................................................19

*FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638 (2022) .........................................3, 17-18

*Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596 (E.D. Wis. 2020) ............18, 19

*Foster v. Love*, 522 U.S. 67 (1997)............................................................... *passim*

*Gill v. Whitford*, 585 U.S. 48 (2018)..............................................................................19

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) ........................................20, 25, 26

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ....................................................7

*Hotze v. Hudspeth*, 16 F.4th 1121 (5th Cir. 2021)..........................................................13

*Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173 (1979)..........................30

*Ill. Conservative Union v. Illinois*,
    2021 U.S. Dist. LEXIS 102543 (N.D. Ill. June 1, 2021) ...................................31

*Jackson Mun. Airport Auth. v. Harkins*,
    2024 U.S. App. LEXIS 7846 (5th Cir. April 2, 2024).........................................5

*Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000) ....................................................8, 11

*Lance v. Coffman*, 549 U.S. 437 (2007) ..........................................................................7

*Libertarian Party of Ill. v. Scholz*, 872 F.3d 518 (7th Cir. 2017) ..............................8, 11

*Lubin v. Panish*, 415 U.S. 709 (1974)..............................................................................9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................1, 3, 4, 14, 19

*McPherson v. Blacker*, 146 U.S. 1 (1892) .......................................................................1

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001) ....................................................29

*Moore v. Circosta*, 494 F. Supp. 3d 289 (M.D.N.C. 2020) ...........................................18

*Moore v. Ogilvie*, 394 U.S. 814 (1969)............................................................................1

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986).............................................1, 30

*NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010) .................................................................11, 12

*Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253 (D. Utah 2015)................................................31

*Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004) ..........................................................................1, 30

*Pond v. United States*, 69 F.4th 155 (4th Cir. 2023).....................................................................23

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .........................................................................................19

*Republican Party v. Boockvar*, 141 S. Ct. 1 (2020)......................................................................10

*Republican Party v. Degraffenreid*, 141 S. Ct. 732 (2021) ..........................................................10

*Reynolds v. Sims*, 377 U.S. 533 (1964)..........................................................................................19

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) ................................................................................28

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........................................................................1, 3, 18

*Storer v. Brown*, 415 U.S. 724 (1974) ...........................................................................................17

*Tashjian v. Republican Party*, 479 U.S. 208 (1986)......................................................................15

*Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) ...................................... *passim*

*Tex. State LULAC v. Elfant*, 52 F.4th 248 (5th Cir. 2022)...............................................................8

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ..................................................................4, 5

*Trump v. Wis. Elections Comm'n*, 983 F.3d 919 (7th Cir. 2020) ....................................1-2, 10, 14

*United States v. Classic*, 313 U.S. 299 (1941)................................................................................1

*United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950) ..............................................................10

*US Inventor, Inc. v. Vidal*, 2022 U.S. App. LEXIS 27454 (5th Cir. Sept. 30, 2022) ...................11

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir. 2000)..........................................29

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (6th Cir. 2001)..............................27, 29

*Warth v. Seldin*, 422 U.S. 490 (1975) ...........................................................................................18

*Young Conservatives of Tex. Found. v. Univ. of N. Tex.*,
   569 F. Supp. 3d 484 (E.D. Tex. 2021)........................................................................................5

**Federal Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 1 ................................................................22

U.S. Const. art. I, § 4 cl. 1 ..........................................................20, 21, 31

U.S. Const. art. II, § 1 cl. 4 .........................................................20, 21, 31

**State Constitutional Provisions**

Ariz. Const. Art. VIII ......................................................................21

**Federal Statutes**

2 U.S.C. § 1 .....................................................................................2

2 U.S.C. § 7 ...........................................................................2, 26, 30

3 U.S.C. § 1 ................................................................................2, 30

3 U.S.C. § 21 ...................................................................2, 24, 25, 26

26 U.S.C. § 7502 ...........................................................................23

42 U.S.C. § 1983 ...........................................................................10

52 U.S.C. § 20508 .........................................................................21

52 U.S.C. § 21082 .........................................................................28

**State Statutes**

10 ILCS 5/19-8 ..............................................................................27

25 Pa. Cons. Stat. § 3511 ...............................................................27

Ala. Code § 17-11-18 .....................................................................27

Ark. Code. Ann. § 7-5-411 .............................................................27

Cal. Elec. Code. § 3020 ..................................................................27

D.C. Code § 1-10001.05 .................................................................27

Fla. Stat. § 101.6952 ......................................................................27

Ga. Code Ann. § 21-2-386 ...........................................................................................27

Ind. Code § 3-12-1-17 ...............................................................................................27

Kan. Stat. Ann. § 25-1132 .........................................................................................27

Mass. Gen. Laws ch. 54, § 93 ...................................................................................27

Md. Code Regs. 33.11.03.08 .....................................................................................27

Mich. Comp. Laws § 168.759a .................................................................................27

Miss. Code Ann. § 23-15-637 ..............................................................................4, 27

Miss. Code Ann. § 23-15-785 ...................................................................................15

Mo. Rev. Stat. § 115.920 ..........................................................................................27

Nev. Rev. Stat. § 293.269921 ...................................................................................27

N.J. Stat. Ann. § 19:63-22 ........................................................................................27

N.Y. Elec. Law § 8-412 ............................................................................................27

Or. Rev. Stat. § 253.070 ............................................................................................27

R.I. Gen Laws § 17-20-16 .........................................................................................27

S.C. Code Ann. § 7-15-700 .......................................................................................27

S.C. Code Ann. § 7-17-10 .........................................................................................27

Tex. Elec. Code Ann. § 86.007 .................................................................................27

Utah Code Ann. § 20A-3a-204 .................................................................................27

Va. Code Ann. § 24.2-709 .........................................................................................27

W. Va. Code § 3-3-5 ..................................................................................................27

**<u>Federal Rules</u>**

Fed. R. Civ. P. 56 ........................................................................................................4

**<u>Other Authorities</u>**

Cong. Globe, 42 Cong., 2d Sess. 676 (1872)...................................................................27

John C. Fortier & Norman J. Ornstein*, Symposium, Election Reform:*
    *The Absentee Ballot and the Secret Ballot: Challenges For Election Reform*,
    36 U. Mich. J.L. Reform 483 (2003) ................................................................27

Josiah Henry Benton, VOTING IN THE FIELD (1915) .............................................23, 24

Receipt and Postmark Deadlines for Absentee/Mail Ballots,
    Nat'l Conf. of State Legis ................................................................................27

Plaintiff Libertarian Party of Mississippi ("Plaintiff" or "Party"), through counsel, submits this Memorandum in Support of Its Opposition to Defendant Secretary of State Michael Watson, et al.'s Motion for Summary Judgment and Intervenor-Defendants Mississippi Alliance for Retired Americans, et al.'s Motion for Summary Judgment. ECF 53 and 54; ECF 61 and 62.

## INTRODUCTION

For at least 130 years the Supreme Court has assumed jurisdiction in cases involving candidates' claims that state time, place, or manner regulations burden their rights as federal candidates. *See*, *e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 23-24 (1892); *Moore v. Ogilvie*, 394 U.S. 814 (1969); *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Bush v. Gore*, 531 U.S. 98 (2000); and *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70 (2000).

Plaintiff Libertarian Party of Mississippi needs only to show one injury in fact for this Court to have jurisdiction under Article III. Plaintiff has shown six—four organizational and two associational injuries. The economic injuries, shown below as both organizational and associational injuries, easily satisfy controlling authority in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), and *Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006). In addition, Plaintiff has shown intangible but concrete injuries to long-recognized rights.[1] *See Spokeo*, 578 U.S. at 340-41 (noting that First Amendment injuries have been traditionally regarded as providing a basis for suit). Indeed, at least two Circuits recently affirmed that such injuries are cognizable because they are concrete and particularized. *See Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020) and *Trump v. Wis. Elections Comm'n*, 983 F.3d

---

[1]    Courts have long recognized the right to vote and right to stand for office. *See United States v. Classic*, 313 U.S. 299, 314 (1941)*; Nader v. Keith*, 385 F.3d 729, 737 (7th Cir. 2004) (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986)).

919, 924-25 (7th Cir. 2020). Defendant Watson misconstrues Plaintiff's non-economic injuries. ECF 54 at 9-12. Plaintiff does not contend that it has "standing due to an alleged conflict between the Mississippi Statute and federal law." *Id.* at 9. While it is true that Plaintiff has alleged a conflict and also an injury, the conflict is not *the injury*. As shown below, Plaintiff's injuries are to its own protectable interests as an organization, and to the interests of its candidates and members in a representative capacity. This court has jurisdiction to consider the merits.

With respect to the merits, Mississippi's authority to extend its ballot Receipt Deadline past Election Day was "necessarily displaced" by federal Election Day statutes.[2] *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013). Crucially, preemption under the Elections and Electors Clauses is different than under the Supremacy Clause. *Id.* at 13-14 (citing *Ex parte Siebold*, 100 U.S. 371 (1880)). The Supreme Court previously considered state authority that was displaced under the Election Day statutes. *Foster v. Love*, 522 U.S. 67, 71-73 (1997). It held that Congress displaced state authority to regulate deadlines for the "combined actions of voters and officials" meant to make a final selection of an officeholder, which together constituted "the election." *Id.* Plaintiff submits that these "combined actions" include ballot receipt, based on the historical electoral practices utilized under the common law during the Colonial, early Republic, Civil War, and Reconstruction eras. Plaintiff respectfully submits that the best evidence shows that the original public meaning of the term "the election" includes ballot receipt by state election officials.

---

[2]     In 1845, Congress passed the "Presidential Election Day Act," which is now codified as 3 U.S.C. § 1. 28 Cong. Ch. 1, 5 Stat. 721. Twenty-seven years later, Congress passed what is now 2 U.S.C. § 7, establishing the same day for congressional elections. In 1914, Congress enacted 2 U.S.C. § 1, which aligned Senate elections with Election Day; that statute is not at issue in this suit. In 2022, Congress enacted 3 U.S.C. § 21.

## SUMMARY JUDGMENT STANDARD

Plaintiff incorporates the standard it previously set forth in its Motion for Summary Judgment. ECF 56 at 11. Merits contentions are accepted as valid for the purposes of analyzing standing. *Dep't of Educ. V. Brown*, 143 S. Ct. 2343, 2353 (2023) (citing *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1647-48 (2022)). Accordingly, in evaluating Defendants' and Intervenor-Defendants' standing arguments, the Court must accept Plaintiff's claim that Mississippi's Receipt Deadline violates the federal Election Day statutes.

## ARGUMENT

### I.       Plaintiff Has Standing.

Standing under Article III requires a showing that the plaintiff (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 560-61 (citations omitted). An injury in fact is one in which plaintiff claims to have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (citations omitted). An injury may be "fairly traceable" even if it is not "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). "We have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Ted Cruz for Senate*, 142 S. Ct. at 1647 (citation omitted). "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. The Supreme Court has described a 'concrete' injury as an injury in fact, one that is real and not abstract, although it need not necessarily be tangible. *Spokeo*, 578 U.S. at 339-40. Concrete injuries can be either tangible (*e.g.*, bodily or financial harm)

or intangible (*e.g.*, violation of constitutional rights). *Id.* at 340-41; *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Plaintiff has alleged both types here.

Save Plaintiff's bylaws, neither Defendants nor Intervenor-Defendants offered any new materials or affidavits in support of their motions. Fed. R. Civ. P. 56(c)(2); *see generally* ECF 53 and 54; ECF 61 and 62. Thus, the record with respect to Plaintiff's injuries consists of the undisputed allegations in the complaint, much of which Ms. Hanson verified in her declaration. ECF 1 and ECF 55-3.[3] Ms. Hanson submitted a second declaration, which the Party filed concurrently with this Memorandum. Hanson 2nd Decl., Ex. 1. Neither motion seems to dispute that the extension of the Receipt Deadline has inflicted additional monetary and volunteer resource costs on Plaintiff. Rather, they challenge the legal significance of those expenses under *Lujan*.

Plaintiff has made the necessary showings to satisfy *Lujan* and establish that this Court has jurisdiction under Article III. Mississippi's authority to modify Election Day by extending its Receipt Deadline[4] is preempted by the federal Election Day statutes. Plaintiff, its members, and its candidates are injured, not by the alleged conflict with federal law but by its tangible and intangible effects on them. Because neither of the pending motions contend the Plaintiff has failed to satisfy the traceability or redressability requirements under *Lujan*, Plaintiff's opposition focuses on the injury in fact. *See* ECF 54 and 62.

### A.   Plaintiff Has Shown Cognizable Organizational Injuries.

Plaintiff has established four kinds of organizational injuries that support standing.

---

[3]   Plaintiff Libertarian Party of Mississippi's complaint was docketed in Case No. 1:24-cv-37-LG-RPM. Save that citation, all other citations to the record are to the docket for Case No. 1:24-cv-25-LG-RPM.

[4]   Miss. Code Ann. § 23-15-637(1)(a).

### 4.    Plaintiff's Traditional Economic Injuries.

"'[M]onetary harms' are among the '[t]he most obvious…traditional tangible harms' that 'readily qualify as concrete injuries under Article III.'" *Book People, Inc. v. Wong*, 91 F.4th 318, 331 n.63 (5th Cir. 2024) (quoting *TransUnion*, 141 S. Ct. at 2204); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("economic injury is a quintessential injury upon which to base standing") (citations omitted). As long as there is monetary harm, the amount does not matter. *Jackson Mun. Airport Auth. V. Harkins*, 2024 U.S. App. LEXIS 7846, at *11 (5th Cir. April 2, 2024) (en banc) (Ho, J., concurring) ("there's no *de minimis* exception to economic injury under Article III") (citations omitted). In particular, economic injury due to a preempted statute is sufficient to confer standing to challenge that statute. *See Young Conservatives of Tex. Found. V. Univ. of N. Tex.*, 569 F. Supp. 3d 484, 490-91 (E.D. Tex. 2021) (economic injury in the form of higher tuition rates conferred standing to challenge state law alleged to be preempted by federal law), *rev'd on other grounds sub. Nom. Young Conservatives of Tex. V. Smatresk*, 73 F.4th 304 (5th Cir. 2023); *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 301-02 (5th Cir. 2005) (economic injury due to restrictions on oil and gas drilling conferred standing to challenge city ordinance alleged to be preempted by state law).

In this case, Plaintiff's "traditional tangible harms" (*TransUnion*, 141 S. Ct. at 2204), *viz.*, the costs inflicted on it by the preempted Receipt Deadline, are injuries sufficient to confer standing. Plaintiff's complaint set forth allegations regarding how Mississippi's invalid Receipt Deadline cost it and its candidates money and resources. ECF 1 at ¶¶ 39, 43, and 47-51. In her first declaration, Vicky Hanson testified about and confirmed that the resource injuries traceable to the new Receipt Deadline incurred by Plaintiff and its candidates. ECF 55-3 at ¶¶ 15, 22-26. She explained that the Party's candidates rely on federal and state law in allocating their campaign

resources. *Id.* at ¶ 15. While Plaintiff is the third largest party in Mississippi, it remains a minor political party with very limited resources, especially relative to the two major parties. *Id.* at ¶ 22.

It is important for Plaintiff—as for any political party—to monitor the counting of absentee ballots. *Id.* at ¶ 18. Many ballots, especially late-arriving ballots, are incorrectly recorded or have discrepancies. *Id.* Pointing this out during canvassing will affect final vote totals. *Id.* Plaintiff and its candidates do not have resources to hire staff to monitor canvassing. *Id.* at ¶ 23. Plaintiff depends on campaign and party volunteers to monitor elections, who must take time off from work or away from family obligations to volunteer. *Id.* at ¶ 23. These resources have been so scarce that Plaintiff's ability to monitor post-election canvassing is often limited to precincts where volunteers live. *Id.* at ¶¶ 23-24.

While it has always been difficult, the task of finding money and volunteers to monitor canvassing has become more difficult for Plaintiff since Mississippi extended its ballot Receipt Deadline. *Id.* at ¶¶ 25-27. Plaintiff's ability to monitor election canvassing has been further diminished because the costs and resources needed to monitor during the five business days following Election Day have increased. *Id.* Plaintiff has so far been unable to field monitors for all five extra business days in the two elections since the law changed and is unlikely to be able to do so in the near term. *Id.* After 2020, Plaintiff is in an even worse relative position to the other parties given that the resource costs needed to participate in canvassing have increased substantially while it still has limited resources. *Id.* At ¶ 27.

The tangible burdens described by Ms. Hanson establish Plaintiff's injuries and, consequently, its standing to challenge Mississippi's Receipt Deadline. Her account accords with common sense. Whatever tasks a Mississippi political party or candidate performs during the course of a campaign, and however much time is devoted to them, the Receipt Deadline increases

those tasks and that time by five business days. Staffing a campaign for an additional five business days necessarily costs more than not doing so. This cost constitutes economic harm that confers standing.[5] Moreover, as Ms. Hanson's testimony confirms, monitoring the vote count during those five days is important to Plaintiff as a political party. If, in the alternative, Plaintiff must forgo this monitoring because it simply cannot afford it, Plaintiff is also harmed.

These injuries refute Defendants' and Intervenor-Defendants' repeated assertions that Plaintiff's claims are an "undifferentiated, generalized grievance about the conduct of government." ECF 54 at 10; *see id.* at 9-12; ECF 62 at 10-11. Specific, tangible costs inflicted on political parties and their candidates by an invalid ballot-receipt statute are not a "generalized grievance." The existence of these costs also fully distinguishes *Lance v. Coffman*, 549 U.S. 437, 442 (2007), where no economic harm was claimed, and "[t]he only injury plaintiffs allege[d] is that the law—specifically the Elections Clause—has not been followed."

Defendants and Intervenor-Defendants also wrongly assume that Plaintiff can *only* base standing on economic injuries by asserting a "diversion of resources" theory of the kind set forth in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *E.g.*, ECF 54 at 17 (Plaintiff must show "diverted resources"); ECF 62 at 11 (Plaintiff has "not suffered a cognizable diversion of resources injury"). These arguments are simply misguided, because Plaintiff's economic injuries do not have to be framed as "diversions of resources." In *Havens*, housing discrimination inflicted an intangible injury on a Virginia nonprofit by rendering it less able to achieve its stated goal of making "'equal opportunity in housing a reality in the Richmond Metropolitan Area.'" 455 U.S. at 368. The Supreme Court held "that when an organization's ability to pursue its mission is 'perceptibly

---

[5]     Note that Defendants and Intervenor-Defendants do not seem to dispute that the Receipt Deadline imposes additional resource costs on Plaintiff, but only the significance of that fact.

impaired' because it has 'diverted significant resources to counteract the defendant's conduct,' it has suffered an injury under Article III." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022) (citations omitted). The "diversion of resources need not be monetary," because the injury focuses on the organization's ability to pursue its mission. *Doe v. United States Imm. & Customs Enf't*, 490 F. Supp. 3d 672, 684 (S.D.N.Y. 2020) (citation omitted). This theory is one way for groups pursuing public or ideological interests to allege standing.

By contrast, courts have regarded economic injuries to political parties as sufficient, without more, for standing. Thus, in *Benkiser*, the Texas Democratic Party (TDP) challenged Republican Tom DeLay's late removal from the ballot based on a finding by the Republican Party that he was ineligible. The court held that "the TDP has direct standing because DeLay's replacement would cause it economic loss….the TDP would suffer an injury in fact because it 'would need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame.'" *Benkiser*, 459 F.3d at 586. The court did not mention, let alone require TDP to proceed under, a "diversion of resources" theory. Similarly, in *Libertarian Party of Ill. V. Scholz*, 872 F.3d 518, 522-23 (7th Cir. 2017), standing was based on a "full slate" requirement that "raise[d] the cost of ballot access to…the Libertarian Party and is a continuing burden on its ability to field candidates." *Scholz* did not mention *Havens* or rely on a "diversion of resources." And in *Krislov v. Rednour*, 226 F.3d 851, 856 (7th Cir. 2000), the plaintiffs challenged a statute requiring circulators to be registered voters in the political subdivision where a candidate was seeking office. Among the bases for standing was the fact that candidates had to "allocate additional campaign resources to gather signatures." *Id*. at 857.

There are logical reasons why tangible burdens on political parties are enough on their own to confer standing. As the *Benkiser* court noted, political parties are fundamentally different from

8

nonprofits or other associations pursuing what they judge to be the public good. A "political party's interest in a candidate's success is *not merely an ideological interest*. Political victory accedes power to the winning party, enabling it to better direct the machinery of government toward the party's interests." *Benkiser*, 459 F.3d at 587 (citation omitted) (emphasis added). Indeed, as members of a legislative body, winning candidates can craft laws of universal application enforced by the police power. It has long been recognized, moreover, that parties occupy a unique place in the American political system, because voters usually exercise their First and Fourteenth Amendment voting rights by voting for a party candidate. *See Lubin v. Panish*, 415 U.S. 709, 716 (1974) (if a law "unfairly or unnecessarily burden[s] either a minority party[] or an individual candidate[]…[t]he interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both"); *cf. Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) ("our cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'selects a standard bearer'") (citation omitted).

Intervenor-Defendants argue that Plaintiff's claim of "financial harm" is "indistinguishable from theories that both the Third Circuit in *Bognet* and the district court in *Bost* rejected." ECF 62 at 15; *see Bognet v. Sec'y Commonwealth of Pa*., 980 F.3d 336 (3rd Cir. 2020), *cert. granted, vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Bost v. Ill. State Bd. of Elections*, No. 22-2754, 2023 U.S. Dist. LEXIS 129509 (N.D. Ill. Jul. 26, 2023), *appeal pending*, No. 23-2644 (7th Cir. Argued Mar. 28, 2024). This is incorrect. Even ignoring the fact

that *Bognet* was vacated as moot by the Supreme Court,[6] the allegation there was that Mr. Bognet's campaign "expended additional funds to update voters and staff on the changes the Pennsylvania Supreme Court made to the mail-in voting requirements in its September 17, 2020 ruling." *Bognet v. Boockvar*, No. 3:20-215, 2020 U.S. Dist. LEXIS 200923, *11 (W.D. Pa. Oct. 28, 2020). As the district court noted, "Bognet has already made the expenditures. Therefore, granting the relief Bognet seeks would not address the expenditures he has already made. Further, to the extent Bognet made those expenditures to address a perceived future harm, it is unclear what harm he was seeking to avoid." *Id*. at *13. The situation here is materially different, because Plaintiff's candidates will face additional expenditures going forward, for as long as the Receipt Deadline is law. As for *Bost*, Plaintiff respectfully submits that it was wrongly decided, as counsel argued in the Seventh Circuit a few days ago. Among that decision's many paradoxes is the fact that it implied that a professional congressional campaign could have closed its doors before every ballot was even *received*.[7] Ms. Hanson has testified to the contrary. ECF 55-3 at ¶ 18.

---

[6] Plaintiff submits that the Court should not ignore *Bognet*'s vacatur. As the Supreme Court explained, if a civil case becomes "moot while on its way here," it "reverse[s] or vacate[s] the judgment" and "remand[s] with a direction to dismiss." *United States v. Munsingwear, Inc*., 340 U.S. 36, 39 (1950). That "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance….[T]he rights of all parties are preserved; none is prejudiced by a decision which…was only preliminary." *Id*. at 40. Precisely because it was "preliminary," we should hesitate to rely on it. Regarding *Bognet* in particular, only two months before it was vacated three justices in a related case found claims that the Pennsylvania Supreme Court violated the U.S. Constitution to be "sufficiently meritorious to warrant review." *Republican Party v. Degraffenreid*, 141 S. Ct. 732, 737 (2021) (Thomas, J., dissenting); *see id*. at 738 (Alito, J., dissenting); *see also Republican Party v. Boockvar*, 141 S. Ct. 1 (2020) (four votes favored granting an emergency petition).

[7] The decision in *Bost* failed to consider controlling Seventh Circuit precedent on candidate standing (*Trump*) and, as even the State of Illinois acknowledged during the appeal, wrongly held that official capacity defendants, sued under 42 U.S.C. § 1983, were immune.

In this case, Mississippi's Receipt Deadline forces Plaintiff and its candidates to choose either to devote additional campaign resources to monitoring the vote count in the five business days after an election, or, where they cannot afford to do, to suffer the risks inherent in failing to monitor the vote count. As was true in *Benkiser*, *Scholz*, and *Krislov*, the economic costs imposed by the challenged law confer standing on Plaintiff.

### 2.    Plaintiff's Injuries from a Diversion of its Resources.

In the alternative, notwithstanding the preceding argument that its economic injuries are sufficient on their own to confer standing, Plaintiff can also show that it has endured an injurious diversion of its resources because of the Receipt Deadline. "Under this theory, an organization has a cognizable injury if it exerts resources to counteract effects of an unlawful action by the Government." *US Inventor, Inc. v. Vidal*, 2022 U.S. App. LEXIS 27454, *13 (5th Cir. Sept. 30, 2022) (citation omitted). "Although the injury need only be an 'identifiable trifle'…it must nevertheless perceptibly impair the organization's ability to provide its activities[.]" *Id*. (citations omitted). Plaintiff must show how its use of resources to counter an unlawful act "actually differ[s] from" its "routine operations" or how it has "depart[ed] from its ordinary activities." *Id*. at *17. As an example of how this could be shown, Plaintiff might "identif[y] any specific projects that [it] had to put on hold or otherwise curtail in order to respond" to the unlawful action. *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (citation omitted).

Plaintiff and its members, supporters, and candidates are united by their common beliefs, and they organize, select, and promote the election of party standard bearers and others who share or promote their views. ECF 1 at ¶ 13. Funds, however, are in short supply, and in Ms. Hanson's considerable experience, volunteer hours are also hard to come by. ECF 55-3 at ¶¶ 22-24. Volunteer hours also tend to be capped, in the sense that volunteers typically do not increase their

participation as the Party's needs increase. Ex. 1, Hanson 2nd Decl. ¶ 3. Ms. Hanson plans to volunteer her own time, and also hopes to "recruit, train, allocate and assign volunteers" to monitor post-election ballot canvassing "at the central canvassing location in whatever county they monitored during Election Day." *Id.* at ¶ 7. Ms. Hanson also describes a list of activities she would prefer to perform instead "if the Party did not have to monitor the canvassing of post-election ballots," including "recruiting, training, allocating, and placing election monitors at poll sites on Election Day that we know to be problematic…[and] volunteers to challenge invalid ballots," as well as "working on getting out our vote on Election Day." *Id.* at ¶ 6. These are "specific projects" Plaintiff must "put on hold or otherwise curtail in order to respond" to the Receipt Deadline. *Kyle*, 626 F.3d at 238.

Plaintiff's injury due to a diversion of resources confers standing.

### 3.   Injury to Plaintiff's Electoral Prospects.

The Fifth Circuit in *Benkiser* held that another "basis for the TDP's [Texas Democratic Party's] direct standing is harm to its election prospects. The TDP's witnesses testified below that if the [Republican Party] were permitted to replace DeLay with a more viable candidate, then its congressional candidate's chances of victory would be reduced." 459 F.3d at 586. "While power may be less tangible than money, threatened loss of that power is still a concrete and particularized injury sufficient for standing purposes." *Id*. at 587.

Plaintiff has established the imminent threat of harm to its electoral prospects in two ways. First, Ms. Hanson testified that "many ballots, and particularly late-arriving ballots, are incorrectly recorded or have discrepancies," and that pointing this out on behalf of the Party during canvassing "will affect the final vote totals." ECF 55-3 at ¶ 18. If Plaintiff must forgo monitoring post-election ballots because it simply cannot afford to do so, its electoral prospects are reduced.

12

Second, Ms. Hanson testified that, in her experience going door to door, supporters of the Party tend to vote in person. This means that a higher proportion of late-arriving and, in Plaintiff's view, invalid ballots are cast for other parties, compared to votes cast on Election Day. Thus, these ballots diminish the Party's electoral prospects. ECF 55-3 at ¶ 27. Ms. Hanson also points out that even when a Party candidate has little chance of winning it is important to the Party that its vote total be as high as possible. "The public, the media, and politicians," as well as "donors…volunteers…future candidates for office…[and] new voters" judge the Party by these results. ECF 55-3 at ¶¶ 20-21.

Plaintiff's injury to its electoral prospects is sufficient to confer standing.

### 4.    Injury to Plaintiff's Interest in an Accurate Vote Tally.

Finally, Plaintiff as an organization has endured an injury to its interest in an accurate vote tally. In *Carson*, 978 F.3d at 1054, an extension to a ballot receipt deadline was adopted by means of a consent decree rather than by the action of the state legislature. Plaintiff presidential electors, who were recognized as "candidates" under Minnesota law, argued that this means of adopting the change was unlawful. *Id*. at 1057. The Eighth Circuit credited the plaintiffs' argument that "they have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast," holding that "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."[8] *Id*. at 1058. Note that the Eighth Circuit specifically rejected the

---

[8]    In *Hotze v. Hudspeth*, 16 F.4th 1121, 1124 (5th Cir. 2021), the issue of intangible candidate standing was raised but abandoned: "While [plaintiffs] addressed the separate question of candidate standing in passing in their brief to this court, we conclude that they failed to meaningfully brief that issue, therefore forfeiting it." *See id*. at 1126 (Oldham, J., dissenting) ("it's hard to imagine anyone who has a more particularized injury than the candidate has. And that presumably explains why the only non-vacated circuit authorities to confront this question have held that candidates do have standing to contest violations of election law").

idea that the standing it described was a generalized interest in having the law complied with. "The Electors here have standing independently as elector candidates. Their standing is not based on Minnesota's ability, or lack of ability, to 'enforce its duly enacted laws.'" *Id*. at 1058 n.1. *See also Trump*, 983 F.3d at 924-25 (candidate's injury based on alleged misuse of power by elections officials "is one that 'affect[s] [him] in a personal and individual way'") (citing *Lujan*, 504 U.S. at 560 n.1, and *Carson*, 978 F.3d at 1058).

The complaint in this action specifically alleges the injury described in *Carson*. ECF 1 at ¶¶ 40 and 52-53. Ms. Hanson explained the Party's interest in having a final vote tally that accurately reflects only legally valid votes cast. ECF 55-3 at ¶¶ 18-21 and 27. As a minor political party, the size of its vote tally is particularly important. ECF 55-3 at ¶¶ 19-21. This remains true even if its candidates have little chance of electoral success. *Id.* at ¶ 20. The size, both total and relative to the major parties, is the only opportunity for the Party to measure how its message resonates with Mississippians. *Id.* at ¶ 20. For example, it helps the Plaintiff evaluate whether a fluctuation in support is a protest vote against the major parties or in support of the Plaintiff's message. *Id.* Likewise, an unimpressive performance suggests Mississippians are turning away from the Party's message, affecting its ability to recruit donors, volunteers, future candidates, and register new members. *Id.* at ¶¶ 20-21. It is a measure of how voters perceive Plaintiff and other political parties are doing. *Id.*

Plaintiff has shown it has an interest in ensuring that the final vote tally accurately reflects the legally valid votes cast affords it standing.

**B.  Plaintiff Has Alleged and Shown Cognizable Associational Injuries.**

**1.  Plaintiff Has Associational Standing on Behalf of its Candidates.**

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Benkiser*, 459 F.3d at 587 (citation omitted). The Supreme Court has recognized political parties' associational rights to sue on behalf of their candidates. *See Tashjian v. Republican Party*, 479 U.S. 208 (1986).

In May 2024, 1051 delegates to the national Libertarian Party convention in Washington, D.C. will select the Party's next presidential candidate. Ex. 1, Hanson 2nd Decl. ¶ 19. The national Party has run a candidate for president every presidential election year for over 50 years, since 1972. *Id*. at ¶ 14. The national Party will run a candidate for president in 2024. *Id*. at ¶ 15. Ms. Hanson was a presidential and vice-presidential elector in 2020, and she expects, "with a high degree of certainty," to be a presidential and vice-presidential elector in 2024.[9] *Id*. at ¶ 18.

Plaintiff can establish associational standing on behalf of its presidential candidate; on behalf of Ms. Hanson, who is highly likely to be a presidential and vice-presidential elector for Mississippi; and on behalf of all other Party electors who will be selected. For all of the reasons set forth in the preceding section, these candidates "independently meet the Article III standing requirements." *Benkiser*, 459 F.3d at 587. These candidates face the prospect in all future elections of expending monetary and volunteer resources on post-election canvassing—or else of failing to do so and allowing ineligible ballots that will diminish their electoral totals to be accepted. They

---

[9]      In presidential elections Mississippi voters technically cast their votes for party-affiliated presidential electors. Miss. Code Ann. § 23-15-785.

also face the prospect of diminished electoral performance, both because those canvassing ballots in areas or in elections these candidates cannot afford to monitor will accept invalid ballots they otherwise would have objected to, and because mailed ballots tend to cut against the Libertarian Party. Finally, they face an intangible injury to the interest they share with every candidate, of "ensuring that the final vote tally accurately reflects the legally valid votes cast." *Carson*, 978 F.3d at 1058. There can be no doubt that "the interests the association seeks to protect are germane to the purpose of the organization"—namely, ensuring the election of its candidates—and that "neither the claim asserted nor the relief requested requires participation" of these candidates. *Benkiser*, 459 F.3d at 587. Accordingly, Plaintiff has associational standing on behalf of its candidates.

Defendants' arguments to the contrary are not persuasive. Citing *Bognet*, Defendants argue that, to claim an injury from inaccurate vote tallies, Plaintiff's candidates "would have to show that if all mail-in absentee ballots were received and counted on or before Election Day…Libertarian Party candidates would win federal election contests that they would otherwise lose." ECF 54 at 15. This proposed standard is utterly unworkable. Consider that it would mean that the only individuals with standing to challenge election regulations would be those who lost elections. No incumbent could ever sue. This makes no sense. This was not the standard in *Carson*, nor was it the standard applied in *Benkiser* in assessing competitive injury. To the contrary, that court accepted a claim of injury based on the contention that a "candidate's chances of victory would be *reduced*." *Benkiser*, 459 F.3d at 586 (emphasis added).

Indeed, it is unclear why Defendants rely on a vacated decision from the Third Circuit rather than a controlling decision from the Fifth Circuit. Defendants do argue that "[u]nlike *Benkiser*, this is not a case where Plaintiff is forced to spend money to combat the actions of an

16

opposing political party causing concrete harm to an individual candidate months before a particular election." ECF 54 at 20. If Defendants mean to emphasize that the danger to electoral prospects came from an opposing party, that is a classic distinction without a difference. The vector of the risk is irrelevant, as long as it is traceable to an unlawful action. If instead Defendants' challenge here was to name the candidates who are injured, Plaintiff has now done so.

Intervenor-Defendants suggest that Plaintiff objects to allowing "more ballots cast by qualified voters to be counted," and then make the unique argument that "it is far from clear that enfranchising more voters could cause anyone to be harmed in a way that is legally cognizable under Article III." ECF 62 at 11. Consider what Intervenor-Defendants appear to mean: that as long a person attempting to vote is a qualified voter, no plaintiff would have standing to object to any other legal defect concerning the acceptance of their ballot. Do Intervenor-Defendants mean that no plaintiff—no party, no candidate, no voter—has standing to object to a ballot from an otherwise qualified voter that is received 30 days late? Ninety days late? A year late? That is handwritten, with no envelope? That is submitted by email? Or through social media?

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Intervenor-Defendants later restate their point as follows: "Nor is there any basis for concluding that the 'harm' that *too many qualified voters will have their timely cast ballots counted* is cognizable under Article III." ECF 62 at 20. But this is an improper standing argument premised on their merits defense that the ballots are qualified and timely. *See Ted Cruz for Senate*, 142 S.

Ct. at 1647-48; *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff 's contention that particular conduct is illegal").

Plaintiff has alleged and proved associational standing on behalf of its candidates.

### 2.     Plaintiff Has Associational Standing on Behalf of its Voters.

In its Complaint, Plaintiff alleged an injury standing to challenge the unlawful receipt of absentee ballots after Election Day. *See* ECF 1 at ¶¶ 36-38, 40-42, 44-46, and 52-54. The Plaintiff's dilution injuries are supported by Ms. Hanson's declaration (ECF 55-3); Defendant Watson's "2022 General Election Absentee Report (Oct. 30)," Mississippi Secretary of State's Office, October 30, 2022 (ECF 55-4); and "State of Mississippi's Amended Certification of Vote for Elector for President and Vice President, Summary Report," Mississippi Secretary of State's Office, November 7, 2020. Exhibit 2 ("2020 Summary Report"). Reading together the 2022 Absentee Report and the 2020 Summary Report, the record shows that in 2020 Mississippi received as many as 23,255 ballots during the period between November 3, 2020 (Election Day) and November 10, 2020 (Receipt Deadline).[10] ECF 55-4 and Exhibit 2. This tranche of late-arriving ballots totaled as much as 1.7% of the total votes cast in the 2020 election. *See id.* Stated differently, for every 100 legal votes, there were 2 invalid votes in 2020.[11] *Id.*

Defendants argue Plaintiff's vote dilution injuries are a generalized grievance insufficient to support standing. ECF 54 at 12-15 (citing *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020), *Moore v. Circosta*, 494 F. Supp. 3d 289, 312-13 (M.D.N.C. 2020),

---

[10]     According to Intervenor-Defendants, "large numbers of Mississippians[']" ballots arrive during this five business days after Election Day. ECF 62 at 28.

[11]     Dilution the *injury*, as opposed the *claim*, certainly is an "intangible harm that has traditionally been regarded as providing a basis for a lawsuit" in American courts. *Spokeo*, 578 U.S. at 340-41.

and *Bost v. Ill. State Bd. of Elections*, 2023 U.S. Dist. LEXIS 129509 (N.D. Ill. July 26, 2023)). With the exception of *Bost*, which is currently on appeal, those cases involved claims of general vote dilution common to all voters (from admittedly legal votes) that were not "individual and personal in nature."[12] *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (citing *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found injury in fact." *FEC v. Akins*, 524 U.S. 11, 24 (1998) (citation omitted).

By contrast, the injuries to Plaintiff's members as voters who *vote on Election Day* are individual and personal in nature to them, since Defendants' acceptance of late arriving (i.e., invalid) ballots inflicts concrete and personalized injury by diluting their lawful and timely cast ballots. To be clear, Plaintiffs argue that, under the governing federal law, ballots received after Election Day are categorically invalid, in that they cannot lawfully be used to determine the outcome of a federal election. Again, the merits of this legal contention must be assumed valid for the purposes of evaluating standing.

Plaintiff has alleged and established standing on behalf of its voters.

\* \* \* \* \*

---

[12]     The plaintiffs in *Feehan* lacked standing for a number of reasons but relevant here is that their dilution injuries were based on unproven claims of voter fraud, making the injury untraceable under *Lujan*, as it resulted from independent actions of a third party. *Feehan*, 506 F. Supp. 3d at 608; *see Bennett*, 520 U.S. at 168. The instant motions for summary judgment have not challenged traceability of Plaintiff's shown injuries.

19

In sum, Plaintiff, in its capacity as an organization, has shown economic injury, diversion of resources, diminishment of its electoral prospects, and injury to its interest in an accurate vote tally, and can claim organizational standing on each of those grounds. Further, Plaintiff has alleged and proved associational standing on behalf of both its candidates and its members and supporters who vote for its candidates.

## II.   Federal Election Day Statutes "Necessarily Displaced" Mississippi's Authority to Extend the Ballot Receipt Deadline Past Election Day.

Congress has plenary authority over the timing of federal elections. U.S. Const. art. I, § 4 cl. 1 and art. II, § 1 cl. 4. It exercised this authority enacting a series of statutes establishing a national federal election day. In doing so, "it *necessarily* displace[d] some element of a pre-existing legal regime erected by the States." *See Inter Tribal*, 570 U.S. at 14, *aff'g Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012); *see also Siebold*, 100 U.S. at 391-92. Plaintiff brought these claims because under *Inter Tribal*, Mississippi's authority to modify ballot receipt beyond Election Day was "necessarily displaced" when Congress enacted the federal Election Day statutes. The guiding question in these proceedings is how much state regulatory authority did Congress "necessarily displace" when it enacted the Election Day statutes?

### A.   The Meaning of "The Election" and "Combined Actions" Speaks to What State Authority Was Displaced.

In *Foster*, the Supreme Court relied on the definition of "the election" to determine displaced state authority. 522 U.S. at 71-72. When "statutes speak of the election […] they plainly refer to the *combined actions* of voters and officials meant to make a final selection of an officeholder[.]" *Id.* (emphasis added). Applying this rubric, the Court held that Louisiana's open primary violated federal Election Day statutes because "the combined actions of voters and officials meant to make a final selection of an officeholder" concluded before Election Day. *Id.*

20

The Court defined the range of displaced state authority but did not fully specify which "combined actions of voters and officials" constituted "the election." *Id.* at 73. Based on the original public meaning of the phrase "the election," Plaintiff submits that the specific "combined actions" include ballot receipt by state election officials. *See* ECF 56 at 18-26. Stated differently, federal Election Day statutes displaced Mississippi's authority to extend these "combined actions of voters and officials" beyond Election Day.

The question of displaced state authority came up more recently in *Inter Tribal*. Like all states, Arizona requires individuals to be U.S. citizens to register to vote in federal elections. *Inter Tribal*, 570 U.S. at 6; *see also* Ariz. Const. Art. VIII, §2 (1912). In 2004, Arizona enacted a series of new requirements to further ensure that voter registration applicants were qualified to vote, including requiring voter registration applicants to submit proof of citizenship. *Id.* Several advocacy groups sued, challenging the state's authority to supplement the informational requirements included as part of the National Voter Registration Act of 1993 (NVRA). *Id.* To resolve this question, the Court evaluated Arizona's residual authority after the passage of the NVRA, which was adopted pursuant to Congress' authority under the Elections Clause. *Id.* at 12-13 (discussing 52 U.S.C. § 20508). The Court noted that the preemption analysis under the Elections and Electors Clause is different than the preemption analysis under the Supremacy Clause. *Id.* at 13-14 (citing *Siebold*, 100 U.S. 371). Even though state authority to require proof of citizenship was not expressly displaced by the NVRA's text, the Court ultimately ruled that Arizona could not read into federal law state authority to require additional informational proof

beyond the minimums established by the NVRA.[13] All that the NVRA required was that states must "accept and use" the federal form, which Arizona indisputably continued to do before the lawsuit. But the Court found that the NVRA's statutory requirements necessarily displaced Arizona's authority to expand the informational requirements beyond the federal form.

Mississippi is precluded from extending its Receipt Deadline for federal elections for the same reasons that Arizona was precluded from extending informational requirements to the federal registration form. The Election Day statutes displaced Mississippi's authority to make any regulation, like the Receipt Deadline, that effectively extends that day in any way.

**B.      Neither the Text nor the Original Public Meaning of "the Election" Provide Authority to States to Create a Voting "Mailbox Rule."**

Since *Foster*, there have been two developments that further assist this court in determining that preemption applies here.[14] First, the Supreme Court directed lower courts that, unless otherwise defined, words must be interpreted as taking their ordinary, common public meaning at the time of enactment. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020). Historical electoral practices under the common law during the Colonial, early Republic, Civil War, and Reconstruction eras provide the best evidence of the original public meaning of "the election" when the Election Day statutes were enacted. ECF 56 at 18-25. None of these practices allowed

---

[13]      Compared to Mississippi's Receipt Deadline, Arizona's information requirement seems like an unlikely candidate for preemption. States have substantially more authority to regulate voter qualifications versus regulating the timing of federal elections. *See Inter Tribal*, 570 U.S. at 16; *see also* U.S. Const. art. I, §2, cl. 1 (providing that state law determines the qualifications of congressional voters).

[14]      In addition to the errors previously noted, *supra* note 7, the district court in *Bost* also utterly failed to conduct the necessary analysis of the original public meaning of the term "the election."

post-election receipt.[15] *Id.* Most voting practices from those times, such as voting *viva voce*, by bean, or via ticket, were meaningless gestures unless and until the voter's specific intention was received by a state election official. *Id.* For this reason, the "combined actions of voters and officials" referenced in *Foster* must mean ballot *receipt* by a state election official.

While they do not use the phrase "mailbox rule," Defendants and Intervenor-Defendants effectively claim that, many years following the passage of the Election Day statutes, states retain the right to enact a special mailbox rule appliable to federal elections, where a ballot becomes a validly cast "vote" the instant it is deposited in a mailbox.[16] Like Arizona in *Inter Tribal*, this is an attempt to read into federal law residual state authority that does not exist.

Mississippi cannot claim it retains authority to create this mailbox rule simply because the text of the federal Election Day statutes does not *expressly* displace it. Express displacement is not necessary under the Elections Clause. Similarly, Mississippi cannot claim that it retained this authority based on any historical record or practice, since (as Plaintiff has shown) there was no common law right to vote absentee, and no equivalent to a mailbox rule. *See* ECF 56 at 19-20. Indeed, historical absentee practices, such as proxy voting and state-deputized military officials,

---

[15]     Indeed, the historical record *supporting* post-election receipt is threadbare. The lone exception that Plaintiff has encountered arose under Maryland's temporary Civil War constitution, which allowed soldiers to vote up to five days *after* Election Day. Josiah Henry Benton, VOTING IN THE FIELD 223 (1915), available at https://bit.ly/3P4OQaq. Plaintiff believes all Parties here would agree that a state law allowing voters to mark their ballot five days after Election Day violates federal law.

[16]     The "mailbox rule" is a common law contract doctrine where "[p]roof that a letter properly directed was placed in a U.S. post office mail receptacle creates a presumption that it reached its destination in the usual time and was actually received by the person to whom it was addressed." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citation omitted). On at least one occasion, Congress has provided a statutory "mailbox rule" that mirrors the common law rule for tax filings. *See Pond v. United States*, 69 F.4th 155, 162 (4th Cir. 2023) (citing 26 U.S.C. § 7502). But Congress never authorized such a rule for absentee ballots post-Election Day.

*emphasized* Election Day receipt.[17] ECF 56 at 20-24; *see also* Benton at 15-17 and 43 (describing the practice of establishing poll sites in the field during the Civil War that were operated by servicemen deputized under oath as state election "constables, supervisors, etc."). Indeed, the historical record supports the fact that federal Election Day statutes displaced state authority to extend Receipt Day past Election Day.

A recent development that reinforces the conclusion that state authority was displaced by the Election Day statutes is the passage of Electoral Count Reform Act ("ECRA"). 3 U.S.C § 21; *see also* ECF 56 at 17-18. While ECRA preserved the term "the election" as interpreted in *Foster*, Congress ceded back to the states specific, narrow authority related to Election Day. That is, in certain "force majeure events that are extraordinary and catastrophic[,]" not at issue here, states can modify the period for voting. 3 U.S.C. § 21. Any other state authority to modify "election day" or to modify the period for voting past Election Day necessarily remains displaced.

### C.   Arguments Against Displacement of State Authority Rely on Courts Not Scrutinizing Claims of Long Congressional Tolerance.

Defendants and Intervenor-Defendants address standing more than the merits and, in consequence, offer little historical support for their view that state's retained authority to extend ballot Receipt Deadlines. Their merits arguments argue that (1) Mississippi's Receipt Deadline operates "harmoniously" because the text of the Election Day statutes do not expressly forbid state regulation of receipt deadlines (ECF 54 at 25-29; ECF 62 at 25-26); (2) purported congressional tolerance, "acquiescence," or "silence" related to this "widespread and well known state practice"

---

[17]    Today's practice of allowing post-election receipt in Mississippi is nothing like the practice at remote Civil War poll sites operated by officers who were deputized under oath as state election officials. Those deputized officers were state actors ensuring timely receipt. "It was said that voting was a civil matter, which was under the control of civil officers, answerable for the performance of their duties to the civil and not military power." Benton at 17.

implicitly ratifies it (ECF 54 at 28-29; ECF 62 at 25); (3) any contrary reading threatens disenfranchisement (ECF 62 at 28); and (4) there are distinguishable rulings (ECF 54 at 28-29; ECF 62 at 25-28).

They largely ignore the text of the Election Day statutes, especially 3 U.S.C. § 21, resting instead on conclusory arguments that Mississippi's Receipt Deadline and the Election Day statutes work "harmoniously." They do not address how this can be reconciled with the newly created state powers to modify the period for voting, but *only* in force majeure events. The proper analysis of an Elections Clause enactment is to read the state and federal statutes together as if they came from the same legislature to see if there is a conflict. *Gonzalez*, 677 F.3d at 394. "If Congress addressed the same subject as the state law, we consider whether the federal act has superseded the state act, based on a natural reading of the two laws and viewing the federal act as if it were a subsequent enactment by the same legislature." *Id*. It would be impossible to read Mississippi's Receipt Deadline and 3 U.S.C. § 21 together and not conclude that federal Election Day statutes displaced state authority to extend receipt deadlines, except in specific force majeure events. Indeed, the federal Election Day statutes limit state authority every bit as much as the NVRA limited state registration laws in *Inter Tribal*. Mississippi's mailbox rule deserves the same fate as Arizona's informational requirement.

Intervenor-Defendants argue the Libertarian Party is "rely[ing] on an impossibly broad and unsupportable reading" of the Election Day statutes. ECF 62 at 26. This is a curious response to a reading that maintains Election Day as the voting deadline in a manner the public would have understood in 1845 and 1872.[18] Indeed, Plaintiff's reading is markedly straightforward compared

---

[18]     Plaintiff previously explained why a ballot is not a "vote" until received by state officials. *See* ECF 56 at 13-15.

to Intervenor-Defendants' argument that "'election day' means the Tuesday next after the first Monday in November [except for absentee ballots]" or that the "period for voting" in 3 U.S.C. § 21 does *not* include receipt deadlines. Plaintiff submits that it is the Intervenor-Defendants who are taking a "strained interpretation of the statutes" to reconcile an obvious conflict. *See Gonzalez*, 677 F.3d at 393.

The purported long Congressional tolerance for post-election receipt is not supported by the historical record. Intervenor-Defendants contend that "many other states have extended ballot receipt deadlines for decades" without citation or otherwise signaling the "decades" in question.[19] ECF 62 at 25. The historical record shows that until recently states adhered to Election Day receipt. *See* ECF 56 at 23-34 (describing proxy voting and Civil War poll sites conducted by civil deputized servicemen). While there have been a small number of states that experimented with and abandoned post-election receipt during the 20th century, the experiments appear to have been short lived, except perhaps one. ECF 56 at 25-26. But "many" have not done it for "decades." Regardless, any alleged tolerance must be kept in perspective. Congress "tolerated" Louisiana's open primary for 22 years and malapportionment for 94 years before the Supreme Court put an end to those practices.[20] *See Foster*, 522 U.S. at 20; and *Baker v. Carr*, 369 U.S. 186 (1962). Most

---

[19]    Amicus DNC contends that state post-election receipt regulations are an "unbroken historical practice" that has been going on for "centuries." ECF 57 at 21-22. This claim far exceeds any treatise Plaintiff has been able to find. In support of this claim, the DNC cites several statutes the oldest of which are from Pennsylvania (1813) and New Jersey (1815). Both statutes involved remote poll sites operated by officers deputized as state election officials. Benton at 189-193 (describing Pennsylvania's practice, which was struck down in 1838) and 269-70 (discussing New Jersey practice, which was repealed in 1818). The post-election receipt examples Amicus DNC refers to involve timely ballot receipt by *civilly deputized* poll workers, which supports Plaintiff's historical arguments.

[20]    Congress has repeatedly considered and rejected the idea of allowing multi-day Election Days. For example, during the debate surrounding 2 U.S.C. § 7, Congress considered and rejected

of the current state regulations allowing post-election receipt were enacted in the last 20 years, and typically more recently.

Defendants' and Intervenor-Defendants' argument regarding the long Congressional tolerance quickly falls apart when their other argument about this "widespread" practice is scrutinized.[21] ECF 54 at 28-29; ECF 62 at 25. Most state laws extending receipt deadlines beyond Election Day can be traced back to the federal response to the 2000 election controversy.[22] Almost every state that currently allows post-election receipt adopted this regulation *after* the federal government mandated that all states adopt provisional voting procedures under Section 302 of the Help America Vote Act of 2002 ("HAVA"). After that federal mandate, voting advocates viewed the newly mandated period for resolving eligibility questions for provisional voters as an

---

requests to make the designated day for national elections a multiday event. Cong. Globe, 42 Cong., 2d Sess. 676 (1872); *see also Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1172-74 (6th Cir. 2001).

[21]    Indeed, the vast majority of post-election receipt statutes were enacted *after* Congress enacted § 302 of HAVA in 2002, which created a post-election period for resolving questions about provisional ballots received on Election Day. *See* Tbl. 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots, Nat'l Conf. of State Legis., available at https://bit.ly/3vRBB5G; *see, e.g.,* Cal. Elec. Code. § 3020 (2014); D.C. Code § 1-10001.05(a)(10A) (2019); 10 ILCS 5/19-8 (2005); Kan. Stat. Ann. § 25-1132 (2017); Md. Code Regs. 33.11.03.08 (2004); Mass. Gen. Laws ch. 54, § 93 (2021); Miss. Code. Ann. § 23-15-637 (2020); Nev. Rev. Stat. § 293.269921(2021); N.J. Stat. Ann. § 19:63-22 (2018); N.Y. Elec. Law § 8-412 (1994); Or. Rev. Stat. § 253.070(3) (2021); Tex. Elec. Code Ann. § 86.007 (1997); Utah Code Ann. § 20A-3a-204 (2020); Va. Code Ann. § 24.2-709(B) (2010); W. Va. Code § 3-3-5(g)(2), 3-5-17(1993); Ala. Code § 17-11-18(b) (2014); Ark. Code. Ann. § 7-5-411(a)(1)(A) (2001); Ind. Code § 3-12-1-17(b) (2006); Fla. Stat. § 101.6952(5) (2013); Ga. Code Ann. § 21-2-386(a)(1)(G) (2005); Mich. Comp. Laws § 168.759a (2012); Mo. Rev. Stat. § 115.920(1) (2013); 25 Pa. Cons. Stat. § 3511(a) (2012); R.I. Gen Laws § 17-20-16 (2019); and S.C. Code Ann. §§ 7-15-700(a), 7-17-10 (2015).

[22]    From that controversy, two competing election reform visions arose. *See* John C. Fortier & Norman J. Ornstein, *Symposium, Election Reform: The Absentee Ballot and the Secret Ballot: Challenges For Election Reform*, 36 U. Mich. J.L. Reform 483, 484 (2003) (explaining how one view sought to improve poll sites while the other believed that poll sites discouraged voting and sought to promote voting by mail).

opportunity to allow post-election receipt of absentee ballots.[23] The reality is that almost none of the post-election receipt regulations are "decades" old, and many have existed for a shorter period than Louisiana's open primary in *Foster*.[24]

Intervenor-Defendants argue Plaintiff's reading of the federal Election Day statutes "would disenfranchise large numbers of Mississippians." ECF 62 at 28. They do not explain exactly how requiring Election Day receipt disenfranchises anyone. "[R]easonable election deadlines do not 'disenfranchise' anyone under any legitimate understanding of that term." *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay related to challenge to Wisconsin's Election Day deadline for absentee ballots). "This Court has long explained that a State's election deadline does not disenfranchise voters who are capable of meeting the deadline but fail to do so." *Id.* (citing *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)).[25]

### D.     Plaintiff's Claims Are Consistent with Circuit Early Voting Case Law Relied on By Defendants and Intervenor-Defendants.

Defendants and Intervenor-Defendants reliance on cases involving early voting practices fails to acknowledge the difference between the practices at issue in those cases. ECF 54 at 26-29; and ECF 62 at 27. Each ruling held that early voting did not violate federal law because unlike Louisiana's open primary in *Foster*, early voting practices do not consummate the election before

---

[23]     Section 302 emphasizes Election Day receipt, providing that provisional ballots are provisionally cast and "received" at "polling places" on Election Day pending resolution of any voter eligibility questions. 52 U.S.C. § 21082(a).

[24]     The issue comes up now given the exponential increase nationally in mail balloting. *See* ECF 56 at 25, n. 22.

[25]     One *Amici* outlines a parade of horribles that appears to respond to a complaint filed in some other case. ECF 50 at 15-19. Nothing Plaintiff alleged here could reasonably be viewed to "require" "collecting, tallying, and canvassing" to occur on Election Day evening, or that "destabilize election administration not just in Mississippi but in every state." *Id.* at 16.

Election Day. *See Keisling*, 259 F.3d at 1175-76; *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775-77 (5th Cir. 2000); *Millsaps v. Thompson*, 259 F.3d 535, 543-46 (6th Cir. 2001). Early absentee voting merely complements other "voting," which "still takes place on" Election Day, which was the day of the "final selection of an officeholder." *Keisling*, 259 F.3d at 1175, 1176 (quoting *Foster*, 522 U.S. at 71); *see also Bomer*, 199 F.3d at 776 ("Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day."). In *Keisling*, the Ninth Circuit noted that unlike *Foster* there was still "a residual ritual of in person voting at central election offices still to take place on [Election Day]."[26] *Id.* at 1175. No such "residual ritual" exists after Election Day in Mississippi. Instead, ballots still continue to come in five business days after the residual ritual mentioned in *Keisling*.

### E. Defendants' Acceptance of Late Arriving Absentee Ballots Violates Plaintiff's First and Fourteenth Amendment Rights.

By virtue of enforcing an unconstitutional state statute that burdens Plaintiff's candidates' rights to stand for office and members' rights to vote, Defendants have violated Plaintiff's statutory and constitutional First and Fourteenth Amendment rights.[27]

---

[26]    The Ninth Circuit ultimately determined that the "long history of congressional tolerance" of absentee voting was persuasive in that "difficult case." *Keisling*, 259 F.3d at 1175. Likewise, the Sixth Circuit noted in *Millsaps* the determining factor for it was the long history related to absentee voting, which it found indistinguishable from early voting. *Millsaps*, 259 F.3d at 547-49. As discussed herein, while there is a long history of absentee voting, there is no comparable long history of post-election receipt of absentee ballots.

[27]    At the outset, Defendants implicitly concede that the *Anderson-Burdick* test does not apply to the First and Fourteenth Amendment claims here. Plaintiff agrees. Plaintiff is not alleging that a facially valid regulation is a burden on voters. Rather, Plaintiff alleges that Mississippi's time regulation is invalid on its face and that it conflicts with a federal Time regulation and, therefore, violates federal law. Notably, *Foster* was decided after the Court's *Anderson* and *Burdick* decisions, and yet the *Foster* Court ignored the test. 522 U.S. at 74.

Defendants primarily argue that Plaintiff's members' constitutional rights to stand for office cannot be violated whenever a law does not impose any "legal impediment to any prospective candidate's placement on any given ballot." ECF 54 at 24. But a candidate's constitutional right to stand for office is not limited to whether the voting regulation restricts the candidate's ability to run. The Court has found that a burden on a candidate's rights is also a burden on a voter's right to freely associate and express political preferences. *See e.g.*, *Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Nader*, 385 F.3d at 737 ("the right to stand for office is to some extent derivative from the right of the people to express their opinions by voting" (citing *Munro*, 479 U.S. at 193 (1986)).

Plaintiff's constitutional rights are violated for the simple reason that its members and candidates must abide by a preempted and unconstitutional state timing regulation to run for office. States have no interest, much less a legitimate one, in enforcing a state time regulation that violates the timeline required by federal law. Congress passed the first Election Day statutes more than 175 years ago pursuant to its power under the Electors Clause. 3 U.S.C. § 1. Twenty-seven years later, Congress expanded the application of Election Day statutes pursuant its Elections Clause powers. 2 U.S.C. § 7. Congress did so to establish a uniform date for federal elections across the United States, and to avoid the "evil arising from the election of members of congress occurring at different times in the different states." *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884). Therefore, Electors and Elections Clause legislation inherently requires that conflicting state regulations yield to Congress' determinations. *See Foster*, 522 U.S. at 69; *see also Siebold*, 100 U.S. at 384 (federal election laws governing federal elections "are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative.").

For these reasons, Defendants' reliance on *Bost* is misplaced. *Bost* wrongly assumed that states had delegated to them authority to set timing regulations governing federal elections. 2023 U.S. Dist. LEXIS 129509, at *30. But with respect to the Electors Clause, this is not completely accurate. The federal government's authority to set timing regulations is plenary under the Electors Clause of Article II. *See* U.S. Const. art. II, § 1, cl. 4. States' temporary authority lasts until the point Congress acts. Once it does, that loaned authority to the state is necessarily displaced under *Inter Tribal*. Once Congress exercises its power, that power is "paramount to those made by the State Legislature." *Siebold*, 100 U.S. at 384. Even under the least deferential standard of review, Defendants can never claim a legitimate interest in violating federal law. *See Ill. Conservative Union v. Illinois*, No. 20 C 5542, 2021 U.S. Dist. LEXIS 102543, at *22 (N.D. Ill. June 1, 2021) (finding plaintiffs stated a claim to overcome the presumption of rationality under rational basis review because of the conflict between state election law and the federal National Voter Registration Act); *Nation v. San Juan Cnty.*, 150 F. Supp. 3d 1253, 1269 (D. Utah 2015) ("a county or other local governing body cannot have a legitimate governmental interest in violating state law.").

**CONCLUSION**

For all these reasons, the Court should deny Defendants' and Intervenor-Defendants' Motions for Summary Judgment.


April 9, 2024



      *s/ Russ Nobile*
T. Russell Nobile (MS Bar 100682)
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9866
Rnobile@judicialwatch.org

Robert D. Popper*
Eric W. Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
Rpopper@judicialwatch.org
elee@judicialwatch.org

*\* Application for admission pro hac vice forthcoming*