# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

REPUBLICAN NATIONAL COMMITTEE, et al.,

        Plaintiffs,

   v.

JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, et al.,

        Defendants,

  and

VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS,

        Intervenor-Defendants.

No. 1:24-cv-00025-LG-RPM

*consolidated with*

LIBERTARIAN PARTY OF MISSISSIPPI,

        Plaintiff,

   v.

JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*; et al.,

        Defendants,

  and

VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS,

        Intervenor-Defendants.

No. 1:24-cv-00037-LG-RPM

**CONSOLIDATED MEMORANDUM BRIEF OF INTERVENOR-DEFENDANTS VET
VOICE FOUNDATION AND MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS
IN RESPONSE TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Republican National Committee, Mississippi Republican Party, James Perry, and

Matthew Lamb (the "RNC Plaintiffs") and the Libertarian Party of Mississippi each filed a motion

for summary judgment. (*See* ECF Nos. 55, 58). Intervenor-Defendants Vet Voice Foundation

("Vet Voice") and the Mississippi Alliance for Retired Americans (the "Alliance") (together,

"Intervenors"), submit this consolidated response in opposition.[1] For the following reasons,

Plaintiffs' motions should be denied, and the Defendants' and Intervenors' motions for summary

judgment (ECF Nos. 51, 53, 61), should be granted.[2]

## BACKGROUND

In 2020, the Mississippi Legislature voted overwhelmingly and on a bipartisan basis to

enact Mississippi Code § 23-15-637(1)(a) ("Ballot Receipt Deadline"), a commonsense measure

to ensure that lawful voters' timely cast mail-in absentee ballots will be counted if they are (1)

postmarked on or before election day, and (2) received by election officials within five business

days. (*See* Intervenors' Mem. Br. in support of Mot. for Summ. J. at 3-4, ECF No. 62 ("Intervenors'

---

[1] In its order denying the Democratic National Committee's ("DNC") post-consolidation motion
to intervene in both consolidated cases, (*see* ECF No. 45), the Court concluded that Intervenors
adequately represent DNC's interests and therefore denied its intervention. (*See* ECF No. 47 at 8).
Intervenors understand the Court's order to mean that they are as intervenors in both consolidated
cases, as the DNC otherwise would not be adequately represented in the Libertarian Party action.
*See* Order, *Mi Familia Vota v. Hobbs*, No. 2:22-cv-00509-PHX-SRB, ECF No. 160 (D. Ariz. Oct.
27, 2022) (denying as moot motion to intervene where proposed intervenor was already granted
intervention in consolidated case). After conferring on the matter, Intervenors confirmed that the
Libertarian Party shares this understanding. As a result, Intervenors filed their own motion for
summary judgment against both sets of Plaintiffs (ECF No. 61), and now file this consolidated
Memorandum Brief in support of their Responses to both Plaintiffs' affirmative motions.

[2] In accordance with the Court's Order (ECF No. 38), the parties each filed cross-motions for
summary judgment on March 26, 2024. To avoid repetition, Intervenors where possible
incorporate arguments from their summary judgment brief (ECF No. 62), and in this brief
specifically address arguments and factual assertions raised in Plaintiffs' motions.

Mem.")). The Legislature passed this law consistent with its authority to set the "Times, Places and Manner of holding Elections for Senators and Representatives," U.S. Const., art. I, § 4, cl.1; *see also id.* art. II, § 1, cl.2 (reserving to states the power to choose the "Manner" of appointing electors for President). In doing so, Mississippi joined nearly 20 other states that have similar post-election day ballot receipt deadlines, which help guard against the disenfranchisement of mail voters who timely vote and mail their ballots. (*See* Intervenors' Mem. at 2–4 & nn.1 & 4). These types of laws are particularly helpful to safeguard the right to vote of military and overseas voters, as well as others who may contend with mail delays in returning their ballots.[3]

Plaintiffs here challenge the Ballot Receipt Deadline by arguing that it is preempted by the federal Election Day Statutes, 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1. They contend that Congress's choice to establish a uniform national election day must be read to implicitly and entirely forbid states from counting timely-voted absentee ballots—including those from military and overseas voters—unless they are received by election officials on or before the election day. Plaintiffs are wrong. And their motions for summary judgment are perhaps most notable for what they fail to mention. First, they fail to grapple with, much less distinguish, the extensive case law rejecting similar challenges, both at the threshold on the same theories of standing that Plaintiffs peddle here, and on the merits. Second, Plaintiffs fail to even acknowledge the standard that they must meet to prove their pre-emption claim under binding Fifth Circuit precedent. That standard recognizes "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives *has only one limitation*: the state system cannot *directly conflict*

---

[3] The Court can take judicial notice of the fact that the U.S. Postal Service has settled litigation stemming from delays in delivery of ballots. *See* Stipulation & Consent Order, *Democratic Party of Va. v. Veal*, No. 3:21-cv-671-MHL (E.D. Va. Oct. 28, 2021), ECF No. 27; *NAACP v. U.S. Postal Serv.*, No. 20-cv-2295 (EGS), 2020 WL 6469845 (D.D.C. Nov. 1, 2020) (ordering USPS to take steps to ensure the timely delivery of mail-in ballots); Fed. R. Evid. 201.

with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000) (emphases added).

Here, there is no direct conflict between the federal election day statutes and the Ballot Receipt Deadline. And Plaintiffs barely make any argument in support of their constitutional claims—which are entirely derivative of their preemption claims and fail to state a claim under the governing *Anderson-Burdick* test. Instead, the RNC Plaintiffs merely regurgitate erroneous standing arguments and claim that is enough to establish a violation of their constitutional rights. And the Libertarian Party makes no argument on its constitutional claims at all.

The Court should deny Plaintiffs' motions for summary judgment—for lack of standing, or alternatively on the merits—and enter summary judgment for Defendants and Intervenors.

## ARGUMENT

### I.   Plaintiffs' complaints must be dismissed for lack of standing.

The Court lacks jurisdiction because none of the Plaintiffs have met their burden of showing that they have standing to pursue their claims. Multiple federal courts have considered similar challenges in recent years and each has found that the plaintiffs—who have alleged "injuries" not meaningfully different from those that Plaintiffs claim here—lack standing. (*See* Intervenors' Mem. at 6–9, 12–14, 15–17, 19–22). The RNC itself was a plaintiff in one of those cases, and counsel for the Libertarian Party represented the plaintiffs in another. Yet, neither make any effort to distinguish the standing decisions in these cases.[4] The Court should reject Plaintiffs'

---

[4] The Libertarian Party's motion acknowledges just one of these cases, in a footnote, but says nothing other than that it is currently on appeal. (*See* ECF No. 56 at 5 n.6 (citing *Bost v. Ill. State Bd. of Elections*, No. 22-cv-02754, 2023 WL 4817073 (N.D. Ill. July 26, 2023))). It makes no attempt to explain why that decision—or any of the similar decisions from other courts—are wrong. The RNC Plaintiffs acknowledge some of these decisions—but oddly not the one in which the RNC itself was a plaintiff—in a short footnote in the merits section of their brief. (*See* ECF

standing arguments for the same reasons that those other courts found them insufficient: they are either classic generalized grievances or far too speculative to support standing. (*See* Intervenors' Mem. at 9–19). Plaintiffs simply cannot show that they are harmed by a law that ensures that *more* qualified voters—including Plaintiffs and their supporters—will have their ballots counted.

### A.   Legal Standard

Article III of the Constitution strictly limits federal courts to hearing cases "to redress or prevent actual or imminently threatened injury" to a plaintiff. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). "This limitation 'is founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Id.* at 492–93 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). As one court noted in considering a similar challenge: "'Standing is particularly important in the context of election-law cases, including a case like this one, that challenge the laws, regulations, and guidance issued by elected and appointed state officials through the democratic processes.'" *Donald J. Trump for President, Inc. v. Way*, No. 20-10753 (MAS) (ZNQ), 2020 WL 6204477, at *3 (D.N.J. Oct. 22, 2020) ("*Way II*") (quoting *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 376 (W.D. Pa. 2020)). Standing doctrines "prevent the judicial process from being used to usurp the powers of the political branches." *Id.* (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

Plaintiffs bear the burden of establishing that they have standing. *See El Paso County v. Trump*, 982 F.3d 332, 337–38 (5th Cir. 2020). At the summary judgment stage, this requires not only a cognizable theory of standing but also evidentiary support, with affidavits or other evidence of specific, undisputed facts that satisfy each element of standing. *See Inclusive Cmtys. Project,*

---

No. 60 at 17 n.1). They, too, however, fail to address any of the courts' conclusions regarding standing, much less explain why this Court should come to a different conclusion.

*Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). If Plaintiffs fail to make that showing, the Court lacks jurisdiction and cannot hear their claims. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

None of the Plaintiffs satisfies this standard. Each of their theories fails as a matter of law and has been rejected in similar challenges. (*See* Intervenors' Mem. at 9–19). All are either textbook generalized grievances or far too speculative to satisfy Article III. (*Id.* at 10–11, 13, 15, 19–23). Plaintiffs' conclusory declarations do nothing to remediate Plaintiffs' legally insufficient theories of standing and are insufficient to satisfy their evidentiary burden at this stage of litigation.

### B.    The Political Party Plaintiffs fail to establish organizational standing.

To establish organizational standing, the political party committees were required to come forth with specific evidence showing that (1) they have "diverted significant resources to counteract" the Ballot Receipt Deadline, *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)), and (2) their "ability to carry out [their] mission was perceptibly impaired" *because of* that diversion, *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 352–53 (5th Cir. 2023) ("*LaFHAC*") (cleaned up); (*see also* Intervenors' Mem. at 10–14). In other words, Plaintiffs must show that they diverted resources *from* something due to the Ballot Receipt Deadline and that the diversion "perceptibly impair[s]" their "ability to pursue [their organizational] mission." 82 F.4th at 351. Finally, Plaintiffs must establish that they diverted those resources to avoid some non-speculative harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Plaintiffs fail on all counts. Nothing in the declarations they submit with their motions cures the standing defects that Intervenors have identified. (*See* Intervenors' Mem. at 11–14).

First, no organizational plaintiff has established either that the Ballot Receipt Deadline *requires* them to divert resources to any specific program or activity, or that such diversion hobbles

them in achieving their mission. (*See generally* Declaration of Ashley Walukevich ("Walukevich Decl."), ECF No. 58-1; Declaration of Frank Bordeaux ("Bordeaux Decl."), ECF No. 58-2; Declaration of Vicky Hanson ("Hanson Decl."), ECF No. 55-3). Fifth Circuit precedent requires Plaintiffs to make that showing by identifying specific programs or activities that the organization must curtail or divert resources *from* to counteract the effects of the Ballot Receipt Deadline. *LaFHAC*, 82 F.4th at 351. Plaintiffs' failure to do so defeats organizational standing. *See City of Kyle*, 626 F.3d at 238–39 (finding "no injury in fact" where "Plaintiffs have not identified any specific projects" curtailed in response to challenged law and dismissing for lack of standing).

For example, Ashley Walukevich, the Deputy Political Director of the RNC, claims that the Ballot Receipt Deadline forces the RNC to spend additional resources on its ballot-chase program in the days after election day. (*See* Walukevich Decl. ¶¶ 11–13). But it is not clear why the RNC *must* do so. As the Court in *Bost* noted, "all votes must be cast by Election Day, so [the Republicans'] electoral fate is sealed at midnight on Election Day, regardless of the resources [they] expend[] after the fact." 2023 WL 4817073, at *8. Ms. Walukevich also explicitly declines to identify some other "specific project[]" that suffers as a result of the RNC's diverting money in response to the Ballot Receipt Deadline. Instead, she simply claims "the RNC would spend those resources on other activities, *or not spend them at all*." Walukevich Decl. ¶ 18 (emphasis added).

This vague allusion to unspecified "other activities" that the resources *could* be spent on is precisely the sort of conjecture the Fifth Circuit has repeatedly rejected as insufficient for organizational standing. *E.g.*, *Children's Health Def. v. FDA*, No. 23-50167, 2024 WL 244938, at *5 (5th Cir. Jan. 23, 2024) (unpublished) (affirming dismissal for lack of standing for failure to identify "specific projects" from which resources were diverted); *LaFHAC*, 82 F.4th at 353 ("threadbare allegation that [] projects were 'impaired' is insufficient for injury, even at the motion

to dismiss stage"); *El Paso County*, 982 F.3d at 344–45 (finding "no injury in fact" where plaintiff "merely 'conjectured that the resources could have been spent on other unspecified activities'" (quoting *City of Kyle*, 626 F.3d at 239) (cleaned up)). And Ms. Walukevich's concession that the RNC might "not spend [these resources] *at all*" confirms that resources are *not* in fact being diverted from other programs, as required to show organizational standing. In other words, this admission effectively concedes that it is not the case that the RNC "*must* divert resources from its usual activities in order to lessen the challenged restriction's harm to its mission." *Lewis v. Hughs*, 475 F. Supp. 3d 597, 612 (W.D. Tex. 2020) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)) (emphasis added), *rev'd and remanded on other grounds sub nom. Lewis v. Scott*, 28 F.4th 659 (5th Cir. 2022). As a result, the RNC lacks organizational standing.[5]

MSGOP's declarant, Chairman Bordeaux, fares no better. He similarly claims the Ballot Receipt Deadline obliges MSGOP to "spend money on absentee-specific programs," Bordeaux Decl. ¶ 11, but nowhere explains how another "specific program" at MSGOP is harmed as a result. Instead, he offers the same boilerplate claim as Ms. Walukevich: that these resources could be spent on "other activities" or "not spen[t] at all." *Id.* ¶ 16. For the same reason that this is fatal to the RNC's standing, it is also fatal to MSGOP. Nor is Mr. Bordeaux's conclusory assertion that MSGOP must "divert[]" resources "from the pursuit of its mission in other areas" due to the Ballot Receipt Deadline, sufficient. *Id.* ¶ 20. For one thing, it fails altogether to explain how MSGOP's

---

[5] For the reasons discussed, the theories of standing relied upon by the Plaintiffs fail as a matter of law and are not remedied by the conclusory and speculative statements provided in their declarations, most of which is not competent summary judgment evidence under Rule 56(c). This failure of proof dooms Plaintiffs' standing arguments and the Court should enter summary judgment for Defendants and Intervenors on that basis. If, however, the Court is inclined to find that Plaintiffs have standing based on the claims made in Plaintiffs' declarations, it first should permit Defendants and Intervenors to take limited discovery testing those claims pursuant to Rule 56(d). *See* Declaration of Elisabeth C. Frost ¶¶ 5-8.

"ability to carry out its purpose" was "concretely and 'perceptibly impaired.'" *Children's Health Def.*, 2024 WL 244938, at *5 (quoting *City of Kyle*, 626 F.3d at 238). Further, such "[u]nsupported" and "conclusory" assertions "are insufficient to . . . support . . . a motion for summary judgment." *Favre v. Lyndon Prop. Ins. Co.*, No. CIV.107CV1261HSO-JMR, 2008 WL 3271100, at *3 (S.D. Miss. Aug. 6, 2008) (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)), *aff'd sub nom. In re Favre*, 342 F. App'x 5 (5th Cir. 2009).

Finally, Libertarian Party Secretary Vicky Hanson likewise complains that her party must allocate "limited resources" to monitoring activities, (Hanson Decl. ¶ 22), but does not identify what other distinct program is impaired as a result. In fact, Ms. Hanson is entirely silent as to how any purported diversion impairs her party's mission. (*See generally* Hanson Decl.). For the reasons already discussed, this is insufficient to establish the Libertarian Party's standing.

* * *

At bottom, the organizational plaintiffs' grievance is having to comply with an election rule they dislike. But Plaintiffs may not manufacture standing by purporting to divert resources for no other purpose than to avoid an entirely speculative risk of harm. *See Clapper*, 568 U.S. at 416. This same fatal deficiency caused the district court in *Way II*—where the RNC and the New Jersey Republican Party were plaintiffs—to reject similar declarations as insufficient to support organizational standing in a similar challenge. There, the Chairman of the New Jersey Republican Party "attest[ed] to the need to hire and educate poll watchers in order to challenge election officials' decisions on this new issue." 2020 WL 6204477, at *11 (quotation marks omitted). But, as the court explained, "Plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" *Id.* (quoting *Clapper*, 568 U.S. at 416). Similarly, in *Bost*, the district court explained it was "mere

conjecture" that if Congressman Bost did not spend additional campaign resources to "respond" to the ballot receipt deadline, "his risk of losing the election will increase." 2023 WL 4817073 at *8. And in *Bognet v. Sec'y Commonwealth of Pennsylvania*, the Third Circuit explained that "[a]ny harm Bognet sought to avoid in making th[e]se expenditures was not 'certainly impending'—he spent the money to avoid a speculative harm." 980 F.3d 336, 352 (3d Cir. 2020). So, too, here.

Plaintiffs' efforts to fashion a cognizable theory of standing ring particularly hollow in a case like this because the Ballot Receipt Deadline helps *all* voters—including Plaintiffs' voters—by ensuring that their ballots are counted, meaning that they simply "need not *divert* resources to enable or encourage their voters to vote." *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1002 (D. Nev. 2020). For all of these reasons, the Court should reject the organizational plaintiffs' claims that they have standing in their own right.

### C.     The Political Party Plaintiffs fail to establish standing based on competitive harm.

Plaintiffs also cannot pursue their claims based on unsubstantiated injuries to the rights of unidentified candidates they support or based on a claim of so-called "competitive" standing. To start, as a matter of law, a statute that applies equally to help *all* qualified voters—including Plaintiffs' voters—have their ballots counted cannot inflict a cognizable competitive injury. (*See* Intervenors' Mem. at 17–18). The competitive injury theory of injury applies only when a law creates an *uneven playing field* that grants one side an unfair structural advantage. *See, e.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (explaining 'competitive' standing requires a structural "ongoing, unfair advantage"); *Cegavske*, 488 F. Supp. 3d at 1003 (similar). The Ballot Receipt Deadline does no such thing.

Setting aside this legal deficiency, the record contains no evidence that the Ballot Receipt Deadline will cause any particular party or candidate any specific electoral harm. To be sure,

several of Plaintiffs' declarants *speculate* that may be the case, but those claims are based on nothing beyond their own unsubstantiated beliefs. For example, Libertarian Party declarant Ms. Hanson, "believe[s]" that the Ballot Receipt Deadline "has caused the Party's candidates to have worse electoral results than Republican and Democratic candidates . . . because [she] believe[s] that more mailed ballots coming in after Election Day are cast for Republican or Democratic candidates." (Hanson Decl. ¶ 27). But Ms. Hanson's *belief* that the Ballot Receipt Deadline has harmed the Party's candidates "is inappropriate summary judgment evidence," because "Rule 56[(c)(4)] requires statements in affidavits to be based on personal knowledge and not based on information and belief," *Bolen v. Dengel*, 340 F.3d 300, 313 (5th Cir. 2003), *as amended* (Oct. 1, 2003); *accord* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2738 (4th ed. 2023) ("[S]tatements made on belief or 'on information and belief,' cannot be utilized on a summary-judgment motion.").

Moreover, Ms. Hanson's "belief" runs headlong into the actual electoral record. As Intervenors noted in their motion for summary judgment, the limited extrinsic evidence available suggests the Libertarian Party performed *better* after adoption of the Ballot Receipt Deadline, directly undercutting Ms. Hanson's speculation. (*See* Intervenors' Mem. at 18–19). Ms. Hanson's "unsupported speculation" to the contrary is simply "not competent summary judgment evidence" that can carry Plaintiffs' standing burden. *Patton v. Meridian Sec. Ins. Co.*, 617 F. Supp. 3d 516, 530 (N.D. Tex. 2022); *see also Bearb v. Wal-Mart La. Liab. Corp.*, 534 F. App'x 264, 265 (5th Cir. 2013) (unpublished) (affirming grant of summary judgment against party that offered "only speculation and their own unsubstantiated statements" at this stage).

The Republican Plaintiffs similarly assert that the Ballot Receipt Deadline "heavily favors Democratic candidates and harms Republican candidates" because "late-arriving ballots favor[ ]

Democratic candidates[,] [a]nd because voting by mail is starkly polarized by party." (Walukevich Decl. ¶ 20). But this too is unadorned speculation supported by no competent evidence. Ms. Walukevich's claim that absentee ballots arriving after election day heavily favor Democrats is unaccompanied by any evidence that would substantiate her belief about past Mississippi elections or indicate that those trends are likely to recur in the 2024 election cycle or beyond. She merely expresses a conclusion as to the ultimate issue that the RNC seeks to prove—that the Ballot Receipt Deadline harms Republicans—which is not enough at summary judgment. *See Galindo*, 754 F.2d at 1216; *accord Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) ("Mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment.").[6] Finally, the MSGOP's declarant, Chair Bordeaux, offers nothing at all on the subject of competitive standing.

Given this lack of evidence, "[a]ny estimate[]" this Court makes about the electoral impact of the Ballot Receipt Deadline "would be pure speculation." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1248 (11th Cir. 2020) (holding that plaintiffs challenging a ballot order statute suffered no injury in fact because the statute's electoral impact was purely speculative). As a result, the Court should find that Plaintiffs failed to establish standing based on any alleged competitive harm to their Party's anticipated performance in unidentified contests.

---

[6] In their complaint, the RNC Plaintiffs attempted to support their allegations that timely-cast mail ballots arriving after election day are likely to favor Democratic candidates with reference to nationwide statistics. (RNC Compl. ¶¶ 56–57, ECF No. 1). As Intervenors noted in their motion for summary judgment, that data proves nothing about absentee voting in Mississippi specifically. (*See* Intervenors.' Mem. at 15–17 & n.11). Intervenors expressed skepticism that the RNC Plaintiffs could support these claims with admissible evidence. Now that they have failed to do so, the Court need not consider those allegations any further on summary judgment.

**D.      Plaintiffs' "vote dilution" claims cannot support standing as a matter of law.**

Plaintiffs also attempt to establish that the individual voter Plaintiffs (and the political parties' members) are injured by the purported "dilution" of their lawful ballots by "untimely, invalid ballots" due to the Ballot Receipt Deadline. (RNC Compl. ¶ 4; *id.* ¶¶ 75–80 (Count III); *see also* Libertarian Party Compl. ¶ 36, *Libertarian Party of Miss. v. Wetzel*, No. 1:24-cv-37 (S.D. Miss. Feb. 5, 2024), ECF No. 1). But, as Intervenors and Defendants explain in their motions for summary judgment, Plaintiffs' alleged "vote dilution" injury is insufficiently particularized to satisfy Article III. (*See* Intervenors' Mem. at 19–22; Secretary of State's Mem. at 11–13, ECF No. 52 (explaining Plaintiffs' vote dilution theory is a generalized grievance)). Plaintiffs suffer no particularized injury from the Ballot Receipt Deadline because every Mississippi voter's ballot is impacted in the same way by counting timely-cast ballots under the Ballot Receipt Deadline. *Id.*

Plaintiffs fail to identify a *single* case where a court has found the type of "vote dilution" that they argue here sufficient for standing. Even more incredibly, they fail to acknowledge that every federal court to consider this theory in the context of challenges to state law ballot receipt deadlines has rejected it. The *Bost* court, for example, explained that "an increase in the pool of voters generally does not constitute vote dilution," noting that "a vote dilution claim is about certain votes being given less value than others." 2023 WL 4817073, at *7. The Third Circuit held in *Bognet* that this same theory of "vote dilution" is "indistinguishable from the proposition that a plaintiff has Article III standing to assert a general interest in seeing the 'proper application of the Constitution and laws'—a proposition that the Supreme Court has firmly rejected." 980 F.3d at 360 (quoting *Lujan*, 504 U.S. at 573–74). And the court in *Way II* rejected the "vote dilution" theory offered by the plaintiffs—which included the RNC—and which rested on "their highly speculative fear" that the challenged laws would lead to votes cast after election day being counted. 2020 WL 6204477, at *6. The court found that "Plaintiffs' alleged injury due to the State's

canvassing of allegedly untimely cast ballots lacking postmarks is entirely speculative. Accordingly, Plaintiffs' members may not invoke the Court's Article III power to address alleged violations of the Election Day Statutes that do not create an imminent injury." *Id.* at \*11. Again, Plaintiffs do not even attempt to explain why these holdings are wrong.

This legal deficiency defeats Plaintiffs' vote dilution theory out of the gate. But Plaintiffs' declarants similarly present nothing more than conclusory and speculative claims of harm from vote dilution. For the MSGOP, for example, Mr. Bordeaux simply concludes that, "[b]y counting untimely votes and those received in violation of the federal Election Day deadline, Mississippi dilutes the weight of timely, valid votes, including my own vote and those of the MSGOP's candidates and members." (Bordeaux Decl. ¶ 21; *see also* Declaration of James Perry ¶ 8 ("Perry Decl."), ECF No. 58-3 (same, for RNC Plaintiffs); Walukevich Decl. ¶ 21 (similar, for the RNC)). But that alleged injury is true of *all* Mississippi voters who cast what Plaintiffs deem to be "timely" ballots. Accordingly, Plaintiffs' complaint is nothing more than a "generalized grievance" that is "plainly undifferentiated and 'common to all members of the public'" who vote in-person (as most Mississippi voters do) or are lucky enough to have their mail ballots delivered on or before election day. *Jungemann v. Dep't of State La.*, No. 1:22-CV-02315, 2023 WL 5487390, at \*3 (W.D. La. Aug. 24, 2023) (quoting *Lance v. Coffman*, 549 U.S. 437, 440–41 (2007)) (rejecting complaint about Louisiana election procedures as generalized grievance).

Because the Ballot Receipt Deadline treats all voters the same, no one "is specifically disadvantaged" by this level playing field. *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). This distinguishes Plaintiffs' theory from the distinct circumstances in which courts have found vote dilution to be a cognizable injury. *See id*. at 1314–15 (comparing "vote dilution in this context," which "is a 'paradigmatic generalized grievance that cannot support standing,'" with its

use in the racial gerrymandering and malapportionment contexts, where "vote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts" (quoting *Baker v. Carr*, 369 U.S. 186, 207–08 (1962)). The same is true of Plaintiffs' concerns about the "integrity" of these ballots—that, too, is "far too generalized to warrant standing." *Hotze v. Hudspeth*, 16 F.4th 1121, 1124 (5th Cir. 2021) (rejecting claim that drive-through voting harmed integrity of elections as too generalized to support standing) (citing *Lance*, 549 U.S. at 441–42).

### E.   Plaintiff Lamb does not have standing based on his view of the legality of Mississippi law.

Finally, Mr. Lamb, a George County Election Commissioner, does not have standing based on his contention that the Ballot Receipt Deadline "forces [him] to choose between following Congress' Election Day statutory deadline or Mississippi's post-election deadline," opening him up to the possibility of removal from his position if he elects not to enforce a state law he personally believes to be invalid. (*See* Decl. of Matthew Lamb ¶¶ 9–10, ECF No. 58-4 ("Lamb Decl.")). To hold otherwise would mean *any* state official could invoke federal court jurisdiction to challenge a state statute merely by proclaiming an intent to violate it. Another federal district court recently rejected a similar argument for standing in another challenge to a post-election day receipt deadline. *See Splonskowski v. White*¸ No. 1:23-cv-00123, 2024 WL 402629, at *6 (D.N.D. Feb. 2, 2024) ("This is deeply concerning to the Court that an elected official openly advocates for violating the law he was elected to enforce because he has independently concluded it contradicts federal law."). This theory of standing fails as a matter of law. (*See* Intervenors' Mem. at 22–23).

*First*, it is speculative. Mr. Lamb's declaration fails to prove that his removal from office is certainly impending. As the Secretary explained, numerous procedural steps would need to occur before the Governor could even *consider* removing Mr. Lamb from office. (*See* Secretary's Mem. at 15). Mr. Lamb's declaration nowhere claims that any of these actions—such as the filing of a

verified petition signed by 30 percent of the voters in George County—have occurred or are likely to occur, never mind that the Governor would then elect to convene the necessary "removal council" to remove Mr. Lamb. (*Id.*) Such a "highly speculative and 'attenuated chain of possibilities'" fails to show a certainly impending injury, not least of all because it relies on "'the decisions of independent actors.'" *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018) (quoting *Clapper*, 568 U.S. 398, 410–14).

*Second*, nothing in the record suggests that Mr. Lamb's purported injuries are traceable to the Defendants here—the Secretary of State and several county elections officials. None of the Defendants has any role in the process for removing Mr. Lamb from office described above. This was another reason the district court in *Splonskowski* held that a county election official in North Dakota lacked standing to challenge that state's ballot receipt deadline. *See* 2024 WL 402629, at *5 ("White [the State Election Director of North Dakota] is not a potential cause for Splonskowski's alleged injuries because she has no enforcement authority.").

*Third*, even if Mr. Lamb were likely to be removed from office, that harm would be entirely self-inflicted. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. Nothing is forcing Mr. Lamb to ignore Mississippi law in favor of his own interpretation of federal law. He is *choosing* to do so. Mr. Lamb has not pointed to any harm he is seeking to avoid—hypothetical or otherwise—through this choice. For instance, he has not alleged that he is likely to face any consequences from "violating" the Election Day Statutes by implementing the Ballot Receipt Deadline. *See Kearns v. Cuomo*, 981 F.3d 200, 205-06 (2d Cir. 2000) (holding county official lacked standing because it was purely conjectural that he would be federally prosecuted for implementing an allegedly preempted state law). His purported injury—

potential removal from office—is thus entirely a product of his own *unforced* choice to ignore Mississippi law. *Splonskowski*, 2024 WL 402629, at *5 ("The only cause for his potential injury is himself because he states he will violate North Dakota election law.").

## II. The Ballot Receipt Deadline does not conflict with the Election Day Statutes.

Even if the Court had jurisdiction, Plaintiffs' claims fail on the merits. They fail to acknowledge—much less satisfy—the Fifth Circuit's controlling standard for when federal statutes preempt state election laws. As the Circuit has held: "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives *has only one limitation*: the state system cannot *directly conflict* with federal election laws on the subject." *Bomer*, 199 F.3d at 775 (emphases added).[7] But *none* of the federal statutes at issue—2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1—speaks to when ballots must be received to be counted, much less requires the rejection of timely-cast ballots or otherwise "directly conflicts" with the Ballot Receipt Deadline. Plaintiffs' claims are not novel. Yet every court to address them has rejected Plaintiffs' interpretation. (*See* Intervenors' Mem. at 6–9). Plaintiffs here provide no reason to find otherwise—indeed, they do not even address those decisions, much less offer any argument as to why they are wrong. They are not. And this Court should similarly find that the Ballot Receipt Deadline does not directly conflict with federal law, requiring rejection of Plaintiffs' claims.

---

[7] This omission is particularly glaring given that both sets of Plaintiffs cite the case for ancillary propositions. (*See* Mem. in Supp. of Pl.'s Mot. for Summ. J. at 2 n.2, ECF No. 56 ("Libertarian Mem.") (citing *Bomer* for proposition that "[d]isputes regarding state compliance with federal election day statutes are commonly handled via summary judgment"); Mem. in Supp. of Republican Pls.' Mot. for Summ. J. at 8, 16, 17, ECF No. 60 ("RNC Mem.") (noting *Bomer* viewed *Foster* as instructive on the meaning of the election day statutes, acknowledging *Bomer* declined to interpret the statutes in a manner that would prohibit a "longstanding" practice, and observing it was brought under Section 1983)).

### A.     Legal Standard

The applicable standard is clear and demanding: "[A] state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Bomer*, 199 F.3d at 775. Congress's power to regulate the "Times, Places, and Manner" of congressional elections supersede "inconsistent" State laws "so far as it is exercised, *and no farther*." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)) (emphasis added). When Congress exercises this power, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.* at 14. Thus, Courts should "read Elections Clause legislation simply to mean what it says." *Id.* at 15.

### B.     The Ballot Receipt Deadline does not directly conflict with the Election Day Statutes.

There is no conflict here. Statutory interpretation begins with the text. *Ross v. Blake*, 578 U.S. 632, 638 (2016). The text of the Election Day Statutes simply designates when the "election" must occur. 2 U.S.C. §§ 1, 7; 3 U.S.C. §§ 1, 21(1). Nothing in their text says anything about procedures for transmission, receipt, processing, or counting of ballots. Those decisions are therefore left to the states.

As multiple federal courts have explained: "[f]ederal law does not provide for *when* or *how* ballot counting occurs," *Bognet*, 980 F.3d at 353, and the Election Day Statutes "are silent on methods of determining the timeliness of ballots," *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) ("*Way I*"). Because Congress has not codified a competing receipt deadline, "compliance with both [the Receipt Deadline] and the federal election day statutes does not present 'a physical impossibility,'" and no preemption has occurred. *Millsaps v.*

*Thompson*, 259 F.3d 535, 549 (6th Cir. 2001) (citation omitted) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)). "Put another way, there is no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for holding federal elections." *Id.*; *see also Bost*, 2023 WL 4817073, at *11 (holding Illinois' post-election-day receipt deadline "operates harmoniously with the federal statutes that set the timing for federal elections"). Plaintiffs reach their preferred result through an impossibly broad interpretation of the statutory term "election." But the plain meaning of that term requires only that ballots be *cast* by election day. Plaintiffs' contrary view—that "election" means "casting *and receipt*" of ballots finds no support in the text, structure, or history of the Election Day Statutes.

Congress first enacted the Election Day Statutes in the mid-nineteenth century. *See* 5 Stat. 721 (1845) (predecessor to 3 U.S.C. § 1); 17 Stat. 28 (1872) (predecessor to 2 U.S.C. § 7). As the Libertarian Party notes, nineteenth century dictionaries define "election" as "[t]he day of a public choice of officers." (Libertarian Mem. at 13); *see also Foster v. Love*, 522 U.S. 67, 71 (1997) (defining an "election" as the voters "act of choosing a person to fill an office" (quoting N. Webster, *An American Dictionary of the English Language* 433 (Charles Goodrich & N. Porter eds. 1869))). That is, "election" day is the day on which the "public" make their "choice."

Applying that definition, there is no conflict here. Mississippi's Ballot Receipt Deadline ensures that voters make their "choice" by no later than election day—before any results are announced in other states. When the voter mails the ballot—on or before that day—it is at that point well beyond the voter's custody and control. No one argues that the voter may at that point change the final "choice" that they made by election day. That simple fact distinguishes submitted, postmarked ballots from a "ballot sitting on a voter's kitchen table." (Libertarian Mem. at 8). The Libertarian Party's assertion that the Ballot Receipt Deadline "hold[s] voting open" after election

day, (*id*. at 2,10), is at odds with both the statutory text and its impact in reality. *See also, e.g.*, *Bost*, 2023 WL 4817073, at *11 ("By counting only th[o]se ballots that are postmarked no later than Election Day, the Statute complies with federal law that set[s] the date for Election Day."); *Way I*, 492 F. Supp. 3d at 372 ("New Jersey law prohibits canvassing ballots *cast* after Election Day, *in accordance with the Federal Election Day Statutes*." (emphasis added)). Because, under Mississippi's law, every voter must make their choice and surrender their ballot by election day for it to count, the entire premise of Plaintiffs' claim of any conflict between the Ballot Receipt Deadline and the Election Day Statutes is clearly and demonstrably incorrect.

The Court need go no further than this text to reject Plaintiffs' preemption claim. *See Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018) ("[W]here a statute's text is clear, courts should not resort to legislative history."). But the Ballot Receipt Deadline is also consistent with the purpose and legislative history of the Election Day Statutes. The legislative history shows that the Election Day Statutes were enacted to prevent (1) "distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States" and (2) the "burden on citizens forced to turn out on two different election days to make final selections of federal officers in presidential election years." *Bomer*, 199 F.3d at 777; *see also Foster*, 522 U.S. at 73–74; Cong. Globe, 42d Cong., 2d Sess. 141 (1871). Congress also wished to prevent a situation where voters could travel "from one part of the Union to another[] in order to vote" in multiple States. Cong. Globe, 28th Cong., 1st Sess. 679 (1844). This history shows that when Congress spoke of the day of the "election," it was focused on the actions of *voters*—not administrative acts by election officials. This is reflected in the text of the federal statutes, which as multiple courts have observed, say nothing about the counting of ballots. *See, e.g.*, *Bognet*, 980 F.3d at 353–54; *Bost*, 2023 WL 4817073, at *10–*11; *Way I*, 492 F. Supp. 3d at 372.

19

Plaintiffs' argument is also directly at odds with the Fifth Circuit's own view of the purpose of the Election Day Statutes. As the Circuit said in *Bomer*, "we cannot conceive that Congress intended the federal Election Day Statutes to have the effect of impeding citizens in exercising their right to vote. The legislative history of the statutes reflects Congress's concern that citizens be able to exercise their right to vote." 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407–08 (1872)). Yet, Plaintiffs ask that this Court interpret those statutes to require Mississippi to reject the ballots of lawful, qualified Mississippi voters.

The Receipt Deadline determines only which ballots cast by election day may be counted; nothing more, nothing less. Ballot receipt is thus akin to counting, canvassing, and any number of other ministerial actions of election officials that routinely occur after election day. *See Millsaps*, 259 F.3d at 546 n.5 (recognizing that "official action to confirm or verify the results of the election extends well beyond federal election day"); *see also Bush v. Gore*, 531 U.S. 98, 116 (2000) (Rehnquist, C.J., Scalia & Thomas, JJ., concurring) (cataloguing administrative actions occurring in Florida after election day to conclude the election process). Put differently, the "election" refers to the voters' choice of a candidate, and the process of receiving and counting ballots is a ministerial act aimed at identifying the *results* of the election. *See, e.g.*, Miss. Code § 23-15-651 (requiring results of votes by absentee ballots be announced *after* the five-business-day period for receiving absentee ballots); *id.* § 23-15-603 (requiring election commissioners to transmit final vote counts to Secretary within ten days after election day). Plaintiffs do not argue that these ministerial actions must occur on "election" day—though that is the unavoidable consequence of their interpretation of the Election Day Statutes. And their arbitrary selection of "receipt" as the time at which a ballot is cast has no grounding in statutory text.

The Libertarian Party attempts to support the proposition that a "ballot is not a vote until it is properly marked *and* received by election officials" by reference to the definition of "vote" in the Civil Rights Act of 1957. (Libertarian Mem. at 8). But that definition is immaterial and is in any case inconsistent with their position. In relevant part, the Act reads: "When used in the subsection, the word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election." 52 U.S.C. § 10101(e). The Civil Rights Act, consistent with its remedial purpose, gives the term "vote" a broad meaning, including "steps in the voting process *before entering* the ballot box, 'registration,' and . . . steps in the voting process *after leaving* the ballot box, 'having such ballot counted properly.'" *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (discussing the Voting Rights Act, which employs a similar definition). The Civil Rights Act thus reflects Congress's intent to ensure that lawful voters be given the opportunity to vote *and have their vote counted* rather than arbitrarily disenfranchised based on a technicality outside their control. *See* 52 U.S.C. § 10101(a)(2)(B) (prohibiting the denial of "the right of any individual to vote in any election because of an error or omission ... if such error or omission is not material in determining whether such [voter] is qualified ... to vote in such election"); *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003) (purpose of this provision was to eliminate the use of technical "excuse[s] to disqualify potential voters"). And, once again, if the Libertarian Party's argument is accepted, then all ballot counting would necessarily also have to take place on election day itself—and any election contests, too, resolved the same night. *But see Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324–25 (N.D. Fla. 2000) ("[W]hile it is possible for everyone to

vote on election day, it is highly unlikely that every precinct will be able to guarantee that its votes would be counted by midnight on election day. This has been the case for years, yet votes are not routinely being thrown out because they could not be counted on election day.").

For their part, the RNC Plaintiffs cite *no* statutory text or definition in support of their entirely conclusory statement that the "act of electing" means "a citizen casting the vote, and a state official receiving the vote." (RNC Mem. at 7–8); *see Arizona*, 570 U.S. at 14 (instructing courts to look to the "statutory text" to determine "the scope of Congress's pre-emptive intent"). Instead, they argue it is "intuitive" that these two actions—"casting" and "receipt"—"comprise the "'election,'" because a "voter's desire to elect a particular candidate is ineffective until an election official receives the vote." (RNC Mem. at 7–8). But that argument proves far too much for the reasons just explained: it takes much more than "receipt" of a ballot to give effect to a voter's "desire to elect a particular candidate," and no Plaintiff argues that all the necessary administrative steps for a vote to "count" must occur on or before "election day."

In short, Plaintiffs' reading of the Election Day Statutes is inconsistent with their text, purpose, and legislative history. It is also entirely unworkable because, taken to its logical endpoint, it would require all manner of ministerial acts that normally occur after election day to be completed *on* election day. Plaintiffs apparently agree that these ministerial acts need not occur on election day, so they draw an arbitrary line between "receipt" and other similar, ministerial acts—without any basis in the statute's text, history, or structure. But Plaintiffs cannot demonstrate the requisite "direct conflict" between the Ballot Receipt Deadline and the Election Day Statutes by reading into the latter statutory text that simply is not there. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) ("The problem with this approach is the one that

inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought to be a desirable result.").

### C.   Cases interpreting the term "election" confirm its plain meaning.

Beyond attempting to rewrite the text of the Election Day Statutes, Plaintiffs put forward a strained, overly literal reading of isolated language from the Supreme Court's opinion in *Foster v. Love*. Specifically, they focus on the following passage in *Foster*: "When the federal [election] statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder . . . ." 522 U.S. at 71. The RNC Plaintiffs reason that the statutory term "election," therefore must mean more than merely casting a ballot, because that activity does not involve an election official. (RNC Mem. at 8). That understanding of *Foster* is wrong for two reasons.

First, and most importantly, the Supreme Court expressly declined to offer any opinion regarding the meaning of the term "election" in the Election Day Statutes, beyond its narrow holding that an election that "is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress, clearly violates § 7." 522 U.S. at 72. The Court explicitly cautioned that its decision should not be read to "par[e] the term 'election' in § 7 down to the definitional bone." *Id.* It recognized "room for argument about just what may constitute the final act of selection within the meaning of the law," and emphasized that "our decision does not turn on any nicety in isolating precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute." *Id.*

Accordingly, just as important as what the Court *did* decide in *Foster* is what it expressly *did not* decide: "This case thus does not present the question whether a state must always employ the conventional mechanics of an election. We hold today *only* that if an election does take place, it may not be consummated prior to federal election day." *Id.* at 72 n.4. Plainly, the Ballot Receipt

Deadline does not violate that rule because it does not cause an election to "conclude[] as a matter of law before the federal election day." *Id.* at 72. Plaintiffs ask this Court to ignore the Supreme Court's admonition and broaden *Foster* to control a question that it expressly declined to decide. *See Millsaps*, 259 F.3d at 545 (noting "the Supreme Court's silence in *Foster* as to which acts a State must take on federal election day").

Second, grafting Plaintiffs' highly literal interpretation of this passage from *Foster* into the text of the Election Day Statutes would lead to absurd and catastrophic results. As Plaintiffs understand *Foster*, the "combined actions of voters and officials meant to make a final selection of an officeholder" must all occur *on* election day. That cannot be right. As the RNC Plaintiffs acknowledge: "After election day, election officials go about various duties: counting ballots, disqualifying voters, hearing challenges, and certifying the election." (RNC Mem. at 9). Under Plaintiffs' hyper-literal reading of *Foster*, all of these activities—the "combined actions of voters *and officials*" must occur *on election day*. That would require officials to arbitrarily stop counting ballots at the stroke of midnight on election day, upending election administration in all fifty states.

Not so, Plaintiffs argue, because the only "official action" that needs to occur on election day under *Foster* is "receipt." (RNC Mem. at 8–10). But that purported limitation is an arbitrary and self-serving invention of Plaintiffs' own imagination, with no basis in either *Foster* or the statutory text. There is simply no reason to conclude that by "combined actions of voters and officials meant to make a *final selection* of an officeholder," 522 U.S. at 71 (emphasis added), the *Foster* Court meant to draw the line at "receipt." And, once again, this is not a novel argument. The Sixth Circuit rejected this exact interpretation in *Millsaps*, explaining that "'final selection' of an officeholder requires more than mere receipt of ballots cast by voters." 259 F.3d at 546. Thus, if Plaintiffs are right—and they are not—then *all* of the "combined actions of voters and

officials"—including, counting, canvassing, and certification—must occur on "election day." Neither *Foster* nor the text of the Election Day Statutes require that absurd result, which would upend Mississippi's comprehensive and longstanding post-Election Day procedures.

There is a far simpler, and less disruptive, answer to what the "the combined actions of voters and officials" refers to. The Court itself supplied the answer in *Foster*: the "combined actions of voters and officials" "may not be *consummated prior* to federal election day." 522 U.S. at 71, 72 n.4. *Foster* pointedly says nothing more, and certainly did not encourage courts to traipse down the interpretive thicket that Plaintiffs have constructed for themselves.

Several recent decisions confirm that the Election Day Statutes address when ballots must be *cast*—not when they must be *received*. In *Way I*, the district court rejected the RNC's (and others') challenge to a New Jersey law that allowed for the counting of non-postmarked ballots received after election day. 492 F. Supp. 3d at 369. All parties agreed that ballots must be cast by Election Day to be valid. *Id.* at 371. The specific question presented was "whether the Federal Election Day Statutes preempt New Jersey's method of determining whether a ballot received without a postmark . . . was cast on or before Election Day." *Id.* at 371–72. The court "f[ound] that New Jersey's law permitting the canvassing of ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls is not preempted . . . because the Federal Election Day Statutes *are silent on methods of determining the timeliness of ballots.*" *Id.* at 372 (emphasis added); *see also id.* ("New Jersey law prohibits canvassing ballots *cast* after Election Day, *in accordance with the Federal Election Day Statutes.*" (emphasis added)). Thus, a ballot is "timely" when it is "cast" by Election Day.

The Third Circuit in *Bognet* also treated the "receipt" of ballots as akin to routine post-election actions—like counting and canvassing—distinct from casting or voting a ballot. *Bognet*

addressed a challenge to Pennsylvania's extended ballot receipt deadline during the COVID-19 pandemic. 980 F.3d at 345–46. Although the Third Circuit's decision addressed only standing, the court explained that the "concreteness of the Voter Plaintiffs' alleged vote dilution stemming from the Deadline Extension turns on the federal and state laws applicable to voting procedures." *Id.* at 353. In that context, the court explained that "Federal law does not provide for *when* or *how* ballot counting occurs," and thus "the Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously." *Id.* at 353–54. Accordingly, the plaintiffs had alleged only a violation of *state*—not federal—law. *Id.* at 354–55.

Relying in part on these precedents as well as the plain text of the Election Day Statutes, a court in the Northern District of Illinois recently rejected the merits of an *identical* preemption challenge to Illinois' ballot receipt deadline. *Bost*, 2023 WL 4817073, at *10–*11. As that court succinctly explained: "There is a notable lack of federal law governing the timeliness of mail-in ballots." *Id.* at *11. But "[b]y counting only th[o]se ballots that are postmarked no later than Election Day, the Statute complies with federal law that set[s] the date for Election day." *Id.* The statute therefore "does not facially conflict with the federal election law." *Id.*

Because federal precedent, including *Foster's* progeny in this Circuit, *see Bomer*, 199 F.3d at 775, uniformly cuts against them, Plaintiffs search far and wide for helpful case law, including a decades-old decision from the Montana Supreme Court. But the Montana Supreme Court's interpretation of Montana *state* law cannot support Plaintiffs' interpretation of the federal Election Day Statutes. In *Maddox v. Board of State Canvassers*, the Montana Supreme Court concluded that, under *Montana* law, "voting is done not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day." 149 P.2d 112, 115 (Mont. 1944). The court then went on to say: "The federal and

state laws must be read together; and *since the state law* provides for voting by ballots deposited with the election officials, that act must be completed on the day designated by state and federal laws." *Id.* (emphasis added). That holding provides no support for Plaintiffs' views here about what a different *federal* law requires. Moreover, Montana's state law has since been changed—at least in part. Montana now allows for military-overseas ballots to be counted if transmitted electronically by 8 p.m. on election day and received by elections officials no later 5 p.m. on the day after election day. Mont. Code. Ann. § 13-21-226(1). Montana's choice to amend its state law illustrates precisely why Plaintiffs are wrong here—no *federal* law presently displaces the constitutional prerogative of states retain to choose when ballots must be received.

Mississippi's interpretation—and that of roughly half the other states—"is consistent with a plain, common sense reading of the language of [the Election Day Statutes], the same approach the Court followed in *Foster* to interpret the statute." *Bomer*, 199 F.3d at 776. This Court, like the Supreme Court in *Foster* and the Fifth Circuit in *Bomer*, need go no further.

**D.      Related statutory provisions confirm the plain text meaning of the Election Day Statutes.**

The Election Day Statutes are not Congress's sole enactment governing congressional or presidential elections. And elsewhere in the U.S. Code, federal law acknowledges and respects that many states have post-election ballot receipt deadlines. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) ("[W]e must examine the statute's text in light of context, structure, and related statutory provisions.").

The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) expressly acknowledges and incorporates state ballot receipt deadlines. UOCAVA generally requires states to permit military and overseas voters to vote absentee in federal elections. 52 U.S.C. § 20302(a)(1). If a UOCAVA voter does not receive a write-in ballot from state authorities by the

required deadline, then that voter may instead utilize an alternative "federal write-in absentee ballot." *Id.* § 20303(a)(1). Such federal write-in ballots shall not be counted, however, if the voter also votes a state absentee ballot and that ballot "is received by the appropriate State election official not later than *the deadline for receipt of the State absentee ballot under State law*." *Id.* § 20303(b)(3) (emphasis added). When this provision of UOCAVA was first enacted in 1986, *see* Pub. L. No. 99-410, § 103(b)(3), 100 Stat. 924, multiple states had post-election-day receipt deadlines, as Plaintiffs acknowledge. (*See* Libertarian Mem. at 19; RNC Mem. at 15–16). Rather than choose to displace such laws, Congress expressly incorporated them into federal statute.

The MOVE Act, passed in 2009, also defers to state-law ballot receipt deadlines. It requires officials to ensure that overseas servicemembers' ballots "for regularly scheduled general elections for Federal office" are delivered "to the appropriate election officials" "not later than *the date by which an absentee ballot must be received in order to be counted in the election*." 52 U.S.C. § 20304(b)(1); Pub. L. No. 111-84, div. A, tit. V., subtit. H, § 580(a), 123 Stat. 2190. This language makes no sense if the Election Day Statutes categorically preempted long-existing post-election-day receipt deadlines. Moreover, Congress could have just as easily required that such ballots be delivered to election officials "by Election Day." Instead, it again deferred to the states' constitutional prerogative to set this deadline. Thus, "even federal laws governing elections allow ballots received after Election Day to be counted." *Bost*, 2023 WL 4817073, at *11.

The RNC Plaintiffs argue that Congress has, in other statutory provisions, carved out "exceptions" that prove the general rule that ballots must be received by election day. (RNC Mem. at 9). But each of these "exceptions" is either irrelevant or demonstrates that the Election Day Statutes require nothing more than the casting of ballots by election day.

First, the RNC Plaintiffs point to federal statutes allowing for special elections to fill vacancies in federal office. (RNC Mem. at 9–10). These statutes provide exceptions to the general rule that "election day" is the Tuesday after the first Monday in November. But they say nothing about the statutory meaning of the term "election." Nor do they shed any light on what official actions, if any, must occur on or before "election day." They simply allow states to designate a different "election day" for special elections. *See Foster*, 522 U.S. at 71 n.3 (explaining that 2 U.S.C. § 8 "provides that a State may hold a congressional election on a day other than the uniform federal election day").

The RNC Plaintiffs next observe that, elsewhere in Title 2 of the U.S. Code, Congress has "carved out exceptions for certain absentee voters in special elections." (RNC Mem. at 10). Specifically, Congress has directed states to count the ballots of overseas and military voters in special elections as long as they arrive within 45 days after the state transmits the ballot—even if that is *after* the "day" of the special election. 2 U.S.C. § 8(b)(5). The RNC Plaintiffs read into this "exception" a general rule that ballots must be received by election day under federal law. Not so. While more than half the states do allow varying degrees of post-election-day receipt of military and overseas ballots, the remainder do not. 2 U.S.C. § 8(b)(5) preempts state laws requiring election-day receipt for military and overseas voters in special elections but leaves states free to enact less restrictive regimes for other voters. This demonstrates that when Congress wishes to specify a particular deadline for receipt of election day ballots—thus preempting inconsistent state laws—it knows how to do so. Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005).

Moreover, it would be odd for Congress to enact an extended receipt deadline for certain UOCAVA voters as an "exception" to the Election Day Statutes without at least acknowledging that it was doing so. *Cf. United States v. Vonn*, 535 U.S. 55, 65 (2002) (partial repeals by implication are disfavored). And Plaintiffs have pointed to nothing in statute or legislative history that would suggest Congress *ever* considered whether the Election Day Statutes preempt state law receipt deadlines. Instead, "[t]hese longstanding efforts by Congress and the Executive Branch to ensure that ballots cast by Americans living overseas are counted, so long as they are cast by Election Day, strongly suggest that statutes like the one at issue here are compatible with the Elections Clause." *Bost*, 2023 WL 4817073, at *11.[8]

The RNC Plaintiffs next point to the 1970 amendments to the Voting Rights Act, which require state officials to count the ballots of qualified absentee voters so long as the voters "return such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election." (RNC Mem. at 10–11 (quoting 52 U.S.C. § 10502(d))). That Congress declined to mandate a post-election receipt deadline in the VRA amendments certainly does not demonstrate that Congress understood the Election Day Statutes to *prohibit* such a rule. That argument is expressly foreclosed by the VRA itself. The *same section*

---

[8] Plaintiffs' position is also inconsistent with the longstanding practice of federal courts remedying UOCAVA violations. Courts frequently extend ballot receipt deadlines to remedy such violations—even though UOCAVA itself only requires post-election receipt deadlines in limited circumstances. *See Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act*, Dep't of Just. (Mar. 24, 2022), https://www.justice.gov/crt/cases-raising-claims-under-uniformed-and-overseas-citizen-absentee-voting-act. Plaintiffs' reading of the Election Day Statutes, if correct, would preclude that remedy. *See INS v. Pangilinan*, 486 U.S. 875, 883 (1988) (explaining that even courts of equity cannot "disregard statutory [] requirements" or "create a remedy in violation of law"); *Perkins v. City of Chi. Heights*, 47 F.3d 212, 217–18 & n.4 (7th Cir. 1995) (recognizing that judicially-imposed consent decree must both remedy a violation of *and comply with federal law*) (emphasis added).

specifies: "Nothing in this section shall prevent any State or political subdivision from adopting less restrictive voting practices than those that are prescribed herein." 52 U.S.C. § 10502(g).

> **E.     History confirms the plain text meaning of the Election Day Statutes.**

Plaintiffs' reliance on "historical practice" is misplaced and irrelevant. That history, however intriguing, simply does not govern; the preemption issue before the Court is governed by clear Fifth Circuit precedent that the Plaintiffs simply ignore. *See supra* II.A.

In any event, Plaintiffs offer no evidence at all—in the form of legislative history or otherwise—that the drafters of the Election Day Statutes intended to prohibit states from counting mail ballots received after election day, or that legislators—at any point in history—understood the Election Day Statutes that way. And because voting by mail is, by Plaintiffs' own account, a relatively recent innovation, it follows that the Congress that passed the Election Day Statutes would have no view at all on the subject. Indeed, the Libertarian Party asserts that for much of this history it was "not physically possible" for ballots to be received after election day. (Libertarian Mem. at 14). Putting aside whether that assertion is in fact historically accurate, it makes little sense to say that the Election Day Statutes were "originally" understood to prohibit a practice that was unknown at the time they were enacted. *See Bostock v. Clayton County*, 590 U.S. 644, 654–55 (2020) ("ordinary public meaning" refers to the statute's meaning "at the time of enactment").

Plaintiffs' argument boils down to: because states did not have post-election ballot receipt deadlines in 1872, they are prohibited from enacting them now. That remarkable proposition would turn the Elections Clause on its head. Congress's power under that clause preempts state laws only "so far as it is exercised, and no farther." *Arizona*, 570 U.S. at 9. Congress did not, in passing the Election Day Statutes, freeze state election practices in time, never mind expressly prohibit now common post-election day receipt deadlines. Moreover, as the Fifth Circuit has recognized, what the legislative history of the Election Day Statutes *does* reflect is "Congress's concern that citizens

be able to exercise their right to vote." *Bomer*, 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407–08 (1872)). The Ballot Receipt Deadline furthers that goal by ensuring that voters are not disenfranchised because of mail delays out of their control, while at the same time setting a clear deadline for casting ballots. Plaintiffs ask this Court to disregard all of that, in favor of a legislative history that simply does not exist.

Furthermore, the plain meaning of "election day" as the day of voting—that is, the final day of casting one's ballot—is entirely consistent with historical practice. Post-election absentee ballot receipt deadlines have a long pedigree in the United States. The RNC Plaintiffs provide one early example of an absentee voting law that permitted ballots to be received after election day: In Washington, as early as 1918, voters who were unable to vote in their home counties could cast a ballot in another county which would then be "sealed and returned to the voter's home county." (RNC Mem. at 14 (quoting P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (May 1918))). "In order to be counted the ballot must have been received by the [home] county auditor *within six days from the date of the election or primary*." *Id.* (emphasis added). That is materially indistinguishable from the Ballot Receipt Deadline, which requires voters to transmit their ballots by election day, but allows for those ballots to be counted as long as they are received by the relevant election official within five days thereafter. Handing a ballot to a county election official who is not empowered to count or process it, for delivery to the correct county election official, is no different from handing the ballot to a postal worker.[9]

The RNC Plaintiffs also helpfully point out that in 1942, Congress required states to permit members of the armed services to vote absentee in federal elections in times of war, providing that

---

[9] Plaintiffs further acknowledge that both Nebraska and Washington had post-election receipt deadlines in 1971. (RNC Mem. at 15; Libertarian Mem. at 19). And more recently, dozens of states have enacted post-election day receipt deadlines in various forms. (RNC Mem. at 16).

"no official war ballot shall be valid . . . if it is received by the appropriate election officials . . . after the hour of closing the polls on the date of the holding of the election." Act of Step. 16, 1942, ch. 561, 56 Stat. 753, § 9; (RNC Mem. at 15). This shows that, when Congress wishes to set Election Day as a categorical deadline for receipt of ballots, it knows how to clearly do so. Congress's enactment of that statute directly refutes Plaintiffs' interpretation of the Election Day Statutes, which asks this Court to find such a limitation implicit in the text of provisions that clearly do not impose it explicitly. *See Jama*, 543 U.S. at 341. If, as Plaintiffs contend, it was widely understood that the Election Day Statutes require an election day receipt deadline, then there would have been no need for Congress to specify election day as the receipt deadline for military absentee ballots—the Election Day Statutes themselves would have already provided just such a deadline.

In short, post-election-day ballot receipt deadlines are nothing new. "[Y]et Congress has taken no action to curb this established practice." *Bomer*, 199 F.3d at 776. As the Fifth Circuit explained in the related context of absentee voting: "We are unable to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously well aware." *Id.* "Despite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules." *Bost*, 2023 WL 4817073, at *11. That acquiescence is not a product of mere Congressional inattention. Against the backdrop of these longstanding state election laws, Congress has amended the Election Day Statutes several times without addressing ballot receipt deadlines—including most recently in December 2022. *See* Electoral Count Reform and Presidential Transition Improvement Act of 2022, Pub. L. No. 117-328, div. P, tit. I, 136 Stat. 4459, 5233 (2022) ("ECRA").[10] *Cf. Bob Jones*

---

[10] The ECRA, contrary to the Libertarian Party's assertion, says nothing about receipt deadlines. (Libertarian Mem. at 12). It allows states to "modif[y] the period of *voting*," meaning the period

*Univ. v. United States*, 461 U.S. 574, 599 (1983) (finding "unusually strong case of legislative acquiescence" where Congress was "constantly reminded" and "aware[]" of the issue "when enacting other and related legislation").

## III.     The Ballot Receipt Deadline does not burden the Plaintiffs' constitutional rights.

Plaintiffs' claims that the Receipt Deadline violates both the right to vote and the right to stand for office are also without merit. These claims derive entirely from Plaintiffs' federal preemption claim. (*See* Intervenors' Mem. at 28). If that claim fails, so too do the constitutional claims. But, just as importantly, nothing about the Ballot Receipt Deadline makes it harder to cast a vote or harder to run for office. As Intervenors have explained, alleged burdens on the right to vote and right to stand for office under the First and Fourteenth Amendments are reviewed under the *Anderson-Burdick* test. (Intervenors' Mem. at 28 (citing *Tex. League of United Latin Am. Citizens v. Hughes*, 978 F.3d 136, 143 (5th Cir. 2020)); *Tex. Ind. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996). Plaintiffs, again, fail to even mention this governing standard—let alone satisfy it.

Plaintiffs appear to recognize that they do not in fact have standalone constitutional claims here based on the limited—and, at times, non-existent—argument offered in support of these claims. Indeed, they barely address these claims at all in their motions. RNC Plaintiffs merely argue that their candidates and voters "suffer injury" as a result of the Ballot Receipt Deadline— that is, that they have standing. (RNC Mem. at 18–20). But standing alone is not sufficient to establish a constitutional violation. And Plaintiffs' standing arguments independently fail for the reasons discussed above. Because the RNC Plaintiffs have failed to show even the de minimis

---

during which ballots may be cast, in response to force majeure events. 3 U.S.C. § 21(1) (emphasis added).

injury required for Article III standing, they certainly have not established that the Ballot Receipt Deadline burdens their First or Fourteenth Amendment rights under *Anderson-Burdick*.

Though the Libertarian Party's Motion for Summary Judgment seeks an order "finding" that the Ballot Receipt Deadline "violate[s] the First and Fourteenth Amendment," (ECF No. 55 at 1), their brief presents no argument on that point. They argue only that the Receipt Deadline is preempted by the federal election day statutes—which, as explained above, it is not.

Because Plaintiffs have failed to identify *any* burden on the right to vote or the right to stand for office, let alone a "severe" burden, they cannot prevail on their constitutional claims. And because they cannot demonstrate a "direct conflict" between the Ballot Receipt Deadline and the Election Day Statutes, their preemption claims fail as well.

## CONCLUSION

For the foregoing reasons, Intervenor-Defendants respectfully request that the Court enter summary judgment for Defendants and Intervenor-Defendants and dismiss Plaintiffs' claims as a matter of law.

Dated: April 9, 2024                                    Respectfully submitted,

/s/ Elisabeth C. Frost                              /s/ Robert B. McDuff
Elisabeth C. Frost* (DC Bar # 1007632)      Robert B. McDuff (MS Bar # 2532)
Christopher D. Dodge* (DC Bar # 90011587)    Paloma Wu (MS Bar # 105464)
Michael B. Jones* (DC Bar # 252745)         **MISSISSIPPI CENTER FOR JUSTICE**
Richard A. Medina* (DC Bar # 90003752)      210 E. Capitol Street
Tina Meng Morrison* (DC Bar # 1741090)      Suite 1800
**ELIAS LAW GROUP, LLP**                     Jackson, MS 39201
250 Massachusetts Ave NW                     Phone: (601) 259-8484
Suite 400                                    Fax: (601) 352-4769
Washington, DC 20001                         rmcduff@mscenterforjustice.org
Phone: 202-968-4490                          pwu@mscenterforjustice.org
efrost@elias.law
cdodge@elias.law

mjones@elias.law
rmedina@elias.law                              *Counsel for Intervenor-Defendants Vet Voice*
tmengmorrison@elias.law                        *Foundation and Mississippi Alliance for*
                                               *Retired Americans*

*Admitted *pro hac vice**