UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, et al., <br><br>   Plaintiffs, <br><br> v. <br><br> JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, et al., <br><br>   Defendants, <br><br> and <br><br> VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS, <br><br>   Intervenor-Defendants. | No. 1:24-cv-00025-LG-RPM |

*consolidated with*

| | |
|---|---|
| LIBERTARIAN PARTY OF MISSISSIPPI, <br><br>   Plaintiff, <br><br> v. <br><br> JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*; et al., <br><br>   Defendants, <br><br> and <br><br> VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS, <br><br>   Intervenor-Defendants. | No. 1:24-cv-00037-LG-RPM |

**REBUTTAL MEMORANDUM BRIEF IN SUPPORT OF INTERVENOR-DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Intervenor-Defendants Vet Voice Foundation ("Vet Voice") and the Mississippi Alliance for Retired Americans (the "Alliance") (together, "Intervenors"), submit this rebuttal in support of their motion for summary judgment. For the following reasons, Intervenors' motion for summary judgment (ECF No. 61), should be granted.

## INTRODUCTION

Despite having had numerous opportunities, Plaintiffs fail to meet the well-established requirements for Article III standing under binding Fifth Circuit precedent. Both Intervenors and the Secretary have detailed those requirements and the deficiency in Plaintiffs' legal theories and declarations in their own summary judgment motions, (ECF No. 62) (Intervenors' Mem.), (ECF Nos. 52, 54) (Secretary's Mems.), as well as their responses to Plaintiffs motions, (ECF No. 81) (Intervenors' Resp.), (ECF Nos. 73, 74) (Secretary's Resps.). Indeed, these briefs have given Plaintiffs a detailed roadmap to the Fifth Circuit's requirements to allege a sufficiently concrete, particularized, and non-speculative injury. Yet—even with their new supplemental declarations—Plaintiffs offer nothing more than conclusory, boilerplate statements, with no supporting details. Because Plaintiffs cannot show that they are injured by the Ballot Receipt Deadline, this Court lacks jurisdiction. But even if the Court were to reach the merits, Plaintiffs' claims are facially deficient and must be dismissed as a matter of law.

Plaintiffs' motions for summary judgment (ECF Nos. 55, 58) should be denied, and Intervenors' motion for summary judgment should be granted.

## ARGUMENT

### I.  Plaintiffs lack standing.

Plaintiffs have now tried three times to show that they have standing—first in their pleadings and then in two rounds of declarations and briefing—yet still fall short. This should not

1

come as a surprise—four other courts have rejected prior attempts by plaintiffs making the same arguments as insufficient to trigger federal jurisdiction. Plaintiffs offer nothing to this Court that would justify a different conclusion.

A.  **The Political Party Committee Plaintiffs lack organizational standing.**

The declarations from the RNC and MSGOP make clear that they plan to engage in ballot chase programs and poll watching activities regardless of whether the Ballot Receipt Deadline is enjoined.[1] Plaintiffs have not explained how those activities differ from their "routine" activities, nor have the identified any "specific projects" that they "had to put on hold or otherwise curtail in order to respond to" the Deadline. That failure forecloses organizational standing. *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) ("*LaFHAC*") (cleaned up); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010).

Unable to overcome this binding precedent, Plaintiffs urge the Court to apply their own novel test for organizational standing. Citing *ACORN v. Fowler*, 178 F.3d 350 (5th Cir. 1999), the RNC argues that it has standing because the Ballot Receipt Deadline forces it to spend extra days on its ballot chase and poll watching activities. (ECF No. 75 at 9–10) (RNC Resp.). But in *ACORN*, the plaintiff organization showed that it "expended resources registering voters in low registration areas who would have already been registered" if the defendants had complied with federal law, *and* that "these wasted resources . . . could have [been] put to use registering voters that the NVRA, even properly implemented, would not have reached." 178 F.3d at 361. In other words, it showed what mission-critical use the money would have been towards but for the challenged law. The RNC has no such evidence. And far from showing that it has diverted resources *from* something—

---

[1] The Libertarian Party contends only that it will "try" to monitor post-election canvassing despite volunteers' competing personal and professional obligations. (ECF No. 79-1 ¶ 5) (Second Decl. of Vicky Hanson).

as it must, *see, e.g.*, *City of Kyle*, 626 F.3d at 238—its declarants state that the RNC *might not spend those resources at all*. (ECF No. 58-1 ¶ 18) (Walukevich Decl.); (ECF No. 58-2 ¶ 16) (Bordeaux Decl.); *see also* Intervenors' Resp. at 6–8. Just as importantly, the RNC *nowhere* makes a serious effort to explain how maintaining these routine programs for a few extra days "perceptibly impair[s] its ability to achieve its mission." *LaFHAC*, 82 F.4th at 354. At this stage, the RNC "must go beyond the talismanic words to allege facts showing its ability to achieve its mission was 'perceptibly impaired' such that it suffered a concrete and demonstrable injury." *Id.* at 355. It fails to do so. Nor has it shown that its purported resource diversion is anything other than a self-inflicted injury responding to a speculative harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

The Libertarian Party, relying on *Texas Democratic Party v. Benkiser*, 459 F.3d 482 (5th Cir. 2006), argues that it has standing because the Ballot Receipt Deadline forces it to suffer economic harm, regardless of whether it otherwise satisfies the Fifth Circuit's clear and rigorous organizational standing requirements. (*See* ECF No. 80 at 5–11) (Libertarian Resp.). As Intervenors have explained, the Libertarian Party's declarations are insufficient to establish anything other than, at best, self-inflicted economic harm in response to a speculative fear of future electoral injury. Intervenors' Resp. at 8-9. Nothing in *Benkiser* suggests that political parties are somehow exempt from the standing requirements that the Fifth Circuit applies to all organizational plaintiffs. The plaintiff in *Benkiser* showed that replacing an opposing candidate on the ballot with a new candidate late in the election cycle would force it to scrap the campaign it had been running for months, and "raise and expend additional funds and resources to prepare a new and different

3

campaign." 459 F.3d at 586.[2] There was no doubt in that case that the party's expenditures were necessary to avoid a non-speculative risk of electoral harm. And the Fifth Circuit specifically observed that the district court's "finding of financial injury" was "supported by testimony in the record." *Id.* A decision that forces a party to shift gears to run an entirely new campaign at the last minute is a far cry from a generally applicable state law that ensures that lawful voters' ballots are counted—regardless of party. It is not surprising that the plaintiffs in *Benkiser* were able to satisfy Article III's requirements. The Plaintiffs here, however, do not.

### B. The Plaintiffs cannot establish standing based on competitive harm.

The Plaintiffs have also failed to establish that they have standing based on "competitive" harm. Plaintiffs have submitted *no* competent evidence to establish that they are likely to suffer electoral harm as a result of the enforcement of the Ballot Receipt Deadline. *See* Intervenors' Resp. at 9–11; *see also El Paso County v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) ("[P]laintiffs bear the burden of establishing standing for each claim they assert," and "must have adduced evidence to support controverted factual allegations"). In any event, to establish a cognizable "competitive" injury requires a structural "ongoing, unfair advantage." *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022); *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1003 (D. Nev. 2020). Here, the Ballot Receipt Deadline equally benefits *all* voters, including Plaintiffs' supporters. Rather than a concrete and particularized injury, all Plaintiffs allege here is a generalized interest in compliance with the law.

---

[2] As the district court noted in *Benkiser*, this was "precisely [the] type of injury that the Texas Legislature foresaw and attempted to prevent by enacting the prohibition on replacing a withdrawing candidate where another political party held a primary election and has a nominee for the office sought by the withdrawing candidate." *Tex. Democratic Party v. Benkiser*, No. A 06 CA 459 SS, 2006 WL 1851295, at *3 n.3 (W.D. Tex. July 6, 2006).

To the extent Plaintiffs claim an interest in an "accurate vote tally" based on *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), that case rested on flawed reasoning and has been repeatedly rejected by other federal courts. *See id.* at 1063 (Kelly, J., dissenting) (dissenting judge explaining the plaintiffs' "claimed injury—a potentially 'inaccurate vote tally' . . . —appears to be 'precisely the kind of undifferentiated, generalized grievance about the conduct of government' that the Supreme Court has long considered inadequate for standing." (quoting *Lance v. Coffmann*, 549 U.S. 437, 442 (2007))); *see also Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 351 n.6 (3d Cir. 2020) (explaining *Carson*'s error), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *King v. Whitmer*, 505 F. Supp. 3d 720, 736 (E.D. Mich. 2020) ("This Court . . . is as unconvinced about the majority's holding in *Carson* as the dissent."); *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 612 (E.D. Wis. 2020) ("Judge Kelly's reasoning is the more persuasive."); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 710–11 (D. Ariz. 2020) (joining other courts in repudiating *Carson*'s reasoning); *Bost v. Ill. State Bd. of Elections*, No. 22-cv-02754, 2023 WL 4817073, at *9 (N.D. Ill. July 26, 2023) ("[T]he Court declines to follow *Carson*."). But *Carson* is also distinguishable from this case, because the plaintiffs there "challenged a consent decree that contradicted state law," rather than "a statute passed by the state legislature and signed into law by the governor." *Bost*, 2023 WL 4817073, at *9. Finally, even the rare courts that have accepted *Carson*'s reasoning have still required plaintiffs to "allege[] facts to show that it is plausible that the field is 'tilted'," *Lake v. Hobbs*, 623 F. Supp. 3d 1015, 1029 (D. Ariz. 2022). No Plaintiff has done so here.

*Benkiser* also does not support Plaintiffs' claim of competitive harm. There, the plaintiff demonstrated through testimony that a particular "congressional candidate's chances of victory would be reduced" by an unfair bait-and-switch that would have replaced the Republican Party's

5

nominee with a more viable candidate. 459 F.3d at 586. The court credited that testimony, which was specific to the dynamics of a particular race, in a particular district, between two candidates. Here, Plaintiffs offer nothing more than generalized speculation, unsupported by competent evidence, that ballots arriving after election day are more likely to contain votes for Democrats. At this stage in the proceedings, this is clearly insufficient. *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) ("Conclusory allegations and unsubstantiated assertions . . . are not competent summary judgment evidence.").

      C.     **The individual Plaintiffs lack standing.**

As Intervenors and the Secretary have already explained at length, *see, e.g.*, Intervenors' Resp. at 12–14, Plaintiffs' "vote dilution" theory is a generalized grievance that cannot confer standing. And the type of "vote dilution" that courts *have* recognized, even outside the reapportionment context, requires differential treatment of voters. For instance, the Supreme Court in *Bush v. Gore* held that counting ballots according to different rules in different Florida counties would subject voters to "uneven treatment" in violation of the Equal Protection Clause. 531 U.S. 98, 107 (2000).

The RNC attempts to distinguish this case from the sea of others in which federal courts have repeatedly rejected this exact basis for standing, arguing that this is different because they do not allege that "some number of the late ballots [are] fraudulent." RNC Resp. at 19. Their claim, in other words, is not that their members' votes are "diluted" by fraudulent ballots, but simply by "improperly" or "unlawfully" counted ballots, cast by qualified Mississippi voters. The problem with this argument for standing purposes, again, is that Plaintiffs are not uniquely injured. The *reason* why those votes are "improper" does not alter the conclusion that "no single voter is specifically disadvantaged if a vote is counted improperly." *Wood v. Raffensperger*, 981 F.3d 1037, 1314 (11th Cir. 2020) (quotation omitted).

6

Plaintiff Lamb offers nothing new to cure the previously-identified deficiencies in his standing arguments. *See* Intervenors' Resp. at 14–16. *City of El Cinzo v. Texas*, on which Lamb relies, is distinguishable because, in that case, the Attorney General was *required* to "file an enforcement action" when "presented with evidence that a public officer has violated" the law. 890 F.3d 164, 175 (5th Cir. 2018). Here, Mr. Lamb's harm depends on a highly attenuated chain of events and any resulting injury would be entirely self-inflicted. Intervenors' Resp. at 15–16.

## II.     The Ballot Receipt Deadline does not directly conflict with the Election Day Statutes.

The text, legislative history, and case law make clear that all that is required for an "election" to take place on "election day" under federal law is for voters to make their final choice by that day. Intervenors. Resp. at 17–27. The precise means of transmission, validation, and counting of ballots is left up to the states. The RNC Plaintiffs' only response to this straightforward conclusion is to pluck a quote out of context from *Foster v. Love*, 522 U.S. 67 (1997), and pretend the Supreme Court inserted that language into the statute. But the Supreme Court in *Foster* went to unusual lengths to emphasize that it was *not*, in fact, offering a definition of the term "election" in the Election Day Statutes—let alone replacing the statute's text with selected language from the Court's opinion. *See, e.g.*, *Foster*, 522 U.S. at 72 & n.4.

Plaintiffs fail to identify any support for their interpretation in the text of the Election Day Statutes. That is unsurprising. The very definitions that Plaintiffs rely upon show they require only that, by election day, the voter has taken all action necessary *by them* to cast a ballot. *See* Intervenors' Resp. at 18–19. The legislative history also confirms that, at that point, the purposes of the Election Day Statutes are fulfilled. *Id*. at 19-20. And courts, including the Supreme Court, have acknowledged the commonsense distinction between the discrete acts of *casting* a ballot and *receipt* of a ballot. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam). With no textual support, the RNC Plaintiffs instead rely on (1) a misreading

7

of *Foster*, (2) an 80-year-old decision from the Montana Supreme Court interpreting a long-since-amended state statute, and (3) a series of absurd hypotheticals. As explained, Plaintiffs' reading of *Foster* is foreclosed by express language limiting the Court's holding in that case. Intervenors' Resp. at 23–24. And the Montana Supreme Court's interpretation of state law in *Maddox* has no bearing on the proper interpretation of federal law. *Id.* at 26–27.

The RNC's resort to arguing that Defendants' position means that a ballot is "cast" if a voter returns it to the wrong place, *see* RNC Resp. at 25, only underscores how nonsensical and silly their position is. Mailing a ballot by election day is of course not the *only* requirement for casting an absentee ballot in Mississippi. But it is the *final* step that must be completed by the voter, and thus it marks the point in time at which the ballot is "cast." Before mailing, voters must also mark and sign the ballot, affix postage, and address their ballot to their county registrar—not a trash can, or the Department of Public Safety. Miss. Code § 23-15-631(1)(b), (c). These requirements are well within the state's power to set the Time, Place, and Manner of elections. Then, once the voter has completed these steps to cast their ballot, election officials must "receive[]" the ballot, and place it in a "secured and sealed box in a designated location." *Id.* § 23-15-637(1)(a), (2). The "resolution board" must then "take the envelopes containing the absentee ballots of such electors from the secure location," compare the signature on the envelope to the signature on the absentee ballot application, find that the voter is a registered and qualified voter, open the envelope, remove the ballot, and deposit it in the ballot box. *Id.* § 23-15-639(1). Ballots must then be processed and counted using the detailed procedure specified by law. *Id.*; *id.* § 23-15-523. The results of the vote by absentee balloting are announced "simultaneously with the vote cast on election day; provided that absentee ballots received after 7:00 p.m. the day before the

election shall be kept in a secured and sealed ballot box, and shall be announced after the five-business-day period for receiving absentee ballots." *Id.* § 23-15-651.

Plaintiffs' definition of the term "election" would sweep in this entire process, requiring each step to be completed *on election day*. Even Plaintiffs do not argue for that absurd result, opting instead to arbitrarily draw the line at "receipt." RNC Resp. at 24-25. But they fail to identify any textual basis for that self-serving limitation. That is because the text, history, and purpose of the Election Day Statutes require only that the actions of the *voter* be completed by election day.

Plaintiffs also misrepresent the statutory context and history of the federal statutes in question. The RNC Plaintiffs' arguments regarding UOCAVA are wrong for the reasons Intervenors have explained. Intervenors' Resp. at 27–30 & n.8. But a few points bear emphasizing. *First*, the RNC Plaintiffs argue that extended ballot receipt deadlines ordered as an equitable remedy for UOCAVA violations have no bearing on the meaning of the Election Day Statutes. RNC Resp. at 28. But even courts of equity cannot "disregard . . . statutory requirements" or "create a remedy in violation of law." *INS v. Pangilinan*, 486 U.S. 875, 883 (1988). So, if Plaintiffs' interpretation of the Election Day Statutes is correct, then federal courts have been routinely violating federal law for years in UOCAVA cases. *See* Intervenors' Resp. at 30 n.8. *Second*, it is not true that Congress "has considered and rejected" proposals to "permit" post-election-day receipt of ballots. RNC Resp. at 28. The "legislative history" that the RNC Plaintiffs cite in *Voting Integrity Project, Inc. v. Kiesling*, 259 F.3d 1169, 1171–74 (9th Cir. 2001), addressed "multi-day" voting and said nothing about receipt deadlines. Congress has never had occasion to

9

consider whether to "allow" post-election-day ballot receipt, because no federal law presently prohibits it.[3]

### III.   Plaintiffs concede they have no standalone constitutional claims.

Plaintiffs have now made clear that they do not bring a separate claim for violation of the First or Fourteenth Amendments. Libertarian Resp. at 29 n.27; RNC Resp. at 29 ("This is not an *Anderson-Burdick* case."). They bring only a preemption claim under the Election Day Statutes, and the Elections and Electors Clauses.[4] But, in any event, their claims fail because the Election Day Statutes do not preempt the Ballot Receipt Deadline.

### CONCLUSION

For the reasons above, Intervenors respectfully request that the Court enter summary judgment for Defendants and Intervenors and dismiss Plaintiffs' claims as a matter of law.

Dated: April 16, 2024                                              Respectfully submitted,

*/s/ Elisabeth C. Frost*                                           */s/ Robert B. McDuff*
Elisabeth C. Frost* (DC Bar # 1007632)           Robert B. McDuff (MS Bar # 2532)
Christopher D. Dodge* (DC Bar # 90011587)   Paloma Wu (MS Bar # 105464)
Michael B. Jones* (DC Bar # 252745)              **MISSISSIPPI CENTER FOR JUSTICE**
Richard A. Medina* (DC Bar # 90003752)        210 E. Capitol Street
Tina Meng Morrison* (DC Bar # 1741090)       Suite 1800

---

[3] The Libertarian Party's additional arguments about the "original public meaning" of the Election Day Statutes add nothing new and are wrong for the reasons Intervenors explained in their Response. Intervenors' Resp. at 31-34.

[4] Puzzlingly, Plaintiffs point to *Foster*, *Bomer*, and *Millsaps*. RNC Resp. at 29; Libertarian Resp. at 29 & n.27. But the plaintiffs in those cases did not allege violations of the right to vote or stand for office under the First or Fourteenth Amendments. *See Love v. Foster*, 90 F.3d 1026, 1028 (5th Cir. 1996) ("[W]e address only the pre-emption claim."); *id.* at 1032 n.8 ("The issues not considered in this opinion include whether plaintiffs have stated a claim for a violation of the Privileges and Immunities Clause of the Fourteenth Amendment and whether plaintiffs have stated a claim enforceable under 42 U.S.C. § 1983."); *see also Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 774 (5th Cir. 2000); *Millsaps v. Thompson*, 259 F.3d 536, 536 (6th Cir. 2001).

**ELIAS LAW GROUP, LLP**
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
Phone: 202-968-4490
efrost@elias.law
cdodge@elias.law
mjones@elias.law
rmedina@elias.law
tmengmorrison@elias.law

*Admitted *pro hac vice*

Jackson, MS 39201
Phone: (601) 259-8484
Fax: (601) 352-4769
rmcduff@mscenterforjustice.org
pwu@mscenterforjustice.org


*Counsel for Intervenor-Defendants Vet Voice Foundation and Mississippi Alliance for Retired Americans*