## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION GULFPORT

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; and MATTHEW LAMB, | |
|        Plaintiffs, | No. 1:24-cv-00025-LG-RPM (Lead Case) |
|    v. | **REPLY IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*; TONI JO DIAZ, BECKY PAYNE, BARBARA KIMBALL, CHRISTENE BRICE, and CAROLYN HANDLER, *in their official capacities as members of the Harrison County Election Commission*; and MICHAEL WATSON, *in his official capacity as the Secretary of State of Mississippi*, | |
|        Defendants, | |
| VET VOICE FOUNDATION and MISSISSIPPI ALLIANCE OF RETIRED AMERICANS, | |
|        Intervenor-Defendants. | |
| LIBERTARIAN PARTY OF MISSISSIPPI, | |
|        Plaintiff, | |
|    v. | No. 1:24-cv-00037-LG-RPM (Consolidated Case) |
| JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*, *et al.*, | |
|        Defendants. | |

# TABLE OF CONTENTS

Introduction ...........................................................................................................3

Argument ...............................................................................................................4

    I.   Plaintiffs have four independent bases for standing, which Defendants have
        not defeated. ...........................................................................................4

        A.   Plaintiffs have organizational standing, just like countless other political
            organizations that challenge election laws. ........................................4

        B.   Competitive political injury is an independent basis for organizational
            standing.................................................................................................9

        C.   Elections conducted in violation of law injure candidates and voters. .........10

        D.   Election officials have standing when their position requires them to
            enforce unlawful state practices. ......................................................11

    II.   The Court should look to text, history, and binding precedent to determine
        the original meaning of the "day for the election," not to weak inferences
        about recent federal law. ...................................................................12

    III.  Voters have the right to vote, and candidates have the right to stand for
        office. ......................................................................................................18

Conclusion............................................................................................................20

Certificate of Service ..........................................................................................21

**INTRODUCTION**

*Foster v. Love* resolves most issues in this case. 522 U.S. 67 (1997). History resolves the rest. *Foster* resolves justiciability: just like this case, *Foster* was an action brought by voters to enforce the federal election-day statutes. *Foster* resolves the constitutional violation: States violate voters' constitutional rights when they enforce laws that conflict with the election-day statutes. *Foster* resolves the proper vehicle to vindicate those rights: that case, like this one, was brought under 42 U.S.C. §1983. *Foster* resolves what must occur on election day: the consummation of the election, which requires the "combined actions of voters and officials." *Foster*, 522 U.S. at 71. And history confirms that consummation requires ballots to be received by election officials. Text, history, and precedent prove *Foster* right.

In contrast, the few court opinions that Defendants rely on resolve nothing. What the intervenors call "extensive case law" is a handful of poorly reasoned opinions on some of the issues raised in this case. Doc. 81 at 2. Half of that "extensive case law" is either vacated or on appeal. *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Bost v. Ill. State Bd. of Elections*, 2023 WL 4817073 (N.D. Ill. Jul. 26, 2023), *on appeal* No. 23-2644 (7th Cir.). "Vacated authority, of course, is no authority at all." *Hotze v. Hudspeth*, 16 F.4th 1121, 1126 (5th Cir. 2021) (Oldham, J., dissenting) (citing *Bognet*, 980 F.3d 336). The rest are district court decisions from outside this circuit. *See Donald J. Trump for President, Inc. v. Way*, 2020 WL 6204477 (D.N.J. Oct. 22, 2020); *Splonskowski v. White*, 2024 WL 402629 (D.N.D. Feb. 2, 2024). And all of it is wrong. None of those cases discussed the historical practice that informs the meaning of the election-day statutes, and all relied on weak inferences about congressional acquiescence. This Court should not make those same mistakes.

## ARGUMENT

I.    **Plaintiffs have four independent bases for standing, which Defendants have not defeated.**

A.    **Plaintiffs have organizational standing, just like countless other political organizations that challenge election laws.**

The Republican Party "has direct standing" because the law "would cause it economic loss." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). The intervenors don't cite *Benkiser* in either of their briefs. *See* Docs. 62, 81. The State discusses the case, but their concerns are easily resolved. The State first argues that the RNC and MSGOP "have not identified any specific projects or activities" that suffered as a result of their resource diversion. Doc. 73 at 22. But Plaintiffs' declarations identify those projects: Devoting resources to a longer period for ballot chasing requires the RNC to divert resources away from traditional get-out-the-vote operations. *See* Docs. 75-1 (Blair Decl.); 75-2 (Bordeaux Supp. Decl.). And spending money on additional days and training for poll-watchers forces the parties to divert resources away from other election integrity efforts to educate voters, monitor state and local compliance with election laws, and increase confidence in the election. *See* Docs. 75-1 (Blair Decl.); 75-2 (Bordeaux Supp. Decl.). These facts resolve the State's first concern.

The State next argues that the Republican Party's activities don't suffice because they are routine. But a "diversion-of-resources theory does not require a plaintiff to pursue an entirely new mission in order to gain standing." *Black Voters Matter Fund v. Raffensperger*, 508 F. Supp. 3d 1283, 1292 (N.D. Ga. 2020). The Texas Democratic Party had standing in *Benkiser* to enjoin the removal of a Republican candidate from the ballot even though putting together a "campaign strategy" is the *most* routine activity of a political party. *Benkiser*, 459 F.3d at 586. What mattered was that the challenged conduct was "a but-for cause of the [Democratic Party] having to expend additional money" on those activities. *Id.* Here, the political party is different, but the injury is the same. Mississippi's mail-in receipt deadline necessarily harms the Republican Party's

4

mission by forcing it to divert resources from one set of mission-critical activities to another set of mission-critical activities. "[B]ut for" Mississippi's post-election deadline, the Republican Party would not have to divert its resources to fund those activities for extra election days. *Id.*

The State's attempts to distinguish *Benkiser* don't make sense. The State argues that "[u]nlike *Benkiser*, this is not a case where the RNC Plaintiffs are forced to spend money to combat the actions of an opposing political party causing concrete harm to an individual candidate months before a particular election." Doc. 73 at 23. But the concrete harm in *Benkiser* was the increased risk of losing an election if the party didn't spend money. The court enjoined "the Secretary of State from removing [the Republican candidate's] name from the ballot for the general election" because that state action would harm the Democrat's electoral chances and cost the party money. *Benkiser*, 459 F.3d at 586. The Fifth Circuit did not require the Democratic Party to show how much money it would spend on a new campaign. And it didn't require the party to show that failing to spend that money would result in their electoral defeat. It was enough that the party would have spent money to increase its electoral chances in response to state action. Because only one party needs standing, that resolves the standing issues in this case. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020).

Although the intervenors don't address *Benkiser*, it answers their counterarguments, too. To start, the intervenors still insist that the law must "require" Plaintiffs to divert their resources. Doc. 81 at 5. They acknowledge that the RNC "spend[s] additional resources on its ballot-chase program in the days after election day," but say "it is not clear why the RNC *must* do so." Doc. 81 at 6. But in *Benkiser*, the Democratic Party was not *required* "'to raise and expend additional funds'" on its campaign. *Benkiser*, 459 F.3d at 586. There was nothing about changing the Republican candidate that meant the Democratic Party "must" spend more money on its campaign. Doc. 81 at 6. The test is whether the challenged action is a "but-for cause" of the plaintiffs'

expenses, *Benkiser*, 459 F.3d at 586, not whether the law states, "The RNC must spend money."

The intervenors, all of whom are litigious nonprofits, should know this better than anyone. They frequently rely on organizational standing to challenge election laws across the country. *E.g.*, *La Union del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509, 531 (W.D. Tex. 2022) (Alliance for Retired Americans had standing); *Ariz. All. for Retired Americans v. Clean Elections USA,* 638 F. Supp. 3d 1033, 1040 (D. Ariz. 2022) (same); *Mar. for Our Lives Idaho v. McGrane*, 2023 WL 6623631, at *6 (D. Idaho Oct. 11, 2023) (same). The list of nonprofits with organizational standing to challenge election laws is near endless.[1] Indeed, the organizations who intervened or tried to intervene in this case relied on that precise theory of harm. *See* Doc. 7 at 7 ("Vet Voice dedicates significant resources … to improving military and veteran voter turnout rates"); Doc. 19 at 3 ("DRMS would need to expend additional resources," and the "League dedicates significant resources to voter service projects"); Doc. 46 at 7 ("if Plaintiffs succeed, the DNC will have to devote resources to encourage Mississippi voters" to vote).

The intervenors try to attack Plaintiffs' evidence, but a "factual attack requires a factual dispute." *Const. Party of Penn. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). The intervenors don't actually dispute the claims in the declarations. They say the declarations are "conclusory" but, ironically, do not explain how they arrived at that conclusion. Doc. 81 at 7-8. The handful of cases the intervenors cite only show prove that the declarations are more than sufficient to establish standing: they do not set forth "ultimate or conclusory facts" or "conclusions of law." *Favre v. Lyndon Prop. Ins.*, 2008 WL 3271100, at *3 (S.D. Miss. Aug. 6, 2008), *aff'd sub nom. In re Favre*, 342 F. App'x 5 (5th Cir. 2009). And they do more than "'conjecture[]'" that their resources "'could have

---

[1] *E.g.*, *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1177 (N.D. Ga. 2022); *Pavek v. Simon*, 467 F. Supp. 3d 718, 739-40 (D. Minn. 2020); *Vote.org v. Byrd*, 2023 WL 7169095, at *2 (N.D. Fla. Oct. 30, 2023), *on appeal*, No. 23-13727 (11th Cir.); *Ne. Ohio Coal. For the Homeless v. Larose*, 2024 WL 83036, at *11 (N.D. Ohio Jan. 8, 2024); *Black Voters Matter Fund*, 508 F. Supp. 3d at 1292.

been spent on other unspecified … activities.'" *Children's Health Def. v. FDA*, No. 23-50167, 2024 WL 244938, at *5 (5th Cir. Jan. 23, 2024). The RNC and MSGOP have provided detailed evidence of where, how, when, and why they spend their resources in direct response to the law they challenge, and they explain how the extra days for receiving ballots "increases the resources devoted to programs, 'independent of [the] suit challenging the action.'" *Id.*; *cf. El Paso Cnty. v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) (plaintiff's "single vague, conclusory assertion that the organization had to divert resources is insufficient" because "it is unclear whether any of the resources [plaintiff] diverted are being used for litigation and legal counseling" and because Plaintiff "does not identify any particular projects that suffered").

In a last-ditch effort to avoid the merits, the intervenors request discovery. The State, of course, did not seek discovery. That's because it's both unnecessary and improper. They claim the declarations "are not competent summary judgment evidence." Doc. 81 at 7 n.5. But federal courts routinely find that "declarations along with the allegations in the Amended Complaint are sufficient to establish injury under a diversion of resources theory." *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1287 (N.D. Ga. 2020) (declarations of voter organization explaining that the challenged law "will force [them] to redirect its resources away from its typical activities to those centered on educating and assisting voters" established standing on preliminary injunction).[2] A "declaration" explaining how Plaintiffs "devoted resources to investigating and counteracting [the Sate law], which left [them] with fewer resources for other programs," is "sufficient to, at minimum, create a genuine issue of material

---

[2] *See also Black Voters Matter Fund*, 508 F. Supp. 3d at 1291-92 & nn.6, 7 (voter organizations had standing based on declarations filed in response to the State's opposition to their preliminary injunction); *Hisp. Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1243 (11th Cir. 2012) (declaration of executive director of company sufficient for organizational standing on preliminary injunction); *PETA v. Miami Seaquarium*, 189 F. Supp. 3d 1327, 1338 (S.D. Fla. 2016) (affidavit of general counsel sufficient to establish standing on summary judgment), *aff'd*, 879 F.3d 1142 (11th Cir. 2018).

fact as to the diversion of resources." *Equal Rts. Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 725 (D. Md. 2011). The Court should thus deny the Defendants' motions.

The intervenors are also not entitled to Rule 56(d) discovery. "A Rule 56(d) movant first must demonstrate that additional discovery will create a genuine issue of material fact." *Bailey v. KS Mgmt. Servs., L.L.C.*, 35 F.4th 397, 401 (5th Cir. 2022). The intervenors want to "test the assertions" of Plaintiffs' declarations, but they don't explain what facts they could uncover that would defeat standing. Doc. 77-1. Nor could they. The amount of money Plaintiffs spend is irrelevant because "[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (holding that voter ID law "injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"), *aff'd*, 553 U.S. 181 (2008). And Plaintiffs' declarations submitted in response to Defendants' motions for summary judgment satisfy the intervenors' request for "more specific information about what Plaintiffs have diverted resources from." Doc. 77-1 at 2. No additional evidence is needed to satisfy the Court of its power to decide this case.

All parties—intervenors included—agreed to bypass discovery in favor of resolving this case on summary judgment. In the one case the intervenors cite in their Rule 56(d) affidavit, Doc. 77-1 at 2, the plaintiffs moved for summary judgment, a preliminary injunction, and a trial on the merits "[o]ne day after the Complaint was filed." *Bosarge v. Edney*, 2023 WL 8002680, at *2 (S.D. Miss. Mar. 9, 2023). "Plaintiffs have provided enough information to show the Court that they have diverted resources in response to the Secretary's actions." *Black Voters Matter Fund*, 508 F. Supp. 3d at 1291. The Court should thus deny the Defendants' motions and proceed to the merits.

**B.    Competitive political injury is an independent basis for organizational standing.**

Courts have "long-held" that the "'*potential* loss of an election' may give rise to standing." *Mecinas v. Hobbs*, 30 F.4th 890, 899 (9th Cir. 2022) (emphasis added). A political party has standing to avoid "harm to its election prospects," and all that is required is that the party's "chances of victory" are "reduced" by the law it challenges. *Benkiser*, 459 F.3d at 586. Hence, "[p]olitical parties have often been determined to have standing to challenge the constitutionality of federal or state election laws." *Benkiser*, No. A-06-ca-459, 2006 WL 1851295, at *3 (W.D. Tex. July 6, 2006) (collecting cases), *aff'd*, 459 F.3d 582. "This principle is neither novel nor unique to the realm of the electoral." *Mecinas*, 30 F.4th at 898.

The intervenors argue that a law that "applies equally to help *all* qualified voters" can't create a competitive injury. Doc. 81 at 9. But the cases they cite bely that claim. The ballot-order statutes at issue in *Mecinas*, for example, were facially neutral. They required ballots to list candidates for governor "in descending order according to the votes cast for governor for that county in the most recent general election for the office of governor." *Mecinas*, 30 F.4th at 895 (quoting Ariz. Rev. Stat. §16-502(E)). "[T]he DNC, as the operational arm of the Democratic Party" had standing in that case because the facially neutral ballot-order statute *resulted in* a marginal benefit "to their rival candidates." *Id.* Contrary to intervenors' arguments, "[i]f an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation were declared unlawful, those injured parties have the requisite concrete, non-generalized harm to confer standing." *Id.* at 898.

The intervenors again try to create an evidentiary issue without any evidence of their own. Plaintiffs' declarations are sufficient evidence of electoral injury. *See Schulz v. Williams*, 44 F.3d 48, 52-53 (2d Cir. 1994) (affidavit satisfied the competitive-injury test by stating that election rules "could siphon votes from the Conservative Party line

and therefore adversely affect the interests of the Conservative Party"). In part, that is because judgments of advantage and political strategy are ill-suited to judicial scrutiny. *See Becker v. FEC*, 230 F.3d 381, 387 (1st Cir. 2000) (declining "to second-guess a candidate's reasonable assessment of his own campaign") (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)). In any event, Plaintiffs' evidence—however minimal Defendants think it is—outweighs the zero evidence introduced by Defendants that the ballot deadline is politically neutral.

That Republicans still win in Mississippi is not evidence that the deadline doesn't cause an injury. Electoral injury doesn't turn on whether a given law causes political parties to win or lose, but on whether the law "enable[s] their opponents to obtain an unfair advantage." *Owen v. Mulligan*, 640 F.2d 1130, 1132 (9th Cir. 1981). This was the fundamental error in *Bost* and *Bognet*, which applied a rule about post-election challenges to pre-election risk analysis. *See Bognet*, 980 F.3d at 351-52 ("What's more, for Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment."); *see also Bost*, 2023 WL 4817073, at *8. After an election concludes, it makes sense to require a challenger in an election contest to show that the claim would change the results. But before an election takes place, a plaintiff need only show that "the defendant's actions harm the candidate's chances of winning," not that a favorable decision would guarantee electoral victory. *Nelson v. Warner*, 472 F. Supp. 3d 297, 304 (S.D.W. Va. 2020) (collecting cases) (citing *Tex. Democratic Party*, 459 F.3d at 587-88). Any other rule would require clairvoyance about the outcome of elections, and thus eviscerate the competitive standing doctrine.

## C. Elections conducted in violation of law injure candidates and voters.

In arguing against vote dilution, Defendants resort exclusively to the few district court cases that have considered the issue. Those cases are wrong, as Plaintiffs have

explained. *See* Doc. 75 at 19-20. In brief, those courts improperly reasoned that because the injury is shared by many people, it is a generalized grievance. *But see Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."). In distinguishing redistricting cases, they misunderstood the nature of a vote dilution harm. *See Baker v. Carr*, 369 U.S. 186, 208 (1962). They failed to credit multiple "point[s] of comparison," Doc. 52 at 31, such as partisan vote dilution. *See Davis v. Bandemer*, 478 U.S. 109, 119 (1986). They omit recent authority crediting voter dilution as "a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Green v. Bell*, 2023 WL 2572210, at *4 (W.D.N.C. Mar. 20, 2023). And the plaintiffs in those cases relied on predictions of voter fraud, which Plaintiffs do not rely on here. *See* Doc. Doc. 75 at 19. Defendants present no new arguments against vote dilution. If a redistricting plaintiff suffers an injury when her district, as a whole, might lose some amount of electoral power, then an individual voter suffers an injury when the power of his individual ballot is reduced by unlawful votes.

### D.  Election officials have standing when their position requires them to enforce unlawful state practices.

A final independent basis for standing is Mr. Lamb's distinct injury as an election official. Defendants start by disputing the merits, not the injury. The intervenors say that Mr. Lamb doesn't have standing based on "his view of the legality of Mississippi law." Doc. 81 at 14. But it's not merely "his view." It's federal law. And "[f]or standing purposes, [courts] accept as valid the merits of [the plaintiff's] legal claims." *FEC v. Cruz*, 596 U.S. 289, 298 (2022). "[J]ust because a plaintiff's claim might fail on the merits does not deprive the plaintiff of standing to assert it." *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021).

In the same vein, the intervenors argue that "[n]othing is forcing Mr. Lamb to ignore Mississippi law," and it's merely something he "is *choosing* to do." Doc. 81 at 15.

But that ignores Mr. Lamb's oath, by which he pledges to enforce both state and federal law. That Mr. Lamb must make a choice doesn't mean he faces no injury. Courts "have never recognized a rule of this kind under Article III." *Cruz*, 596 U.S. at 297. "To the contrary, [courts] have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Id.* If Mr. Lamb is "correct on the merits, as [the court] must assume for standing purposes, [Plaintiffs'] challenge presents a clearly redressable injury." *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012); *see also Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).

Next, the intervenors argue that "[n]one of the Defendants has any role in the process for removing Mr. Lamb from office described above." Doc. 81 at 15. Tellingly, none of the State Defendants—those responsible for enforcing the law challenged here— make that argument. Intervenors' only support for the argument is one of the incorrect district court cases it depends on. *See Splonskowski*, 2024 WL 402629, at *6. In the Fifth Circuit, however, the test is whether "[j]udicial invalidation of the [state law] would obviate the plaintiffs' concerns." *City of El Cenizo v. Texas*, 890 F.3d 164, 186 (5th Cir. 2018). The result in the Fifth Circuit cases is an injunction against enforcing the state law that puts the plaintiff in that impossible position. Mr. Lamb is injured, and an injunction in his favor will resolve that injury.

## II.    The Court should look to text, history, and binding precedent to determine the original meaning of the "day for the election," not to weak inferences about recent federal law.

When Congress mandated a single day for federal elections, it "necessarily displace[d]" the State's ability to receive ballots after election day. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 & n.6 (2013) (emphasis omitted) ("[A]ll action under the Elections Clause displaces some element of a pre-existing state regulatory regime, because the text of the Clause confers the power to do exactly (and only) that.").

That is "the fairest reading" of the election-day statutes, and thus "the Elections Clause requires that [Mississippi's] rule give way." *Id.* at 15. Defendants insist that the proper test is whether Mississippi's post-election deadline "directly conflict[s] with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). But Defendants' insistence on that test hardly helps the Court resolve whether *there is* a "direct conflict." In other words, this case does not turn on whether a conflict is "direct" or "indirect." All of these tests get at the same issue: if Mississippi's ballot-receipt deadline is "'inconsistent with'" the election-day statutes, it is "void" and "cease[s] to have effect." *Ex parte Siebold*, 100 U.S. 371, 397 (1879).

When Defendants say there is no "direct conflict" with the election day statutes, they mean that "[n]othing in their text says anything about procedures for transmission, receipt, processing, or counting of ballots." Doc. 81 at 17-18. Under that view, the only kind of state law that would "directly conflict" with the election-day statutes would be one that says, "Federal elections shall not take place on the second Tuesday after the first Monday in November." (And under Defendants' standing theories, still no one could challenge such a law.) But if that were the test, *Foster* would have come out the other way: the election-day statutes govern the general election, not primary elections; "[n]othing in their text" says anything about an open primary. Doc. 81 at 17-18. In fact, it was undisputed in *Foster* that "Louisiana [held] its general election on the federal election day." *Love*, 90 F.3d at 1030. Under Defendants' magic-words interpretation, the court should have stopped there and held there was no "direct conflict" between the open-primary statute and the election-day statutes. But it didn't. The Fifth Circuit and the Supreme Court both interpreted the meaning of "election" and concluded that "Louisiana's system squarely 'conflicts with the federal statutes that establish a uniform federal election day.'" *Foster*, 522 U.S. at 70. No less than *Foster*, this case requires the Court to interpret the meaning of "election." And "*Foster* is instructive on the meaning of 'election.'" *Bomer*, 199 F.3d at 775.

13

In an attempt to distance themselves from *Foster*, Defendants raise issues that are immaterial to this case. Defendants point out that "[f]ederal law does not provide for *when* or *how* ballot counting occurs." Doc. 81 at 26 (quoting *Bognet*, 980 F.3d at 353). The United States makes the same point in the brief it filed last week. *See* Doc. 84 at 8 ("Casting a ballot is distinct from counting a ballot, and the Federal Election Day Statutes permit post-election day counting."). That's true, but irrelevant. The deadline for receiving ballots has nothing to do with counting ballots, whether the counting is done under state statute, HAVA, or any other law. *See* Doc. 84 at 14-15. Defendants also point out that *Foster* did not decide "whether a State must always employ the conventional mechanics of an election." Doc. 81 at 23-24 (quoting *Foster*, 522 U.S. at 72 n.4). Also true, and also irrelevant. Nothing in this case requires the Court to decide that issue, either.

Defendants next try to limit *Foster* to actions "prior to" election day. *Foster*, 522 U.S. at 73. They emphasize that timing throughout their briefs. *See* Doc. 73 at 29-31; Doc. 81 at 25. But they shy away from the implications of that interpretation: if the election-day statutes only concern what happens "before" election day, Doc. 73 at 30, then they don't prevent a State from extending electoral acts *after* election day. That is, *Foster* would not prevent a State from allowing a period of "late voting" after election day because, in Defendants' view, *Foster* is limited to consummation "prior to" election day. *Foster*, 522 U.S. at 73. But even Defendants agree that allowing voters to *send in* their ballots after election day would violate the election-day statutes. Their contrived before–after distinction of *Foster* is unhelpful and wrong. By designating "the day" for the election, Congress forbids states from taking certain electoral acts both before and after that single day. 2 U.S.C. §7. The parties' real disagreement is what electoral acts Congress "necessarily displace[d]," *Inter Tribal Council of Ariz.*, 570 U.S. at 15 & n.6, but there can be no serious dispute that "extend[ing]" those displaced acts "beyond the election day" would violate the election-day statutes, *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944).

14

Defendants' magic-words test is further undercut by their invention of a "custody and control" theory of a valid ballot. Doc. 81 at 18-19. The intervenors' idea that a ballot is final when the voter surrenders "custody and control" is not found in the election-day statutes (Doc. 81 at 17), nor is it found in *Bomer* (Doc. 81 at 16), nor in the dictionaries (Doc. 81 at 16), nor in the legislative history (Doc. 81 at 19), nor in the historical practice (Doc. 81 at 31-33). In short, they made it up.

In contrast, receipt by state election officials is well-established as the "the final act of selection within the meaning of the law." *Foster*, 522 U.S. at 72. Defendants misunderstand the value of historical practice. They claim it "simply does not govern" because it does not show what "the drafters of the Election Day Statutes intended." Doc. 81 at 31. But what governs is the "ordinary public meaning" of the election-day statutes "at the time of enactment," not an abstract intent of the drafters. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-55 (2020). Historical practice "[a]t the time of the Act's adoption" is primary evidence of the original public meaning of a statute, *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 276-77 (2018), which is why the Ninth Circuit extensively analyzed the historical voting practice of absentee voting when applying the election-day statutes. *See Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1172-76 (9th Cir. 2001). And "historical practice" is "particularly pertinent when it comes to the Elections and Electors Clauses." *Moore v. Harper*, 600 U.S. 1, 32 (2023).

The intervenors' misrepresentation of Washington's 20th-century law proves that history does not support their position. As Plaintiffs explained in their opening brief, Doc. 59 at 14, Washington permitted voters to vote anywhere within the State on election day. *See* P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (May 1918), available at https://bit.ly/3PAlbsi. An absent voter could vote in the polling place of another county, and the election officials would then deliver the ballot to the voter's home precinct. *Id.* at 253. The intervenors ignore that the voter had to cast her ballot in a polling place on election day. Doc. 81 at 32. All valid ballots in Washington

were received by election officials on election day. Defendants don't address the other historical evidence. Decades of uniform, uninterrupted practice indicates that the plain meaning of the "day" for holding an "election" was the day ballots were received by election officials.

In this regard, the Washington law was like field-voting during the Civil War. The United States' brief tries to distinguish that history by suggesting those who "received" the ballots were "[m]ilitary officers or regular soldiers, rather than local civilian election officials." Doc. 84 at 11. But the very sources it relies on rebut that assertion. The idea that soldiers would receive ballots was a frequent source of objection to field-voting. The problem "was avoided by the appointment in the soldiers' voting acts, of officers or soldiers to act in an election as constables, supervisors, etc., as the laws of the State might designate, would act in elections at home." Josiah Henry Benton, *Voting in the Field* 17 (1915), perma.cc/QEY2-92FK. The sources the United States relies on describe how the soldiers took oaths and occupied election offices to become judges, clerks, supervisors, and constables. *See* Doc. 84 at 11 nn.3 & 4. That is, States designated the soldiers *as election officials* so that they could receive ballots *on election day*. In the absence of that designation, receiving ballots "could not be done by military officers, even if they were authorized to do it by the State," because "voting was a civil matter, which was under the control of civil officers, answerable for the performance of their duties to the civil and not the military power." *Id.* Again, history demonstrates that receipt by election officials on election day was the necessary criteria for a timely ballot.

Defendants offer no other contemporaneous historical evidence permitting election officials to count ballots received after election day. Even under the most generous reading of the history in Defendants' favor, post-election receipt of ballots doesn't come close to the "longstanding practice" of absentee voting. *Bomer*, 199 F.3d at 776. And Defendants admit that even today post-election receipt of ballots is not

"universal." *Id.* Every court to address the post-election receipt of mail-in ballots has overlooked this history. But the history resolves the original meaning of the election-day statutes, and it supports summary judgment in Plaintiffs' favor.

The intervenors also try to distinguish Congress's 1942 law requiring war ballots to be "received by the appropriate election officials" by "the hour of the closing of the polls on the date of the holding of the election." Act of Sept. 16, 1942, ch. 561, §8, 56 Stat. 753. The intervenors argue this shows that "when Congress wishes to set Election Day as a categorical deadline for receipt of ballots, it knows how to clearly do so." Doc. 81 at 33. That might have been a valid inference if the 1942 statute had established "Election Day as a categorical deadline." Doc. 81 at 33. But it didn't—it set a more specific deadline of "the hour of closing the polls on the date of the holding of the election." Act of Step. 16, 1942, ch. 561, §9. In any event, Congress can make whatever deadlines it wants, because "Congress may at any time by Law make or alter" state and federal election rules. U.S. Const. art. I, §4. By altering the default deadline of "the day for the election" to "the hour of closing the polls on the date of the holding of the election," Congress was simply exercising its broad power under the Elections Clause. The most that can be inferred from the 1942 statute is that Congress understands receipt by state election officials as the mark of a timely ballot.

Defendants' continued reliance on UOCAVA is just a congressional acquiescence argument in disguise—and a poor one at that. As Plaintiffs have explained, UOCAVA doesn't set a post-election receipt deadline. *See* Doc. 75 at 28-29. The default, universal receipt deadline under federal law is still the "day for the election." 2 U.S.C. §7. In recognizing that States can set more specific receipt deadlines before election day, UOCAVA did not grant States license to violate the election-day statutes by permitting receipt *after* the election. Nothing in the text supports that inference. And even prevailing on that thin inference wouldn't help Defendants because UOCAVA is at most an exception for overseas ballots, not a universal deadline for all mail-in ballots.

Defendants, the United States, and other courts have relied on UOCAVA as the best evidence of Congress approving of post-election deadlines. But it doesn't show that. The best evidence of the original meaning of the election-day statutes continues to be the decades of historical practice treating the "day for the election" as the day election officials received ballots.

Defendants' policy arguments are misguided. Bringing Mississippi in line with federal law will not disenfranchise voters. "[V]oting necessarily requires some effort and compliance with some rules," and ensuring a ballot is received by election officials on election day is nothing more than "the 'usual burdens of voting.'" *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021) (quoting *Crawford*, 553 U.S. at 198). As Defendants recognize, most States still comply with that election-day receipt deadline. A ruling in Plaintiffs' favor will also not disenfranchise overseas voters, as UOCAVA ensures those voters have plenty of time to receive and cast ballots by mail. Neither would such a ruling "require officials to arbitrarily stop counting ballots at the stroke of midnight on election day." Doc. 81 at 24. Officials can continue counting ballots, tallying votes, challenging voter qualifications, and conducting the assortment of administrative tasks well after election day. The holding Plaintiffs' request is simple, and upsets no other election processes: ballots are valid only if received on or before election day.

## III. Voters have the right to vote, and candidates have the right to stand for office.

*Foster v. Love* resolves Defendants' arguments on the remaining claims. Plaintiffs and the State both understand that *Anderson-Burdick* does not apply. The Court would err by importing that standard into this case, but the intervenors still insist on it. Federal preemption cases under the Elections Clause do not use the *Anderson-Burdick* test. In *Foster*, the Court analyzed the voters' §1983 claims by deciding whether the state law conflicted with federal law. It did, so the Court held that the voters' constitutional rights were violated. *Foster*, 522 U.S. at 74. Likewise, when the Court

considered claims by "individual Arizona residents" and "nonprofit organizations" that Arizona's voter-registration rules conflicted with the National Voter Registration Act, it did not apply the *Anderson-Burdick* test. *Inter Tribal Council of Ariz.*, 570 U.S. at 7. Again, the Court analyzed whether the state law conflicted with the federal law. It did, so the voters' rights were violated. As these and other cases demonstrate, voters' and candidates' constitutional rights are violated by state time-place-and-manner laws that conflict with federal law. The proper vehicle to vindicate those rights is 42 U.S.C. §1983, and the proper analysis is simply whether the statutes conflict. *E.g.*, *Keisling*, 259 F.3d at 1170 & n.2; *Bomer*, 199 F.3d at 774; *Millsaps v. Thompson*, 259 F.3d 535, 542 (6th Cir. 2001).

Finally, the State suggests that Plaintiffs must meet the permanent-injunction factors to prevail on their summary judgment motion. Doc. 73 at 35. But whether Plaintiffs prevail on the merits of their claims is a separate question from whether an injunction should issue. "An injunction is a remedy, not a separate claim or cause of action." *Collier v. Buckner*, 303 F. Supp. 3d 1232, 1280 (M.D. Ala. 2018). Courts often consider a motion for permanent injunction only after resolving the merits of the claims on summary judgment. *E.g.*, *TD Bank, N.A. v. Hill*, 2016 WL 3448264, at *1 (D.N.J. June 14, 2016), *vacated and remanded on other grounds*, 928 F.3d 259 (3d Cir. 2019); *Stouder v. M&A Tech., Inc.*, 2010 WL 11627423, at *2 (D. Kan. Aug. 19, 2010) ("The Court incorporates its previous findings in its [summary judgment order], finding irreparable harm to defendant, that the balance of harms weighs in favor of defendant, and that the injunction is not adverse to the public interest."). The parties can move for permanent injunctions if the Court grants Plaintiffs' motions for summary judgment. But it need not consider the remaining permanent injunction factors until that time, which is why the parties did not brief those issues.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment (Doc. 58), and it should deny Defendants' motions for summary judgment (Docs. 51, 61).


Dated: April 16, 2024                   Respectfully submitted,

Thomas R. McCarthy*                     <u>*s/ Spencer M. Ritchie*</u>
Conor D. Woodfin*
CONSOVOY MCCARTHY PLLC                  Spencer M. Ritchie (MSB #103636)
1600 Wilson Blvd., Ste. 700             FORMAN WATKINS & KRUTZ LLP
Arlington, VA 22209                     210 East Capitol Street, Suite 2200
(703) 243-9423                          Jackson, MS 39201
tom@consovoymccarthy.com                (601) 960-3172
conor@consovoymccarthy.com              spencer.ritchie@formanwatkins.com


*pending *pro hac vice* admission       *Counsel for Plaintiffs in*
                                        *Case No. 1:24-cv-25*

**CERTIFICATE OF SERVICE**

I certify that on April 16, 2024, the foregoing document was filed on the Court's CM/ECF system, which notifies all counsel of record.

*s/ Spencer M. Ritchie*

Spencer M. Ritchie
*Counsel for Plaintiffs in*
*Case No. 1:24-cv-25*
