IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, et al.,<br><br>    Plaintiffs,<br><br> v.<br><br>JUSTIN WETZEL, et al.,<br><br>    Defendants. | No. 1:24-cv-25-LG-RPM<br>(lead case) |
| LIBERTARIAN PARTY OF MISSISSIPPI,<br><br>    Plaintiff,<br> v.<br><br>JUSTIN WETZEL, et al.,<br><br>    Defendants. | No. 1:24-cv-37-LG-RPM<br>(consolidated) |

**PLAINTIFF LIBERTARIAN PARTY OF MISSISSIPPI'S REPLY
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# ARGUMENT

## I. Plaintiff Has Standing.

Plaintiff unavoidably makes arguments here that it made at greater length in its opposition to pending Defendants' and Intervenor-Defendants' motions for summary judgment. *See* ECF 80 at 3-20.[1] To avoid simply repeating text, Plaintiff will note new arguments, and otherwise respectfully refer the Court to its prior discussion.

Plaintiff adopts the standards for Article III standing previously set forth. *See* ECF 80 at 3-4, citing, *inter alia*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016); *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1647 (2022) (an "injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred") (citation omitted).

Merits contentions are accepted as valid for the purposes of analyzing standing. *Dep't of Educ. v. Brown*, 143 S. Ct. 2343, 2353 (2023) (citing *Ted Cruz for Senate*, 142 S. Ct. at 1647-48). Accordingly, in evaluating Article III standing, the Court must accept Plaintiff's legal claims as true that Mississippi's Receipt Deadline violates federal Election Day statutes and Plaintiff's statutory and constitutional rights.

### A. Plaintiff Has Shown Cognizable Organizational Injuries.

#### 1. Plaintiff's Traditional Economic Injuries.

As previously discussed, a monetary injury, in any amount, is a traditional, concrete, tangible injury conferring Article III standing. ECF 80 at 5, citing, *inter alia*, *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). Economic injury due to a preempted statute

---

[1] All page references are to internal (author-assigned) page numbers.

is sufficient to confer standing to challenge that statute. *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, 569 F. Supp. 3d 484, 490-91 (E.D. Tex. 2021), *rev'd on other grounds sub. nom. Young Conservatives of Tex. v. Smatresk*, 73 F.4th 304 (5th Cir. 2023); *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 301-02 (5th Cir. 2005).

Vicky Hanson testified about Plaintiff's resource injuries traceable to the Mississippi's Receipt Deadline incurred by Plaintiff's members and its candidates. ECF 55-3 (Hanson Decl.) at ¶¶ 15, 18-27; *see* ECF 80 at 5-7. The tangible burdens she described establish Plaintiff's injuries and, consequently, its standing to challenge the Receipt Deadline.

Both Defendants and Intervenor-Defendants make the mistake of assuming that tangible economic injuries must be shown under a theory of "diversion of resource." ECF 74 at 17; ECF 81 at 5. This assumption is incorrect. Courts have regarded economic injuries to political parties as sufficient, without more, for standing. *See* ECF 80 at 8, discussing *Benkiser*, 459 F.3d at 586; *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 522-23 (7th Cir. 2017); *Krislov v. Rednour*, 226 F.3d 851, 856 (7th Cir. 2000). None of these decisions premised Article III standing on a "diversion of resources" theory.[2]

Intervenor-Defendants also argue that Plaintiff "may not manufacture standing" by responding to speculative harm, citing, *inter alia*, *Bost v. Ill. State Bd. of Elections*, No. 22-2754, 2023 U.S. Dist. LEXIS 129509 (N.D. Ill. Jul. 26, 2023), *appeal pending*, No. 23-2644 (7th Cir. Argued Mar. 28, 2024). ECF 81 at 8-9. But Ms. Hanson has testified regarding the costs inflicted on Plaintiff and the importance to Plaintiff of monitoring the canvassing of ballots (ECF 55-3 at

---

[2] Intervenor-Defendants request that if "the Court were to find that any of Plaintiffs' legal theories in support of standing could suffice to satisfy Article III," it should then "permit Intervenors to take limited discovery testing those claims pursuant to Rule 56(d)." ECF 77-1 at ¶¶ 5-6. The Court should decline their invitation to consider a contingent motion or otherwise grant them a second round of motion practice on the issue of standing, if Plaintiff prevails here. Should they believe the Court erred in ruling against them here, then they can file the appropriate motion for reconsideration.

¶¶ 18-26), and her testimony has not been challenged by affidavit or other evidence. Thus, Ms. Hanson's testimony on these issues is, at present, undisputed. Indeed, Defendants and Intervenor-Defendants do not contest that the Receipt Deadline imposes additional resource costs on Plaintiff, but only the significance of that fact under *Lujan*.

### 2. Plaintiff's Injuries from a Diversion of its Resources.

In the alternative, notwithstanding the preceding point, Plaintiff has shown that it has endured an injurious diversion of its resources. *See* ECF 80 at 11-12. Defendants and Intervenor-Defendants argued that Plaintiff must "identify[] specific programs or activities that the organization must curtail or divert resources *from* to counteract the effects of the Ballot Receipt Deadline." ECF 81 at 6; *see also* ECF 74 at 18.

Plaintiff has now identified such programs. *See* ECF 80 at 12, discussing ECF 79-1 at ¶ 6 (Ms. Hanson testifying that "if the Party did not have to monitor the canvassing of post-election ballots" she would "recruit[], train[], allocate[e], and plac[e] election monitors" at specific poll sites and "volunteers to challenge invalid ballots," as well as "working on getting out our vote").

### 3. Injury to Plaintiff's Electoral Prospects.

*Benkiser* held that one basis for a political party's "direct standing" was "harm to its election prospects" where, if a challenged action took place, "then its…candidate's chances of victory would be reduced." 459 F.3d at 586; *see* ECF 80 at 12-13.

Note in particular that Ms. Hanson testified to *two* kinds of competitive injury from having to comply with the Receipt Deadline that reduced Plaintiff's chances. *Id.*, citing ECF 55-3 at ¶¶ 18 and 27. The first of these was that "many ballots, and particularly late-arriving ballots, are incorrectly recorded or have discrepancies." ECF 55-3 at ¶ 18. "Pointing this out at the right time

3

will affect the final vote totals for each candidate." *Id*. Defendants and Intervenor-Defendants have yet to address this particular point.

### 4. Injury to Plaintiff's Interest in an Accurate Vote Tally.

In *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020), the Eighth Circuit held that the candidate plaintiffs "have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast," and that "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *See* ECF 80 at 13-14; *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924-25 (7th Cir. 2020) (candidate's injury based on alleged misuse of power by elections officials "is one that 'affect[s] [him] in a personal and individual way'") (citing *Lujan*, 504 U.S. at 560 n.1, and *Carson*, 978 F.3d at 1058).

Plaintiff has alleged and shown this injury. ECF 1 at ¶¶ 40, 52-53; ECF 55-3 at ¶¶ 18-21 and 27. Defendants and Intervenor-Defendants have yet to address this point.

### B.  Plaintiff Has Alleged and Shown Cognizable Associational Injuries.

### 1.  Plaintiff Has Associational Standing on Behalf of its Candidates.

Plaintiff previously set forth how it has shown associational standing on behalf of its candidates. ECF 80 at 15-18. Defendants argue that "Plaintiff has not identified a single, specific member or candidate of the Libertarian Party who has been or will be harmed by operation of the Mississippi Statute." ECF 74 at 14.

Plaintiff has now done so, identifying Ms. Hanson, who was a presidential and vice-presidential elector in 2020 and is likely "with a high degree of certainty" to be selected as a presidential and vice-presidential elector for 2024; the Party's presidential candidate, who will be finally selected at a Party convention next month; and the other electors who will be selected along with Ms. Hanson. ECF 79-1 at ¶¶ 14-19.

4

### 2. Plaintiff Has Associational Standing on Behalf of its Voters.

Plaintiff also has shown an injury to its voters in the form of vote dilution. Defendants' admissions support the conclusion that late-arriving ballots were as much as 1.7% of total votes cast in 2020. *See* ECF 1 at ¶ 29 (citing press release available at https://bit.ly/48O0VuM), at ¶¶ 32, 36, 44-45; ECF 55-4; ECF 55-5; ECF 79-2. Intervenor-Defendants dispute these allegations on non-substantive grounds (ECF 77-2 at ¶¶ 20-22), but concede that it is "undisputed that there were some ballots transmitted and counted" in both 2020 and 2022 "that were received by counties after Election Day." *Id*. at ¶¶ 21, 22; *see* ECF 62 at 28 (admitting that "large numbers of Mississippians[']" ballots arrive during the five business days after Election Day).

Defendants argue Plaintiff's vote dilution injuries are a generalized grievance insufficient to support standing. ECF 74 at 13-14 (citing *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609 (E.D. Wis. 2020), *Moore v. Circosta*, 494 F. Supp. 3d 289, 312-13 (M.D.N.C. 2020), and *Bost v. Ill. State Bd. of Elections*, 2023 U.S. Dist. LEXIS 129509 (N.D. Ill. July 26, 2023)). With the exception of *Bost*, which is currently on appeal, those cases involved claims of general vote dilution common to all voters, from admittedly legal votes, which were not "individual and personal in nature."[3] Here, the injuries to Plaintiff's members as voters who *vote on Election Day* are individual and personal in nature to them, since Defendants' acceptance of late arriving (*i.e.*, invalid) ballots dilute their lawful and timely cast ballots.

Intervenor-Defendants' reliance on *Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) is similarly misplaced. ECF 81 at 13. In rejecting a voter's claim of vote dilution, *Wood* relied on a Third Circuit ruling later vacated by the U.S. Supreme Court. *Id.* at 1314-15 (citing *Bognet v.*

---

[3] The plaintiffs in *Feehan* lacked standing for a number of reasons but relevant here is that dilution was based on unproven claims of voter fraud, making the injury untraceable under *Lujan*, as it resulted from the independent actions of third parties. *Feehan*, 506 F. Supp. 3d at 608; *see Bennett v. Spear*, 520 U.S. 154, 168 (1997).

5

*Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3rd Cir. 2020), *cert. granted, vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021)); *see* ECF 80 at 10 & n.6. Importantly, the Eleventh Circuit in *Wood* noted that if the plaintiff "were a political candidate harmed by the [challenged] recount, he would satisfy" the requirement to show a particularized injury. *Id.* at 1314 (citing *Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995)). Thus, *Wood* supports Plaintiff's standing derived from the injuries to its candidates, discussed above.

## II. Plaintiff Has Shown That Mississippi's Receipt Deadline Is Inconsistent with Federal Election Day Statutes and Is, therefore, Preempted.

The "inconsistent with" standard from *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013), controls preemption analysis under the Elections and Electors Clauses. ECF 80 at 20-28. Accordingly, Defendants and Intervenor-Defendants argue the wrong preemption standard (ECF 74 at 5, 9, 27-31; ECF 81 at 16-27).[4] State election regulations must "give way" if they are "*inconsistent with*" federal regulations under the Elections and Electors Clauses. 570 U.S. at 15 (emphasis added). This is a less demanding preemption standard than the "directly conflict" standard found in *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). *Inter Tribal* does not require a textual or "facial conflict." *Compare* ECF 74 at 11 (quoting *Bost v. Ill. State Bd. of Elections,* 2023 U.S. Dist. LEXIS 129509, at *32 (N.D. Ill. July 26, 2023)) and 27; ECF 81 at 17-19.

The difference between these two standards is material. In *Inter Tribal*, the Court found the Arizona regulation was preempted as inconsistent with the language of the federal NVRA, even though there was no evidence of direct conflict between the text of the state and federal laws

---

[4] Oddly, Intervenor-Defendants identify the correct standard but cite to the more lenient standard throughout its argument. ECF 81 at 17. Thus, Plaintiff did not "fail to even acknowledge the standard" or otherwise a commit "glaring omission" (ECF 81 at 1 and 16 n.7) because *Inter Tribal* was decided after *Bomer* and the Supreme Court's standard superseded *Bomer*'s standard for Elections Clause preemption.

and even though the state functionally complied with the mandate that it "accept and use" the federal registration form. 570 U.S. at 15-20. Like Mississippi, Arizona claimed an important role in regulating federal elections, which the Court acknowledged. But "States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'" *Id*. at 15 (citation omitted). This is because "[w]hen Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Id*. at 14. Thus, Arizona's regulation had to "give way" merely because it was "inconsistent." *Id*. at 15. Likewise, in this case, Plaintiff has shown that Mississippi's Receipt Deadline is "inconsistent with" federal Election Day statutes. *See* ECF 80 at 22 n.13.

Intervenor-Defendants turn to legislative history, concluding that when Congress "spoke of the day of the 'election,' it was focused on the actions of *voters*—not administrative actions of officials." ECF 81 at 19. This assertion about Congress' "focus" at the time is factually incorrect. *See* Jeffrey M. Stonecash, Jessica E. Boscarino, Rogan T. Kersh, CONGRESSIONAL INTRUSION TO SPECIFY STATE VOTING DATES FOR NATIONAL OFFICES, PUBLIUS: THE JOURNAL OF FEDERALISM 141, Vol. 38, Issue 1, Winter 2008 (finding that Congress had "very specific concerns about state administration of the [electoral] process") (attached hereto as Exhibit 1); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1172 (9th Cir. 2001) ("reforming the system" of multi-day voting was prioritized over other considerations).

Intervenor-Defendants' flawed history leads them to conclude that "the 'election' refers to the voters' choice of a candidate," which they contrast with "the process of receiving and counting ballots," which "is a ministerial act aimed at identifying the *results* of the election." *Id*. at 20. This theory is flatly contradicted by the Supreme Court's holding in *Foster v. Love*, 522 U.S. 67, 71-72

(1997), which states that when "statutes speak of the election […] they plainly refer to the *combined actions of voters and officials* meant to make a final selection of an officeholder." (Emphasis added.) Intervenor-Defendants have left out the latter half of the equation.

Intervenor-Defendants are wrong to characterize *receiving* ballots as the same kind of administrative activity as *counting* ballots. Counting can be (and is occasionally) enjoined; ballots may be sequestered to be canvassed later; counting may be stopped and started; and the same ballots may be (and often are) subject to a recount weeks or even months later. None of this changes the "selection of an officeholder" embodied in the ballots that *were* cast and received. That is to say, the margin the ballots express should be the same no matter when or how many times they are counted. (If the margin does change that can only be due to human error, or wrongdoing.) By contrast, the *receipt* of additional ballots most assuredly *can* change the selection of an officeholder, which selection is never finally determined until all ballots are in. Moreover, if ballot *receipt* is ever enjoined, the consequences are almost certainly irrevocable. Voting stops, the election is over, and what its outcome would have been can never be known. Nothing can be done at that point but to schedule and hold a new election.

Even when ballots are "well beyond the voter's custody and control" (ECF 81 at 18) it does not mean their ballot has been cast into a vote. Indeed, many states allow voters to change their ballots after mailing. *See, e.g.*, Wis. Stat. Ann. § 6.86; and Mich. Comp. Laws Serv. § 168.765b. That practice clearly shows that mailing itself is not considered to be an essential component of "the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71-72.

Plaintiff agrees that reading "the election" to require that all ministerial actions must occur by midnight on Election Day is "absurd." ECF 81 at 25. This is one of Intervenor-Defendants'

8

straw men. Plaintiff has never contended or argued that. Plaintiff contends instead that the meaning of the term "the election" requires that ballot receipt must occur by Election Day. In any case, it can hardly be considered "catastrophic" (*id*. at 24) to suggest that federal Election Day statutes comport with the majority practice in this country for two centuries.

Finally, non-merit trial court rulings from truncated proceedings involving emergency relief are not controlling, not even in their own districts. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 374-76 (D.N.J. 2020) (denying motion by order to show cause for preliminary injunction 28 days prior to Election Day); *Trump for President, Inc. v. Way*, Civ. No. 20-10753, 2020 U.S. Dist. LEXIS 196911 (D.N.J. Oct. 22, 2020) (granting motion by order to show cause for expedited dismissal 12 days prior to Election Day).[5]

### A. Other Voting Statutes Addressing Special Circumstances are Not Relevant to the Meaning of Election Day.

Defendants and (especially) Intervenor-Defendants rely on other federal statutes to fashion a Congressional intent narrative. ECF 74 at 28; ECF 81 at 21-22 and 27-30. The analysis of these statutes does not meaningfully advance the preemption analysis. Attenuated extrapolations, stacked one upon another, muddle more than they clarify. Plaintiff agrees with RNC, *et al.*, that reading the tea leaves related to perceived Congressional action, inaction, tolerance, or "acquiescence" raises more questions than answers. *See* ECF 75 at 27 (discussing *Rapanos v.*

---

[5] Aside from the extreme, emergency posture of the *Way* case, the facts differed from those presented here. The plaintiff in *Way* alleged likely fraud by unknown third parties, which could not credibly be connected to its claims. 492 F. Supp. 3d at 373-74; *see* 2020 U.S. Dist. LEXIS 196911, *19 ("Plaintiffs' vote dilution claims rest on assumptions about the machinations of third-parties intent on committing election fraud"). Plaintiff makes no equivalent allegation here. The relevant organizational claim, which was not controlled by *Benkiser*, relied entirely on a non-specific allegation that resources would have to be diverted to "educat[e] voters" on changes in the law and "encourage[] them to vote regardless." *Id*. at *26. Finally, the *Way* court relied on *Bomer* and its "directly conflict" standard to determine preemption—not *Inter Tribal*. 492 F. Supp. 3d at 370. Plaintiff respectfully submits this was error.

9

*United States*, 547 U.S. 715, 749-50 (2006)). There is a long, at times inglorious, record of Congress failing to address illegal election regulations, necessitating court intervention. *See* ECF 80 at 26 (noting that Congress tolerated malapportionment for 90 years).

Before illustrating why this analysis is unhelpful, Plaintiff first notes that the *entire* discussion regarding alleged threat this lawsuit poses to UOCAVA voters is a strawman.[6] ECF 74 at 28; ECF 81 at 27-30; and ECF 84 at 15-21. When initially enacted, UOCAVA updated federal regulations regarding state duties to timely transmit absentee ballots to military and overseas voters.[7] In 2009 amendments, Congress updated these regulations again, mandating a hard 45-day deadline for states to transmit timely-requested UOCAVA ballots. 52 U.S.C. § 20302(a)(8). UOCAVA did not modify ballot receipt deadlines or grant *states* authority to do the same. Plaintiff agrees that *federal courts* can order receipt deadline extensions as *remedies* for UOCAVA violations if the state failed to mail ballots within the 45-day deadline.[8] In situations where a state fails to timely transmit ballots, the United States often obtains court-ordered relief extending receipt deadlines to ensure UOCAVA voters get the benefit of the full 45-day period to receive and return their ballots. *See* ECF 84 at 19 n.9; ECF 81 at 30 n.8. But this case is about preemption of *state* authority to extend receipt deadlines, not that of *Congress* or the *federal judiciary*. It goes without saying that Congress has authority to pass a law that contemplates such relief—as it could,

---

[6] Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA") 52 U.S.C. §§ 20301 to 20311, as amended by the Military and Overseas Voter Empowerment Act of 2009, Pub L. No. 111 84, Subtitle H, §§ 575 589, 123 Stat. 2190, 2318 2335 ("MOVE Act").

[7] *See generally* Robert T. Reagan, Fed. Jud. Ctr., *Overseas Voting: The Uniformed and Overseas Citizens Absentee Voting Act*, (2016) at pp. 1-3 (available at https://bit.ly/3QapF67).

[8] The United States' citation to *Harris v. Florida Elections Comm'n*, 235 F.3d 578, 579 (11th Cir. 2000), *aff'g Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324–25 (N.D. Fla. 2000) must have been made in error. ECF 84 at 5. Admittedly convoluted, that case was ultimately about a "federally ordered mandate" (*i.e.*, consent decree) to extend ballot receipt deadlines for a violation. 122 F. Supp. 2d at 14-15. Whether a federal court has authority to extend ballot receipt deadlines has no bearing on preemption. Plaintiff agrees federal courts have remedial authority under UOCAVA. 52 U.S.C. § 20307.

if it wished, repeal or amend the Election Days statutes to allow late ballot receipt in any other circumstances, or even at the unfettered discretion of the states. But Congress has not done so.

Simply put, UOCAVA is a statute designed for a special set of circumstances that have no relevance here. A textual analysis of its provisions does not shed any light on the preemption question. Intervenor-Defendants also point to 52 U.S.C. § 20304(b)(1). ECF 81 at 28. While 52 U.S.C. § 20302(a) sets forth state responsibilities, 52 U.S.C. § 20304 directs the Secretary of Defense to "implement procedures that facilitate" the timely delivery of military ballots, including the collection of certain military ballots seven days before Election Day for delivery "not later than the date by which an absentee ballot must be received in order to be counted in the election." 52 U.S.C. § 20304(a)-(b). According to Intervenor-Defendants, it makes "no sense" for Congress to include this language if it considered state authority preempted. ECF 81 at 28. The defect in their reasoning is the fact that some states require that absentee ballots arrive *before* Election Day. S*ee, e.g.,* Miss. Code Ann. § 23-15-637 (amended 2020); and La. Rev. Stat. § 18:1311. If the cited text stated instead "not later than Election Day," UOCAVA ballots for voters from these states could arrive too late to be counted under state law.

Likewise, federal law concerning special elections does not meaningfully color the preemption analysis. The timing of most special federal elections is not covered by the Election Day statues. *See* 2 U.S.C. § 8 ("the time for holding [special] elections […] may be prescribed by the laws of the several States and Territories respectively"); *see id*. at § 8(b) (specifying special rules for "extraordinary circumstances" where House vacancies exceed 100). For any of a number of possible reasons, Congress has decided not to preempt state time regulations related to special elections. Beyond that, little else can be extracted from the text of 2 U.S.C. § 8, other than to note that in a 2005 amendment Congress established the first 45-day deadline for UOCAVA voters. 2

U.S.C. § 8(b)(5)(B). As enacted, it provides that regardless of state time regulations states must accept UOCAVA ballots if returned within 45 days of transmission. Mandating that states "accept" such ballots is necessary to enforce the 45-day deadline since Congress again deferred to the states on the timing of special elections in extraordinary circumstances.

Ascertaining the original public meaning of "the election" requires more than a drive-by interpretation of other statutes designed for special circumstances.

### B. Historical Analysis of Original Public Meaning.

Other than text of the Election Day statutes, the two best authorities for determining the meaning of "the election" are *Foster* and 3 U.S.C. § 21.[9] *See* ECF 80 at 25. If the meaning of "the election" cannot be answered at that point, the Supreme Court directs courts to interpret statutory words in their ordinary, common public meaning at the time of enactment. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020); *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (providing that courts should look to the development and evolution of the common-law definition). As with preemption, Intervenor-Defendants again acknowledge the correct standard only to ignore it. ECF 81 at 24-26. Rather than meaningfully address the original public meaning of "the election," they dismiss the historical record as "intriguing." ECF 81 at 31.[10] But in order to determine whether the Receipt Deadline is "inconsistent with" the Election Day statutes, the original public meaning of "the election" at the time of Congress' enactment must be ascertained.

---

[9] Intervenor Defendants' argument that 3 U.S.C. § 21's "period of voting" "says nothing about receipt deadlines" makes no sense. ECF 81 at 33 n.10. It is not reasonable to suggest that the power to regulate the "period of voting" "*says nothing*" about the timing of the event that marks the end of voting or determines when a ballot must be received to be counted.

[10] "Original public meaning is not to be confused with the subjective intent of legislators." *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 335 n.1 (5th Cir. 2019) (Ho, J. concurring). The "lodestar is original public meaning, not original intent." *Id*.

Plaintiff has shown that the country's first absentee voting practices (*i.e.*, proxy or voting in the field) were predicated on receipt by state-deputized election officials by Election Day. ECF 80 at 32-3; ECF 56 at 24-25; Benton at 15-18. Indeed, the country's very first absentee ballot statute was struck down, in part, because the absentee ballots were *not* being received by state election officials. Benton at 17 (discussing *Chase v. Miller*, 41 Pa. 403 (1862)); *see generally id*. at 189-203. Absentee advocates got around this by appointing "officers or soldiers to act in an election as [state] constables, supervisors, etc., as the laws of the state might designate […] in elections at home." Benton at 17. "It was said that voting was a civil matter, which was under the control of civil officers, answerable for the performance of their duties to the civil and not military power." *Id.* Those deputized officers and servicemen were state actors ensuring timely receipt.

Neither Defendants, nor Intervenor-Defendants, nor *amici*, nor the United States explains how the 1845 or 1872 public would have understood Election Day as anything other than the deadline by which state election officials needed to receive their voice votes, beans, or tickets. Intervenor-Defendants cite Plaintiff's point that widespread election practices made it "physically impossible" for votes to be received after Election Day to argue that it "makes little sense to say that the Election Day statutes were 'originally' understood to prohibit a practice that was unknown at the time they were enacted." ECF 81 at 31. In doing so, they conflate "physically impossible" with "unknown." Like their contemporaries, Colonial, early Republic, Civil War, and Reconstruction era citizens had business and family obligations, travel, etc. that created scheduling conflicts. They would have been aware there were times where they needed to be in one place when their vote needed to be elsewhere. These conflicts led colonial corporations to introduce proxy voting, which the states later adopted. ECF 56 at 14 (discussing early proxy voting). The

13

public would have understood that the national day of election was the day by which state officials needed to receive their voice vote, bean, or ticket ballot.

Absentee voting has been around since the early 19th century. ECF 56 at 16-18. The Sixth and Ninth Circuit relied on this history to uphold pre-Election Day receipt via early voting. *Keisling*, 259 F.3d at 1175; and *Millsaps v. Thompson*, 259 F.3d. 535, 544 (6th Cir. 2001) (holding that the long history of absentee voting was applicable early voting practices). By contrast, post-Election Day receipt does not have a "long pedigree," nor does Plaintiff "acknowledge" that "multiple" states had post-Election Day receipt in 1986.[11] ECF 81 at 28 and 30. State election officials receiving ballots on Election Day certainly "is materially []distinguishable" from ballots received by state election officials five days after Election Day. ECF 81 at 31. This was a well understood difference in 1845 and 1872. Benton at 17. It prompted the innovation to create remote field poll sites, "under the control of civil officers," to receive ballots. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for Summary Judgment. ECF 55 and ECF 56.

---

[11] The historical record shows: In 1864, Maryland ignored the Election Day statutes and allowed soldiers to vote five days *after* Election Day. ECF 80 at 23. A 1933 treatise indicated that California experimented with late receipt, and ultimately abandoned it, before reinstituting it in 2014. ECF 56 at 19 n.20; ECF 80 at 27 n.21. A 1970 congressional report noted that at the time Washington State and Nebraska had ballot receipt deadlines 15 and 1 day after election day, respectfully. ECF 56 at 19 n.19-20. Nebraska long ago abandoned this practice. Neb. Rev. Stat. § 32-950. In sum, during the 20th century, there were a handful of episodes where a state experimented with and abandoned post-Election Day receipt, the longest being Washington State. *See* ECF 56 at 19 n.21. A "few late-in-time outliers" from territories do not provide much insight into historical meaning, especially where contradicted by the overwhelming weight of other, contemporaneous historical evidence. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 64-70 (2022).

14

| | |
|---|---|
| *s/ Russ Nobile* | Robert D. Popper* |
| T. Russell Nobile (MS Bar 100682) | Eric W. Lee* |
| JUDICIAL WATCH, INC. | JUDICIAL WATCH, INC. |
| Post Office Box 6592 | 425 Third Street SW, Suite 800 |
| Gulfport, Mississippi 39506 | Washington, DC 20024 |
| Phone: (202) 527-9866 | Phone: (202) 646-5172 |
| Rnobile@judicialwatch.org | Rpopper@judicialwatch.org |
| | elee@judicialwatch.org |

\* *Application for admission pro hac vice forthcoming*