# EXHIBIT 1

# Research Note

# Congressional Intrusion to Specify State Voting Dates for National Offices

Jeffrey M. Stonecash,* Jessica E. Boscarino,* and Rogan T. Kersh[†]

Through the nation's first century, states used their concurrent constitutional right to schedule presidential and House elections at widely varying times. Senators were also elected within the states at diverse times. This study examines the gradual establishment of uniform election dates and offers an explanation of why Congress felt it appropriate to override state autonomy to eventually establish uniformity of state practices.

In the late 1700s and through much of the 1800s states held elections for national offices across a wide array of dates. Presidential electors were elected at diverse times. State legislatures chose senators at different times. States held House elections across a wide array of months in the year before Congress assembled – April, May, August, September, October, and December (Bates 1989). Until the 1850s almost one-half of the states held House elections in odd-numbered years, or during the year that Congress convened. This state autonomy in setting election dates persisted until Congress passed laws requiring a uniform date for presidential (1844), then for Senate (1866), and finally for House (1872) elections. A concurrent constitutional power was used by Congress to legislate uniformity of state practices.

While much of the scholarship on federalism focuses on the tangle of federal, state, and local policy delivery relationships (Grodzins 1966; Dilger 1989; O'Toole 2007) and the slow process by which the federal government seeks to influence subnational policy (Derthick 1970), sometimes Congress simply legislates state practices (Zimmerman 2005). In the case of election dates, rather than trying to induce specific behaviors, Congress asserted the right to displace diverse state practices and create a uniform election date for national offices.

The concern of this analysis is why Congress took these actions. Why did Congress see it as appropriate to override state autonomy and diversity and

*Department of Political Science, Maxwell School, Syracuse University
[†]Wagner School of Public Policy, New York University

Publius: The Journal of Federalism volume 38 number 1, pp.137–151
doi:10.1093/publius/pjm027
Advance Access publication 5 November 2007
© The Author 2007. Published by Oxford University Press on behalf of CSF Associates: Publius, Inc.
All rights reserved. For permissions, please email: journals.permissions@oxfordjournals.org.

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

legislate a uniform election date? We first establish the importance of the issue of state autonomy in setting election dates by reviewing the initial constitutional debates about who should regulate elections. We propose an explanation of why uniformity was legislated, focusing on the emergence of national institutions seeking to be less reliant on state actions, a decline in diversity that reduced resistance and problems with continued reliance on differing state election dates. We then review in succession the debates and passage of uniform election dates for presidential, Senate and House elections.

## The Importance of State Control of Election Dates

American federalism was created during a time of great unease about the dangers of central governments overriding state and local government practices and diminishing freedom (Wood 1969). The initial proposal of concurrent powers for the regulation of elections reflected the existing divisions of opinion about the national government. As might be expected when anxiety about national powers was an issue, the first proposal to grant Congress the power to regulate elections to national offices created controversy.

The primary rationale for providing for congressional regulation came from James Madison who argued that Congress should be able to control the rules and procedures governing the election of its own members (Horn 1942, 40). There were, however, several arguments against the provision. Some saw the grant as too broad and prone to lead to an extension of federal powers and perhaps consolidation of federal power (Bailyn 1993, Part One: 813, 818–9). One opponent of ratifying the Constitution, who used the name of Brutus, worried that ''By this clause the right of election itself is, in a great measure, transferred from the people to the rulers,'' and that the ''rulers'' could abuse this power to serve their own interests. The concern was that ''the federal legislature may institute such rules respecting elections as to lead to the choice of one description of men.'' They might ''make the whole state one district, and direct that the capital (the city of New York, for instance) shall be the place for holding the election; the consequence would be, that none but men of the most elevated rank in society would attend, and they would certainly choose men of their own class'' (Bailyn 1993, Part One: 428). This action would make those elected ''not the true and genuine representatives of the people, but creatures of the Congress'' (Bailyn 1993, Part One: 896). There was also fear that Members of Congress might use this power to ''prolong their existence in office, for life, by postponing the time of their election and appointment...,'' using various excuses of national problems to justify the delays (Bailyn 1993, Part One: 539, 813, 861).

The proponents of Article I, Section IV tried to calm these anxieties by assuring opponents of the clause that these powers would be used only if the states failed to

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

handle elections properly (Bailyn 1993, Part One: 293). Nonetheless, numerous state conventions supported inclusion in the Constitution of provisions such as "That Congress do not exercise the powers vested in them by the fourth section of the first article but in cases where a state shall neglect or fail to make regulations therein mentioned ...." (Bailyn 1993, Part Two: 551, 554, 573). Efforts were made to include such language in the Bill of Rights in 1789, but the amendment was defeated (Horn 1942, 77).

Despite these misgivings and efforts at changing language, Article I, Section IV of the Constitution was retained as originally written. This created the concurrent power which states:

> The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators.

## Explaining Intrusion

Given the unease about national intrusion into state election practices, why would Congress later choose to override state autonomy? These intrusions, we argue, came about because of a combination of an increasing number of states using the same election dates and emerging national institutions that perceived problems with the remaining diversity. In essence, Congress is more likely to establish uniform practices when a majority of states have already adopted a practice and there are fewer states to resist. That inclination is likely to be greater when those within national institutions see problems for the institution in continuing state diversity.

Federalism was created out of a powerful desire to respect and preserve state autonomy and diversity. The presumption was that states represent "small republics" and these republics would be more responsive to people and more likely to fight off the imposition of potentially tyrannical nationally imposed rules (Storing 1981, 15–23). Preserving state autonomy to control policies was crucial to preserving meaningful republics. Yet intrusions do occur, even if the process is slow (Derthick 1970).

Elazar argues that two conditions are important for intrusion to occur. First, "...states are [generally] left to administer their own services within their own boundaries in a manner consonant with their respective policies. Only in those cases where it has been demonstrated that the states cannot or will not implement the U.S. Constitution as interpreted does it become possible for the federal authorities to intervene" (1984, 11). State failure to execute "properly" creates the potential for federal action. As a consensus emerges within the nation and deviations from a national consensus decline, intrusion is more likely (1984,

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

12–25). Thus problems with execution and declining diversity make intrusion more likely. As we shall indicate, these two conditions were very important in prompting congressional action setting a uniform time for national elections.

Second, there must be some sense that some national value is being undermined with negative consequences, and there is a national interest in intruding to override diversity. It is not sufficient to have diversity decline to a minority of states. There must be a sense that the remaining diversity is detrimental to the nation. While harm is often discussed as involving people, such as with civil rights (Elazar 1984, 9–14) or eligibility for welfare (Derthick 1970) or Food Stamps (Dilger 1989, 73–88), it can also involve institutions. In this case, the development of the national institution of Congress and its ability to assure that it could function independently of the states was at issue. At the beginning of the nation there was considerable uncertainty about how the proposed national institutions of the presidency and a national legislature would develop (James 2005; Stewart 2005). Members of Congress were unsure that they could count on the election of their members in a timely fashion by the states. To the extent that the state actions to establish elections were irregular, Congress could not be assured that there was an ongoing process that would consistently select the members of the institution. Congress acted eventually out of a sense that the states were not fulfilling their duties of insuring the election of national officials in a timely manner. The combination of clear problems among some states in the execution of the responsibility to schedule elections, declining diversity in actual practices, and concern that Congress was too reliant on state action to fill its positions prompted Congress to enact legislation to impose uniform election dates.

## The First Foray: Presidential Elections

The first national action in regulating election practices occurred with regard to selecting the president. Even while the constitutional convention was debating concurrent powers for congressional elections, there was a sense that it was necessary to make sure the office of the president would be filled in a timely manner. This was a new office with no history in the nation, and there was concern about getting it established as an independent national institution. The convention adopted a resolution urging Congress to act immediately to require that the electoral college would meet and vote in a timely fashion:

> "Resolved, That it is the Opinion of this Convention, that as soon as the Convention of nine States shall have ratified the Constitution, the United States in Congress assembled should fix a Day on which Electors should be appointed by the States which shall have ratified the same, and a Day on

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016



*Source*: Data compiled by authors. See endnote 1.

**Figure 1** Percentage of states holding presidential elections during November 1–10 of election year

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

> which the electors should assemble to vote for the President, and the Time and Place for commencing Proceedings under this Constitution.... That the Electors should meet on the day fixed for Election of the President, and should transmit their vote..." (Bailyn 1993, Part Two: 939).

This resolution was followed and on November 1, 1791, the Senate established a committee to create a bill to implement this resolution. By November 30 that bill was produced with a section specifying that:

> "...Electors shall be appointed in each State, for the election of a President and Vice-President of the United States, within thirty-four days preceding the first Wednesday in December, 1792, and within thirty-four days preceding the first Wednesday in December in every fourth year succeeding the last election" (U.S. Senate 1791, 37–38).

The bill containing this language (U.S. Senate 1791, 89–90) was eventually adopted in February 1792. Congress did not specify when presidential elections had to occur, but it did specify that the process within states had to occur by a certain date so the electoral college could assemble and deliver its votes. As Figure 1 indicates there was a fairly quick movement toward uniformity of election dates among a majority of states. During the early 1800s 50–60 percent of states held their presidential elections during the first 10 days of November.[1]

The remaining diversity, however, was still seen as a possible source of problems. Elections were still held on different days and there were concerns about the political parties recruiting voters to move from site to site to engage in repeat voting. The elections of 1840 and 1844, which were followed by accusations of widespread fraud in voting, prompted very specific concerns about state administration of this process (Holt 1999, 198–199). In response a bill was introduced in Congress in 1845 to establish the "first Tuesday after the first Monday in November" as a uniform date for electing presidential electors

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

(Kelly 1991, 95–6). There were objections that a single date might inconvenience voters in rural areas who might find it difficult to get to the polls (*Congressional Globe* 1844, 15), but the bill engendered little objection that this was an inappropriate exercise of congressional powers. The measure passed with almost no opposition in January 1845.[2] By the 1848 presidential election, all 30 states complied, scheduling the presidential contest on the appointed day. The pattern established here was to rely on autonomous state administration until a majority of states had moved to a uniform date and there was evidence that current scheduling practices were creating possible problems with the legitimacy of the process.

## Changing State Practices for Electing Senators

While the election of presidential electors was regulated in 1845, congressional election practices continued to vary considerably. In the Senate, some state legislatures voted *viva voce*, while others utilized anonymous balloting; some legislatures met first as separate houses, whereas others met immediately in joint conventions. Unlike House elections (which will be analyzed later), there is no known record of when senators were elected in the states. Documentation on the U.S. Senate website indicates the dates of service for each senator but does not provide specific information on election dates (Senate Historical Office 2006). Therefore, it is not possible to generate a quantitative assessment of the lack of uniformity in Senate election timing. Nonetheless, there is substantial evidence suggesting that the Senate was plagued by inconsistent electoral practices, which, when combined with an enormous amount of turnover, created many vacancies. In the 30th Congress (1847–1849), for example, five senators died while in office and another six resigned; in the 32nd Congress (1851–53), there were three deaths and six resignations (U.S. Congress 2005). The lack of regulations guiding electoral practices and timing meant that the resulting vacancies were not always filled in a timely manner. Tennessee failed to elect a senator to the 27th Congress, Iowa went without *any* Senate representation for the entire 29th Congress, and California experienced repeated electoral failures in 1851, 1855 and 1856 (Haynes 1906, 21).

When an election outcome within a state was disputed, which happened frequently, the two houses of state legislatures often deadlocked, preventing them from agreeing on a winner. William Pitt Fessenden was elected by the Maine State Senate eighteen times during one legislative session; each time, the House refused to concur. Fessenden was finally elected by both chambers and took his seat on February 10, 1854, nearly a year after the 32nd Congress convened. A battle between the Indiana House and Senate prevented the selection of a senator until the last month of the 35th Congress, when a contested election took place in a special session of the state legislature, at which a majority, but not quorum, of members was present.

These so-called failed elections became a source of embarrassment for the Senate. More importantly, they posed a danger to the solvency of the institution itself. If states continued to fail to elect Senate delegates within a reasonable timeframe (or, indeed, at all), they left themselves unrepresented and the Senate unable to carry out its constitutional duties. State-by-state variation in electoral practices thus emerged as a concern for Congress, and in February 1857, a bill was introduced to regulate the times and manner for electing senators.

The bill languished in committee, however, while Congress dealt with issues related to the Civil War, and little action was taken until another high-profile election raised the visibility of Senate electoral practices. In 1866, the election of John Stockton as senator of New Jersey was hotly contested. Challengers charged that the joint assembly that elected Stockton acted extra-legally by declaring that a plurality of votes was all that was needed to declare him the winner. The matter was brought before the Senate, and Stockton was eventually unseated. This glaring example of the dangers of inconsistent state electoral practices appears to have "exhausted the patience of Congress," (Haynes 1906, 23) and the Senate quickly renewed its interest in legislation.

Upon introduction, Sen. Daniel Clark (R-NH) noted that "The object of this bill is to secure uniformity in the manner of electing Senators of the United States, that we may avoid the questions and differences that have sometimes existed" (*Congressional Globe* 1866, 3727). Debate focused on the need to ensure that the Senate not fall prey to "a factious opposition in one branch of the Legislature or the other [that] sometimes prevent the two Houses from meeting together" (CG 1866, 3727) and electing a representative. In the words of Sen. Lyman Trumbull (D/R-IL),

> "The public interest requires that each State should be represented in the Senate of the United States, and it may sometimes happen that the two branches of the Legislature are of different politics and then will not meet together to elect a Senator. We think the public interest is not subserved by leaving a State unrepresented; the intention of the Constitution is that it should be represented, and it is for the public good that we should have a law that will produce uniformity in these elections and secure representation" (CG 1866, 3728).

After seventy-five years of allowing states the freedom to carry out elections, Congress saw the need to exercise its constitutional right to regulate the timing and manner of Senate elections. The bill encountered some opposition, most often by lawmakers who believed the existing situation to be sufficient and who feared national usurpation of states' rights. The leading opponent to the measure, Sen. Willard Saulsbury (D-DE), opined, "For one, sir, I have seen enough of the grasping power of the Federal Government, the attempt to swallow up every right and privilege of the States" (CG 1866, 3728). Saulsbury found few supporters in

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

**Table 1** Number of House seats elected by year and month for selected Congresses, 1801–1871

| | Year new Congress convenes years and months of elections held for that Congress | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1801 | | 1811 | | 1821 | | 1831 | | 1841 | | 1851 | | 1861 | | 1871 | |
| Month | 00 | 01 | 10 | 11 | 20 | 21 | 30 | 31 | 40 | 41 | 50 | 51 | 60 | 61 | 70 | 71 |
| January | | | | | | | | | | | | | | | | |
| February | | | | | | | 1 | | | | | | | | | |
| March | | 1 | | | | | | 8 | | 5 | | 4 | | 3 | | 3 |
| April | 10 | 27 | 17 | 22 | | 57 | | 6 | | 42 | | 6 | | 6 | | 4 |
| May | | | | | | | | | | 46 | | | | | | |
| June | | | | | | | | | | | | | | 16 | 1 | |
| July | | | | | 1 | | 3 | | 3 | | | | | | | |
| August | 16 | 2 | 25 | 3 | 22 | 20 | | 65 | | 3 | 7 | 49 | 7 | | 14 | 4 |
| September | 9 | | 4 | | 4 | 2 | 9 | | 13 | | 11 | 2 | 9 | | 8 | 3 |
| October | 19 | 3 | 53 | | 55 | | 55 | 9 | 66 | | 53 | 30 | 59 | 3 | 68 | |
| November | 14 | | 17 | | 26 | | 53 | | 62 | 2 | 63 | 8 | 69 | | 133 | |
| December | 5 | | | | | | | | | | | | | | | |
| Total | 73 | 33 | 116 | 25 | 108 | 79 | 121 | 88 | 144 | 98 | 134 | 99 | 144 | 28 | 224 | 14 |

*Note*: For the 1861 session, one member (Kansas) was elected in 1859, three were elected in 1862, and two in 1863.
*Source*: Data compiled by authors. See endnote 1.

the Senate, however. While most of his colleagues agreed that state autonomy should not be infringed upon without cause, they believed that the frequent "embarrassments" that resulted from failed elections justified the imposition. On July 25, 1866, Congress passed a bill that established the first Tuesday after the first Monday in November (concurrent with the presidential election) as the official date for the election of Senators.[3]

## The Evolution of House Election Dates

The timing of House elections was very diverse in the early 1800s and remained that way through mid-century. This diversity of state schedules is evident in Table 1, which presents the distribution of House election months for the first year in each decade from 1800 through 1870. For the Congress convening in 1811, for example, elections were held from April 1810 until October 1811. The election season for the Congress that convened in 1831 lasted from February 1830 until October 1831.

Figure 2 provides a summary of the extent of divergence from current practices over time. For much of the early 1800s only about 20 percent of



*Source*: Data compiled by authors. See endnote 1.

**Figure 2** Percentage of House elections held in year prior to new Congress and in November of year prior, 1789–1881

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

elections occurred during November in the year before Congress convened. Until 1860 only about 60 percent of elections were held in the year before Congress convened.[4] After the Civil War this percentage gradually increased, and by 1881 almost all House elections were scheduled on the same Tuesday in November.

## Growing Efforts to Regulate House Election Dates

Bills that would impose the same November election date for House seats in all states were introduced in 1862, 1863, 1865, 1866, 1867, 1869, 1870, and 1871. Why did Congress finally intervene regarding House elections? Several matters came together to prompt action. The removal of Southern states from Congress because of the Civil War resulted in diminished diversity and more of a consensus among the remaining states. Second, there were continuing perceptions of problems with state administration. Congress was receiving reports of corruption in elections, including both voter fraud in the North and voting rights violations in the South in the wake of the Reconstruction Amendments. Legislation governing the election of House members was part of a larger body of laws asserting national control of elections during this time. Finally, Congress was faced with a likely increase in diversity of dates with Southern states reentering the Congress after the Civil War. These states continued to set their elections at widely varying times, contrasting severely with the North, which exhibited a clear trend toward the adoption of a November date.

### Northern Standardization

While diversity in House election dates continued until well into the 1860s, the North began a steady shift towards uniformity earlier than the rest of the



*Source*: Data compiled by authors. See endnote 1.

**Figure 3** Standard deviations of differences from November, by region, 1789–1881
*Source*: Data compiled by authors. See endnote 1.

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

nation. Figure 3 illustrates the regional differences in election dates between the Non-South and the South. Using the November before Congress assembled as a baseline, the difference in months of each state's practices from November (the number of months prior to – a positive number – or after that month – a negative number) was calculated for each Congress. The standard deviation of these difference scores is presented. Beginning in the mid-1840s, the Northern states began a steady trend towards the adoption of a November election date, reflecting a growing consensus in the region on a national standard. With the exclusion of the Southern states during the Civil War (which will be discussed in detail below), a large part of the nation had accepted a uniform election date, removing a major barrier to legislation: state diversity.

Federalism creates a representation system in which a majority of majorities (within states) must agree, and imposing uniformity is easier when a majority of states have already adopted the practice being imposed (Elazar 1972, 32). Congressional action regulating House election dates largely involved ratifying electoral practices that were already converging.

### The Issue of State Execution of Responsibilities

Just as with presidential and Senate elections, state administration of election practices also played a role. This issue first surfaced with regard to whether House elections should be statewide or by districts. During the first three decades of the 1800s there were complaints of corruption in the voting process of statewide elections and representatives from some states sought to require elections by district, under the premise that the elections would be easier to manage and less susceptible to manipulation (Horn 1942, 78–80). The concerns about mismanaged statewide elections continued as the House was presented with numerous elections

in which the outcome was contested because of alleged voting irregularities. Eventually Congress passed the 1842 Mandatory Districting Act, requiring all states to employ districts, a law which was ignored by many states (Horn 1942, 88–115).

Problems with state election practices continued in the mid-1800s. Large cities in the North had a widespread problem with "colonization," in which parties brought in voters from outside districts to cast votes in their favor (Summers 1987, 54–57). Even more common than colonizers were "floaters," individuals who were disinterested in politics and willing to sell their votes to the highest bidder (Summers 1987, 56). Men accepted bribes from the parties – often in the form of liquor or a few dollars – that rose in proportion to the closeness of the race. At times, the parties employed "strikers" that rounded up eligible voters *en masse* to deliver votes for their candidates (Summers 1987, 57).

Corrupt practices reached a head in the 1868 presidential election. In an effort to elect Democrat Horatio Seymour over Republican Ulysses S. Grant, the Democratic Party in New York under Boss Tweed orchestrated a grand effort to fraudulently naturalize as many as 60,000 immigrants. When the scheme was uncovered, the House launched a special investigation into elections fraud that found corruption to be "prolific" in New York, Maryland, Louisiana, and other states (U.S. House of Representatives 1869, 3–4). The committee report noted not only naturalization fraud, but also repeat voting, in which individuals voted in as many as three or four districts in the same election. As a remedy, the investigations committee recommended the establishment of a single, uniform election day throughout the country. By imposing a national standard, Congress hoped to prevent the multiple voting that occurred when individuals traveled among states to take advantage of different election dates.

Voting violations in the South took a much different form. Despite the passage of the 14th and 15th amendments guaranteeing equal rights (including the right to vote) to all citizens, abuses against blacks nonetheless continued. White Southerners used violence and intimidation to disenfranchise blacks (Nieman 1991, 78). At the polls, elections commissioners, largely Democratic, would fail to count African American votes and "count in" false votes for the Democratic Party (Valelly 2004, 51). It quickly became clear that further federal action was needed to secure black voting rights.

**Asserting National Control**

The efforts to increase national control of state elections increased during the Civil War, when the idea of federal oversight began to gain currency. During the war, the executive took unprecedented control of the polls and deployed the military to polling places under the rationale of stemming potential violence. During Reconstruction, the military maintained a presence on election day to prevent

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

abuses of voting rights. To combat the extralegal disenfranchisement of blacks, Congress passed a series of laws aimed at protecting voting rights. The Enforcement Act of 1870 was designed to enforce the implementation of the 15th Amendment. The act made it a federal crime for state officials to deny eligible voters the right to vote, and, for the first time, targeted private citizens who used violence or economic coercion to prevent qualified voters from voting (Nieman 1991, 83). The Ku Klux Klan Act followed in April of 1871, targeting the emergence of organized violence against blacks. During Reconstruction, the Klan was a presence in roughly 25 percent of Southern counties (Valelly 2004, 92). The Ku Klux Klan Act made it a federal crime for two or more persons to deny anyone equal protection of the law and authorized the President to use the Army or militias to secure such rights. Within a few short years, these and other laws supported the notion that the national government could exert control over state election practices.

### The Southern Difference

Attempts to establish a uniform date for House elections faced an uphill battle in the South. As Southern states were welcomed back into the Union, many continued to reject the now-dominant November election date. In the election of the 41st Congress, seated in 1869, twenty states set their election date for November 1868. In contrast, Virginia held its elections in July 1869, Texas held it in August of the same year, and several districts in Mississippi elected representatives in October.

The resistance to a uniform election date partly reflected a general Southern sentiment against national standardization (Perman 1984). Reconstruction was marked by Southern bitterness at federal ''enforcement acts'' designed to secure voting rights for blacks and some white Unionists in the South; disloyalty charges on both sides of the Mason–Dixon line; and frustration among Northern abolitionists (Foner 1988, 451–9). Given such a context, those Southern states which traditionally held elections preceding the November Tuesday presidential contest (North Carolina, Georgia, Louisiana, Texas, and the border state of West Virginia) were loath to alter their practice to accommodate Northern concerns.

### Legislating a Uniform House Election Date

Given the trend toward greater uniformity and the re-introduction of greater diversity via Southern states, lawmakers saw the necessity of passing legislation to bring these remaining holdout states into line and stem rampant election fraud and abuses. The greater the amount of control the national government held over the times, places, and manner of House elections, the more it could ensure a functioning legislative body. This combination of conditions prompted Congress to override state autonomy in 1872.

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

There were disagreements with the legislation, but most of them had to do with seeking some flexibility in execution. Some Members objected that in their state, voting was spread out over several days to allow time for getting to the polls. That complaint was met with a response that more voting precincts could be established (*Congressional Globe* 1872, 3408). Others raised questions about the year that the law should take effect.[5] Some wanted the law to apply immediately, but this was met with considerable opposition from those who said their states could not accommodate that. Many Members of Congress noted that the date of elections was set either in their state statutes or constitution and accommodating the new legislation would take time. Statutes are easier to change, but even in those situations, many Members noted that their legislature did not meet regularly, or had already met and change would take a year or two (*Congressional Globe* 1871, 63–64). Those states in which the election date was in the state constitution argued that they had to wait until the legislature met again and even then it might take two sessions of the legislature for the change to take effect. Surprisingly, there was little expression of fundamental opposition to imposing a uniform election date. It may well be that amid debates about such matters as the fifteenth amendment, apportionment, enfranchisement of former slaves, and direct federal intrusion in state management of election practices, a move to establish a uniform election date for the House of Representatives was less controversial.

## Conclusion

The constitutional convention created concurrent powers to regulate elections, which made some participants and delegates in some state constitutional conventions uneasy. Perhaps recognizing and respecting that unease, Congress was disinclined to intrude on state autonomy to set election dates for over fifty years, except for specifying when the electoral college should assemble. Members of Congress came from the states and were inclined to respect the autonomy of state practices and not intrude. Congress essentially followed the urgings of state conventions ratifying the Constitution and intervened slowly. Intrusion occurred with the emergence of consensus and perceived failures of states to handle this responsibility.

Within a federal system, the inclination of the national government to override state autonomy develops slowly. In the case of regulating the timing of state elections, it took Congress almost 100 years to assert its right to use a concurrent power to set the time of House elections. Congress acted incrementally, enacting legislation in 1845, 1866, and 1872. In each case, action did not occur until there was cumulative evidence that the states were not handling this responsibility in a way that assured Congress that the institutional needs of national offices were being met. Change occurs within federalism, but it occurs slowly.

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016

## Notes

1. These data are from Phil Lampi, who works for the American Antiquarian Society. He has devoted his career to assembling historical information about American elections. We are very grateful for his generosity in sharing his data. For House elections, we used Michael J. Dubin. 1998. *United States Congressional Elections, 1788–1997*. Jefferson: McFarland and Company, Inc. This book records the dates of elections. We used this book and the election dates recorded therein to create a data set with the year and month of the election of each seat to the House. In cases in which there was a run-off following the initial election, we used the initial date because that is the date the state scheduled for an election. We did not use the ICPSR data file because it has numerous missing elections in the first five decades and many errors for the early decades. We will be glad to share the data file we have created. Please contact jstone@syr.edu if you wish to have the data set.
2. As a reflection of the lack of opposition to the bill, it passed in the House 187 to 1. (*Congressional Globe*, 28th Cong., 2nd sess.: 35 and 149).
3. Senators' Election Act of 1866. 14 Stat. 243.
4. It is important to note that the assembly date of Congress was also evolving and erratic. Until the 20th Amendment was passed in 1933, new congressional sessions typically began in December of odd-numbered years (http://clerk.house.gov/art_history/house_history/Session_Dates/index.html). This date for beginning congressional sessions meant that some states elected House members 20 months prior to assembly and others elected them just before.
5. For examples, see *Congressional Globe*, 42nd Cong., 2nd sess., December 13, 1871: 115–117; December 14, 1871: 137–139 and May 29, 1872: 3975–3976.

## References

Bates, F. G. 1989. *Rhode Island and the formation of the Union*. Unpublished. PhD diss., Columbia University.

Bailyn, B, ed. 1993. *The debate on the Constitution. Part one and part two*. New York: Library of America.

Congressional Globe. 1844. 28th Cong., 2nd sess. http://memory.loc.gov/cgi-bin/ampage.

Congressional Globe. 1866. 39th Cong., 1st sess. http://memory.loc.gov/cgi-bin/ampage.

Congressional Globe. 1871. 42nd Cong., 2nd sess. http://memory.loc.gov/cgi-bin/ampage.

Congressional Globe. 1872. 42nd Cong., 2nd sess. http://memory.loc.gov/cgi-bin/ampage.

Derthick, M. 1970. *The influence of federal grants*. Cambridge: Harvard University Press.

Dilger, R. J. 1989. *National intergovernmental programs*. Englewood Cliffs, NJ: Prentice-Hall.

Elazar, D. J. 1972. *American federalism: a view from the states*, Second Edition. New York: Thomas Y. Crowell.

———. 1984. *American federalism: a view from the states*, Third Edition. New York: Thomas Y. Crowell.

Foner, E. 1988. *Reconstruction, 1863–1877: America, unfinished revolution*. New York: Harper & Row.

Grodzins, M. 1966. *The American system*. Chicago: University of Chicago Press.

Haynes, G. H. 1906. *The election of senators*. New York: Henry Holt and Company.

Holt, M. F. 1999. *The rise and fall of the American Whig Party*. New York: Oxford University Press.

Horn, R. A. 1942. *National control of congressional elections*. Unpublished. PhD diss., Princeton University.

James, S. C. 2005. The evolution of the presidency: between the promise and the fear. In *The executive branch*, ed. J. D Aberbach, and M. A Peterson, 3–40. New York: Oxford University Press.

Kelly, K. 1991. *Election day: an American holiday, an American history*. New York: Facts on File.

Nieman, D. C. 1991. *Promises to keep: African-Americans and the constitutional order, 1776 to the present*. New York: Oxford University Press.

O'Toole, L. J., ed. 2007. *American intergovernmental relations*. Washington, D.C: CQ Press.

Perman, M. 1984. *The road to redemption: southern politics, 1869–1879*. Chapel Hill: University of North Carolina Press.

Senate Historical Office. 2006. *Senators of the United States, 1789-2007*. http://senate.gov/artandhistory/history/resources/pdf/chronlist.pdf.

Stewart, C III. 2005. Congress and the constitutional system. In *The legislative branch*, ed. P. J Quirk, and S. A Binder, 3–34. New York: Oxford University Press.

Storing, H. J. 1981. *What the Anti-Federalists were for*. Chicago: University of Chicago Press.

Summers, M. W. 1987. *The plundering generation: corruption and the crisis of the Union, 1849–1861*. New York: Oxford University Press.

U.S. Congress. 2005. *Biographical directory of the United States Congress 1774-2005* (House Document No. 108-222). http://www.gpoaccess.gov/serialset/cdocuments/hd108-222/index.html.

U.S. House of Representatives. 1869. *New York elections fraud* (House Report No. 31, 40th Cong., 3rd sess.).

U.S. Senate. 1791. History of Congress, Proceedings: 2nd Cong., 1st sess. In *A century of lawmaking for new nation: U.S. congressional documents and debates, 1774-1875*. Annals of Congress. http://memory.loc.gov/cgi-bin/ampage.

Valelly, R. M. 2004. *The two reconstructions: the struggle for black enfranchisement*. Chicago: University of Chicago Press.

Wood, G. 1969. *The creation of the American republic, 1776 – 1787*. Chapel Hill: University of North Carolina Press.

Zimmerman, J. F. 2005. *Congressional preemption: regulatory federalism*. Albany: SUNY Albany.

Downloaded from http://publius.oxfordjournals.org/ at Serials Record on March 6, 2016