IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


REPUBLICAN NATIONAL COMMITTEE;          PLAINTIFFS
MISSISSIPPI REPUBLICAN PARTY;
JAMES PERRY; AND MATTHEW LAMB

VS.                                     CIVIL NO. 1:24CV25

JUSTIN WETZEL, IN HIS OFFICIAL
CAPACITY AS THE CLERK AND REGISTRAR
OF THE CIRCUIT COURT OF HARRISON
COUNTY, ET AL                           DEFENDANTS

*CONSOLIDATED WITH*

LIBERTARIAN PARTY OF                    PLAINTIFF
MISSISSIPPI

v.                                      CIVIL NO. 1:24cv37

JUSTIN WETZEL, IN HIS OFFICIAL          DEFENDANTS
CAPACITY AS THE CLERK AND REGISTRAR
OF THE CIRCUIT COURT OF HARRISON
COUNTY, ET AL


**MOTIONS HEARING**

BEFORE THE HONORABLE LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

JULY, 9, 2024
GULFPORT, MISSISSIPPI


**REPORTED BY:** SHERRI L. PENNY, RPR, FCRR
            Mississippi CSR #1609
            2012 15th Street, Suite 403
            Gulfport, Mississippi  39501
            (228) 563-1781

1   **APPEARANCES:**

2   **REPRESENTING THE REPUBLICAN PARTY PLAINTIFFS:**
    SPENCER MARK RITCHIE, ESQUIRE
3   FORMAN WATKINS & KRUTZ, LLP - JACKSON
    P.O. BOX 22608
4   210 EAST CAPITOL STREET, SUITE 2200
    Jackson, MISSISSIPPI  39225-2608
5                   *And*
    CONOR D. WOODFIN, ESQUIRE - PHV
6   CONSOVOY MCCARTHY, PLLC
    1600 Wilson Blvd., SUITE 700
7   ARLINGTON, VIRGINIA  22209

8   **REPRESENTING LIBERTARIAN PARTY OF MISSISSIPPI:**
    T. RUSSELL NOBILE, ESQUIRE
9   JUDICIAL WATCH, INC.
    P. O. BOX 6592
10  GULFPORT, MISSISSIPPI  39506

11  **REPRESENTING SECRETARY OF STATE MICHAEL WATSON:**
    REX M. SHANNON, III, ESQUIRE
12  WILSON MINOR, ESQUIRE
    OFFICE OF THE ATTORNEY GENERAL - JACKSON
13  550 HIGH STREET
    JACKSON, MISSISSIPPI  39201
14
    **REPRESENTING INTERVENOR DEFENDANTS VET VOICE FOUNDATION AND**
15  **MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS:**
    CHRISTOPHER D. DODGE, ESQUIRE
16  PALOMA WU, ESQUIRE
    ELIAS LAW GROUP, LLP
17  250 MASSACHUSETTS AVENUE NW
    SUITE 400
18  WASHINGTON, DC 20001

19  **REPRESENTING DEFENDANTS JUSTIN WETZEL, ET AL:**
    TIM C. HOLLEMAN, ESQUIRE
20  BOYCE HOLLEMAN, P.A.
    1720 - 23RD AVENUE
21  GULFPORT, MISSISSIPPI  39501

22

23                         - - -

24

25

1          **THE COURT:**  Madam Clerk, you may call the case.

2          **DEPUTY CLERK:**  The United States District Court for

3   the Southern District of Mississippi, Southern Division, civil

4   case number 1:24cv25, Republican National Committee, et al,

5   versus Wetzel, et al, consolidated with case 1:24cv37,

6   Libertarian Party of Mississippi versus Wetzel, et al.

7          **THE COURT:**  What says the plaintiff, Republican

8   National Committee?

9          **MR. WOODFIN:**  Good afternoon, Your Honor.  Conor

10  Woodfin, and with me is Spencer Ritchie for the Republican

11  Party plaintiffs.

12         **THE COURT:**  Thank you and good afternoon.

13      What says the plaintiff, Mississippi Republican Party?

14         **MR. WOODFIN:**  Also for the Mississippi Republican

15  Party, and the two individual plaintiffs as well.

16         **THE COURT:**  You have all of the additional individual

17  plaintiffs as well?

18         **MR. WOODFIN:**  Yes, Your Honor.

19         **THE COURT:**  All right.  I will skip right through

20  that and then we'll move to the plaintiff in the consolidated

21  matter, Libertarian Party of Mississippi.

22         **MR. NOBILE:**  Good afternoon, Your Honor.  Russell

23  Nobile from Judicial Watch on behalf of the Libertarian Party

24  of Mississippi.  We are ready.

25         **THE COURT:**  Thank you, very good.  Thank you, Mr.

1    Nobile, and good afternoon.

2        What says the defendant, Justin Wetzel?

3        **MR. HOLLEMAN:**  Tim Holleman for Mr. Wetzel, and I

4    represent the five Harrison County election commissioners,

5    also, who are sued in their official capacities.

6        **THE COURT:**  Thank you, Mr. Holleman.  Good afternoon.

7        **MR. HOLLEMAN:**  Good afternoon to you, Your Honor.

8        **THE COURT:**  What says the defendant, Michael Watson,

9    in his capacity as Secretary of State?

10       **MR. SHANNON:**  Good afternoon, Your Honor.  Rex

11   Shannon with the Mississippi Attorney General's Office here on

12   behalf of Secretary Watson.  I am joined by my co-counsel,

13   Wilson Minor.

14       **THE COURT:**  Thank you, gentlemen, good afternoon.

15   And the intervenor defendant, the Vet Voice Foundation, what is

16   your announcement?

17       **MR. DODGE:**  Good afternoon, Your Honor.  Christopher

18   D. Dodge of the Elias Law Group on behalf of intervenor

19   defendants, joined today by Paloma Wu from the Mississippi

20   Center for Justice.

21       **THE COURT:**  Thank you and good afternoon.  I believe

22   we had one additional intervenor defendant.  Brittany, am I

23   wrong, would that be the Mississippi Alliance for Retired

24   Americans?

25       **MR. DODGE:**  I represent them as well, Your Honor, all

1    intervenor defendants.  Thank you.

2             **THE COURT:**  Very good.  Thank you for those

3    announcements.  And the Court, of course, appreciates your

4    willingness to appear here today for an oral argument on what

5    appears to me to be cross-motions for summary judgment on two,

6    at least two overarching important issues, one of which is, of

7    course, standing.

8         The federal courts, of course, are courts of limited

9    authority, limited jurisdiction, that is limited power, and it

10   is incumbent upon the parties to prove to the Court that they

11   have standing in order to bring these claims.

12        In addition to that, of course, the other overarching

13   issue is the merits of the claim, and that is whether or not

14   the Mississippi Absentee Voting Statute is in conflict with

15   federal law.

16        Now, these are two cross-motions for summary judgment, so

17   it really doesn't matter who goes first, sort of a coin toss.

18   I tossed the coin myself.  Mississippi Republican Party and the

19   plaintiffs, the Libertarian Party, you won the toss, you get to

20   go first.

21        Now, there are -- we're going to have 20 minutes for oral

22   argument for each group, that is Republican Party gets 20

23   minutes, and then Libertarian Party, you get 20 minutes as

24   well.  And all parties will get that same amount of time.  If

25   you wish, you may reserve up to five minutes for rebuttal.

1          Now, I don't intend to interrupt anybody by asking

2     questions in the middle of your arguments.  I will give you a

3     full and fair opportunity to argue your case and your

4     positions, and at the conclusion when you tell me that you're

5     through I may have some questions directed at each of the

6     individual lawyers as they argue.  Again, at the conclusion you

7     can reserve up to five minutes for a rebuttal.

8          Any questions on behalf of the plaintiffs?

9          **MR. NOBILE:**  Your Honor, Russell Nobile.  The Court's

10    order had asked us to try to work with each other to try to

11    make sure we do not overlap on certain questions.  So I just

12    wanted to understand the sequence as to if the other plaintiffs

13    will follow me or whatnot.  Obviously, I can dictate because I

14    can cover everything first on the front end, but I want to make

15    sure that we're covering what we need to and I can anticipate

16    the sequence that the Court is planning.

17         **THE COURT:**  If I were you, I'd handle it by myself.

18         **MR. NOBILE:**  Perfect.

19         **THE COURT:**  And nobody is going to cover for me and

20    my client but you.

21         **MR. NOBILE:**  Perfect.

22         **THE COURT:**  But again, you can reserve up to five

23    minutes of your 20-minute period in order to rebut any argument

24    that may be made by the defendants.

25         And Mr. Holleman, it was my understanding that you do not

1    intend to argue on behalf of the individual defendants?

2          **MR. HOLLEMAN:**  That is correct, Your Honor.  We'll

3    join in the arguments of the Secretary of State.

4          **THE COURT:**  All right.  Basically, we're going to

5    have four groups that will argue their positions.  I do

6    encourage you not to overlap.  I also encourage you -- I have

7    read, obviously, all of the briefs by the parties, but I note

8    that we received several briefs from Amici that were very

9    helpful and we had an opportunity to review those as well.  So

10   again, I encourage you not to be repetitious of what may be in

11   your briefs.  I know that you, obviously, will have to argue

12   the points, but just don't regurgitate what's in the briefs.  I

13   have already read the briefs.  Try not to overlap if you can;

14   otherwise, I will get out of your way.  And Mr. Nobile, you can

15   begin on behalf of the Republican Party.

16         **MR. NOBILE:**  Thank you, Your Honor.  Russell Nobile

17   for the Libertarian Party.  I would like to reserve five

18   minutes of time.

19         Touching on the standing question to begin with.  The

20   political parties and candidates have standing to sue over

21   state regulations affecting the timing of the federal

22   elections.  Every non-vacated circuit ruling and Supreme Court

23   ruling on this question has assumed or affirmatively held that

24   they do.  In fact, we have been unable to find any non-vacated

25   or circuit ruling or Supreme Court ruling that held otherwise.

1 Indeed, as best we can tell neither have either set of

2 defendants.

3  If I have time, I will try to address all the lower court

4 rulings that have been addressed by the defendants.  I note,

5 however, that most that were cited in their papers were never

6 appealed with the exception of *Bost*, which I argued two and a

7 half months ago, which is still pending before the Seventh

8 Circuit.  Almost all were preliminary rulings.  These

9 preliminary rulings are not controlling anywhere, not even in

10 their home districts.

11  Most of the defendants' standing arguments challenge our

12 merits of our legal claims.  But the Supreme Court has made

13 clear that in determining standing, Courts are required to

14 accept as valid the merits of our legal claims.  The Court

15 recently affirmed that in *FEC versus Ted Cruz*, 569 U.S. 289.

16  Here, what that means is that in determining the

17 Libertarian Party standing, the Court must accept as valid our

18 claim that Mississippi law is preempted by federal law by the

19 election day statutes, and that late-arriving ballots are

20 categorically invalid under federal law.  The Libertarian Party

21 has shown six types of standing injuries.  As the Court has

22 indicated, I am not going to repeat every one of them, but we

23 only need to show that there is no question of material fact

24 for one of our injuries that we have shown to prevail.  All six

25 of these injuries have been recognized either by circuit courts

1    or the Supreme Court.  Our injuries are intuitive, meaning that
2    one would reasonably expect a political party to experience
3    such injuries based on these valid legal theories.  For
4    example, one would reasonably expect the Libertarian Party of
5    Mississippi to spend at least one dollar in monitoring
6    late-arriving ballots in all 82 counties for five extra
7    business days.  In fact, it would almost be improbable to
8    maintain that the Libertarian Party doesn't suffer at least $1
9    of expense related to monitoring ballots five extra days in 82
10   counties.
11        These injuries are not just expected, though, we have
12   shown that in the record.  We have shown affirmatively based on
13   the declarations of Vicki Hanson that the Court has.  The only
14   record evidence on the question that shows that these costs
15   were, in fact, incurred by the Libertarian Party.  Based on her
16   declaration, there is no genuine dispute of fact that these
17   costs were incurred, which may explain why both sets of
18   defendants do not seem to challenge that they actually incurred
19   these expenses, they challenge whether or not these expenses
20   are traceable, or excuse me, are covered under the injury in
21   fact analysis covering, or triggering Article III standing.
22        I would also note that the standing requires, of course,
23   injury in fact, traceability and redressability.  Both
24   defendants almost exclusively argue injury in fact.  They do
25   not appear to challenge traceability; obviously, they can stand

1    up and speak for themselves in a second.  That said, the only

2    record evidence here is for Ms. Hanson, and that establishes

3    that these injuries are traceable to the statute in question

4    and that, of course, this Court can redress any of these

5    injuries with an order enjoining the state statute.

6         Turning to the merits.  I want to first orient the Court

7    about the authority to regulate federal elections as structured

8    in the Constitution, because the overall structure really sort

9    of matters here and it animates a lot of this conversation.

10        No federal government existed prior to the founding of the

11   United States; thus, the previously sovereign and independent

12   colonies had no right with respect to regulating federal

13   elections and no powers to regulate under common law.  That is

14   why the regulatory powers reserved under the 10th Amendment

15   does not include regulatory powers related to federal

16   elections, and that power must come from the Constitution.  And

17   I'm paraphrasing all of this from Supreme Court opinion called

18   *U.S. Term Limits versus Thornton*, 514 U.S. 779, which goes

19   through an extensive recounting of the allocation of authority.

20   So basically, the state started with zero authority, and then

21   the Constitution either expressly gave them certain authority

22   or temporarily loaned authority until the federal government

23   exercised its prerogatives.  And so most cases, the authority

24   states have is only on temporary loan under the Constitution.

25   This is all part of the analysis that's in *Arizona Inter*

1    *Tribal*.

2           Using these timing powers, their absolute powers, the

3    federal government established a national election day.  And

4    under *Arizona Tribal*, this necessarily displaced the loaned

5    power and the federal government reclaimed that power back from

6    the states.  The Supreme Court has made clear that we only need

7    to show that the state regulation is inconsistent with election

8    day statutes to prevail.  That is a much lower standard than

9    the standard cited in the *Bomer* case and relied on by the

10   defendants.  Now, it wasn't explicitly done so, but that

11   standard in *Bomer* says directly conflict.  The *Arizona Inter*

12   *Tribal* makes clear that they don't have to find a direct

13   conflict.  Because frankly, states have more authority in the

14   qualifications of voters in filling out a voter registration

15   form than they do in the timing of regulations.  So to try to

16   distill that down, where states even have more authority they

17   can be inconsistent with federal law, which is what Scalia,

18   Justice Scalia said in *Arizona Inter Tribal*.

19          Now, all of this boils down to what does election day

20   mean, and that task is the first step at hand here, so we have

21   to address that.  And unfortunately Congress and -- Congress

22   has not really given a functional precise deadline of it.  And

23   the Supreme Court, with the exception of *Foster v. Love*, hasn't

24   done much else.  So the definition must be resolved first

25   before we move on to whether or not the statute is inconsistent

1    with federal law.  This requires, of course, a determination of

2    the original public meaning of election day, which the Supreme

3    Court has advised courts to do in the *Bostock* opinion to

4    determine the original public meaning in 1845 and 1872 when

5    these statutes were enacted.  That means what a reasonable

6    reader, fully competent in the language, would've understood

7    election day to mean at the time enacted.  For this, the Court

8    has directed some of the text, the history and the precedent,

9    and the best we have here is, of course, common law practices

10    and the absence of practices that regulate the federal

11    government, federal elections that I have touched on, and then

12    also *Foster v. Love*.

13        Again, not only did the federal government not have

14    authority under common law to regulate federal elections, there

15    was no absentee right under common law, and certainly no

16    mailbox rule under federal law -- excuse me, under common law.

17    So there's no basis to reach to that to think that voters

18    would've assumed that ballots could be received or could've --

19    or voters could've relied on a receipt deadline or mailbox rule

20    to turn in their late ballots.

21        Defendants have not explained how after Congress reclaimed

22    this authority in 1845 and 1872 suddenly the states had

23    authority that didn't exist in common law to claw this back.

24    They somehow found the power after Congress exercised their

25    preliminary power, we think this makes it inconsistent.

```
1        When states eventually enacted absentee voting and proxy
2   laws during the Civil War -- and to be clear, there's a lot of
3   mismatch in some of the analysis.  Absentee and proxy voting
4   laws are distinct from late-arriving ballot laws, right?  The
5   deadlines for receiving ballots or mailbox rule is distinct in
6   whether or not states have allowed absentee balloting.  But
7   even when they created absentee balloting during the Civil War,
8   the first statute in Pennsylvania was struck down, and they
9   created this fiction where they deputized militia men to accept
10  ballots at the poll site in the middle of a war zone.  And
11  likewise, with proxy votings -- so in that sense a state
12  official is receiving the ballot, and they knew that they had
13  to be received.
14       And with respect to proxy voting practices, the public
15  knew that in some instances a voter and his vote could not be
16  in the same place at the same time, and they understood that
17  election day meant that the agent proxy had to show up at the
18  poll site and cast his principal's ballot, and so they would've
19  understood that.
20       Notably, most of all these Civil War practices and these
21  proxy voting practices in the 19th Century, as we stated in our
22  brief, were done away with.  They tinkered with it a little bit
23  in the late 19th century, but largely were done away with until
24  World War I came about.  And then, obviously, people were more
25  transient and moving and traveling more with the invention of
```

1    the widespread use of trains in World War I, and so they needed

2    that.  The historical authorities show that the enactment, the

3    public understood it was required to receive the ballot.

4        The public knew that their electoral choices did not

5    become a vote unless and until received by election officials.

6    So a bean vote, voters would express their choice by a bean;

7    they would express their choice by a voice vote; they would

8    express their choice by a ticket.  That is a meaningless

9    gesture up until the point that it's deposited with the state

10   election officials.  The analogy that I use privately with

11   colleagues is, you know, you can place an order for food, but

12   until you show up at the restaurant and tell them what you

13   want, that's just you saying I want a hamburger into the ether.

14   You have to actually -- somebody has to be there to receive it.

15   And so without that combined action, both citizens and

16   election, state election officials, no vote occurred.

17       Congress recently during the pendency of the *Bost* case

18   passed 3 U.S.C. 21.  In that context, the federal government is

19   ceding back to states their absolute authority over the timing

20   of federal elections.  In that case, under the text of that

21   statute and only in presidential elections, and a force majeure

22   event, can states change the period of voting.  And so we think

23   that's the best evidence as to what -- how it's inconsistent.

24   Obviously, there's other case rulings.  If I have a second, I

25   will get into that.

1          I want to touch on a couple of other things that have been

2    played really prominently in these cases, and this is question

3    of the case of UOCAVA balloting, military votes.  I was at the

4    DOJ when the MOVE Act happened in 2009.  I was responsible for

5    enforcing it.  The MOVE Act only established that states -- it

6    used to be that states had to give ballots out in a reasonable

7    period, and that got to be too squishy.  So, basically,

8    Congress came in and said okay, 45 days, a hard 45-day

9    deadline.  Nothing about this -- nothing about this action

10   changes that.  States will still have to extend, or still have

11   to send ballots out within 45 days.  And the DOJ, when a state

12   fails to do that, can still come in and seek relief and ask a

13   federal court to extend ballot receipt deadlines to make sure

14   that these voters are accommodated with their rights under

15   UOCAVA.

16        This case is about whether or not the Mississippi

17   legislator has authority to send ballot receipt, not a question

18   of Congressional authority to extend ballot receipt and not a

19   question of Article III court's authority to extend ballot

20   receipt.  They plainly do.

21        There's one statute that gets confused, the Court in the

22   Seventh Circuit got confused with it or was uncertain about it,

23   and I wasn't really prepared for the question during the

24   argument, was 52 U.S.C. 20304(b)(1), which talks about the

25   Department of Defense's responsibilities in sending out

1   ballots.  And in that context, they say it needs to go out --

2   it must be received by the date ballots are due in order to be

3   counted by an election.  The Seventh Circuit took that or sort

4   of read that to mean, or a signal that they might read that to

5   mean that Congress knew the difference.  But what I was not

6   prepared at the time and I want to point out is that many

7   states, until recently, required absentee ballots to be due

8   before election day, and so that's really nothing telling.

9       I want to touch on a couple of the cases that constantly

10  and frequently appear, the *Lance v. Coffman* case out of

11  Colorado from the Supreme Court on standing.  That was clearly

12  a generalized grievance, basically taxpayer standing.  That

13  case involved a claim where the plaintiffs allege legislature

14  thereof provision of the Constitution was violated and that the

15  statutes were enacted by the wrong state organ.  That is a

16  generalized grievance.  There's no taxpayer standing.  We don't

17  have that here.

18      The *Bognet* case from the Third Circuit, which constantly

19  comes up, obviously it's vacated so it's not really of much

20  use, but let me just talk about the substance for a minute.

21  Footnote 9 of the *Bognet* case expressly disclaims the claims

22  we're making here.  It says this isn't a preemption claim.

23  That case was about whether or not the state supreme court was

24  the proper organ to adopt the timing regulation in

25  Pennsylvania.

1    Here, we're not disputing that if anybody was going to

2    enact it, the Mississippi legislature would be the one to enact

3    it.  So that is a distinct case from here.  That was a

4    legislature thereof question, not necessarily an election day

5    question.  It gets confusing.

6    Another point in *Bognet* is the plaintiff there admitted

7    that the statute was otherwise legal.  So, you know, that would

8    be the equivalent of us saying that the election day statute

9    we're challenging here is otherwise legal.  Well, you can't

10    show a harm from the statute when you say it's otherwise legal.

11    So our injuries here are completely separate from the injuries

12    alleged there.

13    And I would note that in footnote 6 of filing 880, we

14    discussed the back and forth with the Supreme Court.  The

15    *Bognet* went up under several different names.  It was an

16    extensive fighting between the judges about whether or not to

17    grant cert on *Bognet*.  They had four votes for an emergency

18    cert petition, they needed five for the emergency context, so

19    it failed.  And then when it came back up under a regular cert

20    petition, it was post January 6, and they lost a couple of the

21    votes and so the case was never heard.

22    The Eleventh Circuit case that the Court may be aware of,

23    that relied on *Bognet*.  So *Bognet* has been vacated and

24    *Raffensperger* chiefly relied on it.  I would note that in that

25    case, the Eleventh Circuit, Judge Pryor noted that if the

1    plaintiff had been a candidate, he would've had standing.  And

2    we represent our candidates, we're here on behalf of our

3    candidates, we have a totally different injury.  And according

4    to what Justice Pryor says, we would've had standing in *Wood v.*

5    *Raffensperger*. With that, I reserve the balance of my time.

6           **THE COURT:**  All right.  Let me ask you a couple of

7    questions, Mr. Nobile, if you don't mind.  Maybe some

8    elementary things that we can all agree on.  It is the

9    plaintiff here, plaintiffs here that bear the burden of

10   standing, showing standing, would that be accurate?

11          **MR. NOBILE:**  Correct, Your Honor.

12          **THE COURT:**  And what is that burden?

13          **MR. NOBILE:**  I think it's more likely than not, I

14   believe.

15          **THE COURT:**  A preponderance standard?

16          **MR. NOBILE:**  Preponderance of the evidence, yes, Your

17   Honor.  Of course, we talked about this internally, we're at

18   the summary judgment stage, so we just need to show is there a

19   material question of fact of whether or not it happened, which

20   is based on the preponderance of evidence.  Given we're at the

21   summary judgment stage, that's what we settled on internally.

22          **THE COURT:**  Now, do you hang your hat on

23   organizational standing, is that what you're telling the Court

24   that's the standing?

25          **MR. NOBILE:**  I think it's absolute standing.  The

1    *Benkiser* case makes it clear that political parties are

2    different.  So we think this case or our injuries alleged in

3    what we have shown fits neatly within that.  We don't hang our

4    hat on that.  We think, you know, the Northern District of

5    Illinois to be, with all due respect, got it wrong on *Bost*.

6    We'll see if I am proven right in the Seventh Circuit.  The

7    Seventh Circuit law that the Northern District of Illinois

8    ignored said that candidates had standing.  Of course, in our

9    associational -- I am getting to our, I guess, associational

10    injuries are on behalf of our candidates, and so a candidate

11    would have standing.  We think, you know --

12    **THE COURT:**  Do you think *Bost* was wrong on the

13    standing issue?

14    **MR. NOBILE:**  Respectfully, yes, Your Honor.  We think

15    they ignored even controlling Seventh Circuit opinion.  It's

16    *Trump v. Wisconsin*, which cited *Carson v. Simon*.  We think we

17    get standing based on *Carson v. Simon*, both as an organization

18    and also based on our associational representation of our

19    candidate members.

20    And then, of course, we have two economic injuries, the

21    out-of-pocket expenses, which we detail in our opposition to

22    summary judgment where we show that we have incurred $1 -- I

23    mean, all we have to do is show $1.  And it's honestly hard to

24    imagine that you don't have at least $1 expense.  And then, of

25    course, there's the quasi diversion of resource issue that we

1     raise.  And I note that in *Benkiser*, together with the recent
2     ruling from the Supreme Court, the FDA -- and I am going to
3     butcher the case -- it's the FDA opinion that came out recently
4     about the abortion medication.  They talk about organizational
5     standing, and they talked about why that plaintiff failed to
6     have standing in that instance.  And it explained that the
7     organizational costs weren't really tied to its core business,
8     its core mission.  And if you read that together with *Benkiser*,
9     our core mission, my client's core mission is to get people
10    elected and to win elections and win political power.

11         The Fifth Circuit discussed the core business of a
12    political party in *Benkiser*.  So if you read what the Fifth
13    Circuit described in *Benkiser* and you apply it to what the
14    Supreme Court recently affirmed in the FDA ruling about two
15    weeks ago, we fit squarely within that.  Our job is to win
16    elections.  And then *Carson v. Simon*, I think this fits neatly
17    in there.

18         So we don't hang -- I wouldn't say we hang our hat on any
19    one, we think they're all very good.  The dilution claim has
20    gotten complex because courts have over-complicated it a little
21    bit, they have mixed, I think -- I think they have mixed the
22    dilution claim with the injury claim.  And in here, we're
23    saying there are invalid ballots coming in, which the Court has
24    to assume is right under the Supreme Court's direction.  So
25    we're saying two percent of the ballots coming in right now are

1    invalid, and that dilutes.  Does that mean we win?  That's

2    obviously not the basis for our win, but we do think dilution

3    is an intuitive injury.  There's a long history of the Supreme

4    Court recognizing dilution injuries.  We think there's been

5    some -- and even in *Gill versus Whitford* from Wisconsin in the

6    last five or seven years, the Supreme Court did not reject

7    dilution-based injuries.  They said in that case they didn't

8    have the adequate evidence and there was some other issues

9    going on in that case.  So we actually think that all six of

10   our claims are very good on injury.

11            **THE COURT:**  All right.  If your argument on the

12   merits is correct, does that mean that every state that has a

13   regimen whereby they allow absentee voting, absentee votes to

14   be accepted after election day, does that mean that those

15   statutes are also invalid and inconsistent with federal law?

16            **MR. NOBILE:**  Without having read all of them right

17   here, I would say probably, yes, Your Honor.  I mean, I think

18   so.

19            **THE COURT:**  In view of that, is there any case

20   anywhere that has ruled in your favor insofar as that theory is

21   concerned?

22            **MR. NOBILE:**  No, Your Honor.  But I will say no Court

23   has ruled on the original public meaning of election day, and

24   no Court has defined the range of conduct that the Supreme

25   Court claimed when it passed -- it reclaimed when it passed the

1    election day statutes.

2         **THE COURT:**  Why do we have an election day?  Why do
3    we have a federal election day?

4         **MR. NOBILE:**  Because Courts were confused, or
5    Congress was confused, or worried, I guess is a better way to
6    put it, that states were going to send their electors to
7    Congress.  And there is an exhibit, the Stonecash political
8    science article that I attached to the back of our second, or I
9    think document 80, could be wrong, Stonecash article from a
10   couple of political scientists that explained what happened
11   before election day or what precipitated it.  But largely,
12   states weren't sending their electors, and it was getting
13   worse.  And they were worried that if they couldn't elect a
14   president, the entire government would collapse.  So they set a
15   firm date on the president first in 1845 and then moved on, of
16   course, 30 years later to do the 1872 for Congressional.

17        **THE COURT:**  And I presume we will all have the
18   opportunity to go and vote for a president on the first Tuesday
19   in November.  Is that when the president will be elected, on
20   that day?

21        **MR. NOBILE:**  That is when the electors are chosen, so
22   your choice of the elector.  And of course, Mrs. Hanson was an
23   elector and will be again this fall.  So as a technical matter,
24   that's when you choose your elector, and then there's all the
25   back-end canvassing and certifications and all these different

1    things that go on up until the electors show up and vote.

2    Well, they vote in the capital building.  Excuse me, they vote

3    in their home capitals, and then those votes are counted up in

4    DC.

5                    THE COURT:  That doesn't happen on Tuesday?

6                    MR. NOBILE:  Correct, Your Honor.

7                    THE COURT:  First Tuesday in November.

8                    MR. NOBILE:  Yes.  Well, you know, otherwise, if you

9    are going to -- if that was going to become a part of the

10   electoral process from my analysis, that would mean all of that

11   stuff would have to be pulled forward, which would honestly be

12   a more burdensome position.  And I am not saying the Court is

13   advocating this, obviously, but that would be a more burdensome

14   position than even the things that we're alleging is a proper

15   rule.

16       We think that the ballot goes into the box, the ballot is

17   received, and then the counting continues, and it doesn't have

18   to be declared on election night.  We, of course, did not say

19   that the president needs to be declared by election night.

20   Obviously, people have different perspectives on whether or not

21   that should happen, but we don't think that's what the

22   historical practice has.  I could go on to different things I

23   have read in other contexts about how that was handled, but

24   historically they allowed some time after the election to

25   finalize it.

1          **THE COURT:**  One other thing I want you to clarify for

2    me.  Are you saying there's a difference between a direct

3    conflict with federal law and inconsistence?

4          **MR. NOBILE:**  We believe there is, Your Honor.

5          **THE COURT:**  Tell me what that -- seems to me that if

6    something is in direct conflict with something else, then it's

7    obviously inconsistent with it and vice versa.  So what is the

8    difference between those two standards?

9          **MR. NOBILE:**  Well, we think direct is a higher

10    burden, is a higher proof to show preemption.  The *Arizona*

11    *Inter Tribal* case is a difficult case because it talks about

12    the NVRA statute, which is a difficult statute and honestly

13    puts a lot of people to sleep, including people like me that

14    deal with it.  You know, the Arizona law did not conflict with

15    the NVRA, and even the majority opinion recognized that in its

16    discussions.  It described yeah, it may not, but it's

17    inconsistent with it.  And you will read the -- I think there

18    was a dissent that explains that you can read them both in

19    harmony, and the majority opinion said that doesn't matter.  Is

20    it inconsistent?  Is it within this territory of range of

21    conduct that Congress has restaked out for itself?  We think

22    directly conflict is a higher standard.  I don't know that I

23    have got an authority here, hopefully my co-plaintiff does that

24    shows exactly how to measure that difference, but we think

25    directly conflict is a higher standard.  And I don't know why,

1     I will be interested to hear everyone else's position on why

2     that still controls after *Arizona Inter Tribal*, but, of course,

3     it has not been ruled on by the Fifth Circuit yet.

4              **THE COURT:**  Okay.  And I don't want to pick on you

5     too much, but I have -- I had the pleasure of listening to the

6     oral arguments at the Seventh Circuit, I think you were there.

7              **MR. NOBILE:**  I was, Your Honor.

8              **THE COURT:**  At the conclusion of all of the arguments

9     and the questions that were asked by the judges at the Seventh

10    Circuit, how did you feel about your standing issue?

11             **MR. NOBILE:**  You know, it's hard to say.  I felt

12    pretty good about standing going in and coming out.  And we

13    think, you know, up until 2020, I don't think there really has

14    ever been a district court ruling that ever said a federal

15    candidate didn't have Article III standing or an Article III

16    injury to challenge a state regulation relating to the time,

17    place and manner of his election.  There may be something out

18    there I have missed in the 20 years I have been doing election

19    law, I haven't seen it.  And it was very unusual.  And *Trump v.*

20    *Wisconsin* was spot on, *Carson v. Simon*, and it was controlling

21    in the Seventh Circuit.  That's exactly the injury we alleged.

22    I don't quite know why the Northern District of Illinois didn't

23    follow it, but it was the controlling law there.

24             **THE COURT:**  Thank you.

25             **MR. WOODFIN:**  Good afternoon, Your Honor.  Conor

```
 1    Woodfin for the Republican Party plaintiffs.  I'd like to
 2    reserve five minutes for rebuttal, please.
 3         I am going to start by addressing the standing of the
 4    Republican Party plaintiffs and then I will turn to the merits.
 5    We have all sorts of bases for standing.  Parties, candidates,
 6    organizations and voters have all sued under the election day
 7    statutes and courts have adjudicated those disputes on the
 8    merits.  We have all of those parties here and more.  But you
 9    only need to agree with us on one of those parties to reach the
10    merits.
11         So I will start with organizational standing.  We think
12    this is the simplist path to finding standing in this case, but
13    I will provide a few more bases as well.  My colleague brought
14    up *Alliance for Hippocratic Medicine*.  I will start there,
15    that's a recent Supreme Court case on this issue.  It really
16    just confirms the reasoning for organizational standing.  It
17    doesn't change the standard for organizational standing, simply
18    reaffirms what the Court had previously held in *Havens*, that
19    when an organization diverts resources it must show that the
20    diversion of resources that is incurred from the action they
21    challenge is harming its core mission.  That's the Fifth
22    Circuit's standard in the cases applying to *Havens*, and so we
23    think all of this is consistent, and all of this is in our
24    declarations.
25         The mission of the RNC and the Mississippi Republican
```

1   Party is to elect republican candidates and to turn out

2   republican voters.  Extending the time that ballots are

3   accepted necessarily imposes burdens on committees and on

4   candidates who in order to achieve their goals of electing

5   republican candidates and turning out voters must continue

6   their electoral efforts beyond election day.

7        So we have provided two concrete examples of how the

8   Republican Party is incurring those costs to prevent the harms

9   to their core missions as a result of this post-election-day

10  rule.  The first is the ballot chase programs.  The RNC and

11  Mississippi Republican Party run programs, contact voters to

12  encourage them to turn in their mailed ballots.  Prolonging the

13  receipt time for absentee ballots necessarily requires them to

14  run those programs longer and that harms their core mission by

15  causing them to divert resources from other mission-critical

16  activities.

17       The second concrete example we provide is poll watching.

18  Again, extending the time for ballots to come in necessarily

19  requires the Republican Party to divert resources to training,

20  for post-election-day observation, challenges, preparation of

21  materials, securing additional volunteer time.  All of this

22  requires them to divert resources away from other election

23  integrity efforts, other voter turnout efforts, in-person

24  turnout efforts.  That all satisfies the *Alliance for*

25  *Hippocratic Medicine*'s test, the test under *Havens*, the Fifth

1    Circuit's test.  All of these cases say the same thing.  The

2    declarations show concrete examples of how that diversion is

3    harming the core mission of the RNC and the Mississippi

4    Republican Party.

5         The two best cases on this from the Fifth Circuit are

6    *Benkiser* and *Acorn*.  Both are still good law, applied in

7    *Havens*.  The Democratic Party had standing in *Benkiser* to

8    challenge the removal of a republican candidate from the ballot

9    because they said they would have to spend more money reworking

10   their campaign.  And that was true even though the Democratic

11   Party's normal operations were running a campaign.  That is the

12   definition of the normal operations of any political party.  So

13   it didn't matter that that was a part of their business

14   activity, it was the fact they would have to spend more money

15   in a way that harmed their mission to elect democratic

16   candidates that gave them organizational standing.

17        Again, in *Acorn*, the voter registration group had standing

18   because it had to spend more money on voter registration

19   efforts in a way that made their mission to register voters

20   less effective; that impedes their mission.

21        A second independent basis for standing in this case is

22   competitive standing.  Again here, *Benkiser* is directly on

23   point.  As the Fifth Circuit explained, voluminous authority

24   shows that candidates and parties suffer a concrete injury when

25   their chances of victory would be reduced.

1    The defendants argue that we must show that republican
2    candidates will lose the election due to late-arriving ballots,
3    but *Benkiser* forecloses that argument.  The Texas Democratic
4    Party did not need to show that they would lose the upcoming
5    election, it was simply enough that their chances of victory
6    would be reduced.

7    We also don't need to show that late-arriving ballots will
8    favor democrats, although we do have evidence of that.  It is
9    enough that late-arriving ballots forces the republican
10   plaintiffs to rework their programs in a way that damages their
11   electoral efforts.  That is what produces the competitive
12   injury.  It makes it less likely that their efforts will be
13   successful.  That's enough under *Benkiser*, it's enough under
14   *Carson versus Simon* from the Eighth Circuit, and it satisfies
15   competitive standing here.

16   A third independent basis is voter dilution.  Voter
17   dilution is a well-established injury in redistricting cases,
18   but there's no principled way to say that vote dilution is a
19   particularized injury in redistricting cases, but a generalized
20   injury here.  And that's because the mathematical disadvantage
21   that the Supreme Court described in the vote dilution cases in
22   redistricting context, the mathematical disadvantage and the
23   effectiveness of their vote is the basis for standing, basis
24   for injury in the redistricting context, that's the same injury
25   that's present here.

 1          Courts that have rejected vote dilution as a theory of
 2     standing rejected a version of it that we don't rely on here.
 3     Those cases ruled that the risk of fraudulent votes is a
 4     speculative injury that's generalized.  We don't rely on the
 5     risk of fraud to dilute the votes.  As Mr. Nobile said, it's
 6     the fact that all of the votes that come in late are invalid as
 7     a matter under the merits that dilutes the votes.  And so for
 8     that reason, the vote dilution necessarily occurs, it's not
 9     merely a risk of it occurring.  It will occur if Mississippi
10     enforces the law that we challenge, and so that distinguishes
11     those vote dilution cases that got it wrong.
12          The fourth independent basis for standing is conscience
13     injuries.  Again, here I will return to *Alliance for*
14     *Hippocratic Medicine* because it has a nice explanation of
15     conscience injuries and what criteria satisfies them.  So in
16     that case, doctors asserted a conscience-based injury based on
17     a fear that they would have to provide abortions in a way that
18     violated their conscience.  And the Supreme Court said that a
19     conscience injury is a valid Article III injury, and the
20     government even conceded that point in the case.  The reason it
21     held that the doctors did not have standing under their
22     conscience-based injury was because a separate federal law
23     provided an exception for their conscience objections.  So if
24     they had this conscience-based injury, federal law provided
25     them an out.  They did not have to take part in the act that

1    violated their conscience.  Mr. Lamb here does not have the

2    out.  He is responsible for running the county's general and

3    special elections, which means he must choose between enforcing

4    Mississippi's post-election-day deadline or enforcing the

5    federal election-day deadline.  He has taken an oath to both

6    constitutions.  He cannot apply one standard without violating

7    the other.  So he does not have the out that was present to the

8    doctors in *Alliance for Hippocratic Medicine*.

9         And the Supreme Court actually provided a nice roadmap for

10   what constitutes a conscious-based injury.  It said -- in that

11   case the doctors did not say, here is the treatment I provided,

12   here is how it violated my conscience, and here is why

13   conscience protections were unavailable to me.  Mr. Lamb has

14   provided those in his declaration.  He said, here are the

15   actions I must take under Mississippi law, here is how it has

16   violated my conscience by forcing me to violate my oaths.  And

17   there's no conscience protection available to him under the

18   Fifth Circuit standard.  The only remedy for him is a judicial

19   invalidation of the state law that would obviate his concerns.

20   That's the standard under *City of El Cenizo versus Texas* in the

21   Fifth Circuit, and that's the injunction we're requesting here.

22        So just to wrap up standing, any one of those four bases

23   is sufficient because only one plaintiff needs standing for

24   each claim asserted in the complaint.  So as long as you agree

25   with us on at least one of those, then you can reach the

1    merits.

2         So turning to the merits, Mr. Nobile has addressed the

3    history, I will focus my remarks on the text and structure of

4    the election day statutes.  But our argument is really quite

5    simple, I can sum it up in two premises.  The first is an

6    election is consummated when the final ballot is received by

7    the proper election official.

8         The second premise is that federal law prohibits an

9    election from being consummated after election day.  So if you

10   accept both of those premises, then the conclusion must follow

11   by counting ballots that are received after election day

12   Mississippi is violating federal law.

13        So I will return to the first premise, which is really the

14   substance of the disagreement in this case, that an election is

15   consummated when the final ballot is received by the proper

16   election official.  This just comes right from *Foster*.  The

17   Supreme Court said, when the federal statutes speak of the

18   election of a senator or representative, they plainly refer to

19   the combined actions of voters and officials meant to make a

20   final selection of an officeholder.  So only once the ballot is

21   in the custody of an election official has that final selection

22   occurred.  And note that it's the combined action of voters and

23   election officials.  It's not the voters' unilateral action of

24   filling out a ballot, of marking a ballot, of putting a ballot

25   in the mailbox, or of giving a ballot to their mom to take to

1   the election office.  Those are unilateral actions, they are
2   not the combined actions of the election official and the
3   voter.  It's also not the unilateral actions of the election
4   officials on the back end, counting ballots, tabulating
5   ballots, resolving ballot disputes, certifying the election.
6   Those are not combined actions, those are unilateral actions by
7   the election officials.  The only moment in the election, that
8   is the combined action of voters and election officials, is
9   depositing the ballot into the custody of the election
10  officials.  That moment is the election.
11      One of the best explanations of this principle comes from
12  the Supreme Court of Montana in *Maddox*.  We cited this case in
13  our brief, but it contains quite an extensive discussion of
14  what it means to transfer a ballot to an election official.
15  And the Supreme Court said, a ballot is cast when it is in the
16  custody of election officials.  So whether you frame this as
17  receipt or casting a ballot, or custody, or transfer, or final
18  selection, all of these words mean the same thing, it's giving
19  the ballot from the voter to the election official, that's the
20  moment when the election is consummated.
21      So the second point on this is statutory context.  This
22  informs the meaning of election day that's in the statutes
23  because Congress carved out exceptions to holding an election
24  on election day.  The exceptions Congress needed to spell out
25  and the ones it didn't spell out tell us exactly what actions

1    amount to an election.  So for example, states can conduct

2    elections outside of election day for runoffs and for

3    vacancies.  Congress didn't carve out exceptions for counting

4    ballots or certifying results.  Those actions are not part of

5    conducting the election, or they're not part of the moment of

6    election, more precisely.

7         And another good explanation of these exceptions is

8    actually the Fifth Circuit's opinion in *Foster* that the Supreme

9    Court ended up taking and affirming.  It contains a discussion

10   of why these exceptions matter in deciding, determining the

11   meaning of election day.  So that's the first premise, an

12   election is consummated when the final ballot is received by

13   the proper election official.

14        The second premise is that the election day statutes

15   prohibit an election from being consummated on election day.

16   *Foster* says that the election day statutes prohibits states

17   from consummating an election before election day.  And the

18   defendants, throughout their brief, seem to imply that that's

19   the only thing it means, that the election day statutes can't

20   mean anything about what happens after election day.  That just

21   makes no sense.  I think the defendants would have to concede

22   that if Mississippi opened up polling booths on the Wednesday

23   after election Tuesday and allowed voters to walk in and cast

24   their votes that that would violate the election day statutes.

25   These statutes in *Foster* apply just as well to what happens

1    after election day as before election day.  There's no

2    principled way to distinguish between those two actions.  The

3    only principle transition that constitutes the moment of an

4    election is when the ballots go from the voter to the custody

5    and control of the election officials.  So if you accept both

6    of those premises, then the conclusion must follow by counting

7    ballots that are received by election officials after election

8    day, Mississippi is violating federal law.

9         With that, I will just conclude, and I will reserve the

10   balance of my time.  But I am happy to answer any questions you

11   have for me.

12        **THE COURT:**  Do you agree with Mr. Nobile that there's

13   a difference between the standard that the Supreme Court

14   applied, that is the inconsistency standard with the direct

15   conflict standard?

16        **MR. WOODFIN:**  We agree that the correct standard is

17   inconsistent.  As you're writing the opinion, that's the

18   correct case to cite for the standard.  But as a practical

19   matter, we think these are reconcilable, they all say the same

20   thing.  The question is really that first premise that I laid

21   out, is an election -- does election mean giving the ballots to

22   the election officials?  If it does, then there is a direct

23   conflict, that's the necessary conclusion.

24        And so -- actually, one of the best ways to, I think,

25   frame this is Judge Dennis' dissent in *Foster* at the Fifth

1    Circuit.  So he said there's no direct conflict because the

2    election day statutes say nothing about open primaries.

3    They're totally silent on open primaries.  That was an argument

4    made in that case, and that's an argument made in this case,

5    that the election day statutes are completely silent about when

6    absentee ballots can come in.  The Fifth Circuit rejected that

7    argument, the Supreme Court unanimously rejected that argument,

8    and that's because the real dispute is over the meaning of an

9    election.

10        So the Supreme Court never -- it didn't bother the Supreme

11   Court that the election day statutes are silent about open

12   primaries, it shouldn't bother you that the election day

13   statutes don't say anything explicitly about absentee ballots,

14   it's all in the meaning of an election.  That's what the

15   Supreme Court said in *Foster*, it's what the Fifth Circuit said

16   in *Foster* and was affirmed, and that's what we're saying here.

17        **THE COURT:**  Now I am going to jump back a little bit

18   insofar as standing is concerned.  I may be wrong on this, you

19   correct me, I don't think our colleague in the Seventh Circuit

20   had the benefit of an organization as a plaintiff, am I right

21   on that, in the *Bost* case, there were only individuals and

22   candidates?

23        **MR. WOODFIN:**  *Bost*, I believe, was only individuals.

24   Mr. Nobile can correct me if I am wrong.

25        **THE COURT:**  I think that's right.

```
 1        MR. WOODFIN:  It was candidates, specifically.  So I
 2   am not sure that -- I don't think an organizational standing
 3   was at issue.
 4        THE COURT:  I don't think that was argued.  Go ahead,
 5   Mr. Nobile.
 6        MR. NOBILE:  That's correct, it was just candidates
 7   and voters.
 8        THE COURT:  But there was no organizational standing
 9   argued at the District Court or at the Seventh Circuit level?
10        MR. NOBILE:  Correct.
11        THE COURT:  Now I just confused myself.  Let me jump
12   back again.  So what you're telling me is that absentee ballots
13   are okay if they are received on election day and are counted
14   on election day.  What about absentee ballots that are cast
15   before election day?  That's not election day.
16        MR. WOODFIN:  Yeah, that's totally fine.  That's
17   *Kiesling*, the Ninth Circuit's opinion there.  Of course, the
18   Fifth Circuit upheld early voting in *Bomer*.  Nothing about the
19   rule that we are advocating here calls into question absentee
20   voting in general or early voting because that is not the final
21   selection.  And that is the key point in *Foster*, that when you
22   have voters who are casting ballots 10 days, 20 days before an
23   election, that's not yet the final selection.  The final
24   selection occurs when the last ballot is transferred to the
25   custody of the election officials.  That is the moment the
```

1    election itself is consummated.

2            **THE COURT:**  I guess there's the rub.  What does it

3    mean, or is there a case that tells us what it means for the

4    election officials to possess or to have received the ballot?

5            **MR. WOODFIN:**  So *Maddox* from the Supreme Court of

6    Montana is the most on point here.  It specifically addressed

7    that question.  So it said, casting a ballot means, not merely

8    filling it out or putting it in the mailbox.  It means giving

9    it to the election official, transferring it to the custody of

10   the election official.  And I will note, they are applying the

11   election day statutes in that case.  They cited 3 U.S.C.

12   Section 1.

13           **THE COURT:**  What about the argument that once you

14   place something in the mail you cannot take it back.  It is

15   constructively in the possession of the person that you intend

16   to receive it.

17           **MR. WOODFIN:**  It is constructively in the possession

18   of the U.S. Postal Service.  It is not in the possession of the

19   state election officials.  If the U.S. Postal Service fails to

20   deliver, and this happens, if they fail to deliver it to the

21   election officials that ballot is not going to be counted, it's

22   not appropriately cast, as the Supreme Court of Montana says.

23   And that's different.  I know Mississippi doesn't have

24   drop-boxes.  That's different than maybe a drop-box that is

25   actually in the custody of the election officials.  So that is

1    the key distinction, is the ballot in the custody and control

2    of the election officials.

3                 **THE COURT:**  All right.  Fair enough.  Thank you.

4                 **MR. DODGE:**  Your Honor, I apologize for the

5    interruption.  If I might be excused from the courtroom for two

6    minutes?

7                 **THE COURT:**  But of course.

8                 **MR. DODGE:**  Thank you.

9                 **MR. SHANNON:**  May it please the Court.  Good

10   afternoon, Your Honor.  Rex Shannon with the Mississippi

11   Attorney General's Office.  I am here with my co-counsel,

12   Wilson Minor, on behalf of the sole state defendant in the

13   case, Secretary of State Michael Watson.

14        Your Honor, the pending cross-motions for summary judgment

15   have been extensively briefed.  All of the Secretary's

16   arguments are set out in detail in his papers.  Given the time

17   constraints here today, I will not attempt to cover every

18   argument that is presented in the six filed briefs filed by the

19   Secretary, but I will focus on what the Secretary believes are

20   the key points in deciding these motions.

21        In a nutshell, Your Honor, the Secretary submits that both

22   of these cases should be dismissed for lack of standing.

23   Alternatively, Your Honor, all three of the claims asserted by

24   these plaintiffs fail on the merits, and the Court should grant

25   summary judgment for the defendants in both of these cases.

1      By way of background, as I am sure the Court appreciates

2  at this point, the only Mississippi law being challenged in

3  either of these lawsuits is Mississippi Code Section 23-15-637,

4  and it's only subsection (1)(a) that's being challenged.

5      Your Honor, that is Mississippi statute governing the

6  deadline for receipt of mail-in absentee ballots in most state

7  and federal elections.  In response to the COVID-19 pandemic in

8  2020, the legislature amended that statute to provide that

9  mail-in absentee ballots would be counted in state and federal

10  elections provided that two things occurred:  Number 1, that

11  the ballot is postmarked on or before election day; and number

12  2, that they are received by the registrar no more than five

13  business days after election day.

14      State law further provides, Your Honor, that any mail-in

15  absentee ballot received after that time period will not be

16  opened and will not be counted.  Your Honor, the sole merits

17  issue before this Court is whether the five business day

18  counting period violates federal law.

19      Your Honor, before we get to the merits, Secretary Watson

20  submits at the outset that this Court need not even reach the

21  merits because none of these plaintiffs have standing to

22  challenge this statute.  Your Honor, it is settled law in the

23  Fifth Circuit that when the defendant moves for summary

24  judgment on standing, the plaintiff must present competent

25  summary judgment evidence to establish standing.  Standing is

1    jurisdictional.  Your Honor, even under the Rule 12(b)(1)

2    standard the burden of establishing subject matter

3    jurisdiction, including standing, is always on the plaintiff,

4    and I don't believe these attorneys here today for the

5    plaintiffs have disputed that.  Your Honor, the plaintiffs have

6    not met that burden here.  I heard some discussion earlier

7    about something referred to as intuitive standing.  I have

8    never seen that in the case law that I am aware of, Your Honor.

9    All of the cases that I am aware of say that the plaintiff has

10   the burden to present evidence of specific concrete and

11   particularized injury in fact under the *Lujan* line of cases to

12   establish Article III standing.

13       Your Honor, the only two individual plaintiffs in these

14   cases are James Perry and Matthew Lamb.  As we have set out in

15   our briefs, both of these men merely assert a generalized

16   grievance.  They don't establish any specific personal harms.

17   Your Honor, under *Lance v. Coffman*, 549 U.S. 437, these two

18   individuals have not made the requisite showing to establish

19   standing by virtue of any alleged violation of federal law.

20   Their allegations of vote dilution have likewise been held to

21   be too speculative and too generalized to confer standing.  We

22   have cited recent federal cases from Illinois, from North

23   Carolina and from Wisconsin, all of which rejected this same

24   theory of vote dilution as a basis for Article III standing in

25   the same or similar context.

1            Additionally Your Honor, neither of these individual

2     plaintiffs have shown that any alleged injury is certainly

3     impending.  As to Mr. Perry, Your Honor, the RNC plaintiffs

4     didn't mention him anywhere at all in their response to the

5     Secretary's motion for summary judgment.  Your Honor, since the

6     law says that cross motions for summary judgment must be

7     considered independently, the Secretary submits that the

8     plaintiffs have abandoned any claim of standing as to

9     Mr. Perry.

10           Your Honor, as to Mr. Lamb, he argues that he will face

11    the prospect of removal from office as a George County election

12    commissioner if he doesn't comply with the Mississippi statute.

13    Your Honor, as we set out in detail in our briefs, and I won't

14    recite the whole lengthy process, there is a very lengthy and

15    uncertain legal process for removing him from office that is

16    far too attenuated to constitute imminent harm sufficient to

17    establish standing.

18           Your Honor, I heard some discussion earlier about a

19    conscience-based injury on the basis that Mr. Lamb doesn't want

20    to violate his oath.  Your Honor, we would submit he doesn't

21    have a moral objection, he has a legal objection.  There's been

22    no evidence here to present any showing of a concrete specific

23    injury that he will experience if he follows one law and not

24    the other.  Again, that process is set out in detail, the

25    process for removal from office, and it is lengthy and very

1    uncertain and speculative.

2        Your Honor, the other plaintiffs in these lawsuits are

3    political parties, they have likewise to establish both

4    associational and organizational standing.  Your Honor, for all

5    the reasons that Mr. Perry and Mr. Lamb lack standing, the

6    political party plaintiffs lack associational standing.  These

7    will be their members and voters and candidates.

8        To highlight the additional points on associational

9    standing, the RNC plaintiffs have not produced any evidence

10   that the counting of mail-in ballots, absentee ballots, in the

11   five business day period after election day has harmed or will

12   harm the electoral prospects of a single republican candidate

13   for federal office on the ballot in Mississippi.

14       Your Honor, this court may take judicial notice that

15   President Trump won Mississippi's electoral votes in 2020, and

16   that all but one of the remaining federal offices in

17   Mississippi are held by republicans.  The sole remaining

18   federal office is held by Congressman Benny Thompson, a

19   democrat.  Your Honor, there's no evidence in this record to

20   show that any election for president or for Congress would have

21   resulted or will result in a different outcome in Mississippi

22   but for the counting of mail-in ballots in that five business

23   day mail in period after election day.

24       Relatedly Your Honor, there's no evidence in this record

25   to show that the Mississippi statute diminishes republican

1      voters' political effectiveness in Mississippi.  Same goes for

2      the Libertarian Party, Your Honor.  It hasn't shown that any of

3      its candidates might win a federal election in Mississippi if

4      enforcement of the Mississippi law is enjoined.

5          Your Honor, as the record bears out, mail-in absentee

6      ballots received within that five business day period after

7      election day represent, by all indications, a very small

8      percentage of the total vote in any federal election in

9      Mississippi, certainly not enough to change the outcome of any

10     federal election in this state.

11         Your Honor, as to organizational standing, the key point

12     there, Your Honor, is that neither of the political party

13     plaintiffs has shown any alleged diversion of resources, that

14     any alleged diversion of resources perceptively impairs its

15     ability to achieve its mission in Mississippi.  That's the

16     showing they have to make under the cases we cited.

17         Your Honor, there's no competent summary judgment evidence

18     in this record to show that the Mississippi statute has caused

19     either of these political parties to be less effective in

20     carrying out its mission in Mississippi than it was prior to

21     2020 when the challenged language was added to the statute.

22     Nor is there any evidence in this record to substantiate any

23     alleged voter fraud in Mississippi tied to the challenge

24     statute or otherwise.

25         Your Honor, to the extent these plaintiffs argue for

1    standing under the *Benkiser* or the *Carson* case, neither of

2    those cases are applicable here.  And I won't get into the

3    details on that, we have distinguished those at length in our

4    briefing, other than to say *Benkiser* involved specific alleged

5    harms to a specific candidate caused by an opposing political

6    party specific candidate.  That's not what we have here.

7        Your Honor, for the reasons I have discussed and those set

8    out in our papers, the Secretary of State submits that all of

9    these plaintiffs lack Article III standing and that these cases

10   should accordingly be dismissed for lack of subject matter

11   jurisdiction, and thus the Court need not even reach the merits

12   of these cases.  Your Honor, turning now to the merits.

13       Shifting gears, I'd like to focus on the plaintiffs'

14   principal claim that the Mississippi statute is preempted by

15   federal election law.  Your Honor, the U.S. Supreme Court has

16   held that states are given and, in fact, exercise wide

17   discretion in establishing the time, the place and the manner

18   of electing their federal representatives.  That's *United*

19   *States v. Classic*, 313 U.S. 299.

20       Your Honor, the Fifth Circuit has held that the state's

21   discretion is bounded by, "only one limitation, the state

22   system cannot directly conflict with federal election laws on

23   the subject."  That's *Voting Integrity Project, Inc., v. Bomer*,

24   199 F.3d 773.

25       Your Honor, we agree that the direct conflict standard is

1    higher than mere inconsistency.  To give an example, direct
2    conflict would be yes versus no; mere inconsistency, yes versus
3    maybe.  Your Honor, the general rule in federal conflict
4    preemption is there has got to be a direct conflict between
5    state and federal law for federal law to preempt the state law.
6    And we believe that is consistent with what the Fifth Circuit
7    said in the *Bomer* case related specifically to the issue before
8    the Court today in terms of these federal election statutes.

9        Your Honor, the Mississippi statute does not directly
10   conflict with federal election laws.  Over the years, Your
11   Honor, the Supreme Court has defined the term "election" in
12   different yet similar ways.  Your Honor, in the *Newberry* case
13   that is cited in our papers, election is defined as the final
14   choice of a federal officer by the voters.  And the *Classic*
15   case that I mentioned a moment ago, election is defined as the
16   expression of the voters of their choice of candidates.  In the
17   1997 case of *Foster v. Love*, it's defined as, "the combined
18   actions of voters and officials meant to make a final selection
19   of an officeholder."

20       Your Honor, the Mississippi statute generally comports
21   with these definitions and is facially compatible with the
22   federal election statutes.  Once the voter deposits an absentee
23   ballot in the mail, Your Honor, that ballot has been
24   irretrievably cast and that voter has thereby expressed his or
25   her final choice in the selection of candidates for that

1  election.

2      Your Honor, I would say this about the finality and the
3  consequential nature of depositing something in the mail.  I
4  heard it being compared to ordering fast food and placing an
5  order for fast food.  Your Honor, I don't think those two
6  things are analogous.  Deposition an item in the mail is a much
7  more consequential action than ordering food.  Just to give
8  some examples, I would cite the mailbox rule from insurance
9  law.  An insurance policy in Mississippi, as I recall, is
10  deemed renewed once the premium is deposited in the mail.  So
11  there's a legal consequence and a presumption of receipt
12  attached to depositing that premium in the mail.

13      Same thing, my colleague Mr. Minor reminded me before we
14  had ECF filing.  We would serve papers under Rule 5 in the mail
15  and there was a presumption that service had been effected once
16  those papers were deposited in the mail.  Nobody had to follow
17  up to make sure somebody got something.  That certificate of
18  service was signed and it was put in the mail and it was
19  served.

20      Your Honor, I think the Court was correct earlier when it
21  mentioned constructive possession framework.  And I would say
22  that to the extent there's any question here about what the
23  action of the registrar is in terms of accepting the vote, it
24  is the presumption of receipt that the statute contemplates by
25  the registrar of the mail-in absentee ballot within that time

1      period.

2           Your Honor, by counting only those ballots that are

3      postmarked on election day, the Secretary submits that the

4      Mississippi statute complies with federal law, regardless of

5      what one may think of the policy underpinnings of the statute.

6      The bottom line here is that the Mississippi statute does not

7      directly conflict with federal election statutes, Your Honor.

8      Instead, it operates harmoniously with federal election law.

9           The legality of the Mississippi statute is further

10     supported by congressional acquiescence by comparable federal

11     statutes and by legislative history.  One thing, Your Honor,

12     many other states, likewise, have post-election-day absentee

13     ballot receipt deadlines.  Congress is aware of this, there's

14     no question about that, yet it has never stepped in to alter

15     the rules.  Additionally, Your Honor, there are also federal

16     laws we have heard of today that allow for post-election-day

17     receipt of ballots.  For instance, the UOCAVA law that we have

18     talked about allows for the post-election-day counting of

19     ballots received from Americans living overseas, including

20     members of the U.S. military.

21          And finally, Your Honor, legislative history indicates

22     that Congress wanted a uniform election day for three reasons:

23     Number 1, to prevent early elections in some states from unduly

24     influencing voters voting later in other states; number 2, to

25     prevent fraudulent voting in multiple state elections; and

1    number 3, to remove the burden of voting in more than one

2    federal election in a given year.

3        Your Honor, the Mississippi statute does not stand as an

4    obstacle to accomplishing any of these congressional

5    objectives, nor does it implicate the congressional concern

6    that states would not send their electors to Washington.

7        Your Honor, the plaintiffs' preemption claim in both of

8    these cases is predicated almost exclusively on what the

9    Secretary submits is a tortured reading of the U.S. Supreme

10   Court's opinion in *Foster v. Love*.  Your Honor, at bottom,

11   that's the case they have tried to build their principal claim

12   around, but it doesn't work here because *Foster* doesn't go as

13   far as the plaintiffs need it to go, and its holding doesn't

14   speak to the issue at hand at all.

15       Your Honor, in *Foster*, the Supreme Court held that

16   Louisiana's open primary system violated federal election

17   statutes because it permitted the conclusion of a congressional

18   election before the election day chosen by Congress.  The

19   *Foster* Court was concerned with preventing what the Fifth

20   Circuit has called the, quote, two primary evils identified by

21   congress as reasons for passing these federal election statutes

22   in the first place.  One being the risk that an early election

23   in one state could influence voting in later states, and the

24   other being the burden on citizens who are forced to turn out

25   on two different election days to make a final selection of

1    federal officers in presidential election years.  Your Honor,

2    the narrow holding of *Foster* was only that a federal election

3    cannot be consummated before election day because that would

4    foster these two so-called evils that Congress was worried

5    about.  Your Honor, the Supreme Court in *Foster* took great care

6    to limit its holding to the facts of that case, which did not

7    involve post-election-day counting of mail-in absentee ballots

8    postmarked by election day.

9        Your Honor, the Supreme Court in *Foster* expressly declined

10   to, quote, pair the term election down to its definitional

11   bone, end quote.  And the Court expressly left, "room for

12   argument about just what may constitute the final act of

13   selection within the meaning of the law."

14       Your Honor, the Fifth Circuit in the *Bomer* case that I

15   mentioned has reiterated that the Supreme Court in *Foster*

16   refused to give a hypertechnical meaning to the term

17   "election."  Your Honor *Foster*'s narrow holding does not

18   establish a direct conflict between the Mississippi statute and

19   the federal law, particularly when it's read in conjunction

20   with the *Newberry* case and the *Classic* case.

21       Your Honor, in addition to *Foster*, the Libertarian Party

22   in its briefing cited the *Inter Tribal* case for the

23   proposition.  And I think Mr. Nobile mentioned it here today,

24   that federal election law necessarily displaced Mississippi's

25   authority to extend the ballot receipt deadline past election

1    day.  But Your Honor, all the *Inter Tribal* case says is that

2    the preemptive sweep of federal election statutes goes no

3    further than the statutory text of those statutes.  We believe

4    that is totally consistent with the Fifth Circuit's holding in

5    *Bomer*, and that the only limitation on states in this arena is

6    that state law not directly conflict with federal law.  Thus,

7    Your Honor, the *Inter Tribal* case does no harm to the

8    Mississippi statute.

9        In fact, Your Honor these plaintiffs have not cited a

10   single controlling authority holding that post-election-day

11   counting of mail-in absentee ballots postmarked by election day

12   conflicts with federal election statutes.

13       Your Honor, as to the plaintiffs remaining constitutional

14   claims evoking the right to vote and a right to stand for

15   office, the RNC plaintiffs, we submit, have abandoned those

16   claims which are not addressed at all in their response to the

17   Secretary's Motion for Summary Judgment.  The Libertarian Party

18   gave short shrift to those claims in their response to the

19   Secretary's motion.  Your Honor, Secretary Watson's arguments

20   on both claims are well presented in their briefs.  Given the

21   time constraints, I won't belabor the Court with the discussion

22   of those arguments today, except to say that the Secretary

23   stands on his briefs as to those claims and seeks summary

24   judgment across the board in both cases.

25       Your Honor, in conclusion, none of these plaintiffs has

1    established Article III standing to file these lawsuits, and

2    the Secretary submits that this Court should dismiss both

3    complaints without ever reaching the merits.  And Your Honor,

4    even if the Court decides that it has subject matter

5    jurisdiction here, all of these plaintiffs' claims fail on the

6    merits.

7         Again, Your Honor, whatever one may think of the policy

8    embodied in the Mississippi statute, it does not violate

9    federal statutory law governing federal elections, nor does it

10   violate the U.S. Constitution.

11        Your Honor, for all the reasons I have discussed and those

12   set forth in the Secretary's six filed briefs, Secretary of

13   State Michael Watson respectfully requests that the Court would

14   dismiss both complaints for lack of standing, and hence lack of

15   subject matter jurisdiction.

16        Alternatively, Your Honor, Secretary Watson would

17   respectfully requests the Court grant him summary judgment on

18   all claims, thereby disposing of both cases in their entirety

19   with prejudice, Your Honor.  Thank you.

20        **THE COURT:**  A couple of questions, primarily on the

21   standing issue.  Do you tend to agree with counsel for the

22   plaintiffs that it is not necessary for all of the plaintiffs

23   to demonstrate standing or for them to substantiate or to prove

24   every theory of standing, that one would be sufficient?

25        **MR. SHANNON:**  I will say this, as to each plaintiff,

1    each plaintiff must individually establish standing.  I think

2    the law is clear that standing is not established *en gros*.  It

3    has to be established for each claim that is asserted and each

4    type of relief that is sought by each plaintiff.  Now, whether

5    that comes in the form of one theory of standing that is viable

6    or five theories, I don't think that matters, but each

7    plaintiff must separately establish standing.

8         **THE COURT:**  I agree with that concept.  But do you

9    also concede that, for example, the Libertarian Party, or for

10   that matter the Republican Party, if they're able to show

11   organizational standing, it is not necessary for the remaining

12   -- the Court could proceed, in other words, to the merits of

13   the case having concluded that organizational standing exists?

14        **MR. SHANNON:**  Your Honor, if the Court were to, as I

15   appreciate the Court's question, if the Court were to conclude

16   that one of the organizational plaintiffs, the party

17   plaintiffs, has organizational standing, then I believe the

18   Court could proceed to reach the merits as to that plaintiff.

19   I believe that is a proper statement.

20        **THE COURT:**  Now, there have been some -- there has

21   been some material that was submitted to the Court tending to

22   at least allege or tending to show that resources would need to

23   be diverted by the organizations if the period for counting

24   absentee ballots were to be extended.  How do you respond to

25   that argument?

1           **MR. SHANNON:**  Your Honor, I would say two things in

2     response to that.  I think they're both set out in our briefs.

3     Number 1, we don't believe a sufficient evidentiary basis has

4     been presented to establish any diversions of resources as to

5     either plaintiff; number 2, even if the Court were to disagree

6     with us on that, the plaintiffs, under the case law, still have

7     to show that the diversion of resources has diminished or

8     deleteriously affected their ability to carry out their mission

9     in Mississippi.  We don't believe they have made that showing,

10    Your Honor.  In other words, they would have to show -- this

11    statute was amended in 2020.  They would have to show that

12    something has changed in their ability to effectuate their

13    missions as political parties in Mississippi since 2020 when

14    these absentee ballots started being counted after election

15    day.  And we don't believe they have made that showing.

16          **THE COURT:**  All right.  And one last question, and

17    this is probably a procedural question more than anything else.

18    Obviously, if the Court were to rule that the plaintiffs in

19    this case do not have standing and does not rule on the merits

20    of the case, but only on the jurisdictional question, and let's

21    face it, I don't always get it right, and if that issue were to

22    go to the Court of Appeals and they were to determine that, no,

23    Guirola was wrong, the parties did have standing and we're

24    going to send it back, should this Court, as an alternative,

25    that's assuming without deciding that the plaintiffs in this

1    case do not have standing, should the Court alternatively rule

2    on the merits?

3            **MR. SHANNON:**  Your Honor --

4            **THE COURT:**  The whole banana would go up rather than

5    just a piece.

6            **MR. SHANNON:**  I was trying to understand the Court's

7    question.  I would say this, I believe the law is clear, and I

8    stand to be corrected as well standing here today, but I

9    believe the law is clear, that standing is jurisdictional, and

10   the Court must make a determination of subject matter

11   jurisdiction with finality before it can proceed to rule on the

12   merits.  Now, I stand to be corrected if there's a case

13   somewhere saying otherwise, but that's what I would think the

14   answer would be standing here today.

15           **THE COURT:**  Well, I am thinking that my colleague in

16   the Seventh Circuit did rule that the plaintiffs did not have

17   standing, but then went on to rule on the merits of the case.

18           **MR. SHANNON:**  Very well may have happened.

19           **THE COURT:**  In view of the issues, and the need for

20   resolution of those issues well in advance of the election,

21   would it be better if the Court adopted the procedure that was

22   used by my colleague in *Bost*?

23           **MR. SHANNON:**  Your Honor, I would say subject to the

24   case law in the Fifth Circuit that speaks to that issue, if

25   indeed there is any, we would defer to the Court's wisdom in

1    that regard.

2             **THE COURT:**  Thank you.

3             **MR. HOLLEMAN:**  Your Honor, for the record we would

4    join in the arguments of the Secretary of State on behalf of

5    the circuit clerk and the Harrison County election commissioner

6    so we won't burden the Court with additional argument.

7             **THE COURT:**  Thank you, Mr. Holleman, well stated.

8             **MR. DODGE:**  I plan to use some demonstratives without

9    objection from the other parties.  I have paper copies if the

10   Court would like them; otherwise, I can just publish them to

11   the Court.

12            **THE COURT:**  You may proceed.

13            **MR. DODGE:**  Would Your Honor like paper copies?

14            **THE COURT:**  I have a screen here myself.

15            **MR. DODGE:**  If I could ask for the Court's -- thank

16   you.

17       Good afternoon, Your Honor.  Christopher D. Dodge of Elias

18   Law Group on behalf of the intervenor defendants in this case,

19   Vet Voice and the Mississippi Alliance for Retired Americans.

20   I'd like to reserve three minutes for rebuttal if the Court

21   will permit that.

22       Both of intervenor defendants in this case represent

23   groups of Mississippi voters who are most at risk from the

24   relief requested in this lawsuit.  Vet Voice represents active

25   and retired military members, many of whom, out of necessity,

1    must vote by mail in Mississippi, in particular those who are

2    serving overseas or in military installations outside of the

3    state.  The Mississippi Alliance represents retirees over the

4    age of 65 who are granted a special right under Mississippi law

5    to vote by mail.

6        We join in the arguments presented by the Secretary here.

7    We agree that plaintiffs lack Article III standing, and we

8    agree that they have not met the high bar to show preemption as

9    set forth by the standard in *Bomer*.  My presentation here today

10   will focus in particular on the history of ballot receipt

11   deadlines in the United States, which plaintiffs have made much

12   of in their briefing, along with statutory context that

13   reinforces the absence of preemption here.  And in particular I

14   am going to focus on how this history affects military voters.

15       I want to start, though, by grounding the issue in the

16   fact that this historical analysis really does not control the

17   Court's inquiry, and we make that clear in our briefing.  The

18   Secretary got it exactly right.  The governing standard here is

19   set forth in *Bomer*, sets a very high bar for preemption, a

20   direct conflict.  My friend, Mr. Nobile, suggested for the

21   first time in argument today that *Bomer* is not good law on that

22   point.  That is not in their briefing, so far as I can tell,

23   and I would suggest that's wrong, that *Bomer* continues to

24   control here.  It is not inconsistent with Supreme Court

25   precedent.  In fact, some of the Supreme Court precedent my

1    friend Mr. Shannon pointed to, the *Classic* case, I'd also point
2    to the *Smiley* case from, I believe, 1932, go to great lengths
3    to stress the autonomy and discretion that states have in
4    determining the manner of their elections under our federal
5    system.

6        That said, the history here is worth considering because
7    while the plaintiffs pick at bits of it in their briefing, when
8    you actually look at the broad sweep of it, it shows two things
9    that I think are relevant to the Court.  First, it shows that
10   over the last century many states, far more than suggested in
11   the briefing, have, in fact, adopted post-election-day ballot
12   receipt deadlines.

13       The second point that I think is worth bearing in mind is
14   that Congress has been acutely aware of these state laws at
15   various points in time over the past century, during time of
16   war, during time of peace, and it has not taken a single act to
17   try and bar or inhibit or preempt these efforts.  And I will
18   get into that in a bit.

19       As Mr. Nobile said, these absentee voting laws began to
20   emerge during the Civil War era.  Many states adopt laws to
21   permit service members in the field to vote.  The way many of
22   those laws work, this is spelled out by the United States at
23   their statement of interest at 11 at 12, is that soldiers would
24   cast ballots in the field oftentimes in front of their own
25   officers who would serve as de facto election officials.  Those

1    ballots then had to be transmitted back after election day to

2    their home states to actually be counted by the relevant local

3    officials who are responsible for tabulating the votes,

4    canvassing the votes, and announcing the results.

5        My friend Mr. Woodfin suggested that there is a very easy

6    rule in this case, which is that whenever the election official

7    receives the ballot, that's when the election is consummated.

8    But as far back as the Civil War, these absentee laws

9    contemplated that service members would vote on election day in

10   the field, and that the actual relevant election official who

11   is responsible for tabulating that vote, adding it to the

12   canvas, would not even receive it until days later.  So from

13   the very start, the rule proposed by plaintiffs here just

14   doesn't work with the history.

15       As Mr. Nobile said, these laws really began to proliferate

16   in the early 20th century with the advent of the secret ballot,

17   the advent of the first World War.  And a lot of states started

18   adopting absentee ballot laws of different flavors and

19   reflecting the very federal nature of our Constitution and our

20   electoral system, they adopt very different models.  Four

21   states adopt a model whereby a person absent from their

22   precinct on election day is permitted to vote on election day

23   elsewhere in the state, and their ballot is then transmitted

24   back through the mail to their home precinct to be counted.

25   That is little different than the Mississippi law before us

1    here today.  That included states like Kansas, Missouri, Oregon
2    and Florida.

3        At the same time, other state's adopted models more
4    similar to what we recognize as absentee voting today, where a
5    person requests a ballot ahead of time, completes it and mails
6    it back.  And at least one state at that time, roughly a
7    century ago, adopted a law, again not dissimilar to the
8    Mississippi law here today.  That was California.  California
9    had a rule whereby an absentee ballot cast on the day of the
10   election was counted provided it was received by the election
11   office within 15 days thereafter.  Of course, we have a far
12   narrower law here.

13       These laws also were motivated by the first World War.  In
14   the wake of the first World War, 18 states had adopted statutes
15   specifically addressing overseas military voters, and several
16   of these included express post-election-day ballot receipt
17   deadlines.  Maryland had a 7-day post-election-day ballot
18   receipt deadline; Kansas has had a 10-day ballot receipt
19   deadline.  Those military-focused laws cannot be separated when
20   it comes to the rule put forward by plaintiffs.  They would be
21   every bit as invalid as a general all-purpose post-election-day
22   statute.

23       This then leads to the second World War era where this
24   issue proliferates even further.  Millions of Americans are
25   serving overseas, it becomes an acute issue of public concern

1    that they be able to participate in elections.  So in 1942,

2    Congress passes something called the Soldier Voting Act, which

3    is discussed somewhat in the briefing.  It creates a new novel

4    federal war ballot that creates a federal minimum so all

5    service members, regardless of what state they are voting in,

6    can at least participate in federal elections overseas via a

7    war ballot, even if their state doesn't otherwise offer

8    absentee voting.

9        And as we note in their briefing, Congress, knowing that

10    there was not, in fact, a federal default deadline for ballots,

11    for the first time expresses, very clearly and categorically in

12    that 1942 act, these federal war ballots must be returned by

13    the hour the polls close on election day.  There would be no

14    need for such a rule if, as my friends urge, there had, in

15    fact, been a long-standing federal default.  Congress

16    prescribed it because they knew that that rule was lacking in

17    federal statute.  And they further knew it because at the time,

18    by 1943, there were eight states that had post-election-ballot

19    receipt deadlines.

20        You have before you here a document that was actually

21    pushed by the Office of War Information for soldiers during the

22    second World War advising them of the deadline by which they

23    had to ensure that their state ballots were successfully

24    returned.  And as you see in the red boxes, there were seven

25    states as of 1942 that had dates after the date of the

1    election.  Nebraska joined them a year later.  Congress knew

2    about this, they knew about this, in fact, because a

3    congressman from Mississippi, Congressman Rankin, introduced it

4    into the Congressional record in 1943 when Congress was

5    debating amendments to the 1942 act.  Again, they were well

6    aware of these state rules.

7        These rules, this is just a sampling of them here, these

8    state rules at the time of the second World War are materially

9    indistinguishable from the law before us here today.  They're

10   in the congressional record, I won't read them all here, but

11   just to give a sample, for example Rhode Island had a rule

12   that on election day the voter had to mark their ballot, before

13   midnight they had to mail the ballot, and then it had to reach

14   the Secretary of State by the second Monday after the election.

15   Again, these laws are not the novelty plaintiffs suggest they

16   are.

17        In the post war era, these laws continue to exist.  The

18   United States points to several in their statement of interest,

19   including Missouri and Alaska.  The plaintiffs themselves can

20   see that there were certain states, Nebraska and Washington,

21   that also continued to use them.  And Congress was aware of

22   them.  As I believe the DNC points out in their Amicus brief,

23   none other than Senator Goldwater acknowledged in 1970 when

24   discussing amendments to the Voting Rights Act, that there were

25   states that had post-election-ballot receipt deadlines.  Once

1    more, uncontested evidence that Congress has known about these

2    laws for decades.

3         And this gets to a statute that's already been mentioned,

4    which is UOCAVA.  UOCAVA was signed into law in 1986 by

5    President Reagan.  It creates a federal write-in ballot for

6    service members and Americans overseas to be able to vote.  In

7    passing that law, Congress heard testimony from the director of

8    the federal voting assistance program, which is something

9    that's a part of the Department of Defense, it exists to help

10   service members overseas to be able to vote.  They heard

11   testimony from the director of that program that as of the mid

12   '80s, 12 states had extended the deadline for the receipt of

13   voted ballots to a specific number of days after the election,

14   at least for service members.  So as of the mid '80s, you have

15   a dozen states that have adopted these sorts of

16   post-election-ballot receipt deadlines.

17        In the face of that knowledge, Congress then passes

18   UOCAVA, which as Mr. Shannon pointed out, and as discussed in

19   the briefing, expressly adopts state deadlines into federal

20   statute.  My friend Mr. Nobile suggested, oh, they did this

21   because there were a handful of states that had pre-election

22   day deadlines and Congress wanted to respect that.  That is, at

23   best, a partial answer to that statutory text because, in fact,

24   as the Congressional record makes clear Congress knew there

25   were a dozen states out there that had deadlines after election

1    day.  And what did they do in the face of that knowledge?  They

2    put the term state deadline into federal statute.  They

3    certainly didn't believe that the existing election day

4    statutes answered the question.  And they didn't even then say,

5    well, no, these federal ballots, they have to arrive by

6    election day come high water, we're going to respect that

7    states have made certain determinations here oftentimes

8    specifically for service members.

9         And I would point out that your colleague in the Northern

10   District in the *Bost* case pointed to this at page 11 of his

11   decision saying that the UOCAVA law demonstrated that even

12   federal laws governing elections allowed ballots received after

13   election day to be counted.  I think that was an entirely

14   correct observation.

15        This gets into more recent history.  My friend from the

16   Republican National Committee suggests that these laws, again,

17   have proliferated in the last few years in response to

18   COVID-19.  That, again, is at best is a partial history.  After

19   the 2000 election, the Government Accountability Office does a

20   report looking at access to the ballot for service members and

21   they prepare a report for Congress which is delivered in May of

22   2001.

23        The comptroller general reports that at that time 15

24   states had post-election-ballot receipt deadlines, at least for

25   service members, 15 states.  Another report put out by the GAO

1     that same year points out that there are ten states that permit

2     post-election-receipt for all voters, including military

3     voters.  I think it's worth noting, as well, that these states

4     are not localized to a particular region of the country,

5     they're not rural states, they are not urban states, they are

6     states of all character.  They included at that time Alaska,

7     Iowa, Maryland, Nebraska, New York, North Dakota, Utah,

8     Washington, West Virginia and the District of Columbia.

9          And of course, as the Court well knows from the briefing,

10    these states have grown in frequency in the intervening years.

11    Your question, Your Honor, to Mr. Nobile at the outset noted

12    that these laws exist in many states now.  At this point, there

13    are 18 states, the District of Columbia and several territories

14    that have general purpose post-election-ballot receipt

15    deadlines.  And I think, particularly relevant to my client,

16    there are nine states that do not have general purpose laws,

17    but they do have laws specifically for the service members,

18    which means at this point in time you now have the majority of

19    states which have adopted laws.  And as Mr. Nobile I think

20    candidly conceded, there is little basis to distinguish these

21    laws materially from the challenge at issue here today, and I

22    think the Court is clearly aware of that issue.

23         So I will just close by, again, going back to these two

24    points.  These laws have existed for far longer than my friends

25    on the other side would like to admit.  They have been far more

1    common than they would like to admit, they go back at least a
2    century, they reflect the federalized nature of our electoral
3    system, they reflect an acute policy concern for voters who
4    deeply rely on mail absentee voting in order to exercise the
5    franchise.  And as the congressional history from the second
6    World War shows, from UOCAVA shows, from Senator Goldwater
7    shows, from the testimony of the comptroller general shows,
8    Congress has time and time and time been aware of these laws.
9    My friends on the other side cannot point to a single
10   Congressional effort to tamp down on these laws, not one in
11   over a century.

12        And as the *Bomer* decision points out, courts should be
13   very light to disturb such longstanding precedent.  I think as
14   Mr. Shannon said, their burden here is high to show a direct
15   conflict.  They are asking us all to squint at these election
16   day statutes to find a conflict that isn't really there.  They
17   haven't met that bar.  And with that, I am glad to answer the
18   Court's questions.

19        **THE COURT:**  I am aware there are many states that
20   have post-election-day absentee ballots that are received, and
21   there are different time limitations in many different states.
22   Does there ever come a time when a statute passed by one of our
23   states for the receipt and ultimate counting of absentee
24   ballots, does there ever come a time when that statute becomes
25   so burdensome that it, and I am talking about time-wise, that

1   it then becomes inconsistent with the election day law?

2           **MR. DODGE:**  I will start with the obvious caveat that

3   that is not the issue we have here where we have a relatively

4   conservative such state law.  But taking Your Honor's

5   hypothetical, the answer is that it depends on the election.

6   And I would point first to the fact that under federal law,

7   there are mandatory dates of events that must occur for a

8   presidential election.  The electors -- Congress must accept

9   the electors.  The president must be sworn in.  So for

10  presidential elections, federal law provides a very clean outer

11  limit because you could not count ballots a year later.

12          For congressional elections, I think this is just a

13  practical question.  We have pointed out there are half the

14  states, roughly, that have these laws.  I think the most

15  lenient is two weeks, and that's because there are other

16  election administration duties that states have.  They have to

17  canvas the votes, they have to collect the ballots.  There are

18  all these other tasks that are part of the electoral sequence.

19  No state has gone beyond something like two weeks.  Again, two

20  weeks is what California had a century ago.  And in that time,

21  we have not seen any sort of ludicrous nine month sort of rule.

22          So I can't draw a line here today and say a month is

23  acceptable, but six weeks isn't.  I think the laws as they

24  exist today in states across the country are well within

25  whatever that hypothetical outer boundary might be.

1          **THE COURT:**  Assuming that there's a line somewhere,

2     what would the standard be for determining whether that line is

3     proper or whether it should be shorter, longer?

4          **MR. DODGE:**  Well, certainly it would depend on the

5     nature of the claim.  Their claim here is chiefly a preemption

6     claim.  Their claim is here is that congress has spoken to the

7     issue.  I think as other case law is made clear, as Mr. Shannon

8     made clear in his argument, Congress has not spoken to this

9     issue.  Could there be some plausible due process argument at

10    some point that a person's right to an electoral outcome is

11    somehow inhibited if you have some sort of ludicrous,

12    far-fetched statute?  Possibly.  That's not their claim.

13         **THE COURT:**  Thank you.  Why don't we take a

14    five-minute recess and I will allow you all to collect

15    yourselves, and when we come back I will hear what rebuttals

16    you may have.  Be in recess for five minutes.

17         **(RECESS TAKEN AT 3:10 P.M. UNTIL 3:27 P.M.).**

18         **THE COURT:**  Gentlemen, do you wish to make a

19    rebuttal?  We'll start with you, Mr. Nobile, and work our way

20    around the horn.

21         **MR. NOBILE:**  Thank you, Your Honor.  Russ Nobile for

22    the Libertarian Party again.  The Court correctly recognized

23    the limiting principle problem with the position that the other

24    side is taking regarding late-arriving ballots.  There's

25    nothing to stop conceptually 90 days, 100 days, it's a real

1    problem.  As we noted in our initial papers that we agree that

2    states have experimented with this, the 50 laboratories about

3    late-arriving ballots, most of those states abandoned those

4    over the years.  We would note that in Footnote 21 of document

5    80, we set forth the current ones and how recently they have

6    been enacted.  Most of them were after the passage of HAVA in

7    2004, with the exception of Washington State, which we concede

8    has been going on for a while.

9        I appreciate a good election law history lesson.  I have a

10   little trouble reading one of these documents that he presents

11   here, but my friend on the other side provided, is that many of

12   these states require pre-election receipt, including some

13   required receipt by the primaries.  It just goes to show you

14   that during the election, during the wartime they made a number

15   of different policies.

16       This issue comes up now because in 1920 there was

17   .5 percent of the ballots were absentee.  And then in the year

18   2000, 10 percent; 2016 it was 21 percent; in 2020 it's

19   46 percent are ballots received by mail now.  People largely --

20   Congress, to the extent they paid attention to it, largely

21   ignored it because it was de minimis for most of the time when

22   states experimented it.  That is set out in Footnote 22 of

23   document 56.

24       And I think a lot of this discussion about congressional

25   tolerance needs to appreciate how difficult it is to have any

```
1    legislation regarding elections passed through Congress.  There
2    were almost floor fights over House Bill 1 three years ago, or
3    in 2021 when I testified on the hill four times regarding it.
4    That bill failed.  It is very difficult to get legislation
5    through Congress on federal elections.  And so to the extent
6    that there is, indeed, this perception of congressional
7    tolerance, I don't think -- I think they're over extrapolating
8    it.
9           And finally, in terms of duration, we noted the statute
10   struck down in Foster, which had been there 22 years, the
11   Supreme Court tolerated one-person, one-vote violations for
12   almost 90 years before they announced the one-person, one-vote
13   standard.  The Court touched on whether or not this would have
14   a broad effect on other states.  There's a dissent from Justice
15   Harlan in the Reynolds v. Sims case from 1964 which applied
16   one-person, one-vote to state legislators.  In there he pointed
17   out that the one-person, one-vote standard would require six
18   states to redistrict impacting over 44 legislature districts.
19   When it's a material question or significant question,
20   sometimes it will have broad effect, but I don't know that that
21   should affect the Court's, the possible expanse should affect
22   the Court's decision making.  Unless the Court has any other
23   questions?
24          THE COURT:  I might, hang on there.  Let me get
25   through my notes.  Mr. Nobile, could Congress in its wisdom
```

1    decide to change the election day statute to eliminate absentee

2    ballots that are received after the election day?

3              **MR. NOBILE:**  Could Congress create legislation that

4    bans post receipt -- post-receipt ballots, or post election,

5    yes.  Well, let me think.  It's taken for granted a lot of

6    times, the elections and the electors clause have coterminous

7    or equal control over the timing concept, but the manner

8    concept is a little different in the elector's clause context.

9              **THE COURT:**  That was going to be the second part of

10   my question.  If they have the power to do that, would that

11   then be inconsistent with the portion of the Constitution that

12   gives that authority to the states?

13             **MR. NOBILE:**  In *Foster v. Love* the Court talked about

14   this because Louisiana said, well, Your Honor, that's just a

15   manner regulation, don't be distracted, you know, that's

16   outside a timing context.  And the Supreme Court said, we don't

17   care.  If it's a manner regulation -- and I'm paraphrasing,

18   obviously.  It says, if you are intruding on the timing it

19   doesn't matter what you call it, and it's towards the end of

20   the argument.

21             **THE COURT:**  Thank you.

22             **MR. NOBILE:**  Or I should say ruling, not argument.

23             **MR. WOODFIN:**  Just a few points on rebuttal.  There

24   was a suggestion that we abandoned a few arguments, I want to

25   briefly address those.  There is a suggestion that we abandoned

1    Mr. Perry's standing.  We didn't.  He is a voter.  The basis

2    for his standing is vote dilution.  We address that on pages 16

3    through 19 of our response brief, and pages 10 through 11 of

4    our reply.

5         There was also suggestion that we abandoned the

6    constitutional claim.  Again, we didn't abandon those, those

7    are addressed on pages 29 through 30 of our response brief, and

8    pages 18 through 19 of our reply.

9         Turning to standing very briefly, you do rather -- one

10   plaintiff is enough, that's the rule.  And it's one plaintiff

11   is enough for each claim.  So as long as there's standing for

12   each claim in the complaint, then you don't need to satisfy

13   yourself that all plaintiffs have standing.  The best

14   explanation of this is Footnote 6 of the Supreme Court's case a

15   few years ago in *Little Sisters of the Poor versus*

16   *Pennsylvania*.  The Court said as long as one party has standing

17   for each claim in the complaint, then there is a justiciable

18   controversy over each claim, and that satisfies Article III.

19        And the Court went further and said the District Court

20   would err by inquiring into the standing of other plaintiffs if

21   it satisfies itself that at least one plaintiff has standing

22   for each claim in the complaint.  So it's actually error -- in

23   order to dismiss on standing, you would have to dismiss on all

24   standing grounds on every single theory we raise.  And of

25   course, we do have standing under all of those theories.

1          Briefly, on the competitive standing injury, the only

2     argument I heard on this really is that we haven't shown that

3     there will be a different outcome in the election.  *Benkiser*

4     does not require us to predict the results of the next

5     election, it doesn't require you to predict the results of the

6     next election in order to show we have an injury.  This really

7     comes from the Third Circuit's vacated opinion in *Bognet*, and

8     it's an error that confuses post-election challenges where

9     there's a prudential rule that a Court will not set aside

10    ballots or count additional ballots unless that will change the

11    result of an election that has already happened.  That's when

12    you have the information in front of you and you know when an

13    election will flip.  That prudential rule post-election is

14    different than seeking what we're doing here, is prospective

15    relief before an election we're allowed under TransUnion to sue

16    for the risk of harm.  Here the injury, the competitive injury

17    is the decreased risk in the electoral chances.

18         On organizational standing, really the only argument I

19    heard is that we have no competent summary judgment evidence or

20    the evidence we do present doesn't amount to it.  The best

21    place I can point you to in the record is document 75-1, this

22    is Mr. Blair's declaration, specifically paragraphs 5 and 6.

23    He outlines exactly how the RNC's mission is harmed,

24    Traditional get out the vote operations are critical to the

25    RNC's mission to represent the interest of the Republican Party

1    and secure the election of republican candidates by causing the

2    RNC to divert resources away from those efforts in Mississippi

3    and in other states.  Mississippi's post-election receipt of

4    mail-in ballots directly harms the RNC's mission.  This is

5    competent summary judgment evidence under Rule 56(c)(4).  This

6    is a declaration sworn under penalty of perjury.  They don't

7    dispute the facts in these declarations and that's sufficient.

8        Finally, the Civil War absentee voting issue is actually a

9    great picture how this works out.  Those soldiers were sworn in

10   as state election officials.  They were sworn in as judges, as

11   registrars, as clerks so that they could consummate the

12   election when they received the absentee ballots.  That's the

13   original understanding, the original meaning of the election

14   day clauses.

15       I have not heard a concise, sensible explanation of what

16   an election day means from my friends on the other side, but we

17   have given you a clear rule that is supported by the text,

18   history, structure and case law, an election day means the

19   final day ballots are received by election officials.  And if

20   you agree with us on the bottom line, then we ask that the

21   Court deny the defendants' motions and grant the plaintiffs'

22   motions for summary judgment.

23           **THE COURT:**  Thank you.

24           **MR. SHANNON:**  Your Honor, Rex Shannon for the

25   Secretary of State.  Very briefly, just so there's no -- just

1   so it's clear, I think we provided a definition of what the

2   Secretary believes election day means.  And just to reiterate

3   that, we believe it is the date that the ballot, the mail-in

4   absentee ballot is irretrievably cast in the mail, deposited in

5   the mail, and that at that point it is presumptively,

6   constructively received, deemed to be received, soon to be

7   received by the voting registrar.  So that is the election day

8   definition that we believe -- that's what we believe election

9   day means under the federal election day statutes, what it

10  means under the Mississippi statute.

11          Certainly, the *Foster* case does no harm to that for the

12  reasons that we stated, and I won't belabor the point.  But I

13  wanted to be clear that we have attempted to define election

14  day to the extent we are required to under the case law.

15  That's all I have, Your Honor.

16          **THE COURT:**  You know, curiosity more than anything

17  else compels me to ask.  I am aware that the legislature took

18  up the possibility, or took it up amending absentee ballot law

19  to eliminate the five-day period, and I guess my question is

20  what happened.

21          **MR. SHANNON:**  Your Honor, my client is the Secretary

22  of State as Your Honor knows, he is not a member of the state

23  legislature.  I don't represent the Mississippi legislature.  I

24  don't know what happened.  Far be it from me to speculate, Your

25  Honor.  That's the best I can tell you.  I do not know the

1    answer.

2            **THE COURT:**  Then my curiosity will have to remain

3    unquenched.  Thank you.

4            **MR. SHANNON:**  Thank you, Your Honor.

5            **MR. DODGE:**  Just a few points, Your Honor.  Going

6    back to the question you asked me at the end of my presentation

7    about sort of the limiting principle here.  I wanted to add one

8    thing to my answer, which is that all parties here agree today

9    that ballots must be cast by election day.  Typically,

10   something sent in the mail takes two, three, maybe four days to

11   arrive, and that is why you see states adopting laws that are

12   roughly of that length, maybe a little extra wiggle room,

13   before the state has to canvas results.

14        The reason these sort of fanciful hypotheticals really

15   need not bother the Court is not only the fact that no state

16   has adopted them over the last century, but the fact that they

17   don't correspond to the fact that the ballot must still be cast

18   by election day.  Maybe one vote takes a circuitous trip around

19   the country and takes six months to arrive at the local

20   election officer's station, but that's not the ordinary course.

21   Most of these things are going to be delivered in the following

22   week.  And I think that casting deadline sets an anchor that

23   hopefully addresses the Court's concern.

24        Let me rase a couple more points.  Coming back to the

25   issues of UOCAVA.  This is addressed in the briefing, but I

1    think it bears stressing because it was mentioned by the other

2    side.  District Courts across this country, this is in the

3    United States' brief in great detail, oftentimes as a remedy

4    for failure to provide UOCAVA ballots in time for overseas

5    voters will, as a matter of equity, extend state ballot receipt

6    deadlines.  That has happened for decades.  Under plaintiffs'

7    view, that relief can no longer be available.  They say, well,

8    it's an equitable remedy so it's fine, it doesn't matter that

9    there's a federal statute that precludes it.  That's not what

10   the Supreme Court said in *INS v. Pargilnana*, I'll spell it,

11   P-A-R-G-I-L-N-A-N-A, it's in our briefing.  The Supreme Court

12   there says in 1988 very clearly, courts of equity cannot

13   provide a remedy that contravenes statute.  So if they are

14   right, that equitable relief for overseas voters disappears.

15       Going back to the history -- I won't repeat things.  My

16   friend, Mr. Woodfin, said that the Civil War history aids him.

17   I have a hard time understanding that.  Under his reading of

18   the term "election," it is consummated when the election

19   official receives it.  But all parties here agree that at the

20   time of the Civil War those officers had to bring the ballots

21   back to their home states.  What if they were way-layed, what

22   if they didn't do so.  In fact, in one of the treatises they

23   cite, it was acknowledged that they did not get back in time

24   for the state canvassing deadline in the State of Vermont, so

25   they didn't count.  Plainly, it's not consummated at their

1    encampment on the field of battle when their officer tallies

2    their votes because it has to get back to the state to matter.

3    And the Vermont example illustrates that, in fact, their

4    definition breaks down as early as the 1860s.

5        A final point, Your Honor, U.S., Mr. Nobile, I think the

6    million dollar question here, could congress legislate on this

7    question.  He said yes.  That's entirely correct.  They

8    haven't.  That resolves the preemption here lock, stock and

9    barrel.  What they are asking you to do is to legislate in the

10   place of Congress, to add a little bit of text into the

11   election day statutes, to do what Mr. Nobile conceded they

12   could do, but have not in 150 years.  And that really resolves

13   the merits here.  Unless Your Honor has additional questions.

14        **THE COURT:**  Thank you.

15        Ladies and gentlemen, I want to thank all of you

16   presenters that have argued on behalf of your clients.  I found

17   your arguments very insightful and very helpful, and I

18   appreciate them very much.

19        I also want to commend all of the Amici in this case that

20   took time to submit briefs and materials as well.  I found

21   those also very helpful and insightful as well.

22        Now, I think I can go out on a limb here and say that

23   there is no category of case that is more important, more

24   critical than one which asks the Courts to rule on a case or on

25   issues that may affect the right to vote.  Those types of

1  cases, not only are they critically important, but they require

2  very careful consideration.  For that reason, obviously, I will

3  not rule from the bench.  Instead, I am going to take the time

4  to review once again the briefs, the arguments that have been

5  made here today, and the case law that's available to me before

6  I issue a written opinion.

7      I wanted to ask you, Mr. Shannon, what is the timeframe?

8  I know that the Secretary of State has got to get these

9  absentee ballots out with some rapidity.  What is the timeframe

10  here?

11      **MR. SHANNON:**  Yes, sir.  I don't know the exact

12  timeframe in terms of the absentee ballot issue.  I believe

13  we're 100 some odd days from the November 5th election at this

14  point.  I know there are timeframes that come into play pretty

15  quickly here but I don't have that information at had.  I can

16  certainly get that for the Court and follow up.

17      **THE COURT:**  Well, I'll pledge to you that I am not

18  going to take a vacation or anything, I am going to get on it

19  pretty quickly.  This is an important case and I will try get

20  it right.

21      **MR. SHANNON:**  We know you will, Your Honor.  Thank

22  you.

23      **THE COURT:**  Anything else on behalf of the

24  plaintiffs?

25      **MR. WOODFIN:**  No, Your Honor.

1              **MR. NOBILE:**  No, Your Honor.

2              **THE COURT:**  Anything else on behalf of the defendants

3     and intervenor?

4              **MR. DODGE:**  No, Your Honor.

5              **MR. WOODFIN:**  No, Judge.

6              **THE COURT:**  Nothing then, we're adjourned.

7                          (HEARING CONCLUDED)

8                              – – –

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                  CERTIFICATE OF COURT REPORTER

3

4        I, Sherri L. Penny, RPR, FCRR, Official Court Reporter

5   for the United States District Court for the Southern District

6   of Mississippi, appointed pursuant to the provisions of Title

7   28, United States Code, Section 753, do hereby certify that the

8   foregoing is a correct transcript of the proceedings reported

9   by me using the stenotype reporting method in conjunction with

10   computer-aided transcription, and that same is a true and

11   correct transcript to the best of my ability and understanding.

12        I further certify that the transcript fees and format

13   comply with those prescribed by the Court and the Judicial

14   Conference of the United States.

15

16

17

                  *S/ Sherri L. Penny*
18                OFFICIAL COURT REPORTER

19

20

21

22

23

24

25