# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 25, 2024

Lyle W. Cayce
Clerk

No. 24-60395

---

REPUBLICAN NATIONAL COMMITTEE; MISSISSIPPI REPUBLICAN PARTY; JAMES PERRY; MATTHEW LAMB,

*Plaintiffs—Appellants,*

*versus*

JUSTIN WETZEL, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*; TONI JO DIAZ, *in their official capacities as members of the Harrison County Election Commission*; BECKY PAYNE, *in their official capacities as members of the Harrison County Election Commission*; BARBARA KIMBALL, *in their official capacities as members of the Harrison County Election Commission*; CHRISTENE BRICE, *in their official capacities as members of the Harrison County Election Commission*; CAROLYN HANDLER, *in their official capacities as members of the Harrison County Election Commission*; MICHAEL WATSON, *in his official capacity as the Secretary of State of Mississippi,*

*Defendants—Appellees,*

VET VOICE FOUNDATION; MISSISSIPPI ALLIANCE FOR RETIRED AMERICANS,

*Intervenor Defendants—Appellees.*

---

LIBERTARIAN PARTY OF MISSISSIPPI,

*Plaintiff—Appellant,*

*versus*

Justin Wetzel, *in his official capacity as the clerk and registrar of the Circuit Court of Harrison County*; Toni Jo Diaz *in their official capacities as members of the Harrison County Election Commission*; Becky Payne, *in their official capacities as members of the Harrison County Election Commission*; Barbara Kimball, *in their official capacities as members of the Harrison County Election Commission*; Cristene Brice, *in their official capacities as members of the Harrison County Election Commission*; Carolyn Handler, in their official capacities as members of the Harrison County Election Commission; Michael Watson, *in his official capacity as the Secretary of State of Mississippi*,

*Defendants—Appellees*,

Vet Voice Foundation; Mississippi Alliance for Retired Americans,

*Intervenor Defendants—Appellees*.

––––––––––––––––––––––––––––––––

Appeal from the United States District Court
for the Southern District of Mississippi
USDC Nos. 1:24-CV-25, 1:24-CV-37

––––––––––––––––––––––––––––––––

Before Ho, Duncan, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

Congress statutorily designated a singular "day for the election" of members of Congress and the appointment of presidential electors. Text, precedent, and historical practice confirm this "day for the election" is the day by which ballots must be both *cast* by voters and *received* by state officials. Because Mississippi's statute allows ballot receipt up to five days after the

No. 24-60395

federal election day, it is preempted by federal law. We reverse the district court's contrary judgment and remand for further proceedings.

I

A

Two constitutional provisions are relevant to this case. First, the Electors Clause provides: "The Congress may determine the Time of chusing the Electors" for President. U.S. CONST. art. II, § 1, cl. 4. Pursuant to the Electors Clause, the Second Congress mandated that States appoint presidential electors within a 34-day period "preceding the first Wednesday in December in every fourth year." Act of Mar. 1, 1792, ch. 8, § 1, 1 Stat. 239. Some States responded by adopting multi-day voting periods—but this caused election fraud, delay, and other problems. *See, e.g.*, Cong. Globe, 28th Cong. 2d Sess. 14–15, 29 (1844). So Congress intervened in 1845, fixing a "uniform time" for appointing presidential electors on the Tuesday after the first Monday in November. Act of Jan. 23, 1845, ch. 1, 5 Stat. 721 (to be codified at 3 U.S.C. § 1).

The second relevant constitutional provision is the Elections Clause. It provides: "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. CONST. art. I, § 4, cl. 1. The Elections Clause imposes a "duty" upon States to hold elections for federal officers. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). It also vests "power" in Congress to "alter those [state] regulations or supplant them altogether." *Ibid.* In the early Republic, congressional elections occurred at varying times, providing some States with an "undue advantage" of "indicating to the country the first sentiment on great political questions." Cong. Globe, 42d Cong., 2d. Sess., 141, 116 (1871). And the establishment of a uniform day for

presidential elections resulted in many States having two separate days for federal elections. *Id.* at 141. As a result, Congress scheduled all House elections to occur on the presidential election day. Act of Feb. 2, 1872, ch. 11, § 3, 17 Stat. 28 (to be codified at 2 U.S.C. § 7).[1]

The upshot: These statutes "mandate[] holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster v. Love*, 522 U.S. 67, 70 (1997). As to the President, "The electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day." 3 U.S.C. § 1. And as to the House of Representatives, "The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election." 2 U.S.C. § 7. Throughout this opinion, we use the term "Election Day" to refer to this singular day established by federal law as the time for choosing members of Congress and presidential electors.

B

During the COVID-19 pandemic, Mississippi amended its election laws to accept absentee ballots "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." Act of July 8, 2020, ch. 472 § 1, 2020 Miss. Laws 1411; Miss. Code § 23-15-637(1)(a). Now, after the pandemic, Mississippi has preserved that deadline and amended the statute to cover absentee ballots transmitted by common carriers in addition to the United States Postal Service. 2024 Miss. Laws H.B. 1406; Miss. Code § 23-15-637(1)(a).

---

[1] After the passage of the Seventeenth Amendment, Congress immediately scheduled Senate elections to occur on the same day. Act of June 4, 1914, ch. 103, § 1, 38 Stat. 384.

No. 24-60395

On January 26, 2024, plaintiffs Republican National Committee, Mississippi Republican Party, James Perry, and Matthew Lamb sued various state officials in the Southern District of Mississippi to enjoin them from enforcing the State's post-election ballot deadline. On February 5, 2024, plaintiff Libertarian Party of Mississippi brought a functionally identical lawsuit. Both complaints alleged the federal Election Day statutes preempt Mississippi's law by establishing a uniform day for choosing members of Congress and appointing presidential electors. 3 U.S.C. § 1; 2 U.S.C. §§ 1, 7. They also brought claims under 42 U.S.C. § 1983 alleging violations of the right to stand for public office and the right to vote under the First and Fourteenth Amendments. The district court consolidated the cases.[2]

Plaintiffs and defendants jointly moved to schedule briefing on cross-motions for summary judgment. The district court granted defendants' motion for summary judgment on July 28. Plaintiffs timely appealed. We granted Plaintiff-Appellants' motion to expedite the appeal on August 9. Jurisdiction is proper under 28 U.S.C. § 1291.[3]

## II

Turning to the merits, we first (A) describe the preemption inquiry that applies in election law cases. We then (B) hold Mississippi's law is preempted by the uniform federal Election Day. Finally (C), we explain how historical practice confirms our holding.

---

[2] The district court also granted a motion to intervene as defendants by Defendant-Appellees Vet Voice Foundation and Mississippi Alliance for Retired Americans.

[3] Neither party disputes the plaintiffs' standing before this court. That is presumably because this case fits comfortably within our precedents. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *Vote.Org v. Callanen*, 89 F.4th 459, 471 (5th Cir. 2023).

We "review a district court's grant of summary judgment *de novo*." *Huskey v. Jones*, 45 F. 4th 827, 830 (5th Cir. 2022). On cross-motions for summary judgment, we review each motion independently, "with evidence and inferences taken in the light most favorable to the nonmoving party." *White Buffalo Ventures, LLC v. Univ. of Tex.*, 420 F.3d 366, 370 (5th Cir. 2005).

A

The constitution struck a delicate balance between state and federal power to regulate elections. The Elections Clause creates a "default" presumption of state regulation, subject to Congress's powerful check. *Foster*, 522 U.S. at 69. States can regulate many elements of federal elections, "but only so far as Congress declines to preempt state legislative choices." *Ibid.* Congress retains the power under the Elections Clause to "override state regulations by establishing uniform rules for federal elections, binding on the States." *Ibid.* (quotation omitted). When Congress exercises that power, "any regulations it may make necessarily supersede inconsistent regulations of the State" given its "paramount" constitutional authority in this area. *Ex Parte Siebold*, 100 U.S. 371, 372 (1879). The question, then, is whether Mississippi's law is "inconsistent with" federal statutes establishing "the day for the election." *Inter Tribal*, 570 U.S. at 15.[4]

We generally apply a presumption against preemption when Congress "legislate[s] in areas traditionally regulated by the States." *See, e.g.*, *Gregory*

---

[4] Fifth Circuit precedent states the preemption inquiry differently, asking whether a state statute "directly conflict[s] with federal election laws." *Voting Integrity Proj., Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). Without expressly addressing the difference, a prior panel of this court has used both interchangeably. *Voting for America, Inc. v. Steen*, 732 F.3d 382, 399–400 (5th Cir. 2013) (using "conflict" and "inconsistent" interchangeably to analyze election-law preemption, citing both *Inter Tribal* and *Bomer*).

*v. Ashcroft*, 501 U.S. 452, 460 (1991). That presumption does not apply under the Elections Clause, however. "Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Inter Tribal*, 570 U.S. at 14. *See also Gonzalez v. Arizona*, 677 F.3d 383, 392 (9th Cir. 2012), *aff'd sub nom. Inter Tribal*, 570 U.S. 1 (2013) ("In contrast to the Supremacy Clause . . . the Elections Clause affects only an area in which the states have no inherent or reserved power: the regulation of federal elections."). Unlike other subjects of federal legislation, election law "*always* falls within an area of concurrent state and federal power." *Inter Tribal*, 570 U.S. at 14 n.6 (emphasis in original). We therefore need not employ any presumption against preemption.

### B

Our preemption analysis begins with the statutory text, as interpreted by the Supreme Court. *See id.* at 9–10. Preemption thus turns on the meaning of election within "the day for the election." *See* 2 U.S.C. § 7; 3 U.S.C. §§ 1, 21. We must "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quotation omitted).

The Supreme Court's decision in *Foster v. Love* guides our understanding of the statutory text.[5] That case involved Louisiana's open primary

---

[5] While dictionary definitions often help our understanding of statutory text, they do not shed light on Congress's use of the word "election" in the nineteenth century. Plaintiff-Appellants emphasize one that largely restates the federal election statutes: "[t]he day of a public choice of officers." *Election*, *in* Noah Webster, An American Dictionary of the English Language (1830); *see also* GOP Blue Br. at 19. But most other contemporary sources make no mention of deadlines or ballot receipt. *See, e.g.*, *Election, in* 3 The Century Dictionary and Cyclopedia 1866 (1901) ("The act or process of choosing a person or persons for office by vote . . . . [A]lso, the occasion or set time and provision for making such choice."); *Election, in* James Stormonth,

system. 522 U.S. at 70. The State held congressional primary elections in which all candidates appeared on one ballot, and all voters could cast their votes. *Ibid.* If no candidate won a majority of votes, the general election proceeded as normal on the federal Election Day between the two candidates with the most votes. *Ibid.* If a candidate won a majority of votes, however, the election concluded then and there—*before* the federal Election Day. *Ibid.* The Court held this system preempted by 2 U.S.C. §§ 1 and 7. *Ibid.* Although the *Foster* Court declined to "par[e] the term 'election' in § 7 down to the definitional bone," three definitional elements bear emphasis: (1) official action, (2) finality, and (3) consummation. *Ibid.* (discussing 2 U.S.C. § 7). We discuss each in turn.

1

First, official action. *Foster* teaches that elections involve an element of government action. "When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder." *Id.* at 71. The State contends that "an election official's only necessary involvement is giving a voter the means to make a final selection—such as by offering a ballot and a method to cast it." MS Red Br. at 28.

The State's problem is that it thinks a ballot can be "cast" before it is received. What if a State changes its law to allow voters to mark their ballots and place them in a drawer? Or what if a State allowed a voter to mark a ballot and then post a picture on social media? The hypotheticals are obviously

---

ETYMOLOGICAL AND PRONOUNCING DICTIONARY OF THE ENGLISH LANGUAGE (W. Blackwood ed., 1881) ("[T]he choice or selection of a person or persons to fill some office"); *Election*, BLACK'S LAW DICTIONARY (1st ed. 1891) ("The selection of one man from among several candidates to discharge certain duties in a state, corporation, or society.").

absurd. But it should be equally obvious that a ballot is "cast" when the State takes custody of it.

2

Second, finality. The Supreme Court has said "the word [election] now has the same general significance as it did when the Constitution came into existence—final choice of an officer by the duly qualified electors." *Newberry v. United States*, 256 U.S. 232, 250 (1921). An election involves more than government action; it also involves the polity's *final* choice of an officeholder.

A voter's *selection* of a candidate differs from the public's *election* of the candidate. Officials tally each voter's *selection* and then declare a winner of the *election*. Those are the not the same thing. And while an individual voter might be able to make his or her selection in private, alone, it makes no sense to say the electorate as a whole has made an election and finally chosen the winner before all voters' selections are received.

That is not to say all the ballots must be counted on Election Day. Even if the ballots have not been counted, the result is fixed when all of the ballots are received and the proverbial ballot box is closed. The selections are done and final. By contrast, while election officials are still receiving ballots, the election is ongoing: The result is not yet fixed, because live ballots are still being received. Although a single voter has made his final selection upon marking his ballot, the entire polity must do so for the overall election to conclude. So the election concludes when the final ballots are received and the *electorate*, not the individual *selector*, has chosen.

Mississippi's regulations further confirm this result. The absentee-ballot statute authorizes the Secretary of State to issue rules and regulations to effectuate the State's absentee voting scheme. Miss. Code § 23-15-637(3). And those regulations state that "an absentee ballot is the final vote

of a voter when, during absentee ballot processing by the Resolution Board, *the ballot is marked accepted*." 01-17 Miss. Admin. Code R2.1 (emphasis added). For absentee ballots submitted by mail, the ballot "shall be final, if accepted by the Resolution Board" after receipt, processing, and deposit into a secure ballot box. *Id.* at R.2.3(a). Thus, Mississippi's own law belies its mailbox-rule theory of finality. *See* Red Br. at 2 ("Voters make a *conclusive choice*—a *final selection* that *concludes* and *consummates* the election—when they mark and submit their ballots as required by law. The final selection is then made." (emphasis in original)).

Mississippi's regulations also bring this case squarely within the holding of *Maddox v. Board of State Canvassers*, 149 P.2d 112 (Mont. 1944). In that case, the Montana Supreme Court found the Electors Clause preempted a state law that allowed receipt of ballots after Election Day. *Id.* at 116. Montana state law defined casting a ballot as "depositing [] the ballot in the custody of the election officials." *Id.* at 115. By the State's own terms, its statute thus permitted voters to cast ballots five days after Election Day. That conflicted with, and hence was preempted by, federal law. So too with Mississippi's law because it, like Montana's, provides that a ballot is "final" when accepted by election officials—five days *after* Election Day.

Finally, mail-in ballots are less final than Mississippi claims. The postal service permits senders to recall mail, with the exception of overseas UOCAVA ballots. *See* Domestic Mail Manual, §§ 507.5, 703.8; 39 C.F.R. § 111.1 and 39 C.F.R. § 211.2 (incorporating the Domestic Mail Manual by reference into the Postal Service Regulations). This indicates that at least domestic ballots are not cast when mailed, and voters can change their votes after Election Day. That further undermines the State's claim that ballots are "final" when mailed.

3

Third, consummation. The *Foster* Court stated that "if an election does take place, it may not be *consummated* prior to federal election day." 522 U.S. at 72 n.4 (emphasis added). Louisiana's law ran afoul of the uniform federal Election Day because it permitted the State to conclude its election early with no further action on Election Day.

Similarly, we have blessed a Texas early-voting law that permitted "unrestricted" early voting up to 17 days before Election Day. *See Voting Integrity Proj., Inc. v. Bomer*, 199 F.3d 773, 774 (5th Cir. 2000). We held that scheme not preempted because election results would not be "decided or consummated before federal election day." *Id.* at 776 (quotation omitted). The *Bomer* panel emphasized that Texas's early voting scheme left polls open on federal election day and that most voters cast their ballots on that day. *Id.* at 775–76. In other words, so long as the State continued to *receive* ballots, the election was ongoing and had not been consummated. Other circuits have agreed. *See Voting Integrity Proj., Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001) ("But we have a Supreme Court decision which we must follow . . . emphasizing that it found a violation of the statute only because there was no act of officials or voters left to be done on federal election day."); *Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001) ("*Foster*'s narrow holding suggests that, so long as a State does not conclude an election prior to federal election day, the State's law will not 'actually conflict' with federal law."). Thus, the election is consummated when the last ballot is received and the ballot box is closed.

Of course, it can take additional time to tabulate the election results. *Cf. Bush v. Gore*, 531 U.S. 98, 116 (2000) (Rehnquist, C.J., concurring). It has become a "routine[]" practice for election officials to count (or recount) ballots after Election Day. *Harris v. Fla. Elections Canvassing Comm'n*, 122 F.

Supp. 2d 1317, 1325 (N.D. Fla. 2000), *aff'd sub nom. Harris v. Fla. Elections Comm'n,* 235 F.3d 578 (11th Cir. 2000); *see also Millsaps*, 259 F.3d at 546 n.5 ("[O]fficial action to confirm or verify the results of the election extends well beyond federal election day . . ."). The election is nonetheless consummated because officials know there are X ballots to count, and they know there are X ballots to count because the proverbial ballot box is closed. In short, *counting* ballots is one of the various post-election "administrative actions" that can and do occur after Election Day. *Millsaps*, 259 F.3d at 546 n.5. *Receipt* of the last ballot, by contrast, constitutes consummation of the election, and it must occur on Election Day.

C

History confirms that "election" includes both ballot casting and ballot receipt. *Moore v. Harper* teaches that this "historical practice" is "particularly pertinent when it comes to the Elections and Electors Clauses." 143 S. Ct. 2065, 2086 (2023). For over a century after Congress established a uniform federal Election Day, States understood those statutes to mean what they say: that ballots must be *received* no later than the first Tuesday after the first Monday in November. *See Overseas Absentee Voting: Hearing on S. 703 Before the S. Comm on Rules and Admin*, 95th Cong. 33–34 (1977) (listing 48 States, Puerto Rico, the Virgin Islands, and the District of Columbia as requiring ballot receipt on or before Election Day).

By necessity, early American voting occurred contemporaneously with receipt of votes. Voting typically occurred *viva voce*, by showing hands, or by using handwritten ballots that voters physically brought to the polls for submission and counting. *Burson v. Freeman*, 504 U.S. 191, 200 (1992). Later, political parties started to print and disseminate ballots, which voters would take and submit. *Ibid.* Polling places became "akin to entering an open auction place," rife with "bribery and intimidation." *Id.* at 201–02. Adoption of

the "Australian system" (including universal ballots and private polling booths) in the early 1890s addressed these issues. *Id.* at 202–05. The Australian system bifurcated the voting process so that a voter could express his preference non-contemporaneously with receipt and counting. But at the time Congress established a uniform election day in 1845 and 1872, voting and ballot receipt necessarily occurred at the same time.

Absentee voting began during the Civil War to secure the franchise of soldiers in the field. *See* Josiah Henry Benton, Voting in the Field: A Forgotten Chapter of the Civil War 5, 9 (1915). Before the war, citizens could vote only in person at meetings in their election districts, and no jurisdiction permitted voting anywhere outside of the voter's district. *Id.* at 5. But when the war began, soldiers effectively lost their votes when they left their districts, which engendered a sense of injustice: "There seemed to be no reason why the man who was qualified to vote at home should be disqualified merely because he was out of the State fighting the battles of the Union or of the Confederacy." *Ibid.* As a result, States invented absentee voting procedures that severed the tie between physical presence and voting.

States authorized absentee voting for soldiers using two methods. First, voting in the field. Election officials brought ballot boxes to the battlefield, where soldiers cast their ballots. *Id.* at 15. In such cases, the voter's "connection with his vote ended when he put it in the box, precisely as it would have ended if he had put it into the box . . . at home." *Ibid.* Unlike Mississippi's mailbox-rule analogy, field voting involved soldiers directly placing their ballots into official custody with no carrier or intermediary. The act of voting simultaneously involved receipt by election officials. The second method, proxy voting, allowed soldiers to prepare ballots in the field and send them to a proxy for deposit in the ballot box of the soldier's home precinct. *Ibid.* When proxy voting occurred, "the voter's connection with his ballot did

not end until it was cast into the box at the home precinct, and therefore []
the soldier really did vote, not in the field, but in his precinct at home." *Ibid.*
Here, again, the voter voted when the vote was received by election officials.
Both methods underscore that official receipt marked the end of voting.

Early postwar iterations of absentee voting universally required re-
ceipt by Election Day. After the Civil War ended, most States eliminated field
voting. *See id.* at 314–15 (cataloging expiration of wartime voting measures).
By the time of World War I, however, many States had adopted a variety of
absentee voting laws. Some States limited absentee voting to soldiers and fur-
ther limited it to only wartime elections. P. Orman Ray, *Military Absent-
Voting Laws*, 12 Am. Pol. Sci. Rev. 461, 461–62 (1918). Nine States re-
quired voting on the day of the election, whether by proxy or by field voting.
*Id.* at 464. New York's law allowed commanding officers to set a date and
account for military emergencies, but "in no case shall it be later than the day
of the general or special election." *Ibid.* Three States required ballots to be
marked and submitted well before Election Day. *Ibid.* And West Virginia did
not specify a date, so long as ballots were returned by mail "in time to be
counted at home on election day." *Ibid.* Thus, *even* during the height of war-
time exigency, a ballot could be counted only if *received* by Election Day.

Around this time, States that permitted civilian absentee voting im-
posed the same Election Day deadline for receiving ballots. Washington State
permitted voters to return ballots to be counted in a voter's home county af-
ter Election Day, but those ballots were still collected by state officials by
Election Day. P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci.
Rev. 251, 253 (1918). Three States required voters to swear that they would
return ballots on or before Election Day. *Id.* at 255. Minnesota did not count
ballots received in the voter's home district after Election Day. *Id.* at 256. Of
the States permitting absentee ballots, only Illinois addressed what to do with
ballots received too late: It provided for their destruction. *Id.* at 259. These

early absentee voting laws universally foreclosed the possibility of accepting and counting ballots received *after* Election Day because they specified that ballots would be counted on Election Day.

Absentee and mail-in voting became more common over the course of the twentieth century. By 1938, 42 States permitted some form of absentee voting. Paul G. Steinbicker, *Absentee Voting in the United States*, 32 Am. Pol. Sci. Rev. 898, 898–99 (1938). But it was almost impossible to count a ballot received after Election Day. All but one of the 42 absentee voting States also had time limits for ballot receipt, with the "usual requirement" of Election Day. *Id.* at 905–06. By 1977, only two of the 48 States permitting absentee voting counted ballots received after Election Day. *Overseas Absentee Voting: Hearing on S. 703 Before the S. Comm on Rules and Admin*, 95th Cong. 33–34 (1977).

Even today, a substantial majority of States prohibit officials from counting ballots received after Election Day. In January 2020, before the COVID-19 pandemic, only 14 States and the District of Columbia accepted ballots postmarked by Election Day—with the other 36 requiring *receipt* on or before that date. Nat'l Conf. of State Legislatures, *Table 6: The Evolution of Absentee/Mail Voting Laws, 2020–22* (Oct. 26, 2023), https://www.ncsl.org/elections-and-campaigns/the-evolution-of-absentee-mail-voting-laws-2020-through-2022 [https://perma.cc/8ABZ-YFXC]. In advance of the 2020 general election, seven States extended their ballot-receipt deadlines, including Mississippi. *See ibid.* Of those seven, two already allowed post-election day receipt (California and North Carolina). *Ibid.* While Mississippi and Massachusetts retained their 2020 ballot-receipt dates, every other State that changed their receipt deadline subsequently reverted to earlier deadlines. *Ibid.* All told, as of November 2022, 18 States and the District of Columbia permit post-Election Day receipt. *See ibid.*

No. 24-60395

The considerable historical support for absentee voting says nothing about whether States can extend the election past the uniform, singular Election Day required by federal law. Instead, the practice of absentee voting that arose during the Civil War demonstrates that the election concludes when all ballots are received. A few "late-in-time outliers" say nothing about the original public meaning of the Election-Day statutes. *Cf. N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 250–51 (2022).

## III

Mississippi, Intervenors, and *amici* make several counterarguments. Each is unavailing. We (A) discuss other federal statutes' bearing on the preemption inquiry. We then (B) address Mississippi's analogy to the mailbox rule. We then (C) discuss relief and the limited nature of today's decision.

## A

Mississippi offers several federal statutes purporting to show Congress "has reinforced that the federal election-day statutes do not require ballot receipt by election day." MS Red Br. at 2. But these statutes do no such thing. The cited statutes are *silent* on the deadline for ballot receipt—and congressional silence does not "reinforce[]" anything. *Ibid.*

First, the Uniform and Overseas Citizens Absentee Voting Act ("UOCAVA") provides procedures for voting by military members and civilians living abroad. *See* 52 U.S.C. § 20301 *et seq*. The Act requires federal officials to submit ballots to state election officials "not later than the date by which an absentee ballot must be received in order to be counted in the election." *Id.* § 20304(b)(1). It also creates a fail-safe federal absentee ballot for voters who do not receive their state ballots on time. *Id.* § 20303(a)(1). But

16

those, too, must be submitted in the same manner and on the same timeline as absentee ballots in the voter's State. *Id.* § 20303(b).

Next, the 1970 Amendments to the Voting Rights Act. These amendments established a uniform absentee-ballot scheme for presidential elections. *See* 52 U.S.C. § 10502. And like UOCAVA, the 1970 Amendments say nothing about the date or timing of ballot receipt. Instead, voters must return ballots "to the appropriate election official of [their] State not later than the time of closing of the polls in such state on the day of such election." *Id.* § 10502(d).

Nothing in these statutes says that States are allowed to accept and count ballots received after Election Day. Other statutes invoked by both parties and *amici* suffer from the same deficiencies: All are silent on ballot receipt and Election Day timing. At bottom, the very best Mississippi and its *amici* can muster is that some federal election statutes are silent about—and hence do not expressly prohibit—receiving and counting ballots after Election Day. And if all we had was congressional silence, it would be difficult or impossible for the plaintiffs to show preemption of state law.

But this is not a congressional-silence case. As demonstrated in Part II, *other* federal statutes—in their text, tradition, and interpretation by the Supreme Court—*do* require States to receive all ballots by Election Day. So the plaintiff political parties have federal statutes that conflict with Mississippi's state law, and the defendants, intervenors, and their *amici* have only congressional silence. Which is to say the latter have nothing at all. *See Sedima, SPRL v. Imrex Co., Inc.*, 473 U.S. 479, 495 n.13 (1985) ("[C]ongressional silence, no matter how 'clanging,' cannot override the words of the statute."); *Rapanos v. United States*, 547 U.S. 715, 749 (2006) (plurality op.) (noting the Court's "oft-expressed skepticism toward reading the tea leaves of congressional inaction").

No. 24-60395

Congress's silence is particularly unhelpful to the State because other statutes show that Congress knew how to authorize post-Election Day voting when it wanted to do so. For example, the United States as *amicus* proffers the Help America Vote Act of 2002 ("HAVA"). *See* Brief for United States as *Amicus Curiae* 15–16; *see also* 52 U.S.C. § 20901 *et seq.* HAVA establishes a procedure for provisional voting when a voter's eligibility is in question. 52 U.S.C. § 21082. The voter casts a ballot and transmits it to appropriate election officials, who then determine his eligibility to vote under state law. *Id.* § 21082(a)(1)–(3). Upon that verification, "the individual's provisional ballot shall be counted as a vote in that election in accordance with State law." *Id.* § 21082(a)(4). All jurisdictions that issue such ballots accept them after Election Day. *See* Brief for United States as *Amicus Curiae* 16.

But the fact that Congress authorized a narrow exception for potentially ineligible voters to cast provisional ballots after Election Day does not impliedly repeal all of the other federal laws that impose a singular, uniform Election Day for every other voter in America. As the Supreme Court has explained:

> When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both. A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow. The intention must be clear and manifest. And in approaching a claimed conflict, we come armed with the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute.

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quotation and citations omitted). The United States as *amicus* cannot come close to showing that HAVA displaces or impliedly repeals the longstanding general rule that the federal Election Day is the singular day on which the ballot box closes. Rather, the best way to harmonize HAVA with the other statutes governing the federal Election Day is that the former is a narrow exception that authorizes States to receive a certain small number of provisional ballots after Election Day from potentially unqualified voters. Not that it allows States to extend the federal Election Day by one day, five days, or 100 days for all voters.

UOCAVA also permits post-Election Day balloting, but it does so through its statutory text. UOCAVA's remedial provisions authorize the Attorney General to bring civil actions in federal court for declaratory or injunctive relief needed to enforce the Act. 52 U.S.C. § 20307(a). And the Attorney General has done so. *See Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act*, Dep't of Just. (Mar. 24, 2022), perma.cc/J8AS-X3K6. In many of these cases, federal courts have awarded injunctive relief that includes extending ballot-receipt deadlines. *See ibid.* That *federal* officials, pursuant to *federal* law, may take enforcement actions in which *federal* courts grant ballot-receipt extensions says nothing about Mississippi's capacity to do so. And in any event, the fact that UOCAVA authorizes such actions in its text is very different from Mississippi's contention that congressional silence is enough to abrogate the uniform federal Election Day.

So too with the other Election Day exceptions. For instance, 2 U.S.C. § 8 permits States to hold congressional elections on days other than the federal Election Day in the event of a vacancy, including those caused by "death," "resignation," "incapacity," or "failure to elect" a candidate on Election Day (i.e., permitting runoff elections). *Id.* at § 8(a). As such, it "creates an exception to section 7's absolute rule." *Busbee v. Smith*, 549 F. Supp.

494, 526 (D.D.C. 1982). Likewise, 3 U.S.C. § 21(1) permits States to "modif[y] the period of voting" in presidential elections for "force majeure events." Where Congress wants to make exceptions to the federal Election Day statutes, it has done so. All of this further proves Congress did not abrogate the uniform Election Day in other, non-excepted circumstances.

## B

Mississippi next urges us to adopt a new mailbox rule: Once a voter casts her ballot, her "election" of a candidate is complete. *See* MS Red Br. at 18, 23. Such rules are embraced in other areas of the law. For example, a contract is formed when the offeree's acceptance is "put out of [his] possession, without regard to whether it ever reaches the offeror." Restatement (Second) of Contracts § 63(a) (Am. L. Inst. 1981). Federal tax law adopts such a mailbox rule. *See* 26 U.S.C. § 7502(a). But voting is not a contract or tax return. So the fact that mailbox rules are authorized in other areas of law is at best irrelevant. And at worst, it shows that Congress knows how to embrace a mailbox rule when it wants to do so.

Mississippi further points to a recent Supreme Court opinion discussing election deadlines as support for its proposed mailbox rule. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423 (2020) (per curiam). In response to COVID, a federal district court in Wisconsin issued a preliminary injunction extending the State's primary election, such that ballots mailed and postmarked up to six days after the State's deadline would be counted. *Id.* at 423–24. The Court's opinion states the injunction at issue "would allow voters to *mail their ballots* after election day, which is extraordinary relief and would fundamentally alter the nature of the election by allowing *voting* for six additional days after the election." *Id.* at 426 (emphasis added). Mississippi claims that this statement proves the act of mailing

ballots equates to voting, and it further reads the Supreme Court as embracing a mailbox rule for voting. MS Red Br. at 29.

But this is neither a logical nor necessary implication of the case. The Court's conclusion that mailing ballots after Election Day allows voting after the election is equally consistent with the ballot-receipt requirement. If voters can mail their ballots after Election Day, those ballots are necessarily received after Election Day, too. And in any event, the Supreme Court has repeatedly cautioned that "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023).

## C

Today's decision says nothing about remedies. We decline to grant plaintiffs' initial request for a permanent injunction, which they have not renewed before this court. *See* GOP Reply Br. at 2, MSLP Reply Br. at 22. Instead, we remand to the district court for further proceedings to fashion appropriate relief, giving due consideration to "the value of preserving the status quo in a voting case on the eve of an election." *Tex. All. for Retired Ams. v. Hughs*, 976 F.3d 564, 567 (5th Cir. 2020); *see also Purcell v. Gonzalez*, 549 U.S. 1 (2006).[6]

---

[6] When reviewing the district court's grant of summary judgment, we consider only their entitlement to judgment as a matter of law. But "well-established principles of equity" require a plaintiff to demonstrate, before the court issues a permanent injunction, "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (citations omitted). These factors require due consideration on remand.

No. 24-60395

IV

In addition to their preemption claims, plaintiffs claimed violations of the right to vote and the right to stand for office under the First and Fourteenth Amendments and brought actions under 42 U.S.C. § 1983. The district court concluded that Plaintiff-Appellants' claims under § 1983 "stand or fall on whether the Mississippi absentee-ballots statute conflicts with federal law." *Republican Nat'l Comm. v. Wetzel*, No. 1:24-CV-00025-LG-RPM, 2024 WL 3559623, at *11 (S.D. Miss. July 28, 2024). Because the district court erroneously concluded that Mississippi's statute is not preempted by federal law, we vacate its grant of summary judgment on plaintiffs' § 1983 claims and remand for reconsideration.

\*　　\*　　\*

As Justice Kavanaugh recently emphasized: "To state the obvious, a State cannot conduct an election without deadlines . . . A deadline is not unconstitutional merely because of voters' own failures to take timely steps to ensure their franchise." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 33 (2020) (Mem.) (Kavanaugh, J., concurring in denial of application to vacate stay) (quotation omitted); *see also Burdick v. Takushi*, 504 U.S. 428, 438 (1992) ("Reasonable regulation of elections . . . *does* require [voters] to act in a timely fashion if they wish to express their views in the voting booth." (emphasis in original)). Federal law requires voters to take timely steps to vote by Election Day. And federal law does not permit the State of Mississippi to extend the period for voting by one day, five days, or 100 days. The State's contrary law is preempted.

The judgment of the district court is REVERSED in part and VACATED in part, and the case is REMANDED for further proceedings consistent with this opinion.